The Honorable Kymberly K. Evanson
Trial Date: January 20, 2026

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON

CYMBIDIUM RESTORATION TRUST,

Plaintiff,

v.

AMERICAN HOMEOWNER PRESERVATION TRUST SERIES AHP SERVICING; its Trustee, U.S. BANK TRUST N.A.; AHP CAPITAL MANAGEMENT, LLC; AMERICAN HOMEOWNER PRESERVATION SERIES 2015A+; its Trustee, U.S. BANK TRUST NATIONAL ASSOCIATION; AHP SERVICING, LLC; and JORGE NEWBERY,

Defendants.

AMERICAN HOMEOWNER PRESERVATION TRUST SERIES AHP SERVICING; AHP CAPITAL MANAGEMENT, LLC; AMERICAN HOMEOWNER PRESERVATION SERIES 2015A+; and AHP SERVICING, LLC,

Counter-Plaintiffs,

v.

CYMBIDIUM RESTORATION TRUST,

Counter-Defendant.

NO. 2:24-cv-00025-KKE

**PLAINTIFF'S TRIAL BRIEF**

**TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION..................................................................1

II.   CASE SUMMARY & BACKGROUND FACTS....................................1

    A.   The MLSA's Operative Provisions Unambiguously
        Transfer Ownership.......................................................3

    B.   The AHP Trusts' Failure to Deliver Mortgage Loan
        Documents Is a Material Breach That Enabled
        Ongoing Conversion by AHP and Waste..............................4

        1.   Delivery of The Mortgage Loan Documents
            Was a Mandatory, Central Obligation Under
            The MLSA. ......................................................4

        2.   Defendants' Withholding of Mortgage Loan Documents
            Enabled Conversion, Self-Dealing, and Resulted in
            Widespread Asset Waste......................................6

    C.   The Accounting Shows That AHP Continues to Owe Many
        Millions of Dollars.......................................................8

        1.   Clear Examples of Where Credit Was Given and Then
            Needed To Be Adjusted. ......................................10

    D.   All Third-Party Costs and Fees Are Expressly Allowed Under
        the Waterfall, and Defendants Have No Evidence They Were
        Improper or Excessive....................................................12

        1.   Servicing Fees Such As From Land Home and Others. ....13

        2.   Legal Fees and Costs. .........................................13

        3.   Insurance Charges.............................................14

III.  LEGAL DISCUSSION ..........................................................14

    A.   The AHP Trusts Breached The MLSA and Its First
        Amendment. ...............................................................14

        1.   Valid Contract and Clear Duties......................................15

        2.   Material Breach....................................................16

        3.   Damages............................................................16

    B.   Defendants Converted Funds Belonging to Cymbidium.........17

1.       Cymbidium's Ownership of the Property Converted. ........18

2.       Conversion by the AHP Trusts: Unauthorized Control Over Cymbidium's Property.........................................................19

3.       Independent Conversion by AHP As Manager of the AHP Trusts.............................................................................19

4.       Conversion Is Separate and Apart From Breach of Contract..............................................................................20

5.       Resulting Harm. ..............................................................20

**C.      AHP's Affirmative Defenses and Counterclaims All Fail.**........20

1.       AHP's Affirmative Defenses Are Legally Deficient and Factually Unsupported. ....................................................21

2.       AHP's Counterclaims Fail Because They Rest On the Same False Premise. ...................................................................24

**IV.     CONCLUSION** .........................................................................25

## I.   **INTRODUCTION**

This case should begin and end with the parties' contract. As this Court has already recognized, "the Contract should be the beginning and end of the analysis." Dkt. 37. The Mortgage Loan Sale Agreement ("MLSA") is not ambiguous, conditional, or provisional. It is a sale agreement. Under it, the AHP Trusts sold—and Cymbidium purchased—hundreds of mortgage loans and related security interests, for which Cymbidium paid over $24 million.

The fundamental question for trial is therefore straightforward: Who owns the MLSA loans and their proceeds today?

The answer, under the plain language of the MLSA and its First Amendment, is Cymbidium. What complicates this case is not the contract—but Defendants' refusal to honor it from its inception and continuing to today. Since closing, Defendants have failed to deliver required Mortgage Loan Documents, wrongfully retained control over the loans and loan proceeds Cymbidium purchased, and Defendants have sold the same loans to others, encumbered them for their own benefit, and pocketed millions of dollars in proceeds that belonged to Plaintiff under the MLSA and its First Amendment. What began as a serious breach of contract morphed into ongoing conversion, asset dissipation, and waste.

This Court is being asked to determine ownership, stop ongoing misconduct, and impose a framework that prevents further irreparable harm.

## II.   **CASE SUMMARY & BACKGROUND FACTS**

Beginning in 2016, Oak Harbor Capital, acting as manager for various investment funds, engaged in numerous business transactions with AHP Capital Management, LLC, which exercised direct control over multiple affiliated funds, including co-Defendants in this action, and personally executed the transaction documents on behalf of the trusts, binding them to the contract at issue here.

In August 2022, Defendants American Homeowner Preservation Trust Series AHP Servicing and American Homeowner Preservation Series 2015A+ (collectively, the "AHP

PLAINTIFF'S TRIAL BRIEF
(NO. 2:24-cv-00025-KKE) - 1

Trusts") entered into an agreement with Cymbidium Restoration Trust for the sale of a portfolio of non-performing mortgage loans for $2.5 million subject to a repurchase obligation due by October 10, 2022. AHP executed that agreement on behalf of the AHP Trusts. As the repurchase deadline approached, AHP lacked sufficient liquidity to perform. The AHP Trusts were late repaying a separate loan, and their lender was declining to grant an extension.

Against this backdrop, William Weinstein and Jorge Newbery, acting on behalf of the AHP Trusts and AHP, negotiated the transaction that is the basis of this litigation. Under the transaction, the AHP Trusts received more than $24 million from Cymbidium. That infusion of capital served multiple purposes: it eliminated the impending August 2022 repurchase obligation, provided the funds the AHP Trusts needed to pay off their lender, and—according to Mr. Newbery's representations—the AHP Trusts would be able to pay Cymbidium what it was owed through the sale of a large pool of loans through Mission Capital.

