HONORABLE KYMBERLY K. EVANSON

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

CYMBIDIUM RESTORATION TRUST,

Plaintiff,

v.

AMERICAN HOMEOWNER PRESERVATION TRUST SERIES AHP SERVICING; ITS TRUSTEE, U.S. BANK TRUST N.A.; AHP CAPITAL MANAGEMENT, LLC; AMERICAN HOMEOWNER PRESERVATION SERIES 2015A+; ITS TRUSTEE, U.S. BANK TRUST NATIONAL ASSOCIATION; AHP SERVICING, LLC; AND JORGE NEWBERY,

Defendants.

AMERICAN HOMEOWNER PRESERVATION TRUST SERIES AHP SERVICING; AHP CAPITAL MANAGEMENT, LLC; AMERICAN HOMEOWNER PRESERVATION SERIES 2015A+; and; AHP SERVICING, LLC,

Counter-Plaintiffs,

v.

CYMBIDIUM RESTORATION TRUST,

Counter-Defendant.

Case No.  2:24-cv-0025-KKE

DEFENDANTS / COUNTER-PLAINTIFFS' TRIAL BRIEF

DEFENDANTS / COUNTER-PLAINTIFFS'
TRIAL BRIEF – Page 1

BAILEY DUQUETTE P.C.
800 FIFTH AVENUE, SUITE 101-800
SEATTLE, WASHINGTON 98104
T 206.225.2250 | F 888.233.5869

TABLE OF CONTENTS

I.    INTRODUCTION..................................................................................................4

II.   FACTUAL BACKGROUND ...............................................................................5

   A. William Weinstein and the Weinstein Enterprise ..................................... 5

   B.  The Weinstein–Newbery Relationship and the August 2022 Financing
       Transaction ................................................................................................. 6

   C.  The Negotiations and Terms of the MLSARO ..........................................7

   D.  Pledging of the Mortgage Loans to Western Alliance Bank Before the
       MLSARO Took Effect ............................................................................... 8

   E.  Limited Powers of Attorney ...................................................................... 9

   F.  The First Amendment to the MLSARO .................................................. 10

   G.  Pre-Suit Accounting, Requests for an Independent Reconciliation,  and the
       Filing of this Action ................................................................................ 11

   H. Post-Filing Accounting Revisions .......................................................... 14

       1. Late October 2023 (Pre-Suit Baseline)............................................... 14

       2. December 2023 Internal Spreadsheet ................................................. 15

       3. March 2024 Internal Spreadsheet....................................................... 15

       4. April 2024 Initial Disclosures............................................................ 16

       5. December 2024 Spreadsheet Production............................................. 17

       6. December 2025 Depositions and Trial Proffers.................................. 18

       7. January 6, 2026 Spreadsheet for Trial ............................................... 19

   I.  The Spreadsheets Include "Improvement Costs" Attributed to Weinstein-
       Related Entities........................................................................................ 20

   J.  The "Atrocities" or Put-Back Amounts Increased Substantially After the
       Contractual Deadline............................................................................... 21

III.  PROCEDURAL BACKGROUND ..........................................................................23

   A. The Instant Case.......................................................................................23

BAILEY DUQUETTE P.C.
800 FIFTH AVENUE, SUITE 101-800
SEATTLE, WASHINGTON 98104
T 206.225.2250 | F 888.233.5869

**B. Related Actions** ........................................................................................**24**

IV.    LEGAL ISSUES .................................................................................26

**A. Cymbidium Is Not the Real Party in Interest** ........................................**26**

  1. Having Transferred All Beneficial and Economic Interests to Magerick, Cymbidium Lacks Standing to Pursue Its Claims................................................27

  2. Cymbidium Cannot Cure This Defect by Late Substitution ...............................29

  3. **The MLSARO and Amendment Were a Financing Arrangement,  Not a True Sale** .......................................................................................................32

**B. AHP'S Counterclaims Against Cymbidium** ...........................................**40**

  1. Declaratory Judgment.......................................................................................40

  2. Equitable Accounting........................................................................................41

  3. Breach of Contract ...........................................................................................46

  4. Conversion........................................................................................................47

**C. AHP'S Defenses To Cymbidium's Claims**...........................................**48**

  1. Cymbidium's Claims Fail As a Matter of Contract Law ....................................48

  2. Cymbidium's Conversion Categorically Fails. ..................................................55

  3. Cymbidium's Claims Fail Based on Lack of Formation and Impossibility  of Performance ................................................................................................56

DEFENDANTS / COUNTER-PLAINTIFFS'
TRIAL BRIEF – Page 3

BAILEY DUQUETTE P.C.
800 FIFTH AVENUE, SUITE 101-800
SEATTLE, WASHINGTON 98104
T 206.225.2250 | F 888.233.5869

## I.    INTRODUCTION

This case arises from a structured mortgage-loan transaction that functioned in substance as a financing arrangement secured by a defined pool of loans and governed by a contractual waterfall—not as an open-ended damages regime. AHP has paid, based on Cymbidium's own records, nearly $30 million toward a Category B loan balance that began at $19.75 million, repeatedly demanded a neutral reconciliation to determine what—if anything—remained due, and offered to fund an independent accounting. Cymbidium declined. Instead, it filed suit without prior notice and has since advanced a moving set of internal spreadsheets that changed repeatedly over time—first asserting a balance in the low single millions, later escalating to more than $24 million on the eve of trial, while adding post-deadline "put-backs" or "atrocities" and affiliate "improvement costs" not authorized by the governing agreements.

Two threshold issues frame the Court's task. First, the record shows that the economic interests, financing, and accounting for the loans resided with Magerick LLC—not Cymbidium—raising a fundamental real-party-in-interest problem for claims premised on ownership and impairment of the loan portfolio. Second, the Mortgage Loan Sale Agreement with Repurchase Obligation ("MLSARO") and First Amendment ("Amendment") allocate risk, compensation, and reversionary rights in a manner consistent with secured financing, not a true sale—an issue that

BAILEY DUQUETTE P.C.
800 FIFTH AVENUE, SUITE 101-800
SEATTLE, WASHINGTON 98104
T 206.225.2250 | F 888.233.5869

determines whether Cymbidium's ownership-based theories and "put-back" damages have legal relevance at all.

On the merits, AHP seeks affirmative relief to bring finality to a dispute that has otherwise resisted conventional adjudication: a declaration of the parties' rights and obligations under the MLSARO and Amendment, and a court-ordered equitable accounting to determine recoveries received, deductions permitted, and the resulting net balance. AHP will further prove that Cymbidium breached its own contractual duties by engaging in non-arm's-length affiliate transactions, failing to account for proceeds as required, and disclosing contract terms in violation of confidentiality obligations. And to the extent Cymbidium presses tort theories, AHP will show that Cymbidium cannot identify any specific, segregated funds allegedly converted and instead attempts to convert a disputed contractual reconciliation into a possessory tort. The Court should resolve this case on the agreements as written and the reliable financial record they require—rather than on late-produced, ever-changing spreadsheets that neither side, nor the Court, can meaningfully test in real time.

## II.   FACTUAL BACKGROUND

### A. William Weinstein and the Weinstein Enterprise

William Weinstein is a investor and financier in the distressed mortgage-loan space who operates through a network of affiliated entities performing distinct roles in loan acquisition, financing, servicing, and collateralization. Those interrelated

BAILEY DUQUETTE P.C.
800 FIFTH AVENUE, SUITE 101-800
SEATTLE, WASHINGTON 98104
T 206.225.2250 | F 888.233.5869

entities include, without limitation, Oak Harbor Holdings LLC, Oak Harbor Management, LLC, Oak Harbor Capital LLC (together, "**Oak Harbor**"), Holdphrysing, Inc. ("**Holdphrysing**"), Atlantica, LLC ("**Atlantica**"), Magerick, LLC ("**Magerick**"), Land Home Financial Services, Inc. ("**Land Home**"), Cymbidium Restoration LLC and Cymbidium Restoration Trust (together, "**Cymbidium**") (collectively, the "**Weinstein Enterprise**").[1]

Within the Weinstein Enterprise, nominal title, economic risk, financing, and accounting frequently reside in different entities. Discovery and other litigation have shown that Weinstein often uses trusts or special-purpose entities as nominal holders while deploying affiliated operating companies to finance, pledge, and monetize loan portfolios. This forms the backdrop for this dispute.[2]

**B. The Weinstein–Newbery Relationship and the August 2022 Financing Transaction**

Jorge Newbery founded and operates American Homeowner Preservation ("**AHP**"), a mortgage-loan acquisition and resolution platform. Weinstein and Newbery had an established relationship before the transactions at issue in this case.

In August 2022, AHP and Cymbidium closed a $2.5 million transaction involving a pool of mortgage loans. Although styled as a "Mortgage Loan Sale

---

[1] Oak Harbor is owned and controlled by Weinstein. Oak Harbor manages Atlantica. Magerick, another affiliate of Oak Harbor, has two members, one of whom is Land Home. Oak Harbor is the manager of Cymbidium. The common thread across these entities is Weinstein.

BAILEY DUQUETTE P.C.
800 FIFTH AVENUE, SUITE 101-800
SEATTLE, WASHINGTON 98104
T 206.225.2250 | F 888.233.5869

Agreement with Repurchase Obligation," both parties treated the transaction as a financing arrangement. AHP received capital, temporarily transferred loan interests, remitted recoveries, and upon repayment, recovered the loans. Neither AHP nor Cymbidium disputed that the August 2022 transaction was a financing arrangement—and not a permanent transfer of ownership. That transaction set the commercial expectations for the larger transaction that followed.

### C.  The Negotiations and Terms of the MLSARO

By fall 2022, AHP was seeking replacement financing in a tightening credit market. Weinstein proposed a structure that mirrored the August 2022 transaction, using a subset of AHP's loan portfolio to secure a larger advance.

In October 2022, AHP and Cymbidium entered into the Mortgage Loan Sale Agreement with Repurchase Obligation—styled in the same format as the earlier August 2022 transaction. As before, Weinstein—a licensed lawyer—drafted the documentation. In the MLSARO, Weinstein proposed a two-tier structure: (a) a $5.25 million sale of "Category A" loans ("**Category A Loans**") and (b) a $19.75 million financing secured by "Category B" loans ("**Category B Loans**") (together, the "**Mortgage Loans**"). Throughout negotiations, Weinstein represented that AHP would retain the economic upside of the Category B portfolio and recover remaining loans and excess proceeds upon repayment.

---

[2] As reflected in the accounting and testimony below, this separation of formal title, economic control, and accounting control—and the opacity it created—prevented Cymbidium from producing a stable, contract-compliant damages computations.

DEFENDANTS / COUNTER-PLAINTIFFS'
TRIAL BRIEF – Page 7

BAILEY DUQUETTE P.C.
800 FIFTH AVENUE, SUITE 101-800
SEATTLE, WASHINGTON 98104
T 206.225.2250 | F 888.233.5869

As to Category B loans, the transaction included features commonly associated with secured financing, including interest payments, continuing remittance of recoveries, reversionary rights upon repayment, guaranty requirements, and default penalties. *See* MLSARO, §§ 1, 4, 6. The MLSARO became effective on October 7, 2022. It required repayment of a defined obligation, after which Cymbidium was required to return remaining loans and remit excess proceeds. The agreement did not authorize assignments without AHP's consent or permit non-party entities to encumber the collateral.

The MLSARO also granted Cymbidium a discretionary right to "put back" loans, but only within six months—through April 7, 2023.

Notably, even though the MLSARO expressly contemplated a reversionary right for AHP, internal communications at the time reflect that Weinstein privately characterized the transaction as likely to result in a "big loss for Jorge [Newbery]" and warned that AHP faced "real problems going forward."

**D. Pledging of the Mortgage Loans to Western Alliance Bank Before the MLSARO Took Effect**

On October 6, 2022—one day before the MLSARO became effective—Weinstein caused Magerick, a non-party to the MLSARO, to pledge the Mortgage Loans, including the Category B Loans, to Western Alliance Bank ("**WAB**") as collateral for an increased credit facility.

The pledging required representations regarding ownership and authority that were inconsistent with the MLSARO structure. For example, although Magerick

BAILEY DUQUETTE P.C.
800 FIFTH AVENUE, SUITE 101-800
SEATTLE, WASHINGTON 98104
T 206.225.2250 | F 888.233.5869

represented to WAB that it owned the Mortgage Loans, (a) Cymbidium, not Magerick, was the party to the MLSARO; (b) Cymbidium had not even acquired the Mortgage Loans to convey to Magerick at the time of the pledge; and (c) even if it had, Cymbidium did not hold clean title free of reversionary rights. AHP did not consent to the pledges and understood WAB's role to be custodial only.

Discovery has since confirmed that economic interests and accounting related to the loans resided with Magerick. Weinstein testified that Magerick financed the acquisition and owed the debt to WAB. Sonal Gupta testified that all revenues, expenses, and recoveries were recorded in Magerick's general ledger and that Cymbidium functioned as an intermediary entity which didn't even have a bank account.

As lender scrutiny increased, Cymbidium entered into "Participation Agreement" with Magerick purporting to reflect the transfer of beneficial and economic interests to Magerick. The agreement was executed in July 2023, months after the MLSARO and Amendment, and back-dated to October 7, 2022, after disputes regarding ownership and accounting had emerged. During this period, AHP had understood WAB's role, as represented by Weinstein, to be limited to custodial functions—nothing more.