Cymbidium funded the transaction on October 6, 2022, and the MLSA was executed by the parties effective October 7, 2022. Initially the MLSA had two groups of loans: Category A and Category B loans. The Category B loans were a $19.75 million pool of loans that the AHP Trusts agreed in the MLSA were to be sold through Mission Capital.  Any Category B loans not sold through Mission Capital or through other means, were to be repurchased by AHP a few months later. However, the Mission Capital sale ended up not proceeding because AHP claimed it was not satisfied with the bids Mission Capital received. Because the Mission Capital sale fell through, AHP was unable to repurchase the Category B loans by January 2023 as it was contractually required to do under the initial MLSA. The parties then entered into the First Amendment effective March 15, 2023. Under the First Amendment, AHP provided Cymbidium an additional 277 mortgage loans, AHP's repurchase obligation was eliminated, and the distinction between the two categories of loans was eliminated. Under the First Amendment, Category B loans were to be sold with all proceeds going to Cymbidium until it received the $19.75 million, plus an agreed rate of return, and all of its financing and certain other costs. Only

PLAINTIFF'S TRIAL BRIEF
(NO. 2:24-cv-00025-KKE) - 2

after those amounts were paid in full, if there were any remaining loans, those remaining loans would be conveyed back to AHP.

Critically, the waterfall provision in the First Amendment expressly required repayment of the Western Alliance Bank financing before any potential reversion of loans would occur. Paragraph 6 of the First Amendment specifically addressed that, while best efforts in good faith would be exercised to maximize loan recoveries, the repayment obligation to Western Alliance Bank had to be met. There was no mystery or nondisclosure regarding the financing: AHP knew before closing that it was Magerick, an affiliate of Cymbidium, that had borrowed most of the purchase price from Western Alliance and that Cymbidium was purchasing the loans on behalf of Magerick. In contemporaneous email communications, the parties even referred to the transaction as the "AHP–Magerick transaction." Nothing in the MLSA restricts Cymbidium or its affiliate from pledging, transferring, or encumbering the loans, and AHP expressly warranted that it retained no claim to them.[1]

## A.     The MLSA's Operative Provisions Unambiguously Transfer Ownership.

The MLSA clearly provides that the loans were (i) sold by AHP to Cymbidium, and (ii) that AHP retained no ownership interest in the loans or their proceeds unless, and until, Cymbidium has received all amounts under the MLSA.

The transaction begins with the MLSA's recitals, the first "whereas" clause recites the AHP Trusts' desire to sell the loans and Cymbidium's desire to purchase them. Section 2 provides that the AHP Trusts "sell, transfer, assign, and convey" to Cymbidium all right, title, and interest in the loans, including any interest the Trusts held in them. Section 2 further confirms that Cymbidium, as purchaser, is entitled to receive all payments and other recoveries arising from the loans. Section 8.01(vii) contains a sweeping warranty that the transfer vests in

---

[1] *See* Order Granting in Part and Denying in Part, *AHP Capital Management LLC v. Oak Harbor Capital et al.*, No. C25-0007-KKE (W.D. Wash. July 08, 2025), Dkt. No. 108 at 9 (hereinafter, the "RICO action") (this Court already addressed the contract construction issue and ruled that, under the MLSA, Defendants transferred the loans to Cymbidium).

PLAINTIFF'S TRIAL BRIEF
(NO. 2:24-cv-00025-KKE) - 3

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

Cymbidium "all rights as owner of such Mortgage Loans free and clear of any and all claims," including those of the seller. Finally, Section 15 reiterates the parties' express intent that the MLSA constitutes a sale of the loans.[2]

The First Amendment reinforced, not reversed, that ownership structure. Accordingly, even if AHP disputes the accounting under the waterfall, that dispute does not alter the fundamental ownership transfer. At most, AHP asserts a contractual entitlement to receive any remaining loans after Cymbidium is fully paid. A claimed contractual right is not ownership. Under the MLSA and its First Amendment, ownership of the loans vested in Cymbidium at closing—and it remains there today because the evidence will show that AHP continues to owe many millions of dollars.

**B.      The AHP's Trusts Failure To Deliver Mortgage Loan Documents Is A Material Breach That Enabled Ongoing Conversion by AHP and Waste.**

      1.      <u>Delivery of the Mortgage Loan Documents Was a Mandatory, Central Obligation Under the MLSA</u>.

The MLSA does not merely contemplate delivery of Mortgage Loan Documents—it required it. Delivery of those documents is a fundamental provision of the MLSA, and it was essential to Cymbidium's ability to realize the benefit of the bargain.

Section 1 of the MLSA defines the key components of each "Mortgage Loan." They include the "Mortgage," the "Note," the "Mortgage File," and the "Mortgage Loan Documents." The contractual definitions of those terms in the MLSA are not incidental. They reflect the commercial reality that a mortgage loan is not merely an abstract payment stream, but a bundle of enforceable legal rights that depends on possession and control of specific documents.

---

[2] *Id.* at 8, the Court already noted that the MLSA's provision requiring any remaining Loans to be conveyed "back" to AHP after all amounts owed were paid confirms that the transaction effected a present transfer of ownership. If ownership had not initially transferred to Cymbidium, there would have been nothing to convey "back" at all.

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON  98104
(206) 622-2000

PLAINTIFF'S TRIAL BRIEF
(NO. 2:24-cv-00025-KKE) - 4

The contractual definitions are:

- Mortgage: For each Mortgage Loan, the Mortgage, Deed of Trust, or other instrument encumbering the Mortgage Property securing the Note.

- Mortgage File: The Mortgage Loan Documents pertaining to the related Mortgage Loan and Servicing File.

- Mortgage Loan: Each residential Mortgage Loan sold, assigned, and transferred to the Purchaser …including to the extent available, the Mortgage File, the Monthly Payments and all other rights, benefits, proceeds, and obligations arising from a Mortgage Loan.

- Note: The original executed Note, or other evidence of the Mortgage Loan indebtedness.

- Mortgage Loan Documents: The documents listed in Exhibit 1 to the MLSA for each Mortgage Loan, which include:

  - the original Note and endorsements;

  - an assignment of mortgage acceptable for recording;

  - any loan modification agreements;

  - title policies; and

  - any other security agreements.

Exhibit 1 of the MLSA requires that all of these documents, defined as the "Mortgage Loan Documents," "shall" be delivered to Cymbidium.[3] With the Mortgage Loan Documents, Cymbidium would have (and control) everything needed to realize a recovery from the MLSA

---

[3] Exhibit 1 of the MLSA, titled "Mortgage Loan Documents," provides: "With respect to each Mortgage Loan set forth on a related Mortgage Loan Schedule, the [AHP Trusts] shall deliver and release to [Cymbidium], the following documents:.."

PLAINTIFF'S TRIAL BRIEF
(NO. 2:24-cv-00025-KKE) - 5

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON  98104
(206) 622-2000

loans either through a borrower "work out,"  by obtaining a deed in lieu of foreclosure and selling the "REO"[4] property, through foreclosure, or by selling the loan.