### E.  Limited Powers of Attorney

In connection with discrete administrative functions, AHP granted limited powers of attorney ("**LPOAs**") to Oak Harbor in April 2023. Those LPOAs were

DEFENDANTS / COUNTER-PLAINTIFFS'
TRIAL BRIEF – Page 9

BAILEY DUQUETTE P.C.
800 FIFTH AVENUE, SUITE 101-800
SEATTLE, WASHINGTON 98104
T 206.225.2250 | F 888.233.5869

narrowly drawn and expressly premised on continued ownership of the loans by the AHP trusts—not by Cymbidium, Magerick, or any other Weinstein-controlled entity. They authorized only ministerial and management-related acts and expressly disclaimed any transfer of ownership or general agency authority.

### F.  The First Amendment to the MLSARO

In March 2023, AHP and Cymbidium executed the First Amendment to the MLSARO (the "**Amendment**"). The Amendment modified payment mechanics but did not eliminate AHP's reversionary rights. It provided that AHP was entitled to recoveries in excess of specified deductions, and upon payment in full, remaining loans and excess cash were to be returned to AHP.

Specifically, Section 5 of the Amendment provided that AHP would be

". . . entitled to all amounts recovered on the Mortgage Loans in excess of (i) repayment of all debt and interest related to the transactions contemplated under the [MLSARO], (ii) all unrelated third-party costs and fees related to managing the Mortgage Loans, (iii) the 16% Applicable Pricing Rate and (iv) the Management Fee. **Thus, upon payment in full, the remaining Mortgage Loans and other assets including excess cash are to be assigned and transferred back to [AHP].**"

(Emphasis added). The outstanding balance was set forth at approximately $21 million at the time of the Amendment. § 6. Except as expressly provided therein, the MLSARO terms remained "unchanged," including the April 7, 2023 put-back deadline. § 12.

BAILEY DUQUETTE P.C.
800 FIFTH AVENUE, SUITE 101-800
SEATTLE, WASHINGTON 98104
T 206.225.2250 | F 888.233.5869

**G. Pre-Suit Accounting, Requests for an Independent Reconciliation, and the Filing of this Action**

By mid-2023, Newbery began repeatedly requesting a complete accounting. In October 2023, Weinstein represented—based on his own spreadsheet—that AHP owed between $1.75 and $2.0 million.

As of October 27, 2023, Weinstein's spreadsheet showed total payments of $22,869,183.37 and an outstanding balance of $3,745,343.47, including approximately $2 million attributed to the KeyDally Loan. That amount was later determined by the King County Superior Court to be unrecoverable. Excluding it, the balance immediately prior to suit was, according to Weinstein's own numbers, $1,745,343.47.[3]  In an October 2023 email, Weinstein reinforced to Newbery that "I think you owe us between $1.75 and $2.0 million to resolve the issues."

The following illustration comes from Weinstein's October 27, 2023, spreadsheet.

---

[3] *See* Findings of Facts and Conclusions of Law, in *Oak Harbor Capital Speical Opportunities Master Fund, L.P. v. AHP Servicing, LLP et al.*, No. 23-2-25722-7 SEA, dated Oct. 28, 2025.

BAILEY DUQUETTE P.C.
800 FIFTH AVENUE, SUITE 101-800
SEATTLE, WASHINGTON 98104
T 206.225.2250 | F 888.233.5869

| | # | Date | Pending debt | Improvement cost | Payment | Number of Days | Interest | Mgmt fees | Outstanding repurchase price |
|---|---|---|---|---|---|---|---|---|---|
| 10/31/2022 | 1 | 10/7/2022 | 19,750,000.00 | - | - | - | - | | 19,750,000.00 |
| 11/30/2022 | 2 | 11/30/2022 | 19,750,000.00 | 30,600.00 | - | 54 | 467,506.85 | | 20,248,106.85 |
| 12/31/2022 | 3 | 12/31/2022 | 20,248,106.85 | 69,899.10 | - | 31 | 275,152.36 | | 20,593,158.31 |
| 1/31/2023 | 4 | 1/31/2023 | 20,593,158.31 | 618.08 | 3,200,000.00 | 31 | 279,841.27 | | 17,673,617.66 |
| 2/28/2023 | 5 | 2/28/2023 | 17,673,617.66 | 2,000.00 | 300,000.00 | 28 | 216,925.50 | | 17,592,543.16 |
| 3/31/2023 | 6 | 3/31/2023 | 17,592,543.16 | 14,439.62 | 125,000.00 | 31 | 239,065.79 | 12,744.59 | 17,733,793.16 |
| 4/30/2023 | 7 | 4/30/2023 | 17,733,793.16 | 42,287.02 | 1,594,029.05 | 30 | 233,211.53 | 23,610.99 | 16,438,873.65 |
| 5/31/2023 | 8 | 5/31/2023 | 16,438,873.65 | 95,103.12 | 560,812.59 | 31 | 223,388.53 | 24,072.96 | 16,220,625.67 |
| 6/30/2023 | 9 | 6/30/2023 | 16,220,625.67 | 107,938.86 | 12,599,089.57 | 30 | 213,312.34 | 5,671.13 | 3,948,458.43 |
| 7/31/2023 | 10 | 7/31/2023 | 3,948,458.43 | 145,327.62 | 1,062,319.96 | 31 | 53,655.76 | 4,585.42 | 3,089,707.27 |
| 8/30/2023 | 11 | 8/31/2023 | 3,089,707.27 | 262,150.13 | 1,303,575.18 | 31 | 41,986.16 | 3,106.77 | 2,093,375.15 |
| 9/30/2023 | 12 | 9/30/2023 | 2,093,375.15 | 254,015.90 | 1,908,617.07 | 30 | 27,529.32 | 670.71 | 466,974.01 |
| 10/31/2023 | 13 | 10/31/2023 | 466,974.01 | 23,614.37 | 215,739.95 | 31 | 6,345.73 | 417.94 | 281,612.10 |
| | | Total | | 1,047,993.82 | 22,869,183.37 | | 2,277,921.13 | 74,880.51 | |

**Notes**

Payment - Col G
June numbers changed as Sales activity of $2,173,000 was booked for June
Sep numbers changed by $491,285.12 as they were not finalized when last recon was sent
Oct'23 numbers are not finalized yet

Improvement Cost - Col F
Sep numbers changed by $205470.81 as they were not finalized when last recon was sent
Oct'23 numbers are not finalized yet

**Other items #**

| | | |
|---|---|---|
| 1 | Insurance | 300,358.57 |
| 2 | Putbacks | 1,103,372.80 |
| | 48051212 - 519 Kirchner Rd, Dalton MA | 261,729.84 |
| | Road, Staatsburg, NY | 180,000.00 |
| | Avenue NW, Seattle, WA | 661,642.96 |
| 3 | KeyDally loan | 2,000,000.00 |
| 4 | Activist Legal 5K*12 months | $ 60,000.00 |
| | Amount outstanding | $ 3,745,343.47 |

Believing that Weinstein's claim of an outstanding balance was inaccurate and that all amounts due had been paid—thereby triggering AHP's reversionary rights and entitlement to excess cash under the Amendment—Newbery continued to press for a formal reconciliation during the fall of 2023. He repeatedly proposed an independent audit, at AHP's expense, and sought Weinstein's cooperation in resolving the accounting issues.

For example:

- **October 18, 2023**: Newbery proposed that accounting firm Cherry Bekaert audit the transaction "at AHP's expense" to address anticipated scrutiny and close accounting gaps.

- **October 19, 2023**: Newbery invited Weinstein to participate in a call with Cherry Bekaert to discuss the proposed audit.

DEFENDANTS / COUNTER-PLAINTIFFS'
TRIAL BRIEF – Page 12

BAILEY DUQUETTE P.C.
800 FIFTH AVENUE, SUITE 101-800
SEATTLE, WASHINGTON 98104
T 206.225.2250 | F 888.233.5869

- **October 23, 2023**: Newbery advised that AHP had fulfilled its obligations under the MLSARO/Amendment, calculated at most a *de minimis* remaining balance based on Weinstein's September reconciliation, noted that Cymbidium appeared to have overpaid due to omitted asset sales.

- **October 30, 2023**: Newbery reiterated that AHP has "more than fully repaid/satisfied" the transaction and demand return of unsold assets and excess cash, explaining that the only remaining issue was determining the amount of excess cash Cymbidium owed AHP—something that could be resolved only with complete reports. He again offered to fund an independent review to make the accounting audit-ready.

On October 31, 2023, Weinstein responded that all further communications needed to occur between attorneys.

As AHP's accounting concerns escalated—and it became clear that Magerick, not Cymbidium, was exercising control over the loans, with Weinstein-affiliated entities asserting authority beyond that granted under the transaction documents—AHP expressly revoked all limited powers of attorney in October and, in November 2023, recorded formal notices of revocation. Any subsequent transfers or pledges occurred after revocation, and any use of the LPOAs to move loans into Magerick or to support third-party financing was outside the scope of any authority AHP ever granted.

DEFENDANTS / COUNTER-PLAINTIFFS'
TRIAL BRIEF – Page 13

BAILEY DUQUETTE P.C.
800 FIFTH AVENUE, SUITE 101-800
SEATTLE, WASHINGTON 98104
T 206.225.2250 | F 888.233.5869

On November 14, 2023, Newbery contacted Land Home's president, Bradley Waite (copying Weinstein), explaining that he had delayed reaching out in hopes Weinstein would provide an accurate accounting, but that Weinstein had "failed to provide an accounting" and was "unable or unwilling to concede" that AHP's obligations had been satisfied. Newbery again reiterated AHP's offer to pay for a third-party auditor.

Three days later, rather than provide an accounting or engage an independent auditor, Weinstein caused Cymbidium to file this lawsuit. Weinstein followed up that filing with threats to Newbery that he would "bury [him] in litigation and incinerate [him]."

### H. Post-Filing Accounting Revisions

Both before and after filing suit, Cymbidium's claimed outstanding balance changed repeatedly through revised spreadsheets. Internal spreadsheets circulated in October 2023, December 2023, March 2024, December 2024, and January 2026 reflected materially different balance, driven by newly added line-items / put-backs, expense allocation, and loan-level adjustments.

1. Late October 2023 (Pre-Suit Baseline)

As discussed above, the last balance stated before suit—reflected on Weinstein's own spreadsheet as of October 27, 2023—was $3,745,343.47, a figure that included $2,000,000 attributed to the so-called "KeyDally Loan." Excluding that item, the balance reflected immediately before suit was approximately $1,745,343.47.

DEFENDANTS / COUNTER-PLAINTIFFS'
TRIAL BRIEF – Page 14

BAILEY DUQUETTE P.C.
800 FIFTH AVENUE, SUITE 101-800
SEATTLE, WASHINGTON 98104
T 206.225.2250 | F 888.233.5869

After litigation commenced, the claimed balance did not remain stable. Instead, it escalated in stages, reflected in new spreadsheets produced or referenced during discovery.

2. December 2023 Internal Spreadsheet

In the initial months after filing, Cymbidium circulated revised spreadsheets that departed from the October 27, 2023 baseline by adding new line items and reallocating recoveries. These versions reflect changes tied to loan-level adjustments and expense allocations not reflected in the October 2023 spreadsheet.

On or about December 14, 2023, Sonal Gupta circulated an updated spreadsheet reflecting a balance due of **$3,497,311.14**, slightly lower than the October 27, 2023 version. See illustration below.

| | # | Date | Pending debt | Improvement cost | Payment | Number of Days | Interest | Mgmt fees | Outstanding repurchase price |
|---|---|---|---|---|---|---|---|---|---|
| 10/31/2022 | 1 | 10/7/2022 | 19,750,000.00 | - | - | - | - | | 19,750,000.00 |
| 11/30/2022 | 2 | 11/30/2022 | 19,750,000.00 | 30,600.00 | - | 54 | 467,506.85 | | 20,248,106.85 |
| 12/31/2022 | 3 | 12/31/2022 | 20,248,106.85 | 69,899.10 | - | 31 | 275,152.36 | | 20,593,158.31 |
| 1/31/2023 | 4 | 1/31/2023 | 20,593,158.31 | 618.08 | 3,200,000.00 | 31 | 279,841.27 | | 17,673,617.66 |
| 2/28/2023 | 5 | 2/28/2023 | 17,673,617.66 | 2,000.00 | 300,000.00 | 28 | 216,925.50 | | 17,592,543.16 |
| 3/31/2023 | 6 | 3/31/2023 | 17,592,543.16 | 14,439.62 | 125,000.00 | 31 | 239,065.79 | 12,744.59 | 17,733,793.16 |
| 4/30/2023 | 7 | 4/30/2023 | 17,733,793.16 | 42,287.02 | 1,594,029.05 | 30 | 233,211.53 | 23,610.99 | 16,438,873.65 |
| 5/31/2023 | 8 | 5/31/2023 | 16,438,873.65 | 95,103.12 | 560,812.59 | 31 | 223,388.53 | 24,072.96 | 16,220,625.67 |
| 6/30/2023 | 9 | 6/30/2023 | 16,220,625.67 | 107,938.86 | 12,599,089.57 | 30 | 213,312.34 | 5,671.13 | 3,948,458.43 |
| 7/31/2023 | 10 | 7/31/2023 | 3,948,458.43 | 145,327.62 | 1,062,319.96 | 31 | 53,655.76 | 4,585.42 | 3,089,707.27 |
| 8/30/2023 | 11 | 8/31/2023 | 3,089,707.27 | 262,150.13 | 1,303,575.18 | 31 | 41,986.16 | 3,106.77 | 2,093,375.15 |
| 9/30/2023 | 12 | 9/30/2023 | 2,093,375.15 | 236,715.90 | 1,908,617.07 | 30 | 27,529.32 | 645.83 | 449,649.13 |
| 10/31/2023 | 13 | 10/31/2023 | 449,649.13 | 181,485.97 | 615,739.95 | 31 | 6,110.30 | 31.96 | 21,537.41 |
| 11/30/2023 | 14 | 11/30/2023 | 21,537.41 | 12,004.47 | - | 30 | 283.23 | 48.65 | 33,873.76 |
| 12/14/2023 | 15 | 12/14/2023 | 33,873.76 | (540.86) | - | 15 | 222.73 | 24.13 | 33,579.77 |
| | | | Total | 1,200,029.03 | 23,269,183.37 | | 2,278,191.67 | 74,542.44 | |

| Notes | Other items # | |
|---|---|---|
| | 1 Insurance | 300,358.57 |
| Nov '23 and dec'23 numbers are not finalized yet | 2 Putbacks | 1,103,372.80 |
| | 48051212 - 519 Kirchner Rd, Dalton MA | 261,729.84 |
| | Road, Staatsburg, NY | 180,000.00 |
| | Avenue NW, Seattle, WA | 661,642.96 |
| | 3 KeyDally loan | 2,000,000.00 |
| | 4 Activist Legal 5K*12 months | $ 60,000.00 |
| | Amount outstanding | $ 3,497,311.14 |