This delivery obligation is reinforced throughout the MLSA. Section 7.01 requires that the servicer's computer systems clearly reflect that the loans have been sold and mandates the delivery of Mortgage Loan Files to the successor servicer after a transition period. Section 7.02 provides that the AHP Trusts release any interest they may have in the Mortgage Files. These provisions collectively confirm that possession and control of the Mortgage Loan Documents were integral to the completed sale. In the mortgage industry, control of these documents is what gives the buyer control of the asset. The MLSA recognizes this reality, which is precisely why delivery of all of the Mortgage Loan Documents was required.

The AHP Trusts' refusal to deliver Mortgage Loan Documents for a substantial number of MLSA loans, therefore, constitutes a material breach—one that goes to the essence of the contract and defeats its central purpose.

2.      Defendants' Withholding Of Mortgage Loan Documents Enabled Conversion, Self-Dealing, And Resulted In Widespread Asset Waste.

The harm caused by Defendants' failure to deliver the Mortgage Loan Documents is not theoretical. It has enabled a sustained pattern of misconduct by AHP that goes far beyond nonperformance of contract obligations and into outright conversion.

By retaining possession of Mortgage Loan Documents, Defendants retained de facto control over assets they had sold. They then used that wrongful control to engage in a series of acts fundamentally inconsistent with Cymbidium's ownership rights, including:

- selling MLSA loans and REO properties to third parties;
- encumbering MLSA properties with new debt for their own benefit;
- blocking Cymbidium from recording deeds or assignments;
- revoking powers of attorney needed to complete sales;

---

[4] When a lender takes control of a property pledged as collateral, it is referred to in the industry as a "REO" property, and that term is used here.

PLAINTIFF'S TRIAL BRIEF
(NO. 2:24-cv-00025-KKE) - 6

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON  98104
(206) 622-2000

- refusing to execute or record documents necessary to preserve title; and
- and refusing to pay taxes, insurance, association fees, and preservation costs.

These actions were not isolated mistakes or administrative delays. They were affirmative acts of dominion over Cymbidium's property, exercised without authorization and for Defendants' own benefit. Each such act constitutes conversion. Taken together, they reflect an ongoing scheme enabled by Defendants' wrongful retention of the Mortgage Loan Documents.

The consequences have been severe and compounding. Because Cymbidium lacks the documents needed to complete foreclosures or convey title, properties have languished. Taxes have gone unpaid. Insurance has lapsed. Properties have been lost to tax sales, been condemned, or demolished. Even where properties remain standing, neglect and legal uncertainty have significantly diminished their value.

At the same time, Defendants have exploited that same document retention to sell or pledge the very assets Cymbidium purchased, pocketing proceeds while leaving Cymbidium to absorb the costs of servicing, preservation, litigation, and lost opportunity. In multiple instances, Cymbidium has incurred substantial out-of-pocket expenses to stabilize and prepare properties for sale—only to discover that Defendants had secretly encumbered or sold the property using the very documents they were contractually obligated to deliver.

This dual harm—preventing Cymbidium from realizing value while enabling Defendants to misappropriate that value—is not accidental. It is the predictable and intended result of Defendants' refusal to comply with their document delivery obligations. And it is why this case has expanded beyond a simple, but serious breach of contract claim into one involving conversion, waste, and the need for equitable intervention.

Absent Court-ordered relief compelling delivery of the Mortgage Loan Documents and restraining Defendants from further unauthorized dispositions and interference, the harm will continue. Each day Defendants retain control of the documents is another day they can further dissipate assets that do not belong to them.

PLAINTIFF'S TRIAL BRIEF
(NO. 2:24-cv-00025-KKE) - 7

**C.    The Accounting Shows That AHP Continues to Owe Many Millions of Dollars.**

Beginning in March 2023, Oak Harbor Capital, LLC ("Oak Harbor"), acting as manager for Cymbidium began compiling detailed reconciliation summaries to track amounts owed under the MLSA and First Amendment. These reconciliations were prepared contemporaneously based in large part on (i) information provided by AHP, (ii) funds actually received, and (iii) Oak Harbor's understanding—based on AHP's representations in the MLSA and subsequently—of the status of individual mortgage loans.

This process unfolded against the backdrop of Defendants' ongoing breaches. At the outset, AHP had not transferred all hard-copy loan files or original Mortgage Loan Documents, and many non-performing loans had not yet been transferred for servicing as required under the MLSA.[5] Nevertheless, Oak Harbor was actively and diligently marketing pools of loans to third-party buyers to reduce the Western Alliance Bank[6] loan. Under the First Amendment, AHP was required to engage in the same efforts and to ensure that all proceeds were directed to pay certain specified costs and to reduce the amounts owed regarding the Western Alliance financing.

Using the information available at the time, Oak Harbor credited AHP whenever a loan pool was sold, a loan was paid off, or an REO property was sold—**but only on the assumption that AHP had, in fact, transferred a valid, salable asset as it had expressly warranted in the MLSA**. At the same time, Oak Harbor accounted for all costs expressly permitted under the First Amendment. This reconciliation process continued through approximately October 2023 and was updated as additional information became available.

The structure of the reconciliation spreadsheet reflects this real-time process. The "Updated Loan Summary" tab is the clearest way to understand the accounting and should be

[5] "Servicing Transfer Date: For loans in Category A Loans as soon as practicable following the Conveyance Date. For Loans in Category B, as soon as is practicable following February 3, 2023."

[6] Defendants' later attack on Western Alliance Bank in the RICO action appears calculated to induce a default on the very loan used to fund AHP's payment, underscoring the opportunistic nature of Defendants' conduct.

PLAINTIFF'S TRIAL BRIEF
(NO. 2:24-cv-00025-KKE) - 8

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON  98104
(206) 622-2000

read as a chronological record of how credits were initially applied and, when necessary, subsequently corrected. That tab aggregates payment data, adjustments for defective or ineligible loans, and the resulting net credits, and it corresponds directly with the "Summary" tab, which presents the same information in a different format. Each figure in the Updated Loan Summary is supported by loan-level detail in the subsequent tabs, and the underlying backup documents have been produced.

The key columns operate together and tell a single story:

- **Column G (Gross Credit)** reflects the credit originally extended to AHP for a loan or group of loans at the time of a reported payoff, sale, or other monetizing disposition. These credits were based on AHP's express representations and warranties that the loans were valid, had not been previously sold or encumbered, and were fully compliant with the representations regarding them in the MLSA.

- **Column H ("Atrocity Adjustments")** reflects downward adjustments made when those assumptions and representations later proved false—most often because a loan was unsaleable due to missing or defective documentation, or it had already been sold by AHP to a third-party, or it was subject to competing ownership claims. The details supporting these reversals are drawn from the supporting tabs, including "Schedule A purchase putbacks," "Keydally $10M purchase," and "Put back list_Bill."