3. March 2024 Internal Spreadsheet

Defendants / Counter-Plaintiffs'
Trial Brief – Page 15

BAILEY DUQUETTE P.C.
800 Fifth Avenue, Suite 101-800
Seattle, Washington 98104
T 206.225.2250 | F 888.233.5869

Then, on or about March 29, 2024, Gupta circulated internally another updated spreadsheet reflecting total payments of nearly $25 million and a claimed balance due of **$2,642,259.53**. That spreadsheet included approximately $3 million in items characterized as "put-backs," which later versions also describe as an "atrocity list) (see notes column below).

| | # | Date | Pending debt | Improvement cost | Payment | Number of Days | Interest | Mgmt fees | Outstanding repurchase price | Notes |
|---|---|---|---|---|---|---|---|---|---|---|
| 10/31/2022 | 1 | 10/7/2022 | 19,750,000.00 | - | - | - | - | | 19,750,000.00 | |
| 11/30/2022 | 2 | 11/30/2022 | 19,750,000.00 | 30,600.00 | - | 54 | 467,506.85 | | 20,248,106.85 | |
| 12/31/2022 | 3 | 12/31/2022 | 20,248,106.85 | 69,899.10 | - | 31 | 275,152.36 | | 20,593,158.31 | Expenses paid till 12/31 |
| 1/31/2023 | 4 | 1/31/2023 | 20,593,158.31 | 618.08 | 3,200,000.00 | 31 | 279,841.27 | | 17,673,617.66 | Purchase made by Magerick - $2.7M - Credit to outstanding loan AHP |
| 2/28/2023 | 5 | 2/28/2023 | 17,673,617.66 | 2,000.00 | 300,000.00 | 28 | 216,925.50 | | 17,592,543.16 | |
| 3/31/2023 | 6 | 3/31/2023 | 17,592,543.16 | 14,439.62 | 125,000.00 | 31 | 239,065.79 | 26,338.82 | 17,747,387.39 | |
| 4/30/2023 | 7 | 4/30/2023 | 17,747,387.39 | 42,287.02 | 1,594,029.05 | 30 | 233,390.30 | 23,630.80 | 16,452,666.46 | |
| 5/31/2023 | 8 | 5/31/2023 | 16,452,666.46 | 95,103.12 | 560,812.59 | 31 | 223,575.96 | 24,093.74 | 16,234,626.69 | |
| 6/30/2023 | 9 | 6/30/2023 | 16,234,626.69 | 107,938.86 | 12,599,089.57 | 30 | 213,496.46 | 5,691.54 | 3,962,663.98 | $10M purchase |
| 7/31/2023 | 10 | 7/31/2023 | 3,962,663.98 | 145,327.62 | 1,018,754.48 | 31 | 53,848.80 | 4,671.57 | 3,147,757.50 | |
| 8/30/2023 | 11 | 8/31/2023 | 3,147,757.50 | 262,150.13 | 1,283,575.18 | 31 | 42,775.01 | 3,223.95 | 2,172,331.40 | |
| 9/30/2023 | 12 | 9/30/2023 | 2,172,331.40 | 236,715.90 | $1,886,233.07 | 30 | 28,567.65 | 793.08 | 552,174.96 | |
| 10/31/2023 | 13 | 10/31/2023 | 552,174.96 | 181,485.97 | $482,466.26 | 31 | 7,503.53 | 384.50 | 259,082.70 | |
| 11/30/2023 | 14 | 11/30/2023 | 259,082.70 | 124,096.90 | 46,252.13 | 30 | 3,407.11 | 489.52 | 340,824.11 | |
| 12/31/2023 | 15 | 12/31/2023 | 340,824.11 | 179,908.25 | 76,080.44 | 31 | 4,631.47 | 667.77 | 449,951.16 | |
| 1/31/2024 | 16 | 1/31/2024 | 449,951.16 | 117,075.20 | 92,030.96 | 31 | 6,114.40 | 715.07 | 481,824.88 | |
| 2/29/2024 | 17 | 2/29/2024 | 481,824.88 | 87,845.31 | 1,229,416.53 | 29 | 6,125.12 | | (653,621.22) | |
| | | | Total | 1,697,491.08 | 24,493,740.26 | | 2,301,927.58 | 90,700.37 | | |
| | | | | | | | Other items # | | | |
| | | | | | | 1 Insurance | | | 300,358.57 | |
| | | | | | | 2 Putbacks | | | 2,995,522.58 | As per Gabrielle's Atrocity list |
| | | | | | | 3 Stolen Assets | | | | |
| | | | | | | Amount outstanding | | | $    2,642,259.93 | |
| | | | | | | Additional claims | | | | |
| | | | | | | 1 KeyDaily loan | | | 2,000,000.00 | |
| | | | | | | 2 Activist Legal 5K*12 months | | | 60,000.00 | |

4. <u>April 2024 Initial Disclosures</u>

Consistent with the internal reconciliation figures at the time, in its April 4, 2024 Initial Disclosures, Cymbidium stated that it "believes" AHP owed approximately **$2.6 million**, including interest, fees, expenses, taxes, and "put-backs". See language from the Initial Disclosures below.

DEFENDANTS / COUNTER-PLAINTIFFS'
TRIAL BRIEF – Page 16

BAILEY DUQUETTE P.C.
800 FIFTH AVENUE, SUITE 101-800
SEATTLE, WASHINGTON 98104
T 206.225.2250 | F 888.233.5869

### C. Computation of Damages.

The plaintiff believes the defendants jointly and severally owe approximately $2.6 million, which includes but is not limited to principal, interest, bank fees, management fees, advanced expenses, including but not limited to closing fees, legal fees, insurance fees, taxes, HOA fees, loss mitigation costs, and other categories of expenses, and "put-backs" or recourse loans.

### 5. December 2024 Spreadsheet Production

In December 2024, Cymbidium produced what it characterized as a more comprehensive damages spreadsheet. This version differed substantially from earlier iterations in both structure and totals. It reflects **$31,820,463.16** in total payments, and a claimed balance due of **$12,174,819.06**, after adding and/or reclassifying line items, including "atrocities" (the majority dated after April 7, 2023, per the spreadsheet's own date fields).

| | # | Date | Pending debt | Improvement cost | Payment | Atrocity List - adjustment | Number of Days | Interest | Mgmt fees | Outstanding repurchase price | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 10/31/2022 | 1 | 10/7/2022 | 25,000,000.00 | - | 5,250,000 | | - | - | | 19,750,000.00 | schedule A loan related |
| 10/31/2022 | 2 | 10/31/2022 | 19,750,000.00 | - | - | (1,416,047.94) | 24 | 207,780.82 | | 21,373,828.76 | schedule A loan atrocity list putbacks due |
| 11/30/2022 | 3 | 11/30/2022 | 21,373,828.76 | 30,600.00 | - | | 30 | 281,080.49 | | 21,685,509.25 | |
| 12/31/2022 | 4 | 12/31/2022 | 21,685,509.25 | 69,899.10 | | | 31 | 294,685.28 | | 22,050,093.63 | |
| 1/31/2023 | 5 | 1/31/2023 | 22,050,093.63 | 618.08 | 3,200,000.00 | (1,032,391.34) | 31 | 299,639.63 | | 20,182,742.67 | |
| 2/28/2023 | 6 | 2/28/2023 | 20,182,742.67 | 2,000.00 | 300,000.00 | | 28 | 247,722.43 | | 20,132,465.11 | |
| 3/31/2023 | 7 | 3/31/2023 | 20,132,465.11 | 14,439.62 | 125,000.00 | | 31 | 273,580.90 | 14,596.07 | 20,310,081.69 | |
| 4/30/2023 | 8 | 4/30/2023 | 20,310,081.69 | 42,287.02 | 1,594,029.05 | (13,225.18) | 30 | 267,091.49 | 27,384.37 | 19,066,040.69 | |
| 5/31/2023 | 9 | 5/31/2023 | 19,066,040.69 | 95,103.12 | 560,812.59 | | 31 | 259,089.21 | 28,030.78 | 18,887,451.22 | |
| 6/30/2023 | 10 | 6/30/2023 | 18,887,451.22 | 107,938.86 | 12,599,089.57 | (4,417,033.42) | 30 | 248,382.92 | 15,910.69 | 11,077,627.54 | includes $10M KeyDaily sale file / atrocity list putbacks |
| 7/31/2023 | 11 | 7/31/2023 | 11,077,627.54 | 145,327.62 | 1,062,319.96 | | 31 | 150,534.34 | 15,325.51 | 10,326,495.04 | |
| 8/31/2023 | 12 | 8/31/2023 | 10,326,495.04 | 262,150.13 | 1,303,575.18 | (197,650.73) | 31 | 140,327.17 | 14,302.75 | 9,637,350.63 | |
| 9/30/2023 | 13 | 9/30/2023 | 9,637,350.63 | 236,715.90 | 1,908,617.07 | (991,139.87) | 30 | 126,737.76 | 13,065.06 | 9,096,392.15 | |
| 10/31/2023 | 14 | 10/31/2023 | 9,096,392.15 | 181,485.97 | 506,212.15 | (400,000.00) | 31 | 123,611.25 | 13,815.58 | 9,309,092.80 | |
| 11/30/2023 | 15 | 11/30/2023 | 9,309,092.80 | 124,096.90 | 46,252.13 | | 30 | 122,420.95 | 13,677.84 | 9,523,036.36 | |
| 12/31/2023 | 16 | 12/31/2023 | 9,523,036.36 | 179,908.25 | 76,080.44 | | 31 | 129,408.93 | 14,500.76 | 9,770,773.87 | |
| 1/31/2024 | 17 | 1/31/2024 | 9,770,773.87 | 117,075.20 | 92,030.96 | | 31 | 132,775.45 | 14,756.88 | 9,943,350.44 | |
| 2/29/2024 | 18 | 2/29/2024 | 9,943,350.44 | 122,996.91 | 1,385,338.12 | (29,754.00) | 29 | 126,405.14 | 12,287.29 | 8,849,453.66 | |
| 3/31/2024 | 19 | 3/31/2024 | 8,849,453.66 | 89,251.26 | 803,702.93 | (457,000.00) | 31 | 120,255.59 | 12,949.04 | 8,725,206.62 | |
| 4/30/2024 | 20 | 4/30/2024 | 8,725,206.62 | 66,513.09 | 28,710.66 | (77.85) | 30 | 114,742.44 | 12,769.48 | 8,890,598.83 | |
| 5/31/2024 | 21 | 5/31/2024 | 8,890,598.83 | 235,018.50 | 136,950.69 | | 31 | 120,814.71 | 13,539.46 | 9,123,040.61 | |
| 6/30/2024 | 22 | 6/30/2024 | 9,123,040.61 | 90,281.95 | 163,964.99 | (65,000.00) | 30 | 119,974.23 | 13,282.26 | 9,247,614.06 | |
| 7/31/2024 | 23 | 7/31/2024 | 9,247,614.06 | 87,292.94 | 219,334.25 | (186,282.15) | 31 | 125,666.21 | 14,012.14 | 9,441,533.25 | |
| 8/31/2024 | 24 | 8/31/2024 | 9,441,533.25 | 150,146.60 | 238,075.32 | | 31 | 128,301.38 | 14,092.97 | 9,495,998.88 | |
| 9/30/2024 | 25 | 9/30/2024 | 9,495,998.88 | 194,552.25 | 76,769.16 | | 30 | 124,878.89 | 14,007.66 | 9,752,668.52 | |
| 10/31/2024 | 26 | 10/31/2024 | 9,752,668.52 | 89,393.24 | 121,504.90 | (41,888.82) | 31 | 132,529.41 | 14,706.92 | 9,909,682.01 | |
| 11/30/2024 | 27 | 11/30/2024 | 9,909,682.01 | 2,332.24 | 22,113.04 | | 30 | 130,319.11 | 14,412.65 | 10,034,632.96 | |
| 12/31/2024 | 28 | 12/5/2024 | 10,034,632.96 | 2,000.00 | - | | 5 | 21,993.72 | 2,411.31 | 10,061,037.99 | |
| | | Total | | 2,739,424.55 | 31,820,463.16 | (9,247,491.30) | | 4,570,747.83 | 323,837.48 | | |

**Other items #**

| | | |
|---|---|---|
| Insurance - Nov'24 | (not included above yet) | 53,781.07 |
| AHP $2M deposit due on Keydally SCL purchase | 3 | 2,000,000.00 |
| Activist Legal 5K*12 months | 4 | $ 60,000.00  Added as per Bill |
| Amount outstanding | | $ 12,174,819.06 |

BAILEY DUQUETTE P.C.
800 FIFTH AVENUE, SUITE 101-800
SEATTLE, WASHINGTON 98104
T 206.225.2250 | F 888.233.5869

### 6. December 2025 Depositions and Trial Proffers

During deposition in December 2025, Cymbidium's witnesses confirmed that the figures reflected in the prior spreadsheets, including the December 2024 spreadsheet, remained in flux and were dependent on the most current internal Excel versions.