- **Column L (Net Credit)** reflects the final credit, calculated by backing out the Column H adjustments from the original Column G credit. This figure represents AHP's true entitlement to a credit—if any—after ineligible assets are removed.

Importantly, the spreadsheet is organized by month, and that structure is intentional. Credits were recorded in the month they were initially applied, and any subsequent reversals were made in that same month. This approach preserves the chronological integrity of the accounting, ensuring that MLSA charges tied to amounts then due are accurately reflected. The chronological approach also allows the Court to see precisely when funds were credited, when defects were discovered, and why adjustments were required.

As new information was discovered during the course of this lawsuit, Oak Harbor learned that many of the loans for which AHP had received credit were ones for which the credit should be reversed. In numerous instances, AHP had already sold the same loans to third parties. And in

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

PLAINTIFF'S TRIAL BRIEF
(NO. 2:24-cv-00025-KKE) - 9

many other instances, AHP withheld loan documentation in breach of the MLSA, rendering the loans unsaleable. And in other instances, AHP's threats to title companies and others rendered properties and loans unsaleable. When those facts came to light—often after Cymbidium had already sold loans to others or incurred costs regarding them based on AHP's warranties—the credits previously given to AHP had to be reversed along with any sales made.

1.    Clear Examples of Where Credit Was Given and Then Needed To Be Adjusted.

The Hawaii Property provides a concrete example of how this worked and why the accounting accurately reflects that AHP continues to owe Cymbidium many millions of dollars. One of the MLSA REO assets was a residential condominium in Mililani, Hawaii (the "Hawaii Property"). Acting on Cymbidium's behalf, Oak Harbor incurred substantial out-of-pocket expenses to preserve and prepare that property for resale. Nearly $50,000 in delinquent condominium association fees were paid to clear title. Additional payments included $14,790 to Caneel Group, $1,277 in delinquent taxes, and $5,000 to the occupants to vacate the unit so it could be sold. In total, Cymbidium funded nearly $70,000 in expenses, and because of those payments, the property became marketable and financeable.

All of these expenditures were made with AHPs' knowledge and consent. On September 25, 2023, Jorge Newbery expressly approved the sale of the Hawaii Property. Yet, when Cymbidium attempted to record the deed regarding its sale on December 28, 2023, it discovered that AHP had secretly encumbered the property with a $450,000 loan and, shortly thereafter, sold the condominium to a third party for $595,000. AHP pocketed both the financing and sale proceeds.

As a result, Cymbidium received nothing from the sale of its own asset, despite having funded the almost $70,000 of costs that made the sale possible. AHP, by contrast, retained the financing and sale proceeds, and it had already received credit for the sale of the condominium as part of the reconciliation spreadsheet. The reconciliation therefore reflects not only the

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON  98104
(206) 622-2000

reversal of any credit previously given to AHP for the Hawaii Property, but also the close to $70,000 of cost incurred.

The same pattern appears throughout the accounting. Credit for Mortgage Loans was initially given to AHP based on its express warranties that the loans were valid, unencumbered, and had not been previously sold. When those representations later proved false—because the loans were defective, already sold, or rendered unsaleable by AHP's own actions—the credits had to be reversed. Those reversals forced Cymbidium to unwind completed transactions, retract credits, and absorb losses directly caused by AHP's misconduct.

One of the largest and clearest examples is the approximately $10 million credit initially given to AHP in connection with the Keydally loan portfolio sale. That $10 million credit was given after Newbery personally approved both the composition of the loan pool and the price. At the time the credit was given, Cymbidium reasonably relied on AHP's express MLSA warranties that the loans were valid and enforceable first liens and that Cymbidium was acquiring them free and clear of any and all claims including any claims by AHP. After the Keydally credit was given in earlier reconciliation, however, Cymbidium discovered that many of the loans in the Keydally portfolio had either already been sold by AHP or were later rendered unmarketable by AHP's subsequent conduct. In particular, after receiving the $10 million credit, AHP began wrongfully revoking powers of attorney and it took other actions that led to loans and REOs being unsalable and not capable of being financed due to AHP clouding title, threatening lawsuits, and claiming ownership. As a result, loans that had been represented as salable, credit-worthy, and free from any claims by AHP, became uninsurable, unsalable, and incapable of being monetized.

Those defects were not inherent in the loans; they were caused by AHP's post-transaction actions. Because AHP's conduct destroyed the marketability of the very loans for which it had already received credit in earlier reconciliations, the corresponding portions of the Keydally

PLAINTIFF'S TRIAL BRIEF
(NO. 2:24-cv-00025-KKE) - 11

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

credit had to be reversed. In many instances, additional legal action was required to clear title or otherwise restore value to those loans—costs and risks borne entirely by Cymbidium.

The accounting therefore, cannot be dismissed as discretionary adjustments, hindsight re-characterizations, or delayed "put back" allocations. It reflects the unavoidable consequence of AHP's actions: credits initially were applied based on AHP's express warranty that loans were valid first liens free from any claim by AHP regarding them, and those credits were reversed when AHP's misconduct made those same loans defective, unsaleable, and AHP claimed ownership despite expressly warranting that it had no claim to them.

When these reversals are properly accounted for, the reconciliation demonstrates that AHP is far from a "net creditor" under the MLSA. To the contrary, after backing out ineligible assets and accounting for improper sales and withheld documentation, AHP continues to owe Cymbidium many millions of dollars.

**D.    All Third-Party Costs and Fees Are Expressly Allowed Under the Waterfall, and Defendants Have No Evidence They Were Improper or Excessive.**

The MLSA and First Amendment expressly contemplate that Cymbidium, as purchaser, would retain third-party servicers to service the mortgage loans and to market and sell any REO properties obtained through foreclosure or related transactions. Consistent with that structure, paragraph three of the First Amendment provided for the recovery of "unreimbursed third-party costs advanced by the Purchaser related to the Mortgage Loans" and the fifth level in the "waterfall" provision provides for payment of "the servicers, including legal, to pay any servicing fees and third-party costs related to the Mortgage Loans." Contrary to arguments brought forth in the past by Defendants, the MLSA authorizes the payment of fees to third parties.

The challenged costs fall squarely within these provisions. They consist of ordinary-course servicing expenses, legal work required to administer and monetize the loans, and insurance-related risk management costs. Nothing in the MLSA required Cymbidium to obtain

PLAINTIFF'S TRIAL BRIEF
(NO. 2:24-cv-00025-KKE) - 12

approval from Defendants prior to entering into the various required services agreements. The only restriction regarding service providers was that until July 1, 2023, Cymbidium was to use AHP Servicing and SN Servicing. After that, it was free to use whatever service providers it wanted.