On December 8, 2025, Weinstein testified that damages were still being reconciled and that the spreadsheets changed as additional issues were identified. When asked who was responsible for preparing the spreadsheets (including the December 2024 version), Weinstein testified that Michael Basile prepared them through at least early 2025, and that Gupta took over after Basile became seriously ill.

> Q: And can you talk to me about who was in charge at – on your side to prepare those spreadsheets?
>
> A: Michael Basile.
>
> Q: Anybody else?
>
> A: Well, only after Mike Basile became very sick, Sonal Gupta took over.
>
> Q: When did Mike Basile become very sick?
>
> A: February or March of 2025.

Weinstein Dep. Trans. 115:6–13.

When asked to quantify the amount allegedly owed, Weinstein could offer only a broad estimate:

> Q: How much does AHP owe currently, based on your best understanding?

BAILEY DUQUETTE P.C.
800 FIFTH AVENUE, SUITE 101-800
SEATTLE, WASHINGTON 98104
T 206.225.2250 | F 888.233.5869

A: I don't know anything. You can check with [Sonal] Gupta. But it's probably between 15 and 20 million.

Weinstein Dep. Trans., 133:5–8.[4]

Two days later, Sonal Gupta testified that the figures were provisional, subject to adjustment, and dependent on whichever internal Excel version happened to be current. Notably, she testified that Cymbidium had only begun updating the December 2024 spreadsheet in the prior week—despite the fact that discovery had closed months earlier.

"[L]ast week is when we started updating it …"

Gupta Dep. Trans. 26:9–18.

7.   January 6, 2026 Spreadsheet for Trial

On January 6, 2026—two weeks before trial and one day after AHP shared a draft of a motion in limine to exclude evidence of undisclosed damages—Cymbidium provided, through counsel, another revised spreadsheet reflecting a claimed balance due of **$24,648,553.97**.

---

[4] The $15 million to $20 million estimated range, as of mid-December 2025, reflected a 477% to 679% increase over the all-inclusive damages figure Cymbidium disclosed in its April 2024 Initial Disclosures, illustrating the moving-target nature of Cymbidium's damages theory.

DEFENDANTS / COUNTER-PLAINTIFFS'
TRIAL BRIEF – Page 19

BAILEY DUQUETTE P.C.
800 FIFTH AVENUE, SUITE 101-800
SEATTLE, WASHINGTON 98104
T 206.225.2250 | F 888.233.5869

| | # | Date | Pending debt | Improvement cost | Payment | Atrocity List - adjustment | Number of Days | Interest | Mgmt fees | Outstanding repurchase price |
|---|---|---|---|---|---|---|---|---|---|---|
| 10/31/2022 | 1 | 10/7/2022 | 25,000,000.00 | - | 5,250,000 | - | | - | | 19,750,000.00 |
| 10/31/2022 | 2 | 10/31/2022 | 19,750,000.00 | - | - | (2,392,486.21) | 24 | 207,780.82 | | 22,350,267.04 |
| 11/30/2022 | 3 | 11/30/2022 | 22,350,267.04 | 30,600.00 | - | | 30 | 293,921.32 | | 22,674,788.36 |
| 12/31/2022 | 4 | 12/31/2022 | 22,674,788.36 | 69,899.10 | - | | 31 | 308,128.63 | | 23,052,816.09 |
| 1/31/2023 | 5 | 1/31/2023 | 23,052,816.09 | 618.08 | 3,200,000.00 | (1,490,039.89) | 31 | 313,265.67 | | 21,656,739.72 |
| 2/28/2023 | 6 | 2/28/2023 | 21,656,739.72 | 2,000.00 | 300,000.00 | | 28 | 265,814.23 | | 21,624,553.95 |
| 3/31/2023 | 7 | 3/31/2023 | 21,624,553.95 | 14,439.62 | 125,000.00 | | 31 | 293,856.95 | 15,683.73 | 21,823,534.25 |
| 4/30/2023 | 8 | 4/30/2023 | 21,823,534.25 | 42,287.02 | 1,594,029.05 | | 30 | 286,994.42 | 29,570.86 | 20,588,357.50 |
| 5/31/2023 | 9 | 5/31/2023 | 20,588,357.50 | 95,103.12 | 560,812.59 | | 31 | 279,776.04 | 30,324.15 | 20,432,748.22 |
| 6/30/2023 | 10 | 6/30/2023 | 20,432,748.22 | 107,938.86 | 12,599,089.57 | (9,439,170.24) | 30 | 268,704.63 | 25,386.23 | 17,674,858.61 |
| 7/31/2023 | 11 | 7/31/2023 | 17,674,858.61 | 145,327.62 | 1,018,754.48 | | 31 | 240,184.38 | 25,328.98 | 17,066,945.11 |
| 8/31/2023 | 12 | 8/31/2023 | 17,066,945.11 | 262,150.13 | 1,200,577.18 | (762,126.00) | 31 | 231,923.42 | 25,449.30 | 17,148,016.77 |
| 9/30/2023 | 13 | 9/30/2023 | 17,148,016.77 | 236,715.90 | 1,886,236.07 | (499,999.98) | 30 | 225,508.17 | 23,335.90 | 16,247,340.65 |
| 10/31/2023 | 14 | 10/31/2023 | 16,247,340.65 | 181,485.97 | 421,469.23 | | 31 | 220,785.78 | 24,119.91 | 16,252,263.08 |
| 11/30/2023 | 15 | 11/30/2023 | 16,252,263.08 | 124,096.90 | 46,252.13 | | 30 | 213,728.39 | 23,795.93 | 16,567,632.17 |
| 12/31/2023 | 16 | 12/31/2023 | 16,567,632.17 | 179,908.25 | 76,080.44 | | 31 | 225,138.23 | 25,113.44 | 16,921,711.65 |
| 1/31/2024 | 17 | 1/31/2024 | 16,921,711.65 | 117,075.20 | 92,030.96 | | 31 | 229,949.83 | 25,529.76 | 17,202,235.48 |
| 2/29/2024 | 18 | 2/29/2024 | 17,202,235.48 | 122,996.91 | 178,158.70 | | 29 | 218,680.47 | 24,145.53 | 17,389,899.70 |
| 3/31/2024 | 19 | 3/31/2024 | 17,389,899.70 | (113,374.07) | 396,702.93 | | 31 | 236,312.06 | 25,439.73 | 17,141,574.50 |
| 4/30/2024 | 20 | 4/30/2024 | 17,141,574.50 | 66,513.09 | 28,710.66 | | 30 | 225,423.45 | 25,034.30 | 17,429,834.68 |
| 5/31/2024 | 21 | 5/31/2024 | 17,429,834.68 | 235,018.30 | 136,930.69 | | 31 | 236,854.74 | 26,403.81 | 17,791,180.84 |
| 6/30/2024 | 22 | 6/30/2024 | 17,791,180.84 | 90,281.95 | 29,892.27 | | 30 | 233,966.21 | 26,013.44 | 18,111,550.18 |
| 7/31/2024 | 23 | 7/31/2024 | 18,111,550.18 | 87,292.94 | 33,052.10 | | 31 | 246,118.60 | 27,365.65 | 18,439,275.26 |
| 8/31/2024 | 24 | 8/31/2024 | 18,439,275.26 | 352,771.93 | 23,756.39 | | 31 | 250,572.07 | 28,267.76 | 19,047,130.63 |
| 9/30/2024 | 25 | 9/30/2024 | 19,047,130.63 | 194,552.25 | 76,182.98 | | 30 | 250,482.81 | 27,927.10 | 19,443,909.81 |
| 10/31/2024 | 26 | 10/31/2024 | 19,443,909.81 | 89,393.24 | 79,616.08 | | 31 | 264,224.09 | 29,306.76 | 19,747,217.82 |
| 11/30/2024 | 27 | 11/30/2024 | 19,747,217.82 | 75,490.79 | 138,209.03 | (79,234.00) | 30 | 259,689.44 | 28,800.81 | 20,052,223.84 |
| 12/31/2024 | 28 | 12/31/2024 | 20,052,223.84 | 325,758.23 | 16,605.61 | | 31 | 272,490.49 | 30,668.14 | 20,664,535.09 |
| 1/31/2025 | 29 | 1/31/2025 | 20,664,535.09 | 80,721.16 | 23,570.94 | | 31 | 280,811.22 | 31,216.04 | 21,033,712.57 |
| 2/28/2025 | 30 | 2/28/2025 | 21,033,712.57 | 83,455.09 | 36,646.27 | | 28 | 258,167.21 | 28,646.46 | 21,367,335.06 |
| 3/31/2025 | 31 | 3/31/2025 | 21,367,335.06 | 50,126.10 | 17,012.14 | | 31 | 290,361.59 | 32,239.08 | 21,723,049.70 |
| 4/30/2025 | 32 | 4/30/2025 | 21,723,049.70 | 159,360.27 | 7,096.81 | | 30 | 285,672.98 | 31,875.39 | 22,192,861.53 |
| 5/31/2025 | 33 | 5/31/2025 | 22,192,861.53 | 49,881.35 | 10,494.14 | | 31 | 301,579.71 | 33,492.06 | 22,567,320.51 |
| 6/30/2025 | 34 | 6/30/2025 | 22,567,320.51 | 81,110.67 | 9,765.98 | | 30 | 296,775.72 | 32,989.33 | 22,968,430.25 |
| 7/31/2025 | 35 | 7/31/2025 | 22,968,430.25 | 93,508.01 | 65,836.31 | | 31 | 312,118.94 | 34,643.04 | 23,342,863.94 |
| 8/31/2025 | 36 | 8/30/2025 | 23,342,863.94 | 48,566.07 | 38,732.91 | | 30 | 306,974.65 | 34,031.03 | 23,693,702.78 |
| 9/30/2025 | 37 | 9/30/2025 | 23,693,702.78 | 86,148.22 | 12,055.12 | | 31 | 321,974.70 | 35,804.66 | 24,125,575.24 |
| 10/31/2025 | 38 | 10/31/2025 | 24,125,575.24 | 106,827.79 | 8,184.26 | | 31 | 327,843.43 | 36,491.76 | 24,588,553.97 |
| | | Total | | 3,976,046.06 | 29,737,544.02 | (14,663,056.32) | | 9,782,555.52 | 904,440.08 | |

Other items #

Activist Legal 5K*12 months — $ 60,000.00

Amount outstanding — $ 24,648,553.97

*See* Plaintiff's Exhibit 185.

The January 2026 spreadsheet reflects totals and line items that differ materially from the December 2024 version, including changes to reported payment and to amounts attributed to "atrocities" and other adjustments. Incredibly, it asserts a purported balance ~$5 million more than the original $19.75 million Category B loan balance, notwithstanding that Cymbidium had already received nearly $30 million in payments.

## I. The Spreadsheets Include "Improvement Costs" Attributed to Weinstein-Related Entities

Each of the spreadsheets circulated by Cymbidium includes line items labeled "Improvement Costs," which are deducted from incoming payments in calculating

DEFENDANTS / COUNTER-PLAINTIFFS'
TRIAL BRIEF – Page 20

BAILEY DUQUETTE P.C.
800 FIFTH AVENUE, SUITE 101-800
SEATTLE, WASHINGTON 98104
T 206.225.2250 | F 888.233.5869

the claimed outstanding balance. As reflected in the January 6, 2026 spreadsheet, these "Improvement Costs" total nearly $4 million.

The spreadsheets further reflect that a substantial portion of these costs were purportedly incurred by entities affiliated with William Weinstein, rather than by unrelated third parties. The payees listed include Weinstein-controlled or related entities involved in servicing, management, legal work, and asset disposition.

The Amendment to the MLSARO permits deductions only for "**unrelated third-party costs and fees** related to managing the Mortgage Loans." The spreadsheets do not distinguish between costs incurred by unrelated third parties and those charged by affiliated entities, nor do they reflect any adjustment to exclude affiliate-incurred costs from the claimed balance.

### J.   The "Atrocities" or Put-Back Amounts Increased Substantially After the Contractual Deadline

The spreadsheets also reflect a dramatic expansion of amounts attributed to loan "put-backs," later relabeled as "atrocities," over the course of this litigation.

Under the MLSARO, Cymbidium's discretionary right to put back loans expired six months after the reconveyance date—April 7, 2023. Despite that limitation, the spreadsheets show that put-back or "atrocity" amounts were not fixed at or near the deadline, but instead grew materially after it passed and continued to increase throughout the litigation.

As of October 27, 2023, Weinstein's spreadsheet included approximately $1.1 million in largely expired put-backs as part of the stated outstanding balance, of

BAILEY DUQUETTE P.C.
800 FIFTH AVENUE, SUITE 101-800
SEATTLE, WASHINGTON 98104
T 206.225.2250 | F 888.233.5869

which $661,642.92 pertained to a putback from a separate transaction between Magerick and AHP unrelated to the instant transaction with Cymbidium. The remaining two were putbacks after the contractual deadline.

Post-filing of lawsuit, the amounts ballooned. In an internal spreadsheet circulated in March 2024, Cymbidium reflected total "atrocities" of $2,995,522.58, nearly a threefold increase from the October 2023 figure. This increase occurred despite the absence of any contractual extension of the put-back period.