Defendants' objections therefore to the servicing fees and improvement costs on the reconciliations provided by Plaintiff do not identify any contractual prohibition; they reflect disagreement with how the waterfall operates. The evidence will show that the costs were paid to unaffiliated third parties, were consistent with (and in several instances below) prevailing market rates, and were incurred to service, protect, and monetize the MLSA loans and related REOs. Under the plain language of the First Amendment, those costs are reimbursable and must be applied in the waterfall before any reversion of proceeds to Defendants.

1.    Servicing Fees Such As From Land Home and Others.

As required under the MLSA, and the applicable law, Cymbidium, as the purchaser and ultimate owner of the loans, was required to begin servicing the mortgage loans "as soon as practicable following the Conveyance Date" (October 7, 2022). MLSA pp. 2 and 4. Additionally, as already stated, under the First Amendment, the parties agreed to maintain certain servicers only through July 1, 2023. However, since the execution of the MLSA, the AHP Trusts were aware that "the related Mortgage Files, [would] be delivered to the Purchaser's successor servicer." MLSA ¶ 7.01. Ultimately, under the MLSA, Cymbidium was free to hire any mortgage servicers it preferred, and it hired Land Home. If a loan is performing, the servicer collects and processes loan payments from the borrower. If the loan is in default, they see that the property is maintained.

2.    Legal Fees and Costs.

Weinstein & Riley, PC, is a law firm Cymbidium hired to prepare and record assignments of the mortgages acquired under the MLSA. Under the First Amendment, legal services are included as a type of service needed and whose fees would be paid under the "waterfall"

PLAINTIFF'S TRIAL BRIEF
(NO. 2:24-cv-00025-KKE) - 13

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON  98104
(206) 622-2000

provision. Defendants' suggestion that Weinstein & Riley payments were improper ignores the undisputed record. Mr. Newbery acknowledged the use of Weinstein & Riley, and its fees were below what Plaintiff would have incurred had it retained another law firm or mortgage servicer. There is no evidence that Weinstein & Riley's involvement increased costs or resulted in any improper benefit to Plaintiff, to the contrary, there's evidence that the fees and costs charged were below the market rate for similar work performed.

3.     Insurance Charges.

The insurance-related charges were a legitimate risk-management costs incurred in connection with the MLSA loans. The charges funded a dedicated, defined fund used to pay covered claims for property damage coverage within the $150,000 deductible of a Lloyd's of London policy. Property damage claims have in fact been paid from that fund, and the pool functioned as a third-party risk-bearing mechanism. At all relevant times, a separate insurance policy issued by Lloyd's of London was in place covering the loans and properties at issue. Third-party liability coverage under the Lloyd's policy was not subject to the $150,000 deductible. Only property damage coverage was subject to that deductible, which was addressed through the self-insurance sinking fund.

Amounts charged for that risk coverage and advanced and paid into the dedicated sinking fund for claims are "Mortgage Loan Costs" under the First Amendment. They are unreimbursed third-party costs advanced by the purchaser related to the Mortgage Loans. The MLSA does not require that insurance be obtained from a traditional carrier, nor does it exclude self-insurance or pooled-risk structures. Under the contract's plain language, those insurance-related advances are reimbursable in the first tier of the waterfall.

## III.     LEGAL DISCUSSION

### A.     The AHP Trusts Breached the MLSA and Its First Amendment.

Under Washington law, a plaintiff establishes breach of contract by proving (1) the existence of a valid contract (2) a duty imposed by the contract (3) breach of that duty, and (4)

PLAINTIFF'S TRIAL BRIEF
(NO. 2:24-cv-00025-KKE) - 14

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON  98104
(206) 622-2000

resulting damages. Each element is satisfied here. *Silvey v. Numerica Credit Union*, 23 Wn. App. 2d 535, 544, 519 P.3d 920, 925 (2022). "The primary objective in contract interpretation is to ascertain the mutual intent of the parties at the time they executed the contract." *Viking Bank v. Firgrove Commons 3, LLC*, 183 Wn. App. 706, 712, 334 P.3d 116 (2014) (*citing Int'l Marine Underwriters v. ABCD Marine, LLC*, 179 Wn.2d 274, 282, 313 P.3d 395 (2013) (plurality opinion)). Washington law requires that the explicit terms of the agreement control. *See Hearst Commc'ns, Inc. v. Seattle Times Co.*, 154 Wash.2d 493, 503, 115 P.3d 262 (2005). "We generally give words in a contract their ordinary, usual, and popular meaning unless the entirety of the agreement clearly demonstrates a contrary intent." *Id*. at 504, 115 P.3d 262. And courts view the contract as a whole, interpreting particular language in the context of other contract provisions. *See Weyerhaeuser Co. v. Com. Union Ins. Co.*, 142 Wn.2d 654, 669-70, 15 P.3d 115 (2000); *see Int'l Union of Bricklayers & Allied Craftsman Local Union No. 20, AFL-CIO v. Martin Jaska, Inc.*, 752 F.2d 1401, 1406 (9th Cir. 1985) (explaining that a disagreement among the parties as to the meaning of a contract does not render the contract ambiguous).

      1.      Valid Contract and Clear Duties.

The MLSA and its First Amendment reflect a negotiated, arms-length transaction between sophisticated parties, and Defendants' attempt to impose conditions or limitations that do not appear in the text is contrary to settled Washington contract law. There is no dispute that the MLSA is a valid, enforceable contract. The Court need not look beyond the four corners of the agreement to resolve Defendants' contract-based defenses. Its operative provisions unambiguously establish that the MLSA was a transfer of any interest AHP had in the mortgage loans.

The MLSA expressly provides that AHP "sells, transfers, assigns, and conveys" to Cymbidium all right, title, and interest in the loans, and warrants that Cymbidium receives "all rights as owner … free and clear of any and all claims," including those of the seller. The First Amendment reaffirmed that ownership structure and modified the economic waterfall governing

PLAINTIFF'S TRIAL BRIEF
(NO. 2:24-cv-00025-KKE) - 15

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

whether—after Cymbidium was fully paid—if there were any residual loans, they would revert to AHP.

Separate and independent from the waterfall, the MLSA imposed a mandatory duty on the AHP Trusts to deliver the Mortgage Loan Documents, including original notes, assignments, title policies, and related instruments. Those documents define the mortgage loans themselves and are essential to enforcement, foreclosure, resale, or REO disposition. Delivery was not optional, conditional, or discretionary.

2.      Material Breach.

The AHP Trusts materially breached the MLSA in at least two ways.

First, they failed and refused to deliver Mortgage Loan Documents for a substantial number of loans. That failure goes to the heart of the contract. In the mortgage industry, possession and control of loan documents is control of the asset. By withholding them, Defendants deprived Cymbidium of the very benefit it purchased— ownership and control of the loans.