By December 2024, Cymbidium produced a spreadsheet reflecting total "atrocities" of $9,247,491.30. The entries underlying that figure show that the vast majority of the alleged atrocities were dated after April 7, 2023, well beyond the expiration of the put-back right.

The escalation continued. On January 6, 2026, Cymbidium's alleged total "atrocity" number is $14,663,056.03—an increase of more than $5.4 million from the December 2024 figure, and more than $11 million above the March 2024 amount. As with prior versions, the spreadsheet reflects that most of these amounts correspond to loans or adjustments arising after the April 7, 2023 deadline.

As the record demonstrates, Cymbidium's claimed balance did not evolve through application of fixed contractual rules, but expanded through post hoc adjustments, expired remedies, related-party charges, and spreadsheets that were never stabilized or disclosed in time for meaningful testing.

BAILEY DUQUETTE P.C.
800 FIFTH AVENUE, SUITE 101-800
SEATTLE, WASHINGTON 98104
T 206.225.2250 | F 888.233.5869

### III.   PROCEDURAL BACKGROUND

#### A.  The Instant Case

On November 17, 2023, Cymbidium commenced this action in King County Superior Court, asserting claims for breach of contract and conversion arising out of the MLSARO and Amendment. AHP removed the action to this Court and filed an answer denying Cymbidium's allegations, along with counterclaims seeking declaratory relief, breach of contract damages, and recovery of alleged overpayments and excess loan recoveries. Dkt. 5 at 9–13.

On January 26, 2024, AHP filed a third-party complaint naming several Weinstein-related entities, including Oak Harbor Capital, Atlantica, Land Home, WWR Management, South Watuppa, LP, Magerick, LLC, and Weinstein & Riley, P.S. Dkt. 12. The third-party defendants moved to dismiss, arguing that they were separate and independent entities that had no contractual relationship with AHP and that AHP's claims did not derive from Cymbidium's claims. Dkt. 41 at 5–9. On June 28, 2024, Judge Jamal Whitehead granted the motion to dismiss, concluding that AHP's third-party claims did not depend on or derive from Cymbidium's claims and that permitting them would complicate discovery and trial and risk jury confusion. The Court stated that it was more appropriate for AHP to pursue those claims in separate actions. Dkt. 59 at 5:11–16, 7:1–18.

On January 8, 2025, AHP filed amended affirmative defenses and counterclaims. Dkt. 113. Among other defenses, AHP asserted fraudulent

BAILEY DUQUETTE P.C.
800 FIFTH AVENUE, SUITE 101-800
SEATTLE, WASHINGTON 98104
T 206.225.2250 | F 888.233.5869

inducement based in large part on allegations that, without authority or notice, Cymbidium transferred the Mortgage Loans that were the subject of the MLSARO to Magerick, which in turn pledged those loans as collateral to WAB prior to the consummation of the MLSARO. AHP further alleged that, at the time Cymbidium entered into the MLSARO, Cymbidium lacked the ability to perform its contractual obligations related to the Mortgage Loans—and, conversely, had rendered it impossible for AHP to perform its contractual obligations to "repurchase" those loans—because those loans had already been transferred and pledged by a third party. *Id*. at 8.

On January 16, 2025, AHP moved to consolidate this case with related actions it had filed against Oak Harbor and other Weinstein-related entities, including Magerick. *See AHP Capital Management LLC v. Oak Harbor Capital LLC et al.*, No. 25-0007-KKE (the "0007 action"). Cymbidium opposed consolidation (Dkt. 125), and the Court denied the motion. Dkt. 156. As a result of these rulings, Magerick and other Weinstein-related entities were not joined in this action, notwithstanding multiple attempts to bring those entities into the case.

**B. Related Actions**

In addition to this action and the 0007 action, the parties are involved in extensive related litigation nationwide. Within approximately 120 days after this case was filed, Cymbidium and its affiliates initiated thirteen separate lawsuits against AHP in multiple jurisdictions and recorded more than 150 notices of *lis*

DEFENDANTS / COUNTER-PLAINTIFFS'
TRIAL BRIEF – Page 24

BAILEY DUQUETTE P.C.
800 FIFTH AVENUE, SUITE 101-800
SEATTLE, WASHINGTON 98104
T 206.225.2250 | F 888.233.5869

*pendens* referencing this action. Many of those notices affected properties and assets held by AHP. As of today, approximately twenty lawsuits between the parties or their affiliates remain pending across the country, a number of which have been stayed pending resolution of this trial.

Only one of those actions has proceeded to trial. On December 29, 2023, Oak Harbor filed an action against AHP in King County Superior Court alleging breach of contract, conversion, and turnover, and seeking damages exceeding $11 million. *See Oak Harbor Capital Special Opportunities Master Fund  et al. v. AHP Servicing et al.*, No. 23-2-25722-7-SEA. Following trial, the court entered judgment in AHP's favor. In its Findings of Fact and Conclusions of Law dated October 28, 2025, the court found that the plaintiffs had collected approximately $773,000 on the loans at issue without sharing those proceeds with AHP as required under the contractual waterfall, failed to disclose those collections until trial, and that AHP had no obligation to pay interest unless and until prior waterfall tiers were satisfied. The court also found that AHP properly exercised its put rights within the contractual time window, and the court rejected Weinstein's contrary interpretations as not credible, noting  that "the Court will not read ambiguity into a contract where there is none." In a separate December 5, 2025 order, the court awarded AHP $800,868.18 in attorneys' fees.

DEFENDANTS / COUNTER-PLAINTIFFS'
TRIAL BRIEF – Page 25

BAILEY DUQUETTE P.C.
800 FIFTH AVENUE, SUITE 101-800
SEATTLE, WASHINGTON 98104
T 206.225.2250 | F 888.233.5869

## IV.   LEGAL ISSUES

## THRESHOLD QUESTIONS

### A. Cymbidium Is Not the Real Party in Interest

A threshold question has emerged: Is Cymbidium the proper party to pursue claims premised on ownership, control, and impairment of the Mortgage Loans and their proceeds? The answer, based on the undisputed factual record, is no.

At the time that this lawsuit was filed—and as confirmed through discovery--Magerick—not Cymbidium—held the economical and beneficial interests in the Mortgage Loans at issue. Magerick controlled the loan proceeds, bore the economic risk associated with any WAB financing, and maintained the accounting reflecting revenues, expenses, and the figures Cymbidium now labels as "damages." Cymbidium's role, as its own witnesses testified, was at most nominal or intermediary. Because Cymbidium transferred the very interests it now seeks to recover upon, it is not the real party in interest and lacks standing to prosecute its claims, both breach of contract and conversion.

The defect is not technical or academic. It goes to who may invoke the Court's power, whose damages are actually at issue, and whether judgment entered would have proper preclusive effect. Resolving the issue now will prevent the Court from adjudicating claims and damages belonging, if at all, to a non-party.

DEFENDANTS / COUNTER-PLAINTIFFS'
TRIAL BRIEF – Page 26

BAILEY DUQUETTE P.C.
800 FIFTH AVENUE, SUITE 101-800
SEATTLE, WASHINGTON 98104
T 206.225.2250 | F 888.233.5869

1. <u>Having Transferred All Beneficial and Economic Interests to Magerick, Cymbidium Lacks Standing to Pursue Its Claims</u>

Washington Civil Rule 17(a) requires that "[e]very action shall be prosecuted in the name of the real party in interest." The real party in interest is the party that possesses the substantive right being enforced, not merely the entity named in a contract. *Eastlake Constr. Co. v. Hess*, 33 Wn. App. 378, 381 (1982). The purpose of the rule is practical: to protect defendants from multiple liability and to ensure that any judgment has proper res judicata effect.

Federal Rule of Civil Procedure 17(a) imposes the same requirement, and in diversity cases federal courts look to Washington substantive law to determine who qualifies as the real party in interest. *American Triticale, Inc. v. Nytco Servs., Inc.*, 664 F.2d 1136, 1140 (9th Cir. 1981).

Although CR 17(a) permits a party "in whose name a contract has been made for the benefit of another" to sue in some circumstances, that exception applies only where the named party retains enforceable rights or obligations under the contract. It does not apply where the party has assigned or transferred all beneficial and economic interests in the subject matter of the litigation. Courts are clear that once a party assigns "all right, title and interest" in a contract or its proceeds, the assignor is no longer the real party in interest and may not maintain an action to enforce those rights. *Northwest Oil & Refining Co. v. Honolulu Oil Corp.*, 195 F. Supp. 281, 285 (D. Haw. 1961); *Silver State Broad., LLC v. Beasley FM Acquisition*, 148 F. Supp. 3d 1132, 1140–41 (D. Nev. 2015).

DEFENDANTS / COUNTER-PLAINTIFFS'
TRIAL BRIEF – Page 27

BAILEY DUQUETTE P.C.
800 FIFTH AVENUE, SUITE 101-800
SEATTLE, WASHINGTON 98104
T 206.225.2250 | F 888.233.5869

By contrast, cases permitting a contracting party to sue after transferring underlying property—such as *Kim v. Moffett*, 156 Wn. App. 689 (2010)—turn on the fact that the plaintiff remained contractually bound and retained enforceable rights or obligations. The distinction is critical: retention of obligations or partial interests preserves standing; transfer of all beneficial and economic interests does not.

Here, the record establishes that Cymbidium transferred all beneficial and economic interests in the Category B loans and their proceeds to Magerick well before this action was filed:

- Magerick financed the acquisition of the loans and bore the economic risk;

- The debt associated with the loans ran to Magerick, not Cymbidium;

- All loan revenues, expenses, recoveries, adjustments, and alleged losses were booked to Magerick's general ledger, not Cymbidium's;

- Cymbidium maintained no independent accounting and did not even maintain a bank account for the AHP loans;

- Cymbidium entered into a Participation Agreement transferring 100% of the beneficial and economic interests to Magerick, including the right to receive all proceeds and to direct enforcement activity.

Whatever nominal title Cymbidium may have retained for administrative convenience, it did not retain possession, control, economic benefit, or risk. Under Washington law, bare or nominal title divorced from economic interest is insufficient to confer standing to sue for contract damages or conversion of the loans

DEFENDANTS / COUNTER-PLAINTIFFS'
TRIAL BRIEF – Page 28

BAILEY DUQUETTE P.C.
800 FIFTH AVENUE, SUITE 101-800
SEATTLE, WASHINGTON 98104
T 206.225.2250 | F 888.233.5869

themselves. Because Cymbidium transferred the interests it now seeks to recover, Magerick—not Cymbidium—is the real party in interest for any claim seeking damages tied to loan ownership, proceeds, or impairment.

### 2.   Cymbidium Cannot Cure This Defect by Late Substitution

Cymbidium is expected to argue that it should be permitted to substitute Magerick at this late stage. The record forecloses that argument.

#### a.   Cymbidium Concealed Magerick's Role at the Outset of the Case

At the outset of this litigation, Weinstein affirmatively represented that Cymbidium—and only Cymbidium—owned the loans, collected the proceeds, and bore the economic consequences of the transaction. In a February 22, 2024 declaration submitted in opposition to AHP's request for injunctive relief, Weinstein stated that amounts were "owed" to Cymbidium, that Cymbidium was collecting on the loans, and that Cymbidium "need[ed] to repay" its "purchase financing"—without any mention of Magerick or any transfer of economic interests. Dkt. 34 at 2 (¶¶ 4-5, 9).

Those representations were incorrect. At the time the declaration was submitted, Cymbidium and Weinstein knew that Magerick financed the acquisition, held the economic interests, controlled the accounting, and booked all revenues and expenses associated with the Mortgage Loans. Cymbidium did not maintain a bank account for the loans and functioned, at most, as a nominal intermediary. The omission of any reference to Magerick reflected a deliberate litigation position taken

DEFENDANTS / COUNTER-PLAINTIFFS'
TRIAL BRIEF – Page 29

BAILEY DUQUETTE P.C.
800 FIFTH AVENUE, SUITE 101-800
SEATTLE, WASHINGTON 98104
T 206.225.2250 | F 888.233.5869

at a critical procedural moment—while seeking equitable relief and resisting scrutiny of standing.

>    b. *Cymbidium Then Took the Opposite Position to Keep Magerick Out of the Case*

When AHP sought to bring Magerick and other Weinstein-related entities into the case as third-party defendants, Cymbidium and those entities—represented by the same counsel—reversed course.

In a motion filed March 15, 2024, the third-party defendants expressly acknowledged that "individual mortgage loans purchased by Cymbidium were transferred to Magerick," yet argued that Magerick's absence from the MLSARO insulated it from participation because it was not a signatory to any contract with AHP. Dkt. 41 at 8. Separately, Cymbidium successfully opposed efforts to consolidate this case with the 0007 action, also before this Court, that involves Magerick and overlapping allegations.

In other words, Cymbidium and its affiliates simultaneously:

- Disclaimed Magerick's relevance when AHP sought to bring it into the case *twice*; and

- Now suggest that Cymbidium may pursue claims arising from economic interests it had already transferred to Magerick.

Rule 17 does not permit such position-shifting.

DEFENDANTS / COUNTER-PLAINTIFFS'
TRIAL BRIEF – Page 30

BAILEY DUQUETTE P.C.
800 FIFTH AVENUE, SUITE 101-800
SEATTLE, WASHINGTON 98104
T 206.225.2250 | F 888.233.5869

### c. Cymbidium Cannot Claim Surprise or Waiver

Cymbidium cannot avoid this defect by claiming surprise or waiver. Real-party-in-interest is not an affirmative defense under Fed. R. Civ. P. 8(c), and it is not waived simply because it was not pleaded in the Answer—particularly where, as here, the relevant facts were uniquely within the knowledge and were affirmatively misrepresented at the outset of the case.