Second, Defendants violated the MLSA's ownership and exclusivity provisions by selling MLSA loans and REO properties to third parties, encumbering MLSA assets with new debt, purportedly revoking powers of attorney, claiming ownership, blocking recordings, and retaining proceeds—all while warranting that Cymbidium was the sole owner, that Cymbidium was entitled to all recoveries until fully paid, and that AHP had no claim to the loans.

These breaches were neither technical nor harmless. They defeated the MLSA's essential purpose and constitute material nonperformance under Washington law.

3.      Damages.

Cymbidium suffered and continues to suffer extensive damages directly caused by the AHP Trusts' breaches, including lost loan and REO sale proceeds, unreimbursed preservation and servicing costs, reversed credits necessitated by defective or unsaleable assets, and the dissipation of collateral value.

PLAINTIFF'S TRIAL BRIEF
(NO. 2:24-cv-00025-KKE) - 16

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

The Hawaiian property transaction illustrates Defendants' repeated breaches and resulting damages. First, unbeknownst to Plaintiff at the time, Defendants secretly sold the same property to someone else, while at the same time, they had promised to deliver the original promissory note to Plaintiff so Plaintiff could complete a resale to a third-party. Defendants never delivered that note. Instead, Defendants first encumbered the property with hundreds of thousands of debt and then sold the property and kept the additional sale proceeds. Defendants concealed all of this.  Unaware of what Defendants had done, Plaintiff sold the property to a third party and gave Defendants credit for those sale proceeds.

Plaintiff was damaged twice by Defendants' breach regarding the Hawaii property: once by crediting AHP for a sale Plaintiff had made that could not be completed due to AHP's about-face refusal to provide the required documents, and a second time when Plaintiff had to refund the purchase price to its third-party buyer.

The reconciliation accounting—initiated contemporaneously and subsequently corrected when AHP's additional misconduct came to light—demonstrates that, once ineligible assets and improper dispositions are removed, AHP continues to owe Cymbidium many millions of dollars under the MLSA.

**B.    Defendants Converted Funds Belonging to Cymbidium.**

Conversion under Washington law involves three elements: (1) willful interference with chattel belonging to the plaintiff (2) by either taking or unlawful retention, and (3) thereby depriving the owner of possession. *Burton v. City of Spokane*, 16 Wn. App. 2d 769, 482 P.3d 968, 970 (2021) (citing *Judkins v. Sadler-Mac Neil*, 61 Wn.2d 1, 376 P.2d 837, 838 (1962)). Conversion occurs where a defendant exercises dominion or control over property inconsistent with the owner's rights, and liability does not depend on wrongful intent. *Brown v. Brown*, 157 Wn. App. 803, 816, 239 P.3d 602 (2010). Conversion may proceed as a tort separate and apart from breach of contract where the defendants' conduct violates a duty that exists independently of the contract's terms, because the independent duty doctrine does not bar tort recovery when

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON  98104
(206) 622-2000

the alleged misconduct implicates a tort duty arising outside the contract—even if the resulting harm is economic in nature. *Eastwood v. Horse Harbor Found., Inc.*, 170 Wn.2d 380, 393–94, 241 P.3d 1256 (2010). Where a defendant's conduct goes beyond mere nonperformance and instead involves unauthorized dominion, control, or disposition of another's property, the injury is not simply an economic loss flowing from a broken promise—it is an injury remediable in tort. *Id*.

Any argument that the independent duty doctrine bars Cymbidium's conversion claim fails for two independent reasons. First, the conduct at issue here far exceeds a failure to perform contractual duties: Defendants exercised affirmative, unauthorized control over property they had already sold, including selling assets to third parties, encumbering them, and retaining proceeds belonging to Cymbidium. That conduct breaches a duty imposed by tort law, not contract. Second, AHP itself was not a party to the MLSA, yet it directed the wrongful disposition of Cymbidium's property and retained the proceeds for its benefit. The independent duty doctrine therefore has no application to AHP at all, and it does not shield the AHP Trusts where, as here, their conduct constituted conversion rather than mere contractual nonperformance.

1.    Cymbidium's Ownership of the Property Converted.

As shown above, ownership of the MLSA loans and all proceeds vested in Cymbidium at closing. Under the MLSA and its First Amendment, AHP and the AHP Trusts retained no ownership interest in the loans, loan proceeds, or REO properties unless, and until, Cymbidium was fully paid under the contractual waterfall. That condition has never occurred.

At most, the AHP Trusts claim a contingent contractual expectancy to receive residual assets, if there were any, after full payment to Cymbidium of all amounts owed under the MLSA and the First Amendment.

PLAINTIFF'S TRIAL BRIEF
(NO. 2:24-cv-00025-KKE) - 18

2.      Conversion by the AHP Trusts Unauthorized Control Over Cymbidium's Property.

The AHP Trusts committed conversion by exercising dominion over MLSA assets after selling them, including by:

- selling MLSA mortgage loans and REO properties to third parties,

- encumbering MLSA properties with new debt,

- withholding or refusing to deliver Mortgage Loan Documents,

- blocking recordings and foreclosures,

- and retaining sale proceeds that belonged exclusively to Cymbidium.

Each of these acts constitutes conversion because they were affirmative exercises of control inconsistent with Cymbidium's ownership, not mere failures to perform contractual obligations. The Hawaii Property illustrates this: despite Cymbidium funding substantial preservation costs and AHP approving the property's sale, the Trusts first encumbered and then sold the property and retained the proceeds—without disclosing to plaintiff that they were doing so. That conduct destroyed Cymbidium's ownership rights and required reversal of previously credited amounts—classic conversion under Washington law.

3.      Independent Conversion by AHP As Manager of the AHP Trusts.

AHP is separately liable for conversion, in addition to the Trusts, because it directed, controlled, and personally benefited from the wrongful disposition of Cymbidium's property. As manager of the AHP Trusts, AHP:

- directed the sale and encumbrance of MLSA loans and REO properties;

- controlled the servicing relationships and document custody;

- approved third-party sales while blocking Cymbidium's recordings; and

- and caused sale proceeds and loan recoveries to be diverted to itself, rather than remitted to Cymbidium as required.

PLAINTIFF'S TRIAL BRIEF
(NO. 2:24-cv-00025-KKE) - 19

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON  98104
(206) 622-2000

AHP's role was not passive or ministerial. It was the decision-maker and the financial beneficiary. By directing the Trusts' actions and retaining funds for itself, AHP committed its own acts of conversion, distinct from and in addition to the Trusts' liability.