Here, AHP affirmatively sought to bring Magerick into the case as a third-party defendant, only to have Cymbidium and its affiliates successfully oppose joinder while simultaneously acknowledging the transfer of loans to Magerick. Cymbidium cannot now claim surprise based on a defect it knew existed, actively concealed, and strategically exploited to keep the real economic actor outside the litigation. *See BCC Merchant Solutions, Inc. v. Jet Pay, LLC*, 129 F. Supp. 3d 440, 451-52 (N.D. Tex. 2015) (noting factors to consider in deciding waiver include whether the timing of defendant's objection was such that the plaintiff had a "meaningful opportunity to prove its status or join the real party in interest" (internal citation omitted).

### d. Late Substitution Would Be Inequitable and Prejudicial

Although CR 17(a) and Rule 17(a)(3) allow substitution of the real party in interest in appropriate circumstances, substitution is not automatic. It must be practical, convenient, and non-prejudicial. *Miller v. Campbell*, 164 Wn.2d 529, 538 (2008); *Jones v. Las Vegas Metro. Police Dep't*, 873 F.3d 1123, 1129 (9th Cir. 2017).

DEFENDANTS / COUNTER-PLAINTIFFS'
TRIAL BRIEF – Page 31

BAILEY DUQUETTE P.C.
800 FIFTH AVENUE, SUITE 101-800
SEATTLE, WASHINGTON 98104
T 206.225.2250 | F 888.233.5869

Substitution on the eve of trial would be profoundly prejudicial. Discovery closed without Magerick as a party. AHP was denied the opportunity to pursue discovery, counterclaims, setoffs, and relief against the entity Cymbidium now concedes holds the economic interests. Allowing substitution now would alter the case after discovery has closed and trial preparation is complete—and would reward a strategy designed to keep the real economic actor outside the courtroom.

In sum, Cymbidium's claims, premised on economic interests it does not own, should not proceed.

### 3. **The MLSARO and Amendment Were a Financing Arrangement, Not a True Sale**

A second threshold question significantly shapes the legal analysis and the evidentiary record at trial: whether the MLSARO and Amendment effected a true sale of the Category B Loans, or whether—despite sale-style labels—the transaction functioned as a secured financing arrangement.

The answer matters. If the transaction was a financing arrangement, Cymbidium never acquired ownership of the Category B Loans in the first place. In that event, large portions of Cymbidium's damages case—including arguments premised on loan "put-backs," "atrocities," and ownership-based impairment—are legally irrelevant, because they presuppose ownership rights Cymbidium never held. This threshold characterization determines not only liability, but what categories of evidence and damages theories are relevant at trial.

Courts in Washington and the Ninth Circuit do not resolve this question by

DEFENDANTS / COUNTER-PLAINTIFFS'
TRIAL BRIEF – Page 32

BAILEY DUQUETTE P.C.
800 FIFTH AVENUE, SUITE 101-800
SEATTLE, WASHINGTON 98104
T 206.225.2250 | F 888.233.5869

labels. They apply a substance-over-form analysis, focusing on economic reality, allocation of risk, and reversionary rights. Under that framework, the undisputed structure and operation of the MLSARO and Amendment point decisively toward financing, not a true sale.

>    a. *Governing Law: Courts Look to Economic Substance,*
>       *Not Contractual Labels*

Both Washington courts and the Ninth Circuit consistently hold that whether a transaction is a true sale or a financing arrangement turns on economic substance, not how the parties chose to label it.

The Ninth Circuit applies a threshold true-sale test focused primarily on transfer of risk, followed—only if a true sale is found—by a commercial-reasonableness inquiry. *S & H Packing & Sales Co., Inc. v. Tanimura Distrib., Inc.*, 883 F.3d 797, 813 (9th Cir. 2018).

Thus, the core question is who bears the economic risk if the assets fail to perform. Where the purported buyer bears that risk directly, the transaction may constitute a sale. Where the risk remains with the transferor and the "buyer's" risk is derivative or secondary, the transaction is financing. *Id.* at 805-06 (internal citations omitted). Courts are instructed to "look to the substance of the transaction," with risk allocation as the "primary factor," and to disregard "artificial indicators or labels" that contradict economic reality. *Id.*

Washington courts apply the same substance-over-form approach. Courts look to "economic reality and to substance, not the form or legal terminology of a

DEFENDANTS / COUNTER-PLAINTIFFS'
TRIAL BRIEF – Page 33

BAILEY DUQUETTE P.C.
800 FIFTH AVENUE, SUITE 101-800
SEATTLE, WASHINGTON 98104
T 206.225.2250 | F 888.233.5869

transaction." *Sauve v. K.C., Inc.*, 19 Wn. App. 659, 665, 577 P.2d 599 (1978).

In determining whether a transaction is a genuine sale or a disguised loan, courts consider factors including (i) time-based compensation, (ii) collateralization and recourse, (iii) retention of control and collection duties, (iv) reversionary rights, (v) the relationship between the amount advanced and the recipient's business, and (vi) the contemplated use of funds. *Id.* at 667; *see also Atlas Credit of Cal., Inc. v. Hill*, 15 Wn. App. 146, 150–51 (1976); *cf. In re Zetta Jet USA, Inc.*, LA CV21-07572 JAK, 2024 WL 3198826, at *44 (C.D. Cal. Mar. 26, 2024).

Across both jurisdictions, contractual language designating a transaction as a "sale" carries limited weight where the substantive terms allocate risk, control, and economic benefit in a manner characteristic of financing. *See In re Commercial Money Ctr., Inc.*, 350 B.R. 465, 476–78 (B.A.P. 9th Cir. 2006).

> b.  *The MLSARO and Amendment Allocate Risk and Control Consistent with Financing*

Measured against these principles, AHP will establish at trial that the MLSARO and Amendment exhibit the hallmarks of a secured financing arrangement—not a true sale—particularly as to the Category B Loans.

> **(1) AHP Retained Economic Risk; Cymbidium's Risk Was Derivative**

Under the MLSARO and Amendment, the evidence will show:

- AHP remained responsible for payment of a defined outstanding balance;

- Compensation to Cymbidium accrued over time based on that balance;

BAILEY DUQUETTE P.C.
800 FIFTH AVENUE, SUITE 101-800
SEATTLE, WASHINGTON 98104
T 206.225.2250 | F 888.233.5869

- AHP continued remitting recoveries from the loans;

- AHP remained exposed if recoveries were insufficient; and

- Upon satisfaction of the balance, remaining loans and excess proceeds reverted to AHP.

This structure left AHP bearing the primary economic risk of loan performance, while Cymbidium's exposure, in contrast, was limited to delayed or incomplete repayment—credit risk, not asset performance risk. Under applicable authority, that allocation of risk is the hallmark of financing, not a sale.

### (2) Meaningful Reversionary Rights Are Inconsistent with a True Sale

A true sale contemplates a permanent transfer of ownership, with no obligation to return the assets or their residual value. *Central Wash. Bank v. Mendelson-Zeller, Inc.*, 113 Wn.2d 346, 351 (1989).

Here, the MLSARO and Amendment expressly provided that once defined obligations were satisfied, the remaining Category B Loans, excess cash, and other residual assets were to be assigned and transferred back to AHP.

Courts consistently treat such reversionary rights as incompatible with true ownership and indicative of financing. *See In re Commercial Money Ctr.*, 350 B.R. at 477–78; *In re Shoot the Moon, LLC*, 635 B.R. 797, 807–09 (Bankr. D. Mont. 2021).

### (3) Time-Based Compensation Functions as Interest, Not Purchase Price

The MLSARO's "Price Differential" and the Amendment's 16% Applicable

DEFENDANTS / COUNTER-PLAINTIFFS'
TRIAL BRIEF – Page 35

BAILEY DUQUETTE P.C.
800 FIFTH AVENUE, SUITE 101-800
SEATTLE, WASHINGTON 98104
T 206.225.2250 | F 888.233.5869

Pricing Rate functioned as time-based compensation calculated on an outstanding balance. Cymbidium's own internal spreadsheets characterized these amounts as "interest."

Courts routinely treat such time-based returns—especially when paired with repayment-and-return mechanics—as strong indicators of financing. See *In re Commercial Money Ctr.*, 350 B.R. at 478 (fixed returns regardless of asset performance indicate loan).

### (4) Retention of Collection Duties and Servicing Costs Undercuts Sale Characterization

AHP continued to bear operational responsibility for the loans, including collection functions and servicing economics, while Cymbidium deducted costs and fees against recoveries. Courts treat retention of collection duties and cost exposure by the transferor as inconsistent with a true sale. *Id.; Shoot the Moon*, 635 B.R. at 807.

     *c.   Sale Labels Cannot Override Economic Reality*

Although the MLSARO uses sale-style language, courts give such labels limited weight where contradicted by the transaction's structure.

The Ninth Circuit has made clear that labels "cannot change the true nature of the underlying transactions," and "simply calling transactions 'sales' does not make them so." *In re Woodson Co.*, 813 F.2d 266, 272 (9th Cir. 1987). Washington courts similarly disregard form where a transaction is "a camouflaged loan." *Atlas Credit*, 15 Wn. App. at 150.

Here, the combination of—(i) retained risk, (ii) time-based compensation, (iii)

BAILEY DUQUETTE P.C.
800 FIFTH AVENUE, SUITE 101-800
SEATTLE, WASHINGTON 98104
T 206.225.2250 | F 888.233.5869

reversionary rights, (iv) continuing remittance obligations, and (v) repayment-triggered return of assets—overwhelms any sale terminology and establishes a financing arrangement as a matter of economic substance.

Moreover, the MLSARO itself acknowledges that contractual labels cannot control the transaction's true character. Under a section titled "Grant of Security Interests," the agreement states that although the parties "intend that all transactions hereunder be sales and purchases," that intent does not apply "for accounting and tax purposes." § 6. This carve-out is significant. The placement of this language within a security-interest grant, coupled with the express accounting and tax exception, further reinforces the need to give limited weight to sale labels, confirms that the agreement anticipated a divergence between form and substance, and reinforces that the transaction must be evaluated based on risk allocation and economic reality rather than nomenclature.

Additionally, the presence of a guaranty is fundamentally inconsistent with a true sale. In a genuine sale, the buyer assumes the risk of non-performance of the purchased assets and has no need for repayment guarantees. Here, however, Cymbidium demanded protection against repayment risk in the form of a guaranty—an arrangement that makes sense only if AHP retained the primary risk of loss and Cymbidium's concern was repayment, not ownership. Courts consistently treat guaranties as strong evidence of secured lending because they protect the counterparty from credit risk rather than asset risk. *See In re Lendvest*

DEFENDANTS / COUNTER-PLAINTIFFS'
TRIAL BRIEF – Page 37

BAILEY DUQUETTE P.C.
800 FIFTH AVENUE, SUITE 101-800
SEATTLE, WASHINGTON 98104
T 206.225.2250 | F 888.233.5869

*Mortg., Inc.*, 119 B.R. 199, 200 (Bankr. 9th Cir. 1990) ("where risk of loss is shifted from investor to debtor through contractual guaranty of repayment by debtor, transaction is 'loan,' not 'sale.'"); *see also Baxter v. Stevens*, 54 Wn. App. 456, 458-60, 773 P.2d 890 (1989). The guaranty thus reinforces that risk never transferred to Cymbidium and that the transaction must be evaluated as financing notwithstanding any sale labels.

> ### d. *Consequences for Trial: Ownership-Based Theories Are Irrelevant*

If the MLSARO and Amendment are properly characterized as financing, Cymbidium never acquired ownership of the Category B Loans. That conclusion has immediate consequences for the scope of admissible evidence and the viability of Cymbidium's damages theories.

In particular:

- Arguments premised on Cymbidium's ownership of the loans fail;

- Evidence concerning "put-backs" presupposes ownership rights Cymbidium never had;

- Claimed "atrocities" based on loan-level defects are irrelevant absent ownership; and

- Spreadsheet line items treating Cymbidium as an asset owner rather than a secured creditor lack legal foundation.

Thus, resolution of this threshold issue directly informs what evidence is relevant, what damages theories may proceed, and whether large portions of

DEFENDANTS / COUNTER-PLAINTIFFS'
TRIAL BRIEF – Page 38

BAILEY DUQUETTE P.C.
800 FIFTH AVENUE, SUITE 101-800
SEATTLE, WASHINGTON 98104
T 206.225.2250 | F 888.233.5869

Cymbidium's spreadsheet-based case have any bearing at all.

BAILEY DUQUETTE P.C.
800 FIFTH AVENUE, SUITE 101-800
SEATTLE, WASHINGTON 98104
T 206.225.2250 | F 888.233.5869

## B. AHP'S Counterclaims Against Cymbidium

### 1. Declaratory Judgment

AHP seeks declaratory relief to determine the parties' rights and obligations under the MLSARO and Amendment, including whether AHP has satisfied all payment and performance obligations. Washington's Uniform Declaratory Judgments Act authorizes courts to declare contractual rights and legal relations where an actual controversy exists, including disputes over the satisfaction of payment obligations. *See* RCW 7.24.010; RCW 7.24.020.

This case presents a concrete and justiciable controversy concerning whether payments, recoveries, and credits applied through the contractual waterfall fully discharged AHP's obligations. At trial, AHP will establish that Cymbidium received the funds required under the agreements with the mutual intent that those payments satisfy the debt, and that no additional amounts remain due once the contracts are applied as written. *See Howard v. Patenaude & Felix APC*, 634 F. Supp. 3d 990, 997 (W.D. Wash. 2022) (payment requires receipt by the creditor and mutual intent to satisfy the obligation). Declaratory relief is therefore appropriate to resolve the parties' competing interpretations, eliminate uncertainty, and bring finality to a dispute that otherwise turns on shifting and inconsistent accounting positions. *See In re Nash*, 464 B.R. 874, 880 (Bankr. W.D. Wash. 2012).