### 4.     Conversion Is Separate and Apart From Breach of Contract.

Defendants' liability for conversion does not rise or fall with the MLSA's contract terms. The tort arises from what Defendants did with Cymbidium's property after ownership had transferred, not merely from their failure to perform contractual duties.

Withholding documents, selling assets to third parties, encumbering properties, and pocketing proceeds are acts of dominion, not mere nonperformance. They interfered with Cymbidium's possessory and ownership rights in a manner that Washington law recognizes as conversion—even where the same conduct also breached the MLSA.

### 5.     Resulting Harm.

Defendants' conversion caused direct and compounding losses: misappropriated sale proceeds, unreimbursed preservation expenses, clouded title, tax losses, diminished collateral value, and the forced unwinding of transactions previously credited to AHP. The reconciliation accounting reflects the financial consequences of that conversion and confirms that, after backing out assets wrongfully sold or rendered unsaleable by Defendants' conduct, AHP and the AHP Trusts owe Cymbidium millions of dollars.

## C.     AHP's Affirmative Defenses and Counterclaims All Fail.

AHP has thrown the proverbial kitchen sink at this case in the form of affirmative defenses and counterclaims, but in all of its pleadings to date, it has refused to take accountability for its own material breaches of the MLSA. AHP first failed to repurchase the Category B loans as it was originally contractually required to do—conduct that necessitated the First Amendment and the waterfall provision governing how loan recoveries would be applied. AHP likewise refuses to take responsibility for its noncompliance with the express warranties it provided and that it knew—or should have known—that it had already sold some of the loans to

PLAINTIFF'S TRIAL BRIEF
(NO. 2:24-cv-00025-KKE) - 20

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON  98104
(206) 622-2000

third-parties, others had been lost through tax foreclosures, and other loans were burdened by title defects at the inception of the transaction with Cymbidium.

AHP also ignores the commercial reality that it was AHP—not Cymbidium—that needed to enter into the MLSA to, among other things, pay off an overdue loan for which no further extensions were available. Against that backdrop, AHP's assertion of fraud in the inducement does not survive even the most basic scrutiny. When the undisputed facts and the plain language of the MLSA and First Amendment are applied, AHP's affirmative defenses and counterclaims fail.

        1.      <u>AHP's Affirmative Defenses Are Legally Deficient and Factually Unsupported</u>.

AHP's defenses—including improper damages, waiver, unjust enrichment, unclean hands, failure to mitigate, satisfaction and substantial performance, de minimis harm, setoff, failure to identify converted funds, material breach by Cymbidium, fraud in the inducement, impossibility, and lack of real-party-in-interest—fail for overlapping and independent reasons.

First, AHP cannot rely on defenses premised on full performance—including satisfaction, substantial performance, or de minimis harm—because the evidence will establish the opposite. AHP materially breached the MLSA by failing to deliver Mortgage Loan Documents, selling MLSA loans to third parties and not turning over the proceeds, encumbering Cymbidium's assets, and diverting proceeds. A party in material breach cannot invoke substantial performance or claim it satisfied its obligations. *See 224 Westlake, LLC v. Engstrom Props., LLC*, 169 Wn. App. 700, 725, 281 P.3d 693, 707 (2012).

Second, defenses sounding in equity—including waiver, unjust enrichment, unclean hands, and failure to mitigate—fail both because there are no facts supporting them and AHP's own misconduct bars equitable relief. *See Seller Agency Council, Inc. v. Kennedy Ctr. for Real Est. Educ., Inc.*, 621 F.3d 981, 986 (9th Cir. 2010). Cymbidium did not waive breaches it did not know existed; many were concealed by AHP's document withholding and undisclosed third-party sales. Cymbidium's extensive efforts to preserve assets, service loans, clear title, and

PLAINTIFF'S TRIAL BRIEF
(NO. 2:24-cv-00025-KKE) - 21

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON  98104
(206) 622-2000

unwind improper transfers demonstrate mitigation, not neglect. And equity will not reward a party that retained documents, clouded title, and sold assets it did not own.

Defendants' inequitable conduct extends well beyond document withholding and asset dissipation. AHP engaged in a coordinated campaign to pressure Plaintiff to abandon its claims by threatening and suing Plaintiff's lenders, vendors, and key counterparties—including the lender that financed this transaction. These actions forced Plaintiff to incur substantial legal fees and to litigate in multiple jurisdictions simply to protect assets it owned and should have been able to monetize to pay what was owed under the MLSA and the First Amendment. Regardless of whether those expenses are recoverable, Defendants' wrongful conduct that caused Plaintiff to incur them shows their inequitable conduct and unclean hands.

Third, AHP's setoff and "improper damages" defenses fail because they are premised on a false assumption—that AHP retained ownership of the loans or their proceeds and that it has ownership now. Under the MLSA and First Amendment, ownership transferred to Cymbidium, subject only to a contingent right to residual assets after the waterfall was satisfied. There is nothing for AHP to offset.

Fourth, AHP's assertion that Cymbidium failed to identify converted funds is contradicted by the record. The reconciliation spreadsheets, servicer records, recorded instruments, and third-party sale documents identify specific loans, properties, proceeds, dates, and amounts. Conversion is shown loan by loan and property by property.

Fifth, AHP's claim that Cymbidium materially breached the MLSA fails because the alleged breaches—non-arm's-length transactions, affiliate assignments, or servicing arrangements—are not prohibited by the MLSA. The agreement does not restrict Cymbidium's ability to   pledge the loans, nor does it restrict to whom loans can be sold or transferred.  Just the opposite. In the MLSA, AHP expressly warranted that the loans were being sold free and clear of any claims to them, including any claims by AHP. What the agreement does require is that a good faith effort be made to maximize the recovery regarding them—consistent with the need to

PLAINTIFF'S TRIAL BRIEF
(NO. 2:24-cv-00025-KKE) - 22

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON  98104
(206) 622-2000

pay down the purchase financing debt Magerick incurred with Western Alliance Bank. The evidence will show that any supposedly non-arm length transactions AHP now points to were for fair value, were often specifically approved by AHP, and were critically needed to pay down Magerick's purchase financing with Western Alliance Bank. AHP cannot transform contractually permitted conduct into a breach to excuse its own nonperformance.

Sixth, AHP's fraud-in-the-inducement defense fails both legally and factually. Mr. Newbery was a sophisticated businessman and investor who fully understood the structure, purpose, and risks of the transaction. He induced Mr. Weinstein to advance funds specifically to replace a prior lender who was threatening legal action due to payment defaults. The material terms were disclosed, negotiated, and documented before execution of both agreements.[7]

AHP cannot identify any actionable misrepresentation by Cymbidium that induced the MLSA. The transaction was entered into because AHP needed immediate liquidity to resolve an overdue loan. The financing structure, the involvement of Magerick, and the Western Alliance Loan were fully disclosed. Fraud cannot be based on regret or a deteriorating deal, and it certainly cannot be asserted by a party that warranted asset quality it knew was false.