BAILEY DUQUETTE P.C.
800 FIFTH AVENUE, SUITE 101-800
SEATTLE, WASHINGTON 98104
T 206.225.2250 | F 888.233.5869

2. Equitable Accounting

    *a. Legal Standard: Accounting is Ordered Where Financial Issues are Practically Unresolvable Through Ordinary Factfinding*

Washington law authorizes a court sitting in equity to order an accounting when ordinary legal remedies are inadequate to resolve disputed financial matters. An accounting is appropriate where: (1) the relevant transactions are so complex that they cannot be conveniently resolved through ordinary factfinding; (2) the requesting party has demanded an accounting; and (3) the opposing party has refused. *BMO Bank N.A. v. Raiden, LLC*, No. 23-CV-01465, 2023 WL 6541027, at *4 (W.D. Wash. Oct. 6, 2023) (citing *Corbin v. Madison*, 12 Wn. App. 318, 327 (1974); *State v. Taylor*, 58 Wn.2d 252, 262 (1961)).

The touchstone is practical necessity. Washington courts have long recognized that equity intervenes where financial accounts are "so complicated that a trial . . . would be impracticable." *Gatudy v. Acme Constr. Co.*, 196 Wash. 562, 567, 83 P.2d 889, 892 (1938). In such circumstances, an accounting is not a substitute for trial—it is the mechanism by which a court can meaningfully adjudicate the parties' rights.

Federal courts applying Washington law regularly exercise this authority in bench trials involving layered transactions, disputed allocations, and opaque internal records. See *Algaier v. CMG Mortg., Inc.*, No. 13-CV-0380-TOR, 2014 WL 3965180, at *6 (E.D. Wash. Aug. 13, 2014); *LMD Integrated Logistic Servs., Inc. v.*

BAILEY DUQUETTE P.C.
800 FIFTH AVENUE, SUITE 101-800
SEATTLE, WASHINGTON 98104
T 206.225.2250 | F 888.233.5869

*Mercer Distribution Servs., LLC*, No. C10-1381-BHS, Dkt. 120 at 62, 87 (W.D. Wash.) ("The Court here is not a CPA.").

This case presents precisely the circumstances equity was designed to address.

       *b.*   *This Case is a Textbook Example of Why an Accounting is Necessary*

From the outset, this case has presented a finite—but highly technical—accounting question: what proceeds were received on the mortgage loans, what offsets or deductions are contractually permitted, and what—if anything—remains owed under the MLSARO and its Amendment. That question turns entirely on records, classifications, and judgments controlled exclusively by Cymbidium and its affiliated entities. Despite more than two years of litigation, Cymbidium has never produced a stable, final, or reconcilable accounting. That failure is not incidental. It is dispositive.

Throughout discovery, Cymbidium failed to disclose any computation of damages, any settled methodology, or any finalized reconciliation. In its April 4, 2024 Initial Disclosures, Cymbidium offered no computation at all—only an unsupported assertion that AHP owed "approximately $2.6 million," with no inputs, assumptions, or supporting documentation. That omission was never cured.

In December 2024, Cymbidium produced an internal spreadsheet asserting damages of $12,174,819.06—nearly five times the amount referenced in its Initial Disclosures. Yet Cymbidium never identified that document as its operative Rule 26

DEFENDANTS / COUNTER-PLAINTIFFS' TRIAL BRIEF – Page 42

damages computation, never explained the methodology used to generate it, and never represented that it reflected a final—or even provisional—accounting.

More telling still, Cymbidium's own witnesses confirmed that the accounting remained unsettled long after discovery closed. In December 2025, Cymbidium's principal, William Weinstein, testified that damages were still being reconciled and continued to change, offering only a sweeping estimate that AHP owed "somewhere between $15 million and $20 million," untethered to any disclosed analysis. Two days later, Cymbidium's CFO, Sonal Gupta, confirmed that the figures were provisional, dependent on whichever internal Excel version happened to be current, and that no effort had been made to update the December 2024 spreadsheet for a year.

As of December 2025—years into the case and months after discovery closed—Cymbidium still had not finalized the accounting on which its claims purportedly rest. Only after AHP served draft motions in limine did Cymbidium produce yet another set of spreadsheets on January 6, 2026—two weeks before trial—this time asserting damages of $24,648,553.97, nearly ten times the figure referenced in its Initial Disclosures. These spreadsheets were materially restructured, reorganized, and inconsistent with prior versions, rendering earlier testimony obsolete and depriving AHP of any meaningful opportunity to analyze or test the calculations.

This is not ordinary damages proof. It is a rolling, internally controlled reconciliation that has never stabilized and that depends on discretionary judgments

DEFENDANTS / COUNTER-PLAINTIFFS'
TRIAL BRIEF – Page 43

BAILEY DUQUETTE P.C.
800 FIFTH AVENUE, SUITE 101-800
SEATTLE, WASHINGTON 98104
T 206.225.2250 | F 888.233.5869

about affiliate expenses, post-deadline "put-backs," loan-level classifications, and internal reallocations—none of which can be reliably tested through conventional cross-examination or piecemeal trial testimony.

Legal damages presuppose a knowable amount. Cymbidium's own conduct and testimony establish that the amount it claims is neither fixed nor independently verifiable. Where resolution of the dispute requires compelled disclosure, tracing, and reconciliation across records controlled exclusively by one party—and where years of litigation have produced only shifting internal estimates—ordinary legal remedies are inadequate. That is precisely when equity intervenes.

### c. The Court Should Not Be Forced to Serve as a Forensic Accountant

Absent a neutral accounting, the Court would be required to reconstruct years of disputed financial activity from evolving spreadsheets that even Cymbidium's witnesses concede are provisional, incomplete, and subject to ongoing revision. That is not the Court's role.

As courts applying Washington law have recognized, an accounting is appropriate precisely to avoid forcing the judiciary into the role of a forensic accountant tasked with untangling opaque internal records and disputed classifications. See *LMD Integrated Logistic Servs.*, No. C10-1381-BHS ("The Court here is not a CPA").

Here, serious questions exist regarding foundational data, supporting documentation, affiliate transactions, witness competence to authenticate or explain

DEFENDANTS / COUNTER-PLAINTIFFS'
TRIAL BRIEF – Page 44

BAILEY DUQUETTE P.C.
800 FIFTH AVENUE, SUITE 101-800
SEATTLE, WASHINGTON 98104
T 206.225.2250 | F 888.233.5869

the spreadsheets, and Cymbidium's refusal—both before and during litigation—to permit an independent audit at AHP's expense. The record demonstrates that conventional factfinding would require the Court to resolve accounting disputes that Cymbidium itself has never resolved internally.

Equity does not require that result. A neutral accounting allows the Court to adjudicate liability on a reliable, transparent record rather than attempting to resolve a moving financial target in real time at trial.

### d.  AHP Demanded a Neutral Accounting, and Cymbidium Refused

AHP repeatedly demanded a complete and neutral accounting of proceeds and offsets under the MLSARO and its Amendment. AHP proposed an independent audit—at its own expense—to resolve the reconciliation issues and bring transparency to the numbers. Cymbidium refused.

Instead of permitting a neutral review, Cymbidium substituted internally generated spreadsheets that changed repeatedly, were never identified as final, and were never supported by a stable methodology. Cymbidium's own witnesses confirmed that the figures remained provisional and subject to ongoing revision, with no effort to finalize the accounting even after discovery closed.

Washington law does not require a party seeking an accounting to accept a moving target. Where a party with exclusive access to the books responds to repeated demands for transparency by offering inconsistent internal analyses rather than a neutral reconciliation, the demand-and-refusal requirement is satisfied.

BAILEY DUQUETTE P.C.
800 FIFTH AVENUE, SUITE 101-800
SEATTLE, WASHINGTON 98104
T 206.225.2250 | F 888.233.5869

*e. Equity Requires an Independent Accounting Here*

This is not a case where an accounting would be duplicative or unnecessary. It is the only mechanism by which the Court can meaningfully adjudicate the parties' rights. The complexity of the transactions, the exclusive control of the records, the refusal to permit neutral review, and the unstable nature of Cymbidium's claimed balances present a textbook case for equitable accounting under Washington law.

The Court should order a neutral accounting and decline to assume the role of accountant itself.

3. Breach of Contract

AHP will establish at trial that Cymbidium materially breached the MLSA and First Amendment. The evidence will show that the agreements constituted valid and enforceable contracts, and that AHP performed all conditions required of it. Cymbidium, by contrast, failed to perform core contractual obligations, including its duty to act in good faith and to administer the loan transactions in a manner consistent with the agreements' terms.

Specifically, AHP will show that Cymbidium engaged in non-arm's-length transactions by assigning loan interests to entities owned by or affiliated with Cymbidium for no consideration, transacting with affiliated entities for loan servicing, and failing to adequately account for monies received from assignments, servicing, and related activities as required by the MLSARO and Amendment. AHP

DEFENDANTS / COUNTER-PLAINTIFFS'
TRIAL BRIEF – Page 46

BAILEY DUQUETTE P.C.
800 FIFTH AVENUE, SUITE 101-800
SEATTLE, WASHINGTON 98104
T 206.225.2250 | F 888.233.5869

will further establish that Cymbidium materially breached express confidentiality provisions by publicly disclosing and disseminating the terms of the MLSARO and Amendment to third parties, including through the filing and distribution of its Complaint. As a direct and proximate result of these breaches, AHP has incurred and will continue to incur damages, including attorneys' fees, costs, and other expenses, and is entitled to judgment on its breach-of-contract counterclaims.

4. Conversion

AHP will establish at trial that Cymbidium converted property belonging to AHP. In the course of performing under the MLSA and Amendment, AHP overpaid Cymbidium—funds not owed under the contractual waterfall and not authorized by the governing agreements. Upon satisfaction of AHP's payment obligations, Cymbidium's contractual rights to retain funds or loan proceeds were extinguished, and AHP held the superior possessory interest in the overpaid amounts and related assets.

Under Washington law, a party may pursue tort remedies where the injury arises from the breach of an independent duty, including the duty not to exercise wrongful dominion over another's property. *See Eastwood v. Horse Harbor Found., Inc.*, 170 Wn.2d 380, 387–88 (2010); *Snyder v. Med. Serv. Corp. of E. Wash.*, 145 Wn.2d 233, 243 (2001). The evidence will show that AHP demanded return of the overpayment and that Cymbidium refused, despite having no contractual or legal right to retain the funds. Cymbidium's continued retention and use of AHP's

BAILEY DUQUETTE P.C.
800 FIFTH AVENUE, SUITE 101-800
SEATTLE, WASHINGTON 98104
T 206.225.2250 | F 888.233.5869

property after its rights had been extinguished constituted unauthorized dominion outside the contract's four corners and gives rise to an independent claim for conversion. *See Olympic Tug & Barge, Inc. v. Lovel Briere LLC*, 668 F. Supp. 3d 1165, 1176 (W.D. Wash. 2023). As a result, AHP is entitled to recover the converted funds, interest, and related damages.

## C. AHP'S Defenses To Cymbidium's Claims

### 1. Cymbidium's Claims Fail As a Matter of Contract Law

#### a. Satisfaction of Performance

AHP will establish at trial that it satisfied all terms, conditions, duties, and obligations imposed by the MLSARO and Amendment. The agreements established a waterfall-based framework governing repayment, application of recoveries, fees, and interest, rather than a fixed payment obligation. The evidence will show that, once payments made, recoveries received, and required credits are properly applied under that framework, AHP fulfilled its contractual obligations.

Cymbidium's breach claims depend on disregarding amounts already received and recharacterizing disputed or extra-contractual costs as sums allegedly owed. Where a party has received the performance required by the contract, it may not maintain a claim for breach seeking additional recovery. Because AHP performed as required under the governing agreements, Cymbidium's claims are barred, in whole or in part, by satisfaction of all contractual obligations.

BAILEY DUQUETTE P.C.
800 FIFTH AVENUE, SUITE 101-800
SEATTLE, WASHINGTON 98104
T 206.225.2250 | F 888.233.5869

### b. *Cymbidium's Material Breach of Contract*

AHP will establish at trial that Cymbidium materially breached the MLSARO and Amendment, barring or limiting its claims. The evidence will show that Cymbidium failed to perform core contractual obligations, including acting in good faith, engaging only in arm's-length transactions, properly accounting for recoveries, and applying proceeds in accordance with the contractual waterfall. Cymbidium also failed to provide transparent and consistent reconciliations of amounts allegedly owed, instead relying on shifting internal calculations.

Cymbidium's breaches went to the heart of the parties' bargain and deprived AHP of the benefit of the contractual framework governing repayment, reconciliation, and return of residual value. A party that materially breaches a contract may not enforce the same contract to recover damages for the other party's alleged nonperformance. Because Cymbidium's own material breaches preceded and contributed to the disputes it now litigates, its claims are barred, in whole or in part, by its failure to perform.

### c. *Substantial Performance/De Minimis Harm*

AHP will establish at trial that it substantially performed its obligations under the MLSARO and Amendment. The evidence will show that AHP satisfied the core economic purpose of the agreements by making the required payments and participating in the contractual reconciliation process governed by the waterfall. The disputes raised by Cymbidium concern downstream accounting issues, timing,

DEFENDANTS / COUNTER-PLAINTIFFS'
TRIAL BRIEF – Page 49

BAILEY DUQUETTE P.C.
800 FIFTH AVENUE, SUITE 101-800
SEATTLE, WASHINGTON 98104
T 206.225.2250 | F 888.233.5869

documentation, and the characterization of particular line items—not a failure of the essential bargain.