Seventh, impossibility of performance is unavailable where the alleged impossibility was self-created. AHP's inability to deliver documents or convey assets was the result of its own prior sales, encumbrances, and title defects—not external forces beyond its control.

Finally, AHP's assertion for the first time in the pretrial order that Cymbidium is not the real party in interest fails both procedurally and substantively. Real party in interest is an affirmative defense that was never pled. And there would be substantial prejudice if amendment were allowed at this late date since, whomever it is that AHP claims is the real party in interest, could have been joined had that affirmative defense been asserted. From a substantive

---

[7] If anything, the evidence more readily supports the inverse: that Mr. Weinstein was induced to fund the transaction based on representations that Defendants would deliver loan documents, refrain from encumbering sold assets, and cooperate in monetization—representations that were not honored.

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

PLAINTIFF'S TRIAL BRIEF
(NO. 2:24-cv-00025-KKE) - 23

standpoint, Cymbidium is the named purchaser under the MLSA, the owner of the loans, and the entity entitled to receive from AHP the payments due under the MLSA and the First Amendment. That Cymbidium may have obligations to others related to those payments does not divest it of standing to enforce its contractual right to those payments from AHP or to recover for conversion of its property.

2.     AHP's Counterclaims Fail Because They Rest on the Same False Premise.

AHP's counterclaims collapse for the same reason its defenses do: they are premised on the incorrect assumption that AHP repaid all amounts due and is entitled to recover assets or funds from Cymbidium.

AHP's request for a declaratory judgment that it satisfied all obligations fails because it, in fact, still owes many millions of dollars under the parties' contract, especially after credits it was previously given are reversed because loans were unsaleable or were sold by AHP to someone else and not disclosed.

AHP's demand for a court-ordered accounting is unnecessary and improper. Cymbidium has already produced detailed reconciliation spreadsheets, loan-level data, and supporting documents. AHP's demand is not about transparency; it is an attempt to relitigate ownership and delay accountability while continuing to withhold documents and dissipate assets.

AHP's breach-of-contract counterclaims fail because AHP—not Cymbidium—was the breaching party. AHP cannot recover damages or fees under a contract it materially breached. Nor, can it recharacterize contractually permitted transactions as bad faith where the MLSA imposes no restrictions regarding those transactions.

AHP's confidentiality-based counterclaim fares no better. The MLSA does not prohibit filing contracts in court, and Cymbidium made litigation disclosures to enforce contractual rights that AHP breached. *See* generally *Lahrichi v. Curran*, No. 64668-3-I, 2011 WL 5222806, at *4 (Wash. Ct. App. Oct. 31, 2011). AHP cannot shield its misconduct behind a confidentiality provision while simultaneously forcing Cymbidium to litigate nationwide to protect its assets.

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

PLAINTIFF'S TRIAL BRIEF
(NO. 2:24-cv-00025-KKE) - 24

AHP also sustained no damages stemming from its confidentiality-based counterclaim and for that reason alone it fails. *See Karuza v. L. Off. of Paul N. Luvera*, No. 39262-5-I, 1997 WL 523930, at *1 (Wash. Ct. App. Aug. 25, 1997) (holding that alleged breach of a settlement's confidentiality provision, like any contractual term, requires proof of damages, and affirming summary judgment where none were shown).

Finally, AHP's claim that it overpaid Cymbidium approximately $3 million is factually incorrect. As will be shown at trial, AHP still owes plaintiff many millions of dollars especially once significant portions of credits previously given are reversed—as they must be because AHP got credit based on its contractual commitment that the loans were saleable and free of any claims and many of them were not due to AHP's actions.

## IV.   CONCLUSION

This case begins and ends with the parties' contract. The MLSA and its First Amendment are unambiguous. They effected a sale of the mortgage loans at issue. At closing, ownership of the mortgage loans and all related proceeds transferred to Cymbidium. AHP and the AHP Trusts retained no ownership interest—only a contingent contractual expectancy that could arise if Cymbidium were fully paid under the waterfall. That has not occurred. The reconciliation accounting shows that, after backing out undisclosed sales, withheld documentation, and converted proceeds, AHP still owes Cymbidium millions of dollars.

Defendants' breaches were material. They failed to deliver Mortgage Loan Documents central to the assets sold, retained control of those documents to block Cymbidium's exercise of ownership, sold and encumbered assets they no longer owned, and diverted proceeds that belonged to Cymbidium. This conduct was not mere nonperformance; it was affirmative, unauthorized dominion over Cymbidium's property and constitutes conversion under Washington law. AHP's defenses and counterclaims do not change that result.

The Court should enforce the MLSA as written, confirm Cymbidium's ownership of the MLSA loans and proceeds, reject Defendants' affirmative defenses and counterclaims, and enter

PLAINTIFF'S TRIAL BRIEF
(NO. 2:24-cv-00025-KKE) - 25

Byrnes ♦ Keller ♦ Cromwell LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

judgment for Cymbidium on its breach and conversion claims. Cymbidium further requests damages consistent with the reconciliation accounting and an order requiring Defendants—including AHP—to immediately turn over all Mortgage Loan Documents and any other documents necessary to monetize, enforce, transfer, foreclose, or sell the MLSA loans and REO assets, together with such additional equitable relief as necessary to prevent further dissipation of Cymbidium's property.

DATED this 9th day of January, 2026.

BYRNES KELLER CROMWELL LLP

By /s/ Bradley S. Keller
    Bradley S. Keller, WSBA #10665

By /s/ M. Victoria Molina
    M. Victoria Molina, WSBA #62109
    1000 Second Avenue, 38th Floor
    Seattle, Washington  98104
    Telephone: (206) 622-2000
    Facsimile:  (206) 622-2522
    Email:      bkeller@byrneskeller.com
                mvmolina@byrneskeller.com
**Attorneys for Plaintiff**

PLAINTIFF'S TRIAL BRIEF
(NO. 2:24-cv-00025-KKE) - 26

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON  98104
(206) 622-2000

## CERTIFICATE OF SERVICE

The undersigned attorney certifies that on the 9th day of January, 2026, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel on record in the matter.

/s/ M. Victoria Molina
Byrnes Keller Cromwell LLP
1000 Second Avenue, 38th Floor
Seattle, WA  98104
Telephone:  (206) 622-2000
Facsimile:  (206) 622-2522
mvmolina@byrneskeller.com

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON  98104
(206) 622-2000

PLAINTIFF'S TRIAL BRIEF
(NO. 2:24-cv-00025-KKE) - 27