To the extent any deviations occurred, AHP will show that they were minor and resulted in, at most, de minimis harm when measured against the scope of the transaction and the value already received by Cymbidium. Washington law does not permit expansive breach or conversion remedies based on technical or immaterial departures from performance. Accordingly, Cymbidium's claims are barred, in whole or in part, by AHP's substantial performance and the absence of material harm.

### d. Cymbidium's Damages are Legally and Equitably Barred

#### (1) Improper Damages in the Form of, Among Other Things, "Atrocities" and Improvement Costs

AHP will establish at trial that Cymbidium seeks damages that are not authorized by the governing contracts and are inconsistent with the limited reconciliation framework contemplated by the parties. In particular, Cymbidium's damages theory improperly includes so-called "atrocities," improvement costs, and other expenses incurred through Cymbidium's affiliates that were neither contractually permitted nor properly disclosed. The MLSARO and Amendment define a narrow waterfall for application of recoveries, prioritizing repayment of specified amounts and fees, and do not authorize Cymbidium to charge AHP for discretionary property improvements, internal remediation decisions, or costs incurred through non-arm's-length transactions with related parties.

BAILEY DUQUETTE P.C.
800 FIFTH AVENUE, SUITE 101-800
SEATTLE, WASHINGTON 98104
T 206.225.2250 | F 888.233.5869

The evidence will show that many of the challenged line items were incurred unilaterally by Cymbidium or its affiliates, without AHP's approval, outside any contractual obligation, and often in connection with assets Cymbidium and its affiliates elected to retain, rehabilitate, or reposition for their own benefit. Cymbidium did not disclose these expenditures contemporaneously, did not segregate them in a manner consistent with the agreements, and did not provide the documentation necessary to establish that they were reasonable, necessary, or contractually chargeable to AHP. In several instances, Cymbidium seeks to retroactively recharacterize internal investment decisions and affiliate-driven improvements as damages allegedly caused by AHP, despite the absence of any contractual basis for doing so.

AHP will further show that Cymbidium's inclusion of these items reflects an effort to expand a straightforward contractual reconciliation into an open-ended accounting of Cymbidium's own business decisions. Washington law does not permit recovery of damages that are speculative, self-imposed, or untethered from the parties' agreement. Because the "atrocities," improvement costs, and related-party expenses fall outside the scope of recoverable damages under the MLSARO and Amendment, the Court should exclude them and limit any recovery—if any—to amounts expressly permitted by the contracts and supported by competent evidence.

BAILEY DUQUETTE P.C.
800 FIFTH AVENUE, SUITE 101-800
SEATTLE, WASHINGTON 98104
T 206.225.2250 | F 888.233.5869

**(2) Set-off**

AHP will establish at trial that any recovery sought by Cymbidium must be reduced by amounts Cymbidium has already received in connection with the MLSARO and Amendment. The evidence will show that Cymbidium collected substantial payments, recoveries, and other value from the loan portfolio that were required to be applied through the contractual waterfall. To the extent Cymbidium seeks damages without crediting those amounts, its claims overstate any alleged loss.

AHP will further show that Cymbidium received payments and benefits in excess of what the agreements permitted and failed to account for those amounts in its damages calculations. Setoff is required to prevent double recovery and to ensure that any judgment reflects only net amounts, if any, actually owed after crediting all payments, recoveries, and offsets required by the contracts.

**(3) Failure to Mitigate**

AHP will establish at trial that Cymbidium failed to take reasonable steps to mitigate its alleged damages. After disputes arose regarding amounts owed, AHP repeatedly offered a prompt, independent accounting at its own expense to reconcile payments, recoveries, and offsets. Cymbidium declined those proposals and instead allowed alleged damages to accrue while relying on evolving internal calculations.

The evidence will further show that Cymbidium incurred discretionary costs and expenses after the dispute arose, including remediation and improvement

BAILEY DUQUETTE P.C.
800 FIFTH AVENUE, SUITE 101-800
SEATTLE, WASHINGTON 98104
T 206.225.2250 | F 888.233.5869

expenditures, and now seeks to shift those costs to AHP. Washington law does not permit recovery of losses that could have been avoided through reasonable efforts. To the extent Cymbidium's claimed damages reflect avoidable costs or losses incurred after reasonable mitigation options were available, those damages are barred or must be reduced.

### e. Unjust Enrichment

AHP will establish at trial that Cymbidium's damages theory seeks recovery that would result in unjust enrichment. Cymbidium has already received substantial payments and recoveries under the MLSARO and Amendment, yet now seeks additional damages based on categories of costs and charges not authorized by the agreements, including "atrocities," improvement costs, and expenses incurred through related-party transactions. The evidence will show that these costs were unilaterally incurred by Cymbidium or its affiliates and resulted in value retained by Cymbidium rather than AHP. Equity does not permit Cymbidium to recover beyond the benefit of its bargain or to shift its own investment and management decisions to AHP after the fact. To the extent Cymbidium seeks such relief, its claims are barred, in whole or in part, by principles of unjust enrichment.

### f. Waiver

AHP will establish that Cymbidium waived the rights it now seeks to enforce through its own course of conduct. With knowledge of the facts it now characterizes as breaches, Cymbidium elected to amend the MLSARO, continue performing under

BAILEY DUQUETTE P.C.
800 FIFTH AVENUE, SUITE 101-800
SEATTLE, WASHINGTON 98104
T 206.225.2250 | F 888.233.5869

the Amendment, and accept substantial payments and recoveries under the contractual waterfall without declaring default or pursuing enforcement. Cymbidium's conduct treated the relationship as an ongoing financing and reconciliation arrangement, not as an immediate ownership transfer giving rise to conversion claims. By continuing performance and accepting benefits without timely objection, Cymbidium waived claims premised on pre-amendment conduct and damages theories inconsistent with the contractual framework it chose to enforce.

g. *Unclean Hands*

AHP will establish that Cymbidium seeks equitable relief while engaging in inequitable conduct directly related to the transactions at issue. The evidence will show that Cymbidium concealed or failed to disclose material facts concerning the control and encumbrance of the mortgage loans, engaged in non-arm's-length transactions with affiliates affecting loan recoveries and expenses, and retained value internally while seeking to shift those costs to AHP.

The record will further show that Cymbidium refused reasonable requests for an independent accounting while relying on opaque and shifting internal calculations to support its claims. Equity does not aid a party that seeks discretionary relief while frustrating transparency and engaging in self-interested conduct in the same transaction. To the extent Cymbidium seeks equitable remedies

BAILEY DUQUETTE P.C.
800 FIFTH AVENUE, SUITE 101-800
SEATTLE, WASHINGTON 98104
T 206.225.2250 | F 888.233.5869

or damages dependent on equitable discretion, its claims are barred, in whole or in part, by the doctrine of unclean hands.

2. Cymbidium's Conversion Categorically Fails.

a. Failure to Identify any Specific Converted Funds

AHP will establish that Cymbidium's conversion claim fails because Cymbidium has never identified any specific, segregated sum of money allegedly converted by AHP. Instead, Cymbidium relies on shifting spreadsheets and aggregate calculations that reflect disputed contractual balances subject to reconciliation, offsets, and allocation under the contractual waterfall.

Washington law does not permit a conversion claim based on an alleged failure to pay money generally owed under a contract. Because Cymbidium cannot identify a discrete fund to which it had an immediate possessory right—and instead advances a net accounting dispute—its conversion claim is barred as a matter of law.

b. Conversion Claim is Duplicative of Contract

Where an express contract governs the parties' relationship, tort claims based on implied contractual duties are not permitted. *See Fenske-Buchanan v. Bank of America, N.A.*, 2012 WL 1204930, at *7 (W.D. Wash. Apr. 11, 2012) (citing *Chandler v. Washington Toll Bridge Authority*, 17 Wn.2d 591, 604 (1943)).

In this case, Cymbidium's entire theory of conversion is that Defendants failed to produce money or assets allegedly owed under the parties' contract. Plaintiff does not allege that Defendants exercised wrongful dominion over property

DEFENDANTS / COUNTER-PLAINTIFFS'
TRIAL BRIEF – Page 55

BAILEY DUQUETTE P.C.
800 FIFTH AVENUE, SUITE 101-800
SEATTLE, WASHINGTON 98104
T 206.225.2250 | F 888.233.5869

independent of the contract, nor that Plaintiff possessed an immediate right to possession of specific property outside the contractual framework. Any claim Plaintiff asserts to the money or assets at issue arises solely from the parties' express agreement and its performance terms.

Because Plaintiff's allegations describe, at most, a failure to perform contractual obligations—and not the tortious conversion of property—Plaintiff fails to establish a claim for conversion as a matter of law. The conversion claim should therefore be dismissed.

3. Cymbidium's Claims Fail Based on Lack of Formation and Impossibility of Performance

a. Fraud in the Inducement

Under Washington law, a promise made without a present intent to perform constitutes a misrepresentation of an existing fact and may support a claim or defense of fraud. *See PCF Ins. Servs. of the W., LLC v. Fritts*, No. C23-1468-JCC, 2024 WL 1299954, at *2 (W.D. Wash. Mar. 27, 2024); *Markov v. ABC Transfer & Storage Co.*, 76 Wn.2d 388, 396 (1969). Fraud in the inducement is established where one party enters a contract in reliance on material representations that the other party did not intend to honor at the time they were made.

AHP will establish that this standard is met here. In the negotiations leading up to execution of the MLSARO, Weinstein represented that the transaction would follow a two-tier structure: a true sale of the Category A loans, and a financing arrangement secured by the Category B loans, under which AHP would satisfy a

DEFENDANTS / COUNTER-PLAINTIFFS'
TRIAL BRIEF – Page 56

BAILEY DUQUETTE P.C.
800 FIFTH AVENUE, SUITE 101-800
SEATTLE, WASHINGTON 98104
T 206.225.2250 | F 888.233.5869

defined repurchase obligation and thereafter retain the remaining Category B loans. Those representations tracked the parties' prior secured-loan transaction and were central to AHP's understanding of the bargain. AHP alleges that it entered the MLSARO in reliance on those assurances, believing that the Category B loans would be monetized only to the extent necessary to satisfy AHP's debt and then returned.

According to AHP, Cymbidium intended from the outset to retain and encumber the Category B loans for its own financing purposes—conduct inconsistent with the representations that induced AHP to enter the agreement. If proven, such conduct would render the MLSARO and related obligations unenforceable as fraudulently induced under Washington law.

b. *Impossibility of Performance*

AHP will establish at trial that certain obligations Cymbidium seeks to enforce were excused by impossibility of performance. Under Washington law, performance is discharged where a basic assumption of the contract is destroyed and performance becomes objectively impossible or impracticable due to circumstances not attributable to the party seeking relief. *See Pub. Util. Dist. No. 1 of Lewis Cnty. v. Wash. Pub. Power Supply Sys.*, 104 Wn.2d 353, 363–64, 705 P.2d 1195 (1985) (adopting Restatement (Second) of Contracts §§ 261–263)).

Here, the MLSARO and Amendment contemplated that the Category B loans would be monetized to satisfy AHP's obligations and that any remaining loans or residual interests would thereafter be returned. AHP will show that this assumed

DEFENDANTS / COUNTER-PLAINTIFFS'
TRIAL BRIEF – Page 57

BAILEY DUQUETTE P.C.
800 FIFTH AVENUE, SUITE 101-800
SEATTLE, WASHINGTON 98104
T 206.225.2250 | F 888.233.5869

ability to return the Category B loans was destroyed because the loans had been pledged, encumbered, or otherwise disposed of by third parties affiliated with Cymbidium, including as collateral for Cymbidium's own financing. Because the assets could not be returned as contemplated, performance of the alleged obligation was objectively impossible as a matter of fact.

BAILEY DUQUETTE P.C.

By: */s Hozaifa Y. Cassubhai*
Hozaifa Y. Cassubhai, WSBA #39512
William R. Burnside, WSBA #36002
800 Fifth Ave, Suite 101-800
Seattle, Washington 98104
T: 206.225.2250
E: hozaifa@baileyduquette.com
   will@baileyduquette.com

*Attorneys for Defendants/Counter-Plaintiffs*

DEFENDANTS / COUNTER-PLAINTIFFS'
TRIAL BRIEF – Page 58

BAILEY DUQUETTE P.C.
800 FIFTH AVENUE, SUITE 101-800
SEATTLE, WASHINGTON 98104
T 206.225.2250 | F 888.233.5869

**CERTIFICATE OF SERVICE**

I hereby certify that on this date, I caused a true and correct copy of the foregoing Defendants / Counter-Plaintiffs' Trial Brief served upon counsel of record herein, as follows:

Bradley S. Keller, WSBA #10665
M. Victoria Molina, WSBA #62109
1000 Second Avenue, 38th Floor          ☒ Via Email
Seattle, Washington 98104               ☒ Via ECF
Telephone: (206) 622-2000
Facsimile: (206) 622-2522
Email: bkeller@byrneskeller.com
mvmolina@byrneskeller.com

Attorneys for Plaintiff


I declare under penalty of perjury under the laws of the State of Washington that the foregoing is true and correct.

Dated: January 9, 2026 at Westfield, New Jersey.


/s Hozaifa Y. Cassubhai
Hozaifa Y. Cassubhai, WSBA No. 39512

DEFENDANTS / COUNTER-PLAINTIFFS'                    BAILEY DUQUETTE P.C.
TRIAL BRIEF – Page 59                               800 FIFTH AVENUE, SUITE 101-800
                                                    SEATTLE, WASHINGTON 98104
                                                    T 206.225.2250 | F 888.233.5869