# Exhibit 1

# BUSINESS INFORMATION

Business Name:
**ATLANTICA, LLC**

UBI Number:
**603 617 329**

Business Type:
**FOREIGN LIMITED LIABILITY COMPANY**

Business Status:
**TERMINATED**

Principal Office Street Address:
**1415 WESTERN AVE STE 700, MC-CSC1, SEATTLE, WA, 98101-2051, UNITED STATES**

Principal Office Mailing Address:

Expiration Date:
**05/31/2025**

Jurisdiction:
**UNITED STATES, DELAWARE**

Formation/ Registration Date:
**05/09/2016**

Period of Duration:
**PERPETUAL**

Inactive Date:
**09/03/2025**

Nature of Business:
**HOLDING COMPANY**

# REGISTERED AGENT INFORMATION

Registered Agent Name:
**CORPORATION SERVICE COMPANY**

Street Address:
**300 DESCHUTES WAY SW STE 208 MC-CSC1, TUMWATER, WA, 98501, UNITED STATES**

Mailing Address:
**300 DESCHUTES WAY SW STE 208 MC-CSC1, TUMWATER, WA, 98501, UNITED STATES**

# GOVERNORS

| Title | Governors Type | Entity Name | First Name | Last Name |
|-------|----------------|-------------|------------|-----------|
| GOVERNOR | ENTITY | OAK HARBOR CAPITAL, LLC | | |

# BUSINESS INFORMATION

Business Name:
**BONIFERA, LLC**

UBI Number:
**604 733 528**

Business Type:
**FOREIGN LIMITED LIABILITY COMPANY**

Business Status:
**ACTIVE**

Principal Office Street Address:
**4530 S EASTERN AVE STE 10, LAS VEGAS, NV, 89119-6181, UNITED STATES**

Principal Office Mailing Address:
**4530 S EASTERN AVE STE 10, LAS VEGAS, NV, 89119-6181, UNITED STATES**

Expiration Date:
**03/31/2026**

Jurisdiction:
**UNITED STATES, DELAWARE**

Formation/ Registration Date:
**03/24/2021**

Period of Duration:
**PERPETUAL**

Inactive Date:

Nature of Business:
**ANY LAWFUL PURPOSE**

# REGISTERED AGENT INFORMATION

Registered Agent Name:
**CORPORATION SERVICE COMPANY**

Street Address:
**300 DESCHUTES WAY SW, SUITE 208, MC-CSC1, OLYMPIA, WA, 98501, UNITED STATES**

Mailing Address:
**300 DESCHUTES WAY SW, SUITE 208, MC-CSC1, OLYMPIA, WA, 98501, UNITED STATES**

# GOVERNORS

| Title | Governors Type | Entity Name | First Name | Last Name |
|-------|----------------|-------------|------------|-----------|
| GOVERNOR | ENTITY | OAK HARBOR CAPITAL, LLC | | |

# BUSINESS INFORMATION

Business Name:
**CYMBIDIUM RESTORATION, LLC**

UBI Number:
**605 456 255**

Business Type:
**FOREIGN LIMITED LIABILITY COMPANY**

Business Status:
**ACTIVE**

Principal Office Street Address:
**4530 S EASTERN AVE STE 10, LAS VEGAS, NV, 89119-6181, UNITED STATES**

Principal Office Mailing Address:
**4530 S EASTERN AVE STE 10, LAS VEGAS, NV, 89119-6181, UNITED STATES**

Expiration Date:
**03/31/2026**

Jurisdiction:
**UNITED STATES, DELAWARE**

Formation/ Registration Date:
**03/14/2024**

Period of Duration:
**PERPETUAL**

Inactive Date:

Nature of Business:
**ANY LAWFUL PURPOSE**

# REGISTERED AGENT INFORMATION

Registered Agent Name:
**CORPORATION SERVICE COMPANY**

Street Address:
**300 DESCHUTES WAY SW STE 208 MC-CSC1, TUMWATER, WA, 98501, UNITED STATES**

Mailing Address:
**300 DESCHUTES WAY SW STE 208 MC-CSC1, TUMWATER, WA, 98501, UNITED STATES**

# GOVERNORS

| Title | Governors Type | Entity Name | First Name | Last Name |
|-------|----------------|-------------|------------|-----------|
| GOVERNOR | ENTITY | OAK HARBOR CAPITAL, LLC | | |

# BUSINESS INFORMATION

Business Name:
**DLC MORTGAGES, LLC**

UBI Number:
**604 413 792**

Business Type:
**FOREIGN LIMITED LIABILITY COMPANY**

Business Status:
**ACTIVE**

Principal Office Street Address:
**4530 S EASTERN AVE STE 10, LAS VEGAS, NV, 89119-6181, UNITED STATES**

Principal Office Mailing Address:
**4530 S EASTERN AVE STE 10, LAS VEGAS, NV, 89119-6181, UNITED STATES**

Expiration Date:
**03/31/2026**

Jurisdiction:
**UNITED STATES, DELAWARE**

Formation/ Registration Date:
**03/27/2019**

Period of Duration:
**PERPETUAL**

Inactive Date:

Nature of Business:
**ANY LAWFUL PURPOSE**

# REGISTERED AGENT INFORMATION

Registered Agent Name:
**CORPORATION SERVICE COMPANY**

Street Address:
**300 DESCHUTES WAY SW, SUITE 208, MC-CSC1, OLYMPIA, WA, 98501, UNITED STATES**

Mailing Address:
**300 DESCHUTES WAY SW, SUITE 208, MC-CSC1, OLYMPIA, WA, 98501, UNITED STATES**

# GOVERNORS

| Title | Governors Type | Entity Name | First Name | Last Name |
|-------|----------------|-------------|------------|-----------|
| GOVERNOR | ENTITY | OAK HARBOR CAPITAL, LLC | | |

# BUSINESS INFORMATION

Business Name:
**EROSTYLIS, LLC**

UBI Number:
**604 740 423**

Business Type:
**FOREIGN LIMITED LIABILITY COMPANY**

Business Status:
**TERMINATED**

Principal Office Street Address:
**1415 WESTERN AVE STE 700, SEATTLE, WA, 98101-2051, UNITED STATES**

Principal Office Mailing Address:
**1415 WESTERN AVE STE 700, SEATTLE, WA, 98101-2051, UNITED STATES**

Expiration Date:
**04/30/2025**

Jurisdiction:
**UNITED STATES, DELAWARE**

Formation/ Registration Date:
**04/07/2021**

Period of Duration:
**PERPETUAL**

Inactive Date:
**08/03/2025**

Nature of Business:
**ANY LAWFUL PURPOSE**

# REGISTERED AGENT INFORMATION

Registered Agent Name:
**CORPORATION SERVICE COMPANY**

Street Address:
**300 DESCHUTES WAY SW STE 208 MC-CSC1, TUMWATER, WA, 98501, UNITED STATES**

Mailing Address:
**300 DESCHUTES WAY SW STE 208 MC-CSC1, TUMWATER, WA, 98501, UNITED STATES**

# GOVERNORS

| Title | Governors Type | Entity Name | First Name | Last Name |
|---|---|---|---|---|
| GOVERNOR | ENTITY | OAK HARBOR CAPITAL, LLC | | |

FILED
Secretary of State
State of Washington
Date Filed: 11/01/2024
Effective Date: 11/01/2024
UBI No: 601 128 711

## ARTICLES OF CONVERSION

Pursuant to RCW 23B, the Washington Corporation HOLDPHRYSING, INC., is converting to a Texas corporation, OHH Holdings, Inc.

1. The converting entity, HOLDPHRYSING, INC., a Washington Corporation, has been converted into OHH HOLDINGS, INC., a Texas corporation;

2. The name of the converting entity before the conversion was HOLDPHRYSING, INC.;

3. The name of the converted entity after conversion will be OHH HOLDINGS, INC., a Texas corporation;

4. The conversion was duly approved by the sole shareholder of the domestic corporation pursuant to RCW 23B.09.030;

5. The effective date of the conversion is August 27, 2024;

6. The newly converted Texas business entity consents to service of process pursuant to RCW 23.95.450 in a proceeding to enforce any obligation or the rights of dissenting shareholders of the domestic corporation; and

7. The street and mailing address of the principal office address that may be used for service of process under RCW 23.95.450 is 7257 County Road 112, Clyde, Texas 79510.

I hereby certify, under penalty of law, that the above information is accurate and complies with the filing requirements of state law.

_____
Signature of Authorized Person

8/27/2024
_____
Date

William S. Weinstein, President
_____
Printed Name/Title

Work Order #: 2024103100723608 - 1
Received Date: 10/31/2024
Amount Received: $290.00



**Office of the Secretary of State**
**Corporations & Charities Division**

| Physical/Overnight address | Mailing Address |
|---|---|
| 801 Capitol Way S | PO Box 40234 |
| Olympia, WA 98501-1226 | Olympia, WA 98504-0234 |
| Tel: 360.725.0377 | www.sos.wa.gov/corps |

This Box For Office Use Only

# COVER SHEET FOR CONVERSION OF BUSINESS ENTITY

*This form does not replace the documents required to be submitted for a conversion. Please refer to the RCWs below for additional guidance.*

## Converting From:
*(current domicile and business type)*

⬇ **Select current domicile**

- ☑ Domestic (Washington)
- ☐ Foreign (list domicile below)

## Converting to:
*(new domicile and business type)*

⬇ **Select new domicile**

- ☐ Domestic (Washington)
- ☑ Foreign (list domicile below)

  Corporation

⬇ **Select current business type**    Governing Statute

| | | |
|---|---|---|
| ☑ | Profit Corporation | RCW 23.B |
| ☐ | Limited Liability Company (LLC) | RCW 25.15 |
| ☐ | Limited Partnership (LP or LLP) | RCW 25.10 |
| ☐ | Limited Liability Partnership (LLP) | RCW 25.05 |
| ☐ | Unincorporated Entity | |
| ☐ | Other: (list below) | |

⬇ **Select new business type**    Governing Statute

| | | |
|---|---|---|
| ☑ | Profit Corporation | RCW 23.B |
| ☐ | Limited Liability Company (LLC) | RCW 25.15 |
| ☐ | Limited Partnership (LP or LLP) | RCW 25.10 |
| ☐ | Limited Liability Partnership (LLP) | RCW 25.05 |
| ☐ | Unincorporated Entity | |
| ☐ | Other: (list below) | |

1. Current name of business: **Holdphrysing, Inc.**

2. UBI No.: (if available): _____

3. Name of new business: **OHH Holdings, Inc.**

4. Date conversion is to be effective: **8/27/2024**

5. Address for Service of Process if converted business is foreign:

Address: **7257 County Road 112**

City: **Clyde**    State or Country: **TX**    Postal Code: **79510**

■ Attach required documents per RCW: _____

**Contact Name:** William Weinstein    **Phone Number:** 206-269-3490

Work Order #: 2024103100723608 - 1
Received Date: 10/31/2024
Amount Received: $290.00



**OHH HOLDINGS, INC.**
7257 COUNTY ROAD 112, CLYDE, TX 79510

September 17, 2024

Secretary of State
Corporations Division
801 Capitol Way S Olympia
WA 98501-1226

**RE: Submission of Article of Conversion and Fees for Holdphrysing, Inc.**

Dear Secretary of State,

I am writing to submit the Article of Conversion for Holdphrysing, Inc., a Washington Professional Corporation, intending to convert into a Texas Corporation. Enclosed please find the necessary documentation, including the completed Article of Conversion form and the required fee. Additionally, I have included the expedite fee to ensure a swift processing of this conversion.

Details of Submission:
- Entity Name:       Holdphrysing, Inc.
- Entity Type:       Washington Corporation
- New Entity Name:   OHH Holdings, Inc.
- New Entity Type:   Texas Corporation
- Fee Enclosed:      $190
- Expedite Fee:      $100

We kindly request your prompt attention to this matter and would appreciate confirmation upon receipt of the submission. Should any additional information be required, please do not hesitate to contact me at 206-269-3490 or LICENSING@OAKHARBORCAPITAL.COM.

Thank you for your time and assistance in facilitating this conversion process.

Sincerely,

William S. Weinstein / Sole Shareholder

9/17/24
Date

1

Work Order #: 2024103100723608 - 1
Received Date: 10/31/2024
Amount Received: $290.00

# BUSINESS INFORMATION

Business Name:
**MAGERICK, LLC**

UBI Number:
**605 479 524**

Business Type:
**FOREIGN LIMITED LIABILITY COMPANY**

Business Status:
**ACTIVE**

Principal Office Street Address:
**4530 S EASTERN AVE STE 10, LAS VEGAS, NV, 89119-6181, UNITED STATES**

Principal Office Mailing Address:
**4530 S EASTERN AVE STE 10, LAS VEGAS, NV, 89119-6181, UNITED STATES**

Expiration Date:
**03/31/2026**

Jurisdiction:
**UNITED STATES, DELAWARE**

Formation/ Registration Date:
**03/20/2024**

Period of Duration:
**PERPETUAL**

Inactive Date:

Nature of Business:
**ANY LAWFUL PURPOSE**

# REGISTERED AGENT INFORMATION

Registered Agent Name:
**CORPORATION SERVICE COMPANY**

Street Address:
**300 DESCHUTES WAY SW STE 208 MC-CSC1, TUMWATER, WA, 98501, UNITED STATES**

Mailing Address:
**300 DESCHUTES WAY SW STE 208 MC-CSC1, TUMWATER, WA, 98501, UNITED STATES**

# GOVERNORS

| Title | Governors Type | Entity Name | First Name | Last Name |
|-------|----------------|-------------|------------|-----------|
| GOVERNOR | ENTITY | OAK HARBOR MANAGEMENT, LLC | | |

# BUSINESS INFORMATION

Business Name:
**OAK HARBOR CAPITAL, LLC**

UBI Number:
**602 686 878**

Business Type:
**FOREIGN LIMITED LIABILITY COMPANY**

Business Status:
**ACTIVE**

Principal Office Street Address:
**4530 S EASTERN AVE STE 10, LAS VEGAS, NV, 89119-6181, UNITED STATES**

Principal Office Mailing Address:
**4530 S EASTERN AVE STE 10, LAS VEGAS, NV, 89119-6181, UNITED STATES**

Expiration Date:
**01/31/2026**

Jurisdiction:
**UNITED STATES, DELAWARE**

Formation/ Registration Date:
**01/17/2007**

Period of Duration:
**PERPETUAL**

Inactive Date:

Nature of Business:
**ANY LAWFUL PURPOSE, PROVIDE MANAGEMENT AND ADVISORY SERVICES RELATED TO THE DEFAULTED CONSUMER DEBT INDUSTRY**

# REGISTERED AGENT INFORMATION

Registered Agent Name:
**CORPORATION SERVICE COMPANY**

Street Address:
**300 DESCHUTES WAY SW STE 208 MC-CSC1, TUMWATER, WA, 98501, UNITED STATES**

Mailing Address:
**300 DESCHUTES WAY SW STE 208 MC-CSC1, TUMWATER, WA, 98501, UNITED STATES**

# GOVERNORS

| Title | Governors Type | Entity Name | First Name | Last Name |
|-------|----------------|-------------|------------|-----------|
| GOVERNOR | ENTITY | OAK HARBOR HOLDINGS, LLC | | |

# BUSINESS INFORMATION

Business Name:
**OAK HARBOR MANAGEMENT, LLC**

UBI Number:
**604 471 200**

Business Type:
**FOREIGN LIMITED LIABILITY COMPANY**

Business Status:
**WITHDRAWN**

Principal Office Street Address:
**2003 WESTERN AVE STE 340, SEATTLE, WA, 98121-2162, UNITED STATES**

Principal Office Mailing Address:
**2003 WESTERN AVE STE 340, SEATTLE, WA, 98121-2162, UNITED STATES**

Expiration Date:
**06/30/2021**

Jurisdiction:
**UNITED STATES, DELAWARE**

Formation/ Registration Date:
**06/05/2019**

Period of Duration:
**PERPETUAL**

Inactive Date:
**02/08/2021**

Nature of Business:
**ANY LAWFUL PURPOSE**

# REGISTERED AGENT INFORMATION

Registered Agent Name:
**WEINSTEIN & RILEY P.S.**

Street Address:
**2001 WESTERN AVE STE 400, SEATTLE, WA, 98121-3132, UNITED STATES**

Mailing Address:
**2001 WESTERN AVE STE 400, SEATTLE, WA, 98121-3132, UNITED STATES**

# GOVERNORS

| Title | Governors Type | Entity Name | First Name | Last Name |
|-------|---------------|-------------|-----------|-----------|
| GOVERNOR | INDIVIDUAL | | WILLIAM S. | WEINSTEIN |
| GOVERNOR | ENTITY | HOLDPHRYSING, INC. | | |

# BUSINESS INFORMATION

Business Name:
**OHH HOLDINGS, INC.**

UBI Number:
**601 128 711**

Business Type:
**FOREIGN PROFIT CORPORATION**

Business Status:
**CONVERTED**

Principal Office Street Address:
**1415 WESTERN AVE STE 700, SEATTLE, WA, 98101-2051, UNITED STATES**

Principal Office Mailing Address:
**1415 WESTERN AVE STE 700, SEATTLE, WA, 98101-2051, UNITED STATES**

Expiration Date:
**11/30/2024**

Jurisdiction:
**UNITED STATES, TEXAS**

Formation/ Registration Date:
**11/09/1988**

Period of Duration:
**PERPETUAL**

Inactive Date:

Nature of Business:
**OTHER SERVICES**

# REGISTERED AGENT INFORMATION

Registered Agent Name:
**WEINSTEIN & RILEY P.S.**

Street Address:
**1415 WESTERN AVE STE 700, SEATTLE, WA, 98101-2051, UNITED STATES**

Mailing Address:
**1415 WESTERN AVE STE 700, SEATTLE, WA, 98101-2051, UNITED STATES**

# GOVERNORS

| Title | Governors Type | Entity Name | First Name | Last Name |
|---|---|---|---|---|
| GOVERNOR | INDIVIDUAL | | WILLIAM | WEINSTEIN |

# BUSINESS INFORMATION

Business Name:
**WEINSTEIN & RILEY, PC**

UBI Number:
**601 323 673**

Business Type:
**FOREIGN PROFESSIONAL SERVICE CORPORATION**

Business Status:
**CONVERTED**

Principal Office Street Address:
**2001 WESTERN AVE, SUITE 400, SEATTLE, WA, 98121-3132, UNITED STATES**

Principal Office Mailing Address:
**2001 WESTERN AVE, SUITE 400, SEATTLE, WA, 98121-3132, UNITED STATES**

Expiration Date:
**06/30/2024**

Jurisdiction:
**UNITED STATES, TEXAS**

Formation/ Registration Date:
**06/12/1991**

Period of Duration:
**PERPETUAL**

Inactive Date:

Nature of Business:
**ANY LAWFUL PURPOSE**

# REGISTERED AGENT INFORMATION

Registered Agent Name:
**CORPORATION SERVICE COMPANY**

Street Address:
**300 DESCHUTES WAY SW STE 208 MC-CSC1, TUMWATER, WA, 98501, UNITED STATES**

Mailing Address:
**300 DESCHUTES WAY SW STE 208 MC-CSC1, TUMWATER, WA, 98501, UNITED STATES**

# GOVERNORS

| Title | Governors Type | Entity Name | First Name | Last Name |
|-------|----------------|-------------|------------|-----------|
| GOVERNOR | INDIVIDUAL | | WILLIAM | WEINSTEIN |

# Exhibit 2

**MENU**

# MANAGEMENT TEAM

Oak Harbor Capital's management team includes two Managers (William S. Weinstein and Peter J. Fitzpatrick). The team has an outstanding track record and a long history of certain of its members working together, both at Oak Harbor and earlier at a predecessor firm founded by the Principal, B-Line, LLC ("B-Line").

**William S. Weinstein** is the President and CEO of Oak Harbor Capital. Mr. Weinstein has practiced in the bankruptcy and creditor rights arena for 35 years. He is the Founder and Chief Executive Officer of Oak Harbor Capital and the Co-Founder and a member of the Legal Services Provider. Mr. Weinstein started the Legal Services Provider in 1985 and it is now among the largest law firms focusing on creditor rights and bankruptcy in the United States. In 1997, he founded B-Line, one of the largest companies in the United States to purchase and service consumer finance related bankruptcy receivables. Under Mr. Weinstein's direction, B-Line deployed many hundreds of millions of dollars to acquire receivables that totaled over $46 billion in face value of debt. Between B-Line and the Legal Services Provider, approximately 40 million separate distressed debt accounts were purchased or serviced from 1997 to 2006. B-Line was sold in September 2006.

Following the sale of B-Line, Mr. Weinstein launched Oak Harbor Capital, LLC and this investment management firm has become one of the largest buyers of distressed consumer debt in the United States.

Mr. Weinstein has been an industry leader in developing predictive modeling, statistical and quantitative analysis, and pricing strategies for multiple classes of receivables. He is an honors graduate of Stanford University and Boston University School of Law. He has lectured extensively on bankruptcy, creditor rights, commercial litigation and regulatory and compliance issues in the United States and Canada.

**Peter J. Fitzpatrick** is the General Counsel and Chief Compliance Officer of Oak Harbor Capital. Mr. Fitzpatrick has practiced law for over 30 years. Prior to joining Oak Harbor Capital, he was a partner at K&L Gates LLP, where he served as Oak Harbor Capital's longstanding outside legal counsel. Prior to commencing his legal career, Mr. Fitzpatrick was a lending officer at The Chase Manhattan Bank where he completed the Chase Credit Training Program with distinction. He also served as the Assistant to the Director of Labor Relations at Citibank, N.A. He graduated with honors from Harvard College and earned his law degree at Fordham Law School.

Mr. Fitzpatrick was very involved in the early development of the secondary market for distressed debt and helped pioneer some of the original legal documentation used in the trading of distressed debt when the industry was in its nascent stage.

Oak Harbor Capital

4530 South Eastern Avenue, Suite 10

Las Vegas, Nevada 89119

📞 1-855-330-9520

✉ info@oakharborcapital.com

Copyright ©2022 Oak Harbor Capital.

All Rights Reserved.

# Exhibit 3

# Weinstein & Riley PS

## About the Firm

Weinstein & Riley, P.S. is a full service law firm that operates nationally and focuses in the following areas:

Default Servicing

Federal Bankruptcy Litigation

State Court Litigation

Weinstein & Riley, P.S., over a 30 year period, has represented many of the nation's largest banks, credit unions, consumer finance companies and other credit lenders.

### Disclaimer

Pursuant to the Fair Debt Collection Practices Act, please be advised that this entity is a debt collector and any information obtained may be used for that purpose. However, if the debt is in active bankruptcy or has been discharged through bankruptcy, this communication is not intended as and does not constitute an attempt to collect a debt.

For debtors with disputes or needing validation of their debt, please contact Weinstein & Riley, P.S.
toll free at 1-800-349-3739 or
by email at contact@w-legal.com.

Search …

# Exhibit 4

# BUSINESS INFORMATION

Business Name:
**OAK HARBOR CAPITAL I, LLC**

UBI Number:
**602 991 740**

Business Type:
**FOREIGN LIMITED LIABILITY COMPANY**

Business Status:
**WITHDRAWN**

Principal Office Street Address:
**2003 WESTERN AVE STE 340, SEATTLE, WA, 98121, UNITED STATES**

Principal Office Mailing Address:
**2003 WESTERN AVE STE 340, SEATTLE, WA, 98121, UNITED STATES**

Expiration Date:
**02/28/2020**

Jurisdiction:
**UNITED STATES, DELAWARE**

Formation/ Registration Date:
**02/09/2010**

Period of Duration:
**PERPETUAL**

Inactive Date:
**11/13/2019**

Nature of Business:
**OTHER SERVICES, PASSIVE DEBT BUYER**

# REGISTERED AGENT INFORMATION

Registered Agent Name:
**WEINSTEIN & RILEY, P.S.**

Street Address:
**2001 WESTERN AVE STE 400, SEATTLE, WA, 98121-3132, UNITED STATES**

Mailing Address:

# GOVERNORS

| Title | Governors Type | Entity Name | First Name | Last Name |
|-------|----------------|-------------|------------|-----------|
| GOVERNOR | INDIVIDUAL | | | OPHRYS, LLC |

# BUSINESS INFORMATION

Business Name:
**OAK HARBOR CAPITAL II, LLC**

UBI Number:
**603 125 624**

Business Type:
**FOREIGN LIMITED LIABILITY COMPANY**

Business Status:
**WITHDRAWN**

Principal Office Street Address:
**2003 WESTERN AVE STE 340, SEATTLE, WA, 98121, UNITED STATES**

Principal Office Mailing Address:

Expiration Date:
**06/30/2020**

Jurisdiction:
**UNITED STATES, DELAWARE**

Formation/ Registration Date:
**06/30/2011**

Period of Duration:
**PERPETUAL**

Inactive Date:
**11/13/2019**

Nature of Business:
**ANY LAWFUL PURPOSE**

# REGISTERED AGENT INFORMATION

Registered Agent Name:
**WEINSTEIN & RILEY P.S.**

Street Address:
**2001 WESTERN AVE STE 400, SEATTLE, WA, 98121-3132, UNITED STATES**

Mailing Address:
**2001 WESTERN AVE STE 400, SEATTLE, WA, 98121-3132, UNITED STATES**

# GOVERNORS

| Title | Governors Type | Entity Name | First Name | Last Name |
|---|---|---|---|---|
| GOVERNOR | INDIVIDUAL | | * | OAK HARBOR CAPITAL LLC |

# BUSINESS INFORMATION

Business Name:
**OAK HARBOR CAPITAL III, LLC**

UBI Number:
**603 119 791**

Business Type:
**FOREIGN LIMITED LIABILITY COMPANY**

Business Status:
**WITHDRAWN**

Principal Office Street Address:
**2003 WESTERN AVE STE 340, SEATTLE, WA, 98121, UNITED STATES**

Principal Office Mailing Address:
**2003 WESTERN AVE STE 340, SEATTLE, WA, 98121, UNITED STATES**

Expiration Date:
**05/31/2020**

Jurisdiction:
**UNITED STATES, DELAWARE**

Formation/ Registration Date:
**05/26/2011**

Period of Duration:
**PERPETUAL**

Inactive Date:
**11/13/2019**

Nature of Business:
**ANY LAWFUL PURPOSE**

# REGISTERED AGENT INFORMATION

Registered Agent Name:
**WEINSTEIN & RILEY P.S.**

Street Address:
**2001 WESTERN AVE STE 400, SEATTLE, WA, 98121-3132, UNITED STATES**

Mailing Address:

# GOVERNORS

| Title | Governors Type | Entity Name | First Name | Last Name |
|---|---|---|---|---|
| GOVERNOR | INDIVIDUAL | | * | OAK HARBOR CAPITAL, LLC |

# BUSINESS INFORMATION

Business Name:
**OAK HARBOR CAPITAL IV, LLC**

UBI Number:
**603 168 149**

Business Type:
**FOREIGN LIMITED LIABILITY COMPANY**

Business Status:
**WITHDRAWN**

Principal Office Street Address:
**2003 WESTERN AVE STE 340, SEATTLE, WA, 98121, UNITED STATES**

Principal Office Mailing Address:
**2003 WESTERN AVE STE 340, SEATTLE, WA, 98121, UNITED STATES**

Expiration Date:
**12/31/2019**

Jurisdiction:
**UNITED STATES, DELAWARE**

Formation/ Registration Date:
**12/22/2011**

Period of Duration:
**PERPETUAL**

Inactive Date:
**11/13/2019**

Nature of Business:
**ANY LAWFUL PURPOSE**

# REGISTERED AGENT INFORMATION

Registered Agent Name:
**WEINSTEIN & RILEY, P.S.**

Street Address:
**2001 WESTERN AVE STE 400, SEATTLE, WA, 98121-3132, UNITED STATES**

Mailing Address:
**2001 WESTERN AVE STE 400, SEATTLE, WA, 98121-3132, UNITED STATES**

# GOVERNORS

| Title | Governors Type | Entity Name | First Name | Last Name |
|---|---|---|---|---|
| GOVERNOR | INDIVIDUAL | | | OPHRYS LLC |

# BUSINESS INFORMATION

Business Name:
**OAK HARBOR CAPITAL V, LLC**

UBI Number:
**603 184 598**

Business Type:
**FOREIGN LIMITED LIABILITY COMPANY**

Business Status:
**WITHDRAWN**

Principal Office Street Address:
**2003 WESTERN AVE STE 340, SEATTLE, WA, 98121, UNITED STATES**

Principal Office Mailing Address:
**2003 WESTERN AVE STE 340, SEATTLE, WA, 98121, UNITED STATES**

Expiration Date:
**02/28/2020**

Jurisdiction:
**UNITED STATES, DELAWARE**

Formation/ Registration Date:
**02/27/2012**

Period of Duration:
**PERPETUAL**

Inactive Date:
**03/02/2020**

Nature of Business:
**OTHER SERVICES, PASSIVE DEBT BUYER**

# REGISTERED AGENT INFORMATION

Registered Agent Name:
**WEINSTEIN & RILEY, P.S.**

Street Address:
**2001 WESTERN AVE STE 400, SEATTLE, WA, 98121-3132, UNITED STATES**

Mailing Address:

# GOVERNORS

| Title | Governors Type | Entity Name | First Name | Last Name |
|---|---|---|---|---|
| GOVERNOR | INDIVIDUAL | | | OPHRYS, LLC |

# BUSINESS INFORMATION

Business Name:
**OAK HARBOR CAPITAL VI, LLC**

UBI Number:
**603 184 670**

Business Type:
**FOREIGN LIMITED LIABILITY COMPANY**

Business Status:
**WITHDRAWN**

Principal Office Street Address:
**2003 WESTERN AVE STE 340, SEATTLE, WA, 98121, UNITED STATES**

Principal Office Mailing Address:
**2003 WESTERN AVE STE 340, SEATTLE, WA, 98121, UNITED STATES**

Expiration Date:
**02/28/2020**

Jurisdiction:
**UNITED STATES, DELAWARE**

Formation/ Registration Date:
**02/27/2012**

Period of Duration:
**PERPETUAL**

Inactive Date:
**03/02/2020**

Nature of Business:
**OTHER SERVICES, PASSIVE DEBT BUYER**

# REGISTERED AGENT INFORMATION

Registered Agent Name:
**WEINSTEIN & RILEY, P.S.**

Street Address:
**2001 WESTERN AVE STE 400, SEATTLE, WA, 98121-3132, UNITED STATES**

Mailing Address:

# GOVERNORS

| Title | Governors Type | Entity Name | First Name | Last Name |
|-------|----------------|-------------|------------|-----------|
| GOVERNOR | ENTITY | OPHRYS LLC | | OPHYRS LLC |

# BUSINESS INFORMATION

Business Name:
**OAK HARBOR CAPITAL VII, LLC**

UBI Number:
**603 242 905**

Business Type:
**FOREIGN LIMITED LIABILITY COMPANY**

Business Status:
**TERMINATED**

Principal Office Street Address:
**2003 WESTERN AVE STE 340, SEATTLE, WA, 98121, UNITED STATES**

Principal Office Mailing Address:
**2003 WESTERN AVE STE 340, SEATTLE, WA, 98121, UNITED STATES**

Expiration Date:
**10/31/2022**

Jurisdiction:
**UNITED STATES, DELAWARE**

Formation/ Registration Date:
**10/02/2012**

Period of Duration:
**PERPETUAL**

Inactive Date:
**02/03/2023**

Nature of Business:
**ANY LAWFUL PURPOSE**

# REGISTERED AGENT INFORMATION

Registered Agent Name:
**WEINSTEIN & RILEY, P.S.**

Street Address:
**2001 WESTERN AVE STE 400, SEATTLE, WA, 98121-3132, UNITED STATES**

Mailing Address:
**2001 WESTERN AVE STE 400, SEATTLE, WA, 98121-3132, UNITED STATES**

# GOVERNORS

| Title | Governors Type | Entity Name | First Name | Last Name |
|---|---|---|---|---|
| GOVERNOR | ENTITY | OAK HARBOR CAPITAL, LLC | | |

# BUSINESS INFORMATION

Business Name:
**OAK HARBOR CAPITAL VII, LLC**

UBI Number:
**603 242 905**

Business Type:
**FOREIGN LIMITED LIABILITY COMPANY**

Business Status:
**TERMINATED**

Principal Office Street Address:
**2003 WESTERN AVE STE 340, SEATTLE, WA, 98121, UNITED STATES**

Principal Office Mailing Address:
**2003 WESTERN AVE STE 340, SEATTLE, WA, 98121, UNITED STATES**

Expiration Date:
**10/31/2022**

Jurisdiction:
**UNITED STATES, DELAWARE**

Formation/ Registration Date:
**10/02/2012**

Period of Duration:
**PERPETUAL**

Inactive Date:
**02/03/2023**

Nature of Business:
**ANY LAWFUL PURPOSE**

# REGISTERED AGENT INFORMATION

Registered Agent Name:
**WEINSTEIN & RILEY, P.S.**

Street Address:
**2001 WESTERN AVE STE 400, SEATTLE, WA, 98121-3132, UNITED STATES**

Mailing Address:
**2001 WESTERN AVE STE 400, SEATTLE, WA, 98121-3132, UNITED STATES**

# GOVERNORS

| Title | Governors Type | Entity Name | First Name | Last Name |
|---|---|---|---|---|
| GOVERNOR | ENTITY | OAK HARBOR CAPITAL, LLC | | |

# BUSINESS INFORMATION

Business Name:
**OAK HARBOR CAPITAL X, LLC**

UBI Number:
**603 387 495**

Business Type:
**FOREIGN LIMITED LIABILITY COMPANY**

Business Status:
**TERMINATED**

Principal Office Street Address:
**2003 WESTERN AVE STE 340, SEATTLE, WA, 98121, UNITED STATES**

Principal Office Mailing Address:
**2003 WESTERN AVE STE 340, SEATTLE, WA, 98121, UNITED STATES**

Expiration Date:
**03/31/2022**

Jurisdiction:
**UNITED STATES, DELAWARE**

Formation/ Registration Date:
**03/21/2014**

Period of Duration:
**PERPETUAL**

Inactive Date:
**02/09/2023**

Nature of Business:
**ANY LAWFUL PURPOSE**

# REGISTERED AGENT INFORMATION

Registered Agent Name:
**WEINSTEIN & RILEY P.S.**

Street Address:
**2001 WESTERN AVE STE 400, SEATTLE, WA, 98121-3132, UNITED STATES**

Mailing Address:
**2001 WESTERN AVE STE 400, SEATTLE, WA, 98121-3132, UNITED STATES**

# GOVERNORS

| Title | Governors Type | Entity Name | First Name | Last Name |
|---|---|---|---|---|
| GOVERNOR | ENTITY | OAK HARBOR CAPITAL, LLC | | |

# BUSINESS INFORMATION

Business Name:
**OAK HARBOR CAPITAL XI, LLC**

UBI Number:
**603 602 139**

Business Type:
**FOREIGN LIMITED LIABILITY COMPANY**

Business Status:
**TERMINATED**

Principal Office Street Address:
**2003 WESTERN AVE STE 340, SEATTLE, WA, 98121, UNITED STATES**

Principal Office Mailing Address:
**2003 WESTERN AVE STE 340, SEATTLE, WA, 98121, UNITED STATES**

Expiration Date:
**03/31/2022**

Jurisdiction:
**UNITED STATES, DELAWARE**

Formation/ Registration Date:
**03/24/2016**

Period of Duration:
**PERPETUAL**

Inactive Date:
**02/09/2023**

Nature of Business:
**ANY LAWFUL PURPOSE**

# REGISTERED AGENT INFORMATION

Registered Agent Name:
**WEINSTEIN & RILEY, P.S.**

Street Address:
**2001 WESTERN AVE STE 400, SEATTLE, WA, 98121-3132, UNITED STATES**

Mailing Address:
**2001 WESTERN AVE STE 400, SEATTLE, WA, 98121-3132, UNITED STATES**

# GOVERNORS

| Title | Governors Type | Entity Name | First Name | Last Name |
|-------|----------------|-------------|------------|-----------|
| GOVERNOR | ENTITY | OAK HARBOR CAPITAL, LLC | | |

# BUSINESS INFORMATION

Business Name:
**OAK HARBOR CAPITAL XII, LLC**

UBI Number:
**604 101 967**

Business Type:
**FOREIGN LIMITED LIABILITY COMPANY**

Business Status:
**ACTIVE**

Principal Office Street Address:
**4530 S EASTERN AVE STE 10, LAS VEGAS, LAS VEGAS, NV, 89119, UNITED STATES**

Principal Office Mailing Address:
**4530 S EASTERN AVE STE 10, LAS VEGAS, LAS VEGAS, NV, 89119, UNITED STATES**

Expiration Date:
**03/31/2026**

Jurisdiction:
**UNITED STATES, DELAWARE**

Formation/ Registration Date:
**03/13/2017**

Period of Duration:
**PERPETUAL**

Inactive Date:

Nature of Business:
**ANY LAWFUL PURPOSE**

# REGISTERED AGENT INFORMATION

Registered Agent Name:
**CORPORATION SERVICE COMPANY**

Street Address:
**300 DESCHUTES WAY SW STE 208,, MC-CSC1, TUMWATER, WA, 98501-7719, UNITED STATES**

Mailing Address:
**300 DESCHUTES WAY SW STE 208,, MC-CSC1, TUMWATER, WA, 98501-7719, UNITED STATES**

# GOVERNORS

| Title | Governors Type | Entity Name | First Name | Last Name |
|-------|----------------|-------------|------------|-----------|
| GOVERNOR | ENTITY | OAK HARBOR CAPITAL, LLC | | |

# BUSINESS INFORMATION

Business Name:
**OAK HARBOR CAPITAL XIII, LLC**

UBI Number:
**604 429 757**

Business Type:
**FOREIGN LIMITED LIABILITY COMPANY**

Business Status:
**TERMINATED**

Principal Office Street Address:
**2003 WESTERN AVE STE 340, SEATTLE, WA, 98121-2162, UNITED STATES**

Principal Office Mailing Address:
**2003 WESTERN AVE STE 340, SEATTLE, WA, 98121-2162, UNITED STATES**

Expiration Date:
**03/31/2022**

Jurisdiction:
**UNITED STATES, DELAWARE**

Formation/ Registration Date:
**03/27/2019**

Period of Duration:
**PERPETUAL**

Inactive Date:
**02/09/2023**

Nature of Business:
**ANY LAWFUL PURPOSE**

# REGISTERED AGENT INFORMATION

Registered Agent Name:
**WEINSTEIN & RILEY P.S.**

Street Address:
**2001 WESTERN AVE STE 400, SEATTLE, WA, 98121-3132, UNITED STATES**

Mailing Address:
**2001 WESTERN AVE STE 400, SEATTLE, WA, 98121-3132, UNITED STATES**

# GOVERNORS

| Title | Governors Type | Entity Name | First Name | Last Name |
|---|---|---|---|---|
| GOVERNOR | ENTITY | OAK HARBOR CAPITAL, LLC | | |

# BUSINESS INFORMATION

Business Name:
**OAK HARBOR CAPITAL XIV, LLC**

UBI Number:
**604 423 168**

Business Type:
**FOREIGN LIMITED LIABILITY COMPANY**

Business Status:
**TERMINATED**

Principal Office Street Address:
**2003 WESTERN AVE STE 340, SEATTLE, WA, 98121-2162, UNITED STATES**

Principal Office Mailing Address:
**2003 WESTERN AVE STE 340, SEATTLE, WA, 98121-2162, UNITED STATES**

Expiration Date:
**03/31/2022**

Jurisdiction:
**UNITED STATES, DELAWARE**

Formation/ Registration Date:
**03/27/2019**

Period of Duration:
**PERPETUAL**

Inactive Date:
**02/09/2023**

Nature of Business:
**ANY LAWFUL PURPOSE**

# REGISTERED AGENT INFORMATION

Registered Agent Name:
**WEINSTEIN & RILEY P.S.**

Street Address:
**2001 WESTERN AVE STE 400, SEATTLE, WA, 98121-3132, UNITED STATES**

Mailing Address:
**2001 WESTERN AVE STE 400, SEATTLE, WA, 98121-3132, UNITED STATES**

# GOVERNORS

| Title | Governors Type | Entity Name | First Name | Last Name |
|---|---|---|---|---|
| GOVERNOR | ENTITY | OAK HARBOR CAPITAL, LLC | | |

# BUSINESS INFORMATION

Business Name:
**OAK HARBOR CAPITAL NPL VII, LLC**

UBI Number:
**604 438 870**

Business Type:
**FOREIGN LIMITED LIABILITY COMPANY**

Business Status:
**TERMINATED**

Principal Office Street Address:
**1415 WESTERN AVE STE 700, SEATTLE, WA, 98101-2051, UNITED STATES**

Principal Office Mailing Address:
**1415 WESTERN AVE STE 700, SEATTLE, WA, 98101-2051, UNITED STATES**

Expiration Date:
**04/30/2025**

Jurisdiction:
**UNITED STATES, DELAWARE**

Formation/ Registration Date:
**04/09/2019**

Period of Duration:
**PERPETUAL**

Inactive Date:
**08/03/2025**

Nature of Business:
**ANY LAWFUL PURPOSE**

# REGISTERED AGENT INFORMATION

Registered Agent Name:
**CORPORATION SERVICE COMPANY**

Street Address:
**300 DESCHUTES WAY SW, SUITE 208, MC-CSC1, TUMWATER, WA, 98501-7719, UNITED STATES**

Mailing Address:
**300 DESCHUTES WAY SW, SUITE 208, MC-CSC1, TUMWATER, WA, 98501-7719, UNITED STATES**

# GOVERNORS

| Title | Governors Type | Entity Name | First Name | Last Name |
|---|---|---|---|---|
| GOVERNOR | ENTITY | OAK HARBOR CAPITAL, LLC | | |

# BUSINESS INFORMATION

Business Name:
**OAK HARBOR CAPITAL OPPORTUNITIES FUND V, LP**

UBI Number:
**604 419 874**

Business Type:
**FOREIGN LIMITED PARTNERSHIP**

Business Status:
**TERMINATED**

Principal Office Street Address:
**2003 WESTERN AVE STE 340, SEATTLE, WA, 98121-2162, UNITED STATES**

Principal Office Mailing Address:
**2003 WESTERN AVE STE 340, SEATTLE, WA, 98121-2162, UNITED STATES**

Expiration Date:
**03/31/2023**

Jurisdiction:
**UNITED STATES, DELAWARE**

Formation/ Registration Date:
**03/27/2019**

Period of Duration:
**PERPETUAL**

Inactive Date:
**07/03/2023**

Nature of Business:
**ANY LAWFUL PURPOSE**

# REGISTERED AGENT INFORMATION

Registered Agent Name:
**WEINSTEIN & RILEY P.S.**

Street Address:
**2001 WESTERN AVE STE 400, SEATTLE, WA, 98121-3132, UNITED STATES**

Mailing Address:
**2001 WESTERN AVE STE 400, SEATTLE, WA, 98121-3132, UNITED STATES**

# GOVERNORS

| Title | Governors Type | Entity Name | First Name | Last Name |
|-------|----------------|-------------|------------|-----------|
| GOVERNOR | ENTITY | OAK HARBOR CAPITAL, LLC | | |

# BUSINESS INFORMATION

Business Name:
**OAK HARBOR CAPITAL SPECIAL OPPORTUNITIES FUND, LP**

UBI Number:
**604 617 807**

Business Type:
**FOREIGN LIMITED PARTNERSHIP**

Business Status:
**TERMINATED**

Principal Office Street Address:
**2003 WESTERN AVE STE 340, SEATTLE, WA, 98121-2162, UNITED STATES**

Principal Office Mailing Address:
**2003 WESTERN AVE STE 340, SEATTLE, WA, 98121-2162, UNITED STATES**

Expiration Date:
**05/31/2024**

Jurisdiction:
**UNITED STATES, DELAWARE**

Formation/ Registration Date:
**05/15/2020**

Period of Duration:
**PERPETUAL**

Inactive Date:
**09/03/2024**

Nature of Business:
**INVESTMENTS**

# REGISTERED AGENT INFORMATION

Registered Agent Name:
**WEINSTEIN & RILEY P.S.**

Street Address:
**2001 WESTERN AVE, SEATTLE, WA, 98121-2163, UNITED STATES**

Mailing Address:

# GOVERNORS

| Title | Governors Type | Entity Name | First Name | Last Name |
|---|---|---|---|---|
| GOVERNOR | ENTITY | OHCSOF GP, LLC | | |

# Exhibit 5

# LIMITED LIABILITY COMPANY AGREEMENT
## OF
## MAGERICK, LLC

THIS LIMITED LIABILITY COMPANY AGREEMENT of Magerick, LLC, a Delaware limited liability company (the "Company") is made and entered into effective as of October 26, 2021, by and among by Oak Harbor Management, LLC, a Delaware limited liability company ("Oak Harbor") and Land Home Financial Services, Inc., a California corporation ("Land Home"), its members (each, a "Member" and together with any additional members which are added from time to time, the "Members").

## RECITALS

A.      The Company has been formed for the purpose of acquiring, owning, collecting, managing and disposing of Portfolios (as defined below) of defaulted mortgage loans, including, but not limited to, pools offered through Fannie Mae and other programs managed by the U.S. Department of Housing and Urban Development and such other portfolios of loans as determined by mutual agreement of the Members (the "Assets").

B.      The Members by this document intend to establish the operating rules by which the Company is to be governed.

## ARTICLE 1 - DEFINITIONS

(a) *General Interpretive Principles.*  If the context requires, the use of any gender shall also refer to any other gender, and the use of either number shall also refer to the other number.  All accounting terms not specifically defined have the meanings determined by reference to generally accepted accounting principles consistently applied ("GAAP").  The word "including" is not exclusive; if exclusion is intended, the word "comprising" is used instead.  The word "or" shall be construed to mean "and/or" unless the context clearly prohibits that construction.

(b) The following terms used in this Agreement shall have the following meanings, unless otherwise expressly provided herein:

**Act** means the Delaware Limited Liability Company Act.

**Affiliate** means, as to any Person, any other Person that, directly or indirectly (including through one or more intermediaries), controls, is controlled by, or is under common control with such Person, except that Company shall not be deemed to be an Affiliate of any Person for any reason under and for the purposes of this Agreement.  As used in this Agreement, the term "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of voting securities, by contract or otherwise.

1

**Agreement** means this Limited Liability Company Agreement of Magerick, LLC, including all exhibits and schedules attached hereto, as amended from time to time.

**Asset(s)** has the meaning defined in Recital A above.

**Available Cash** means the gross cash proceeds of the Company collected during a given period less the portion thereof used to pay any expenses of the Company including, but not limited to, advances for reasonable and customary costs associated with establishing and/or protecting an Asset's lien priority, due diligence expenses and closing fees, and expenses as described in Exhibit A. "Available Cash" shall not be reduced by depreciation, amortization, cost recovery deductions or similar allowances, but shall be increased by any reductions of reserves previously established pursuant to the first sentence of this definition.

**Bank** means Western Alliance Bank, or comparable comparable banking institution selected by the Manager in its discretion.

**Business Day** means any day that is not (i) a Saturday or Sunday and (ii) a day that is a legal holiday or a day on which banks are closed for business in the States of New York or Washington.

**Certificate of Formation** or **Certificate** means the certificate of formation pursuant to which the Company is formed, as filed with the office of the Secretary of State of Delaware on or about October 20, 2021, as amended, modified, supplemented or restated from time to time.

**Disabling Conduct** means intentional misrepresentation, fraud, willful malfeasance, bad faith, gross negligence or reckless disregard of duties.

**Effective Date** means the date first set forth above.

**Financial Statement** means a balance sheet, an income statement, and a statement of cash flows.

**Fiscal Year** means each calendar year ending on December 31 during the term of this Agreement.

**Formation Date** has the meaning set forth in Section 2(a).

**Legal Servicer** means Weinstein & Riley, P.S., a Washington professional services corporation, or other replacement legal servicer.

**Legal Services Agreement** means the legal services agreement between the Company and the Legal Servicer.

2

**Management Agreement** means the management agreement between the Company and the Manager.

**Manager** means Oak Harbor Management, LLC, a Delaware limited liability company, or other replacement manager.

**Members** mean the Persons identified as such in the preamble to this Agreement or, if the Member(s) transfers its membership interest to any other Person(s) and such Person(s) is (are) admitted to the Company as a Member, such transferee(s).

**Member Cessation Event** means any event that causes the last remaining Member to cease to be a Member, other than upon an assignment by the Member of all of its limited liability company interest in the Company and the admission of the transferee as a Member as permitted in this Agreement.

**Mortgage Servicer** means Land Home Financial Services Inc., a California corporation, or other replacement licensed mortgage servicer with which the Company enters an agreement.

**Person** means any individual, partnership, corporation, trust, limited liability company, or other legal entity, and the heirs, executors, administrators, legal representatives, successors and assigns of such Person where the context so permits.

**Portfolio** means, as applicable, each portfolio of loans that the Company purchases.

**Recovery Period** means the month prior to a Distribution, as that term is defined in Section 10.

**Servicing Agreement** means the Flow Servicing Agreement between Mortgage Servicer and the Company.

**Standard of Conduct** means, with respect to the Manager, the same degree of diligence, care, skill, and prudence that the Manager generally exercises in managing assets that are substantially similar to the Assets.

**Sub-Servicer** means any sub-servicer of the Assets approved by the Manager, including a property manager.

**Transaction Documents** mean this Limited Liability Company Agreement, the Management Agreement, the Legal Services Agreement, the Servicing Agreement and such other agreements entered into related to the Assets described herein.

3

 **Cymbidium128484**

**Trust Account** means the account at the Bank established solely for the purpose of receiving periodic deposits from the Mortgage Servicer, Sub-Servicer, Manager or Legal Servicer related to payments on the Assets and under which distributions are to be made.

**Section 2    Name; Registered Office and Registered Agent of the Company**

(a)    *Formation.*  The Company was formed as a limited liability company under and pursuant to the provisions of the Act and upon the terms and conditions set forth in this Agreement.  The fact that the Certificate is on file in the office of the Secretary of State, State of Delaware, shall constitute notice that the Company is a limited liability company.  The rights and liabilities of the Members shall be as provided under the Act, the Certificate, and this Agreement.  The formation date ("Formation Date") of the Company is October 20, 2021, when the Certificate of Formation was executed and filed with the office of the Secretary of State in accordance with and pursuant to the Act.

(b)    *Name.*  The name of the limited liability company is Magerick, LLC.

(c)    *Registered Office.*  The address of the registered office of the Company in Delaware is the Corporation Service Company, 2711 Centerville Road, Suite 400, Wilmington, Delaware 19808.  The registered office and registered agent may be changed by the Manager from time to time by filing an amendment to the Certificate.

(d)    *Principal Place of Business.*  The principal place of business, the administrative office and the mailing address of the Company shall be c/o 2003 Western Avenue, Suite 340, Seattle, WA 98121, Attention: Manager.  The Manager shall have the right to change the principal place of business of the Company or the administrative office and mailing address of the Company, subject to the provisions of the Act.  In addition, the Company may establish any other places of business as the Manager may from time to time deem advisable in its sole discretion.

(e)    *Term.*  The existence of the Company shall be perpetual, unless the Company is dissolved sooner in accordance with the provisions of the Act or Section 9 of this Agreement.

**Section 3    Purposes and Powers of Company**

(a)    *Purposes.*  The Company is formed solely for the purposes listed below.  The Company shall engage in no other business.

(i)    acquire, own, manage and dispose of the Assets and Portfolios;

(ii)    engage Sub-Servicers, the Legal Servicer, the Mortgage Servicer and other service providers to recover on the value of the loans and properties purchased thereunder through the provision of comprehensive recovery management services and/or resale to third party purchasers; and

4

(iii)    transact any and all lawful business for which a limited liability company may be formed under the laws of the State of Delaware that is incident, necessary and appropriate to accomplish the foregoing.

(b)    *Powers.*  The purposes for which the Company is formed are not intended as a limitation of its powers.  The Company shall have the power to do all acts necessary to carry out its purposes as permitted by law.

### Section 4    Management by Sole Manager

(a)    *Power of Manager.*  The Company shall be managed by a Manager.  All officers shall report to, and be subject to the control and supervision of, the Manager.  The initial Manager shall be Oak Harbor Management, LLC.  Land Home, or the Members otherwise holding a majority in interest of the Membership Units (as defined below) not held by the Manager, may remove and appoint a different Manager if there has been Disabling Conduct.

(b)    *Manager Obligations.*  The Manager will transact business for the Company and, except to the extent provided otherwise in this Agreement or in any other Transaction Document, including, without limitation, Sections 4(d) and 4(e), below,  will have the sole power or authority to sign, act for or bind the Company. The Members will not hold themselves out to be responsible, and shall not be responsible in any way, for the decisions or actions respecting the business and affairs of the Company, except as stated in this Agreement.

(c)    *Filings.* (i) The Manager shall take any and all other actions reasonably necessary to perfect and maintain the status of the Company as a limited liability company under the laws of the State of Delaware, including the preparation and filing of such amendments to the Certificate and such other assumed name certificates, documents, instruments, and publications as may be required by law, including without limitation, actions to reflect:

(1) A change in the Company name;

(2) A correction of false or erroneous statements in the Certificate or the desire of the Manager to make a change in any statement therein in order that it shall accurately represent the agreement among the Manger and the Members; or

(3) A change in the time for dissolution of the Company as stated in the Certificate and in this Agreement.

(ii)    The Manager shall execute and cause to be filed original or amended certificates and shall take any and all other actions as may be reasonably necessary to perfect and maintain the status of the Company as a limited liability company or similar

5

type of entity under the laws of any other jurisdictions in which the Company engages in business.

(iii)    Upon the dissolution and completion of the winding up and liquidation of the Company in accordance with Section 11, the Manager shall promptly execute and cause to be filed a certificate of cancellation in accordance with the Act and the laws of any other jurisdictions in which the Manager deems such filing necessary or advisable.

*(d)    Certain Member Rights.*    Notwithstanding anything contained in this Agreement to the contrary, the following acts shall require the prior written consent of Land Home, or the Members otherwise holding a majority in interest of the Membership Units (as defined below) not held by the Manager:

(i)    any action that would cause the voluntary liquidation, dissolution or termination of the Company;

(ii)    the authorization of the Company to make an assignment for the benefit of creditors, to file a voluntary petition in bankruptcy, or to file a petition or answer seeking, in respect of the Company, any reorganization, arrangement, compensation, readjustment, liquidation, dissolution or similar relief under any statute, law or regulation or any action in respect of involuntary bankruptcy or like proceeding;

(iii)    except in the ordinary course of business, the sale, lease, or other disposition by the Company of any material portion of its assets;

(iv)    a merger or consolidation of the Company with another limited liability company or other business entity or the sale of substantially all of the assets or business of the Company, or any like transaction which would result in a change in control of the Company;

(v)    except in the ordinary course of business, the entering into of any joint venture, partnerships or new ventures;

(vi)    any material change in the line of the Company business;

(viii)    the creation or assumption of any indebtedness, mortgage, pledge, security interest or encumbrance on any assets, other than in the ordinary course of business;

(ix)    any determination of a distribution of cash not made in accordance with Section 10 hereof;

(x)    any amendment to the Certificate;

(xi)    except in the ordinary course of business, the making of any expenditures by the Company that would exceed $10,000 individually or in the aggregate;

6

DocuSign Envelope ID: 73D01649-EF6A-46D6-8E2B-6B90AAAFCB28

(xii) any action to admit any other Person as a Member, authorize or issue any additional Units in the Company or any other rights to acquire any additional interest or Units in the Company (including options or securities exercisable for Units in the Company or making capital calls) or any redemptions of Units in the Company;

(xiii) entering into any agreement or arrangement with an Affiliate of either the Member or the Manager not expressly permitted herein;

(xiv) approval of any vendors, including, but not limited to, servicers, asset managers and foreclosure counselors;

(xv) approval of any purchases; and

(xiv) any commitment by the Company to do any of the foregoing.

(e) *Banking.* The funds of the Company shall be kept in such accounts as may be designated by the Manager. Company funds shall be deposited into the Trust Account. Each Member shall be authorized to monitor the Trust Account and any related accounts electronically. There shall be no commingling of the assets of the Company with the assets of any other Person. Manager shall instruct any Mortgage Servicer, Sub-Servicer and Legal Servicer to remit all payments in connection with the related Assets to the Trust Account.

(f) *Reliance by third parties.* Persons dealing with the Company are entitled to rely conclusively upon the power and authority of an authorized person as hereinabove set forth and upon the certificate of the Members to the effect that the authorized person is then acting for the Company and has authority to act on its behalf.

(g) *No other fees.* The Manager or its respective Affiliates shall not receive any other fees, commissions or other compensation from the Company or any other Person with respect to the business of the Company except as specifically set forth herein or as may otherwise be approved by the Members.

**Section 5    Officers**

(a) The Members or Manager may, but are not obligated to, designate one or more individuals as officers of the Company, who may but need not have titles, and shall exercise and perform such powers and duties as shall be assigned and delegated to them from time to time by the Manager. Any officer may be removed by the decision of the Manager at any time, with or without cause.

**Section 6    Capital Contributions and Distributions**

(a) *Contributions.* Schedule 1 sets forth the capital contributions by the Members, and may be amended from time to time to reflect capital

7

contributions or other consideration contributed by a Member or new Members subsequent to the date of this Agreement.

i. Notwithstanding any provisions to the contrary, it is the intention and agreement of the Members that while their respective ownership interests are equal, decisions that are subject to Member vote must be unanimous. In the event unanimity is not possible, either Member may seek to advance its position with an independent third party Arbitrator selected through JAMS or American Arbitration Association. Costs of such mediation will be borne by the Member initiating arbitration only if the ultimate arbitration decision does not support the initiating Member's position. If the initiating Member's position is supported by the Arbitrator, the Company will bear the cost of arbitration.

(b)     *Additional Contributions.*  Except as set forth in 6(a), no Member shall be required to make any additional capital contribution.

(c)     *Manager.*  The Manager, in its capacity as Manager, shall not be required to make any capital contributions to the Company.

(d)     *Distributions.*

(i)     Generally.  Distributions, in accordance with this Agreement,  will be made to the Members on a monthly basis, and at such other times, in the aggregate amounts determined by the Manager, to the fullest extent permitted by law.

(ii)     Distributions for Payment of Taxes.  During each calendar year the Manager shall cause the Company to distribute to each Member who is a Member on a date of distribution an amount sufficient to pay federal, state and local income taxes at an amount equal to such Member's share, if any, of the Company's taxable income for the applicable calendar year, but only to the extent (1) Available Cash for distribution exceeds a ninety (90) day reserve for working capital, as determined by the Manager and the Members owning a majority in interest of the Units, and (2) such distributions will not cause a breach under any loan, lease or other Company documents. All payments shall be based on a Company estimate of the tax liability for the applicable calendar year taking into account unused losses from previous calendar years (assuming they are used solely to offset Company taxable income until fully used). Additional payments can be made if the estimated payments were not sufficient to cover the entire tax liability; and if the estimated payments exceeded the actual tax liability, the excess shall offset following year mandatory distributions hereunder.  All determinations as to the amount of taxable income and its treatment, including, for example, the character of a portion of said income as long-term capital gains, shall be made by the accountants for the Company in consultation with the Members and any advisors or accountants designated by the Members, whose

8

determination, as reflected in the tax return of the Company, shall be final and binding on all concerned.

(e) *Membership Units.*

(i) <u>Deemed Securities</u>. Membership Interests shall be issued in the form of membership units (the "<u>Membership Units</u>" or "<u>Units</u>"). The aggregate number of Membership Units that the Company has authority to issue is 100 Membership Units. Each Membership Unit in the Company shall be deemed to constitute a security for purposes of Articles 8 and 9 of the Delaware Uniform Commercial Code. The transfer of all Membership Units in the Company may be made to the extent permitted by law, in accordance with the provisions of this Agreement, and with the prior written consent of the Manager (which such consent shall not be unreasonably withheld or delayed) and a majority in interest of the Membership Units; <u>provided</u>, <u>however</u>, a Member may transfer all or any portion of its Membership Units to any other Member or any Affiliate of such Member without such prior written consent.

(ii) <u>Statement of Membership Units</u>. At the request of any Member, the Company shall state in writing the particular Membership Units owned by that Member as of the date the Company makes the statement. The statement must describe the Member's rights to vote, to share in profits and losses, and to share in distributions, as well as any assignment of the Member's rights then in effect.

## Section 7      Certain Tax and Accounting Matters.

(a) *Fiscal Year.* The Fiscal Year of the Company will be the calendar year.

*(b) Tax Matters.*

(ii) The Manager will serve as the "partnership representative" within the meaning of Section 6223 of the Code (together with applicable Treasury Regulations and other IRS guidance, are referred to herein as the "<u>New Audit Rules</u>") or under any similar state or local law. The "partnership representative" is herein referred to as the "<u>Tax Representative</u>". The Tax Representative is authorized to represent the Company (at the Company's expense) in all audits, disputes, controversies or proceedings with the IRS and is authorized to make any available Tax Representative election with respect to the provisions of Code Sections 6221 through 6241 and take any action the Tax Representative deems necessary or appropriate to comply with the requirements of the Code and to conduct the Company's affairs with respect to these provisions. All expenses incurred in connection with any such audit, investigation, settlement or review shall be borne by the Company.

9

 **Cymbidium128490**

(iii)    The Members agree that any and all actions taken by the Tax Representative shall be binding on the Company and all of the Members. Each Member agrees to take all actions that the Tax Representative makes in connection with an audit pursuant to this Section 7(b), including (i) providing any information reasonably requested in connection with any tax audit or related proceeding (which information may be freely disclosed to the Internal Revenue Service or other relevant taxing authorities), (ii) paying all liabilities attributable to such Member as a result of an election under Section 6226 of the Code and (iii) filing any amended returns that the Tax Representative determines, in accordance with this Section 7(b), to be necessary or appropriate to reduce an imputed underpayment under Section 6225(c) of the Code and paying all liabilities associated with such an amended return. Each Member and former Member shall be obligated to indemnify and hold harmless the Company, Tax Representative, and any designated individual appointment by the Tax Representative to the extent that the Company is required to pay any amounts related to a liability attributable to such Member or former Member.

(iv)    Each Member further agrees that such Member will refrain from taking any action in any tax audits or tax litigation relating to tax items of the Company as that term has been interpreted under Section 6221 of the Code, unless the prior written consent of the Tax Representative has been obtained, which consent shall not be unreasonably withheld.

(v)    The Members hereby consent in advance to any amendments to this Section 7(b) that the Tax Representative determines are reasonably necessary and appropriate to address additional guidance, or that the Tax Representative otherwise determines are in the best interest of the Company and the Members in complying with the New Audit Rules.

(vi)    The Manager shall make such tax elections on behalf of the Company as they shall deem appropriate in their sole discretion. Except as otherwise determined appropriate by the Manager, the Members agree to classify the Company as a partnership for U.S. federal and any applicable state income tax purposes, and neither the Company nor any Member shall file an election to classify the Company as an association taxable as a corporation for such income tax purposes.

(c)    *Audits.*  An accounting firm approved by Members holding a majority in interest of the Membership Units shall conduct an annual full financial audit of the Company, which cost shall be borne by the Company.

(d)    *Records and Reports.*  In accordance with the Act, at the expense of the Company, the Manager shall maintain records and accounts of all operations and expenditures of the Company. At a minimum the Company shall keep at its principal place of business the following records:

10

(vii)     a current list and past list, setting forth the full name and last known mailing address of each Member;

(viii)    a copy of the Certificate of Formation and all amendments thereto;

(ix)     copies of this Agreement and all amendments hereto;

(x)     copies of the Company's federal, state, and local tax returns and reports, if any, for the three (3) most recent years; and

(xi)     copies of the Company's Financial Statements for the three (3) most recent Fiscal Years.

**Section 8     Members.**

(a)     *New Members and Assignment of Interest.*  A new Person may be admitted from time to time as a new Member with the consent of a majority in interest of the Membership Units and the Manager which such consent shall not be unreasonably withheld, delayed or conditioned; provided, however, that each such new Member shall execute an applicable supplement to this Agreement pursuant to which the new Member agrees to be bound by the terms and conditions of this Agreement.  Such admission will be deemed effective immediately prior to the assignment and, following such admission, the transferring Member will cease being a Member if the transfer includes all of the Member's interest.  Admission of a new Member shall not be cause for the dissolution of the Company.

(b)     *Limitation of Liability.*  A Member's liability to the Company, to any other Member or to any third party shall be limited to the maximum extent permitted by law. A Member shall not be held personally liable for any indebtedness, liability or obligation of the Company except as otherwise expressly set forth in this Agreement, the Act and any other applicable law.

(c)     *Priority and Return of Capital.*  If there is more than one Member, no Member shall have a right to demand a return or payment of its capital contribution and no Member shall have priority over any other Member; provided, however, that this subpart shall not apply to any loan or other indebtedness (as distinguished from a capital contribution made pursuant to Section 6(a)) made by a Member to the Company.

(d)     *Limitations on Rights of Members.*  If there is more than one Member, no Member shall have the right to transact business for the Company and will not have the power or authority to sign, act for or bind the Company. The Members will not hold themselves out to be responsible for the decisions or actions respecting the business and affairs of the Company.  Except as otherwise specifically provided in this Agreement to the contrary, no Member shall have the right to:

(i)     sign for or to bind the Company, such power being vested solely and exclusively in the Manager;

11

(ii) bring an action for partition of the Company's assets or to compel any sale or appraisal of the Company's assets;

(iii) sell or assign such Member's interest or to constitute the vendee or assignee thereunder a Member;

(iv) subject the assets of the Company (or any part thereof) to the authority of any court or to any bankruptcy, insolvency, receivership or similar proceeding; or

(v) remove or replace the Manager.

(f) *Liability of a Member to the Company.* A Member that rightfully receives the return of any portion of its capital contribution is liable to the Company only to the extent now or hereafter provided by the Act. A Member that receives a distribution made by the Company in violation of this Agreement shall be liable to the Company for the amount of such distribution.

(g) *Amendment to this Agreement.* In the event that the Manager or a Member proposes an amendment or modification to this Agreement, the Manager or such Member, as the case may be, shall send notice specifying the proposed change to the Manager and all other Members. Any amended or modification to this Agreement must be approved by the written consent of a majority in interest of the Membership Units.

(h) *Meetings.* There shall be no annual meetings of the Members of the Company. Meetings of the Members, for any purpose or purposes, may be held on any business day, when called by a Manager or a vote of the Members. Unless otherwise agreed to by all Members, the meeting must be held on a date not less than ten (10) but not more than sixty (60) days after the giving of notice by a Member. Each meeting shall be called to convene between 9:00 a.m. and 5:00 p.m., and shall be held at a place designated in the notice and the location of the meeting shall be in at a mutually acceptable place in Seattle, Washington. Meetings shall be chaired by the Manager. Notwithstanding anything to the contrary contained in this Agreement, the Manager and the Members may participate in any meeting by means of conference telephone or similar communications equipment by means of which all persons participating in the meeting can hear each other, and such participation shall constitute attendance at such meeting.

(i) *Action by Members Without a Meeting.* Whenever the Members of the Company are required or permitted to take any action by vote, such action may be taken without a meeting, without prior notice and without a vote, if a consent or consents in writing, setting forth the action so taken, shall be signed by the Members who hold voting interests having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all of the Members entitled to vote thereon were present and voted and shall be delivered to the administrative office of the Company, or to an employee or agent of the Company.

12

(j)   *Waiver of Notice.*  When any notice of meeting is required to be given to any Member, a waiver of the notice of meeting in writing signed by the Member entitled to the notice of meeting, whether before, at, or after, shall be equivalent to the giving of the notice of meeting.

(k)   *Quorum; Adjournment.*  Except as may otherwise be provided by law, at any meeting of the Members, the presence of Members holding more than 66-2/3% percent of the outstanding interests of the Members shall be necessary to constitute a quorum for the transaction of business.

(l)   *Proxies.*  Members entitled to vote may vote in person or by proxy.  The Person appointed as proxy need not be a Member.  Unless the writing appointing a proxy otherwise provides, the presence at a meeting of the Member who appointed a proxy shall not operate to revoke the appointment.  Notice to the Company, in writing or in open meeting, of the revocation of the appointment of a proxy shall not affect any vote or action previously taken or authorized.

(m)   *Votes of Members.*  All votes of Members shall be in accordance with the percentage of the Membership Units owned by each Member.  Voting need not be by ballot.

(n)   *Manner of Acting.*  If a quorum is present, a vote of Members owning at least 51% of the outstanding Membership Units of the Company shall be the act of the Members, unless the vote of a greater or lesser proportion is otherwise required by the Act or by this Agreement.

(o)   *No Exclusive Duty to Company.* A Member may have other business interests and may engage in other activities in addition to those relating to the Company, whether or not such business interests or activities may be competitive with those of the Company.

(p)   *Death, Incapacity or Bankruptcy of Member.*  In the event of the death, incapacity or bankruptcy of a Member, the successor in interest to such Member's rights, title and interest as a Member shall, with respect to such Member's interest in the Company, replace such Member as the successor Member in the Company.

(q)   *No Dissolution.*  The Company shall not be dissolved by the admission of new Members in accordance with the terms of this Agreement.

(r)   *Waiver of Dilution.* Notwithstanding any provision in this Agreement to the contrary, no action shall be taken that will effectively dilute the Membership interest of any Member in the Company without a specific written waiver by such Member of such dilution.

**Section 9    Management of Company.**

13

(a) *Powers of Manager.* In accordance with the Act, management and operation of the Company shall be vested exclusively in, and the primary responsibility of, the Manager; and, except as expressly otherwise provided in this Agreement, the Manager is hereby authorized, on behalf and in the name of the Company, to carry out any and all of the objects and purposes of the Company and to enter into and perform all contracts and other undertakings that the Manager may deem necessary or advisable or incidental thereto, solely to the extent consistent with the terms and conditions of this Agreement. Without limiting the generality of the foregoing, subject to the terms and conditions of this Agreement, the Manager shall have power and authority, on behalf of the Company, to:

(i) perform due diligence on the Portfolios and determine whether and for what price Portfolios should be acquired for the Company; provided, that the prior written consent of Land Home shall be required for any acquisitions;

(ii) purchase liability and other insurance to protect the Company's assets and business;

(iii) execute instruments and documents, including without limitation contracts to convey real property and any documents incidental or required to give effect thereto, checks, drafts, notes and other negotiable instruments, mortgages or deeds of trust, security agreements, financing statements, documents providing for the acquisition, mortgage or disposition of the Company's property, assignments, bills of sale, leases, and any other instruments or documents necessary to the business of the Company; provided, that the prior written consent of Land Home shall be required for any such acquisitions, mortgages or dispositions;

(iv) employ or retain accountants, legal counsel, managing agents or other experts to perform reasonable and necessary services for the Company and reasonably compensate them from Company funds;

(v) enter into contracts of insurance for the Company's benefit;

(vi) enter into any and all other agreements with any other Person for any purpose consistent with the business of the Company, in such form as the Manager may approve, including loan modification agreements and agreements to sell property;

(vii) open or close bank accounts in the name of the Company, with such signatories as the Manager shall determine;

(viii) commence, prosecute and defend lawsuits and all other proceedings;

(xi) enter into or accept assignment of contracts and take all actions required by or arising out of such contracts, including termination of such contracts; and

14

(x)     do and perform all other acts as may be reasonable and necessary to the conduct of the Company's business.

(b)     *Management of Assets.*  The Manager shall direct and manage the servicing of the Assets through the Company's relationship with its Sub-Servicers, the Legal Servicer and the Mortgage Servicer.  Any Asset purchases and sales shall be approved by the Manager and Land Home.

(c)     *Standard of Conduct.*

(i)     The Manager shall act in good faith and in accordance with the Standard of Conduct in performing and carrying out each of its duties or obligations hereunder.  Each Member hereby agrees that any standard of care or duty imposed under the Act or any other applicable law shall be modified, waived or limited in each case as required to permit the Manager, as the case may be, to act under this Agreement and to make any decision pursuant to the authority prescribed in this Section 9(e) so long as such action or decision  complies with the Standard of Conduct and does not constitute intentional misrepresentation, fraud, misconduct, bad faith or negligence or any material violation of applicable law or regulation or breach of this Agreement and is reasonably believed by the Manager to be consistent with the overall purposes and objectives of the Company.  The Members hereby acknowledge that the Manager owns and/or manages directly or through Affiliates other portfolios and assets similar to the Portfolios and that such ownership and activities and the purchase of any such portfolio or assets shall not be viewed as "business opportunities" for the Company and shall be permitted activities by the Manager even if in competition with the Company.  The Manager shall not in any way be deemed to be a Member as result of its rights, duties and activities provided for herein.

(ii)     Notwithstanding the foregoing subsection (c)(i), Manager may cause the Company to participate, directly or indirectly, in transactions, including the purchase or sale of Assets, in which the counter-party is the Manager or its owners or wholly-owned subsidiaries, or an entity that is also managed or advised by the Manager.  These transactions by their nature involve a potentially conflicting division of loyalties and responsibilities of the Manager with respect to the parties to such transactions.  Upon the prior written consent of the Members holding a majority in interet of the Members, the Manager may engage in such transactions, provided, that the transactions are upon terms and conditions that are commercially reasonable and substantially similar to those that would be available on an arm's-length basis with third parties and are otherwise in compliance with all applicable laws.

(iii)     This Agreement is not intended to, and does not, create or impose any fiduciary duty on any Member.  Furthermore, each of the Members, the Company, the Manager hereby waives any and all fiduciary duties of the Members that, absent such waiver, may be implied by applicable law, and in doing so,

15

acknowledges and agrees that the duties and obligation of the Members to each other, to the Company and to the Manager are only as expressly set forth in this Agreement. The provisions of this Agreement, to the extent that they restrict the duties and liabilities of a Member otherwise existing at law or in equity, are agreed by the Members to replace such other duties and liabilities of such Member. Whenever in this Agreement a Member is permitted or required to make a decision or provide any consent or approval (including a decision or approval that is in such Member's "discretion" or under a grant of similar authority or latitude), the Member shall be entitled to consider only such interests and factors as such Member desires, including its own interests, and shall have no duty or obligation to give any consideration to any interest of or factors affecting the Company or any other Person. Whenever in this Agreement a Member is permitted or required to make a decision in such Member's "good faith," the Member shall act under such express standard and shall not be subject to any other or different standard imposed by this Agreement or any other applicable law.

(d)     *Notice.*  The Company shall provide notice to each Member of (i) the occurrence of any "Termination Event" under the Management Agreement, and (ii) any known breach of any provision of any Transaction Document.  The Company shall deliver to each Member any report, notice or other information received by the Company pursuant to the Transaction Documents.

(e)     *Reports to Members.*  The Manager will distribute to all Members monthly reports of the performance of the Company, in a format and scope to be approved by a majority of the Members.

### Section 10     Cash Distributions.

(a)     *Nonliquidating Distributions.*  Distributions of Available Cash with respect to each Portfolio other than distributions in liquidation pursuant to <u>Section 10(b)</u> and <u>Section 11</u> (each, a "<u>Distribution</u>") shall be made on a monthly basis, from the Trust Account set up by the Legal Servicer for benefit of the Company in the following order of priority:

i.  first, to the Mortgage Servicer, to the extent not paid or held back out of recoveries by the Mortgage Servicer prior to remittance to the Trust Account, to be distributed in the following priority:

1.     to refund any mortgage obligor funds determined to be in excess of the amounts required under the terms of the related loan documents;

2.     to pay the Servicing Fee earned during the Recovery Period;

3.     to reimburse for Servicing Fees earned during prior Recovery Periods, to the extent not previously paid or reimbursed;

16

4.  to reimburse for approved expenses in accordance with the Servicing Agreement entered into by the Company and Mortgage Servicer or Sub-Servicer, as the case may be.

ii. to the Legal Servicer, the Legal Servicing Fees;

iii. to the Manager, the Management Fee, as that term is defined in the Management Agreement, and any deferred Management Fees not previously paid in prior periods;

iv. to the Bank, any amounts due and owing under the Company's loan agreement with the Bank;

v. to the Members, any remaining amounts in accordance with the percentage of Membership Units owned by each Member.

(b)  *Distributions in Liquidation.* Notwithstanding <u>Section 10(a)</u>, distributions made upon liquidation of the Company shall be made in accordance with Section 11.

(c)  *Distributions in Kind.* For purposes of this Agreement, non-cash assets, if any, shall be distributed in a manner that reflects how cash proceeds from the sale of such assets for fair market value would have been distributed (after any unrealized gain or loss attributable to such non-cash assets has been allocated among the Members in accordance with <u>Article 9</u>).

## Section 11  Dissolution.

(a)  *Dissolution.* Subject to any other provisions of this Agreement that would defer or prevent dissolution of the Company, the Company shall be dissolved upon the first to occur of the following:

(1) the latest date on which the Company is to dissolve, if any, as set forth in the Certificate of Formation or this Agreement;

(2) the occurrence of a Member Cessation Event unless the Company is continued without dissolution in a manner permitted by this Agreement or the Act;

(3) the entry of a decree of judicial dissolution under Section 18-802 of the Act; or

(4) the Manager determines, in the Manager's reasonable discretion and with the consent of a majority in interest of the Membership Units, that the costs of operating or continuing the Company exceed the benefit to the Members.

17

(b)     *No Resignation of Member.*  If there is only one Member, such Member may not resign from the Company prior to the dissolution of the Company.

(c)     *Winding Up.*  The Manager shall have full power and authority to sell, assign, and encumber any or all of the Company's assets and to wind up and liquidate the affairs of the Company in an orderly and business-like manner. The Manager shall sell or otherwise liquidate all of the Company's assets as promptly as practicable and shall apply the proceeds of such sale and the remaining Company assets in the following order or priority:

(d)     The assets of the Company shall be distributed as follows:

(1) First, to the payment of the debts and liabilities of the Company, including any expense of the Company incidental to such winding-up and dissolution;

(2) Second, to the setting up of any reserves which may be deemed reasonably necessary for any contingent or unforeseen liabilities or obligations of the Company as provided in Section 18-804(h) of the Delaware Act and, subject to such Section 18-804(b), at the expiration of such period as for distribution in the manner hereinafter provided; and

(3) Third, in accordance with and in the manner provided in Section 10(a) of this Agreement.

(e)     *Cancellation of Certificate of Formation.*  Upon the completion of the distribution of the Company's assets as provided in Section 11(d) hereof, the Company shall be terminated, and the Certificate of Formation shall be canceled and other such actions shall be taken as may be necessary to terminate the Company.

(f)     *Termination.*  Upon completion of the dissolution, winding up, liquidation, and distribution of the assets of the Company, the Company shall be deemed terminated.

## Section 12     Exculpation and Indemnification.

No Manager, Member, officer or other authorized agent of the Company will be liable to the Company, or any other Person who has an interest in the Company, for any loss, damages or claim incurred by reason of any act or omission performed or omitted by such Person in good faith on behalf of the Company and in a manner reasonably believed to be within the scope of the authority conferred on such Person by this Agreement, except that such Person will be liable for any such loss, damage or claim incurred by reason of such Person's willful misfeasance, breach, fraud, gross negligence, or bad faith, or breach of this Agreement which such breach shall have not been cured within ten (10) days after such Member's receipt of written notice of such breach.  In the event that any Member, or any of its directors, indirect partners, directors, managing directors, officers, stockholders,

18

DocuSign Envelope ID: 73D01649-EF6A-46D6-8E2B-6B90AAAFCB28

employees, agents, affiliates or controlling persons, or any Manager or Officer (individually and collectively, an "Indemnified Person"), becomes involved, in any capacity, in any threatened, pending or completed, action, suit proceeding or investigation, in connection with any matter arising out of or relating to the Company's business or affairs, to the fullest extent permitted by applicable law, any legal and other expenses (including the cost of any investigation and preparation) incurred by such Indemnified Person in connection therewith will, from time to time, be advanced by the Company prior to the final disposition of such action, suit, proceeding or investigation upon receipt by the Company of an undertaking by or on behalf of the Indemnified Person to repay such amount if it will ultimately be determined that such Indemnified Person is not entitled to be indemnified by the Company in connection with such action, suit proceeding or investigation as provided in the exception contained in the next succeeding sentence. To the fullest extent permitted by law, the Company also will indemnify and hold harmless an Indemnified Person against any losses, claims, damages, liabilities, obligations, penalties, actions, judgments, suits, proceedings, costs, expenses and disbursements of any kind or nature whatsoever (collectively, "Costs"), to which such Indemnified Person may become subject in connection with any matter arising out of or in connection with the Company's business or affairs, except to the extent that any such Costs result solely from the willful misfeasance or bad faith of such Indemnified Person. If for any reason (other than the willful misfeasance or bad faith of such Indemnified Person) the foregoing indemnification is unavailable to such Indemnified Person, or insufficient to hold it harmless, then the Company will contribute to the amount paid or payable by such Indemnified Person as a result of such Costs in such proportion as is appropriate to reflect not only the relative benefits received by the Company on the one hand and such Indemnified Person on the other hand but also the relative fault of the Company and such Indemnified Person, as well as any relevant equitable considerations. The reimbursement, indemnity and contribution obligations of the Company under this Section will be in addition to any liability which the Company may otherwise have to any Indemnified Person and will be binding upon and inure to the benefit of any successors, assigns, heirs and personal representatives of the Company and any indemnified Person. The reimbursement, indemnity and contribution obligations of the Company under this Section will be limited to the Company's assets, and no Member will have any personal liability on account thereof. Notwithstanding the foregoing, the initial Members and their successors, assigns, heirs and personal representatives shall have full indemnification for any reason and shall have no liability with regards to this Agreement. The foregoing provisions will survive any termination of this Agreement.

**Section 13    No Third Party Beneficiaries**.

Except as provided in Section 15 of this Agreement, (i) no provisions of this Agreement are intended to, and no provisions will, confer any right or claim upon or otherwise inure to the benefit of any creditor or other third party having dealings with the Company, (ii) this Agreement is expressly not intended for the benefit of any creditor of the Company or any other Person and (iii) no such creditor or any third party shall have

19

DocuSign Envelope ID: 73D01649-EF6A-46D6-8E2B-6B90AAAFCB28

any rights under this Agreement or any agreement between the Company and Member with respect to any capital contribution or otherwise.

### Section 14    Governing Law.

This Agreement will be governed by, and construed under, the laws of the State of Delaware, without regard to principles of conflict of laws.

### Section 15    "SPE Provisions".

(a)    *Effect of Section 15 Generally.*

(1)    The provisions of this Section (the "SPE Provisions") will become effective upon entry of the Company into a loan agreement with the Bank, and will remain in effect until such time as all of the Company's obligations thereunder have been paid and discharged in full.   If there is any inconsistency between the provisions of the loan agreement, on one hand, and the provisions of this Agreement or of any other document governing the formation, management or operation of the Company, on the other hand, the provisions of the loan agreement will prevail.

(2)    If the SPE Provisions are effective, if there is any inconsistency between the provisions of this Section and any other provision of this Agreement or of any other document governing the formation, management or operation of the Company, the provisions of this Section will prevail.

(b)    *Preservation of Company Existence and Maintenance as a Separate Entity.*

(1)    The Company will do or cause to be done all things necessary to preserve and keep in full force and effect its limited liability company existence, rights (charter and statutory) and franchises.

(2)    The Company will not dissolve under Section 11(a)(1) and will do everything reasonably possible to avoid dissolving under Section 11 (a)(2).

(c)    *Specific Affirmative Covenants.*   The Company will:

(1)    maintain complete and accurate books and financial statements and records of the Company separate from those of its Members or any other Affiliate or Person;

(2)    file its own tax returns separate from those of any other person in the event the Company is not treated as a tax-disregarded entity under applicable law;

**CONFIDENTIAL**                                                      **Cymbidium128501**

(3)     observe all limited liability company procedures and formalities, including maintaining minutes of meetings of the Managers and acting only pursuant to due authorization of the Managers;

(4)     conduct its dealings with third parties in its own name and as a separate and independent entity;

(5)     maintain its bank accounts, funds and assets separately from those of its Members, any of their Affiliates or any other Person;

(6)     use stationery, invoices, checks and other business forms of the Company bearing the name of the Company and not those of any Member, any affiliate thereof or any other Person;

(7)     use its best efforts to avoid the appearance (i) of conducting business on behalf of its Members, any Affiliates thereof or any other Person, or (ii) that the assets of the Company are available to pay the creditors of its Members, any Affiliates thereof or any other Person;

(8)     pay the salaries of its own employees, if any;

(9)     allocate fairly and reasonably any overhead expenses that are shared with an Affiliate, including paying for shared office space and any services performed by an employee of an Affiliate;

(10)     use all reasonable efforts to promptly correct any known misunderstanding regarding its separate identity;

(11)     hold itself out as a separate entity;

(12)     hold all of its assets in its own name;

(13)     pay its own liabilities out of its own funds;

(14)     maintain a sufficient number of employees in light of its contemplated business operations, if any;

(15)     maintain adequate capital in light of its contemplated business operations;

(16)     maintain financial statements which show its assets and liabilities separate and apart from those of any other person; except that Company's financial position, assets, liabilities, net worth and operating results may be included in the consolidated financial statements of an Affiliate, provided that such consolidated financial statements contain a footnote indicating that Company is a separate legal entity whose

21

assets and credit are unavailable to satisfy the debt or other obligations of such Affiliate and that Company maintains separate books and records; and

(17)   comply with this Section.

The failure of the Company to comply with the foregoing covenants will not affect the status of the Company as a separate legal entity or adversely affect the limited liability of the Members, Manager or the officers.

(d)   *Specific Negative Covenants.*  The Company will not:

(1)   guarantee, become obligated for or hold itself or its credit out as being liable for the satisfaction of debts or other obligations of its Members or any Affiliates thereof or any other Person;

(2)   engage in any transaction with its Members or any Affiliate or the Company or its Members unless such transaction is on an arm's length basis and otherwise on terms no less favorable than the terms and conditions available at the time to the Company for comparable transactions with other Persons;

(3)   pledge its assets for the benefit of any other Person other than the Bank or make loans or advances to any other Person (including any Affiliate or Member or Affiliate of any Member);

(4)   commingle the funds or any other assets of the Company with those of any Affiliate or Member or any Affiliate of any Member or any other Person;

(5)   form, acquire or hold any subsidiary other than related to its business purpose;

(6)   have fewer than one Member;

(7)   make any investments other than in the Assets and Portfolios;

(8)   identify itself as a division of any other Person;

(9)   to the fullest extent permitted by law, engage in any dissolution, liquidation, consolidation, conversion, merger or sale, assignment or transfer of all or substantially all of the properties and assets of the Company or of any assets outside the ordinary course of the Company's business;

(10)   engage, either directly or indirectly, in any business other than the ownership, management and operation of the assets of the Company;

22

(11) without the consent of the Members holding at least a majority the outstanding Membership Units in the Company, or as allowed under this Agreement, amend or modify the Certificate of Formation of the Company or this Agreement; or

(12) without the consent of the Members holding at least a majority of the outstanding Membership Units or as otherwise allowed under this Agreement, (a) except as permitted under the Transaction Documents, settle claims with parties, (b) amend or waive Events of Default by another party under the Management Agreement, the Legal Services Agreement or the Servicing Agreement, or (c) amend open, close or amend the terms of, any deposit account (including any legal trust account).

(e) *No Other Indebtedness.* The Company will not voluntarily incur any liability, obligation or indebtedness, secured or unsecured, direct or indirect, absolute or contingent other than to the Bank or related to the leverage of its Portfolio acquisitions.

(f) *Transfer Restrictions.* No Member may transfer or assign in whole or in part its Membership Units without the written consent of the Manager and the Members holding a majority of the Membership Units.

(g) *Distributions.* The Company will only make such distributions to the Members as are authorized by this Agreement.

(h) *No Amendment of this Section.* No amendment may be made to this Section without the written consent of the Members holding at least a majority of the Membership Units.

(i) The Manager shall take all action necessary and proper to maintain the Company's compliance with this Section 15.

Section 16    **Confidentiality.**

(a) ***Confidentiality Obligations.*** Each Member and the Manager acknowledges that, in the course of performance of this Agreement, such Member will receive information related to the Company and its business that is considered confidential. Each Member and the Manager agrees that, during the term of this Agreement and for a period of three (3) years after the expiration or termination thereof, it will maintain in strict confidence and not disclose to any third party not under a binder of secrecy the Confidential Information (as defined below); *provided, however,* nothing herein shall restrict the disclosure by a Member of any Confidential Information (a) to (i) its Affiliates or any of its or its Affiliates' respective directors, officers, employees, members, investment managers or advisors, including attorneys, accountants or other professional advisors or consultants, who, in the sole judgment of such Member, has a need to know such information so long as such Persons are under a duty of confidentiality or (ii) the Manager or the other Members, (b) to the extent such disclosure is (x) required by applicable law,

23

rule or regulation or similar requirement of a Regulatory Authority or (y) requested by or in connection with any legal, judicial, regulatory or administrative proceedings or otherwise requested by any governmental agency or regulatory, administrative or supervisory authority (including, any stock exchange or other self-regulatory organization having jurisdiction) (each, a "Regulatory Authority") or any bank examiner, so long as, in the case of this clause (b), to the extent permitted by applicable law and if circumstances permit, such Member shall provide written notice to the Manager in advance of any such disclosure, (c) to the extent reasonably necessary to defend or prosecute any litigation or other similar proceeding or in connection with the exercise of any remedy hereunder or under any of the Transaction Documents or (d) with the prior consent of the Manager. Each Member acknowledges and agrees that money damages may not be a sufficient remedy for any breach of this Section 16(a), that each of the Company and the non-breaching Members is entitled to seek specific performance and injunctive or other equitable relief in connection with any breach of this Section 16(a) and that no proof of special damages shall be necessary in connection with the enforcement of this Section 16(a). Such remedy shall not be deemed to be the exclusive remedy for breach of this Section 16(a), but shall be in addition to all other remedies available at law or equity to the Company and the non-breaching Members.

(b)     *Certain Definitions.* For purposes of this Section 16, the following terms shall have the following meanings:

(ii)     "Confidential Information" shall mean confidential information related to the Company and its business that is disclosed to a Member by the Manager ("Receiving Party") other than any information that (i) was, is or becomes generally available to the public other than as a result of a disclosure by such Receiving Party in breach of this Agreement, (ii) was within the possession of such Receiving Party prior to being furnished to such Receiving Party pursuant hereto or is lawfully obtained by such Receiving Party thereafter from a source that, to the knowledge of such Receiving Party, is not, by virtue of such disclosure, in breach of any obligation of confidentiality with respect to such information, or (iii) is or was independently developed by such Receiving Party.

## Section 17     General Provisions.

(a)     *Notices.* Any notice, demand or other communication required or permitted to be given pursuant to this Agreement shall have been sufficiently given for all purposes if (i) delivered personally or by overnight courier service to the party to whom such notice, demand or other communication is directed or (ii) sent by registered or certified mail, postage prepaid, addressed to the Members or the Company at its address set forth in this Agreement, including Schedule I. Except as otherwise provided in this Agreement, any such notice shall be deemed to be given (i) when received if delivered personally or by overnight courier and (ii) three (3) business days after the date on which it was deposited in a regularly maintained receptacle for the deposit of United States mail, addressed and sent as set forth in this section.

24

(b)  *Headings.*  The headings in the Agreement are for convenience only and shall not be used to interpret or construe any provision of this Agreement.

(c)  *Waiver.*  No failure of a Member to exercise, and no delay by a Member in exercising, any right or remedy under this Agreement shall constitute a waiver of such rights or remedy.  No waiver by a Member of any such right or remedy under this Agreement shall be effective unless made in a writing duly executed by all Members and specifically referring to each such right or remedy being waived.

(d)  *Severability.*  Whenever possible, each provision of this Agreement shall be interpreted in such a manner as to be effective and valid under applicable law.  However, if any provision of this Agreement shall be prohibited by or invalid under such law, it shall be deemed modified to conform to the minimum requirements of such law, or, if for any reason it is not deemed so modified, it shall be prohibited or invalid only to the extent of such prohibition or invalidity without the remainder thereof or any other such provision being prohibited or invalid.

(e)  *Successors and Assigns.*  Each of the covenants, terms, provisions and agreements herein contained shall be binding and inure to the benefit of the parties hereto and, to the extent permitted by this Agreement, their respective successors and assigns; *provided* that the Manager may not assign this Agreement or any of its rights or obligations hereunder to any Person without the prior written consent of the Members.

(f)  *Counterparts.*  This Agreement may be executed in multiple counterparts (including, without limitation, facsimile counterparts), each of which will be deemed an original, but all of which together will constitute one and the same instrument.

(g)  *Exclusive Jurisdiction; Waiver of Jury Trial.*  Each of the parties hereto agrees that any legal action or proceeding with respect to this Agreement or any agreement, certificate or other instrument entered into in contemplation of the transactions contemplated by this Agreement, or any matters arising out of or in connection with this Agreement or such other agreement, certificate or instrument, and any action for the enforcement of any judgment in respect thereof, shall be brought exclusively in the courts of the State of Delaware, or the Federal District Court for the State of Delaware, unless the parties to any such action or dispute mutually agree to waive this provision.  By execution and delivery of this Agreement, each of the parties hereto irrevocably consents to service of process out of any of the aforementioned courts in any such action or proceeding by the mailing of copies thereof by registered or certified mail, postage prepaid, or by recognized express carrier or delivery service, to the applicable party at his, her or its address referred to in Section 18.1.  Each of the parties hereto irrevocably waives any objection which he, she or it may now or hereafter have to the laying of venue of any of the aforementioned actions or proceedings arising out of or in connection with this Agreement, or any related agreement, certificate or instrument referred to above, brought in the courts referred to above and hereby further irrevocably waives and agrees, to the fullest extent permitted by

25

DocuSign Envelope ID: 73D01649-EF6A-46D6-8E2B-6B90AAAFCB28

applicable law, not to plead or claim in any such court that any such action or proceeding brought in any such court has been brought in any inconvenient forum. Nothing herein shall affect the right of any party to serve process in any other manner permitted by law. **EACH PARTY HERETO HEREBY WAIVES, TO THE EXTENT PERMITTED BY LAW, ITS RIGHT TO A TRIAL BY JURY FOR ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT.**

*[Remainder of Page Intentionally Left Blank]*

**CONFIDENTIAL** **Cymbidium128507**

IN WITNESS WHEREOF, the Member has signed this Agreement as of the date set forth above.

MEMBERS:

OAK HARBOR MANAGEMENT, LLC

By: _____
Name: Tony Yu
Title: Authorized Representative

LAND HOME FINANCIAL SERVICES, INC.

By: _____
Name: Chris Wittrig
Title: Vice President

Acknowledged by:

OAK HARBOR MANAGEMENT, LLC, AS THE MANAGER

By: _____
Name: Tony Yu
Title: Authorized Representative

DocuSign Envelope ID: 73D01649-EF6A-46D6-8E2B-6B90AAAFCB28

## EXHIBIT A

EXPENSES

Licensing costs.

Customary and reasonable due diligence costs of evaluating Portfolios which may be purchased by the Company, regardless of whether the Company purchases a Portfolio for which it conducts such due diligence, up to $10,000 individually or in the aggregate unless approved by a majority in interest of the Membership Units.

Servicing fees.

Sub-Servicer fees, if approved by Manager.

Trustee fees.

Audit costs.

Valuation costs.

Other customary and reasonable business expenses, up to $10,000 individually or in the aggregate unless approved by a majority in interest of the Membership Units.

28

 **Cymbidium128509**

# SCHEDULE I

## SCHEDULE OF MEMBERS

| Name of Member | Address of Member | Capital Contribution | Portion of Membership Interests and Number of Units |
|---|---|---|---|
| Oak Harbor Management, LLC | 2003 Western Ave. Suite 340 Seattle, WA 98121 | $ TBD | 50% 50 Units |
| Land Home Financial Services, Inc. | 1355 Willow Way, # 250, Concord, CA 94520 | $ TBD | 50 % 50 Units |

**CONFIDENTIAL** **Cymbidium128510**

# Exhibit 6

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

_____

CYMBIDIUM RESTORATION TRUST,     )
                                          )
                                          )
                                          )    Case No.
                  Plaintiff,       )
                                          )    2:24-cv-00025-KKE
            vs.                      )
                                          )
AMERICAN HOMEOWNER PRESERVATION    )
TRUST SERIES AHP SERVICING; its   )
Trustee, U.S. BANK TRUST, N.A.;   )
AHP CAPITAL MANAGEMENT, LLC;      )
AMERICAN HOMEOWNER PRESERVATION    )
SERIES 2015A+; its Trustee, U.S.  )
BANK TRUST NATIONAL ASSOCIATION;  )
AHP SERVICING, LLC; and JORGE     )
NEWBERY,                            )
                                          )
                                          )
                  Defendants.

_____

REMOTE VIDEOTAPED DEPOSITION OF WILLIAM WEINSTEIN
December 8, 2025
Witness Location:  Seattle, Washington
Commencing at 1:10 P.M.

Reported by:
Connie Recob, CCR, RMR, CRR
Washington CCR No. 2631
Oregon CCR No. 15-0436
Utah CCR No. 1133171-7801
Idaho CCR No. SRL-1220

HUDSON COURT REPORTING & VIDEO   (800) 310-1769

**New York**
**212-273-9911**       **Hudson Court Reporting & Video**
**1-800-310-1769**       **New Jersey**
**732-906-2078**

REMOTE APPEARANCES

For the Plaintiff:
BRADLEY S. KELLER
VICTORIA MOLINA
BYRNES KELLER CROMWELL LLP
1000 Second Avenue, 38th Floor
Seattle, Washington 98104
(206) 622-2000
bkeller@byrneskeller.com
vmolina@byrneskeller.com

For the Defendant:
HOZAIFA Y. CASSUBHAI
WILLIAM BURNSIDE
BAILEY DUQUETTE P.C.
800 Fifth Avenue, Suite 101-800
Seattle, Washington 98104
(206) 225-2250
hozaifa@baileyduquette.com
will@baileyduquette.com

Also Present:
Albert Boots - Videographer
Jorge Newbery

A. No, I have no reason to doubt the allegations in the complaint.

Q. Turning to Paragraph 14, it's on Page 5. I don't know if it's showing up on your end, but let me know if you need a moment.

Do you see Paragraph 14?

A. Yes.

Q. Under the title, "The AHP Sellers Breached the Contract, All Defendants Convert Plaintiff's Funds and Other Property," under Paragraph 14, Cymbidium alleges that, quote, "Over 200 of the loans purportedly sold to Cymbidium on October 7th, 2022, were no longer outstanding as of that date."

Do you see that?

A. Yes.

Q. On what basis were you alleging that, quote/unquote, over 200 loans were no longer outstanding as of that date?

A. Well, after the transaction occurred in October 2022, we discovered that there were many loans that had been collected on by AHP or otherwise sold or hypothecated and were no longer -- and were not available to be liquidated for the benefit of submitting them. And we later found out through employees or former employees of Cymbidium that Mr. Newbery knew about the sale of these loans or the hypothecation of these loans, and he failed to disclose that information to us.

**New York**
**212-273-9911**

**Hudson Court Reporting & Video**
**1-800-310-1769**

**New Jersey**
**732-906-2078**

Q. Specifically referring to the 200 loans, over 200 loans, did you -- were you responsible for tracking the loan statuses for Cymbidium?

A. Sorry, I don't understand your question.

Q. Let me reask it.

Prior to filing the complaint, did you personally identify over 200 loans that were no longer outstanding?

A. The answer, I believe, is yes.

Q. And can you explain to me the process that you went through to identify over 200 loans?

A. Well, when we went to sell the loans, we found out that, in fact, they were no longer owned by AHP or they were hypothecated to other third parties.

Q. I understand that's your allegation. I'm more specifically drawn to the number here, over 200 loans.

Did you personally identify over 200 loans that had been sold prior to October 7th, 2022?

A. I don't recall if it was over 200 or not. The answer is, is that there were at least 200 loans that were sold and/or hypothecated by the time this complaint was filed. Were all 200 of those loans compromised prior to October 2022? I don't know the answer to that. But there are at least 200 loans that are compromised at this point. I'd have to go back and look at -- we have a schedule that we're preparing to say when, in fact, Newbery and AHP covertly sold those

**New York**
**212-273-9911**

**Hudson Court Reporting & Video**
**1-800-310-1769**

**New Jersey**
**732-906-2078**

loans or hypothecated them and converted the assets.

Q. What do you mean by -- you've used this word "sold" or "hypothecated." What do you mean by "hypothecated"?

A. Hypothecated means that he pledged the loans and some other party received compensation for it.

Q. I think you just testified that you're not sure if it was prior to October 7th, 2022, but that you believe that there were over 200.

Is that your testimony?

A. I don't have the exact number, but at trial we will be able to present exact dates for each one. None of this information was provided by Mr. Newbery. We had to find it out through a very costly and expensive process of trying to sell each one of these loans. So ultimately there will be title reports and other information that will show when Mr. Newbery sold or hypothecated the loans. Do I know any case when the loan was sold or hypothecated? Not off the top of my head.

Q. Right. But you approved the allegation before filing that there were -- over 200 of these loans were sold to Cymbidium were no longer outstanding as of October 7th.

So again, my question remains, did you personally -- are you aware of any document as you sit here today that listed out over 200 loans that were no longer outstanding as of October 7th, 2022?

**New York**
**212-273-9911**

**Hudson Court Reporting & Video**
**1-800-310-1769**

**New Jersey**
**732-906-2078**

A. As I stated a moment ago, I am aware that there are over 200 loans that fall in this category. Do I know exactly when Mr. Newbery sold or hypothecated the loans off the top of my head, no, but there are documents that show that.

Q. Right. But you understand -- you're an attorney, correct?

A. I am an attorney.

Q. You understand the need to conduct -- to make allegations in good faith prior to filing a complaint, correct?

A. I didn't file the complaint, by the way. Byrnes and Keller did.

Q. I understand. But you reviewed the complaint before it was filed, correct?

A. No. I testified that I don't recall if I reviewed the complaint.

Q. Okay. So are you saying that Byrnes Keller filed a false allegation when it stated over 200 of the loans were purportedly sold to Cymbidium on October 7th, 2022, and no longer outstanding?

A. No, I'm not saying that at all.

Q. Okay. So I'm, again, trying to drill down on what particular piece of information or source of information were you relying on when you or when Byrnes Keller signed off on a complaint that said that there were -- over 200 of these loans were no longer outstanding as of October 7th.

A. As I testified earlier, there are over 200 loans that were

**New York**
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

**New Jersey**
732-906-2078

A. Yes.

Q. Okay. Now, this is an e-mail exchange between Jamie Moring and Karen Kamphausen, along with a couple of other individuals, with the subject line "AHP SOLD report."

Do you see that?

A. Yes.

Q. And this -- the initial e-mail is from Jamie Moring, who's listed as the transaction asset manager at Oak Harbor Capital, correct?

A. That's what she was, yes.

Q. Okay. Is she still with the company?

A. No.

Q. She writes to Karen. This is the Karen from AHP that you were referring to earlier, Karen Kamphausen?

A. Is that a question?

Q. Yes. This is the same Karen that you were earlier testifying about?

A. Yes.

Q. And Ms. Moring writes, "Karen, when should we anticipate the report in reference to this AHP SOLD report?"

And then Karen writes, "Great timing. Just finished."

And she attaches the sold loans document, an Excel file which I have now marked as Exhibit 5.

(Exhibit No. 5 marked

for identification.)

**New York**
**212-273-9911**

**Hudson Court Reporting & Video**
**1-800-310-1769**

**New Jersey**
**732-906-2078**

BY ATTORNEY CASSUBHAI:

Q. So if you can turn to that or have your attorney please show that on the screen. Let me know when you see it.

A. Yeah, I see it.

Q. Okay. Now, if you were to scroll all the way down, there are 32 rows of loans on this document.

Do you see that?

A. Yes.

Q. And so here, as of what looks like August 11th, 2023, Karen from AHP is identifying 32 loans, according to this document, that she is acknowledging were sold prior to October 2022.

Is that your understanding?

A. I don't recall being copied on that e-mail with Jamie Moring, but I did see this document that Kamphausen sent, if that's your question.

Q. All right. Did you -- at that point in time, August 2023, did -- did Cymbidium or somebody at Oak Harbor compile a list that exceeded 32 loans?

A. Yes.

Q. And do you know how many loans -- more loans it identified?

A. At that time, I don't. But I know it was considerably more than 32 loans.

Q. Like over 100?

A. I don't know the number at that time. I know it was a while ago. I know it was more than 32 loans.

**New York**
**212-273-9911**

**Hudson Court Reporting & Video**
**1-800-310-1769**

**New Jersey**
**732-906-2078**

Q. Do you know how much more?

A. **In fact, Mr. Newbery, in July -- because this list was created because I asked Mr. Newbery to acknowledge how many loans he had sold without telling me, and he said that he would instruct Kamphausen to create that list. But he admitted there were a lot more, but how many more he didn't know. But it was more than 32 loans.**

Q. Okay.

(Exhibit No. 6 marked

for identification.)

BY ATTORNEY CASSUBHAI:

Q. I've marked what we -- I'm putting in front of you what we've marked as Exhibit 6. Let me know when you have the document in front of you.

Do you see an e-mail in front of you, Mr. Weinstein?

A. **Yes.**

Q. All right. Now, this e-mail, Exhibit 6, is dated November 1, 2023, from Emma Brookman to, it appears you and a GValenzuela.

WSW@OakHarborCapital.com, that's your e-mail address, correct?

A. **(No answer.)**

Q. Is that correct, that's your e-mail address?

A. **That's one of my e-mail addresses, yes.**

Q. And here Ms. Brookman is saying, "Hi, Bill. Please find

agreement, with or without our consent, in many cases.

Q. So this is the money that you're referring to that -- so I guess let me ask you this: Was Newbery -- did you know that Newbery was selling assets -- selling loans?

A. In some cases he told us he was. And in other cases he told us he wasn't, and he did. It just depended. It depended on the transaction.

Q. Right. So in those cases where he told you he did, why is it the case that he was able to sell assets if, in fact, Cymbidium is owning those assets?

A. Because the property had not been transferred into Cymbidium's name. It was still in AHP's name, and AHP was still the mortgage servicer. And Newbery was -- allegedly, to accelerate liquidation of these assets, he was supposed to, in some cases, sell these loans with our consent and then remit the full amount of the proceeds, but in many cases he did not do that.

Q. In your experience being in this industry for as many years as you have, in a standard sale of distressed mortgage loans, would the buyer obtain full title to the loans at closing?

A. That's supposed to be the case, yes.

Q. And this would include both the legal title to the notes and the beneficial interest in the loans, right?

A. Well, it depends how the transaction is set up. Sometimes you get a simple transfer of the loan. In other cases there

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

ways, depending on what the agreement states.

Q. But that wasn't this agreement, correct?

A. In this agreement, Cymbidium bought 700-plus loans from AHP, and then Cymbidium was supposed to get complete fee simple ownership of those loans.

Q. And it bought those loans as of October 7th, 2022? That's your testimony?

A. Yes.

Q. In a standard distressed loan sale, the buyer receives the original promissory notes, correct?

A. That's supposed to be the case, yes. They were supposed to have been conveyed by AHP, but in many cases they never were.

Q. And those notes are typically endorsed either in blank or specifically to the buyer, correct?

A. They can be, yes.

Q. And the buyer's possession of these original notes is considered the strongest evidence of legal title; isn't that correct?

A. In most cases, that's true.

Q. And what are some examples where that would not be true?

A. Well, for example, if you had -- you couldn't provide the note, the original note, there's something called a lost note affidavit that, depending on the state, the applicable state law, may or may not be accepted.

That would be an example.

**New York**
212-273-9911

**Hudson Court Reporting & Video**
1-800-310-1769

**New Jersey**
732-906-2078

Q. document says it was a sale, it was always treated as a sale. Cymbidium purchased those loans.

Q. Okay. Turning to this section, the paragraph smaller letter i, under Section 4, "Price Differential," what does that contemplate?

A. It says that, "The seller shall pay the purchaser the accrued and unpaid price differential with respect to the mortgage lost in arrears on a monthly basis," and it says how that's calculated.

Q. Okay. So it's essentially an interest payment?

A. Yeah. The money that was being provided by Cymbidium was ultimately borrowed from Western Alliance, and that was money that we were paying the interest so if the repurchase obligation occurred, that we wanted to get paid back for the interest we were paying Western Alliance.

Q. Did this agreement -- do you know if this agreement referred to made any reference to Western Alliance? What was Western Alliance's role in connection with this agreement?

A. Western -- Western Alliance provided financing to Magerick for the money that was used to finance this agreement to buy the loans.

Q. Are there any e-mails -- did you have a discussion with Mr. Newbery prior to executing this agreement that Western Alliance would be providing finance to Magerick for purchases of these loans?

**New York**
**212-273-9911**

**Hudson Court Reporting & Video**
**1-800-310-1769**

**New Jersey**
**732-906-2078**

answer that. You're not going to get into my trial strategy and my discussions with him about that.

ATTORNEY CASSUBHAI: Okay. That's fair.

BY ATTORNEY CASSUBHAI:

Q. Why don't I ask it differently.

Have you had discussions with anybody at Western Alliance about securing their testimony for trial in this case?

ATTORNEY KELLER: Just answer as to yourself personally whether you have had discussions.

THE WITNESS: No.

BY ATTORNEY CASSUBHAI:

Q. Which party pledged the collateral for purposes of securing the loan from Western Alliance, which entity?

**A. I believe it was Magerick, but without looking at the documents, I can't tell you.**

Q. Okay. So can you explain to me how Magerick came to pledge collateral in connection with the MLSA that was signed by Cymbidium?

**A. Again, I'd have to look at the documents, but I believe that Magerick lent the money to Cymbidium and Cymbidium, in turn, used the money to purchase the loans. Without looking at the documents, I can't say that for sure.**

Q. But that would be your expectation?

**A. That would be my best guess at this point without -- again, I**

Oak Harbor or involved with Magerick?

A. **It's typically signed by our chief financial officer.**

Q. And who would that have been in 2022?

A. **It would have been Michael Basile.**

Q. Is Michael Basile still around with the company?

A. **No. Unfortunately, he passed this last spring.**

Q. Sorry to hear that.

And who was Michael Basile employed by?

A. **Oak Harbor Capital.**

Q. But he was an authorized signator for Magerick too?

A. **Correct.**

Q. And here, as part of all these borrowing statements, is a representation that the undersigned makes that all information contained herein is true and correct in all material respects.

Do you see that?

A. **Yes.**

Q. Okay. Do you have any reason to doubt the validity of any of the borrowing -- I think you referred to it as the borrowing base certificates that have been submitted on behalf of Magerick?

A. **Not to my knowledge.**

Q. Looking at the September 29, 2022, certificate, would the loans that were ultimately, as you claim, purchased by Cymbidium, would they have been listed or pledged as part of

**New York**
**212-273-9911**

**Hudson Court Reporting & Video**
**1-800-310-1769**

**New Jersey**
**732-906-2078**

this certificate?

A. I don't believe so, but I'd have to look at the document. I don't believe they would have been. I'd have to check.

Q. And I'll represent to you that we have not been able to identify any loan as of September 29th, 2022, that was out of the purchase of the MLSA. But let me now flip to another document which we are now going to mark as Exhibit 11.

(Exhibit No. 11 marked for identification.)

BY ATTORNEY CASSUBHAI:

Q. And let me know when this appears on your screen.

Do you see Exhibit 11, sir?

A. I do.

Q. Okay. Actually, on this document, if we go to the second page, there's a signature for Magerick. Do you know who that signature belongs to?

A. I can't see the page.

ATTORNEY KELLER: Give me a second.

THE WITNESS: It looks like it's Mike Basile.

BY ATTORNEY CASSUBHAI:

Q. Okay. Now, this report was submitted by Magerick to Western Alliance Bank in connection with Magerick's borrowing under the -- under the credit facility, correct?

A. I think that's true.

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Q. Sorry. You think that's true?

A. I think that's true, yes.

Q. Okay. And as of -- the loan tape data date which is October 4th, 2022, this report reflects the collateral that Magerick was pledging to Western Alliance Bank as of that date, correct?

A. It should be.

Q. At the end of this report, this print is obviously not going to be decipherable, but there are loan-level listings that include loans classified under what your MLSA refers to as Category B loans.

Did you know that?

A. That would make sense. We were using the Western Alliance line to finance the purchase of these loans.

Q. And so these category loans that are listed in this Magerick borrowing base certificate are the same loans that AHP purportedly sold Cymbidium as of October 7th, 2022, correct?

A. That's true. Excuse me.

Q. Do you know why a loan date data -- tape data date of October 4, 2022, prior to the execution of the MLSA date, lists pledged collateral from AHP?

A. I don't know the answer to that. You would have to ask Mike Basile.

Q. Well, Mike Basile is not here. So what's your understanding of why collateral that had not been, quote/unquote, sold yet

**New York**
**212-273-9911**

**Hudson Court Reporting & Video**
**1-800-310-1769**

**New Jersey**
**732-906-2078**

is listed as pledged by Magerick to Western Alliance as of this date?

A. I can't tell you in terms of why the date is reflected of what it is. But I do know those are loans that we pledged to Western Alliance to secure a line of credit.

Q. So would you agree at least that as of October 4th, 2022 -- even assuming that this was a true sale, that as of October 4, 2022, AHP still owned 100 percent of Category B loans?

A. I'd have to look at the agreement. I don't know. If the date was off a day or two, you'd have to show me, go back to, I think, whatever that other exhibit was. But if there was a day or two where it was off, the answer was made right when the agreement was signed and the consideration was sent.

Q. Well, we can go back to the MLSA, which is Exhibit 9, and if your counsel wants to put it up, we can read it together. But it is dated October 7th, 2022, which is three days after this loan tape data.

A. Well, you'd have to ask Mr. Basile. But in the end, as of October 7th, that was an accurate statement about the loans.

Q. That was an accurate statement as of October 7th, but was it an accurate statement as of October 4th?

A. The answer is I don't know. The answer is that probably not, but the answer is that I don't -- I think -- I don't know why the dates don't match, but as of October 7th, it was

**New York**
212-273-9911

**Hudson Court Reporting & Video**
1-800-310-1769

**New Jersey**
732-906-2078

definitely an accurate statement.

Q. Okay. We were earlier talking about the participation agreement. I'm showing you what is marked as Exhibit 12, and I'd like you to just let me know if this is what you were referring to.

(Exhibit No. 12 marked for identification.)

ATTORNEY KELLER: I have a problem here.

BY ATTORNEY CASSUBHAI:

Q. Do you see the document in front of you?

A. I do.

Q. Okay. And this document, it purports to state that this was made and entered as of October 7th, 2022, between Cymbidium and Magerick with the title "Secured Participation Agreement."

And is this your signature on Page 4 under Magerick?

A. Yes.

Q. And the Cymbidium Restoration Trust, that is being signed by Adam Henderson, who we discussed earlier, correct?

A. Correct.

Q. What was your understanding of the participation agreement? What was it intended to accomplish?

A. The intent was to -- excuse me, to be able to -- I'm sorry. I need to get some water. Excuse me. I'm sorry.

It was intended to be able to access the line of credit

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

160

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

CYMBIDIUM RESTORATION TRUST,          )
                                      )
          Plaintiff,                  )
                                      ) Case No.
Vs.                                   ) 2:24-CV-00025-KKE
                                      )
AMERICAN HOMEOWNER                    )
PRESERVATION TRUST SERIES AHP         )
SERVICING; its Trustee, U.S.          )
Bank Trust, N.A.; AHP CAPITAL         )
MANAGEMENT, LLC; AMERICAN             )
HOMEOWNER PRESERVATION SERIES         )
2015A+; its Trustee, U.S. BANK        )
TRUST NATIONAL ASSOCIATION;           )
AHP SERVICING, LLC; and JORGE         )
NEWBERY,                              )
                                      ) Volume II
          Defendants.                 )
_____/ Pages 160-233

VIDEOTAPED DEPOSITION OF WILLIAM WEINSTEIN
(Taken Virtually by Defendants)
Thursday, December 11th, 2025
1:25 p.m. PST

Certified Stenographic Court Reporter
Amy A. Brauser, RPR, RMR, CRR

HUDSON COURT REPORTING & VIDEO   (800) 310-1769

                    VIRTUAL APPEARANCES

ON BEHALF OF THE PLAINTIFF CYMBIDIUM RESTORATION TRUST:

        BRADLEY S. KELLER, Esquire

        VICTORIA MOLINA, Esquire

        Byrnes Keller Cromwell LLP

        1000 Second Avenue, 38th Floor

        Seattle, Washington 98104

        (206) 622-2000

        bkeller@byrneskeller.com

        mvmolina@byrneskeller.com


ON BEHALF OF THE DEFENDANTS AMERICAN HOMEOWNER, ET. AL.:


        HOZAIFA Y. CASSUBHAI, Esquire

        WILLIAM BURNSIDE, Esquire

        Bailey Duquette

        800 Fifth Avenue, Suite 101-800

        Seattle, Washington 98104

        (206) 225-2250

        hozaifa@baileyduquette.com

        will@baileyduquette.com


ALSO PRESENT:

        Diane Korneychuk, Videographer

        Jorge Newbery

obligations were eliminated"?

A.    I'm sorry, what was your question?

Q.    The first paragraph -- the first paragraph reads:  (Reading)

The seller's repurchase obligations provided for --

A.    I'm sorry, I was confused.  The arrow was pointing to a recital.  And then you're looking -- want me to look at the paragraph.  Okay.  All right.  So your question is about that paragraph.

Q.    Why in Paragraph 1, my question is, did you agree that the seller's repurchase obligations were eliminated?

A.    Because we needed to pay back that loan.  It was very a large amount of money.  We needed to be able to gain title to the properties and be able to sell the loans.  And we wanted to make sure there was no ability to prevent us from selling the loans.

Q.    But you would agree that under that paragraph, that the parties intended to eliminate the seller's, meaning AHP's, repurchase obligations that were outlined in the first MLSA, the original MLSA?

**New York**
**212-273-9911**

**Hudson Court Reporting & Video**
**1-800-310-1769**

**New Jersey**
**732-906-2078**

A.     That's what the document says.

Q.     Let's go to the next page.  Actually, sorry, stay on -- let's go to Paragraph 3.  In -- the applicable pricing rate was amended to be 16 percent.  Did you understand that to be a higher interest rate than vis-a-vis the first, the original MLSA?

A.     Yes.

Q.     What is -- what is your understanding of why that rate was increased?

A.     Because Mr. Newberry, on behalf of AHP, recognized that it failed to meet its obligations under the original agreement, and that when he was in default, effectively a default interest rate would kick in.  That's exactly what this was, was a default interest rate.

Q.     Now, the -- in going up to Number 2, there's a reference to additional mortgage loans that were conveyed under the agreement.

Can you tell me about how many additional mortgage loans do you recall were conveyed as part of the agreement, the amended MLSA?

A.     I don't recall.

Q.     Did those additional mortgage loans get

**New York**
212-273-9911

**Hudson Court Reporting & Video**
1-800-310-1769

**New Jersey**
732-906-2078

MR. CASSUBHAI: Paragraph 4. It's still on page 2.

MR. KELLER: All right.

BY MR. CASSUBHAI:

Q. There's a reference to the approximate, I guess, outstanding purchase price, $21 million.

Do you see that?

A. That was for the Category B loans. That's right.

Q. Is it your position that Cymbidium was entitled to be paid the full $21 million of the purchase price and receive separate repurchase payments for any defective loans?

A. I have no idea what you -- you just asked me. I'm sorry, could you repeat it?

Q. Does Cymbidium have any putback rights under this agreement?

A. I believe it did, although I don't know if it was referred to as a putback right. But I think I know what you're referring to. I think in the agreement, there is a right that Cymbidium has to seek recourse from AHP.

Q. You're not sure one way or the other?

A. No, I believe that there's a provision in there. I just don't know if it's referred to as

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

a putback right.

Q.    Are those words synonymous to you, "repurchase" and "putback"?

A.    Well, they can mean different things, but I think that -- again, I'd ask you to look at the agreement itself and show me the provision. But I believe there's a provision that allows a recourse for putting back or sending back or transferring back to AHP loans that are defective for a variety of reasons.

Q.    Okay.  So then going back to my original question.  Is it your position that Cymbidium is entitled to the -- to be paid the full $21 million of the outstanding purchase price under the original -- under the amendment and then receive separate repurchase or putback payments for the defective loans?

A.    I think they're related.  The issue is, is that if we -- if loans that have been sold to us by AHP are loans that we can't sell because AHP hasn't provided title or because the properties were lost in tax sale or because Mr. Newberry sold the properties or hypothecated the properties to third parties without our knowledge or consent, that in all those situations, he's not only

**New York**
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

**New Jersey**
732-906-2078

breached the contract, but we also have additional rights to try to, if you will, mitigate our losses and be able to pay back the money that we borrowed to pay Mr. Newberry and AHP.

Q. Let me ask that question another way.

This agreement was signed on March 15th, 2023. If after this agreement was signed, say, on March 16th, the day after this agreement was signed, Magerick decided to put back all of the loans back to AHP, in that scenario would Magerick still be entitled to recover the full $21 million of the purchase price?

A. I don't understand that hypothetical. That's not something that was ever contemplated, so I don't know how to answer.

Q. Do you understand the question, though?

A. No, I don't.

Q. Okay. So there were -- let's just say altogether we have in addition to the 300 loans that were purchased as part of this agreement, altogether about a thousand loans, all right. Magerick --

A. I don't think it was a thousand loans.

You know, the deposition would go much more quickly and efficiently if you just refer to

**New York**
**212-273-9911**

**Hudson Court Reporting & Video**
**1-800-310-1769**

**New Jersey**
**732-906-2078**

actual facts and agreements instead of making these statements which slow me down. I mean, it wasn't ever a thousand loans, as an example.

Q. Just -- all right. So how many loans -- what number do you want to use?

A. It was somewhere -- I think it was somewhere around 870 or 880 loans roughly.

Q. So fine, let's use your number, 880 loans. If on March 16th, 2023, the day after this agreement was signed, Cymbidium decided to put back all of the 880 loans, in that scenario, is it your position that Cymbidium would still be entitled to the entire $21 million, the repurchase price?

A. I don't know how to answer that. I mean, it's a hypothetical that makes no sense to me. Because the only way that we could pay back Western Alliance Bank was to sell those loans.

AHP had no money. The whole reason we entered into this agreement on March 15th, 2023 was because AHP didn't have money, because AHP was collapsing as a business, and Mr. Newberry didn't have the ability to be able to sell these loans efficiently or effectively. That was the basis of why we entered into this agreement. It was to try to recover these assets in as efficient and as

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

effective and as expeditious a manner as we could.

Q.    So you can't answer that hypothetical "yes" or "no"?

A.    Not the way you stated it, no.

Q.    Okay.  So maybe I'll just ask it one more time, and if you can't answer it, we'll move on.

If on March 16th, 2023, the day after this agreement was signed, you decided, I want to put back or Cymbidium wants to put back all of these loans and make AHP pay for them and take it all back, in that scenario is it your position that Cymbidium would still be entitled to recover the entire $21 million repurchase price?

A.    So --

Q.    "Yes" or "no"?

A.    The answer is that I can't answer "yes" or "no" because it doesn't make any sense.

Q.    Okay.  I'll move on.

A.    Your hypothetical makes no sense at all.

At some point the loan has to be paid back, and the only way to do that is to sell the assets, something that Mr. Newberry and AHP had failed to do, had no ability to do going forward.

**New York**
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

**New Jersey**
732-906-2078

The only way forward was not a putback.  What we wanted was the opposite of a putback.  We wanted AHP to provide the documents necessary for us to gain title and sell the properties.

Q.     If on March 16th, 2023, the day after this loan was signed, AHP wrote a check for the full $21 million, plus whatever the applicable interest was, what would happen to the loans?

A.     And the answer is I've already answered that question.  AHP had no ability on March 16th to pay anywhere near that amount.  The whole reason of entering into the agreement was because AHP had no ability to make that payment.  And the recourse issue or the putback issue that you've said makes no sense at all because there was no ability for AHP to pay that money.

So in the end, the whole reason we entered into the agreement was because AHP had defaulted and did not have the ability either to pay that money or to continue to sell those loans effectively or efficiently.

And so in the end, your hypothetical makes no sense at all within the reality of that transaction.

Q.     Right, that's why it's a hypothetical

**New York**
**212-273-9911**

Hudson Court Reporting & Video
1-800-310-1769

**New Jersey**
**732-906-2078**

A.    Darragh Birkett.

Q.    How'd you describe Keydally as a company?

A.    Keydally was a corporate shell that was created by Paul Birkett.

Q.    What did you understand about its operations or business?

A.    It was simply a corporate shell.  It was essentially a passive vehicle that was going to be used to hold assets and to be able to sell them on to third parties.

Q.    What did you understand about Keydally's financial capacity to participate in this deal?

A.    Keydally was a corporate shell.  I was looking to Paul Birkett and his investor group who would fund Keydally.

Q.    Did you know what investors he was looking at or targeting?

A.    Yes.

Q.    And what was your understanding?

A.    They had bought assets from my -- various enterprises before.  I had actually talked to him, met with some of his investors.  They were mostly based in Ireland and in the European

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

continent.  And they wanted to buy that investor pool -- or excuse me, they wanted to buy that pool of assets.  So Birkett used a vehicle called Keydally that he created with his brother as the investment vehicle.

Q.    When Magerick sold the loans to Keydally, your testimony is that Keydally obtained title to those loans by entering -- by -- I'm sorry, let me rephrase that.

Your testimony is that you and Mr. Waite funded the purchase of the loans that transferred from Magerick to Keydally?

A.    No.  My testimony is that we provided financing to Keydally to purchase most of those loans.  Birkett also did come up with about $500,000 in investor money to buy assets from Magerick.  But most of the money that was provided was provided by Mr. Waite or myself.

Q.    The Banner Bank money that was -- the money that was borrowed from Banner Bank, who borrowed it?  I mean, who's the -- I guess the borrower, is it an entity or is it you personally?

A.    It's me personally.

Q.    And I guess I'm still missing the step of how these assets ended up back to Magerick?

**New York**
212-273-9911

**Hudson Court Reporting & Video**
1-800-310-1769

**New Jersey**
732-906-2078

A. Mr. Birkett came to me in July or maybe August, I don't recall when, but he said that his investor group could only come up with roughly $500,000 and he couldn't come up with the remaining money. And he was also trying to -- he said he could come up with the money, but he said the assets were only worth $7 million so -- or roughly, I think roughly in that neighborhood. So I said that, well, the assets were worth much more, and he agreed that he would keep the $500,000 in assets that he purchased, but that their other assets would revert back to Magerick.

And then, in turn, hopefully, if AHP were to provide the titles and the other documents that -- then Magerick could then sell those assets and pay back Mr. Waite and myself. That never happened.

Q. Well, I guess I'm confused. You're the one who ultimately advanced the monies personally, you and Mr. Waite, you testified. So how does the asset end up back at Magerick is, again, my question?

A. Because Mr. Waite and I are the principals of Magerick.

Q. Have you made any representations to

**New York**
212-273-9911

**Hudson Court Reporting & Video**
1-800-310-1769

**New Jersey**
732-906-2078

only ability of me to pledge collateral to secure borrowing on the Banner Bank line were for Chapter 13 receivables.

Q.   Did the -- did Keydally contribute any monies -- Keydally, I'm not talking about an individual, Paul Birkett -- did Keydally contribute any money towards this transaction?

A.   Well, it's not clear to me whether the $500,000-plus came through Keydally or it came through another one of Birkett's vehicles.  I don't recall without looking at the legal document.  But I know that Birkett's intent was to purchase all of those assets, either through Keydally or through -- initially through Keydally or maybe another vehicle, and several different vehicles, he purchased assets from us, and whatever vehicle he was going to use, he did end up purchasing about $500,000 of the AHP assets from us during that time period.

Q.   So if the value of these assets was $10 million, altogether, did Keydally receive -- did Keydally receive any funds as part of this transaction in order for it to pay for it?

A.   I don't know.

Q.   Well, you're the one who borrowed the

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

money, so what is your understanding of what happened to that 44 -- $4 million that you testified about?

A.    You asked me a question about did Keydally receive any monies, I don't think so, but I don't know.  I don't know.

Q.    Okay.  So where did the money, the $4 million that you borrowed from Banner Bank, how does that 4 million end up relating to the Keydally transaction?  What happened to the $4 million?

A.    The $4 million, along with Brad Waite's money, was used to pay down the Western Alliance Bank line of credit that was used to purchase, originally, all of the AHP assets.

Q.    So no money hit Keydally's account from -- with respect to the amounts that you borrowed?

A.    I don't know.  I'd have to look at that.  I don't believe so, but I don't know.

Q.    Did Keydally even have a bank account?

A.    Well, in an earlier testimony in another case, Keydally said it didn't have a bank account, but, in fact, it did have a bank account.  But it doesn't matter.  Yes, Keydally had a bank accounting account, but -- Paul Birkett said there

**New York**
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

**New Jersey**
732-906-2078

being pledged to any lender or bank?

A. That's true.

Q. How much does Magerick currently owe to Western Alliance Bank?

A. I don't know the exact number. Roughly $20 million.

Q. And are there --

A. I'm sorry. You said -- I'm sorry. You said that -- I may have mixed things up. You're asking which bank? How much money is owed -- does Magerick owe to Banner Bank, you asked, or Western Alliance Bank?

Q. Western Alliance.

A. I'm sorry. Okay. It was 20 -- roughly $20 million.

Q. And does Magerick have a line of credit with any other bank?

A. No.

Q. Does -- does Cymbidium have a line of credit with any bank?

A. I don't believe so.

Q. Does Cymbidium have any assets?

A. Other than the assets that they purchased from AHP, no.

Q. Well, those assets are -- were -- ended

**New York**
212-273-9911

**Hudson Court Reporting & Video**
1-800-310-1769

**New Jersey**
732-906-2078

back and look.  But it's paid off.  I don't recall when I exactly paid off the loan.

Q.     Okay.  When did you first obtain the line of credit from Banner Bank?

A.     I don't know.  I know 15 or 20 years ago.

Q.     So once you paid off the loan, the line of credit, the obligation under the line of credit, does that line of credit still exist for you to borrow against?

A.     No.

Q.     Why not?

A.     Because I don't want to do business with Banner Bank.  I think that bank had a better -- you have better banking terms with some other banks.

Q.     Did Banner Bank indicate to you that it did not want to do business with you?

A.     I think the better statement is that Banner Bank was disturbed by the fact that they were improperly sued by Mr. Newberry and AHP.  They didn't like being sued, along with being labeled as racketeers.

Q.     Are you currently continuing to add or update the atrocity list?  By "you," meaning is

Magerick or Cymbidium continuing to update the atrocity list?

A.     Yes.

Q.     And when did that process -- how long has that process been ongoing for?

A.     I said the original atrocity list was created in the spring of 2023.

Q.     I guess I'm just trying to get a sense of, you know, after, I guess, the December 2024 document that we looked at earlier, and I'm not trying to misrepresent the document, but the line that we're talking about in Column B that said the last date was December 31, 2024, after that point in time, has the spreadsheet been updated to include what additional revenue has come in as well as what expenses have gone out?

A.     I have no idea about the revenue or expenses, that's accounting.  I think the list you showed me wasn't an atrocity list, it was an accounting document.  But the atrocity list continues to be updated.  In fact, today we discovered a new loan that Mr. Newberry had sold in 2024 and pocketed the money and not told us about.

Q.     And this was -- this alleged loan that he pocketed, was that part of the Category B loans

**New York**
**212-273-9911**

**Hudson Court Reporting & Video**
**1-800-310-1769**

**New Jersey**
**732-906-2078**

under the amended agreement?

A.    Yes.

Q.    If he pocketed the money, then that would be money that he wouldn't be credited for under the amended agreement, correct?

A.    Yes.  If he took the money and he should have remitted it to -- to Cymbidium, then the answer is yes, I would -- another word would be theft.

Q.    Is it your position that Cymbidium, any additional revenue that may come in from sale of the loans that are part of the Category B loans, that that money belongs to Cymbidium?

A.    Yes.

Q.    And those rights, you're claiming, derive from the amended agreement?

A.    Yes.

MR. CASSUBHAI:  Let's do this:  I think I'm wrapped up, but I would appreciate maybe just us going off the record for a couple of minutes.  So can we go off the record?

MR. KELLER:  Sure.

THE VIDEOGRAPHER:  Okay.  Off the record at 3:19 p.m.

(Recess taken.)

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

# Exhibit 7

| | |
|---|---|
| **From:** | wsw@oakharborcapital.com |
| **Sent:** | Monday, September 20, 2021 7:27 AM |
| **To:** | eseabrook@ahpservicing.com |
| **Cc:** | bflig@ahpservicing.com; jnewbery@ahpservicing.com; AaronJ@w-legal.com; BenH@OakHarborCapital.com |
| **Subject:** | RE: Thank you - |

Dear Eric,

Thank you again for you and Becky for arranging the meeting.  It was very interesting to see what Jorge and you were creating.  Very ambitious and clever.

I am reaching out to you, Becky and Jorge as follows:

Eric:      Pricing on a tape.  Potential collaboration on software platform.

Becky:   Completing initial sale and working on boarding your NPL sales platform.

Jorge:  Discussing with him initially the software platform and also discussing a potentially    important initiative involving Restora (Skid Road JV).

Again, thank you for your kinetic energy and synergy.  And, congratulations on your latest new hire.  She'll protect Jorge's businesses like Cerberus at the gates of Hell.

Warm regards,

Bill

**From:** Eric Seabrook <eseabrook@ahpservicing.com>
**Sent:** Monday, September 20, 2021 6:44 AM
**To:** William S. Weinstein <wsw@oakharborcapital.com>
**Cc:** Becky Flig <bflig@ahpservicing.com>; Jorge Newbery <jnewbery@ahpservicing.com>
**Subject:** Thank you -

Bill –

Thank you for making the trip out to Chicago and meeting with us – appreciate the opportunity to continue the discussion / potential partnership.  As we discussed give me a week or so to provide you a tape to price on our NPLs.  Meanwhile I will get with Jorge and Becky to find out what other action items were discussed after I left dinner.  If there is anything I can do until then please let me know.

Thanks
Eric

PS – I made my flight with 1 minute to spare, then there was lightning, and we sat on the tarmac for almost 2.5 hours!  Needless to say I made it home just later than expected.

W&R_0012693

**Eric Seabrook | President**

AHP Servicing LLC
**Direct:** (872) 260-4006
**Cell:** (480) 540-5125
440 S. LaSalle St., Suite 1110, Chicago, IL 60605
AHPServicing.com



This communication is for the intended recipient only. This communication may contain information that is privileged, confidential and exempt from disclosure under applicable law and constitutes an electronic communication within the meaning of the Electronic Communications Privacy Act, 18 U.S.C. 2510. If you are not the intended recipient, you are hereby notified that any unauthorized use, dissemination, distribution or copying of this communication is strictly prohibited and may subject you to criminal or civil penalty. If you have received this communication in error, please notify us immediately by email, delete the message, and destroy any copies.

W&R_0012694

# Exhibit 8

| **From:** | MBasile@OakHarborCapital.com |
| **Sent:** | Tuesday, August 9, 2022 5:13 PM |
| **To:** | wsw@oakharborcapital.com |
| **Subject:** | RE: proposal |

Am I not remembering yesterday's email correctly? Sorry if I didn't remember the $300K correctly. $100K is still good for the Fund!

And...I haven't heard we are doing nothing either....I was told yesterday that we are still doing service transfers/ other normal purchase work. I didn't think that made sense...so wanted to confirm what work was going to be needed.

**From:** William S. Weinstein <wsw@oakharborcapital.com>
**Sent:** Tuesday, August 9, 2022 4:40 PM
**To:** Michael Basile <MBasile@OakHarborCapital.com>; Peter Fitzpatrick <peter.fitzpatrick@OakHarborCapital.com>
**Cc:** Jennifer Drain <JDrain@oakharborcapital.com>; Frank (Trip) Brannen III <FBrannen@oakharborcapital.com>
**Subject:** RE: proposal

Please let me explain when you are feeling better. We're getting $100K in two months for doing nothing. And if AHP defaults for some reason, we are oversecured on the loans.

**From:** Michael Basile <MBasile@OakHarborCapital.com>
**Sent:** Tuesday, August 9, 2022 4:34 PM
**To:** William S. Weinstein <wsw@oakharborcapital.com>; Peter Fitzpatrick <peter.fitzpatrick@OakHarborCapital.com>
**Cc:** Jennifer Drain <JDrain@oakharborcapital.com>; Frank (Trip) Brannen III <FBrannen@oakharborcapital.com>
**Subject:** FW: proposal

So we went from a $300K facility fee yesterday to $50K today?

Who is providing the funding for this transaction Is it still the Evergreen Funds??

If AHP is repurchasing in 60 days....are we bothering with a service transfer, assignments, etc, or not wasting the time/effort/costs?

Will there be a participation agreement between the Fund and Cymbidium Restoration Trust so that the Fund is not loaning this $2.5M to AHP with no documentation? As I've asked before....Cymbidium Trust doesn't even have a bank account....so any cash flows would need to be handled by the Fund loaning the money.

Also....please forward the excel spreadsheet that agrees to the loans listed in the signed agreements.

Thanks,
Mike

**From:** Jorge Newbery <jnewbery@ahpservicing.com>
**Sent:** Tuesday, August 9, 2022 2:24 PM
**To:** Sarah Brink <SBrink@OakHarborCapital.com>; William S. Weinstein <wsw@oakharborcapital.com>
**Cc:** Frank (Trip) Brannen III <FBrannen@oakharborcapital.com>; Peter Fitzpatrick

<peter.fitzpatrick@OakHarborCapital.com>; Michael Basile <MBasile@OakHarborCapital.com>; Christine Sahyers <csahyers@ahpservicing.com>
**Subject:** Re: proposal

Sounds good. Thanks!

## Jorge Newbery | Chief Executive Officer

AHP Servicing LLC
**Direct: (312) 651-4325**
440 S. LaSalle St., Suite 1110, Chicago, IL 60605
AHPServicing.com

This email and any files transmitted with it are confidential and intended solely for the use of the individual or entity to whom they are addressed. If you are not the named addressee you should not disseminate, distribute, or copy this e-mail. Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail from your system. AHP accepts no liability for any damage caused by any virus transmitted by this email.

If you have filed a bankruptcy petition and there is an "automatic stay" in effect in your bankruptcy case or received a discharge of your personal liability for the obligation identified in this letter, we may not and do not intend to pursue collection of that obligation from you personally. If either of these circumstances apply, this notice is not and should not be construed to be a demand for payment from you personally. Unless the Bankruptcy Court has ordered otherwise, please also note that despite any such bankruptcy filing, whatever rights we hold in the property that secures the obligation remain unimpaired.

**From:** Sarah Brink <SBrink@OakHarborCapital.com>
**Sent:** Tuesday, August 9, 2022 4:20 PM
**To:** Jorge Newbery <jnewbery@ahpservicing.com>; William S. Weinstein <wsw@oakharborcapital.com>
**Cc:** Frank (Trip) Brannen III <FBrannen@oakharborcapital.com>; Peter Fitzpatrick <peter.fitzpatrick@OakHarborCapital.com>; Michael Basile <MBasile@OakHarborCapital.com>; Christine Sahyers <csahyers@ahpservicing.com>
**Subject:** RE: proposal

Jorge,

Thank you for sending and for your patience. Please find the attached fully executed Agreement.

Please confirm I will mail the three documents to:

Jorge Newbery
540 S. Summit Street
Barrington IL 60010

Thank you,

Sarah Brink
Investor Relations Manager
Oak Harbor Capital, LLC | Seattle, Wa
Direct : 206.493.1510 Fax: 206.267.7840

---

**From:** Jorge Newbery <jnewbery@ahpservicing.com>
**Sent:** Tuesday, August 9, 2022 2:05 PM
**To:** Sarah Brink <SBrink@OakHarborCapital.com>; William S. Weinstein <wsw@oakharborcapital.com>
**Cc:** Frank (Trip) Brannen III <FBrannen@oakharborcapital.com>; Peter Fitzpatrick <peter.fitzpatrick@OakHarborCapital.com>; Michael Basile <MBasile@OakHarborCapital.com>; Christine Sahyers <csahyers@ahpservicing.com>
**Subject:** Re: proposal

See attached. Thanks.

## Jorge Newbery | Chief Executive Officer

AHP Servicing LLC
**Direct: (312) 651-4325**
440 S. LaSalle St., Suite 1110, Chicago, IL 60605
AHPServicing.com

This email and any files transmitted with it are confidential and intended solely for the use of the individual or entity to whom they are addressed. If you are not the named addressee you should not disseminate, distribute, or copy this e-mail. Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail from your system. AHP accepts no liability for any damage caused by any virus transmitted by this email.

If you have filed a bankruptcy petition and there is an "automatic stay" in effect in your bankruptcy case or received a discharge of your personal liability for the obligation identified in this letter, we may not and do not intend to pursue collection of that obligation from you personally. If either of these circumstances apply, this notice is not and should not be construed to be a demand for payment from you personally. Unless the Bankruptcy Court has ordered otherwise, please also note that despite any such bankruptcy filing, whatever rights we hold in the property that secures the obligation remain unimpaired.

---

**From:** Sarah Brink <SBrink@OakHarborCapital.com>
**Sent:** Tuesday, August 9, 2022 4:01 PM
**To:** Jorge Newbery <jnewbery@ahpservicing.com>; William S. Weinstein <wsw@oakharborcapital.com>
**Cc:** Frank (Trip) Brannen III <FBrannen@oakharborcapital.com>; Peter Fitzpatrick <peter.fitzpatrick@OakHarborCapital.com>; Michael Basile <MBasile@OakHarborCapital.com>; Christine Sahyers <csahyers@ahpservicing.com>
**Subject:** RE: proposal

Hi Jorge,

We are happy to have a fully executed version of your personal Guaranty back asap.

However, I can't seem to find one from you that's not from AHP. Do you mind resending?

I apologize for any inconvenience, and if I am mistaken.

Sincerely,

SARAH BRINK
INVESTOR RELATIONS MANAGER
OAK HARBOR CAPITAL, LLC | SEATTLE, WA
DIRECT : 206.493.1510 Fax: 206.267.7840

---

**From:** Jorge Newbery <jnewbery@ahpservicing.com>
**Sent:** Tuesday, August 9, 2022 1:09 PM
**To:** Sarah Brink <SBrink@OakHarborCapital.com>; William S. Weinstein <wsw@oakharborcapital.com>
**Cc:** Frank (Trip) Brannen III <FBrannen@oakharborcapital.com>; Peter Fitzpatrick <peter.fitzpatrick@OakHarborCapital.com>; Michael Basile <MBasile@OakHarborCapital.com>; Christine Sahyers <csahyers@ahpservicing.com>
**Subject:** Re: proposal

Hi Sarah -

The Guarantor on the fully-executed Guaranty which was emailed to me was from AHP Servicing. I also signed a Guaranty from me personally, as I believe that this is Bill's preference. Will you be sending a fully-executed version of that as well?

Also, please share the Fed reference number for the wire.

Thanks.

# Jorge Newbery | Chief Executive Officer

AHP Servicing LLC
**Direct: (312) 651-4325**
440 S. LaSalle St., Suite 1110, Chicago, IL 60605
<u>AHPServicing.com</u>

This email and any files transmitted with it are confidential and intended solely for the use of the individual or entity to whom they are addressed. If you are not the named addressee you should not disseminate, distribute, or copy this e-mail. Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail from your system. AHP accepts no liability for any damage caused by any virus transmitted by this email.

If you have filed a bankruptcy petition and there is an "automatic stay" in effect in your bankruptcy case or received a discharge of your personal liability for the obligation identified in this letter, we may not and do not intend to pursue collection of that obligation from you personally. If either of these circumstances apply, this notice is not and should not be construed to be a demand for payment from you personally. Unless the Bankruptcy Court has ordered otherwise, please also note that despite any such bankruptcy filing, whatever rights we hold in the property that secures the obligation remain unimpaired.

**From:** Sarah Brink <<u>SBrink@OakHarborCapital.com</u>>
**Sent:** Tuesday, August 9, 2022 2:24 PM
**To:** Jorge Newbery <<u>jnewbery@ahpservicing.com</u>>; William S. Weinstein <<u>wsw@oakharborcapital.com</u>>
**Cc:** Frank (Trip) Brannen III <<u>FBrannen@oakharborcapital.com</u>>; Peter Fitzpatrick <<u>peter.fitzpatrick@OakHarborCapital.com</u>>; Michael Basile <<u>MBasile@OakHarborCapital.com</u>>
**Subject:** RE: proposal

Dear Jorge,

Thank you.

Please find Bill's executed copies attached. Schedule 1 has been included in the Mortgage Loan Sale Agreement.
Can you please initial these pages similar to what Bill has done?

Kindly let us know if you have any questions or need anything additional.

Thanks so much!

SARAH BRINK
INVESTOR RELATIONS MANAGER
OAK HARBOR CAPITAL, LLC | SEATTLE, WA
DIRECT : 206.493.1510 Fax: 206.267.7840

---

**From:** Jorge Newbery <jnewbery@ahpservicing.com>
**Sent:** Tuesday, August 9, 2022 8:52 AM
**To:** William S. Weinstein <wsw@oakharborcapital.com>
**Cc:** Frank (Trip) Brannen III <FBrannen@oakharborcapital.com>; Peter Fitzpatrick <peter.fitzpatrick@OakHarborCapital.com>; Michael Basile <MBasile@OakHarborCapital.com>; Sarah Brink <SBrink@OakHarborCapital.com>
**Subject:** Re: proposal

Hi Bill -

See attached AHP-executed agreements, funding schedule, and redlines showing changes.

Please review and let me know if you have any questions.  If all is agreeable, please wire to:

Fifth Third Bank
38 Fountain Square Plaza, Cincinnati, OH 45263
ABA:042000314
AHP Servicing LLC
Account: 7906464743

Thanks.

## Jorge Newbery | Chief Executive Officer

AHP Servicing LLC
**Direct: (312) 651-4325**
440 S. LaSalle St., Suite 1110, Chicago, IL 60605
AHPServicing.com

This email and any files transmitted with it are confidential and intended solely for the use of the individual or entity to whom they are addressed. If you are not the named addressee you should not

disseminate, distribute, or copy this e-mail. Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail from your system. AHP accepts no liability for any damage caused by any virus transmitted by this email.

If you have filed a bankruptcy petition and there is an "automatic stay" in effect in your bankruptcy case or received a discharge of your personal liability for the obligation identified in this letter, we may not and do not intend to pursue collection of that obligation from you personally. If either of these circumstances apply, this notice is not and should not be construed to be a demand for payment from you personally. Unless the Bankruptcy Court has ordered otherwise, please also note that despite any such bankruptcy filing, whatever rights we hold in the property that secures the obligation remain unimpaired.

---

**From:** William S. Weinstein <wsw@oakharborcapital.com>
**Sent:** Monday, August 8, 2022 5:06 PM
**To:** Jorge Newbery <jnewbery@ahpservicing.com>
**Cc:** Frank (Trip) Brannen III <FBrannen@oakharborcapital.com>; Peter Fitzpatrick <peter.fitzpatrick@OakHarborCapital.com>; Michael Basile <MBasile@OakHarborCapital.com>; Sarah Brink <SBrink@OakHarborCapital.com>
**Subject:** FW: proposal

Dear Jorge,

Enclosed as promised (if a little late) are the documents. Please review tonight so we can turn them tomorrow morning, execute them, and initiate the wires.

Best wishes,

Bill

---

**From:** Jorge Newbery <jnewbery@ahpservicing.com>
**Sent:** Wednesday, August 3, 2022 8:32 AM
**To:** William S. Weinstein <wsw@oakharborcapital.com>
**Subject:** proposal

Hi Bill -

Is Oak Harbor or any of your affiliates in a position to loan AHP $2,500,000 for 60 days? We have had some closings delayed and need capital short term.

The easiest structure may be to sell the 56 NY loans identified on the attached, with property values of $12,913,400, principal balances of $9,090,752 and total debt of $17,952,349, and agree to buyback within 60 days for the $2,500,000 + 12% annual return. We can also pay a $50,000 fee. All the loans are serviced at SN.

I am trying to make this very attractive in order to make a decision easy and funding fast.

Let me know. Thanks.

# Jorge Newbery | Chief Executive Officer

AHP Servicing LLC
**Direct: (312) 651-4325**
440 S. LaSalle St., Suite 1110, Chicago, IL 60605
AHPServicing.com

This email and any files transmitted with it are confidential and intended solely for the use of the individual or entity to whom they are addressed. If you are not the named addressee you should not disseminate, distribute, or copy this e-mail. Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail from your system. AHP accepts no liability for any damage caused by any virus transmitted by this email.

If you have filed a bankruptcy petition and there is an "automatic stay" in effect in your bankruptcy case or received a discharge of your personal liability for the obligation identified in this letter, we may not and do not intend to pursue collection of that obligation from you personally. If either of these circumstances apply, this notice is not and should not be construed to be a demand for payment from you personally. Unless the Bankruptcy Court has ordered otherwise, please also note that despite any such bankruptcy filing, whatever rights we hold in the property that secures the obligation remain unimpaired.

This communication is for the intended recipient only. This communication may contain information that is privileged, confidential and exempt from disclosure under applicable law and constitutes an electronic communication within the meaning of the Electronic Communications Privacy Act, 18 U.S.C. 2510. If you are not the intended recipient, you are hereby notified that any unauthorized use, dissemination, distribution or copying of this communication is strictly prohibited and may subject you to criminal or civil penalty. If you have received this communication in error, please notify us immediately by email, delete the message, and destroy any copies.

This communication is for the intended recipient only. This communication may contain information that is privileged, confidential and exempt from disclosure under applicable law and constitutes an electronic communication within the meaning of the Electronic Communications Privacy Act, 18 U.S.C. 2510. If you are not the intended recipient, you are hereby notified that any unauthorized use, dissemination, distribution or copying of this communication is strictly prohibited and may subject you to criminal or civil penalty. If you have received this communication in error, please notify us immediately by email, delete the message, and destroy any copies.

This communication is for the intended recipient only. This communication may contain information that is privileged, confidential and exempt from disclosure under applicable law and constitutes an electronic communication within the meaning of the Electronic Communications Privacy Act, 18 U.S.C. 2510. If you are not the intended recipient, you are hereby notified that any unauthorized use, dissemination, distribution or copying

of this communication is strictly prohibited and may subject you to criminal or civil penalty. If you have received this communication in error, please notify us immediately by email, delete the message, and destroy any copies.

This communication is for the intended recipient only. This communication may contain information that is privileged, confidential and exempt from disclosure under applicable law and constitutes an electronic communication within the meaning of the Electronic Communications Privacy Act, 18 U.S.C. 2510. If you are not the intended recipient, you are hereby notified that any unauthorized use, dissemination, distribution or copying of this communication is strictly prohibited and may subject you to criminal or civil penalty. If you have received this communication in error, please notify us immediately by email, delete the message, and destroy any copies.

# Exhibit 9

| | |
|---|---|
| **From:** | wsw@oakharborcapital.com |
| **Sent:** | Sunday, September 18, 2022 2:58 PM |
| **To:** | jnewbery@ahpservicing.com |
| **Subject:** | Pending transaction |

One item that was unclear was whether the $25 Million included paydown of the $2 Million + loan or not. Do you need to borrow $27 Million instead of $25 Million?

# Exhibit 10

| From: | wsw@oakharborcapital.com |
|---|---|
| Sent: | Tuesday, August 9, 2022 1:31 PM |
| To: | jnewbery@ahpservicing.com; SBrink@OakHarborCapital.com |
| Cc: | FBrannen@oakharborcapital.com; peter.fitzpatrick@OakHarborCapital.com; MBasile@OakHarborCapital.com; csahyers@ahpservicing.com |
| Subject: | RE: proposal |

Yes please.

**From:** Jorge Newbery <jnewbery@ahpservicing.com>
**Sent:** Tuesday, August 9, 2022 1:09 PM
**To:** Sarah Brink <SBrink@OakHarborCapital.com>; William S. Weinstein <wsw@oakharborcapital.com>
**Cc:** Frank (Trip) Brannen III <FBrannen@oakharborcapital.com>; Peter Fitzpatrick <peter.fitzpatrick@OakHarborCapital.com>; Michael Basile <MBasile@OakHarborCapital.com>; Christine Sahyers <csahyers@ahpservicing.com>
**Subject:** Re: proposal

Hi Sarah -

The Guarantor on the fully-executed Guaranty which was emailed to me was from AHP Servicing. I also signed a Guaranty from me personally, as I believe that this is Bill's preference. Will you be sending a fully-executed version of that as well?

Also, please share the Fed reference number for the wire.

Thanks.

# Jorge Newbery | Chief Executive Officer

AHP Servicing LLC
**Direct: (312) 651-4325**
440 S. LaSalle St., Suite 1110, Chicago, IL 60605
AHPServicing.com



**CONFIDENTIAL**

This email and any files transmitted with it are confidential and intended solely for the use of the individual or entity to whom they are addressed. If you are not the named addressee you should not disseminate, distribute, or copy this e-mail. Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail from your system. AHP accepts no liability for any damage caused by any virus transmitted by this email.

If you have filed a bankruptcy petition and there is an "automatic stay" in effect in your bankruptcy case or received a discharge of your personal liability for the obligation identified in this letter, we may not and do not intend to pursue collection of that obligation from you personally. If either of these circumstances apply, this notice is not and should not be construed to be a demand for payment from you personally. Unless the Bankruptcy Court has ordered otherwise, please also note that despite any such bankruptcy filing, whatever rights we hold in the property that secures the obligation remain unimpaired.

**From:** Sarah Brink <SBrink@OakHarborCapital.com>
**Sent:** Tuesday, August 9, 2022 2:24 PM
**To:** Jorge Newbery <jnewbery@ahpservicing.com>; William S. Weinstein <wsw@oakharborcapital.com>
**Cc:** Frank (Trip) Brannen III <FBrannen@oakharborcapital.com>; Peter Fitzpatrick <peter.fitzpatrick@OakHarborCapital.com>; Michael Basile <MBasile@OakHarborCapital.com>
**Subject:** RE: proposal

Dear Jorge,

Thank you.

Please find Bill's executed copies attached. Schedule 1 has been included in the Mortgage Loan Sale Agreement.
Can you please initial these pages similar to what Bill has done?

Kindly let us know if you have any questions or need anything additional.

Thanks so much!

SARAH BRINK
INVESTOR RELATIONS MANAGER
OAK HARBOR CAPITAL, LLC | SEATTLE, WA
DIRECT : 206.493.1510 Fax: 206.267.7840

**From:** Jorge Newbery <jnewbery@ahpservicing.com>
**Sent:** Tuesday, August 9, 2022 8:52 AM
**To:** William S. Weinstein <wsw@oakharborcapital.com>
**Cc:** Frank (Trip) Brannen III <FBrannen@oakharborcapital.com>; Peter Fitzpatrick <peter.fitzpatrick@OakHarborCapital.com>; Michael Basile <MBasile@OakHarborCapital.com>; Sarah Brink <SBrink@OakHarborCapital.com>
**Subject:** Re: proposal

Hi Bill -

See attached AHP-executed agreements, funding schedule, and redlines showing changes.

Please review and let me know if you have any questions.  If all is agreeable, please wire to:

Fifth Third Bank
38 Fountain Square Plaza, Cincinnati, OH 45263
ABA:042000314
AHP Servicing LLC
Account: 7906464743

Thanks.

## Jorge Newbery | Chief Executive Officer

AHP Servicing LLC
**Direct: (312) 651-4325**
440 S. LaSalle St., Suite 1110, Chicago, IL 60605
AHPServicing.com

This email and any files transmitted with it are confidential and intended solely for the use of the individual or entity to whom they are addressed. If you are not the named addressee you should not disseminate, distribute, or copy this e-mail. Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail from your system. AHP accepts no liability for any damage caused by any virus transmitted by this email.

If you have filed a bankruptcy petition and there is an "automatic stay" in effect in your bankruptcy case or received a discharge of your personal liability for the obligation identified in this letter, we may not and do not intend to pursue collection of that obligation from you personally. If either of these circumstances apply, this notice is not and should not be construed to be a demand for payment from you personally. Unless the Bankruptcy Court has ordered otherwise, please also note that despite any such bankruptcy filing, whatever rights we hold in the property that secures the obligation remain unimpaired.

**From:** William S. Weinstein <wsw@oakharborcapital.com>
**Sent:** Monday, August 8, 2022 5:06 PM
**To:** Jorge Newbery <jnewbery@ahpservicing.com>
**Cc:** Frank (Trip) Brannen III <FBrannen@oakharborcapital.com>; Peter Fitzpatrick <peter.fitzpatrick@OakHarborCapital.com>; Michael Basile <MBasile@OakHarborCapital.com>; Sarah Brink <SBrink@OakHarborCapital.com>
**Subject:** FW: proposal

Dear Jorge,

Enclosed as promised (if a little late) are the documents. Please review tonight so we can turn them tomorrow morning, execute them, and initiate the wires.

Best wishes,

Bill

**From:** Jorge Newbery <jnewbery@ahpservicing.com>
**Sent:** Wednesday, August 3, 2022 8:32 AM
**To:** William S. Weinstein <wsw@oakharborcapital.com>
**Subject:** proposal

Hi Bill -

Is Oak Harbor or any of your affiliates in a position to loan AHP $2,500,000 for 60 days? We have had some closings delayed and need capital short term.

The easiest structure may be to sell the 56 NY loans identified on the attached, with property values of $12,913,400, principal balances of $9,090,752 and total debt of $17,952,349, and agree to buyback within 60 days for the $2,500,000 + 12% annual return. We can also pay a $50,000 fee. All the loans are serviced at SN.

I am trying to make this very attractive in order to make a decision easy and funding fast.

Let me know. Thanks.

## Jorge Newbery | Chief Executive Officer

AHP Servicing LLC
**Direct: (312) 651-4325**
440 S. LaSalle St., Suite 1110, Chicago, IL 60605
AHPServicing.com

This email and any files transmitted with it are confidential and intended solely for the use of the individual or entity to whom they are addressed. If you are not the named addressee you should not disseminate, distribute, or copy this e-mail. Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail from your system. AHP accepts no liability for any damage caused by any virus transmitted by this email.

If you have filed a bankruptcy petition and there is an "automatic stay" in effect in your bankruptcy case or received a discharge of your personal liability for the obligation identified in this letter, we may not and do not intend to pursue collection of that obligation from you personally. If either of these circumstances apply, this notice is not and should not be construed to be a demand for payment from you personally. Unless the Bankruptcy Court has ordered otherwise, please also note that despite any such bankruptcy filing, whatever rights we hold in the property that secures the obligation remain unimpaired.

This communication is for the intended recipient only. This communication may contain information that is privileged, confidential and exempt from disclosure under applicable law and constitutes an electronic communication within the meaning of the Electronic Communications Privacy Act, 18 U.S.C. 2510. If you are not the intended recipient, you are hereby notified that any unauthorized use, dissemination, distribution or copying of this communication is strictly prohibited and may subject you to criminal or civil penalty. If you have received this communication in error, please notify us immediately by email, delete the message, and destroy any copies.

This communication is for the intended recipient only. This communication may contain information that is privileged, confidential and exempt from disclosure under applicable law and constitutes an electronic communication within the meaning of the Electronic Communications Privacy Act, 18 U.S.C. 2510. If you are not the intended recipient, you are hereby notified that any unauthorized use, dissemination, distribution or copying of this communication is strictly prohibited and may subject you to criminal or civil penalty. If you have received this communication in error, please notify us immediately by email, delete the message, and destroy any copies.

This communication is for the intended recipient only. This communication may contain information that is privileged, confidential and exempt from disclosure under applicable law and constitutes an electronic communication within the meaning of the Electronic Communications Privacy Act, 18 U.S.C. 2510. If you are not the intended recipient, you are hereby notified that any unauthorized use, dissemination, distribution or copying of this communication is strictly prohibited and may subject you to criminal or civil penalty. If you have received this communication in error, please notify us immediately by email, delete the message, and destroy any copies.

# Exhibit 11

## MORTGAGE LOAN SALE AGREEMENT
## WITH REPURCHASE OBLIGATION

This MORTGAGE LOAN SALE AGREEMENT WITH REPURCHASE OBLIGATION (this "Agreement"), dated as of August [9], 2022 (the "Effective Date"), is by and between U.S. Bank Trust N.A. as Trustee of American Homeowner Preservation Trust Series AHP Servicing, a Delaware Statutory Trust and U.S. Bank Trust National Association as Trustee of American Homeowner Preservation Series 2015A+, a Delaware Statutory Trust (collectively the "Seller") and Cymbidium Restoration Trust, a Delaware statutory trust (the "Purchaser").

## W I T N E S S E T H:

WHEREAS, the Seller desires to sell to the Purchaser, and the Purchaser desires to purchase from the Seller, certain residential mortgage loans (the "Mortgage Loans"), as described herein, on a servicing-released basis, and which shall be delivered in a group of whole loans on August [9], 2022 (the "Conveyance Date"), with a simultaneous agreement by the Purchaser to transfer to the Seller and the Seller to repurchase such Mortgage Loans in a repurchase transaction to occur on or by [October 10, 2022], against the transfer of funds by the Seller to the Purchaser of the Repurchase Price (as defined herein);

WHEREAS, each Mortgage Loan is secured by a mortgage, deed of trust or other security instrument encumbering a residential dwelling located in the jurisdiction indicated on the schedule annexed hereto as Schedule I (the "Mortgage Loan Schedule"); and

WHEREAS, as additional credit enhancement in connection with the transactions hereunder and as a condition precedent to the Purchaser entering into the transactions hereunder, the Guarantor (as defined herein) shall deliver an absolute and unconditional guaranty to the Purchaser of the Seller's Obligations (as defined herein) hereunder, as more particularly set forth in the Guaranty Agreement attached hereto as Exhibit 3.

NOW, THEREFORE, in consideration of the premises and mutual agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Purchaser and the Seller agree as follows:

SECTION 1. Definitions. For the purposes of this Agreement the following capitalized terms shall have the respective meanings set forth below.

Agreement: This Mortgage Loan Sale Agreement with Repurchase Obligation, including all exhibits, schedules, amendments and supplements hereto.

Applicable Pricing Rate: 12% per annum.

Assignment of Mortgage: An individual assignment of the Mortgage, notice of transfer or equivalent instrument in recordable form, sufficient under the laws of the jurisdiction wherein the related Mortgaged Property is located to give record notice of the sale of the Mortgage to the Purchaser.

1

CONFIDENTIAL

Cymbidium004174

Business Day: Any day other than a Saturday or Sunday, or a day on which banking and savings and loan institutions in the State of New York is authorized or obligated by law or executive order to be closed.

Closing Documents: The documents required pursuant to Section 10.

Conveyance Date: The closing date of this transaction which shall be August [9], 2022, or such other date as may be mutually agreed upon by the Seller and the Purchaser.

Cut-off Date: August 8, 2022.

Default Rate: The lesser of (i) the Applicable Pricing Rate plus three percent (3.00%) per annum, or (ii) the maximum non-usurious per annum interest rate, if any, that at any time, or from time to time, may be contracted for, taken, reserved, charged or received under the laws of the United States and the State of New York.

Event of Default. A misrepresentation or breach of a covenant made by the Seller hereunder, including without limitation the repurchase obligation under Section 4 hereof.

Facility Fee. The amount of $[50,000].

Guarantor: AHP Servicing LLC and its successors and permitted assigns.

Guaranty Agreement: The guaranty agreement dated as of the date hereof by the Guarantor in favor of the Purchaser.

Lien: Any mortgage, lien, pledge, charge, security interest or similar encumbrance.

Modification Agreement: With respect to each Mortgage Loan, each written agreement modifying, adding, extending or amending the terms of both, or either of, the Note and Mortgage, entered into between the Mortgagor and the owner of the Mortgage Loan at the time such agreement was executed, or its agent.

Monthly Payment: With respect to any Mortgage Loan, the scheduled combined payment of principal and/or interest payable by a Mortgagor under the related Note on each due date.

Monthly Payment Date: The 15th of every month.

Mortgage: With respect to each Mortgage Loan, the mortgage, deed of trust or other instrument encumbering the Mortgaged Property securing the Note, including any riders and/or addenda thereto, as such Mortgage may be amended, modified or extended by one or more Modification Agreement.

Mortgage File: The Mortgage Loan Documents pertaining to the related Mortgage Loan and the Servicing File.

2

CONFIDENTIAL

Cymbidium004175

Mortgage Loan: Each residential mortgage loan sold, assigned and transferred to the Purchaser pursuant to this Agreement and identified on the Mortgage Loan Schedule, which Mortgage Loan includes, to the extent available, the Mortgage File, the Monthly Payments and all other rights, benefits, proceeds and obligations arising from or in connection with such Mortgage Loan.

Mortgage Loan Documents: The documents listed in Exhibit 1 hereto pertaining to any Mortgage Loan.

Mortgage Loan Schedule: The schedule of Mortgage Loans attached hereto as Schedule I and setting forth certain information regarding each Mortgage Loan.

Mortgaged Property: With respect to each Mortgage Loan, the Mortgagor's real property encumbered by the Mortgage securing repayment of a related Note.

Note: The original executed note, or other evidence of the Mortgage Loan indebtedness of a Mortgagor, secured by the related Mortgage, including any riders and/or addenda thereto, as may be amended, modified or extended by one or more Modification Agreement.

Mortgagor: The obligor on a Note, the owner of the Mortgaged Property and the grantor or mortgagor named in the related Mortgage and such grantor's or mortgagor's successors in title to the Mortgaged Property.

Obligations: (a) Any amounts owed by the Seller to the Purchaser in connection with any or all transactions hereunder, together with interest thereon (including interest which would be payable as post-petition interest in connection with any bankruptcy or similar proceeding) and all other amounts, fees or expenses which are payable hereunder or under any of the related transaction documents, (b) all other obligations or amounts owed to the Purchaser under the Guaranty Agreement and (c) all other obligations or amounts owed by the Seller to the Purchaser or an affiliate of the Purchaser under any other contract or agreement in connection with the transactions contemplated hereunder, in each case, whether such amounts or obligations owed are direct or indirect, absolute or contingent, matured or unmatured.

Outstanding Purchase Price: An amount equal to the aggregate Purchase Price of the Mortgage Loans, as such amount may be decreased by the aggregate amount, without duplication, of any cash or proceeds received by the Purchaser and applied in reduction of such Outstanding Purchase Price.

Person: An individual, corporation, limited liability company, partnership, joint venture, association, joint-stock company, trust, unincorporated organization or government or any agency or political subdivision thereof.

Price Differential: As of any date of determination, with respect to the Mortgage Loans subject to this Agreement, an amount equal to the product of (a) (i) if an Event of Default is not continuing on such date, the Applicable Pricing Rate or (ii) during the continuance of an Event of Default, the Default Rate and (b) the Outstanding Purchase Price.

3

CONFIDENTIAL

Cymbidium004176

Purchase Price: The price paid on the Conveyance Date by the Purchaser to the Seller pursuant to Section 3 hereof.

Purchase Price Percentage: With respect to any Mortgage Loan, the percentage corresponding to each such Mortgage Loan entered on the Mortgage Loan Schedule.

Repurchase Date. The date on or prior to October [10], 2022.

Repurchase Price: With respect to a Mortgage Loan or Loans in the aggregate, as of any date of determination, the sum of (i) the Outstanding Purchase Price as of such date, (ii) any applicable fees, expenses, servicing advances and indemnities owed by the Seller to the Purchaser as of such date and (iii) the Price Differential due on such Outstanding Purchase Price pursuant to Section 2.4 hereof.

Servicer: SN Servicing Corporation.

Servicing File: With respect to each Mortgage Loan, the file retained by the Servicer that includes all the documents, files, records, servicing documents, servicing records, logs, data tapes, computer records, or other information pertaining to the servicing of the Mortgage Loan during the time such Mortgage Loan was owned by the Seller, or pertaining to the past servicing of the Mortgage Loan, to the extent such documents, records and information, are in the Seller's or Servicer's possession.

SECTION 2. Agreement to Purchase/Payment of Facility Fee. The Seller agrees to sell, and the Purchaser agrees to purchase, on the Conveyance Date and on the terms and conditions stated herein, the Mortgage Loans listed on the Mortgage Loan Schedule.

On the Conveyance Date, upon the payment of the Purchase Price and delivery of the documents described herein, the Seller shall sell, transfer, assign, set over, and convey to the Purchaser, subject to the representations, warranties, terms and provisions of this Agreement, all the right, title, and interest of the Seller in and to the Mortgage Loans, servicing released.

The Seller shall pay the Facility Fee to the Purchaser on the Conveyance Date as a condition precedent to the Purchaser entering into the transactions under this Agreement.

Upon the successful completion of the purchase and sale transactions contemplated herein on the Conveyance Date, the Purchaser shall own and be entitled to receive with respect to each Mortgage Loan all related Monthly Payments and all other payments and recoveries of principal, interest, late payment charges, prepayment premiums and other fees, charges and sums paid or recovered on or with respect to such Mortgage Loans on and after the Cut-off Date.

SECTION 3. Purchase Price. The purchase price (the "Purchase Price") for the Mortgage Loans shall be the sum of the purchase prices for each of the Mortgage Loans as indicated by the corresponding Purchase Price Percentages listed on the Mortgage Loan Schedule.

The Purchaser shall pay the Purchase Price to the Seller, no later than 1:00 p.m. (Central time), on the Conveyance Date, by wire transfer of immediately available funds to the

4

Cymbidium004177

account designated by the Seller pursuant to the wire transfer information attached hereto as Exhibit 2.

SECTION 4.    Seller Repurchase Obligation.  On the Repurchase Date, the Seller will pay to Purchaser the Repurchase Price which will result in the termination of the original conveyance of the Mortgage Loans hereunder, the effect of which will be the repurchase by the Seller of the Mortgage Loans as provided herein, and all of the Purchaser's rights, title and interests in the Mortgage Loans shall revert to the Seller as of the Repurchase Date.

(i)    Price Differential.  Notwithstanding that the Seller and the Purchaser intend that the transactions hereunder be sales by the Seller to the Purchaser of the Mortgage Loans for all purposes except accounting and tax purposes, the Seller shall pay to the Purchaser the accrued and unpaid Price Differential in respect of the Mortgage Loans, in arrears, on a monthly basis from the Purchase Date until, but not including, the date on which the Repurchase Price is paid in full; provided that if the Repurchase Price is not paid by the Seller when due (whether at the Repurchase Date, upon acceleration or otherwise), the transaction shall bear a Price Differential from the date due until paid in full at the Default Rate.

(ii)    Time for Payment.  The Price Differential with respect to the Mortgage Loans shall be due and payable on the Monthly Payment Date occurring in the month following the Purchase Date and thereafter on each subsequent Monthly Payment Date.  On the date that the Repurchase Price for such Purchased Asset is due, all accrued Price Differential not otherwise paid by the Seller with respect to such Purchased Asset shall be due and payable.

SECTION 5.    Examination of Mortgage Files.  The Seller shall make the related Mortgage Files available to the Purchaser for examination at the offices of the Seller's document custodian, or such other location where the Mortgage Files are stored, or as shall otherwise be agreed upon by the Purchaser and the Seller in writing, and during normal business hours.  To the extent practicable, the Seller shall request that its custodian make images of the related Mortgage Files available to the Purchaser for examination.

SECTION 6.    Grant of Security Interest.  With respect to the Mortgage Loans, although the parties intend that all transactions hereunder be sales and purchases (other than for accounting and tax purposes) and not loans, and without prejudice to the expressed intent of the parties, if any transactions are deemed to be loans, and in any event as security for the performance of all of the Obligations hereunder, the Seller hereby pledges, assigns and grants to the Purchaser a continuing first priority security interest in and Lien upon the Mortgage Loans and all rights related thereto, whether now owned or hereafter acquired, now existing or hereafter created.  The grant of security interest set forth in this Section 6 is intended to constitute a security agreement or arrangement or other credit enhancement related to this Agreement and transactions hereunder as contemplated by Sections 101(47)(A)(v) and 741(7)(xi) of the Bankruptcy Code.

SECTION 7.    Conveyance from Seller to Purchaser.

Subsection 7.01.    Possession of Mortgage Files.

The Mortgage Files retained by the Servicer with respect to each Mortgage Loan sold pursuant to this Agreement shall be appropriately identified in the Servicer's computer system

5

Cymbidium004178

to reflect clearly the sale of such related Mortgage Loan to the Purchaser upon the completion of the purchase and sale contemplated by this Agreement. On the Servicing Transfer Date, the Seller shall release from its custody, or cause the Servicer to release from its custody, the related Mortgage Files, which shall be delivered to the Purchaser's successor servicer to the extent applicable. Notwithstanding the forgoing, Seller and the Servicer shall be entitled to retain copies of the Mortgage Files, as of the Conveyance Date, for such period after the transfer as required by applicable law.

Subsection 7.02. <u>Delivery of Mortgage Files.</u>

Upon payment of the Purchase Price on the Conveyance Date, the Seller shall release any interest that it has in the Mortgage Files upon its receipt of the Purchase Price for the Mortgage Loans and will deliver the Mortgage Files to the Purchaser's custodian as directed.

SECTION 8. <u>Representations, Warranties and Covenants of the Seller: Remedies for Breach.</u>

Subsection 8.01. <u>Representations and Warranties Respecting the Seller.</u>

The Seller represents, warrants and covenants to the Purchaser as of the Conveyance Date, that to the best of the Seller's knowledge:

(i) The Seller is duly organized, validly existing and in good standing under the laws of its state of organization;

(ii) The Seller has the full power and authority to hold each Mortgage Loan, to sell each Mortgage Loan, and to execute, deliver and perform, and to enter into and consummate, all transactions contemplated by this Agreement. The Seller has duly authorized the execution, delivery and performance of this Agreement, has duly executed and delivered this Agreement, and this Agreement, assuming due authorization, execution and delivery by the Purchaser, constitutes a legal, valid and binding obligation of the Seller, enforceable against it in accordance with its terms except as the enforceability thereof may be limited by bankruptcy, insolvency or reorganization;

(iii) The execution and delivery of this Agreement by the Seller and the performance of and compliance with the terms of this Agreement will not violate the Seller's organizational documents or constitute a default under or result in a breach or acceleration of, any material contract, agreement or other instrument to which the Seller is a party or which may be applicable to the Seller or its assets;

(iv) The Seller is not in violation of, and the execution and delivery of this Agreement by the Seller and its performance and compliance with the terms of this Agreement will not constitute a violation with respect to, any order or decree of any court or any order or regulation of any federal, state, municipal or governmental agency having jurisdiction over the Seller or its assets, which violation might have consequences that would materially and adversely affect the condition (financial or otherwise) or the operation of the Seller or its assets or might have consequences that would materially and adversely affect the performance of its obligations and duties hereunder;

6

CONFIDENTIAL

(v)     The Notes and Mortgages are genuine and each is the legal, valid and binding obligation of the maker thereof, enforceable in accordance with its terms except as such enforcement may be limited by bankruptcy, insolvency, reorganization or other similar laws affecting the enforcement of creditors' rights generally and by general equity principles (regardless of whether such enforcement is considered in a proceeding in equity or at law).

(vi)     Except by entering into a Modification Agreement, if applicable, the Seller has not knowingly impaired, waived, altered or modified the related Mortgages or Notes in any material respect, or satisfied, canceled, rescinded or subordinated such Mortgages or Notes in whole or in part or released all or any material portion of the related Mortgaged Properties from the lien of the related Mortgages, or executed any instrument of release, cancellation, rescission or satisfaction of the related Notes or Mortgages.

(vii)     The Seller has good title to and is the sole owner and holder of the related Mortgage Loans. Immediately prior to the transfer and assignment to the Purchaser, the related Notes and Mortgages were not subject to an assignment or pledge, other than with respect to which a release has been obtained in connection with such transfer, and the Seller has full right and authority to sell and assign such Mortgage Loans. The transfer, assignment and delivery of the related Mortgage Loans in accordance with terms and conditions of this Agreement shall vest in the Purchaser all rights as owner of such Mortgage Loans free and clear of any and all claims, charges, defenses, offsets and encumbrances of any kind or nature whatsoever, including, but not limited to, those of the Seller;

(viii)     During the period that the Seller has owned the Mortgage Loan, the Mortgage Loan has been serviced in compliance with applicable law and the terms of the Mortgage and Note;

(ix)     There are no actions or proceedings against, or, to the Seller's knowledge, investigations of, the Seller before any court, administrative agency or other tribunal (A) that might prohibit its entering into this Agreement, (B) seeking to prevent the sale of the Mortgage Loans or the consummation of the transactions contemplated by this Agreement or (C) that might prohibit or materially and adversely affect the performance by the Seller of its obligations under, or the validity or enforceability of, this Agreement; and

(x)     The information set forth in the Mortgage Loan Schedule is complete, true and correct, including, without limitation, the paid to date ("PTD") field, notwithstanding any payments returned for insufficient funds after the Cut-off Date;

(xi)     The Seller has not worked with any broker, finder or similar party due any commission or fee in connection with the transactions contemplated herein.

(xii)     The related Mortgage is a valid, subsisting, enforceable and perfected first lien on the Mortgaged Property, including all buildings on the Mortgaged Property, as applicable, of the Mortgage subject only to:

(a)     the lien of current real property taxes and assessments not yet due and payable,

7

     Cymbidium004180

(b)     covenants, conditions and restrictions, rights of way, easements and other matters of the public record as of the date of recording acceptable to mortgage lending institutions generally in the area in which the Mortgaged Property is located,

(c)     liens created pursuant to any federal, state, or local law, regulation, or ordinance affording liens for the costs of clean-up of hazardous substances or hazardous wastes or for other environmental protection purposes,

(d)     such other matters to which like properties are commonly subject that do not individually or in aggregate materially interfere with the benefits of the security to be provided by the Mortgage,

(e)     any generally applicable foreclosure moratoriums or delays,

(f)     any unrecorded mechanics liens to the extent having priority over the Mortgage under applicable law upon their recordation;

(g)     any security agreement, chattel mortgage, or equivalent document related to and delivered to the Purchaser or to its custodian with any Mortgage establishes in it a valid and subsisting first lien on the property described therein.

Subsection 8.02.     <u>Remedies for Breach of Representations and Warranties.</u>

Upon discovery, during the six (6) months after the Conveyance Date, by the Seller or the Purchaser of a breach of any of the foregoing representations and warranties which materially and adversely affects the value of the Mortgage Loans or the interest of the Purchaser therein, the party discovering such breach shall give prompt written notice to the other, along with evidence supporting the breach claim.

Within thirty (60) days after the Seller receives written notice of any breach of a representation or warranty which materially and adversely affects the value of a Mortgage Loan or the Mortgage Loans, the Seller shall use commercially reasonable efforts to cure such breach in all material respects and, if such breach cannot be cured, the Seller shall, at the Purchaser's option, repurchase such Mortgage Loan at the Repurchase Price within ten (10) Business Days following the expiration of the related cure period. Any repurchase of a Mortgage Loan(s) pursuant to the foregoing provisions of this Subsection 8.02 shall occur upon a mutually agreeable date and shall be accomplished by wire transfer of immediately available funds on the repurchase date to an account designated in writing by the Purchaser.

At the time of repurchase of any Mortgage Loan pursuant to the terms of this Section 8.02, the Purchaser and the Seller shall arrange for the reassignment of the repurchased Mortgage Loan to the Seller and the delivery to the Seller of any documents held by the Purchaser or its custodian relating to the repurchased Mortgage Loan. Upon such repurchase the related Mortgage Loan Schedule shall be amended to reflect the withdrawal of the repurchased Mortgage Loan from this Agreement.

CONFIDENTIAL     Cymbidium004181

SECTION 9.  Representations, Warranties and Covenants of the Purchaser.

The Purchaser represents, warrants and covenants to the Seller as of the Conveyance Date:

(i)      The Purchaser is duly organized, validly existing and in good standing under the laws of the state of its organization and is and will remain in compliance with the laws of each state in which any Mortgaged Property is located to the extent necessary to ensure the enforceability of each Mortgage Loan and the servicing of the Mortgage Loan in accordance with the terms of this Agreement.  No licenses or approvals obtained by the Purchaser have been suspended or revoked by any court, administrative agency, arbitrator or governmental body and no proceedings are pending which might result in such suspension or revocation;

(ii)     The Purchaser has the full power and authority to hold each Mortgage Loan, to purchase each Mortgage Loan, and to execute, deliver and perform, and to enter into and consummate, all transactions contemplated by this Agreement.  The Purchaser has duly authorized the execution, delivery and performance of this Agreement, has duly executed and delivered this Agreement, and this Agreement, assuming due authorization, execution and delivery by the Seller, constitutes a legal, valid and binding obligation of the Purchaser, enforceable against it in accordance with its terms except as the enforceability thereof may be limited by bankruptcy, insolvency or reorganization;

(iii)    The execution and delivery of this Agreement by the Purchaser and the performance of and compliance with the terms of this Agreement will not violate the Purchaser's articles of incorporation or by-laws or constitute a default under or result in a breach or acceleration of, any material contract, agreement or other instrument to which the Purchaser is a party or which may be applicable to the Purchaser or its assets;

(iv)     The Purchaser is not in violation of, and the execution and delivery of this Agreement by the Purchaser and its performance and compliance with the terms of this Agreement will not constitute a violation with respect to, any order or decree of any court or any order or regulation of any federal, state, municipal or governmental agency having jurisdiction over the Purchaser or its assets, which violation might have consequences that would materially and adversely affect the condition (financial or otherwise) or the operation of the Seller or its assets or might have consequences that would materially and adversely affect the performance of its obligations and duties hereunder;

(v)      The Purchaser has not worked with any broker, finder or similar party due any commission or fee in connection with the transactions contemplated herein, except David Pollio.

(vi)     The transactions contemplated by this Agreement do not involve, nor are they intended in any way to constitute, the sale of a "security" or "securities" within the meaning of any applicable securities laws, and none of the representations, warranties or agreements of the Purchaser shall create any inference that the transactions involve any "security" or "securities".

9

CONFIDENTIAL                                                          Cymbidium004182

(vii)   Neither the Purchaser nor its servicer shall initiate any contact with any Mortgagor related to any Mortgage Loan prior to the Conveyance Date, unless otherwise required by applicable law and with prior notice and approval in writing of the Seller.

Subsection 9.02.    Indemnification.

Each party agrees to pay, or reimburse the other, and to protect, defend, indemnify, save and hold harmless the other, and its agents, assigns, employees, officers, directors and advisors and contractors from and against any losses, liabilities, claims, causes of action, damages, demands, taxes, fees, costs and expenses of whatever kind, arising out of or incurred in connection with breach of any material term, representation, warranty, or covenant of this Agreement, or failure to comply with applicable laws, or perform obligations under this Agreement. The indemnification provided under this Section 9.02 shall be with respect to losses involving third-parties and losses between Seller and the Purchaser. Each party shall immediately notify the other of any such claim or threatened claim that may exist. The provisions of this Section 9.02 shall survive termination of this Agreement.

SECTION 10. Closing. The closing for the sale and purchase of the Mortgage Loans shall take place on the Conveyance Date. As mutually agreed between the Seller and the Purchaser, the closing shall be either by telephone, confirmed by letter or wire as the parties shall agree, or conducted in person, at such place as the parties shall agree.

Subsection 10.01.    Closing Documents. The Closing Documents for the Mortgage Loans to be purchased on each Conveyance Date shall consist of fully executed originals of the following:

(i)     this Agreement;

(ii)    the Guaranty Agreement; and

(iii)   the related Mortgage Loan Schedule.

SECTION 11. Confidentiality.

The Seller and the Purchaser acknowledge and agree that the terms of this Agreement and any information whether oral, written or otherwise provided by the Seller to the Purchaser pursuant to this Agreement or the transactions contemplated herein shall be kept confidential, shall not be divulged to any party other than those that have a need to know such information in order to complete the transaction contemplated herein, including without limitation, the Interim Servicer, governmental authorities, due diligence, service providers and attorneys, without the other parties' consent, and shall be maintained according to applicable privacy laws. Notwithstanding the foregoing, the Purchaser may disclose Mortgage Loan data (excluding non-public personal information regarding the borrowers), but only in the manner authorized by applicable privacy law.

Each party shall hold and use all Confidential Information, as hereinafter defined, in compliance with Subtitle A of Title V of the Gramm-Leach-Bliley Act (codified at 15 U.S.C. §

10

Cymbidium004183

6801 et seq.), as it may be amended from time to time (the "GLB Act"), the regulations promulgated thereunder, the Fair Credit Reporting Act, 15 U.S.C. § 1681 et seq. (the "FCRA") and all other applicable law. "Confidential Information" shall mean any data or information that is proprietary to the disclosing party and not generally known to the public, whether in tangible or intangible form, including, but not limited to, the following information: inventions, trade secrets, know-how, software, databases, customer lists, all personal information about the Mortgagors that is supplied to the Seller or the Purchaser by or on behalf of the Mortgagors, and other customer or consumer specific data deemed to be "nonpublic personal information" under the GLB Act or the FCRA. Each party shall take all reasonable measures to ensure that the Confidential Information is not disclosed, published, released, transferred, duplicated or otherwise made available to others in contravention of the provisions of this Agreement or of the GLB Act, the regulations promulgated thereunder, the FCRA or other applicable law. If the GLB Act, the regulations promulgated thereunder, the FCRA or other applicable law now or hereafter in effect impose a higher standard of confidentiality to the Confidential Information, such standard shall prevail over the provisions of this Agreement. Each party shall indemnify and hold harmless any other party for all damages incurred by such party arising from such party's failure to comply with the GLB Act and the FCRA.

Notwithstanding anything to the contrary in this Agreement, each party may disclose another party's Confidential Information in a judicial proceeding when required to do so by law when responding to a subpoena or as otherwise required by applicable law or regulatory agency rule or regulation. If any court, governmental agency, or regulatory body demands that a party disclose any information contained in the Confidential Information to the public or to a third party other than the court, governmental agency or regulatory body, the recipient of such demand may, in the absence of a protective order, disclose such information to the extent that it is advised in writing that it must do so by its legal counsel; provided that the recipient of such demand shall, unless restrained by court order, provide written notice of such demand to the party that disclosed the Confidential Information and copies of all notice papers, orders, requests or other documents in order to allow such disclosing party to seek an appropriate protective order, and shall not disclose such information until five (5) Business Days after providing such notice. The recipient of a demand described in the preceding sentence shall cooperate fully with a disclosing party seeking a protective order, at the cost and expense of the party seeking a protective order, should a disclosing party seek such an order.

In addition, notwithstanding anything to the contrary in this Agreement, each party may disclose Confidential Information to the extent that (i) it is reasonably necessary for such party to do so in working with its officers, directors, employees, consultants, legal counsel, auditors, taxing authorities or governmental agencies, (ii) the Purchaser provides this Agreement to banking institutions for diligence purposes in connection with potential financing transactions so long as the Purchaser has a confidentiality agreement in place with each such banking institution that would prohibit each such banking institution from disclosing the information described in this Section 13 to any other party (iii) the Seller is required to disclose the material terms of this Agreement in compliance with the public filing requirements of HLSS, Ltd., the public company parent of the Seller, (iv) information which now or later becomes generally available to the public other than as a result of a disclosure in breach of this Agreement, (v) information already in such party's possession prior to the disclosure under this agreement and such party can demonstrate such possession with written or electronic documentation/evidence; (vi) information which is

11

 Cymbidium004184

obtained by such party on a non-confidential basis from a third person who, insofar as is known to such party, is not prohibited from transmitting the information by any contractual, legal, or fiduciary obligation; (vii) information that has been independently developed by such party without using or referring to the information; (viii) information as otherwise agreed by Seller and Purchaser from time to time. The terms and provisions of this Section 13 shall survive the termination of this Agreement.

SECTION 12. Notices. All demands, notices and communications hereunder shall be in writing and shall be deemed to have been duly given if mailed, by registered or certified mail, return receipt requested, or, if by other means, when received by the other party at the address as follows:

(i) if to the Purchaser:

_____

_____

_____

if to the Seller:

AHP Servicing LLC
Attn: Jorge Newbery
██████████████████;
Legal@ahpservicing.com

or such other address as may hereafter be furnished to the other party by like notice. Any such demand, notice or communication hereunder shall be deemed to have been received on the date delivered to or received at the premises of the addressee (as evidenced, in the case of registered or certified mail, by the date noted on the return receipt).

Severability Clause. Any part, provision, representation or warranty of this Agreement which is prohibited or which is held to be void or unenforceable shall be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof. Any part, provision, representation or warranty of this Agreement which is prohibited or unenforceable or is held to be void or unenforceable in any jurisdiction shall be ineffective, as to such jurisdiction, to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction as to any Mortgage Loan shall not invalidate or render unenforceable such provision in any other jurisdiction. To the extent permitted by applicable law, the parties hereto waive any provision of law which prohibits or renders void or unenforceable any provision hereof. If the invalidity of any part, provision, representation or warranty of this Agreement shall deprive any party of the economic benefit intended to be conferred by this Agreement, the parties shall negotiate, in good-faith, to develop a structure the economic effect of which is nearly as possible the same as the economic effect of this Agreement without regard to such invalidity. The terms and provisions of this Section 14 shall survive the termination of this Agreement.

12

Cymbidium004185

SECTION 13. <u>Counterparts</u>. This Agreement may be executed simultaneously in any number of counterparts. Each counterpart shall be deemed to be an original, and all such counterparts shall constitute one and the same instrument. An executed counterpart signature page delivered by facsimile or .pdf attachment to email shall have the same binding effect as an original signature page.

SECTION 14. <u>Governing Law</u>. The Agreement shall be construed in accordance with the laws of the State of Washington without regard to any conflicts of law provisions and the obligations, rights and remedies of the parties hereunder shall be determined in accordance with the laws of the State of Washington, except to the extent preempted by Federal law.

SECTION 15. <u>Intention of the Parties</u>. It is the intention of the parties that the Purchaser is purchasing, and the Seller is selling, the Mortgage Loans and not a debt instrument of the Seller or another security. Accordingly, the parties hereto each intend to treat the transaction for Federal income tax purposes as a sale by the Seller, and a purchase by the Purchaser, of the Mortgage Loans.

SECTION 16. <u>Waiver of Jury Trial</u>. To the extent permitted by law, each party hereto hereby waives trial by jury in any judicial proceeding involving, directly or indirectly, any matter (whether sounding in tort, contract or otherwise) in any way arising out of, related to, or connected with this Agreement or the relationships established hereunder.

SECTION 17. <u>Successors and Assigns</u>. This Agreement shall bind and inure to the benefit of and be enforceable by the Seller and the Purchaser and the respective successors and assigns of the Seller and the Purchaser. Neither Party may assign this Agreement without the other's prior written consent, which consent may be granted or withheld in the Seller's sole discretion.

SECTION 18. <u>Waivers</u>. No term or provision of this Agreement may be waived or modified unless such waiver or modification is in writing and signed by the party against whom such waiver or modification is sought to be enforced.

SECTION 19. <u>Exhibits</u>. The exhibits and schedules to this Agreement are hereby incorporated and made a part hereof and are an integral part of this Agreement.

SECTION 20. <u>No Use of Seller's Name</u>.

Purchaser shall not, without the express prior written consent of Seller: (i) use or permit the use by any person, the name of Seller or any of its affiliates; (ii) represent or imply that it is affiliated with, authorized by, or in any way related to Seller or any of its affiliates; (iii) institute any legal, collection or enforcement proceeding in the name of Seller or any of its affiliates or continue to prosecute any pending legal, collection or enforcement proceeding in the name of Seller or any of its affiliates; or (iv) mislead, whether through misrepresentation or nondisclosure or otherwise, a Mortgagor or any other person as to the identity of the owner of any Mortgage Loan.

CONFIDENTIAL

SECTION 21. <u>General Interpretive Principles</u>. For purposes of this Agreement, except as otherwise expressly provided or unless the context otherwise requires:

(a) the terms defined in this Agreement have the meanings assigned to them in this Agreement and include the plural as well as the singular, and the use of any gender herein shall be deemed to include the other gender;

(b) accounting terms not otherwise defined herein have the meanings assigned to them in accordance with generally accepted accounting principles;

(c) references herein to "Articles," "Sections," "Subsections," "Paragraphs," and other subdivisions without reference to a document are to designated Articles, Sections, Subsections, Paragraphs and other subdivisions of this Agreement;

(d) reference to a Subsection without further reference to a Section is a reference to such Subsection as contained in the same Section in which the reference appears, and this rule shall also apply to Paragraphs and other subdivisions;

(e) the words "herein," "hereof," "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular provision; and

(f) the term "include" or "including" shall mean without limitation by reason of enumeration.

SECTION 22. <u>Reproduction of Documents</u>. This Agreement and all documents relating thereto, including, without limitation, (a) consents, waivers and modifications which may hereafter be executed, (b) documents received by any party at the closing, and (c) financial statements, certificates and other information previously or hereafter furnished, may be reproduced by any photographic, photostatic, microfilm, micro-card, miniature photographic or other similar process. The parties agree that any such reproduction shall be admissible in evidence as the original itself in any judicial or administrative proceeding, whether or not the original is in existence and whether or not such reproduction was made by a party in the regular course of business, and that any enlargement, facsimile or further reproduction of such reproduction shall likewise be admissible in evidence.

SECTION 23. <u>Further Agreements; Cooperation; Equitable Remedies</u>. The Seller and the Purchaser each agree to execute and deliver to the other such reasonable and appropriate additional documents, instruments or agreements as may be necessary or appropriate to effectuate the purposes of this Agreement.

The parties agree to act reasonably, in good faith and in accordance with all applicable laws and regulations and to do all things necessary to effect the transactions contemplated hereby including, without limitation, complying with all reasonable requests provided by one party to the other relating to the transactions set forth herein.

14

CONFIDENTIAL

Each party agrees to take, or cause to be taken, all such further or other actions as shall reasonably be necessary to make effective, to consummate and to perform the undertakings and obligations contemplated by this Agreement.

In the event of default by either party, the non-defaulting party shall be entitled to equitable and injunctive relief hereunder.

**INTENTIONALLY LEFT BLANK**

**SIGNATURE PAGE FOLLOWS**

15

IN WITNESS WHEREOF, the Seller and the Purchaser have caused their names to be signed hereto by their respective officers thereunto duly authorized as of the date first above written.

Seller:

U.S. Bank Trust N.A. as Trustee of American Homeowner Preservation Trust Series AHP Servicing

By: AHP Capital Management LLC, Administrator

By:_____

Name: Jorge Newbery
Title: CEO

U.S. Bank Trust National Association as Trustee of American Homeowner Preservation Series 2015A+

By: AHP Capital Management LLC, Administrator

By:_____

Name: Jorge Newbery
Title: CEO

**CONFIDENTIAL**

Cymbidium004189

Purchaser:

CYMBIDIUM RESTORATION TRUST

By: Cymbidium Restoration, LLC

By:_____

Name: _____
Title:

## SCHEDULE I

MORTGAGE LOAN SCHEDULE

**CONFIDENTIAL**

## EXHIBIT 1

## MORTGAGE LOAN DOCUMENTS

With respect to each Mortgage Loan set forth on a related Mortgage Loan Schedule, the Seller shall deliver and release to the Purchaser's custodian, the following documents:

1. the original Note bearing all original intervening endorsements necessary to show a complete chain of endorsements from the original payee to the Seller, endorsed in blank, "Pay to the order of _____ , without recourse", and, if previously endorsed, signed in the name of the last endorsee by a duly qualified officer of the last endorsee, or a copy of the Note (endorsed as provided above) together with a lost note affidavit;

2. for each Mortgage Loan, the original Assignment of Mortgage for each Mortgage Loan, in form and substance acceptable for recording. The Mortgage shall be assigned, with assignee's name left blank;

3. the original of any guaranty executed in connection with the Note, if any;

4. the Mortgage with evidence of recording thereon. If the Mortgage with evidence of recording thereon has not been returned by the public recording office where such Mortgage has been delivered for recordation, a copy of such Mortgage;

5. all assumption, consolidation or extension agreements, or Modification Agreements with evidence of recording thereon, if any;

6. all intervening assignments of mortgage evidencing a complete chain of ownership from the originator of the Mortgage Loan to the last assignee, in each case, with to the extent available evidence of recording thereon. If any such intervening assignment of mortgage has not been returned from the applicable public recording office, a copy of such intervening assignment of mortgage;

7. if the Note, the Mortgage, any Assignment of Mortgage, or any other related document has been signed by a Person on behalf of the Mortgagor, the power of attorney or other instrument that authorized and empowered such Person to sign;

8. the lender's title insurance policy in the form of an ALTA mortgage title insurance policy and insuring the Mortgage Loan Purchaser and its successors and assigns as to the lien of the Mortgage in the original principal amount of the Mortgage Loan; and

9. any security agreement, chattel mortgage or equivalent document executed in connection with the Mortgage, if any; or

10. to the extent any of the foregoing have been released for servicing, foreclosure or similar reasons, such assurance and/or documentation as the parties shall mutually agree.

**CONFIDENTIAL**

## EXHIBIT 2

## WIRE TRANSFER INFORMATION

WIRE TO:



**CONFIDENTIAL**

EXHIBIT 3

<u>GUARANTY AGREEMENT</u>

**Cymbidium004194**

# Exhibit 12

# GUARANTY AGREEMENT

THIS GUARANTY AGREEMENT, dated as of August 9, 2022 (including any schedule attached hereto and as amended, restated, supplemented and otherwise modified from time to time, this "Guaranty Agreement"), is made byAHP Servicing LLC, a Delaware Statutory Trust  a limited liability company formed and registered under the laws of Delaware  (the "Guarantor"), in favor of Cymbidium Restoration Trust the ("Purchaser"), a Delaware Statutory Trust.

## RECITALS

A.  Pursuant to that certain Mortgage Loan Sale Agreement with Repurchase Obligation, dated as of August 9, 2022 (as amended, restated, supplemented or otherwise modified from time to time, the "Agreement"), by and between U.S. Bank Trust N.A. as Trustee of American Homeowner Preservation Trust Series AHP Servicing, a Delaware Statutory Trust and U.S. Bank Trust National Association as Trustee of American Homeowner Preservation Series 2015A+, a Delaware Statutory Trust  (the "Seller") and Cymbidium Restoration Trust, a Delaware statutory trust (the "Purchaser"), the Purchaser has agreed to enter into the transactions in which the Seller agrees to transfer to the Purchaser certain mortgage loans (as more particularly described and defined in the Agreement, the "Mortgage Loans") against the transfer of funds by the Purchaser, with a simultaneous agreement by the Purchaser to transfer to the Seller such Mortgage Loans on or by October 10, 2022, against the transfer of funds by the Seller.

B.  As of the date hereof, the Guarantor indirectly owns 100 % of the equity interests in the Seller.

C.  The Guarantor will derive a substantial direct and indirect benefit from the transactions entered into by the Purchaser under the Agreement.

D.  It is a condition precedent to the Purchaser's agreement to engage in the transactions contemplated under the Agreement that the Guarantor shall have executed and delivered this Guaranty Agreement to the Purchaser.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto hereby agree as follows:

1.  **Defined Terms**.

(a)  Unless otherwise defined herein, terms defined in the Agreement and used herein shall have the meanings given to them in the Agreement.

"Guaranty Expenses" means 100% of the losses, damages, costs, expenses, liabilities, claims or other obligations incurred by the Purchaser (including attorneys' fees and costs) associated with enforcing any rights with respect to, or collecting, any or all of any Guaranty Obligations and/or enforcing any rights with respect to, or collecting against, the Guarantor under this Guaranty Agreement.

"Guaranty Obligations" means the Seller's Obligations.

- 1 -

CONFIDENTIAL

Cymbidium004435

"Seller Delinquency Notice" means, upon the failure of the Seller to pay any Seller's Obligations (a "Seller's Delinquency Event"), a written notice sent by the Purchaser to the Guarantor of such Seller's Delinquency Event and the amount of the applicable delinquent payment (the "Seller Delinquency Amount").

"Seller's Obligations" means the obligation of the Seller to (i) make any payment of Repurchase Price when due pursuant to the terms of the Agreement whether by acceleration, mandatory repurchase or otherwise repurchase the Mortgage Loans on the applicable Repurchase Date, (ii) make any payment of Price Differential when due, or (iii) make any payment of any amount owing to the Purchaser (other than Repurchase Price and Price Differential) when due under the terms of the Agreement, including the Seller's indemnification obligations under the Agreement, and such failure continues beyond the expiration of any applicable grace periods.

"Termination Date" shall have the meaning set forth in Section 2(e) hereof.

(b)     The words "hereof", "herein" and "hereunder" and words of similar import when used in this Guaranty Agreement shall refer to this Guaranty Agreement as a whole and not to any particular provision of this Guaranty Agreement and section and paragraph references are to this Guaranty Agreement unless otherwise specified.

(c)     The meanings given to terms defined herein shall be equally applicable to both the singular and plural forms of such terms.

2.     **Guaranty.**

(a)     The Guarantor hereby unconditionally and irrevocably guarantees to the Purchaser and its successors, indorsees, transferees and assigns, the prompt and complete payment and performance by the Seller when due, whether at the stated maturity, by acceleration, demand or otherwise (or would otherwise be owing, due or payable under the Agreement but for the commencement of any bankruptcy, insolvency or similar proceeding in respect of the Seller) of its present and future Guaranty Obligations, whether absolute or contingent. Without in any way limiting the foregoing, promptly upon receipt of a Seller Delinquency Notice (but in any event no later than two (2) Business Days following delivery of such Seller Delinquency Notice), the Guarantor shall pay the Seller Delinquency Amount specified therein. This is a guaranty of payment and performance, and not merely of collection. The Guarantor further agrees to pay any Guaranty Expenses, which may be paid or incurred by the Purchaser.

(b)     In no event shall the Purchaser be obligated to take any action, obtain any judgment or file any claim prior to enforcing this Guaranty Agreement. The rights, powers, remedies and privileges provided in this Guaranty Agreement are cumulative and not exclusive of any rights, powers, remedies and privileges provided by any other agreement or by law.

(c)     With respect to Guarantor's Guaranty Obligations, no payment or payments made by the Seller or any other Person (other than the Guarantor) or received or collected by the Purchaser from the Seller or any other Person (other than the Guarantor) by virtue of any action or proceeding or any set-off or appropriation or application at any time or from time to time in reduction of or in payment of the Guaranty Obligations shall be deemed to modify, reduce, release or otherwise affect the liability of the Guarantor hereunder.

- 2 -

CONFIDENTIAL

Cymbidium004436

(d)      The Guarantor agrees that whenever, at any time, or from time to time, it shall make any payment to the Purchaser on account of its liability hereunder, it will promptly notify the Purchaser in writing that such payment is made under this Guaranty Agreement for such purpose.

(e)      The Guarantor hereby agrees that this is an absolute, unconditional and continuing guaranty and that it shall remain liable under this Guaranty Agreement until the date on which its Guaranty Obligations and Guaranty Expenses are satisfied and paid in full and the Agreement is terminated in accordance with the terms thereof (such date, the "Termination Date"), notwithstanding that from time to time prior thereto the Seller may be free from any Obligations.

3.      **Representations and Warranties of Guarantor**.      The Guarantor hereby represents and warrants, as to itself on the date hereof and during the duration of this Guaranty Agreement, that:

(a)      It is duly formed and registered and validly existing under the laws of the jurisdiction of its formation, has the full legal power and authority and has all governmental licenses, authorizations, consents and approvals, necessary to own its property and to carry on its business as currently conducted, is duly qualified to do business and is in good standing in each jurisdiction in which the transaction of its business makes such qualification necessary.  It has the authority under its organizational documents and applicable law to enter into this Guaranty Agreement and to perform all acts contemplated hereby or in connection herewith.  It has taken all action necessary to make this Guaranty Agreement its valid and binding obligation enforceable in accordance with the terms hereof.

(b)      The execution, delivery and performance by the Guarantor of this Guaranty Agreement and the transactions contemplated hereby are within its powers, have been duly authorized by all necessary action and do not constitute or will not result in a breach of any of the terms, conditions or provisions of its organizational documents or result in a breach of any legal restriction or result in the breach of any provision of, or conflict with or constitute a default under or result in the acceleration of any obligation under, any agreement, indenture, loan or credit agreement or other instrument to which it or any of its property is subject, or result in the violation of any law, rule, regulation, order, judgment or decree to which it or its property is subject.

(c)      This Guaranty Agreement constitutes legal, binding and valid obligations of the Guarantor, enforceable against it in accordance with its terms, except as limited by bankruptcy, insolvency or other similar laws affecting the enforcement of creditor's rights generally.  The execution and delivery of this Guaranty Agreement and the performance of its obligations hereunder do not require any license, consent, approval, authorization or other action of any Governmental Authority or any other Person, or if required, such license, consent, approval, authorization or other action has been obtained prior to the Effective Date.

(d)      The information, reports, financial statements, exhibits and schedules furnished in writing by or on behalf of the Guarantor or any of its Subsidiaries to the Purchaser in connection with the negotiation, preparation or delivery of this Guaranty Agreement and the other Facility Documents or included herein or therein or delivered pursuant hereto or thereto, when taken as a whole, do not contain any untrue statement of material fact or omit to state any material

- 3 -

CONFIDENTIAL                                                                      Cymbidium004437

fact necessary to make the statements herein or therein, in light of the circumstances under which they were made, not misleading.

(e) There is no action, suit, proceeding, inquiry or investigation, at law or in equity, or before or by any court, public board or body pending or, to the Guarantor's knowledge, threatened against or affecting it (or, to its knowledge, any basis therefor) wherein an unfavorable decision, ruling or finding would adversely affect the validity or enforceability of this Guaranty Agreement or any agreement or instrument to which it is a party and which is used or contemplated for use in the consummation of the transactions contemplated hereby, would materially adversely affect the execution and delivery of this Guaranty Agreement by the Guarantor or would or could materially and adversely affect its ability to carry out its obligations hereunder.

(f) This Guaranty Agreement has not been entered into fraudulently by the Guarantor with the intent to hinder, delay or defraud any creditor or the Purchaser.

(g) The Guarantor is and will be solvent, is and will be able to pay its debts as they mature and does not and will not have unreasonably small capital to engage in the business in which it is engaged and proposes to engage. It does not intend to incur, or believe that it has incurred, debts beyond its ability to pay such debts as they mature. It is not contemplating the commencement of insolvency, bankruptcy, liquidation or consolidation proceedings or the appointment of a receiver, liquidator, conservator, trustee or similar official in respect of it or any of its assets.

(h) The Guarantor is not required to register as an "investment company" within the meaning of the Investment Company Act of 1940, as amended.

(i) The Guarantor has independently reviewed the Agreement and related agreements and has made an independent determination as to the validity and enforceability thereof, and in executing and delivering this Guaranty Agreement to the Purchaser, it is not in any manner relying upon the validity, enforceability, attachment or perfection of any Liens or security interests of any kind or nature granted by the Seller to the Purchaser, now or at any time and from time to time in the future.

(j) The Guarantor has a direct or indirect and substantial economic interest in the Seller and expects to derive substantial benefits from the transactions of the Seller under the Agreement. It is entering into this Guaranty Agreement for legitimate business purposes and reasonably believes that its guaranty of its Guaranty Obligations and its Guaranty Expenses is in its best interests.

4. **Covenants of Guarantor**. The Guarantor hereby covenants and agrees, as to itself, that:

(a) It shall (i) preserve and maintain its existence as a [Delaware limited company], (ii) qualify and remain qualified in good standing in each jurisdiction where the failure to be so qualified would have a Material Adverse Effect and (iii) comply with its organizational documents. It shall maintain and preserve all of its material rights, privileges, licenses and franchises necessary for the operation of its business. It will comply with the requirements of all

- 4 -

CONFIDENTIAL

Cymbidium004438

applicable laws, rules, regulations and orders of Governmental Authorities to which it is or may become subject.

(b)     The Guarantor shall deliver to the Purchaser, promptly upon becoming aware thereof (but in no event later than one (3) Business Days after becoming aware), written notice, in reasonable detail of:

(i)     the occurrence of any default, breach or failure to or inability to perform under this Guaranty Agreement; and

(ii)    any other action, event or condition of any nature that could reasonably be expected to result in a Material Adverse Effect with respect to the Guarantor.

(c)     The Guarantor shall not file or cause or suffer to be filed with respect to the Seller a voluntary petition in bankruptcy to seek relief under any provision of any bankruptcy, reorganization, moratorium, delinquency, arrangement, insolvency, readjustment of debt, dissolution or liquidation law of any jurisdiction whether now or subsequently in effect, or consent to the filing of any petition against the Seller under any such law, or consent to the appointment of or taking possession by a custodian, receiver, conservator, trustee, liquidator, sequestrator or similar official of all or any part of the Seller's property.

5.     **Right of Set-off**. The Purchaser is hereby irrevocably authorized at any time and from time to time without notice to the Guarantor, any such notice being hereby waived by the Guarantor, to set off and appropriate and apply any and all monies and other property of the Guarantor, deposits (general or special, time or demand, provisional or final), in any currency, and any other credits, indebtedness or claims, in any currency, in each case whether direct or indirect, absolute or contingent, matured or unmatured, at any time held or owing by the Purchaser to or for the credit or the account of Guarantor, or any part thereof in such amounts as the Purchaser may elect, on account of Guarantor's Guaranty Obligations and liabilities hereunder and claims of every nature and description of the Purchaser against the Guarantor, in any currency, whether arising hereunder, under the Agreement or otherwise, as the Purchaser may elect, whether or not Purchaser has made any demand for payment and although the Guarantor's Guaranty Obligations and liabilities and claims may be contingent or unmatured. The Purchaser shall notify the Guarantor promptly of any such set-off and the application made by the Purchaser; provided that the failure to give such notice shall not affect the validity of such set-off and application. The rights of the Purchaser under this paragraph are in addition to other rights and remedies (including, without limitation, other rights of set-off) which the Purchaser may have.

6.     **No Subrogation**. Notwithstanding any payment or payments made by the Guarantor hereunder or any set-off or application of funds of the Guarantor by the Purchaser, the Guarantor shall not be entitled to be subrogated to any of the rights of the Purchaser against the Seller or any collateral security or guarantee or right of offset held by the Purchaser for the payment of Guarantor's Guaranty Obligations or Guaranty Expenses, nor shall the Guarantor seek or be entitled to seek any contribution, indemnity or reimbursement from the Seller in respect of payments made by the Guarantor hereunder, until the Termination Date. If any amount shall be paid to the Guarantor on account of such subrogation rights at any time when all of the Obligations

- 5 -

shall not have been paid and satisfied in full, such amount shall be held by the Guarantor in trust for the Purchaser, segregated from other funds of the Guarantor, and shall, forthwith upon receipt by the Guarantor, be turned over to the Purchaser in the exact form received by the Guarantor (duly indorsed by the Guarantor to the Purchaser, if required), to be applied against the Obligations or Guaranty Obligations, as applicable, whether matured or unmatured, in such order as the Purchaser may determine.

7. **Amendments, Etc. with Respect to the Obligations**. The Guarantor shall remain obligated hereunder notwithstanding that, without any reservation of rights against the Guarantor and without notice to or further assent by the Guarantor, any demand for payment of any of the Obligations made by the Purchaser to the Seller may be rescinded by Purchaser and any of the Obligations continued, and the Obligations, or the liability of any other party upon or for any part thereof, or any collateral security or guarantee therefor or right of offset with respect thereto, may, from time to time, in whole or in part, be renewed, extended, amended, modified, accelerated, compromised, terminated, waived, surrendered or released by the Purchaser, and the Agreement and any other documents executed and delivered in connection therewith may be amended, modified, supplemented or terminated, in whole or in part, as the Purchaser may deem advisable from time to time, and any collateral security, guarantee or right of offset at any time held by the Purchaser for the payment of the Obligations may be sold, exchanged, waived, surrendered or released. The Purchaser shall not have any obligation to protect, secure, perfect or insure any lien at any time held by it as security for the Obligations or for this Guaranty Agreement or any property subject thereto. When making any demand hereunder against the Guarantor, the Purchaser may, but shall be under no obligation to, make a similar demand on the Seller, and any failure by the Purchaser to make any such demand or to collect any payments from the Seller or any release of the Seller shall not relieve the Guarantor of its obligations or liabilities hereunder, and shall not impair or affect the rights and remedies, express or implied, or as a matter of law, of the Purchaser against the Guarantor. For the purposes hereof "demand" shall include, without limitation, the commencement and continuance of any legal proceedings.

8. **Waiver of Rights**. Except as otherwise expressly provided herein, the Guarantor waives any and all notice of any kind including, without limitation, notice of the creation, renewal, extension or accrual of any of the Guaranty Obligations, and notice of or proof of reliance by the Purchaser upon this Guaranty Agreement or acceptance of this Guaranty Agreement; the Guaranty Obligations shall conclusively be deemed to have been created, contracted or incurred, or renewed, extended, amended or waived, in reliance upon this Guaranty Agreement; and all dealings between the Seller and the Guarantor, on the one hand, and the Purchaser, on the other hand, likewise shall be conclusively presumed to have been had or consummated in reliance upon this Guaranty Agreement. The Guarantor waives diligence, presentment, protest, demand for payment or nonpayment to or upon the Seller with respect to the Obligations or the Guarantor with respect to the Guaranty Obligations and the Guaranty Expenses. In addition, the Guarantor waives any requirement that the Purchaser first exhaust any right, power, remedy or proceeding against the Seller.

9. **Guaranty Absolute and Unconditional**. The Guarantor understands and agrees that this Guaranty Agreement shall be construed as a continuing, absolute and unconditional guarantee of the full and punctual payment and performance of its Guaranty Obligations and Guaranty Expenses and not of their collectability only and is in no way conditioned upon any

- 6 -

Cymbidium004440

requirement that the Purchaser first attempt to collect any of the Guaranty Obligations or Guaranty Expenses from the Seller, without regard to (a) the validity, regularity or enforceability of the Agreement or any other transaction document, any of the Guaranty Obligations or Guaranty Expenses therefor or guarantee or right of offset with respect thereto at any time or from time to time held by the Purchaser, (b) any defense, set-off, deduction, abatement, recoupment, reduction or counterclaim (other than a defense of payment or performance) which may at any time be available to or be asserted by Seller against the Purchaser, (c) the lack of authority of the Seller to execute or deliver the Agreement, (d) any change in the time, manner or place of payment of, or in any other term of, or amendment to the Agreement, (e) any waiver or consent by the Purchaser with respect to any provisions of the Agreement or any compromise or release of any of the obligations thereunder, (f) the absence of any action to enforce the Agreement, to recover any judgment against the Seller or to enforce a judgment against the Seller under the Agreement, (g) the occurrence of any Event of Default or potential Event of Default under the Agreement, (h) the existence of bankruptcy, insolvency, reorganization or similar proceedings involving the Seller, (i) any impairment, taking, furnishing, exchange or release of, or failure to perfect or obtain protection of any security interest in, collateral securing the Agreement, (j) any change in the laws, rules or regulations of any jurisdiction, (k) any present or future action of any Governmental Authority or court amending, varying, reducing or otherwise affecting or purporting to amend, vary, reduce or otherwise affect, any of the obligations of the Seller under the Agreement or of the Guarantor under this Guaranty Agreement, or (l) any other circumstance whatsoever (with or without notice to or knowledge of the Seller or the Guarantor) which constitutes, or might be construed to constitute, an equitable or legal discharge of the Guarantor from this Guaranty Agreement, in bankruptcy or in any other instance. When pursuing its rights and remedies hereunder against the Guarantor, the Purchaser may, but shall be under no obligation to, pursue (i) such rights, powers, privileges and remedies as it may have against the Seller or any other Person or (ii) any right of offset with respect thereto, and any failure by the Purchaser to pursue such other rights or remedies or to collect any payments from the Seller or any such other Person or to exercise any such right of offset, or any release of the Seller or any such other Person or right of offset, shall not relieve the Guarantor of any liability hereunder, and shall not impair or affect the rights, powers, privileges and remedies, whether express, implied or available as a matter of law or equity, of the Purchaser against Guarantor. This Guaranty Agreement shall remain in full force and effect and be binding in accordance with and to the extent of its terms upon the Guarantor and its successors and assigns, and shall inure to the benefit of the Purchaser, and its successors, indorsees, transferees and assigns, until the Termination Date shall have occurred.

10. **Reinstatement**. This Guaranty Agreement shall continue to be effective, or be reinstated, as the case may be, if at any time payment, or any part thereof, of any of the Guaranty Obligations or Guaranty Expenses is rescinded or must otherwise be restored or returned by the Purchaser upon the insolvency, bankruptcy, dissolution, liquidation or reorganization of the Seller or the Guarantor, or upon or as a result of the appointment of a receiver, intervenor or conservator of, or trustee or similar officer for, the Seller or the Guarantor or any substantial part of its property, or otherwise, all as though such payments had not been made.

11. **Event of Default**. If an Event of Default under the Agreement shall have occurred and be continuing, the Guarantor agrees that, as between the Guarantor and the Purchaser, the Obligations may be declared to be due in accordance with the terms of the Agreement for purposes of this Guaranty Agreement notwithstanding any stay, injunction or other prohibition which may

- 7 -

CONFIDENTIAL

Cymbidium004441

prevent, delay or vitiate any such declaration as against Seller and that, in the event of any such declaration (or attempted declaration), the Guaranty Obligations shall forthwith become due by the Guarantor for purposes of this Guaranty Agreement.

12. **Payments**. The Guarantor hereby guarantees that payments hereunder will be paid to the Purchaser without deduction, abatement, recoupment, reduction, set-off or counterclaim, in U.S. Dollars and in accordance with the wiring instructions of the Purchaser.

13. **Notices**. Any and all notices, statements, demands or other communications hereunder may be given by a party to the others by mail, facsimile, messenger or otherwise to the address specified at the "Address for Notices" specified on the signature page in the case of the Guarantor, or in accordance with Section 12 of the Agreement in the case of the Purchaser, or so sent to such party at any other place specified in a notice of change of address hereafter received by the other. All notices, demands and requests hereunder may be made orally, to be confirmed promptly in writing, or by other communication as specified in the preceding sentence.

14. **Severability**. Any provision of this Guaranty Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

15. **Integration**. This Guaranty Agreement and the provisions of the other transaction documents expressly referenced herein or therein represent the agreement of the Guarantor with respect to the subject matter hereof and thereof and there are no other promises or representations by the Guarantor or the Purchaser relative to the subject matter hereof or thereof not reflected herein or therein.

16. **Amendments in Writing; No Waiver; Cumulative Remedies**.

(a)     None of the terms or provisions of this Guaranty Agreement may be waived, amended, supplemented or otherwise modified except by a written instrument executed by the Guarantor and the Purchaser; provided that any provision of this Guaranty Agreement may be waived in writing by the Purchaser.

(b)     The Purchaser shall not be deemed by any act (except by a written instrument pursuant to this Section 16), delay, indulgence, omission or otherwise be deemed to have waived any right, power, privilege or remedy hereunder or to have acquiesced in any potential Event of Default or Event of Default or in any breach of any of the terms and conditions hereof. No failure to exercise, nor any delay in exercising, on the part of the Purchaser, any right, power, remedy or privilege hereunder shall operate as a waiver thereof. No single or partial exercise of any right, power, remedy or privilege hereunder shall preclude any other or further exercise thereof or the exercise of any other right, power or privilege. A waiver by the Purchaser of any right, power, privilege or remedy hereunder on any one occasion shall not be construed as a bar to any right, power, privilege or remedy which the Purchaser would otherwise have on any future occasion.

- 8 -

(c)     The rights and remedies herein provided are cumulative, may be exercised singly or concurrently and are not exclusive of any other rights or remedies provided by law.

17.     <u>Section Headings</u>. The section headings used in this Guaranty Agreement are for convenience of reference only and are not to affect the construction hereof or be taken into consideration in the interpretation hereof.

18.     <u>Successors and Assigns</u>. This Guaranty Agreement shall be binding upon the successors and permitted assigns of Guarantor and shall inure to the benefit of the Purchaser and its successors and assigns. This Guaranty Agreement may not be assigned by the Guarantor without the express written consent of the Purchaser in its sole discretion and any attempt to assign or transfer this Guaranty Agreement without such consent shall be null and void and of no effect whatsoever.

19.     <u>Governing Law; Jurisdiction</u>.

(a)     THIS GUARANTY AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO ANY CONFLICTS OF LAW PROVISIONS (EXCEPT FOR SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW).

(b)     THE GUARANTOR HEREBY WAIVES TRIAL BY JURY. THE GUARANTOR HEREBY IRREVOCABLY CONSENTS TO THE EXCLUSIVE JURISDICTION OF ANY COURT OF THE STATE OF NEW YORK, OR IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK, ARISING OUT OF OR RELATING TO THE FACILITY DOCUMENTS IN ANY ACTION OR PROCEEDING. THE GUARANTOR HEREBY SUBMITS TO, AND WAIVES ANY OBJECTION IT MAY HAVE TO, EXCLUSIVE PERSONAL JURISDICTION AND VENUE IN THE COURTS OF THE STATE OF NEW YORK AND THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK, WITH RESPECT TO ANY DISPUTES ARISING OUT OF OR RELATING TO THE FACILITY DOCUMENTS.

20.     <u>Waivers</u>. THE GUARANTOR HEREBY WAIVES ANY RIGHT TO ASSERT A COUNTERCLAIM, OTHER THAN A COMPULSORY COUNTERCLAIM, IN ANY ACTION OR PROCEEDING BROUGHT AGAINST IT BY THE PURCHASER.

21.     <u>Electronic Signatures and Notices</u>. The Purchaser and the Guarantor agree that this Guaranty Agreement, any documents to be delivered pursuant to this Guaranty Agreement and any notices hereunder may be transmitted between them by email and/or facsimile. The Purchaser and the Guarantor intend that faxed signatures and electronically imaged signatures such as .pdf files shall constitute original signatures and are binding on all parties.

22.     <u>Intent</u>. The Guarantor (a) acknowledges that each of the Agreement and each Transaction thereunder constitutes a "securities contract" as that term is defined in Section 741(7)(A)(i) of the Bankruptcy Code and a "master netting agreement" as that term is defined in Section 101(38A)(A) of the Bankruptcy Code, (b) intends and acknowledges that this Guaranty Agreement is "a security agreement or arrangement or other credit enhancement" that is "related to" and provided "in connection with" the Agreement and each transaction thereunder and is within

- 9 -

**CONFIDENTIAL**

**Cymbidium004443**

the meaning of Sections 101(38A)(A), 101(47)(a)(v) and 741(7)(A)(xi) of the Bankruptcy Code and is, therefore, (i) a "securities contract" as that term is defined in Section 741(7)(A)(xi) of the Bankruptcy Code and (ii) a "master netting agreement" as that term is defined in Section 101(38A) of the Bankruptcy Code and (c) intends and acknowledges that any party's right to cause the termination, liquidation or acceleration of, or to offset net termination values, payment amounts or other transfer obligations arising under or in connection with the Agreement and this Guaranty Agreement is in each case a contractual right to cause the termination, liquidation or acceleration of, or to offset net termination values, payment amounts or other transfer obligations arising under or in connection with this Guaranty Agreement as described in Sections 555 and 561 of the Bankruptcy Code.

23. **Process Agent**. For the purposes of this Guaranty Agreement, the Guarantor hereby agrees that service of all writs, process and summonses in any suit, action or proceeding brought under this Guaranty Agreement may be made upon the Corporation Service Company (the "Process Agent"), and the Guarantor hereby confirms and agrees that the Process Agent has been duly and irrevocably appointed as its agent and true and lawful attorney-in-fact in its name, place and stead to accept such service of any and all such writs, processes and summonses, and agrees that the failure of the Process Agent to give any notice of any such service of process to Guarantor shall not impair or affect the validity of such service or of any judgment based thereon.

[SIGNATURE PAGES TO FOLLOW]

- 10 -

CONFIDENTIAL

Cymbidium004444

IN WITNESS WHEREOF, the Guarantor and the Purchaser have caused this Guaranty Agreement to be duly executed and delivered as of the date first above written.

AHP Servicing LLC , **as Guarantor**
By:_____
Name: Jorge Newbery
Title: CEO

<u>Address for Notices:</u>

Jorge Newbery
AHP Servicing LLC
████████████████████
████████████████████ ▓

CONFIDENTIAL

**Cymbidium Restoration Trust, as the Purchaser**

By: Cymbidium Restoration, LLC, as Settlor

By: _____

Name: William S. Weinstein

Title: c EO

[Signature Page – Guaranty]

CONFIDENTIAL

# Exhibit 13

## Re: Washington Federal - Wire Status Change Notification

### Jorge Newbery <jnewbery@ahpservicing.com>
Tue 8/9/2022 4:18 PM
To:William S. Weinstein <wsw@oakharborcapital.com>
Cc:Frank (Trip) Brannen III <FBrannen@oakharborcapital.com>

Likewise.

## Jorge Newbery | Chief Executive Officer
AHP Servicing LLC
**Direct: (312) 651-4325**
440 S. LaSalle St., Suite 1110, Chicago, IL 60605
[AHPServicing.com](AHPServicing.com)



This email and any files transmitted with it are confidential and intended solely for the use of the individual or entity to whom they are addressed. If you are not the named addressee you should not disseminate, distribute, or copy this e-mail. Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail from your system. AHP accepts no liability for any damage caused by any virus transmitted by this email.

If you have filed a bankruptcy petition and there is an "automatic stay" in effect in your bankruptcy case or received a discharge of your personal liability for the obligation identified in this letter, we may not and do not intend to pursue collection of that obligation from you personally. If either of these circumstances apply, this notice is not and should not be construed to be a demand for payment from you personally. Unless the Bankruptcy Court has ordered otherwise, please also note that despite any such bankruptcy filing, whatever rights we hold in the property that secures the obligation remain unimpaired.

---

**From:** William S. Weinstein <wsw@oakharborcapital.com>
**Sent:** Tuesday, August 9, 2022 4:16 PM
**To:** Jorge Newbery <jnewbery@ahpservicing.com>
**Cc:** Frank (Trip) Brannen III <FBrannen@oakharborcapital.com>
**Subject:** RE: Washington Federal - Wire Status Change Notification

I hope we can continue to work more closely together in the future.

---

**From:** Jorge Newbery <jnewbery@ahpservicing.com>
**Sent:** Tuesday, August 9, 2022 2:15 PM
**To:** Frank (Trip) Brannen III <FBrannen@oakharborcapital.com>
**Cc:** William S. Weinstein <wsw@oakharborcapital.com>
**Subject:** Re: Washington Federal - Wire Status Change Notification

Received. Thanks!

## Jorge Newbery | Chief Executive Officer

AHP Servicing LLC

**Direct: (312) 651-4325**

440 S. LaSalle St., Suite 1110, Chicago, IL 60605

[AHPServicing.com](AHPServicing.com)



This email and any files transmitted with it are confidential and intended solely for the use of the individual or entity to whom they are addressed. If you are not the named addressee you should not disseminate, distribute, or copy this e-mail. Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail from your system. AHP accepts no liability for any damage caused by any virus transmitted by this email.

If you have filed a bankruptcy petition and there is an "automatic stay" in effect in your bankruptcy case or received a discharge of your personal liability for the obligation identified in this letter, we may not and do not intend to pursue collection of that obligation from you personally. If either of these circumstances apply, this notice is not and should not be construed to be a demand for payment from you personally. Unless the Bankruptcy Court has ordered otherwise, please also note that despite any such bankruptcy filing, whatever rights we hold in the property that secures the obligation remain unimpaired.

---

**From:** Frank (Trip) Brannen III <[FBrannen@oakharborcapital.com](FBrannen@oakharborcapital.com)>
**Sent:** Tuesday, August 9, 2022 4:13 PM
**To:** Jorge Newbery <[jnewbery@ahpservicing.com](jnewbery@ahpservicing.com)>
**Cc:** William S. Weinstein <[wsw@oakharborcapital.com](wsw@oakharborcapital.com)>
**Subject:** FW: Washington Federal - Wire Status Change Notification

FYI

---

**From:** Frank (Trip) Brannen III
**Sent:** Tuesday, August 9, 2022 2:13 PM
**To:** Karen Kamphausen <[kkamphausen@ahpservicing.com](kkamphausen@ahpservicing.com)>
**Subject:** FW: Washington Federal - Wire Status Change Notification

---

**From:** Jennifer Drain <[JDrain@oakharborcapital.com](JDrain@oakharborcapital.com)>
**Sent:** Tuesday, August 9, 2022 2:11 PM
**To:** Frank (Trip) Brannen III <[FBrannen@oakharborcapital.com](FBrannen@oakharborcapital.com)>
**Subject:** FW: Washington Federal - Wire Status Change Notification

---

**From:** [TreasuryPrime@wafd.com](TreasuryPrime@wafd.com) <[wfb@olbanking.com](wfb@olbanking.com)>
**Sent:** Tuesday, August 9, 2022 2:11 PM

**To:** Jennifer Drain <JDrain@oakharborcapital.com>
**Subject:** Washington Federal - Wire Status Change Notification

## Domestic Wire Notification

---

 WaFd Bank

**Report Date/Time**   08/09/22 14:10:32 PDT

---

This transaction has been successfully completed.

Transaction Number: DWR-00962915

Amount: $2,500,000.00

Beneficiary Name: AHP Servicing LLC

Status: Completed

Confirmation Number: IMAD:20220809GMQFMP01024830

---

**Pursuant to the Fair Debt Collection Practices Act, please be advised that this law firm is a debt collector and any information obtained may be used for that purpose. However, if the debt is in active bankruptcy or has been discharged through bankruptcy, this communication is not intended as and does not constitute an attempt to collect a debt.**

This e-mail, and any attachments thereto, is intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this e-mail, you are hereby notified that any dissemination, distribution or copying of this e-mail, and any attachments thereto, is strictly prohibited. If you have received this e-mail in error, please immediately notify me and permanently delete the original and any copy of this e-mail. Thank you.

This communication is for the intended recipient only. This communication may contain information that is privileged, confidential and exempt from disclosure under applicable law and constitutes an electronic communication within the meaning of the Electronic Communications Privacy Act, 18 U.S.C. 2510. If you are not the intended recipient, you are hereby notified that any unauthorized use, dissemination, distribution or copying of this communication is strictly prohibited and may subject you to criminal or civil penalty. If you have received this communication in error, please notify us immediately by email, delete the message, and destroy any copies.

# Exhibit 14

| **From:** | Jorge Newbery[/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=A350338FFC884C5F80EE3F25EFEF66B0-JNEWBERY-AH] |
|---|---|
| **Sent:** | Sun 9/18/2022 5:11:12 PM (UTC) |
| **To:** | William S. Weinstein[wsw@oakharborcapital.com]; Peter Fitzpatrick[peter.fitzpatrick@OakHarborCapital.com]; Sarah Brink[SBrink@OakHarborCapital.com] |
| **Subject:** | Re: misc. |

Bill -

I am available after 1:30pm Pacific today if needed.

Thanks.

---

**From:** William S. Weinstein <wsw@oakharborcapital.com>
**Sent:** Friday, September 16, 2022 7:46 PM
**To:** Jorge Newbery <jnewbery@ahpservicing.com>; Peter Fitzpatrick <peter.fitzpatrick@OakHarborCapital.com>; Sarah Brink <SBrink@OakHarborCapital.com>
**Subject:** Re: misc.

I just got back from a business trip and am swamped today. Can we set a time to talk over the weekend to get the term sheet in effect?

Get Outlook for iOS

---

**From:** Jorge Newbery <jnewbery@ahpservicing.com>
**Sent:** Friday, September 16, 2022 8:25:31 AM
**To:** William S. Weinstein <wsw@oakharborcapital.com>
**Subject:** misc.

1. Can you provide a basic term sheet on the 25M loan so that I can share with Keystone today?
2. Let me know what else you need from us in order to move the loan and sale along promptly.
3. In the Skid Row AHP offering statement, we indicated that we would hold loans in U.S. Bank Trust NA as Trustee for American Homeowner Preservation Trust Series Skid Row AHP. Please confirm that I should set up this Series of the Trust.

Thanks.

**Jorge Newbery**
**FOUNDER AND CEO**

AHP Servicing LLC

**Direct:** (312) 651-4325
**Email:** jnewbery@ahpservicing.com
440 S LaSalle St, Suite 1110
Chicago, IL 60605
www.ahpservicing.com



NMLS#1651788

*This is an attempt to collect a debt. Any information obtained will be used for that purpose.*

*This email and any files transmitted with it are confidential and intended solely for the use of the individual or entity to whom they are addressed. If you are not the named addressee you should not disseminate, distribute, or copy this e-mail. Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail from your system. AHP accepts no liability for any damage caused by any virus transmitted by this email.*

*If you have filed a bankruptcy petition and there is an "automatic stay" in effect in your bankruptcy case or received a discharge of your personal liability for the obligation identified in this letter, we may not and do not intend to pursue collection of that obligation from you personally. If either of these circumstances apply, this notice is not and should not be construed to be a demand for payment from you personally. Unless the Bankruptcy Court has ordered otherwise, please also note that despite any such bankruptcy filing, whatever rights we hold in the property that secures the obligation remain unimpaired.*

**From:** William S. Weinstein <wsw@oakharborcapital.com>
**Sent:** Thursday, September 15, 2022 6:36 PM
**To:** Jorge Newbery <jnewbery@ahpservicing.com>
**Subject:** Re: call

On airplane so it will have to be tomorrow. Sorry

Get Outlook for iOS

**From:** Jorge Newbery <jnewbery@ahpservicing.com>
**Sent:** Thursday, September 15, 2022 4:34:27 PM
**To:** William S. Weinstein <wsw@oakharborcapital.com>
**Subject:** call

Hi Bill - What is your availability for a call this evening or tomorrow?

Thanks.

**Jorge Newbery**
**FOUNDER AND CEO**

AHP Servicing LLC
**Direct:** (312) 651-4325
**Email:** jnewbery@ahpservicing.com
440 S LaSalle St, Suite 1110
Chicago, IL 60605
www.ahpservicing.com



NMLS#1651788

*This is an attempt to collect a debt. Any information obtained will be used for that purpose.*

*This email and any files transmitted with it are confidential and intended solely for the use of the individual or entity to whom they are addressed. If you are not the named addressee you should not disseminate, distribute, or copy this e-mail. Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail from your system. AHP accepts no liability for any damage caused by any virus transmitted by this email.*

*If you have filed a bankruptcy petition and there is an "automatic stay" in effect in your bankruptcy case or received a discharge of your personal liability for the obligation identified in this letter, we may not and do not intend to pursue collection of that obligation from you personally. If either of these circumstances apply, this notice is not and should not be construed to be a demand for payment from you personally. Unless the Bankruptcy Court has ordered otherwise, please also note that despite any such bankruptcy filing, whatever rights we hold in the property that secures the obligation remain unimpaired.*

This communication is for the intended recipient only. This communication may contain information that is privileged, confidential and exempt from disclosure under applicable law and constitutes an electronic communication within the meaning of the Electronic Communications Privacy Act, 18 U.S.C. 2510. If you are not the intended recipient, you are hereby notified that any unauthorized use, dissemination, distribution or copying of this communication is strictly prohibited and may subject you to criminal or civil penalty. If you have received this communication in error, please notify us immediately by email, delete the message, and destroy any copies.

This communication is for the intended recipient only. This communication may contain information that is privileged, confidential and exempt from disclosure under applicable law and constitutes an electronic communication within the meaning of the Electronic Communications Privacy Act, 18 U.S.C. 2510. If you are not the intended recipient, you are hereby notified that any unauthorized use, dissemination, distribution or copying of this communication is strictly prohibited and may subject you to criminal or civil penalty. If you have received this communication in error, please notify us immediately by email, delete the message, and destroy any copies.

# Exhibit 15

| **From:** | wsw@oakharborcapital.com |
| **Sent:** | Wednesday, September 21, 2022 1:12 PM |
| **To:** | jnewbery@ahpservicing.com |
| **Subject:** | FW: 25M loan |
| **Attachments:** | AHP-Magerick-Mortgage Loan Sale Agreement with RepurchaseObligation-9.21.22.docx; AHP-Magerick-Guarantee of Obligations under Mortgage Loan SaleAgreement with Repurchase Obligation-9.21.22.docx |

Dear Jorge,

As promised, please see attached are suggested forms for the $25M loan documents Jorge refers to below. They are based on the previous forms we have considered with AHP. Cymbidium Restoration Trust is referenced as the purchaser, and will be purchasing for the benefit of Magerick, LLC.

I will circle back on the items you mentioned below. You can also share this agreement with John Earl to give him comfort that this transaction will occur by the end of September.

Warm regards,

Bill

**From:** Jorge Newbery <jnewbery@ahpservicing.com>
**Sent:** Wednesday, September 21, 2022 6:25 AM
**To:** William S. Weinstein <wsw@oakharborcapital.com>
**Subject:** 25M loan

Hi Bill -

I am looking forward to the 25M loan documents which Peter is drafting.

Here are some thoughts to make this work for all sides without the increased loan amount for operating cash, with the 6-month minimum interest, and in recognition of the extraordinary over-collateralization:

1. a. Remittance reports and proceeds to be processed weekly;
2. b. First $3 million of remittance proceeds to Seller;
3. c. 50/50 on remaining proceeds, 50% to Purchaser up to outstanding repurchase price and 50% to Seller;
4. c. Seller has the option, with Purchaser's consent, to substitute in preREO Participation Financing Agreements as collateral. These PFAs will be funded from Purchaser's share of remittance proceeds.
5. d. At the point that original collateral has been disposed of in an amount necessary to satisfy Repurchase Price, Seller to paydown remaining loan in an amount equal to 20% of substituted PFAs, remaining original collateral to be released as collateral, and additional PFAs may be substituted, with Seller or affiliate to fund 20% in subordinate position and Purchaser proceeds to fund 80%.

I have attached the template Participation Finance Agreement and Omnibus Assignment of Participation Agreement. Note buyers pay 25% down to on a discounted note purchase and we finance 75%. Loans are held in a trust and the buyers receive a participation interest, delegated authority to manage, as well as all

**Cymbidium003704**

economics after repayment of the PFA. Borrowers pay monthly payments equal to 12% interest only for up to three years. In the event of default, borrowers have 30-days to cure. Otherwise, their participation interest can be forfeited after an additional 10-day notice.

As an example, if a 150K note secured by a home worth 133K is sold for 100K, the buyer would put down 25K and we would finance 75K, 56% if the property value. At the point we contribute 20%, your 80% would be at 45% of property value.

Are you available at or after 3pm Pacific today for a call to discuss?

Thanks.

1.
2.

**Jorge Newbery**
**FOUNDER AND CEO**

AHP Servicing LLC

440 S. LaSalle St., Suite 1110, Chicago, IL 60605

312.651.4325

jnewbery@ahpservicing.com

ahpservicing.com

NMLS# 1651788





This email and any files transmitted with it are confidential and intended solely for the use of the individual or entity to whom they are addressed. If you are not the named addressee you should not disseminate, distribute, or copy this e-mail. Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail from your system. AHP accepts no liability for any damage caused by any virus transmitted by this email.

If you have filed a bankruptcy petition and there is an "automatic stay" in effect in your bankruptcy case or received a discharge of your personal liability for the obligation identified in this letter, we may not and do not intend to pursue collection of that obligation from you personally. If either of these circumstances apply, this notice is not and should not be construed to be a demand for payment from you personally. Unless the Bankruptcy Court has ordered otherwise, please also note that despite any such bankruptcy filing, whatever rights we hold in the property that secures the obligation remain unimpaired.

This communication is for the intended recipient only. This communication may contain information that is privileged, confidential and exempt from disclosure under applicable law and constitutes an electronic communication within the meaning of the Electronic Communications Privacy Act, 18 U.S.C. 2510. If you are not the intended recipient, you are hereby notified that any unauthorized use, dissemination, distribution or copying of this communication is strictly prohibited and may subject you to criminal or civil penalty. If you have received this communication in error, please notify us immediately by email, delete the message, and destroy any copies.

**Cymbidium003706**

# Exhibit 16

## MORTGAGE LOAN SALE AGREEMENT
## WITH REPURCHASE OBLIGATION

This MORTGAGE LOAN SALE AGREEMENT WITH REPURCHASE OBLIGATION (this "Agreement"), dated as of October 7, 2022 (the "Effective Date"), is by and between U.S. Bank Trust N.A. as Trustee of American Homeowner Preservation Trust Series AHP Servicing, a Delaware Statutory Trust and U.S. Bank Trust National Association as Trustee of American Homeowner Preservation Series 2015A+, a Delaware Statutory Trust (collectively the "Seller") and Cymbidium Restoration Trust, a Delaware statutory trust (the "Purchaser").

## WITNESSETH:

WHEREAS, the Seller desires to sell to the Purchaser, and the Purchaser desires to purchase from the Seller, certain residential mortgage loans (the "Mortgage Loans"), as described herein, on a servicing-released basis, and which shall be delivered in a group of whole loans on October 7, 2022 (the "Conveyance Date"), with a simultaneous agreement by the Purchaser to transfer to the Seller and the Seller to repurchase a portion of such Mortgage Loans in a repurchase transaction to occur on or by January 7, 2023, against the transfer of funds by the Seller to the Purchaser of the Repurchase Price (as defined herein);

WHEREAS, each Mortgage Loan is secured by a mortgage, deed of trust or other security instrument encumbering a residential dwelling located in the jurisdiction indicated on the schedule annexed hereto as Schedule I (the "Mortgage Loan Schedule"); and

WHEREAS, as additional credit enhancement in connection with the transactions hereunder and as a condition precedent to the Purchaser entering into the transactions hereunder, the Guarantor (as defined herein) shall deliver an absolute and unconditional guaranty to the Purchaser of the Seller's Obligations (as defined herein) hereunder, as more particularly set forth in the Guaranty Agreement attached hereto as Exhibit 3.

NOW, THEREFORE, in consideration of the premises and mutual agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Purchaser and the Seller agree as follows:

SECTION 1. Definitions. For the purposes of this Agreement the following capitalized terms shall have the respective meanings set forth below.

Agreement: This Mortgage Loan Sale Agreement with Repurchase Obligation, including all exhibits, schedules, amendments and supplements hereto.

Applicable Pricing Rate: 12% per annum.

Assignment of Mortgage: An individual assignment of the Mortgage, notice of transfer or equivalent instrument in recordable form, sufficient under the laws of the jurisdiction wherein the related Mortgaged Property is located to give record notice of the sale of the Mortgage to the Purchaser.

Business Day: Any day other than a Saturday or Sunday, or a day on which banking and savings and loan institutions in the State of New York is authorized or obligated by law or executive order to be closed.

Closing Documents: The documents required pursuant to Section 10.

Conveyance Date: The closing date of this transaction which shall be October 7, 2022, or such other date as may be mutually agreed upon by the Seller and the Purchaser.

Cut-off Date: September 30, 2022.

Default Rate: The lesser of (i) the Applicable Pricing Rate plus four percent (4.00%) per annum, or (ii) the maximum non-usurious per annum interest rate, if any, that at any time, or from time to time, may be contracted for, taken, reserved, charged or received under the laws of the United States and the State of New York.

Event of Default. The Seller is in default of its repurchase obligation under Section 4.

Facility Fee. The amount of $50,000.

Guarantor: AHP Servicing LLC and its successors and permitted assigns.

Guaranty Agreement: The guaranty agreement dated as of the date hereof by the Guarantor in favor of the Purchaser.

Lien: Any mortgage, lien, pledge, charge, security interest or similar encumbrance.

Modification Agreement: With respect to each Mortgage Loan, each written agreement modifying, adding, extending or amending the terms of both, or either of, the Note and Mortgage, entered into between the Mortgagor and the owner of the Mortgage Loan at the time such agreement was executed, or its agent.

Monthly Payment: With respect to any Mortgage Loan, the scheduled combined payment of principal and/or interest payable by a Mortgagor under the related Note on each due date.

Monthly Payment Date: The 15th of every month.

Mortgage: With respect to each Mortgage Loan, the mortgage, deed of trust or other instrument encumbering the Mortgaged Property securing the Note, including any riders and/or addenda thereto, as such Mortgage may be amended, modified or extended by one or more Modification Agreement.

Mortgage File: The Mortgage Loan Documents pertaining to the related Mortgage Loan and the Servicing File.

Mortgage Loan: Each residential mortgage loan sold, assigned and transferred to the Purchaser pursuant to this Agreement and identified on the Mortgage Loan Schedule, which Mortgage Loan includes, to the extent available, the Mortgage File, the Monthly Payments and all other rights, benefits, proceeds and obligations arising from or in connection with such Mortgage Loan.

Mortgage Loan Documents: The documents listed in Exhibit 1 hereto pertaining to any Mortgage Loan.

Mortgage Loan Schedule: The schedule of Mortgage Loans attached hereto as Schedule I and setting forth certain information regarding each Mortgage Loan. The schedule is divided into Category A Mortgage Loans which will not be subject to the Repurchase Obligation set forth in Section 4 and Category B Mortgage Loans which will be subject to the Repurchase Obligation set forth in Section 4.

Mortgaged Property: With respect to each Mortgage Loan, the Mortgagor's real property encumbered by the Mortgage securing repayment of a related Note.

Note: The original executed note, or other evidence of the Mortgage Loan indebtedness of a Mortgagor, secured by the related Mortgage, including any riders and/or addenda thereto, as may be amended, modified or extended by one or more Modification Agreement.

Mortgagor: The obligor on a Note, the owner of the Mortgaged Property and the grantor or mortgagor named in the related Mortgage and such grantor's or mortgagor's successors in title to the Mortgaged Property.

Obligations: (a) Any amounts owed by the Seller to the Purchaser in connection with any or all transactions hereunder, together with interest thereon (including interest which would be payable as post-petition interest in connection with any bankruptcy or similar proceeding) and all other amounts, fees or expenses which are payable hereunder or under any of the related transaction documents, (b) all other obligations or amounts owed to the Purchaser under the Guaranty Agreement and (c) all other obligations or amounts owed by the Seller to the Purchaser or an affiliate of the Purchaser under any other contract or agreement in connection with the transactions contemplated hereunder, in each case, whether such amounts or obligations owed are direct or indirect, absolute or contingent, matured or unmatured.

Outstanding Purchase Price: An amount equal to the aggregate Purchase Price of the Mortgage Loans, as such amount may be decreased by the aggregate amount, without duplication, of any cash or proceeds received by the Purchaser and applied in reduction of such Outstanding Purchase Price.

Person: An individual, corporation, limited liability company, partnership, joint venture, association, joint-stock company, trust, unincorporated organization or government or any agency or political subdivision thereof.

Price Differential: As of any date of determination, with respect to the Mortgage Loans subject to this Agreement, an amount equal to the product of (a) (i) if an Event of Default

is not continuing on such date, the Applicable Pricing Rate or (ii) during the continuance of an Event of Default, the Default Rate and (b) the Outstanding Purchase Price.

Purchase Price: The price paid on the Conveyance Date by the Purchaser to the Seller pursuant to Section 3 hereof.

Purchase Price Percentage: With respect to any Mortgage Loan, the percentage corresponding to each such Mortgage Loan entered on the Mortgage Loan Schedule.

Repurchase Date: The date on or prior to January 7, 2023.

Repurchase Price: With respect to a Mortgage Loan or Loans in the aggregate, as of any date of determination, the sum of (i) the Outstanding Purchase Price for such Mortgage Loan or Loans as of such date, (ii) all fees, expenses, servicing advances and other costs advanced or borne by the Purchaser related to such Mortgage Loans together with any indemnities owed by the Seller to the Purchaser as of such date and (iii) the Price Differential due on such Outstanding Purchase Price.

Servicer: The mortgage loan servicer of the Mortgage Loan. AHP Servicing LLC as to loans on Schedule I-B-1 and SN Servicing Corporation as to loans on Schedule I-B-2. The

Servicing Transfer Date: For loans in Category A, as soon as is practicable following the Conveyance Date. For loans in Category B, as soon as is practicable following February 3, 2023.

Servicing File: With respect to each Mortgage Loan, the file retained by the Servicer that includes all the documents, files, records, servicing documents, servicing records, logs, data tapes, computer records, or other information pertaining to the servicing of the Mortgage Loan during the time such Mortgage Loan was owned by the Seller, or pertaining to the past servicing of the Mortgage Loan, to the extent such documents, records and information, are in the Seller's or Servicer's possession.

SECTION 2. Agreement to Purchase/Payment of Facility Fee. The Seller agrees to sell, and the Purchaser agrees to purchase, on the Conveyance Date and on the terms and conditions stated herein, the Mortgage Loans listed on the Mortgage Loan Schedule.

On the Conveyance Date, upon the payment of the Purchase Price and delivery of the documents described herein, the Seller shall sell, transfer, assign, set over, and convey to the Purchaser, subject to the representations, warranties, terms and provisions of this Agreement, all the right, title, and interest of the Seller in and to the Mortgage Loans, servicing released.

The Seller shall pay the Facility Fee to the Purchaser on the Conveyance Date as a condition precedent to the Purchaser entering into the transactions under this Agreement.

Upon the successful completion of the purchase and sale transactions contemplated herein on the Conveyance Date, (i) the Purchaser shall own and be entitled to receive with respect to each Mortgage Loan all related Monthly Payments and all other payments and recoveries of principal, interest, late payment charges, prepayment premiums and other fees, charges and sums

paid or recovered on or with respect to such Mortgage Loans on and after the Cut-off Date and (ii) the Mortgage Loans will be put up for sale to be managed by Mission Capital, with the proceeds of any such sales being applied dollar for dollar to the Repurchase Price for the benefit of the Purchaser (including without limitation the full Price Differential for at least 3 months) for such sold Mortgage Loans.

SECTION 3. Purchase Price. The purchase price (the "Purchase Price") for the Mortgage Loans shall be the sum of the purehase prices for each of the Mortgage Loans as indicated by the corresponding Purchase Price Percentages listed on the Mortgage Loan Schedule.

The Purchaser shall pay the Purchase Price to the Seller, no later than 1:00 p.m. (Central time), on the Conveyance Date, by wire transfer of immediately available funds to the account designated by the Seller pursuant to the wire transfer information attached hereto as Exhibit 2.

SECTION 4. Seller Repurchase Obligation. On the Repurchase Date, the Seller will pay to Purchaser the Repurchase Price for the Category B Mortgage Loans which will result in the termination of the original conveyance of such Category B Mortgage Loans hereunder, the effect of which will be the repurchase by the Seller of such Mortgage Loans as provided herein, and all of the Purchaser's rights, title and interests in such Mortgage Loans shall revert to the Seller as of the Repurchase Date. To the extent that the Seller defaults on this payment obligation, it shall have a thirty (30) day grace period during which the payment obligation will continue with the Price Differential accruing at the Default Rate dating back and measured from the original Conveyance Date. To the extent the Repurchase Price is not paid within such grace period, the payment obligation will expire, the Purchaser will retain all right, title and interest in such Mortgage Loans and the Seller will have no further rights therein.

(i) Price Differential. Notwithstanding that the Seller and the Purchaser intend that the transactions hereunder be sales by the Seller to the Purchaser of the Mortgage Loans for all purposes except accounting and tax purposes, the Seller shall pay to the Purchaser the accrued and unpaid Price Differential in respect of the Mortgage Loans, in arrears, on a monthly basis from the Purchase Date until, but not including, the date on which the Repurchase Price is paid in full; provided that if the Repurchase Price is not paid by the Seller when due (whether at the Repurchase Date, upon acceleration or otherwise), the transaction shall bear a Price Differential from the date due until paid in full at the Default Rate.

(ii) Time for Payment. The Price Differential with respect to the Mortgage Loans shall be due and payable on the Monthly Payment Date occurring in the month following the Purchase Date and thereafter on each subsequent Monthly Payment Date. On the date that the Repurchase Price for such Purchased Asset is due, all accrued Price Differential not otherwise paid by the Seller with respect to such Purchased Asset shall be due and payable.

SECTION 5. Examination of Mortgage Files. The Seller shall make the related Mortgage Files available to the Purchaser for examination at the offices of the Seller's document custodian, or such other location where the Mortgage Files are stored, or as shall otherwise be agreed upon by the Purchaser and the Seller in writing, and during normal business hours. To the

extent practicable, the Seller shall request that its custodian make images of the related Mortgage Files available to the Purchaser for examination.

SECTION 6. Grant of Security Interest. With respect to the Mortgage Loans, although the parties intend that all transactions hereunder be sales and purchases (other than for accounting and tax purposes) and not loans, and without prejudice to the expressed intent of the parties, if any transactions are deemed to be loans, and in any event as security for the performance of all of the Obligations hereunder, the Seller hereby pledges, assigns and grants to the Purchaser a continuing first priority security interest in and Lien upon the Mortgage Loans and all rights related thereto, whether now owned or hereafter acquired, now existing or hereafter created. The grant of security interest set forth in this Section 6 is intended to constitute a security agreement or arrangement or other credit enhancement related to this Agreement and transactions hereunder as contemplated by Sections 101(47)(A)(v) and 741(7)(xi) of the Bankruptcy Code.

SECTION 7. Conveyance from Seller to Purchaser.

Subsection 7.01.    Possession of Mortgage Files.

The Mortgage Files retained by the Servicer with respect to each Mortgage Loan sold pursuant to this Agreement shall be appropriately identified in the Servicer's computer system to reflect clearly the sale of such related Mortgage Loan to the Purchaser upon the completion of the purchase and sale contemplated by this Agreement. On the Servicing Transfer Date, the Seller shall release from its custody, or cause the Servicer to release from its custody, the related Mortgage Files, which shall be delivered to the Purchaser's successor servicer to the extent applicable. Notwithstanding the forgoing, Seller and the Servicer shall be entitled to retain copies of the Mortgage Files, as of the Conveyance Date, for such period after the transfer as required by applicable law.

Subsection 7.02.    Delivery of Mortgage Files.

Upon payment of the Purchase Price on the Conveyance Date, the Seller shall release any interest that it has in the Mortgage Files upon its receipt of the Purchase Price for the Mortgage Loans and will deliver upon receipt of a fully executed Bailee Letter the Mortgage Files to the Purchaser's custodian as directed.

SECTION 8. Representations, Warranties and Covenants of the Seller: Remedies for Breach.

Subsection 8.01.    Representations and Warranties Respecting the Seller.

The Seller represents, warrants and covenants to the Purchaser as of the Conveyance Date, that to the best of the Seller's knowledge:

(i)    The Seller is duly organized, validly existing and in good standing under the laws of its state of organization;

(ii)    The Seller has the full power and authority to hold each Mortgage Loan, to sell each Mortgage Loan, and to execute, deliver and perform, and to enter into and consummate,

all transactions contemplated by this Agreement. The Seller has duly authorized the execution, delivery and performance of this Agreement, has duly executed and delivered this Agreement, and this Agreement, assuming due authorization, execution and delivery by the Purchaser, constitutes a legal, valid and binding obligation of the Seller, enforceable against it in accordance with its terms except as the enforceability thereof may be limited by bankruptcy, insolvency or reorganization;

(iii) The execution and delivery of this Agreement by the Seller and the performance of and compliance with the terms of this Agreement will not violate the Seller's organizational documents or constitute a default under or result in a breach or acceleration of, any material contract, agreement or other instrument to which the Seller is a party or which may be applicable to the Seller or its assets;

(iv) The Seller is not in violation of, and the execution and delivery of this Agreement by the Seller and its performance and compliance with the terms of this Agreement will not constitute a violation with respect to, any order or decree of any court or any order or regulation of any federal, state, municipal or governmental agency having jurisdiction over the Seller or its assets, which violation might have consequences that would materially and adversely affect the condition (financial or otherwise) or the operation of the Seller or its assets or might have consequences that would materially and adversely affect the performance of its obligations and duties hereunder;

(v) The Notes and Mortgages are genuine and each is the legal, valid and binding obligation of the maker thereof, enforceable in accordance with its terms except as such enforcement may be limited by bankruptcy, insolvency, reorganization or other similar laws affecting the enforcement of creditors' rights generally and by general equity principles (regardless of whether such enforcement is considered in a proceeding in equity or at law).

(vi) Except by entering into a Modification Agreement, if applicable, the Seller has not knowingly impaired, waived, altered or modified the related Mortgages or Notes in any material respect, or satisfied, canceled, rescinded or subordinated such Mortgages or Notes in whole or in part or released all or any material portion of the related Mortgaged Properties from the lien of the related Mortgages, or executed any instrument of release, cancellation, rescission or satisfaction of the related Notes or Mortgages.

(vii) The Seller has good title to and is the sole owner and holder of the related Mortgage Loans. Immediately prior to the transfer and assignment to the Purchaser, the related Notes and Mortgages were not subject to any assignment, participation or pledge, other than with respect to which a release has been obtained in connection with such transfer, and the Seller has full right and authority to sell and assign such Mortgage Loans. The transfer, assignment and delivery of the related Mortgage Loans in accordance with terms and conditions of this Agreement shall vest in the Purchaser all rights as owner of such Mortgage Loans free and clear of any and all claims, charges, defenses, offsets and encumbrances of any kind or nature whatsoever, including, but not limited to, those of the Seller;

7

Subsection 8.02.    Purchaser Put Right.

Notwithstanding any other provision of this Agreement, at any time during the six (6) month period after the Conveyance Date, the Purchaser may for any reason put any Mortgage Loan conveyed hereunder back to the Seller and the Seller will promptly repurchase such Mortgage Loan by immediately paying the Purchaser the Repurchase Price associated with such Mortgage Loan.

At all times, the Seller promptly after receiving written notice of any breach of a representation or warranty which materially and adversely affects the value of a Mortgage Loan or the Mortgage Loans shall use commercially reasonable efforts to cure such breach in all material respects.

Any repurchase of a Mortgage Loan(s) pursuant to the foregoing provisions of this Subsection 8.02 shall occur upon a mutually agreeable date and shall be accomplished by wire transfer of immediately available funds on the repurchase date to an account designated in writing by the Purchaser.

At the time of repurchase of any Mortgage Loan pursuant to the terms of this Section 8.02, the Purchaser and the Seller shall arrange for the reassignment of the repurchased Mortgage Loan to the Seller and the delivery to the Seller of any documents held by the Purchaser or its custodian relating to the repurchased Mortgage Loan. Upon such repurchase the related Mortgage Loan Schedule shall be amended to reflect the withdrawal of the repurchased Mortgage Loan from this Agreement.

SECTION 9.   Representations, Warranties and Covenants of the Purchaser.

The Purchaser represents, warrants and covenants to the Seller as of the Conveyance Date:

(i)    The Purchaser is duly organized, validly existing and in good standing under the laws of the state of its organization and is and will remain in compliance with the laws of each state in which any Mortgaged Property is located to the extent necessary to ensure the enforceability of each Mortgage Loan and the servicing of the Mortgage Loan in accordance with the terms of this Agreement. No licenses or approvals obtained by the Purchaser have been suspended or revoked by any court, administrative agency, arbitrator or governmental body and no proceedings are pending which might result in such suspension or revocation;

(ii)   The Purchaser has the full power and authority to hold each Mortgage Loan, to purchase each Mortgage Loan, and to execute, deliver and perform, and to enter into and consummate, all transactions contemplated by this Agreement. The Purchaser has duly authorized the execution, delivery and performance of this Agreement, has duly executed and delivered this Agreement, and this Agreement, assuming due authorization, execution and delivery by the Seller, constitutes a legal, valid and binding obligation of the Purchaser, enforceable against it in accordance with its terms except as the enforceability thereof may be limited by bankruptcy, insolvency or reorganization;

(viii)    During the period that the Seller has owned the Mortgage Loan, the Mortgage Loan has been serviced in compliance with applicable law and the terms of the Mortgage and Note;

(ix)    There are no actions or proceedings against, or, to the Seller's knowledge, investigations of, the Seller before any court, administrative agency or other tribunal (A) that might prohibit its entering into this Agreement, (B) seeking to prevent the sale of the Mortgage Loans or the consummation of the transactions contemplated by this Agreement or (C) that might prohibit or materially and adversely affect the performance by the Seller of its obligations under, or the validity or enforceability of, this Agreement; and

(x)    The information set forth in the Mortgage Loan Schedule is complete, true and correct, including, without limitation, the paid to date ("PTD") field, notwithstanding any payments returned for insufficient funds after the Cut-off Date;

(xi)    The Seller has not worked with any broker, finder or similar party due any commission or fee in connection with the transactions contemplated herein.

(xii)    The related Mortgage is a valid, subsisting, enforceable and perfected first lien on the Mortgaged Property, including all buildings on the Mortgaged Property, as applicable, of the Mortgage subject only to:

(a)    the lien of current real property taxes and assessments not yet due and payable,

(b)    covenants, conditions and restrictions, rights of way, easements and other matters of the public record as of the date of recording acceptable to mortgage lending institutions generally in the area in which the Mortgaged Property is located,

(c)    liens created pursuant to any federal, state, or local law, regulation, or ordinance affording liens for the costs of clean-up of hazardous substances or hazardous wastes or for other environmental protection purposes,

(d)    such other matters to which like properties are commonly subject that do not individually or in aggregate materially interfere with the benefits of the security to be provided by the Mortgage,

(e)    any generally applicable foreclosure moratoriums or delays,

(f)    any unrecorded mechanics liens to the extent having priority over the Mortgage under applicable law upon their recordation;

(g)    any security agreement, chattel mortgage, or equivalent document related to and delivered to the Purchaser or to its custodian with any Mortgage establishes in it a valid and subsisting first lien on the property described therein.

8

(iii)     The execution and delivery of this Agreement by the Purchaser and the performance of and compliance with the terms of this Agreement will not violate the Purchaser's articles of incorporation or by-laws or constitute a default under or result in a breach or acceleration of, any material contract, agreement or other instrument to which the Purchaser is a party or which may be applicable to the Purchaser or its assets;

(iv)     The Purchaser is not in violation of, and the execution and delivery of this Agreement by the Purchaser and its performance and compliance with the terms of this Agreement will not constitute a violation with respect to, any order or decree of any court or any order or regulation of any federal, state, municipal or governmental agency having jurisdiction over the Purchaser or its assets, which violation might have consequences that would materially and adversely affect the condition (financial or otherwise) or the operation of the Seller or its assets or might have consequences that would materially and adversely affect the performance of its obligations and duties hereunder;

(v)     The Purchaser has not worked with any broker, finder or similar party due any commission or fee in connection with the transactions contemplated herein.

(vi)     The transactions contemplated by this Agreement do not involve, nor are they intended in any way to constitute, the sale of a "security" or "securities" within the meaning of any applicable securities laws, and none of the representations, warranties or agreements of the Purchaser shall create any inference that the transactions involve any "security" or "securities".

(vii)     Neither the Purchaser nor its servicer shall initiate any contact with any Mortgagor related to any Mortgage Loan prior to the Conveyance Date, unless otherwise required by applicable law and with prior notice and approval in writing of the Seller.

Subsection 9.02.     Indemnification.

Each party agrees to pay, or reimburse the other, and to protect, defend, indemnify, save and hold harmless the other, and its agents, assigns, employees, officers, directors and advisors and contractors from and against any losses, liabilities, claims, causes of action, damages, demands, taxes, fees, costs and expenses of whatever kind, arising out of or incurred in connection with breach of any material term, representation, warranty, or covenant of this Agreement, or failure to comply with applicable laws, or perform obligations under this Agreement. The indemnification provided under this Section 9.02 shall be with respect to losses involving third-parties and losses between Seller and the Purchaser. Each party shall immediately notify the other of any such claim or threatened claim that may exist. The provisions of this Section 9.02 shall survive termination of this Agreement.

SECTION 10. Closing. The closing for the sale and purchase of the Mortgage Loans shall take place on the Conveyance Date. As mutually agreed between the Seller and the Purchaser, the closing shall be either by telephone, confirmed by letter or wire as the parties shall agree, or conducted in person, at such place as the parties shall agree.

Subsection 10.01. Closing Documents. The Closing Documents for the Mortgage Loans to be purchased on each Conveyance Date shall consist of fully executed originals of the following:

(i)  this Agreement;

(ii)  the Guaranty Agreement; and

(iii)  the related Mortgage Loan Schedule.

SECTION 11. Confidentiality.

The Seller and the Purchaser acknowledge and agree that the terms of this Agreement and any information whether oral, written or otherwise provided by the Seller to the Purchaser pursuant to this Agreement or the transactions contemplated herein shall be kept confidential, shall not be divulged to any party other than those that have a need to know such information in order to complete the transaction contemplated herein, including without limitation, the Interim Servicer, governmental authorities, due diligence, service providers and attorneys, without the other parties' consent, and shall be maintained according to applicable privacy laws. Notwithstanding the foregoing, the Purchaser may disclose Mortgage Loan data (excluding non-public personal information regarding the borrowers), but only in the manner authorized by applicable privacy law.

Each party shall hold and use all Confidential Information, as hereinafter defined, in compliance with Subtitle A of Title V of the Gramm-Leach-Bliley Act (codified at 15 U.S.C. § 6801 et seq.), as it may be amended from time to time (the "GLB Act"), the regulations promulgated thereunder, the Fair Credit Reporting Act, 15 U.S.C. § 1681 et seq. (the "FCRA") and all other applicable law. "Confidential Information" shall mean any data or information that is proprietary to the disclosing party and not generally known to the public, whether in tangible or intangible form, including, but not limited to, the following information: inventions, trade secrets, know-how, software, databases, customer lists, all personal information about the Mortgagors that is supplied to the Seller or the Purchaser by or on behalf of the Mortgagors, and other customer or consumer specific data deemed to be "nonpublic personal information" under the GLB Act or the FCRA. Each party shall take all reasonable measures to ensure that the Confidential Information is not disclosed, published, released, transferred, duplicated or otherwise made available to others in contravention of the provisions of this Agreement or of the GLB Act, the regulations promulgated thereunder, the FCRA or other applicable law. If the GLB Act, the regulations promulgated thereunder, the FCRA or other applicable law now or hereafter in effect impose a higher standard of confidentiality to the Confidential Information, such standard shall prevail over the provisions of this Agreement. Each party shall indemnify and hold harmless any other party for all damages incurred by such party arising from such party's failure to comply with the GLB Act and the FCRA.

Notwithstanding anything to the contrary in this Agreement, each party may disclose another party's Confidential Information in a judicial proceeding when required to do so by law when responding to a subpoena or as otherwise required by applicable law or regulatory

agency rule or regulation. If any court, governmental agency, or regulatory body demands that a party disclose any information contained in the Confidential Information to the public or to a third party other than the court, governmental agency or regulatory body, the recipient of such demand may, in the absence of a protective order, disclose such information to the extent that it is advised in writing that it must do so by its legal counsel; provided that the recipient of such demand shall, unless restrained by court order, provide written notice of such demand to the party that disclosed the Confidential Information and copies of all notice papers, orders, requests or other documents in order to allow such disclosing party to seek an appropriate protective order, and shall not disclose such information until five (5) Business Days after providing such notice. The recipient of a demand described in the preceding sentence shall cooperate fully with a disclosing party seeking a protective order, at the cost and expense of the party seeking a protective order, should a disclosing party seek such an order.

In addition, notwithstanding anything to the contrary in this Agreement, each party may disclose Confidential Information to the extent that (i) it is reasonably necessary for such party to do so in working with its officers, directors, employees, consultants, legal counsel, auditors, taxing authorities or governmental agencies, (ii) the Purchaser provides this Agreement to banking institutions for diligence purposes in connection with potential financing transactions so long as the Purchaser has a confidentiality agreement in place with each such banking institution that would prohibit each such banking institution from disclosing the information described in this Section 13 to any other party (iii) the Seller is required to disclose the material terms of this Agreement in compliance with the public filing requirements of HLSS, Ltd., the public company parent of the Seller, (iv) information which now or later becomes generally available to the public other than as a result of a disclosure in breach of this Agreement, (v) information already in such party's possession prior to the disclosure under this agreement and such party can demonstrate such possession with written or electronic documentation/evidence; (vi) information which is obtained by such party on a non-confidential basis from a third person who, insofar as is known to such party, is not prohibited from transmitting the information by any contractual, legal, or fiduciary obligation; (vii) information that has been independently developed by such party without using or referring to the information; (viii) information as otherwise agreed by Seller and Purchaser from time to time. The terms and provisions of this Section 13 shall survive the termination of this Agreement.

SECTION 12. Notices. All demands, notices and communications hereunder shall be in writing and shall be deemed to have been duly given if mailed, by registered or certified mail, return receipt requested, or, if by other means, when received by the other party at the address as follows:

(i)     if to the Purchaser:

Cymbidium Restoration Trust

12

if to the Seller:

AHP Servicing LLC
Attn: Jorge Newbery

█████████████████

---

or such other address as may hereafter be furnished to the other party by like notice. Any such demand, notice or communication hereunder shall be deemed to have been received on the date delivered to or received at the premises of the addressee (as evidenced, in the case of registered or certified mail, by the date noted on the return receipt).

Severability Clause. Any part, provision, representation or warranty of this Agreement which is prohibited or which is held to be void or unenforceable shall be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof. Any part, provision, representation or warranty of this Agreement which is prohibited or unenforceable or is held to be void or unenforceable in any jurisdiction shall be ineffective, as to such jurisdiction, to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction as to any Mortgage Loan shall not invalidate or render unenforceable such provision in any other jurisdiction. To the extent permitted by applicable law, the parties hereto waive any provision of law which prohibits or renders void or unenforceable any provision hereof. If the invalidity of any part, provision, representation or warranty of this Agreement shall deprive any party of the economic benefit intended to be conferred by this Agreement, the parties shall negotiate, in good-faith, to develop a structure the economic effect of which is nearly as possible the same as the economic effect of this Agreement without regard to such invalidity. The terms and provisions of this Section 14 shall survive the termination of this Agreement.

SECTION 13. Counterparts. This Agreement may be executed simultaneously in any number of counterparts. Each counterpart shall be deemed to be an original, and all such counterparts shall constitute one and the same instrument. An executed counterpart signature page delivered by facsimile or .pdf attachment to email shall have the same binding effect as an original signature page.

SECTION 14. Governing Law. The Agreement shall be construed in accordance with the laws of the State of Washington without regard to any conflicts of law provisions and the obligations, rights and remedies of the parties hereunder shall be determined in accordance with the laws of the State of Washington, except to the extent preempted by Federal law.

SECTION 15. Intention of the Parties. It is the intention of the parties that the Purchaser is purchasing, and the Seller is selling, the Mortgage Loans and not a debt instrument of the Seller or another security. Accordingly, the parties hereto each intend to treat the transaction for Federal income tax purposes as a sale by the Seller, and a purchase by the Purchaser, of the Mortgage Loans.

SECTION 16. Waiver of Jury Trial. To the extent permitted by law, each party hereto hereby waives trial by jury in any judicial proceeding involving, directly or indirectly, any matter (whether sounding in tort, contract or otherwise) in any way arising out of, related to, or connected with this Agreement or the relationships established hereunder.

SECTION 17. Successors and Assigns. This Agreement shall bind and inure to the benefit of and be enforceable by the Seller and the Purchaser and the respective successors and assigns of the Seller and the Purchaser. Neither Party may assign this Agreement without the other's prior written consent, which consent may be granted or withheld in the Seller's sole discretion.

SECTION 18. Waivers. No term or provision of this Agreement may be waived or modified unless such waiver or modification is in writing and signed by the party against whom such waiver or modification is sought to be enforced.

SECTION 19. Exhibits. The exhibits and schedules to this Agreement are hereby incorporated and made a part hereof and are an integral part of this Agreement.

SECTION 20. No Use of Seller's Name.

Purchaser shall not, without the express prior written consent of Seller: (i) use or permit the use by any person, the name of Seller or any of its affiliates; (ii) represent or imply that it is affiliated with, authorized by, or in any way related to Seller or any of its affiliates; (iii) institute any legal, collection or enforcement proceeding in the name of Seller or any of its affiliates or continue to prosecute any pending legal, collection or enforcement proceeding in the name of Seller or any of its affiliates; or (iv) mislead, whether through misrepresentation or nondisclosure or otherwise, a Mortgagor or any other person as to the identity of the owner of any Mortgage Loan.

SECTION 21. General Interpretive Principles. For purposes of this Agreement, except as otherwise expressly provided or unless the context otherwise requires:

(a)     the terms defined in this Agreement have the meanings assigned to them in this Agreement and include the plural as well as the singular, and the use of any gender herein shall be deemed to include the other gender;

(b)     accounting terms not otherwise defined herein have the meanings assigned to them in accordance with generally accepted accounting principles;

(c)     references herein to "Articles," "Sections," "Subsections," "Paragraphs," and other subdivisions without reference to a document are to designated Articles, Sections, Subsections, Paragraphs and other subdivisions of this Agreement;

(d)     reference to a Subsection without further reference to a Section is a reference to such Subsection as contained in the same Section in which the reference appears, and this rule shall also apply to Paragraphs and other subdivisions;

(e)     the words "herein," "hereof," "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular provision; and

(f)     the term "include" or "including" shall mean without limitation by reason of enumeration.

SECTION 22. Reproduction of Documents. This Agreement and all documents relating thereto, including, without limitation, (a) consents, waivers and modifications which may hereafter be executed, (b) documents received by any party at the closing, and (c) financial statements, certificates and other information previously or hereafter furnished, may be reproduced by any photographic, photostatic, microfilm, micro-card, miniature photographic or other similar process. The parties agree that any such reproduction shall be admissible in evidence as the original itself in any judicial or administrative proceeding, whether or not the original is in existence and whether or not such reproduction was made by a party in the regular course of business, and that any enlargement, facsimile or further reproduction of such reproduction shall likewise be admissible in evidence.

SECTION 23. Further Agreements; Cooperation; Equitable Remedies. The Seller and the Purchaser each agree to execute and deliver to the other such reasonable and appropriate additional documents, instruments or agreements as may be necessary or appropriate to effectuate the purposes of this Agreement.

The parties agree to act reasonably, in good faith and in accordance with all applicable laws and regulations and to do all things necessary to effect the transactions contemplated hereby including, without limitation, complying with all reasonable requests provided by one party to the other relating to the transactions set forth herein.

Each party agrees to take, or cause to be taken, all such further or other actions as shall reasonably be necessary to make effective, to consummate and to perform the undertakings and obligations contemplated by this Agreement.

In the event of default by either party, the non-defaulting party shall be entitled to equitable and injunctive relief hereunder.

**INTENTIONALLY LEFT BLANK**

**SIGNATURE PAGE FOLLOWS**

IN WITNESS WHEREOF, the Seller and the Purchaser have caused their names to be signed hereto by their respective officers thereunto duly authorized as of the date first above written.

Seller:

U.S. Bank Trust N.A. as Trustee of American Homeowner Preservation Trust Series AHP Servicing

By: AHP Capital Management LLC, Administrator

By:_____

Name: Jorge Newbery
Title:  Manager and CEO

U.S. Bank Trust National Association as Trustee of American Homeowner Preservation Series 2015A+

By: AHP Capital Management LLC, Administrator

By:_____

Name: Jorge Newbery
Title:  Manager and CEO

Purchaser:

CYMBIDIUM RESTORATION TRUST

By: Cymbidium Restoration, LLC

By: _____

Name: William S. Westley

Title: Authorized Representative

# Exhibit 17

| From: | Jorge Newbery <jnewbery@ahpservicing.com> |
|---|---|
| Sent: | Saturday, October 1, 2022 4:10 AM |
| To: | William S. Weinstein |
| Cc: | Peter Fitzpatrick; Gabrielle Ayala-Montgomery; Frank (Trip) BrannenIII |
| Subject: | Re: AHP-Magerick Mortgage Loan Sale Transaction |
| Attachments: | AHP-Magerick-Mortgage Loan SaleAgreement with Repurchase Obligation-10.1.22.docx |

Hi Bill -

Please see attached redlined Mortgage Loan Sale Agreement with Repurchase Obligation.

We have no comments on the Guarantee.

Thanks.

**Jorge Newbery**
**FOUNDER AND CEO**

AHP Servicing LLC
440 S. LaSalle St., Suite 1110, Chicago, IL 60605
312.651.4325
jnewbery@ahpservicing.com
ahpservicing.com
NMLS# 1651788





AHP Servicing LLC is a debt collector. Unless you are in bankruptcy or received a bankruptcy discharge of this debt, AHP Servicing is attempting to collect a debt and any information obtained will be used for that purpose. If you are in bankruptcy or received bankruptcy discharge of this debt, this communication is not an attempt to collect the debt against you personally.

This e-mail and any files transmitted with it are confidential and intended solely for the use of the individual or entity to whom they are addressed. If you are not the named addressee, you should not disseminate, distribute or copy this e-mail. Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail from your system. AHP Servicing LLC accepts no liability for any damage caused by any antivirus transmitted by this e-mail.

**From:** William S. Weinstein <wsw@oakharborcapital.com>
**Sent:** Wednesday, September 28, 2022 5:22 PM
**To:** Jorge Newbery <jnewbery@ahpservicing.com>

**Cc:** Peter Fitzpatrick <peter.fitzpatrick@OakHarborCapital.com>; Gabrielle Ayala-Montgomery <GMontgomery@oakharborcapital.com>; Frank (Trip) Brannen III <FBrannen@oakharborcapital.com>
**Subject:** FW: AHP-Magerick Mortgage Loan Sale Transaction

Dear Jorge,

Enclosed please find a final draft version of the Mortgage Loan Sale Agreement and Guarantee. Please review carefully and give me any final comments. By separate email Trip will send you the Exhibits. One final point: neither document addresses repayment of the prior loan. I would propose that we prepare a simple escrow agreement that directs Cymbidium to withhold that amount of money from the disbursement to AHP and pay it to the Fund that loaned the money.

Let me know your thoughts. We should be able to fund if we can get agreement on the Exhibits, the Escrow Agreement, and the legal documents.

Hope you're having a productive meeting.

Bill

P.S. Let me know how we're doing on Blossom for your law firm. I also may have another application for your law firm as well.

This communication is for the intended recipient only. This communication may contain information that is privileged, confidential and exempt from disclosure under applicable law and constitutes an electronic communication within the meaning of the Electronic Communications Privacy Act, 18 U.S.C. 2510. If you are not the intended recipient, you are hereby notified that any unauthorized use, dissemination, distribution or copying of this communication is strictly prohibited and may subject you to criminal or civil penalty. If you have received this communication in error, please notify us immediately by email, delete the message, and destroy any copies.

# Exhibit 18

| | |
|---|---|
| **From:** | wsw@oakharborcapital.com |
| **Sent:** | Thursday, September 22, 2022 8:06 AM |
| **To:** | cp@mwpnp.com; FBrannen@oakharborcapital.com |
| **Subject:** | RE: AHP loans |

I understand.  This file is going to end up being a big loss for Jorge and I think he has real problems going forward.  The key point, besides choosing $5 Million in loans, is if there is enough remaining value to secure a $20 Million dollar loan?

**From:** Cliff Ponte <cp@mwpnp.com>
**Sent:** Thursday, September 22, 2022 4:50 AM
**To:** Frank (Trip) Brannen III <FBrannen@oakharborcapital.com>
**Cc:** William S. Weinstein <wsw@oakharborcapital.com>
**Subject:** RE: AHP loans

Just want you both to know that I plan to have this AHP review done today with the best loans to review for Magerick.  I was here at 5am working on it.      So far, many of these loans are very low valued properties for the most part.

Cliff Ponte | Project Manager & Consultant
Office Phone: 774-462-3126
Email | cp@mwpnp.com

This communication is for the intended recipient only. This communication may contain information that is privileged, confidential and exempt from disclosure under applicable law and constitutes an electronic communication within the meaning of the Electronic Communications Privacy Act, 18 U.S.C. 2510. If you are not the intended recipient, you are hereby notified that any unauthorized use, dissemination, distribution or copying of this communication is strictly prohibited and may subject you to criminal or civil penalty. If you have received this communication in error, please notify us immediately by email, delete the message, and destroy any copies.

**Pursuant to the Fair Debt Collection Practices Act, please be advised that we assist in attempting to collect a debt and any information will be obtained will be used for that purpose. However, if the debt is in active bankruptcy or has been discharged through bankruptcy, this communication is not intended as and does not constitute an attempt to collect a debt.**

**From:** Frank (Trip) Brannen III <FBrannen@oakharborcapital.com>
**Sent:** Wednesday, September 21, 2022 4:47 PM
**To:** Cliff Ponte <cp@mwpnp.com>
**Subject:** AHP loans

**Pursuant to the Fair Debt Collection Practices Act, please be advised that this law firm is a debt collector and any information obtained may be used for that purpose. However, if the debt is in active bankruptcy or has been discharged through bankruptcy, this communication is not intended as and does not constitute an attempt to collect a debt.**

**This e-mail, and any attachments thereto, is intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this e-mail, you are hereby notified that any dissemination, distribution or copying of this e-mail, and any attachments thereto, is strictly prohibited. If you have received this e-mail in error, please immediately notify me and permanently delete the original and any copy of this e-mail. Thank you.**

# Exhibit 19

## Monthly Settlement Report
## Magerick, LLC
## As of October 6, 2022
## Loan Tape Data As Of: 10/04/2022

| I. Computation of Unpaid Principal Balance | Oct-22 |
|---|---|
| Unpaid Principal Balance of Pledged Assets | $ 77,461,878.26 |

| II. Computation of Real Estate Value | |
|---|---|
| Real Estate Value of Pledged Assets | $ 94,424,410.95 |

| III. Computation of Eligible Collateral Value | |
|---|---|
| Unpaid Principal Balance of Pledged Assets | $ 77,461,878.26 |
| Change in Eligible Collateral Value Due to LTV Limitations | $ 16,962,532.69 |
| Eligible Collateral Value | $ 94,424,410.95 |

| IV. Computation of Maximum Advance | |
|---|---|
| 65% Advance Rate of Eligible Collateral Value | $ 61,375,867.12 |
| Advance Limitations Due to $500,000 Single Note Max Limitation | $ (94,860.00) |
| Overcollateralization Due to Commitment Limitation | $ (22,582,858.38) |
| Maximum Advance | $ 38,698,148.74 |
| | |
| Commitment | $ 40,000,000.00 |
| Withheld Commitment | $ 1,301,851.26 |
| Borrowing Limit | $ 38,698,148.74 |
| | |
| Borrowing Base | |
| Beginning Facility Amount | $ 15,797,050.01 |
| Loan Advances / Reductions | $ - |
| Facility Amount | $ 15,797,050.01 |
| | |
| Availability | $ 22,901,098.73 |
| | |
| WAB Loan Maximum Advance to Maximum Unpaid Principal Balance (LTB) | 89.72% |
| WAB Loan Maximum Advance to Real Estate Value (LTV) | 40.98% |
| Borrower Loan Maximum Advance to Real Estate Value | 82.04% |

The undersigned represents and warrants that this Borrowing Base Certificate is true and correct statement of the Borrowing Base, and that the information contained herein is true and correct in all material respects. The undersigned further represents and warrants that (i) there is no Default or Event of Default occurring or continuing under any of the Facility Documents, (ii) all representations and warranties contained in the Facility Documents are true and correct in all material respects, and (iii) all amounts reflected herein have been determined and calculated in strict compliance with the provisions of the Facility Documents and the Exhibits and Schedules thereto. Capitalized terms used herein and not otherwise defined herein shall have the meanings specified in the Facility Documents.

| Magerick, LLC | WAB Reviewer |
|---|---|
| Signed: | Signed: *Garret Anson* |
| Title: | Title: Sr. Credit Analyst - 10/06/2022 |

| WAB Approval | WAB Additional Approval |
|---|---|
| Signed: *Kevin Chai* | Signed: |
| Title: VP - 10/06/22 | Title: SVP 10/06/22 |

Weinstein
EXHIBIT
011

| Monthly Settlement Report | |
|---|---|
| Magerick, LLC | |
| As of October 6, 2022 | |
| Loan Tape Data As Of: 10/04/2022 | |

| | Oct-22 |
|---|---|
| **I.  Computation of Unpaid Principal Balance** | |
| Unpaid Principal Balance of Pledged Assets | $ 77,461,878.26 |
| | |
| **II.  Computation of Real Estate Value** | |
| Real Estate Value of Pledged Assets | $ 94,424,410.95 |
| | |
| **III.  Computation of Eligible Collateral Value** | |
| Unpaid Principal Balance of Pledged Assets | $ 77,461,878.26 |
| Change in Eligible Collateral Value Due to LTV Limitations | $ 16,962,532.69 |
| Eligible Collateral Value | $ 94,424,410.95 |
| | |
| **IV.  Computation of Maximum Advance** | |
| 65% Advance Rate of Eligible Collateral Value | $ 61,375,867.12 |
| Advance Limitations Due to $500,000 Single Note Max Limitation | $      (94,860.00) |
| Overcollateralization Due to Commitment Limitation | $ (22,582,858.38) |
| Maximum Advance | $ 38,698,148.74 |
| | |
| Commitment | $ 40,000,000.00 |
| Withheld Commitment | $   1,301,851.26 |
| Borrowing Limit | $ 38,698,148.74 |
| | |
| Borrowing Base | |
| Beginning Facility Amount | $ 15,797,050.01 |
| Loan Advances / Reductions | $                  - |
| Facility Amount | $ 15,797,050.01 |
| | |
| Availability | $ 22,901,098.73 |
| | |
| WAB Loan Maximum Advance to Maximum Unpaid Principal Balance (LTB) | 89.72% |
| WAB Loan Maximum Advance to Real Estate Value (LTV) | 40.98% |
| Borrower Loan Maximum Advance to Real Estate Value | 82.04% |

The undersigned represents and warrants that this Borrowing Base Certificate is true and correct statement of the Borrowing Base, and that the information contained herein is true and correct in all material respects. The undersigned further represents and warrants that (i) there is no Default or Event of Default occurring or continuing under any of the Facility Documents, (ii) all representations and warranties contained in the Facility Documents are true and correct in all material respects, and (iii) all amounts reflected herein have been determined and calculated in strict compliance with the provisions of the Facility Documents and the Exhibits and Schedules thereto. Capitalized terms used herein and not otherwise defined herein shall have the meanings specified in the Facility Documents.

| **Magerick, LLC** | **WAB Reviewer** |
|---|---|
| Signed: | Signed: |
| Title: CEO, Other Manager of Magerick, LLC | Title: |

| **WAB Approval** | **WAB Additional Approval** |
|---|---|
| Signed: | Signed: |
| Title: | Title: |

| Note Number | Borrower Name | Property Street | Property City | Property State | Property Zip Code | Property Type Category | Ground Up Construction | REO | Note Balance | Maturity Date | Note Rate | Lien Position | Valuation Date | Cost Basis | Property Value | 3rd Party Valuation | Dwell Time (Days) | Eligible Collateral Value | Advance Rate | Amount Eligible to be Advanced | Amount Outstanding | Additional Capacity |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

| Note Number | Borrower Name | Property Street | Property City | Property State | Property Zip Code | Property Type Category | Ground Up Construction | REO | Note Balance | Maturity Date | Note Rate | Lien Position | Valuation Date | Cost Basis | Property Value | 3rd Party Valuation | Dwell Time (Days) | Eligible Collateral Value | Advance Rate | Amount Eligible to be Advanced | Amount Outstanding | Additional Capacity |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

| Note Number | Borrower Name | Property Street | Property City | Property State | Property Zip Code | Property Type Category | Ground Up Construction | REO | Note Balance | Maturity Date | Note Rate | Lien Position | Valuation Date | Cost Basis | Property Value | 3rd Party Valuation | Dwell Time (Days) | Eligible Collateral Value | Advance Rate | Amount Eligible to be Advanced | Amount Outstanding | Additional Capacity |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 312001281 | | | MUNCIE | IN | 47302 | SFR Owner Occupied | N | N | $ 134,041.62 | 4/1/2032 | 12.25% | 1 | 10/04/22 | $ 51,647.03 | $ 17,000.00 | Y | 0 | $ 17,000.00 | 65.00% | $ 11,050.00 | $ - | $ 11,050.00 |
| | | | DUNCAN | OK | 73534 | SFR Owner Occupied | N | N | $ 55,968.42 | 10/1/2036 | 7.38% | 1 | 10/04/22 | $ 21,249.88 | $ 11,000.00 | Y | 0 | $ 11,000.00 | 65.00% | $ 7,150.00 | $ - | $ 7,150.00 |
| 312001376 | | | SOUTH BEND | IN | 46619 | SFR Owner Occupied | N | N | $ 122,591.53 | 1/1/2040 | 6.75% | 1 | 10/04/22 | $ 55,391.67 | $ 54,000.00 | Y | 0 | $ 54,000.00 | 65.00% | $ 35,100.00 | $ - | $ 35,100.00 |
| 312001383 | | | LAKEVIEW | OH | 43331 | SFR Owner Occupied | N | N | $ 49,204.62 | 11/1/2025 | 6.75% | 1 | 10/04/22 | $ 20,561.83 | $ 45,000.00 | Y | 0 | $ 45,000.00 | 65.00% | $ 20,561.81 | $ - | $ 20,561.81 |
| | | | BRYANT | WI | 54418 | SFR Owner Occupied | N | N | $ 180,570.41 | 6/5/2036 | 9.88% | 1 | 10/04/22 | $ 75,168.71 | $ 98,000.00 | Y | 0 | $ 98,000.00 | 65.00% | $ 63,700.00 | $ - | $ 63,700.00 |
| | | | GRAY | KY | 40734 | SFR Owner Occupied | N | N | $ 81,440.30 | 11/1/2035 | 10.25% | 1 | 10/04/22 | $ 33,860.69 | $ 37,000.00 | Y | 0 | $ 37,000.00 | 65.00% | $ 24,050.00 | $ - | $ 24,050.00 |
| 312001426 | | | COLUMBUS | OH | 43227 | SFR Owner Occupied | N | N | $ 128,135.92 | 7/1/2052 | 5.88% | 1 | 10/04/22 | $ 56,648.1 | $ 79,000.00 | Y | 0 | $ 79,000.00 | 65.00% | $ 51,350.00 | $ - | $ 51,350.00 |
| 312001434 | | | PHILADELPHIA | PA | 19140 | SFR Owner Occupied | N | N | $ 29,187.91 | 1/28/2032 | 11.74% | 1 | 10/04/22 | $ 12,150.48 | $ 75,000.00 | Y | 0 | $ 75,000.00 | 65.00% | $ 12,150.48 | $ - | $ 12,150.48 |
| | | | HOLIDAY | FL | 34691 | SFR Owner Occupied | N | N | $ 218,017.37 | 2/1/2047 | 7.38% | 1 | 10/04/22 | $ 90,757.89 | $ 200,000.00 | Y | 0 | $ 200,000.00 | 65.00% | $ 90,757.89 | $ - | $ 90,757.89 |
| | | | SAINT PETERSBURG | FL | 34713 | SFR Owner Occupied | N | N | $ 222,091.53 | 9/1/2035 | 5.50% | 1 | 10/04/22 | $ 86,956.16 | $ 398,500.00 | Y | 0 | $ 398,500.00 | 65.00% | $ 86,956.16 | $ - | $ 86,956.16 |
| 312001453 | | | FORT LAUDERDALE | FL | 33313 | SFR Owner Occupied | N | N | $ 97,228.40 | 4/1/2044 | 1.16% | 1 | 10/04/22 | $ 40,474.93 | $ 110,000.00 | Y | 0 | $ 110,000.00 | 65.00% | $ 40,474.93 | $ - | $ 40,474.93 |
| 312001457 | | | SOUTH CHICAGO | IL | 60064 | SFR Owner Occupied | N | N | $ 112,393.62 | 7/1/2036 | 2.00% | 1 | 10/04/22 | $ 44,870.51 | $ 42,000.00 | Y | 0 | $ 42,000.00 | 65.00% | $ 20,800.00 | $ - | $ 20,800.00 |
| 312001463 | | | BLUFFTON | IN | 46714 | SFR Owner Occupied | N | N | $ 83,217.52 | 9/1/2044 | 3.13% | 1 | 10/04/22 | $ 34,662.19 | $ 121,800.00 | Y | 0 | $ 121,800.00 | 65.00% | $ 34,662.19 | $ - | $ 34,662.19 |
| 312001466 | | | LOUISVILLE | KY | 40213 | SFR Owner Occupied | N | N | $ 77,684.50 | 8/1/2054 | 2.00% | 1 | 10/04/22 | $ 32,448.46 | $ 152,000.00 | Y | 0 | $ 152,000.00 | 65.00% | $ 32,448.46 | $ - | $ 32,448.46 |
| | | | COLUMBIA | SC | 29229 | SFR Owner Occupied | N | N | $ 117,170.43 | 3/1/2057 | 4.62% | 1 | 10/04/22 | $ 48,776.36 | $ 125,000.00 | Y | 0 | $ 125,000.00 | 65.00% | $ 48,776.36 | $ - | $ 48,776.36 |
| | | | SALEM | OH | 44460 | SFR Owner Occupied | N | N | $ 64,706.88 | 12/1/2040 | 8.38% | 1 | 10/04/22 | $ 26,933.99 | $ 65,000.00 | Y | 0 | $ 65,000.00 | 65.00% | $ 26,933.99 | $ - | $ 26,933.99 |
| 312001478 | | | AUSTIN | IN | 47102 | SFR Owner Occupied | N | N | $ 46,410.44 | 5/1/2041 | 11.50% | 1 | 10/04/22 | $ 19,420.04 | $ 10,000.00 | Y | 0 | $ 10,000.00 | 65.00% | $ 6,500.00 | $ - | $ 6,500.00 |
| 312001479 | | | DAVISBORO | GA | 31018 | SFR Owner Occupied | N | N | $ 54,737.46 | 11/1/2034 | 4.25% | 1 | 10/04/22 | $ 22,865.83 | $ 80,000.00 | Y | 0 | $ 80,000.00 | 65.00% | $ 22,865.82 | $ - | $ 22,865.92 |
| | | | ELROTTON | GA | 31827 | SFR Owner Occupied | N | N | $ 105,456.22 | 8/1/2045 | 2.49% | 1 | 10/04/22 | $ 43,899.82 | $ 95,000.00 | Y | 0 | $ 95,000.00 | 65.00% | $ 43,899.82 | $ - | $ 43,899.82 |
| 312001491 | | | RIVERDALE | IL | 60827 | SFR Owner Occupied | N | N | $ 126,877.93 | 3/1/2053 | 3.34% | 1 | 10/04/22 | $ 53,817.34 | $ 124,000.00 | Y | 0 | $ 124,000.00 | 65.00% | $ 53,817.34 | $ - | $ 53,817.34 |
| | | | NAPLES | ME | 04055 | SFR Owner Occupied | N | N | $ 74,788.19 | 11/24/2031 | 3.24% | 1 | 10/04/22 | $ 40,716.90 | $ 68,000.00 | Y | 0 | $ 68,000.00 | 65.00% | $ 40,716.90 | $ - | $ 40,716.90 |
| 312001494 | | | HINSE | FL | 34672 | SFR Owner Occupied | N | N | $ 74,584.71 | 3/04/2032 | 2.00% | 1 | 10/04/22 | $ 31,068.68 | $ 70,000.00 | Y | 0 | $ 70,000.00 | 65.00% | $ 31,068.68 | $ - | $ 31,068.68 |
| | | | HEWITT | NJ | 07421 | SFR Owner Occupied | N | N | $ 127,136.18 | 5/1/2040 | 2.00% | 1 | 10/04/22 | $ 52,924.86 | $ 140,000.00 | Y | 0 | $ 140,000.00 | 65.00% | $ 52,924.86 | $ - | $ 52,924.86 |
| | | | BRIGANTINE | NJ | 08203 | SFR Owner Occupied | N | N | $ 190,378.29 | 10/1/2041 | 2.49% | 1 | 10/04/22 | $ 79,459.64 | $ 160,000.00 | Y | 0 | $ 160,000.00 | 65.00% | $ 79,459.64 | $ - | $ 79,459.64 |
| | | | STETSON | ME | 04488 | SFR Owner Occupied | N | N | $ 118,341.2 | 9/11/2040 | 4.00% | 1 | 10/04/22 | $ 49,264.68 | $ 110,000.00 | Y | 0 | $ 110,000.00 | 65.00% | $ 49,264.68 | $ - | $ 49,264.68 |
| 312001512 | | | RENTON | NJ | 08618 | SFR Owner Occupied | N | N | $ 83,473.64 | 6/1/2036 | 7.50% | 1 | 10/04/22 | $ 34,768.81 | $ 68,000.00 | Y | 0 | $ 68,000.00 | 65.00% | $ 34,768.81 | $ - | $ 34,768.81 |
| | | | ROSBBONNIS | IL | 60914 | SFR Owner Occupied | N | N | $ 61,990.77 | 5/1/2010 | 1.00% | 1 | 10/04/22 | $ 35,805.81 | $ 31,500.00 | Y | 0 | $ 31,500.00 | 65.00% | $ 20,475.00 | $ - | $ 20,475.00 |
| 312001520 | | | LOCKPORT | IL | 60441 | SFR Owner Occupied | N | N | $ 507,846.6 | 9/1/2032 | 6.00% | 1 | 10/04/22 | $ 444,767.41 | $ 422,370.00 | Y | 0 | $ 422,370.00 | 65.00% | $ 274,946.86 | $ - | $ 274,946.86 |
| 312001526 | | | ROB | LA | 70770 | SFR Owner Occupied | N | N | $ 12,600.66 | 9/1/2035 | 1.00% | 1 | 10/04/22 | $ 5,162.21 | $ 205,000.00 | Y | 0 | $ 205,000.00 | 65.00% | $ 5,162.21 | $ - | $ 5,162.21 |
| | | | PHILADELPHIA | PA | 19140 | SFR Owner Occupied | N | N | $ 12,577.80 | 11/1/2029 | 10.00% | 1 | 10/04/22 | $ 5,245.84 | $ 68,000.00 | Y | 0 | $ 68,000.00 | 65.00% | $ 5,245.96 | $ - | $ 5,245.96 |
| | | | PHILADELPHIA | PA | 19140 | SFR Owner Occupied | N | N | $ 56,411.24 | 6/1/2033 | 6.19% | 1 | 10/04/22 | $ 23,484.14 | $ 75,000.00 | Y | 0 | $ 75,000.00 | 65.00% | $ 23,484.14 | $ - | $ 23,484.14 |
| 312001553 | | | FROSTPROOF | FL | 33843 | SFR Owner Occupied | N | N | $ 151,579.44 | 9/7/2046 | 9.20% | 1 | 10/04/22 | $ 63,100.23 | $ 119,000.00 | Y | 0 | $ 119,000.00 | 65.00% | $ 63,100.23 | $ - | $ 63,100.23 |
| 312001540 | | | JACKSON | MS | 39204 | SFR Owner Occupied | N | N | $ 98,406.54 | 7/1/2028 | 13.74% | 1 | 10/04/22 | $ 40,923.51 | $ 67,000.00 | Y | 0 | $ 67,000.00 | 65.00% | $ 40,923.51 | $ - | $ 40,923.51 |
| | | | CHELM | NC | 28069 | SFR Owner Occupied | N | N | $ 47,449.82 | 6/1/2033 | 9.00% | 1 | 10/04/22 | $ 19,752.64 | $ 50,000.00 | Y | 0 | $ 50,000.00 | 65.00% | $ 19,752.64 | $ - | $ 19,752.64 |
| 312001585 | | | EVERGREEN PARK | IL | 60805 | SFR Owner Occupied | N | N | $ 80,406.53 | 11/1/2035 | 7.00% | 1 | 10/04/22 | $ 33,473.26 | $ 210,000.00 | Y | 0 | $ 210,000.00 | 65.00% | $ 33,473.26 | $ - | $ 33,473.26 |
| 312001587 | | | EUCLID | OH | 44117 | SFR Owner Occupied | N | N | $ 296,281.76 | 10/1/2045 | 9.00% | 1 | 10/04/22 | $ 123,337.58 | $ 85,000.00 | Y | 0 | $ 85,000.00 | 65.00% | $ 55,250.00 | $ - | $ 55,250.00 |
| | | | ERIE | PA | 16504 | SFR Owner Occupied | N | N | $ 51,156.66 | 4/1/2041 | 3.24% | 1 | 10/04/22 | $ 21,294.90 | $ 62,000.00 | Y | 0 | $ 62,000.00 | 65.00% | $ 21,294.90 | $ - | $ 21,294.90 |
| | | | LESTER PRAIRIE | MN | 55354 | SFR Owner Occupied | N | N | $ 247,000.74 | 8/1/2036 | 7.13% | 1 | 10/04/22 | $ 102,822.63 | $ 62,000.00 | Y | 0 | $ 62,000.00 | 65.00% | $ 40,400.00 | $ - | $ 40,400.00 |
| | | | CLINTON | IN | 47842 | SFR Owner Occupied | N | N | $ 148,164.73 | 11/1/2045 | 8.95% | 1 | 10/04/22 | $ 61,761.54 | $ 60,000.00 | Y | 0 | $ 60,000.00 | 65.00% | $ 39,000.00 | $ - | $ 39,000.00 |
| 312001626 | | | DONZALS | LA | 70737 | SFR Owner Occupied | N | N | $ 50,540.24 | 9/1/2032 | 7.88% | 1 | 10/04/22 | $ 21,049.55 | $ 140,000.00 | Y | 0 | $ 140,000.00 | 65.00% | $ 21,049.55 | $ - | $ 21,049.55 |
| | | | PUNXSUTAWNEY | PA | 15767 | SFR Owner Occupied | N | N | $ 44,159.30 | 5/1/2040 | 5.13% | 1 | 10/04/22 | $ 18,466.11 | $ 40,000.00 | Y | 0 | $ 40,000.00 | 65.00% | $ 18,466.11 | $ - | $ 18,466.11 |
| 312001636 | | | COUNTRY CLUB HILLS | IL | 60478 | SFR Owner Occupied | N | N | $ 112,868.70 | 5/15/2042 | 6.00% | 1 | 10/04/22 | $ 46,985.57 | $ 110,000.00 | Y | 0 | $ 110,000.00 | 65.00% | $ 46,985.57 | $ - | $ 46,985.57 |
| | | | CINCINNATI | OH | 45204 | SFR Owner Occupied | N | N | $ 37,815.34 | 6/5/2042 | 3.85% | 1 | 10/04/22 | $ 15,741.90 | $ 90,000.00 | Y | 0 | $ 90,000.00 | 65.00% | $ 15,741.90 | $ - | $ 15,741.90 |
| | | | MILWAUKEE | WI | 53206 | SFR Owner Occupied | N | N | $ 39,476.87 | 1/1/2042 | 7.50% | 1 | 10/04/22 | $ 16,491.07 | $ 45,000.00 | Y | 0 | $ 45,000.00 | 65.00% | $ 16,491.07 | $ - | $ 16,491.07 |
| | | | BARBOURVILLE | KY | 40906 | SFR Owner Occupied | N | N | $ 110,627.39 | 2/1/2034 | 6.20% | 1 | 10/04/22 | $ 46,052.46 | $ 95,000.00 | Y | 0 | $ 95,000.00 | 65.00% | $ 46,052.46 | $ - | $ 46,052.46 |
| 312001646 | | | FORT WAYNE | IN | 46804 | SFR Owner Occupied | N | N | $ 129,994.00 | 12/1/2037 | 8.14% | 1 | 10/04/22 | $ 54,114.34 | $ 68,000.00 | Y | 0 | $ 68,000.00 | 65.00% | $ 44,850.00 | $ - | $ 44,850.00 |
| 312001649 | | | BALTIMORE | MD | 21218 | SFR Owner Occupied | N | N | $ 43,994.50 | 12/1/2020 | 10.00% | 1 | 10/04/22 | $ 18,415.90 | $ 80,000.00 | Y | 0 | $ 80,000.00 | 65.00% | $ 18,415.90 | $ - | $ 18,415.90 |
| | | | TOLEDO | OH | 43611 | SFR Owner Occupied | N | N | $ 130,201.93 | 6/1/2062 | 5.50% | 1 | 10/04/22 | $ 54,254.63 | $ 80,000.00 | Y | 0 | $ 80,000.00 | 65.00% | $ 52,000.00 | $ - | $ 52,000.00 |
| 312001658 | | | CLEVELAND | OH | 44102 | SFR Owner Occupied | N | N | $ 142,580.29 | 3/1/2045 | 8.89% | 1 | 10/04/22 | $ 59,454.64 | $ 55,000.00 | Y | 0 | $ 55,000.00 | 65.00% | $ 35,750.00 | $ - | $ 35,750.00 |
| 312001687 | | | MILWAUKEE | WI | 53218 | SFR Owner Occupied | N | N | $ 137,788.54 | 7/5/2042 | 7.50% | 1 | 10/04/22 | $ 57,364.27 | $ 90,000.00 | Y | 0 | $ 90,000.00 | 65.00% | $ 57,364.27 | $ - | $ 57,364.27 |
| | | | LANCASTER | OH | 43130 | SFR Owner Occupied | N | N | $ 73,510.37 | 11/1/2045 | 3.48% | 1 | 10/04/22 | $ 30,601.25 | $ 74,000.00 | Y | 0 | $ 74,000.00 | 65.00% | $ 30,601.25 | $ - | $ 30,601.25 |
| | | | NEWBURY | OH | 44065 | SFR Owner Occupied | N | N | $ 61,316.40 | 9/1/2036 | 15.35% | 1 | 10/04/22 | $ 25,482.17 | $ 75,000.00 | Y | 0 | $ 75,000.00 | 65.00% | $ 25,482.17 | $ - | $ 25,482.17 |
| 312001723 | | | HARRISBURG | PA | 17103 | SFR Owner Occupied | N | N | $ 41,347.38 | 3/1/2034 | 5.00% | 1 | 10/04/22 | $ 48,000.00 | $ 48,000.00 | Y | 0 | $ 48,000.00 | 65.00% | $ 17,211.25 | $ - | $ 17,211.25 |
| 312001731 | | | BRT WHITE | FL | 32038 | SFR Owner Occupied | N | N | $ 50,164.71 | 12/30/2041 | 4.34% | 1 | 10/04/22 | $ 20,895.40 | $ 65,000.00 | Y | 0 | $ 65,000.00 | 65.00% | $ 20,895.40 | $ - | $ 20,895.40 |
| | | | TOLEDO | OH | 43611 | SFR Owner Occupied | N | N | $ 50,800.06 | 6/30/2038 | 9.99% | 1 | 10/04/22 | $ 21,167.29 | $ 60,000.00 | Y | 0 | $ 60,000.00 | 65.00% | $ 21,167.29 | $ - | $ 21,167.29 |
| 312001751 | | | THOMASVILLE | NC | 27360 | SFR Owner Occupied | N | N | $ 29,361.30 | 4/1/2031 | 4.75% | 1 | 10/04/22 | $ 12,223.95 | $ 81,000.00 | Y | 0 | $ 81,000.00 | 65.00% | $ 12,223.95 | $ - | $ 12,223.95 |
| 312001785 | | | HYSTTVILLE | GA | 30215 | SFR Owner Occupied | N | N | $ 46,064.92 | 6/1/2036 | 4.34% | 1 | 10/04/22 | $ 19,178.21 | $ 60,400.00 | Y | 0 | $ 60,400.00 | 65.00% | $ 19,178.21 | $ - | $ 19,178.21 |
| | | | MALAROS | ME | 04702 | SFR Owner Occupied | N | N | $ 194,827.80 | 9/15/2012 | 11.50% | 1 | 10/04/22 | $ 81,324.85 | $ 70,000.00 | Y | 0 | $ 70,000.00 | 65.00% | $ 45,500.00 | $ - | $ 45,500.00 |
| | | | BROGETON | NJ | 08302 | SFR Owner Occupied | N | N | $ 134,729.81 | 4/1/2065 | 5.13% | 1 | 10/04/22 | $ 56,085.97 | $ 96,000.00 | Y | 0 | $ 96,000.00 | 65.00% | $ 56,085.97 | $ - | $ 56,085.97 |
| | | | RACINE | WI | 53404 | SFR Owner Occupied | N | N | $ 112,706.23 | 6/1/2044 | 5.50% | 1 | 10/04/22 | $ 46,919.34 | $ 58,000.00 | Y | 0 | $ 58,000.00 | 65.00% | $ 37,700.00 | $ - | $ 37,700.00 |
| 312001796 | | | BALTIMORE | MD | 21202 | SFR Owner Occupied | N | N | $ 51,589.76 | 10/1/2036 | 6.50% | 1 | 10/04/22 | $ 21,475.63 | $ 60,000.00 | Y | 0 | $ 60,000.00 | 65.00% | $ 21,475.63 | $ - | $ 21,475.63 |
| 312001829 | | | CALUMET CITY | IL | 60409 | SFR Owner Occupied | N | N | $ 132,011.82 | 2/1/2034 | 5.00% | 1 | 10/04/22 | $ 54,964.51 | $ 84,000.00 | Y | 0 | $ 84,000.00 | 65.00% | $ 54,964.51 | $ - | $ 54,964.51 |
| | | | JACKSONVILLE | FL | 32254 | SFR Owner Occupied | N | N | $ 39,127.60 | 12/26/2036 | 7.86% | 1 | 10/04/22 | $ 16,298.16 | $ 110,000.00 | Y | 0 | $ 110,000.00 | 65.00% | $ 16,298.16 | $ - | $ 16,298.16 |
| 312001831 | | | GARY | IN | 46404 | SFR Owner Occupied | N | N | $ 22,811.49 | 2/1/2032 | 8.47% | 1 | 10/04/22 | $ 14,658.92 | $ 125,000.00 | Y | 0 | $ 125,000.00 | 65.00% | $ 14,658.92 | $ - | $ 14,658.92 |
| | | | MONTICELLO | KY | 42633 | SFR Owner Occupied | N | N | $ 88,844.11 | 2/5/2049 | 6.00% | 1 | 10/04/22 | $ 16,365.63 | $ 45,000.00 | Y | 0 | $ 45,000.00 | 65.00% | $ 16,365.63 | $ - | $ 16,365.63 |
| 312001850 | | | NEW ZION | SC | 29111 | SFR Owner Occupied | N | N | $ 11,546.88 | 7/30/2040 | 2.00% | 1 | 10/04/22 | $ 4,859.80 | $ 45,000.00 | Y | 0 | $ 45,000.00 | 65.00% | $ 4,859.80 | $ - | $ 4,859.80 |
| 312001851 | | | RAND BAY | SC | 29526 | SFR Owner Occupied | N | N | $ 97,510.25 | 4/24/2027 | 9.07% | 1 | 10/04/22 | $ 40,591.63 | $ 54,000.00 | Y | 0 | $ 54,000.00 | 65.00% | $ 35,100.00 | $ - | $ 35,100.00 |
| 312001867 | | | TUSCALOOSA | AL | 35401 | SFR Owner Occupied | N | N | $ 15,613.72 | 7/5/2015 | 5.45% | 1 | 10/04/22 | $ 6,499.34 | $ 66,000.00 | Y | 0 | $ 66,000.00 | 65.00% | $ 6,499.34 | $ - | $ 6,499.34 |
| | | | WINCHESTER | KY | 40391 | SFR Owner Occupied | N | N | $ 48,741.16 | 9/1/2041 | 5.00% | 1 | 10/04/22 | $ 20,290.19 | $ 62,000.00 | Y | 0 | $ 62,000.00 | 65.00% | $ 20,290.19 | $ - | $ 20,290.19 |
| 312001868 | | | OSSIMER | AL | 35023 | SFR Owner Occupied | N | N | $ 87,584.3 | 4/1/1976 | 5.00% | 1 | 10/04/22 | $ 36,460.68 | $ 99,000.00 | Y | 0 | $ 99,000.00 | 65.00% | $ 36,460.68 | $ - | $ 36,460.68 |
| | | | NEWVILLE | AL | 36353 | SFR Owner Occupied | N | N | $ 65,566.48 | 10/15/2049 | 3.49% | 1 | 10/04/22 | $ 27,284.33 | $ 155,000.00 | Y | 0 | $ 155,000.00 | 65.00% | $ 27,284.33 | $ - | $ 27,284.33 |
| 312001880 | | | ROBINSONVILLE | MS | 38664 | SFR Owner Occupied | N | N | $ 85,546.82 | 12/30/2016 | 2.00% | 1 | 10/04/22 | $ 13,522.46 | $ 144,000.00 | Y | 0 | $ 144,000.00 | 65.00% | $ 13,522.46 | $ - | $ 13,522.46 |
| 312001892 | | | WESLACO | TX | 78596 | SFR Owner Occupied | N | N | $ 24,916.63 | 6/3/2014 | 11.00% | 1 | 10/04/22 | $ 10,471.41 | $ 65,000.00 | Y | 0 | $ 65,000.00 | 65.00% | $ 10,471.41 | $ - | $ 10,471.41 |
| | | | ROUNDVILLE | AL | 35474 | SFR Owner Occupied | N | N | $ 37,451.81 | 5/1/2048 | 3.48% | 1 | 10/04/22 | $ 15,571.67 | $ 140,000.00 | Y | 0 | $ 140,000.00 | 65.00% | $ 15,571.67 | $ - | $ 15,571.67 |
| 312001897 | | | SARDIS | MS | 38666 | SFR Owner Occupied | N | N | $ 28,775.81 | 5/5/2032 | 2.00% | 1 | 10/04/22 | $ 11,978.60 | $ 110,000.00 | Y | 0 | $ 110,000.00 | 65.00% | $ 11,978.60 | $ - | $ 11,978.60 |
| 312001900 | | | WINCHESTER | KY | 40391 | SFR Owner Occupied | N | N | $ 80,194.91 | 12/1/2047 | 4.00% | 1 | 10/04/22 | $ 33,408.51 | $ 115,000.00 | Y | 0 | $ 115,000.00 | 65.00% | $ 33,408.51 | $ - | $ 33,408.51 |
| | | | OKLAHOMA CITY | OK | 73116 | SFR Owner Occupied | N | N | $ 57,218.01 | 11/01/2029 | 11.64% | 1 | 10/04/22 | $ 23,813.98 | $ 260,000.00 | Y | 0 | $ 260,000.00 | 65.00% | $ 14,275.35 | $ - | $ 14,275.35 |
| | | | ATHENS | OH | 45701 | SFR Owner Occupied | N | N | $ 36,382.38 | 6/1/2029 | 5.00% | 1 | 10/04/22 | $ 15,143.48 | $ 50,000.00 | Y | 0 | $ 50,000.00 | 65.00% | $ 15,143.48 | $ - | $ 15,143.48 |
| 312001920 | | | BRUCETON | TN | 38317 | SFR Owner Occupied | N | N | $ 20,264.77 | 7/5/2028 | 6.00% | 1 | 10/04/22 | $ 8,435.50 | $ 63,500.00 | Y | 0 | $ 63,500.00 | 65.00% | $ 8,435.50 | $ - | $ 8,435.50 |
| | | | PINEWOOD | SC | 29125 | SFR Owner Occupied | N | N | $ 44,380.08 | 9/1/2040 | 9.23% | 1 | 10/04/22 | $ 18,475.47 | $ 68,000.00 | Y | 0 | $ 68,000.00 | 65.00% | $ 18,475.47 | $ - | $ 18,475.47 |
| 312001926 | | | BANY | GA | 31701 | SFR Owner Occupied | N | N | $ 16,555.25 | 10/20/2047 | 10.44% | 1 | 10/04/22 | $ 6,911.80 | $ 62,000.00 | Y | 0 | $ 62,000.00 | 65.00% | $ 6,889.63 | $ - | $ 6,889.63 |
| | | | BAINBRIDGE | GA | 39819 | SFR Owner Occupied | N | N | $ 37,630.81 | 4/1/2034 | 7.50% | 1 | 10/04/22 | $ 15,411.01 | $ 70,000.00 | Y | 0 | $ 70,000.00 | 65.00% | $ 15,411.01 | $ - | $ 15,411.01 |
| | | | CHICORA | PA | 16025 | SFR Owner Occupied | N | N | $ 95,558.68 | 9/1/2046 | 10.12% | 1 | 10/04/22 | $ 39,778.45 | $ 82,500.00 | Y | 0 | $ 82,500.00 | 65.00% | $ 39,778.45 | $ - | $ 39,778.45 |
| | | | COLTON | AL | 35650 | SFR Owner Occupied | N | N | $ 36,423.96 | 5/1/2042 | 12.50% | 1 | 10/04/22 | $ 15,118.99 | $ 120,000.00 | Y | 0 | $ 120,000.00 | 65.00% | $ 15,118.99 | $ - | $ 15,118.99 |
| | | | DAVENPORT | FL | 71101 | SFR Owner Occupied | N | N | $ 40,423.30 | 6/5/2029 | 9.17% | 1 | 10/04/22 | $ 15,982.21 | $ 35,000.00 | Y | 0 | $ 35,000.00 | 65.00% | $ 15,982.21 | $ - | $ 15,982.21 |
| | | | SAN BENITO | TX | 78586 | SFR Owner Occupied | N | N | $ 45,684.75 | 8/1/2026 | 5.47% | 1 | 10/04/22 | $ 14,586.45 | $ 59,000.00 | Y | 0 | $ 59,000.00 | 65.00% | $ 14,586.45 | $ - | $ 14,586.45 |
| 312001955 | | | ALTMERE | AL | 36402 | SFR Owner Occupied | N | N | $ 34,949.88 | 7/5/2041 | 2.54% | 1 | 10/04/22 | $ 14,548.63 | $ 60,000.00 | Y | 0 | $ 60,000.00 | 65.00% | $ 7,915.10 | $ - | $ 7,915.10 |
| 312001957 | | | CROXY | MS | 39632 | SFR Owner Occupied | N | N | $ 19,011.67 | 6/1/2035 | 2.49% | 1 | 10/04/22 | $ 7,915.10 | $ 60,000.00 | Y | 0 | $ 60,000.00 | 65.00% | $ 7,915.10 | $ - | $ 7,915.10 |
| | | | CHARLESTON | SC | 29412 | SFR Owner Occupied | N | N | $ 107,852.95 | 7/4/2028 | 2.00% | 1 | 10/04/22 | $ 44,897.54 | $ 208,000.00 | Y | 0 | $ 208,000.00 | 65.00% | $ 44,897.54 | $ - | $ 44,897.54 |
| 312001967 | | | BRUNSWICK | GA | 31520 | SFR Owner Occupied | N | N | $ 54,340.02 | 4/1/2050 | 4.50% | 1 | 10/04/22 | $ 22,616.76 | $ 94,000.00 | Y | 0 | $ 94,000.00 | 65.00% | $ 22,616.76 | $ - | $ 22,616.76 |

| Note Number | Borrower Name | Property Street | Property City | Property State | Property Zip Code | Property Type Category | Ground Up Construction | REO | Note Balance | Maturity Date | Note Rate | Lien Position | Valuation Date | Cost Basis | Property Value | 3rd Party Valuation | Dwell Time (Days) | Eligible Collateral Value¹ | Advance Rate | Amount Eligible to be Advanced² | Amount Outstanding | Additional Capacity |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 312001968 | | | CROSSVILLE | TN | 38555 | SFR Owner Occupied | N | N | 98,051.81 | 6/1/2047 | 6.38% | 1 | 10/04/22 | 38,736.88 | 152,000.00 | Y | 0 | 152,000.00 | 65.00% | 38,736.88 | - | 38,736.88 |
| | | | FORT SMITH | AR | 72904 | SFR Owner Occupied | N | N | 101,156.76 | 8/1/2024 | 10.99% | 1 | 10/04/22 | 42,526.40 | 100,500.00 | Y | 0 | 100,500.00 | 65.00% | 42,526.40 | - | 42,526.40 |
| 312001996 | | | FREMONT | AL | 36271 | SFR Owner Occupied | N | N | 23,956.89 | 6/2/2024 | 9.55% | 1 | 10/04/22 | 9,871.87 | 140,000.00 | Y | 0 | 140,000.00 | 65.00% | 9,871.87 | - | 9,871.87 |
| 312002010 | | | SYLACAUGA | AL | 45150 | SFR Owner Occupied | N | N | 42,435.40 | 4/1/2041 | 6.65% | 1 | 10/04/22 | 17,661.68 | 85,000.00 | Y | 0 | 85,000.00 | 65.00% | 17,661.68 | - | 17,661.68 |
| | | | SWINGWAY | SC | 29554 | SFR Owner Occupied | N | N | 24,361.89 | 12/1/2021 | 10.45% | 1 | 10/04/22 | 10,541.48 | 53,000.00 | Y | 0 | 53,000.00 | 65.00% | 10,541.48 | - | 10,541.48 |
| 312002088 | | | SLIPPERY ROCK | PA | 16057 | SFR Owner Occupied | N | N | 54,591.17 | 1/30/2048 | 9.40% | 1 | 10/04/22 | 22,725.89 | 50,000.00 | Y | 0 | 50,000.00 | 65.00% | 22,725.89 | - | 22,725.89 |
| 312002024 | | | MILWAUKEE | WI | 53232 | SFR Owner Occupied | N | N | 54,706.29 | 3/0/2037 | 11.59% | 1 | 10/04/22 | 22,858.46 | 51,000.00 | Y | 0 | 51,000.00 | 65.00% | 22,858.46 | - | 22,858.46 |
| 312002037 | | | EMPHIS | TN | 38114 | SFR Owner Occupied | N | N | 33,947.09 | 1/5/2046 | 12.44% | 1 | 10/04/22 | 14,131.66 | 71,000.00 | Y | 0 | 71,000.00 | 65.00% | 14,131.66 | - | 14,131.66 |
| | | | BATTLE CREEK | MI | 49017 | SFR Owner Occupied | N | N | 56,937.40 | 6/1/2049 | 4.50% | 1 | 10/04/22 | 23,702.13 | 54,600.00 | Y | 0 | 54,600.00 | 65.00% | 23,702.13 | - | 23,702.13 |
| | | | HUBBARD | OH | 44425 | SFR Owner Occupied | N | N | 80,353.51 | 4/1/2045 | 8.56% | 1 | 10/04/22 | 33,408.31 | 110,000.00 | Y | 0 | 110,000.00 | 65.00% | 33,408.31 | - | 33,408.31 |
| 312002052 | | | SALINEVILLE | OH | 43945 | SFR Owner Occupied | N | N | 116,545.81 | 6/1/2055 | 5.07% | 1 | 10/04/22 | 48,516.25 | 140,000.00 | Y | 0 | 48,516.25 | 65.00% | 48,516.25 | - | 48,516.25 |
| 312002059 | | | OMER | LA | 71040 | SFR Owner Occupied | N | N | 75,769.22 | 6/21/2046 | 11.10% | 1 | 10/04/22 | 31,541.57 | 64,500.00 | Y | 0 | 64,500.00 | 65.00% | 31,541.57 | - | 31,541.57 |
| | | | KAPLAN | LA | 70548 | SFR Owner Occupied | N | N | 48,476.40 | 5/8/2045 | 10.88% | 1 | 10/04/22 | 18,893.14 | 29,000.00 | Y | 0 | 29,000.00 | 65.00% | 18,850.00 | - | 18,850.00 |
| 312002061 | | | VANDALIA | MO | 63382 | SFR Owner Occupied | N | N | 38,096.68 | 8/1/2046 | 5.00% | 1 | 10/04/22 | 14,110.40 | 64,500.00 | Y | 0 | 64,500.00 | 65.00% | 14,110.40 | - | 14,110.40 |
| 312002062 | | | ISTON | GA | 30662 | SFR Owner Occupied | N | N | 58,440.31 | 1/0/2048 | 5.00% | 1 | 10/04/22 | 24,427.78 | 155,000.00 | Y | 0 | 155,000.00 | 65.00% | 24,427.78 | - | 24,427.78 |
| | | | LAKE CITY | SC | 29560 | SFR Owner Occupied | N | N | 68,925.70 | 5/5/2021 | 11.44% | 1 | 10/04/22 | 28,692.78 | 46,000.00 | Y | 0 | 46,000.00 | 65.00% | 28,692.78 | - | 28,692.78 |
| 312002085 | | | JACKSON | GA | 30233 | SFR Owner Occupied | N | N | 74,620.13 | 1/1/2025 | 5.00% | 1 | 10/04/22 | 31,064.22 | 120,000.00 | Y | 0 | 120,000.00 | 65.00% | 31,064.22 | - | 31,064.22 |
| | | | PINEVILLE | LA | 71360 | SFR Owner Occupied | N | N | 85,467.65 | 2/11/2040 | 7.24% | 1 | 10/04/22 | 35,527.25 | 140,000.00 | Y | 0 | 140,000.00 | 65.00% | 35,527.25 | - | 35,527.25 |
| 312002088 | | | RY | IN | 46404 | SFR Owner Occupied | N | N | 95,822.57 | 4/1/2057 | 3.00% | 1 | 10/04/22 | 39,889.48 | 149,000.00 | Y | 0 | 149,000.00 | 65.00% | 39,889.48 | - | 39,889.48 |
| | | | NEW CASTLE | DE | 19720 | SFR Owner Occupied | N | N | 101,140.36 | 2/0/2039 | 8.00% | 1 | 10/04/22 | 42,103.39 | 345,000.00 | Y | 0 | 345,000.00 | 65.00% | 42,103.39 | - | 42,103.39 |
| 312002098 | | | SHREVEPORT | LA | 71109 | SFR Owner Occupied | N | N | 55,897.18 | 1/1/2040 | 7.70% | 1 | 10/04/22 | 24,269.35 | 51,000.00 | Y | 0 | 51,000.00 | 65.00% | 24,269.35 | - | 24,269.35 |
| | | | DOWNSVILLE | TX | 78531 | SFR Owner Occupied | N | N | 23,685.40 | 1/15/2039 | 6.00% | 1 | 10/04/22 | 9,352.19 | 64,900.00 | Y | 0 | 64,900.00 | 65.00% | 9,352.19 | - | 9,352.19 |
| 312002101 | | | RAYNE | LA | 70578 | SFR Owner Occupied | N | N | 33,951.13 | 3/15/2041 | 4.00% | 1 | 10/04/22 | 14,134.17 | 70,000.00 | Y | 0 | 70,000.00 | 65.00% | 14,134.17 | - | 14,134.17 |
| | | | JENNETTSVILLE | SC | 29512 | SFR Owner Occupied | N | N | 186,985.20 | 12/1/2045 | 5.13% | 1 | 10/04/22 | 77,889.02 | 60,000.00 | Y | 0 | 60,000.00 | 65.00% | 39,000.00 | - | 39,000.00 |
| 312002130 | | | HOLLIS | OK | 74550 | SFR Owner Occupied | N | N | 46,514.40 | 1/7/2015 | 12.20% | 1 | 10/04/22 | 19,462.81 | 74,000.00 | Y | 0 | 74,000.00 | 65.00% | 19,462.81 | - | 19,462.81 |
| 312002122 | | | INCAN | OK | 73530 | SFR Owner Occupied | N | N | 122,552.34 | 6/9/2048 | 11.61% | 1 | 10/04/22 | 51,016.67 | 74,400.00 | Y | 0 | 74,400.00 | 65.00% | 48,360.00 | - | 48,360.00 |
| | | | POLO | IL | 61064 | SFR Owner Occupied | N | N | 88,496.79 | 5/1/2048 | 8.99% | 1 | 10/04/22 | 36,809.87 | 90,640.00 | Y | 0 | 90,640.00 | 65.00% | 36,809.87 | - | 36,809.87 |
| 312002147 | | | MARTINS FERRY | OH | 43945 | SFR Owner Occupied | N | N | 64,556.85 | 12/30/2042 | 9.51% | 1 | 10/04/22 | 26,457.35 | 53,500.00 | Y | 0 | 53,500.00 | 65.00% | 26,457.35 | - | 26,457.35 |
| 312002154 | | | OLHOCTON | OH | 43812 | SFR Owner Occupied | N | N | 45,566.89 | 4/1/2042 | 4.50% | 1 | 10/04/22 | 18,968.80 | 48,000.00 | Y | 0 | 48,000.00 | 65.00% | 18,968.80 | - | 18,968.80 |
| | | | SATSUMA | AL | 36572 | SFR Owner Occupied | N | N | 70,561.60 | 9/19/2046 | 13.01% | 1 | 10/04/22 | 29,474.35 | 125,000.00 | Y | 0 | 125,000.00 | 65.00% | 29,474.35 | - | 29,474.35 |
| 312002177 | | | NEW BERN | NC | 28562 | SFR Owner Occupied | N | N | 55,381.27 | 1/15/2040 | 4.40% | 1 | 10/04/22 | 23,014.58 | 85,000.00 | Y | 0 | 85,000.00 | 65.00% | 23,014.58 | - | 23,014.58 |
| | | | BEAVERTOWN | PA | 17813 | SFR Owner Occupied | N | N | 107,688.78 | 4/1/2057 | 9.90% | 1 | 10/04/22 | 44,704.31 | 99,900.00 | Y | 0 | 99,900.00 | 65.00% | 44,704.31 | - | 44,704.31 |
| 312002182 | | | SSTROP | LA | 71220 | SFR Owner Occupied | N | N | 67,386.41 | 9/17/2045 | 11.09% | 1 | 10/04/22 | 28,010.41 | 43,500.00 | Y | 0 | 43,500.00 | 65.00% | 28,010.41 | - | 28,010.41 |
| | | | ENTON | OH | 43426 | SFR Owner Occupied | N | N | 82,518.47 | 4/1/2039 | 7.70% | 1 | 10/04/22 | 34,451.14 | 82,000.00 | Y | 0 | 82,000.00 | 65.00% | 34,451.14 | - | 34,451.14 |
| 312002203 | | | SCIOTOVILLE | OH | 45662 | SFR Owner Occupied | N | N | 33,048.65 | 4/10/2021 | 9.97% | 1 | 10/04/22 | 13,778.46 | 85,000.00 | Y | 0 | 85,000.00 | 65.00% | 13,778.46 | - | 13,778.46 |
| 312002208 | | | AVESVILLE | KY | 42048 | SFR Owner Occupied | N | N | 50,111.83 | 12/30/2021 | 10.76% | 1 | 10/04/22 | 20,860.79 | 125,000.00 | Y | 0 | 125,000.00 | 65.00% | 20,860.79 | - | 20,860.79 |
| | | | LIBERAL | KS | 67901 | SFR Owner Occupied | N | N | 63,008.14 | 6/1/2025 | 6.55% | 1 | 10/04/22 | 26,226.84 | 63,500.00 | Y | 0 | 63,500.00 | 65.00% | 26,226.84 | - | 26,226.84 |
| | | | AMARCUS | GA | 31709 | SFR Owner Occupied | N | N | 35,789.34 | 11/15/2040 | 11.38% | 1 | 10/04/22 | 14,898.56 | 64,500.00 | Y | 0 | 64,500.00 | 65.00% | 14,898.56 | - | 14,898.56 |
| 312002218 | | | PHILADELPHIA | PA | 19151 | SFR Owner Occupied | N | N | 101,440.03 | 1/5/2040 | 11.46% | 1 | 10/04/22 | 42,228.43 | 162,000.00 | Y | 0 | 162,000.00 | 65.00% | 42,228.43 | - | 42,228.43 |
| 312002224 | | | CALA | FL | 34475 | SFR Owner Occupied | N | N | 85,949.49 | 1/14/2021 | 11.34% | 1 | 10/04/22 | 34,965.24 | 53,000.00 | Y | 0 | 53,000.00 | 65.00% | 32,905.00 | - | 32,905.00 |
| | | | MOUNT GILEAD | OH | 43338 | SFR Owner Occupied | N | N | 82,039.86 | 1/1/2048 | 4.70% | 1 | 10/04/22 | 34,151.95 | 160,000.00 | Y | 0 | 160,000.00 | 65.00% | 34,151.95 | - | 34,151.95 |
| 312002238 | | | DERRY | VT | 05820 | SFR Owner Occupied | N | N | 104,186.89 | 4/10/2045 | 4.95% | 1 | 10/04/22 | 43,471.41 | 140,000.00 | Y | 0 | 140,000.00 | 65.00% | 43,471.41 | - | 43,471.41 |
| 312002245 | | | ALAND | AL | 36251 | SFR Owner Occupied | N | N | 50,780.45 | 9/20/2044 | 6.00% | 1 | 10/04/22 | 21,149.50 | 140,000.00 | Y | 0 | 140,000.00 | 65.00% | 21,149.50 | - | 21,149.50 |
| | | | AWANNA | HI | 96792 | SFR Owner Occupied | N | N | 82,346.13 | 7/9/2048 | 5.37% | 1 | 10/04/22 | 34,286.98 | 140,000.00 | Y | 0 | 140,000.00 | 65.00% | 34,286.98 | - | 34,286.98 |
| | | | SAMSON | AL | 35085 | SFR Owner Occupied | N | N | 55,088.80 | 9/1/2034 | 5.85% | 1 | 10/04/22 | 22,942.64 | 140,000.00 | Y | 0 | 140,000.00 | 65.00% | 22,942.64 | - | 22,942.64 |
| 312002249 | | | MOUNT PLEASANT | TX | 75455 | SFR Owner Occupied | N | N | 107,705.92 | 7/11/2028 | 8.99% | 1 | 10/04/22 | 44,846.84 | 155,000.00 | Y | 0 | 155,000.00 | 65.00% | 44,846.84 | - | 44,846.84 |
| 312002251 | | | ISTON | LA | 71279 | SFR Owner Occupied | N | N | 56,457.30 | 4/5/2024 | 5.00% | 1 | 10/04/22 | 23,501.48 | 44,000.00 | Y | 0 | 23,501.48 | 65.00% | 23,501.48 | - | 23,501.48 |
| | | | EINARDSVILLE | NC | 28349 | SFR Owner Occupied | N | N | 35,042.36 | 4/1/2042 | 13.74% | 1 | 10/04/22 | 14,584.64 | 122,000.00 | Y | 0 | 122,000.00 | 65.00% | 14,584.64 | - | 14,584.64 |
| 312002266 | | | OGDENSBERG | WI | 54962 | SFR Owner Occupied | N | N | 146,147.26 | 8/15/2045 | 8.00% | 1 | 10/04/22 | 60,848.84 | 59,000.00 | Y | 0 | 59,000.00 | 65.00% | 38,450.00 | - | 38,450.00 |
| 312002278 | | | RINGGOLD | IL | 62704 | SFR Owner Occupied | N | N | 71,808.62 | 1/24/2016 | 15.00% | 1 | 10/04/22 | 29,971.60 | 13,000.00 | Y | 0 | 13,000.00 | 65.00% | 8,450.00 | - | 8,450.00 |
| | | | LINCOLNTON | GA | 30817 | SFR Owner Occupied | N | N | 64,350.98 | 4/1/2058 | 6.00% | 1 | 10/04/22 | 26,746.71 | 175,000.00 | Y | 0 | 175,000.00 | 65.00% | 26,746.71 | - | 26,746.71 |
| 312002647 | | | RIVERDALE | IL | 60827 | SFR Owner Occupied | N | N | 285,251.29 | 9/1/2046 | 10.40% | 1 | 10/04/22 | 118,765.77 | 99,000.00 | Y | 0 | 99,000.00 | 65.00% | 64,350.00 | - | 64,350.00 |
| | | | CLINTON | SC | 29425 | SFR Owner Occupied | N | N | 57,396.44 | 4/1/2039 | 5.00% | 1 | 10/04/22 | 23,896.26 | 15,000.00 | Y | 0 | 15,000.00 | 65.00% | 9,750.00 | - | 9,750.00 |
| 312002648 | | | ICKVILLE | LA | 63448 | SFR Owner Occupied | N | N | 58,480.97 | 4/5/2049 | 6.00% | 1 | 10/04/22 | 24,364.74 | 125,000.00 | Y | 0 | 125,000.00 | 65.00% | 24,364.74 | - | 24,364.74 |
| 312002675 | | | MONROE | LA | 71202 | SFR Owner Occupied | N | N | 26,582.38 | 1/1/2056 | 12.45% | 1 | 10/04/22 | 11,065.85 | 75,000.00 | Y | 0 | 75,000.00 | 65.00% | 11,065.85 | - | 11,065.85 |
| 312002677 | | | ENA | TX | 77613 | SFR Owner Occupied | N | N | 51,580.5 | 6/1/2028 | 9.00% | 1 | 10/04/22 | 21,471.04 | 160,000.00 | Y | 0 | 160,000.00 | 65.00% | 21,471.04 | - | 21,471.04 |
| | | | ENA | TX | 77613 | SFR Owner Occupied | N | N | 54,283.62 | 6/1/2032 | 9.88% | 1 | 10/04/22 | 22,597.44 | 110,000.00 | Y | 0 | 110,000.00 | 65.00% | 22,597.44 | - | 22,597.44 |
| | | | LAST SAINT | IL | 62205 | SFR Owner Occupied | N | N | 38,026.68 | 8/19/2042 | 10.00% | 1 | 10/04/22 | 15,841.18 | 28,000.00 | Y | 0 | 28,000.00 | 65.00% | 15,841.18 | - | 15,841.18 |
| | | | INDEPENDENCE | LA | 70443 | SFR Owner Occupied | N | N | 78,341.44 | 7/1/2029 | 6.00% | 1 | 10/04/22 | 32,570.71 | 110,000.00 | Y | 0 | 110,000.00 | 65.00% | 32,570.71 | - | 32,570.71 |
| 312002695 | | | FORT FAIRFIELD | ME | 04742 | SFR Owner Occupied | N | N | 34,405.64 | 1/1/2050 | 2.40% | 1 | 10/04/22 | 14,405.80 | 71,000.00 | Y | 0 | 71,000.00 | 65.00% | 14,405.80 | - | 14,405.80 |
| 312002698 | | | ALLAS | TX | 75230 | SFR Owner Occupied | N | N | 52,089.37 | 8/10/2046 | 10.00% | 1 | 10/04/22 | 21,683.67 | 55,000.00 | Y | 0 | 21,683.67 | 65.00% | 21,683.67 | - | 21,683.67 |
| 312002704 | | | PINEVILLE | LA | 71360 | SFR Owner Occupied | N | N | 28,650.50 | 5/1/2036 | 12.00% | 1 | 10/04/22 | 11,940.11 | 35,000.00 | Y | 0 | 11,940.11 | 65.00% | 11,940.11 | - | 11,940.11 |
| | | | INDEPENDENCE | LA | 70443 | SFR Owner Occupied | N | N | 53,196.98 | 10/1/2026 | 10.55% | 1 | 10/04/22 | 22,145.05 | 72,000.00 | Y | 0 | 72,000.00 | 65.00% | 22,145.05 | - | 22,145.05 |
| 4MAYO | | | MAYO | NM | 87522 | SFR Owner Occupied | N | N | 73,777.69 | 11/30/2039 | 8.69% | 1 | 10/04/22 | 30,712.53 | 57,000.00 | Y | 0 | 57,000.00 | 65.00% | 30,712.53 | - | 30,712.53 |
| | | | CHICAGO | IL | 60628 | SFR Owner Occupied | N | N | 175,607.80 | 5/14/2046 | 7.88% | 1 | 10/04/22 | 73,102.85 | 225,000.00 | Y | 0 | 73,102.85 | 65.00% | 73,102.85 | - | 73,102.85 |
| 312002862 | | | ALPINE | AL | 35014 | SFR Owner Occupied | N | N | 33,311.66 | 11/15/2022 | 6.00% | 1 | 10/04/22 | 9,882.64 | 90,000.00 | Y | 0 | 90,000.00 | 65.00% | 9,882.64 | - | 9,882.64 |
| | | | CLIMAX | GA | 39834 | SFR Owner Occupied | N | N | 16,534.12 | 9/5/2029 | 9.50% | 1 | 10/04/22 | 6,882.49 | 140,000.00 | Y | 0 | 140,000.00 | 65.00% | 6,882.49 | - | 6,882.49 |
| | | | ALTON | IL | 62002 | SFR Owner Occupied | N | N | 82,967.16 | 1/18/2025 | 10.18% | 1 | 10/04/22 | 34,724.94 | 37,000.00 | Y | 0 | 37,000.00 | 65.00% | 24,050.00 | - | 24,050.00 |
| 312002863 | | | NEW IBERIA | LA | 70563 | SFR Owner Occupied | N | N | 84,936.30 | 10/1/2041 | 10.70% | 1 | 10/04/22 | 34,535.04 | 75,000.00 | Y | 0 | 75,000.00 | 65.00% | 34,535.04 | - | 34,535.04 |
| 312002886 | | | NIVERSAL CITY | TX | 78148 | SFR Owner Occupied | N | N | 57,496.36 | 7/0/2044 | 5.28% | 1 | 10/04/22 | 23,944.82 | 144,000.00 | Y | 0 | 144,000.00 | 65.00% | 23,944.82 | - | 23,944.82 |
| | | | AUBURN | KY | 42206 | SFR Owner Occupied | N | N | 24,401.48 | 12/15/2022 | 9.75% | 1 | 10/04/22 | 10,157.97 | 42,000.00 | Y | 0 | 42,000.00 | 65.00% | 10,157.97 | - | 10,157.97 |
| 312002894 | | | WRENS | GA | 30833 | SFR Owner Occupied | N | N | 16,566.47 | 10/17/2015 | 10.55% | 1 | 10/04/22 | 6,896.37 | 114,000.00 | Y | 0 | 114,000.00 | 65.00% | 6,896.37 | - | 6,896.37 |
| 312002897 | | | SAMSON | AL | 36477 | SFR Owner Occupied | N | N | 9,796.28 | 10/15/2044 | 6.00% | 1 | 10/04/22 | 4,078.07 | 64,678.91 | Y | 0 | 64,678.91 | 65.00% | 4,078.07 | - | 4,078.07 |
| | | | OUTMAN | NC | 28166 | SFR Owner Occupied | N | N | 35,261.71 | 4/14/2015 | 10.00% | 1 | 10/04/22 | 14,678.91 | 64,000.00 | Y | 0 | 64,000.00 | 65.00% | 14,678.91 | - | 14,678.91 |
| 312002907 | | | ATLANTA | GA | 30354 | SFR Owner Occupied | N | N | 146,310.01 | 1/1/2024 | 5.00% | 1 | 10/04/22 | 56,761.78 | 195,000.00 | Y | 0 | 56,761.78 | 65.00% | 56,761.78 | - | 56,761.78 |
| | | | WALLACE | SC | 29596 | SFR Owner Occupied | N | N | 21,280.62 | 11/1/2027 | 8.24% | 1 | 10/04/22 | 8,858.80 | 79,900.00 | Y | 0 | 79,900.00 | 65.00% | 8,858.80 | - | 8,858.80 |
| 312002910 | | | SUMMERBY | NC | 28051 | SFR Owner Occupied | N | N | 59,200.38 | 10/7/2048 | 12.41% | 1 | 10/04/22 | 24,644.17 | 35,000.00 | Y | 0 | 22,750.00 | 65.00% | 22,750.00 | - | 22,750.00 |
| 312002917 | | | OAKDALE | LA | 71463 | SFR Owner Occupied | N | N | 10,317.42 | 4/21/2018 | 5.00% | 1 | 10/04/22 | 4,293.26 | 110,000.00 | Y | 0 | 110,000.00 | 65.00% | 4,293.26 | - | 4,293.26 |
| | | | TICKHAM | LA | 70466 | SFR Owner Occupied | N | N | 84,808.12 | 3/1/2040 | 6.00% | 1 | 10/04/22 | 35,282.66 | 160,000.00 | Y | 0 | 160,000.00 | 65.00% | 35,282.66 | - | 35,282.66 |
| 312002921 | | | ENTON | MI | 49072 | SFR Owner Occupied | N | N | 33,576.89 | 10/1/2042 | 6.17% | 1 | 10/04/22 | 14,977.55 | 157,000.00 | Y | 0 | 157,000.00 | 65.00% | 14,977.55 | - | 14,977.55 |
| 312002938 | | | NEW BERN | NC | 28536 | SFR Owner Occupied | N | N | 10,848.78 | 1/1/2046 | 5.00% | 1 | 10/04/22 | 4,512.02 | 60,000.00 | Y | 0 | 60,000.00 | 65.00% | 4,512.02 | - | 4,512.02 |
| 312002934 | | | ST ALBANS | WV | 25177 | SFR Owner Occupied | N | N | 17,551.28 | 6/0/2028 | 6.00% | 1 | 10/04/22 | 7,551.20 | 8,640.00 | Y | 0 | 8,640.00 | 65.00% | 7,551.20 | - | 7,551.20 |
| | | | MS | TX | 75642 | SFR Owner Occupied | N | N | 22,253.50 | 10/1/2036 | 6.00% | 1 | 10/04/22 | 9,264.63 | 105,000.00 | Y | 0 | 105,000.00 | 65.00% | 9,264.63 | - | 9,264.63 |
| | | | SAB OAKS | FL | 47961 | SFR Owner Occupied | N | N | 29,635.88 | 7/15/2046 | 6.50% | 1 | 10/04/22 | 12,382.78 | 125,000.00 | Y | 0 | 125,000.00 | 65.00% | 12,382.78 | - | 12,382.78 |
| 312002648 | | | BLACKSTONE | VA | 23824 | SFR Owner Occupied | N | N | 58,470.97 | 7/5/2050 | 6.50% | 1 | 10/04/22 | 24,298.95 | 89,000.00 | Y | 0 | 89,000.00 | 65.00% | 24,298.95 | - | 24,298.95 |
| | | | DEL RIO | TX | 78840 | SFR Owner Occupied | N | N | 20,148.12 | 9/1/2028 | 4.50% | 1 | 10/04/22 | 11,990.53 | 110,000.00 | Y | 0 | 11,990.53 | 65.00% | 11,990.53 | - | 11,990.53 |
| 312002956 | | | ILTMORE | MD | 21215 | SFR Owner Occupied | N | N | 357,961.64 | 8/1/2048 | 8.50% | 1 | 10/04/22 | 162,462.59 | 210,000.00 | Y | 0 | 210,000.00 | 65.00% | 162,462.59 | - | 162,462.59 |
| 312002964 | | | CLEVELAND | OH | 44133 | SFR Owner Occupied | N | N | 74,388.64 | 1/14/2015 | 6.50% | 1 | 10/04/22 | 30,966.86 | 50,000.00 | Y | 0 | 30,966.86 | 65.00% | 30,966.86 | - | 30,966.86 |
| | | | STONY POINT | NC | 28678 | SFR Owner Occupied | N | N | 89,805.90 | 2/1/2050 | 3.00% | 1 | 10/04/22 | 37,884.80 | 58,000.00 | Y | 0 | 58,000.00 | 65.00% | 37,884.80 | - | 37,884.80 |

| Note Number | Borrower Name | Property Street | Property City | Property State | Property Zip Code | Property Type Category | Ground Up Construction | REO | Note Balance | Maturity Date | Note Rate | Lien Position | Valuation Date | Cost Basis | Property Value | 3rd Party Valuation | Dwell Time (Days) | Eligible Collateral Value | Advance Rate | Amount Eligible to be Advanced | Amount Outstanding | Additional Capacity |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

| Note Number | Borrower Name | Property Street | Property City | Property State | Property Zip Code | Property Type Category | Ground Up Construction | REO | Note Balance | Maturity Date | Note Rate | Lien Position | Valuation Date | Cost Basis | Property Value | 3rd Party Valuation | Dwell Time (Days) | Eligible Collateral Value | Advance Rate | Amount Eligible to be Advanced | Amount Outstanding | Additional Capacity |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2000000550 | | | SAN ANTONIO | TX | 78234 | SFR Owner Occupied | N | N | 12,970.95 | 9/1/2031 | 4.00% | 1 | 10/04/22 | 5,399.61 | 91,000.00 | Y | 0 | 91,000.00 | 65.00% | 5,399.61 | - | 5,399.61 |
| | | | CARLISLE | SC | 29031 | SFR Owner Occupied | N | N | 21,885.78 | 9/1/2057 | 4.33% | 1 | 10/04/22 | 9,110.70 | 45,000.00 | Y | 0 | 45,000.00 | 65.00% | 9,110.70 | - | 9,110.70 |
| 2000000559 | | | PANTOLA | IL | 61866 | SFR Owner Occupied | N | N | 50,976.67 | 7/21/2039 | 6.75% | 1 | 10/04/22 | 21,177.94 | 68,100.00 | Y | 0 | 68,100.00 | 65.00% | 21,177.94 | - | 21,177.94 |
| 2000000565 | | | SHREVEPORT | LA | 71109 | SFR Owner Occupied | N | N | 18,417.51 | 10/1/2028 | 6.75% | 1 | 10/04/22 | 7,754.21 | 28,000.00 | Y | 0 | 28,000.00 | 65.00% | 7,754.21 | - | 7,754.21 |
| | | | BATON ROUGE | LA | 70813 | SFR Owner Occupied | N | N | 68,164.51 | 7/1/2038 | 4.00% | 1 | 10/04/22 | 28,375.85 | 57,450.00 | Y | 0 | 57,450.00 | 65.00% | 28,375.85 | - | 28,375.85 |
| 2000000583 | | | NEW ORLEANS | LA | 70131 | SFR Owner Occupied | N | N | 40,149.00 | 12/20/2015 | 7.25% | 1 | 10/04/22 | 16,714.42 | 55,000.00 | Y | 0 | 55,000.00 | 65.00% | 16,714.42 | - | 16,714.42 |
| 2000000584 | | | JASPER | FL | 32052 | SFR Owner Occupied | N | N | 47,336.40 | 7/20/2040 | 4.75% | 1 | 10/04/22 | 19,700.43 | 100,000.00 | Y | 0 | 100,000.00 | 65.00% | 19,700.43 | - | 19,700.43 |
| | | | FALLON | IL | 62249 | SFR Owner Occupied | N | N | 138,882.62 | 8/1/2046 | 7.75% | 1 | 10/04/22 | 57,814.73 | 85,000.00 | Y | 0 | 85,000.00 | 65.00% | 55,000.00 | - | 55,350.00 |
| | | | LITTLE ROCK | AR | 72209 | SFR Owner Occupied | N | N | 26,017.99 | 8/1/2040 | 4.00% | 1 | 10/04/22 | 10,840.89 | 88,500.00 | Y | 0 | 88,500.00 | 65.00% | 10,840.89 | - | 10,840.89 |
| | | | HELENA | GA | 31047 | SFR Owner Occupied | N | N | 65,950.88 | 5/1/2058 | 3.18% | 1 | 10/04/22 | 27,454.44 | 78,900.00 | Y | 0 | 78,900.00 | 65.00% | 27,454.44 | - | 27,454.44 |
| 2000000588 | | | PADUCAH | KY | 42001 | SFR Owner Occupied | N | N | 58,044.05 | 9/1/2051 | 2.00% | 1 | 10/04/22 | 24,162.44 | 64,000.00 | Y | 0 | 64,000.00 | 65.00% | 24,162.44 | - | 24,162.44 |
| 2000000603 | | | KEE | LA | 70714 | SFR Owner Occupied | N | N | 146,605.85 | 1/1/2037 | 4.00% | 1 | 10/04/22 | 61,029.78 | 214,600.00 | Y | 0 | 214,600.00 | 65.00% | 61,029.78 | - | 61,029.78 |
| 2000000609 | | | WINNSBORO | SC | 29180 | SFR Owner Occupied | N | N | 464,797.17 | 5/1/2045 | 4.00% | 1 | 10/04/22 | 234,750.83 | 495,700.00 | Y | 0 | 495,700.00 | 65.00% | 234,750.83 | - | 234,750.83 |
| 2000000680 | | | NEW ORLEANS | LA | 70126 | SFR Owner Occupied | N | N | 118,511.09 | 8/1/2038 | 10.50% | 1 | 10/04/22 | 49,751.60 | 280,000.00 | Y | 0 | 280,000.00 | 65.00% | 49,751.60 | - | 49,751.60 |
| 2000001014 | | | LEROALE | IL | 62410 | SFR Owner Occupied | N | N | 85,011.93 | 7/24/2036 | 4.00% | 1 | 10/04/22 | 14,694.47 | 45,000.00 | Y | 0 | 45,000.00 | 65.00% | 14,694.47 | - | 14,694.47 |
| | | | LUCAMA | NC | 27851 | SFR Owner Occupied | N | N | 38,486.27 | 3/1/1978 | 4.63% | 1 | 10/04/22 | 16,021.25 | 79,000.00 | Y | 0 | 79,000.00 | 65.00% | 16,021.25 | - | 16,021.25 |
| | | | CHAPARRAL | NM | 88081 | SFR Owner Occupied | N | N | 174,058.77 | 2/10/2021 | 14.21% | 1 | 10/04/22 | 72,061.76 | 40,000.00 | Y | 0 | 40,000.00 | 65.00% | 19,500.00 | - | 19,500.00 |
| | | | HOLDEN | WV | 25625 | SFR Owner Occupied | N | N | 23,844.9 | 4/1/2012 | 4.50% | 1 | 10/04/22 | 9,921.71 | 12,000.00 | Y | 0 | 12,000.00 | 65.00% | 7,800.00 | - | 7,800.00 |
| 2000001024 | | | CROSS | VA | 28950 | SFR Owner Occupied | N | N | 28,964.61 | 12/1/2034 | 3.88% | 1 | 10/04/22 | 12,054.61 | 48,000.00 | Y | 0 | 48,000.00 | 65.00% | 12,054.61 | - | 12,054.61 |
| 2000001027 | | | EASTLAKE | OH | 44095 | SFR Owner Occupied | N | N | 108,705.34 | 10/28/2047 | 11.22% | 1 | 10/04/22 | 45,264.82 | 205,000.00 | Y | 0 | 205,000.00 | 65.00% | 45,264.82 | - | 45,264.82 |
| 2000001031 | | | GREENSBURG | KY | 42743 | SFR Owner Occupied | N | N | 33,849.03 | 11/1/2048 | 5.31% | 1 | 10/04/22 | 14,090.06 | 150,000.00 | Y | 0 | 150,000.00 | 65.00% | 14,090.06 | - | 14,090.06 |
| | | | ONTGOMERY | AL | 36108 | SFR Owner Occupied | N | N | 11,719.84 | 11/1/2039 | 3.50% | 1 | 10/04/22 | 4,878.58 | 10,000.00 | Y | 0 | 10,000.00 | 65.00% | 4,878.58 | - | 4,878.58 |
| | | | GREENWOOD | FL | 32443 | SFR Owner Occupied | N | N | 19,999.40 | 8/15/2026 | 7.01% | 1 | 10/04/22 | 8,325.44 | 99,000.00 | Y | 0 | 99,000.00 | 65.00% | 8,325.44 | - | 8,325.44 |
| | | | WILMINGTON | NC | 28405 | SFR Owner Occupied | N | N | 16,476.95 | 6/1/2029 | 2.00% | 1 | 10/04/22 | 7,067.24 | 84,000.00 | Y | 0 | 84,000.00 | 65.00% | 7,067.24 | - | 7,067.24 |
| 2000001049 | | | LOUISVILLE | MS | 39339 | SFR Owner Occupied | N | N | 22,686.9 | 1/1/2037 | 4.50% | 1 | 10/04/22 | 9,444.24 | 100,000.00 | Y | 0 | 100,000.00 | 65.00% | 9,444.24 | - | 9,444.24 |
| 2000001050 | | | KOUCAN | KY | 42001 | SFR Owner Occupied | N | N | 70,507.52 | 4/30/2040 | 5.00% | 1 | 10/04/22 | 29,451.20 | 45,000.00 | Y | 0 | 45,000.00 | 65.00% | 29,250.00 | - | 29,250.00 |
| | | | WINNEGAN | ME | 04976 | SFR Owner Occupied | N | N | 177,221.47 | 4/14/2039 | 10.48% | 1 | 10/04/22 | 73,774.60 | 85,000.00 | Y | 0 | 85,000.00 | 65.00% | 55,250.00 | - | 55,250.00 |
| 2000001056 | | | WINDSOR | NC | 27983 | SFR Owner Occupied | N | N | 90,226.6 | 4/1/2042 | 8.48% | 1 | 10/04/22 | 37,554.99 | 51,000.00 | Y | 0 | 51,000.00 | 65.00% | 33,150.00 | - | 33,150.00 |
| 2000001057 | | | SIBORO | NC | 27886 | SFR Owner Occupied | N | N | 51,761.67 | 5/4/2037 | 8.00% | 1 | 10/04/22 | 21,539.88 | 84,000.00 | Y | 0 | 84,000.00 | 65.00% | 21,539.88 | - | 21,539.88 |
| | | | BATSCEY | VA | 24251 | SFR Owner Occupied | N | N | 36,195.40 | 2/30/2028 | 9.61% | 1 | 10/04/22 | 15,067.55 | 79,000.00 | Y | 0 | 79,000.00 | 65.00% | 15,067.55 | - | 15,067.55 |
| | | | PINEVILLE | LA | 71360 | SFR Owner Occupied | N | N | 40,610.57 | 12/5/2023 | 7.50% | 1 | 10/04/22 | 16,905.56 | 85,000.00 | Y | 0 | 85,000.00 | 65.00% | 16,905.56 | - | 16,905.56 |
| 2000001062 | | | FAIRMONT | NC | 28340 | SFR Owner Occupied | N | N | 35,736.94 | 3/1/2026 | 4.00% | 1 | 10/04/22 | 14,875.91 | 47,500.00 | Y | 0 | 47,500.00 | 65.00% | 14,875.91 | - | 14,875.91 |
| 2000001064 | | | IWTON | IL | 62448 | SFR Owner Occupied | N | N | 55,884.88 | 1/1/2061 | 4.25% | 1 | 10/04/22 | 24,264.86 | 40,000.00 | Y | 0 | 40,000.00 | 65.00% | 19,500.00 | - | 19,500.00 |
| | | | APOPKA | FL | 32712 | SFR Owner Occupied | N | N | 70,175.01 | 10/1/2040 | 4.00% | 1 | 10/04/22 | 29,212.79 | 25,000.00 | Y | 0 | 25,000.00 | 65.00% | 16,250.00 | - | 16,250.00 |
| 2000001070 | | | ROBERTSDALE | AL | 36567 | SFR Owner Occupied | N | N | 15,036.55 | 1/10/2026 | 4.50% | 1 | 10/04/22 | 6,260.43 | 95,000.00 | Y | 0 | 95,000.00 | 65.00% | 6,260.43 | - | 6,260.43 |
| 2000001072 | | | TIS | MA | 01253 | SFR Owner Occupied | N | N | 99,815.41 | 5/28/2052 | 5.00% | 1 | 10/04/22 | 41,555.80 | 120,000.00 | Y | 0 | 120,000.00 | 65.00% | 41,555.80 | - | 41,555.80 |
| | | | EFFINGHAM | SC | 29541 | SFR Owner Occupied | N | N | 67,701.00 | 10/5/2045 | 5.00% | 1 | 10/04/22 | 28,183.73 | 170,000.00 | Y | 0 | 170,000.00 | 65.00% | 28,183.73 | - | 28,183.73 |
| 2000001080 | | | MOBILE | AL | 36604 | SFR Owner Occupied | N | N | 41,503.38 | 7/1/2077 | 15.35% | 1 | 10/04/22 | 17,277.44 | 115,000.00 | Y | 0 | 115,000.00 | 65.00% | 17,277.44 | - | 17,277.44 |
| | | | MACON | GA | 31206 | SFR Owner Occupied | N | N | 36,300.28 | 10/1/2040 | 4.00% | 1 | 10/04/22 | 15,111.23 | 54,900.00 | Y | 0 | 54,900.00 | 65.00% | 15,111.23 | - | 15,111.23 |
| 2000001092 | | | DRIVERS | LA | 70419 | SFR Owner Occupied | N | N | 154,428.77 | 11/1/2042 | 4.00% | 1 | 10/04/22 | 64,265.34 | 61,750.00 | Y | 0 | 61,750.00 | 65.00% | 61,750.00 | - | 61,750.00 |
| | | | SOUTH CHINA | ME | 04358 | SFR Owner Occupied | N | N | 100,555.21 | 6/1/2032 | 8.75% | 1 | 10/04/22 | 41,859.60 | 140,000.00 | Y | 0 | 140,000.00 | 65.00% | 41,859.60 | - | 41,859.60 |
| | | | CAMDEN | MS | 39045 | SFR Owner Occupied | N | N | 14,153.58 | 4/1/2040 | 10.78% | 1 | 10/04/22 | 5,892.28 | 44,000.00 | Y | 0 | 44,000.00 | 65.00% | 5,892.28 | - | 5,892.28 |
| 2000001110 | | | VELLAND | TX | 79336 | SFR Owner Occupied | N | N | 17,226.14 | 2/5/2025 | 5.22% | 1 | 10/04/22 | 7,171.24 | 184,000.00 | Y | 0 | 184,000.00 | 65.00% | 7,171.24 | - | 7,171.24 |
| | | | LIZARD | TX | 77964 | SFR Owner Occupied | N | N | 37,739.34 | 4/1/2051 | 3.25% | 1 | 10/04/22 | 15,701.99 | 76,000.00 | Y | 0 | 76,000.00 | 65.00% | 15,701.99 | - | 15,701.99 |
| 2000001122 | | | QUITMAN | TX | 75783 | SFR Owner Occupied | N | N | 41,926.71 | 7/1/2043 | 4.00% | 1 | 10/04/22 | 24,366.74 | 50,000.00 | Y | 0 | 50,000.00 | 65.00% | 24,366.74 | - | 24,366.74 |
| 2000001180 | | | PHARR | TX | 78577 | SFR Owner Occupied | N | N | 28,102.41 | 12/22/2040 | 9.83% | 1 | 10/04/22 | 11,698.61 | 61,000.00 | Y | 0 | 61,000.00 | 65.00% | 11,698.61 | - | 11,698.61 |
| | | | SOMSON | GA | 30824 | SFR Owner Occupied | N | N | 33,669.89 | 5/23/2042 | 15.68% | 1 | 10/04/22 | 14,175.16 | 89,900.00 | Y | 0 | 89,900.00 | 65.00% | 14,175.16 | - | 14,175.16 |
| 2000001185 | | | BASTROP | LA | 71220 | SFR Owner Occupied | N | N | 27,980.68 | 4/5/2046 | 4.25% | 1 | 10/04/22 | 11,647.94 | 117,400.00 | Y | 0 | 117,400.00 | 65.00% | 11,647.94 | - | 11,647.94 |
| 2000001146 | | | FORT WAYNE | IN | 46808 | SFR Owner Occupied | N | N | 271,291.99 | 6/17/2045 | 4.00% | 1 | 10/04/22 | 127,889.00 | 167,000.00 | Y | 0 | 167,000.00 | 65.00% | 15,634.29 | - | 11,614.29 |
| | | | GRAHAM SPRINGS | LA | 70706 | SFR Owner Occupied | N | N | 41,388.05 | 11/1/2040 | 3.25% | 1 | 10/04/22 | 13,482.65 | 67,000.00 | Y | 0 | 67,000.00 | 65.00% | 13,482.65 | - | 13,482.65 |
| 2000001202 | | | FRANKLINTON | LA | 70438 | SFR Owner Occupied | N | N | 42,626.71 | 6/2/2026 | 4.87% | 1 | 10/04/22 | 17,870.90 | 85,000.00 | Y | 0 | 85,000.00 | 65.00% | 17,870.90 | - | 17,870.90 |
| 2000001304 | | | BROCKLET | GA | 30415 | SFR Owner Occupied | N | N | 48,646.72 | 7/10/2042 | 11.00% | 1 | 10/04/22 | 20,273.58 | 66,000.00 | Y | 0 | 66,000.00 | 65.00% | 20,273.58 | - | 20,273.58 |
| | | | CLINTON | MA | 02790 | SFR Owner Occupied | N | N | 341,096.41 | 10/18/2021 | 4.88% | 1 | 10/04/22 | 242,530.62 | 374,700.00 | Y | 0 | 374,700.00 | 65.00% | 242,905.00 | - | 242,905.00 |
| 2000001307 | | | JEFFERSON | TX | 75657 | SFR Owner Occupied | N | N | 42,841.80 | 11/1/2040 | 10.74% | 1 | 10/04/22 | 17,885.22 | 95,000.00 | Y | 0 | 95,000.00 | 65.00% | 17,885.22 | - | 17,885.22 |
| 2000001215 | | | MEMPHIS | TN | 38109 | SFR Owner Occupied | N | N | 63,744.84 | 7/5/2046 | 10.16% | 1 | 10/04/22 | 26,516.65 | 55,000.00 | Y | 0 | 55,000.00 | 65.00% | 26,516.65 | - | 26,516.65 |
| | | | ICHMOND | VA | 47574 | SFR Owner Occupied | N | N | 62,020.67 | 7/15/2046 | 5.00% | 1 | 10/04/22 | 25,243.79 | 75,000.00 | Y | 0 | 75,000.00 | 65.00% | 25,243.79 | - | 25,243.79 |
| | | | DELTON | PA | 17847 | SFR Owner Occupied | N | N | 94,349.80 | 6/1/2024 | 4.00% | 1 | 10/04/22 | 39,276.49 | 109,000.00 | Y | 0 | 109,000.00 | 65.00% | 39,276.49 | - | 39,276.49 |
| | | | LYNCHBURG | VA | 24504 | SFR Owner Occupied | N | N | 50,098.91 | 10/1/2043 | 4.00% | 1 | 10/04/22 | 30,855.41 | 65,000.00 | Y | 0 | 65,000.00 | 65.00% | 30,855.41 | - | 30,855.41 |
| 2000001344 | | | MAYWOOD | IL | 60153 | SFR Owner Occupied | N | N | 402,190.90 | 4/5/2049 | 5.00% | 1 | 10/04/22 | 167,467.5 | 228,000.00 | Y | 0 | 228,000.00 | 65.00% | 148,200.00 | - | 148,200.00 |
| 2000001346 | | | WEST SPRINGFIELD | MA | 01089 | SFR Owner Occupied | N | N | 104,845.68 | 2/3/2048 | 4.88% | 1 | 10/04/22 | 93,647.17 | 250,000.00 | Y | 0 | 250,000.00 | 65.00% | 93,647.17 | - | 93,647.17 |
| 2000001354 | | | NEW BEDFORD | MA | 02740 | SFR Owner Occupied | N | N | 29,267.23 | 10/26/2025 | 7.25% | 1 | 10/04/22 | 12,183.40 | 129,092.83 | Y | 0 | 129,092.83 | 65.00% | 12,183.40 | - | 12,183.40 |
| | | | ALTON | MA | 03236 | SFR Owner Occupied | N | N | 659,147.57 | 11/1/2045 | 5.50% | 1 | 10/04/22 | 261,729.84 | 303,675.00 | Y | 0 | 303,675.00 | 65.00% | 197,488.75 | - | 197,488.75 |
| | | | ERMAN | CA | 93640 | SFR Owner Occupied | N | N | 289,557.54 | 9/1/2048 | 4.00% | 1 | 10/04/22 | 208,185.72 | 435,000.00 | Y | 0 | 435,000.00 | 65.00% | 208,185.72 | - | 208,185.72 |
| 2000001357 | | | BALTIMORE | MD | 21218 | SFR Owner Occupied | N | N | 71,914.70 | 2/1/2040 | 4.24% | 1 | 10/04/22 | 29,884.58 | 110,000.00 | Y | 0 | 110,000.00 | 65.00% | 29,884.58 | - | 29,884.58 |
| | | | UNION | MO | 64084 | SFR Owner Occupied | N | N | 28,092.25 | 5/1/2034 | 10.70% | 1 | 10/04/22 | 11,684.48 | 115,000.00 | Y | 0 | 115,000.00 | 65.00% | 11,684.48 | - | 11,684.48 |
| 2000001358 | | | SIBORO | NC | 27886 | SFR Owner Occupied | N | N | 76,187.80 | 6/1/2042 | 3.88% | 1 | 10/04/22 | 31,699.96 | 114,000.00 | Y | 0 | 114,000.00 | 65.00% | 31,699.96 | - | 31,699.96 |
| 2000001364 | | | DAYKOT | SC | 40824 | SFR Owner Occupied | N | N | 13,269.05 | 5/1/2026 | 4.00% | 1 | 10/04/22 | 5,334.04 | 60,000.00 | Y | 0 | 60,000.00 | 65.00% | 5,334.04 | - | 5,334.04 |
| | | | NEW BERN | TN | 48059 | SFR Owner Occupied | N | N | 44,544.40 | 10/4/2042 | 5.00% | 1 | 10/04/22 | 18,541.76 | 74,900.00 | Y | 0 | 74,900.00 | 65.00% | 18,541.76 | - | 18,541.76 |
| 2000001265 | | | AYNESBORO | GA | 30830 | SFR Owner Occupied | N | N | 44,533.74 | 6/1/2040 | 4.12% | 1 | 10/04/22 | 14,855.17 | 70,000.00 | Y | 0 | 70,000.00 | 65.00% | 14,855.17 | - | 14,855.17 |
| | | | THOMASVILLE | GA | 31792 | SFR Owner Occupied | N | R | 44,024.40 | 6/1/2041 | 5.00% | 1 | 10/04/22 | 17,910.52 | 85,000.00 | Y | 0 | 85,000.00 | 65.00% | 17,910.52 | - | 17,910.52 |
| 2000001272 | | | JACKSONVILLE | FL | 32218 | SFR Owner Occupied | N | N | 102,018.01 | 6/1/2039 | 7.25% | 1 | 10/04/22 | 42,468.54 | 195,000.00 | Y | 0 | 195,000.00 | 65.00% | 42,468.54 | - | 42,468.54 |
| | | | BOWIE | MD | 20720 | SFR Owner Occupied | N | N | 598,642.5 | 12/1/2049 | 5.00% | 1 | 10/04/22 | 478,756.7 | 859,400.00 | Y | 0 | 859,400.00 | 65.00% | 478,756.77 | - | 478,756.77 |
| 2000001274 | | | LARKER | OH | 44694 | SFR Owner Occupied | N | N | 27,644.24 | 6/1/2040 | 3.88% | 1 | 10/04/22 | 11,504.71 | 85,000.00 | Y | 0 | 85,000.00 | 65.00% | 11,504.71 | - | 11,504.71 |
| 2000001275 | | | SANTEE | SC | 29642 | SFR Owner Occupied | N | N | 80,612.78 | 8/24/2025 | 5.00% | 1 | 10/04/22 | 33,557.87 | 65,000.00 | Y | 0 | 65,000.00 | 65.00% | 33,557.87 | - | 33,557.87 |
| 2000001174 | | | LAS CRUCES | NM | 88001 | SFR Owner Occupied | N | N | 198,842.05 | 6/2/2041 | 9.49% | 1 | 10/04/22 | 82,813.48 | 60,000.00 | Y | 0 | 60,000.00 | 65.00% | 39,000.00 | - | 39,000.00 |
| | | | LTIMORE | MD | 21221 | SFR Owner Occupied | N | N | 137,127.51 | 10/1/2034 | 4.88% | 1 | 10/04/22 | 57,084.04 | 77,000.00 | Y | 0 | 77,000.00 | 65.00% | 50,050.00 | - | 50,050.00 |
| | | | MARTINS FERRY | OH | 43435 | SFR Owner Occupied | N | N | 45,276.73 | 6/1/2045 | 5.00% | 1 | 10/04/22 | 18,848.84 | 45,000.00 | Y | 0 | 45,000.00 | 65.00% | 18,848.84 | - | 18,848.84 |
| | | | ATTOCO | GA | 02703 | SFR Owner Occupied | N | N | 287,986.61 | 4/1/2049 | 4.50% | 1 | 10/04/22 | 208,374.44 | 315,988.00 | Y | 0 | 315,988.00 | 65.00% | 205,392.20 | - | 205,392.20 |
| 2000001185 | | | TOCCOA | GA | 30577 | SFR Owner Occupied | N | N | 22,705.16 | 7/20/2021 | 4.50% | 1 | 10/04/22 | 9,905.40 | 6,422.00 | Y | 0 | 6,422.00 | 65.00% | 9,905.40 | - | 9,905.44 |
| 2000001389 | | | ESTOVER | MD | 21871 | SFR Owner Occupied | N | N | 57,294.01 | 10/1/2051 | 3.25% | 1 | 10/04/22 | 24,850.63 | 104,000.00 | Y | 0 | 104,000.00 | 65.00% | 24,850.63 | - | 24,850.63 |
| 2000001294 | | | ST STEPHENS | SC | 29479 | SFR Owner Occupied | N | N | 39,636.88 | 9/1/2047 | 5.00% | 1 | 10/04/22 | 15,608.43 | 33,250.00 | Y | 0 | 33,250.00 | 65.00% | 15,608.43 | - | 15,608.43 |
| 2000001295 | | | CHESTERFIELD | SC | 29709 | SFR Owner Occupied | N | N | 212,540.29 | 7/1/2018 | 4.00% | 1 | 10/04/22 | 186,000.0 | 198,000.00 | Y | 0 | 198,000.00 | 65.00% | 135,608.43 | - | 135,608.43 |
| | | | CHBURG | VT | 05363 | SFR Owner Occupied | N | N | 398,086.86 | 8/1/2044 | 5.00% | 1 | 10/04/22 | 161,101.70 | 315,000.00 | Y | 0 | 315,000.00 | 65.00% | 161,101.70 | - | 161,101.70 |
| 2000001407 | | | HEATH | OH | 43056 | SFR Owner Occupied | N | N | 34,281.47 | 11/30/2046 | 4.00% | 1 | 10/04/22 | 14,236.84 | 80,000.00 | Y | 0 | 80,000.00 | 65.00% | 14,236.84 | - | 14,236.84 |
| 2000001408 | | | ZIMSBURG | TN | 38804 | SFR Owner Occupied | N | N | 13,491.44 | 8/1/2049 | 4.00% | 1 | 10/04/22 | 5,582.45 | 51,000.00 | Y | 0 | 51,000.00 | 65.00% | 45,236.78 | - | 45,236.78 |
| | | | ISWELL | NM | 88201 | SFR Owner Occupied | N | N | 46,427.03 | 11/1/2048 | 4.00% | 1 | 10/04/22 | 19,416.05 | 79,100.00 | Y | 0 | 79,100.00 | 65.00% | 19,416.05 | - | 19,416.05 |
| | | | READING | PA | 19601 | SFR Owner Occupied | N | N | 25,028.40 | 5/5/2032 | 7.00% | 1 | 10/04/22 | 10,418.90 | 89,000.00 | Y | 0 | 89,000.00 | 65.00% | 10,418.90 | - | 10,418.90 |
| 2000001354 | | | PATTERSON | NJ | 07502 | SFR Owner Occupied | N | N | 506,591.96 | 6/1/2032 | 4.00% | 1 | 10/04/22 | 170,868.43 | 217,500.00 | Y | 0 | 217,500.00 | 65.00% | 141,375.00 | - | 141,375.00 |

| Note Number | Borrower Name | Property Street | Property City | Property State | Property Zip Code | Property Type Category | Ground Up Construction | REO | Note Balance | Maturity Date | Note Rate | Lien Position | Valuation Date | Cost Basis | Property Value | 3rd Party Valuation | Dwell Time (Days) | Eligible Collateral Value | Advance Rate | Amount Eligible to be Advanced | Amount Outstanding | Additional Capacity |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2000001338 | | | WATERFORD | MS | 38685 | SFR Owner Occupied | N | N | 14,666.3 | 12/10/2020 | 9.00% | 1 | 10/04/22 | 6,105.3 | 199,200.0 | Y | 0 | 199,200.00 | 65.00% | 6,105.34 | - | 6,105.34 |
| | | | DURHAM | NC | 28425 | SFR Owner Occupied | N | N | 68,594.40 | 10/1/2046 | 3.25% | 1 | 10/04/22 | 28,550.72 | 124,000.0 | Y | 0 | 124,000.00 | 65.00% | 28,550.72 | - | 28,550.72 |
| | | | NORTHPORT | NE | 04889 | SFR Owner Occupied | N | N | 323,603.34 | 12/1/2048 | 4.15% | 1 | 10/04/22 | 134,701.14 | 340,000.00 | Y | 0 | 190,000.00 | 65.00% | 123,500.00 | - | 123,500.00 |
| 2000001346 | | | GEORGIANA | AL | 36033 | SFR Owner Occupied | N | N | 6,867.08 | 9/14/2020 | 10.96% | 1 | 10/04/22 | 2,797.89 | 65,000.0 | Y | 0 | 65,000.00 | 65.00% | 2,797.89 | - | 2,797.89 |
| 2000001349 | | | MORGAN CITY | LA | 70380 | SFR Owner Occupied | N | N | 45,066.91 | 5/5/2031 | 3.35% | 1 | 10/04/22 | 18,760.67 | 130,000.00 | Y | 0 | 130,000.00 | 65.00% | 18,760.67 | - | 18,760.67 |
| | | | TOLEDO | OH | 43615 | SFR Owner Occupied | N | N | 191,652.32 | 7/1/2050 | 4.3.0% | 1 | 10/04/22 | 79,781.94 | 150,000.00 | Y | 0 | 150,000.00 | 65.00% | 79,781.94 | - | 79,781.94 |
| 2000001351 | | | FLANDERS | NJ | 07836 | SFR Owner Occupied | N | N | 454,488.28 | 2/10/2014 | 7.99% | 1 | 10/04/22 | 177,836.48 | 405,435.0 | Y | 0 | 405,435.00 | 65.00% | 177,836.48 | - | 177,836.48 |
| 2000001354 | | | POINT PLEASANT BEACH | NJ | 08742 | SFR Owner Occupied | N | N | 821,809.34 | 8/30/2031 | 3.64% | 1 | 10/04/22 | 450,514.94 | 516,750.00 | Y | 0 | 516,750.00 | 65.00% | 335,887.50 | - | 335,887.50 |
| | | | LONG GROVE | IL | 60047 | SFR Owner Occupied | N | N | 615,458.16 | 11/9/2014 | 3.25% | 1 | 10/04/22 | 501,447.85 | 900,400.00 | Y | 0 | 900,400.00 | 65.00% | 500,000.00 | - | 500,000.00 |
| | | | DEMING | NM | 88040 | SFR Owner Occupied | N | N | 94,690.62 | 11/5/2038 | 5.50% | 1 | 10/04/22 | 39,418.36 | 82,000.00 | Y | 0 | 82,000.00 | 65.00% | 39,418.36 | - | 39,418.36 |
| 2000001619 | | | BAY CITY | OR | 97107 | SFR Owner Occupied | N | N | 165,210.91 | 10/5/2046 | 6.5.0% | 1 | 10/04/22 | 68,691.53 | 169,000.00 | Y | 0 | 169,000.00 | 65.00% | 68,691.53 | - | 68,691.53 |
| 2000008774 | | | COUNTRY CLUB HILLS | IL | 60478 | SFR Owner Occupied | N | N | 58,589.64 | 6/1/2052 | 4.60% | 1 | 10/04/22 | 24,886.50 | 85,000.00 | Y | 0 | 85,000.00 | 65.00% | 24,886.50 | - | 24,886.50 |
| | | | CORNISH | NH | 03745 | SFR Owner Occupied | N | N | 316,548.59 | 5/5/2028 | 4.49% | 1 | 10/04/22 | 148,767.50 | 320,600.00 | Y | 0 | 320,600.00 | 65.00% | 148,767.50 | - | 148,767.50 |
| 2400010858 | | | WAYNESBORO | MS | 39367 | SFR Owner Occupied | N | N | 73,249.75 | 4/1/2052 | 4.50% | 1 | 10/04/22 | 30,492.75 | 130,000.0 | Y | 0 | 130,000.00 | 65.00% | 30,492.5 | - | 30,492.75 |
| 2400010864 | | | EASTMINSTER | SC | 29693 | SFR Owner Occupied | N | N | 54,564.04 | 4/5/2052 | 3.00% | 1 | 10/04/22 | 22,713.76 | 70,000.00 | Y | 0 | 70,000.00 | 65.00% | 22,713.76 | - | 22,713.76 |
| | | | BISHOPVILLE | SC | 29010 | SFR Owner Occupied | N | N | 51,463.39 | 4/1/2052 | 4.25% | 1 | 10/04/22 | 21,424.43 | 55,000.00 | Y | 0 | 55,000.00 | 65.00% | 21,424.43 | - | 21,424.43 |
| | | | SUMTER | SC | 29150 | SFR Owner Occupied | N | N | 40,487.08 | 5/1/2052 | 4.25% | 1 | 10/04/22 | 16,812.53 | 92,000.00 | Y | 0 | 92,000.00 | 65.00% | 16,812.53 | - | 16,812.53 |
| 2400010986 | | | NOTASULGA | AL | 36866 | SFR Owner Occupied | N | N | 43,921.20 | 8/1/2052 | 4.25% | 1 | 10/04/22 | 18,284.36 | 120,000.0 | Y | 0 | 120,000.00 | 65.00% | 18,284.36 | - | 18,284.36 |
| 2400012073 | | | LOUISVILLE | KY | 40210 | SFR Owner Occupied | N | N | 36,513.31 | 8/5/2007 | 7.00% | 1 | 10/04/22 | 15,184.94 | 65,000.00 | Y | 0 | 65,000.00 | 65.00% | 15,184.94 | - | 15,184.94 |
| | | | NIAGARA FALLS | NY | 14305 | SFR Owner Occupied | N | N | 16,634.47 | 6/7/2032 | 10.38% | 1 | 10/04/22 | 6,916.68 | 40,000.00 | Y | 0 | 40,000.00 | 65.00% | 6,916.68 | - | 6,916.68 |
| 0000190586 | | | JAMESTOWN | NY | 14701 | SFR Owner Occupied | N | N | 31,896.83 | 10/1/2031 | 9.75% | 1 | 10/04/22 | 14,278.36 | 75,000.00 | Y | 0 | 75,000.00 | 65.00% | 14,278.36 | - | 14,278.36 |
| | | | ADRION | NY | 13402 | SFR Owner Occupied | N | N | 27,844.77 | 9/27/2020 | 11.50% | 1 | 10/04/22 | 11,591.45 | 50,000.00 | Y | 0 | 50,000.00 | 65.00% | 11,591.45 | - | 11,591.45 |
| | | | JAMESTOWN | NY | 14701 | SFR Owner Occupied | N | N | 26,208.38 | 6/1/2031 | 8.63% | 1 | 10/04/22 | 10,910.11 | 44,000.00 | Y | 0 | 44,000.00 | 65.00% | 10,910.11 | - | 10,910.11 |
| 0000290601 | | | SINCLAIRVILLE | NY | 14782 | SFR Owner Occupied | N | N | 61,077.62 | 5/1/2041 | 7.25% | 1 | 10/04/22 | 25,425.68 | 66,000.00 | Y | 0 | 66,000.00 | 65.00% | 25,425.68 | - | 25,425.68 |
| 0000408394 | | | WARSAW | NY | 14569 | SFR Owner Occupied | N | N | 85,545.55 | 4/1/2047 | 4.88% | 1 | 10/04/22 | 35,611.41 | 164,800.00 | Y | 0 | 164,800.00 | 65.00% | 35,611.41 | - | 35,611.41 |
| 0000408842 | | | AVTON | NY | 14634 | SFR Owner Occupied | N | N | 8,762.64 | 4/15/2032 | 9.38% | 1 | 10/04/22 | 3,647.77 | 50,000.00 | Y | 0 | 50,000.00 | 65.00% | 3,647.77 | - | 3,647.77 |
| | | | BUFFALO | NY | 14206 | SFR Owner Occupied | N | N | 17,538.83 | 3/5/2032 | 3.63% | 1 | 10/04/22 | 7,301.15 | 53,500.00 | Y | 0 | 53,500.00 | 65.00% | 7,301.15 | - | 7,301.15 |
| 0000408848 | | | NICHOLS | NY | 13812 | SFR Owner Occupied | N | N | 32,978.86 | 2/1/2047 | 4.50% | 1 | 10/04/22 | 13,728.48 | 36,000.0 | Y | 0 | 36,000.00 | 65.00% | 13,728.48 | - | 13,728.48 |
| 0000408849 | | | DYNATISKLL | NY | 12198 | SFR Owner Occupied | N | N | 14,176.18 | 4/15/2036 | 2.00% | 1 | 10/04/22 | 5,901.89 | 55,000.00 | Y | 0 | 55,000.00 | 65.00% | 5,901.89 | - | 5,901.89 |
| | | | GLOVERSVILLE | NY | 12078 | SFR Owner Occupied | N | N | 22,663.29 | 4/7/2031 | 11.81% | 1 | 10/04/22 | 9,436.48 | 35,000.00 | Y | 0 | 35,000.00 | 65.00% | 9,436.48 | - | 9,436.48 |
| | | | LIBERTY | NY | 12754 | SFR Owner Occupied | N | N | 65,676.78 | 11/16/2031 | 8.49% | 1 | 10/04/22 | 27,424.75 | 45,000.00 | Y | 0 | 45,000.00 | 65.00% | 27,424.75 | - | 27,424.75 |
| 0000411217 | | | SYRACUSE | NY | 13204 | SFR Owner Occupied | N | N | 49,003.04 | 10/1/2034 | 4.13% | 1 | 10/04/22 | 20,869.2 | 51,000.00 | Y | 0 | 51,000.00 | 65.00% | 20,869.2 | - | 20,869.21 |
| 0000411021 | | | RACLISE | NY | 13219 | SFR Owner Occupied | N | N | 80,645.06 | 2/5/2044 | 6.50% | 1 | 10/04/22 | 34,571.81 | 149,000.00 | Y | 0 | 149,000.00 | 65.00% | 34,571.81 | - | 34,571.81 |
| | | | BALLSTON LAKE | NY | 12019 | SFR Owner Occupied | N | N | 136,871.37 | 10/1/2068 | 3.88% | 1 | 10/04/22 | 56,977.47 | 280,000.00 | Y | 0 | 280,000.00 | 65.00% | 56,977.47 | - | 56,977.47 |
| 0000411024 | | | CORTLAND | NY | 13045 | SFR Owner Occupied | N | N | 102,036.44 | 8/1/2040 | 6.75% | 1 | 10/04/22 | 42,889.54 | 98,000.0 | Y | 0 | 98,000.00 | 65.00% | 42,889.54 | - | 42,889.54 |
| 0000414421 | | | ROOKLYN | NY | 11203 | SFR Owner Occupied | N | N | 319,645.64 | 5/1/2036 | 8.85% | 1 | 10/04/22 | 134,063.53 | 620,000.00 | Y | 0 | 620,000.00 | 65.00% | 134,063.53 | - | 134,063.53 |
| | | | FORT MONTGOMERY | NY | 10922 | SFR Owner Occupied | N | N | 412,824.98 | 11/5/2052 | 3.00% | 1 | 10/04/22 | 171,852.63 | 455,000.00 | Y | 0 | 455,000.00 | 65.00% | 171,852.63 | - | 171,852.63 |
| | | | NORTH SALEM | NY | 10560 | SFR Owner Occupied | N | N | 680,218.80 | 4/1/2038 | 3.25% | 1 | 10/04/22 | 284,170.87 | 855,000.00 | Y | 0 | 855,000.00 | 65.00% | 284,170.87 | - | 284,170.87 |
| 0000415577 | | | BROOKLYN | NY | 11206 | SFR Owner Occupied | N | N | 457,181.21 | 12/1/2040 | 4.64% | 1 | 10/04/22 | 190,317.53 | 635,000.0 | Y | 0 | 635,000.00 | 65.00% | 190,317.53 | - | 190,317.53 |
| 0000415578 | | | EMPSTEAD | NY | 11550 | SFR Owner Occupied | N | N | 336,296.85 | 9/1/2058 | 4.00% | 1 | 10/04/22 | 139,995.36 | 445,000.00 | Y | 0 | 445,000.00 | 65.00% | 139,995.36 | - | 139,995.36 |
| | | | SELDEN | NY | 11784 | SFR Owner Occupied | N | N | 294,561.44 | 4/1/2027 | 6.50% | 1 | 10/04/22 | 122,654.74 | 325,000.00 | Y | 0 | 325,000.00 | 65.00% | 122,654.74 | - | 122,654.74 |
| 0000415582 | | | SANDY CREEK | NY | 13145 | SFR Owner Occupied | N | N | 107,630.2 | 10/1/2023 | 10.00% | 1 | 10/04/22 | 44,804.84 | 94,900.00 | Y | 0 | 94,900.00 | 61.00% | 44,804.84 | - | 44,804.84 |
| 0000415584 | | | DYNATISKLL | NY | 12198 | SFR Owner Occupied | N | N | 169,876.45 | 6/5/2032 | 6.00% | 1 | 10/04/22 | 70,716.94 | 185,000.00 | Y | 0 | 185,000.00 | 65.00% | 70,716.94 | - | 70,716.94 |
| | | | PORT JEFFERSON STATN | NY | 11776 | SFR Owner Occupied | N | N | 404,505.95 | 2/1/2047 | 3.13% | 1 | 10/04/22 | 167,973.48 | 320,000.00 | Y | 0 | 320,000.00 | 65.00% | 167,973.48 | - | 167,973.48 |
| | | | SCHAGHTICOKE | NY | 12154 | SFR Owner Occupied | N | N | 251,728.45 | 2/1/2047 | 8.49% | 1 | 10/04/22 | 104,790.68 | 800,000.00 | Y | 0 | 800,000.00 | 65.00% | 104,790.68 | - | 104,790.68 |
| 0000415587 | | | BROOKLYN | NY | 11203 | SFR Owner Occupied | N | N | 462,508.88 | 6/1/2027 | 6.99% | 1 | 10/04/22 | 192,535.40 | 815,000.0 | Y | 0 | 815,000.00 | 65.00% | 192,535.40 | - | 192,535.40 |
| 0000415589 | | | ATER ISLAND | NY | 10016 | SFR Owner Occupied | N | N | 589,004.03 | 5/5/2026 | 4.25% | 1 | 10/04/22 | 245,194.41 | 780,000.00 | Y | 0 | 780,000.00 | 65.00% | 245,194.41 | - | 245,194.41 |
| | | | BROOKLYN | NY | 11236 | SFR Owner Occupied | N | N | 562,537.08 | 6/1/2028 | 4.00% | 1 | 10/04/22 | 234,164.99 | 805,000.00 | Y | 0 | 805,000.00 | 65.00% | 234,164.99 | - | 234,164.99 |
| 0000415593 | | | PEEKSKILL | NY | 10566 | SFR Owner Occupied | N | N | 363,202.10 | 2/5/2048 | 4.00% | 1 | 10/04/22 | 151,195.54 | 430,000.00 | Y | 0 | 430,000.00 | 65.00% | 151,195.54 | - | 151,195.54 |
| 0000415594 | | | ROMA | NY | 10466 | SFR Owner Occupied | N | N | 84,070.08 | 11/1/2046 | 4.25% | 1 | 10/04/22 | 34,997.28 | 160,000.00 | Y | 0 | 160,000.00 | 65.00% | 34,997.28 | - | 34,997.28 |
| | | | STRATSBURG | NY | 12580 | SFR Owner Occupied | N | N | 141,934.34 | 10/1/2047 | 11.49% | 1 | 10/04/22 | 59,085.20 | 180,000.00 | Y | 0 | 180,000.00 | 65.00% | 59,085.20 | - | 59,085.20 |
| | | | HEMPSTEAD | NY | 11550 | SFR Owner Occupied | N | N | 324,764.69 | 4/1/2051 | 5.57% | 1 | 10/04/22 | 135,184.59 | 380,000.00 | Y | 0 | 380,000.00 | 65.00% | 135,184.59 | - | 135,184.59 |
| 0000415600 | | | GHENT | NY | 12075 | SFR Owner Occupied | N | N | 198,514.43 | 4/7/2047 | 3.63% | 1 | 10/04/22 | 82,648.53 | 175,000.0 | Y | 0 | 175,000.00 | 65.00% | 82,648.53 | - | 82,648.53 |
| 0000415611 | | | WOLCOTT | NY | 13760 | SFR Owner Occupied | N | N | 65,207.76 | 1/5/2047 | 3.00% | 1 | 10/04/22 | 27,165.00 | 71,000.00 | Y | 0 | 71,000.00 | 65.00% | 27,165.00 | - | 27,165.00 |
| 0000415813 | | | EAST MEADOW | NY | 11554 | SFR Owner Occupied | N | N | 334,388.82 | 3/1/2046 | 5.50% | 1 | 10/04/22 | 139,200.89 | 670,000.00 | Y | 0 | 670,000.00 | 65.00% | 139,200.89 | - | 139,200.89 |
| 0000415814 | | | MASSAPEQUA | NY | 11758 | SFR Owner Occupied | N | N | 406,376.99 | 10/5/2044 | 6.34% | 1 | 10/04/22 | 169,292.59 | 560,000.00 | Y | 0 | 560,000.00 | 65.00% | 169,292.59 | - | 169,292.59 |
| | | | ALLEY STREAM | NY | 11581 | SFR Owner Occupied | N | N | 549,851.68 | 2/5/2061 | 3.75% | 1 | 10/04/22 | 228,946.92 | 564,000.00 | Y | 0 | 564,000.00 | 65.00% | 228,946.92 | - | 228,946.92 |
| | | | OCEANSIDE | NY | 11572 | SFR Owner Occupied | N | N | 596,466.60 | 5/1/2040 | 3.25% | 1 | 10/04/22 | 248,104.24 | 560,000.00 | Y | 0 | 560,000.00 | 65.00% | 248,104.24 | - | 248,104.24 |
| | | | CAMBRIA HEIGHTS | NY | 11411 | SFR Owner Occupied | N | N | 477,670.53 | 8/1/2061 | 3.00% | 1 | 10/04/22 | 198,846.97 | 560,000.00 | Y | 0 | 560,000.00 | 65.00% | 198,846.97 | - | 198,846.97 |
| 0000415849 | | | SMITHTOWN | NY | 11787 | SFR Owner Occupied | N | N | 415,506.00 | 8/1/2029 | 6.99% | 1 | 10/04/22 | 172,966.43 | 585,000.00 | Y | 0 | 585,000.00 | 65.00% | 172,966.43 | - | 172,966.43 |
| 0000420851 | | | RIO | NY | 13036 | SFR Owner Occupied | N | N | 103,792.70 | 4/5/2040 | 5.25% | 1 | 10/04/22 | 43,207.63 | 125,000.00 | Y | 0 | 125,000.00 | 65.00% | 43,207.63 | - | 43,207.63 |
| 081-486057 | | | HARRISON | AR | 72601 | SFR Owner Occupied | N | N | 346,606.79 | 6/1/2040 | 5.89% | 1 | 07/26/22 | 143,200.00 | 146,200.00 | Y | 64 | 146,200.00 | 65.00% | 158,080.00 | - | 158,080.00 |
| 084-486031 | | | MOUNTAIN HOME | AR | 72653 | SFR Owner Occupied | N | N | 304,000.00 | 10/1/2055 | 5.66% | 1 | 07/26/22 | 142,750.00 | 220,400.00 | Y | 64 | 220,400.00 | 65.00% | 142,750.00 | - | 142,750.00 |
| | | | BRING | FL | 33872 | SFR Owner Occupied | N | N | 325,240.92 | 8/1/2050 | 5.56% | 1 | 07/26/22 | 275,400.00 | 329,200.00 | Y | 64 | 329,200.00 | 65.00% | 214,980.00 | - | 214,980.00 |
| 094-519764 | | | KISSIMMEE | FL | 34744 | SFR Owner Occupied | N | N | 241,254.68 | 11/1/2058 | 2.08% | 1 | 07/26/22 | 218,700.00 | 376,400.00 | Y | 64 | 376,400.00 | 65.00% | 218,700.00 | - | 218,700.00 |
| | | | DAYTONA BEACH | FL | 32118 | SFR Owner Occupied | N | N | 236,439.91 | 11/1/2048 | 2.08% | 1 | 07/26/22 | 210,050.00 | 379,400.00 | Y | 64 | 379,400.00 | 65.00% | 210,050.00 | - | 210,050.00 |
| 095-019360 | | | ORMOND BEACH | FL | 32176 | SFR Owner Occupied | N | N | 244,304.88 | 6/1/2055 | 2.08% | 1 | 07/26/22 | 225,990.00 | 376,800.00 | Y | 64 | 370,400.00 | 65.00% | 225,990.00 | - | 225,990.00 |
| | | | MIMI | FL | 33175 | SFR Owner Occupied | N | N | 387,131.77 | 8/1/2052 | 2.08% | 1 | 07/26/22 | 346,680.00 | 581,200.00 | Y | 64 | 581,200.00 | 65.00% | 346,680.00 | - | 346,680.00 |
| 147-490664 | | | LAUDERDALE LAKES | FL | 33039 | SFR Owner Occupied | N | N | 241,685.48 | 8/1/2055 | 2.08% | 1 | 07/26/22 | 251,100.00 | 360,000.00 | Y | 14 | 360,000.00 | 65.00% | 234,000.00 | - | 234,000.00 |
| 241-410064 | | | CHICAGO | IL | 60648 | SFR Owner Occupied | N | N | 371,102.83 | 8/29/2055 | 3.00% | 1 | 08/29/22 | 199,193.43 | 294,542.0 | Y | 7 | 294,542.00 | 65.00% | 186,965.31 | - | 186,965.31 |
| | | | WEST | MD | 21154 | SFR Owner Occupied | N | N | 371,182.83 | 10/1/2055 | 3.00% | 1 | 08/29/22 | 80,960.00 | 131,000.00 | Y | 7 | 80,960.00 | 65.00% | 52,300.00 | - | 52,300.00 |
| 271-425258 | | | BALTIMORE | MD | 21215 | SFR Owner Occupied | N | N | 194,607.76 | 8/1/2050 | 5.56% | 1 | 08/29/22 | 133,048.00 | 190,000.00 | Y | 7 | 190,000.00 | 65.00% | 123,500.00 | - | 123,500.00 |
| 277-026787 | | | CHEROKLAR | MI | 49771 | SFR Owner Occupied | N | N | 444,504.88 | 3/1/2055 | 5.56% | 1 | 08/29/22 | 277,425.00 | 360,000.00 | Y | 7 | 360,000.00 | 65.00% | 227,500.00 | - | 227,500.00 |
| | | | GRAND RAPIDS | MN | 55744 | SFR Owner Occupied | N | N | 136,556.20 | 6/1/2054 | 2.08% | 1 | 08/29/22 | 148,200.00 | 149,600.00 | Y | 14 | 148,200.00 | 65.00% | 89,840.00 | - | 89,840.00 |
| | | | BINGHAMTON | NY | 56042 | SFR Owner Occupied | N | N | 869,249.75 | 11/1/2058 | 5.56% | 1 | 08/29/22 | 438,000.00 | 638,800.00 | Y | 14 | 638,800.00 | 65.00% | 285,000.00 | - | 285,000.00 |
| 312000196 | | | GLOVERSVILLE | NY | 12078 | SFR Owner Occupied | N | N | 79,220.46 | 8/1/2050 | 5.50% | 1 | 10/04/22 | 32,941.99 | 40,000.00 | Y | 0 | 40,000.00 | 65.00% | 26,000.00 | - | 26,000.00 |
| 312000248 | | | ALFORD | NY | 14535 | SFR Owner Occupied | N | N | 89,549.36 | 6/5/2027 | 8.20% | 1 | 10/04/22 | 37,279.04 | 43,700.00 | Y | 0 | 43,700.00 | 65.00% | 28,405.00 | - | 28,405.00 |
| | | | ALTONA | NY | 12910 | SFR Owner Occupied | N | N | 88,902.55 | 2/1/2047 | 7.09% | 1 | 10/04/22 | 37,000.78 | 21,500.00 | Y | 0 | 21,500.00 | 65.00% | 13,975.00 | - | 13,975.00 |
| | | | MONSEY | NY | 10952 | SFR Owner Occupied | N | N | 4,789.56 | 8/1/2052 | 7.50% | 1 | 10/04/22 | 1,992.82 | 462,000.00 | Y | 0 | 462,000.00 | 65.00% | 1,992.82 | - | 1,992.82 |
| 312000589 | | | BROOKLYN | NY | 11203 | SFR Owner Occupied | N | N | 113,006.63 | 1/5/2045 | 7.29% | 1 | 10/04/22 | 47,062.11 | 65,000.00 | Y | 0 | 65,000.00 | 65.00% | 47,062.11 | - | 47,062.11 |
| 312001787 | | | LINVILLE | NY | 12418 | SFR Owner Occupied | N | N | 61,218.37 | 7/1/2044 | 3.79% | 1 | 10/04/22 | 25,400.89 | 65,400.00 | Y | 0 | 65,400.00 | 65.00% | 25,408.89 | - | 25,408.89 |
| 312001853 | | | SYRACUSE | NY | 13205 | SFR Owner Occupied | N | N | 12,481.45 | 7/17/2016 | 10.30% | 1 | 10/04/22 | 5,154.64 | 26,000.00 | Y | 0 | 26,000.00 | 65.00% | 5,154.64 | - | 5,154.64 |
| 312001871 | | | HORNELL | NY | 14843 | SFR Owner Occupied | N | N | 48,785.42 | 5/5/2032 | 7.58% | 1 | 10/04/22 | 20,267.95 | 31,000.00 | Y | 0 | 31,000.00 | 65.00% | 20,167.95 | - | 20,267.95 |
| | | | RHIAN | NY | 14514 | SFR Owner Occupied | N | N | 18,765.42 | 5/6/2032 | 7.58% | 1 | 10/04/22 | 7,799.27 | 40,000.00 | Y | 0 | 40,000.00 | 65.00% | 7,799.27 | - | 7,799.27 |
| | | | RUSHVILLE | NY | 14544 | SFR Owner Occupied | N | N | 87,450.30 | 10/1/2047 | 3.88% | 1 | 10/04/22 | 36,616.03 | 77,000.00 | Y | 0 | 77,000.00 | 65.00% | 36,616.03 | - | 36,616.03 |
| | | | ITHACA | NY | 14850 | SFR Owner Occupied | N | N | 45,768.74 | 7/1/2033 | 8.69% | 1 | 10/04/22 | 19,052.82 | 81,000.00 | Y | 0 | 81,000.00 | 65.00% | 19,052.82 | - | 19,052.82 |
| 312002684 | | | MIDDLEPORT | NY | 14105 | SFR Owner Occupied | N | N | 53,761.43 | 8/5/2044 | 3.00% | 1 | 10/04/22 | 11,567.49 | 84,400.00 | Y | 0 | 84,400.00 | 65.00% | 11,567.49 | - | 11,567.49 |
| 312002848 | | | LCKAWANNA | NY | 14218 | SFR Owner Occupied | N | N | 47,294.60 | 5/27/2033 | 7.34% | 1 | 10/04/22 | 19,688.85 | 80,000.00 | Y | 0 | 54,300.00 | 65.00% | 19,688.85 | - | 19,688.85 |
| 312002885 | | | OLEAN | NY | 14760 | SFR Owner Occupied | N | N | 62,904.91 | 4/1/2027 | 4.25% | 1 | 10/04/22 | 26,184.36 | 54,200.00 | Y | 0 | 54,200.00 | 65.00% | 26,184.36 | - | 26,184.36 |
| | | | SHERRILL | NY | 13461 | SFR Owner Occupied | N | N | 46.54 | 7/1/2029 | 6.00% | 1 | 10/04/22 | 19.3 | 167,800.0 | Y | 0 | 167,800.00 | 65.00% | 19.3 | - | 19.37 |



| Note Number | Property City | Property State | Property Zip Code | Property Type Category | Ground Up Construction | REO | Note Balance | Maturity Date | Note Rate | Lien Position | Valuation Date | Cost Basis | Property Value | 3rd Party Valuation | Dwell Time (Days) | Eligible Collateral Value[1] | Advance Rate | Amount Eligible to be Advanced[2] | Amount Outstanding | Additional Capacity |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 312008167 | QUEENSBURY | NY | 12804 | SFR Owner Occupied | N | N | $ 79,136.05 | 10/1/2028 | 9.49% | 1 | 10/04/22 | $ 29,195.70 | $ 28,000.00 | | 0 | $ 28,000.00 | 65.00% | $ 25,850.00 | $ - | $ 25,850.00 |
| | ROME | NY | 13440 | SFR Owner Occupied | N | N | $ 145,588.01 | 8/1/2054 | 2.88% | 1 | 07/26/22 | $ 33,870.00 | $ 197,400.00 | Y | 64 | $ 197,400.00 | 65.00% | $ 33,870.00 | $ - | $ 33,870.00 |
| 381-428649 | NEWPORT | NC | 28570 | SFR Owner Occupied | N | N | $ 197,416.16 | 5/1/2058 | 3.14% | 1 | 07/26/22 | $ 171,500.00 | $ 263,700.00 | Y | 64 | $ 171,500.00 | 65.00% | $ 171,500.00 | $ - | $ 171,500.00 |
| | CONOVER | NC | 28613 | SFR Owner Occupied | N | N | $ 168,298.61 | 6/1/2059 | 4.11% | 1 | 07/26/22 | $ 142,500.00 | $ 217,100.00 | Y | 64 | $ 217,100.00 | 65.00% | $ 141,115.00 | $ - | $ 141,115.00 |
| 411-481210 | SICARUM | OH | 45304 | SFR Owner Occupied | N | N | $ 167,585.71 | 11/1/2046 | 5.25% | 1 | 08/29/22 | $ 64,600.00 | $ 92,000.00 | Y | 7 | $ 92,000.00 | 65.00% | $ 59,800.00 | $ - | $ 59,800.00 |
| 442-194868 | CLEVELAND HTS | OH | 44118 | SFR Owner Occupied | N | N | $ 159,144.44 | 6/1/2055 | 2.04% | 1 | 08/29/22 | $ 69,700.00 | $ 85,000.00 | Y | 7 | $ 85,000.00 | 65.00% | $ 55,250.00 | $ - | $ 55,250.00 |
| 541-832228 | AMBRIDGE | PA | 15003 | SFR Owner Occupied | N | N | $ 155,820.0 | 8/1/2052 | 1.78% | 1 | 08/29/22 | $ 53,944.00 | $ 61,400.0 | Y | 7 | $ 61,400.00 | 65.00% | $ 39,965.00 | $ - | $ 39,965.00 |
| | WOODFORD | VA | 22580 | SFR Owner Occupied | N | N | $ 145,794.68 | 4/1/2056 | 2.58% | 1 | 07/26/22 | $ 126,000.00 | $ 265,200.00 | Y | 64 | $ 265,200.00 | 65.00% | $ 126,000.00 | $ - | $ 126,000.00 |
| | PRINCETON | WV | 24740 | SFR Owner Occupied | N | N | $ 177,981.04 | 5/1/2059 | 3.23% | 1 | 07/26/22 | $ 108,150.00 | $ 290,800.00 | Y | 64 | $ 290,800.00 | 65.00% | $ 108,150.00 | $ - | $ 108,150.00 |
| | CATONSVILLE | MD | 21228 | SFR Owner Occupied | N | Y | $ 499,900.00 | 10/1/2021 | 6.24% | 1 | 10/04/22 | $ 322,807.44 | $ 499,900.00 | Y | 0 | $ 499,900.00 | 65.00% | $ 322,807.44 | $ - | $ 322,807.44 |
| | | | | | | | $ 77,461,878.26 | | | | | $ 43,133,010.80 | $ 94,434,410.95 | | | $ 94,434,410.95 | | $ 38,698,148.74 | $ 15,797,050.01 | $ 22,901,098.73 |

| **Total Pledged Borrowing Base** | | | | | | | $ 77,461,878.26 | | | | | $ 43,133,010.81 | $ 94,434,410.9 | | | $ 94,434,410.9 | | $ 38,698,148.7 | $ 15,797,050.01 | $ 22,901,098.73 |

[1] Eligible Collateral Value is defined as Adjusted UPB.

[2] Amount Eligible to be Advanced is calculated as Eligible Collateral Value multiplied by the Advance Rate. However in no event shall this amount be greater than $500M or 100% of acquisition costs.

| Property Type Category | Advance Rate[1] | Renovation Subholdback ($000's) | Renovation Amount Eligible to be Advanced | | REO Subholdback ($000's) | REO Amount Eligible to be Advanced | |
|---|---|---|---|---|---|---|---|
| | | | ($000's) | (% Pledged) | | ($000's) | (% Pledged) |
| SFR Owner Occupied - Performing | LTV | $42,500 | $ - | 0.0% | $5,000 | $- | 0.0% |
| SFR Owner Occupied - Non-Performing | 60% | $40,000 | $ 38,404 | 100.0% | | $ 323 | 100% |
| **Total Amount Eligible to be Advanced** | | | $ 38,404 | 100% | | $ 323 | 100% |

*Advance shall not exceed 100% of total acquisition cost

# Exhibit 20

**From:**                 wsw@oakharborcapital.com
**Sent:**               Wednesday, December 13, 2023 9:12 AM
**To:**                    peter.fitzpatrick@OakHarborCapital.com
**Subject:**          Re: AHP Dispute follow up

Another matter to debate scuss

Get Outlook for iOS

---

**From:** Lisa Alberti <LAlberti@westernalliancebank.com>
**Sent:** Wednesday, December 13, 2023 9:08:48 AM
**To:** William S. Weinstein <wsw@oakharborcapital.com>
**Cc:** Josh Ormiston <jormiston@westernalliancebank.com>; Ryan Maack <ryan.maack@westernalliancebank.com>; Kevin Chai <kevin.chai@westernalliancebank.com>; Glenn Smith <gsmith02@westernalliancebank.com>; Aaron Maciel <aaron.maciel@westernalliancebank.com>; Richie Walia <RWalia@westernalliancebank.com>
**Subject:** AHP Dispute follow up

Bill,

Thank you for providing the additional information related to the dispute with AHP.  We've asked our counsel (Bruce Johnson with Ballard Spahr) to review the information provided and he has raised some concerns that we would like to discuss with you and/or your counsel.  These issues are noted below:

- Pursuant to Section 2.2(a)(iv), as a condition to WAB's obligation to make any Advance, the Borrower must deliver certain Collateral Documents, including per Exhibit A to the LSA, the underlying Mortgage Note payable to Borrower.  In the current instance, I understand that Magerick has been unable to deliver at least some subset of these notes/allonges, in part due to APS's unwillingness to sign and its revocation of the power of attorney that it had previously granted to Magerick.  As a result, the condition in 2.2(a)(iv) is not satisfied, and WAB could take the position that these mortgages were not appropriately pledged and therefore are not truly included in the borrowing base, meaning Magerick would need either to pay down the loan to bring it back in balanced based on the adjusted borrowing base, or pledge new collateral.

- Additionally, under Section 2.2(a)(iii) all representations and warranties of Magerick must be accurate, which would include the rep in Section 5.15(a) that "Borrower is the legal and equitable owner and holder, free and clear of all Liens, of the Pledged Mortgages.  All Pledged Mortgages have been and will continue to be validly pledged or assigned to Lender, subject to no other Liens."  In the current instance, there is at the least an allegation that this rep and covenant are not currently accurate. ***In advance of the call, would it be possible to get documentation detailing the purchase of the collateral in question?***

- Also, under Section 6.17(a), Magerick is obligated to "defend the right, title and interest" of WAB "in and to the Pledged Mortgages against the claims and demands of all persons whomsoever and shall take any action necessary to assure that Lender has and will at all times have a valid and perfected first priority security interest in each Pledged Mortgage."  And under Section 6.17(d), Magerick is not allowed to "sell, assign, transfer or otherwise dispose of, or grant any option with respect to, or pledge or otherwise encumber … any of the Collateral or any interest therein…." The APS allegations would trigger Magerick's obligation to defend WAB's title and security interest per Section 6.17(a), and the repo arrangement that existed with APS would seem to violate the provisions of Section 6.17(d).

In light of this feedback from counsel, we feel it's prudent to discuss as normal course of due diligence. Please let us know your availability for a call and I will coordinate with WAB team members & Bruce Johnson. Ideally, we'd like to have this call no later than next week, if possible.

Thank you,
Lisa



**Lisa M. Alberti**

Senior Vice President | Note Finance
m (602) 635-8413 | lalberti@westernalliancebank.com
2701 East Camelback Road | Suite 110 | Phoenix, AZ 85016
Western Alliance Bank, Member FDIC.

#1 TOP-PERFORMING BANK (ASSETS $50 BILLION AND ABOVE) FOR 2021, AMERICAN BANKER AND BANK DIRECTOR

Bank on Accountability®

# Exhibit 21

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

CYMBIDIUM RESTORATION TRUST,    )
                                )
            Plaintiff,           )
                                )
      vs.                        ) Case No.
                                ) 2:24-cv-00025-KKE
AMERICAN HOMEOWNER               )
PRESERVATION TRUST SERIES AHP    )
SERVICING; its Trustee, U.S.     )
BANK TRUST, N.A.; AHP CAPITAL    )
MANAGEMENT, LLC; AMERICAN        )
HOMEOWNER PRESERVATION SERIES    )
2015A+; its Trustee, U.S. BANK   )
TRUST NATIONAL ASSOCIATION;      )
AHP SERVICING, LLC; and JORGE    )
NEWBERY,                         )
                                )
            Defendants.          )
_____)

REMOTE VIDEOTAPED DEPOSITION OF SONAL GUPTA
Wednesday, December 10, 2025

STENOGRAPHICALLY REPORTED BY:
RHONDA HALL-BREUWET, RDR, CRR, CSR, CCR, LCR, FPR
Realtime Systems Administrator
HUDSON COURT REPORTING & VIDEO   (800) 310-1769

December 10, 2025

9:04 a.m. PST

Videotaped Deposition of SONAL GUPTA, held remotely before Rhonda Hall-Breuwet, Registered Diplomate Reporter, Certified Realtime Reporter, CA CSR NO. 14411, TX CSR NO. 11956, NJ CCR NO. 30X100245000, NM CCR NO. 584, NV CCR NO. 990, TN LCR NO. 675, LA CCR NO. 2017004, WA CCR NO. 21000131, GA CCR NO. 5087-2801-9674-7264, IL CSR NO. 084004980, AL CCR NO. 729, FL FPR NO. 693, and Notary Public of the State of Florida.

**New York**
212-273-9911

**Hudson Court Reporting & Video**
1-800-310-1769

**New Jersey**
732-906-2078

clarification.)

THE WITNESS:  We will have to kind of present the most updated file.

BY MR. CASSUBHAI:

Q.    So as I understand it, there was a reconciliation file that was produced to my prior -- predecessor counsel for defendants back in December of 2024.

Do you recall the document that I'm referring to that was turned over last year about this time?

A.    Yep.

Q.    Okay.  We will go over that in a bit, but I'd like to ask you, what updates and, to the best of your recollection, when those updates took place after December 2024.  Let me rephrase it.

How many updates have there been to the December 2024 reconciliation report since it was produced to us?

A.    As I said, we just started updating it, and once December 2024 update -- updated file was shared, I don't think so we officially kind of updated any -- updated that file because things are constantly moving.  They're

A.     That's correct.

Q.     Have you reviewed the MLSA?

A.     Yeah, because when I joined, immediately I was assigned with the task of helping Mike on the audited -- on preparing the -- you know, the accounts and everything for the auditors.

And in that process, while working on through the audit, through that process and helping Mike and the auditors, we were supposed to submit all the executed agreements and everything which is impacting Magerick's GL. So, yeah.

Q.     So you assembled it, but my question is a little bit different.  Did you review the terms of the MLSA?

A.     Not -- not in detail.  And -- yeah. No.

Q.     Do you have any understanding as you sit here today about what the specific terms are of the MLSA?

A.     So the modified one, I kind of definitely reviewed it because it has an impact on the loan summary calculation.  Like, when we had to look at the applicable pricing rate and

Q. And what do you base that on?

A. I think I just said basis -- the prior agreement and my conversation which I had with Mike that, yeah, it looks like Cymbidium was the owner.

Q. Cymbidium Trust is the plaintiff in this lawsuit. You indicated that Cymbidium Trust does not have a bank account; correct?

A. Yeah.

Q. Do you know why Magerick is receiving payments under -- if Cymbidium Trust is the owner of these loans?

A. Because once Cymbidium was the purchaser, Cymbidium didn't have its own bank balance or anything like that to kind of go ahead with this transaction. And that was routed through Magerick, but -- and Magerick also utilized its Western Alliance Bank line of credit for this particular transaction.

Q. Are you aware of any agreements between Cymbidium and Magerick that would explain their relationship vis- -vis AHP?

A. No. I don't think I would have looked into that agreement.

Basile or Basile?

A. **Basile.**

Q. Basile. Okay.

-- Mr. Basile's passing, who's your direct supervisor?

A. **CEO, William S. Weinstein.**

Q. We earlier were mentioning these spreadsheets. Or you referred to them as the reconciliation file.

In the course of your responsibilities at Oak Harbor, did you become involved in preparing those spreadsheets?

A. **Yeah. So I do remember when -- the first time when I was asked. So there -- I was responsible for preparing that particular summary file, depending upon -- you know, so I would rely on the GL Extract of Magerick, which would already have all the cash received under the AHP portfolio, all the improvement costs to the servicer and all of those things.**

**So I would use that information filter or take the information which is relevant to AHP and then put that into loan summary, and -- which would kind of get reviewed with Mike, and then later, it kind of**

send on further.

Q.   When was the first spreadsheet
created?

A.   I don't remember the exact date, but
it was in 2023 where we were giving regular
updates to Jorge from AHP.  Maybe it was -- no,
I don't remember the exact date when was the
first time we started.

Q.   Was it before or after you commenced
employment?

A.   So the spreadsheet which we are
referring to, I think, yeah, that was after --
after I joined.

Q.   So after March 2023?

A.   Yep.

Q.   And you -- can you walk me through
the discussions internally that you had or
for -- the reason for creating this
spreadsheet?  Who came up with the idea?  Can
you just walk me through the process of why
that first spreadsheet was created.

A.   I think at that point in time there
was, like, a lot of traction on those -- on
those loans, and then it was more about to
give -- have an understanding and also to

right? It would be the document you would be looking at?

A. Correct, but as I told you, I was not always looking into these documents. Mike was the one who would review all these documents. My job was restricted to look into the GL Extract and accordingly update the sections of the loan summary, depending upon whatever becomes applicable.

Like, I had to change the applicable pricing rate from 12 percent to 16 percent in corporate management fees, but while -- when it comes to the legal language and reviewing all these documents, it was largely done by Bill and Mike.

Q. Okay. At some point you -- after Mike -- actually, scratch that. I'll come back to it.

When you were preparing the spreadsheets, how did you define improvement costs? Is that -- what is improvement costs?

A. Improvement costs would be any of those expenses incurred on the AHP portfolio which can be tagged to an OI or in relation with -- yeah, on those AHP loans would be

**New York**
212-273-9911

**Hudson Court Reporting & Video**
1-800-310-1769

**New Jersey**
732-906-2078

determined as improvement costs.

Q.   And I'm sorry if I've asked this again -- previously, but I'm a little bit confused as to who is the party responsible for those improvement costs.

Can you explain to me who is the party that's paying those improvement costs as part of the AHP loans under the amended agreement?

A.   So there are multiple parties involved in this process, but primarily we are talking about all the servicer-related expenses.  Now, if it is an NPL, the servicer-related expenses would largely go to Landhome, who is responsible for the -- you know, the monthly servicing of these loans, monthly servicing fees, anything that which is happening on those loans, then also following up with the legal team, whatever -- whatever, you know, the kind of work would require to get that loan closer to a resolution, all of those things.

When it -- when an NPL turns into an REO at some point in time -- so the REO expenses would go to Cliff because he's the

servicer. So all the Pyramid expenses where Cliff and his team would be working would be with a lot of subcontractors, would be responsible for, you know, various small -- small kind of expenses like cutting the grass or putting the countertop or whatever is required in terms of those particular properties.

So those expenses would kind of flow into Pyramid, and it would come to us, where we are responsible for paying the vendor who has done the work.

For in Landhome case, we always advance funds to Landhome for the legal and all the tax-related work, which is also managed by Landhome. Then Landhome is also responsible for sending us a monthly detailed file in terms of what all activity Landhome has done for each of those loans, how much fees they have charged, how much cash they have collected, if there is any payoff on those loans.

And then, accordingly, those loans on that portfolio, we can determine that on a monthly basis for this particular portfolio, this is the net cash inflow or the outflow.

These were the improvement costs.  This was the cash collected.  This is the amount of payoff.  And that gets booked into the GL.

So -- and then separately there is, like AOM process.  So that also goes on, and then that is like Magerick is directly paying to the legal team who is responsible for doing the AOM work and filing and all of that.  So it's not -- and then it's -- for the monthly servicer activity, Landhome is giving us the net cash amount.  So it's already reducing the fees what it has charged.

So if it received a payoff, let's say, of 50,000 and they are charging mortgage servicer fees of thousand dollars, then they are sending us cash 49,000, which would be allocated where 50,000 would go to cash and 1,000 would go to expense so that we can show the net cash which was received was 49,000.

Q.    And you said --

A.    For other --

Q.    Go ahead.  Finish your thought.

A.    For the other expenses when we are talking about Pyramid, those are the payments which are directly made by the fund entities by

sending out those checks to those vendors, and I believe we have shared all the details of all the checks for various checks which -- which -- you know, which were made at that point in time under the AHP portfolio.

So for legal, also we would advance the funds from Magerick entity to Landhome, and Landhome will take care of settling that with the lawyers. So that, you know, the -- whatever are the outstanding items on that particular loan, that can get resolved.

Q. Okay. You keep referring to Pyramid. What is Pyramid?

A. Pyramid is, again, a system which houses all of the invoices which are coming on REO properties, which is real estate owned. So it is just a process where all the subcontractors would kind of, you know, put their invoices.

Cliff and his team would approve -- would review those and approve those invoices, and that is -- that is the file which we will kind of -- you know, that's the input which Magerick or the other fund entities will take, and then, accordingly, the vendors would be

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

the management fees.  But clearly looking into the details about what cost, I never independently completely reviewed the amended agreement.

Q.    Okay.  Can you go to page 2 of the document that is in front of you.

A.    Okay.

Q.    Do you see paragraph 5?

A.    Uh-huh.

Q.    Take a moment to review it, please.

A.    (Reviewing document.)

Okay.

Q.    Anything strike you as different than what your understanding was before coming into today?

A.    No.

Q.    Okay.  Were you aware that improvement costs must exclude related-party costs?

MS. MOLINA:  Object to form.

THE WITNESS:  No, I'm not aware about any related-party cost.

BY MR. CASSUBHAI:

Q.    What is your understanding of related party?

A.     I mean, there is a technical definition for related party, but, I mean, anything which, you know, it bases the ownership interest or that will qualify as a related party which is -- involves -- which influences the day-to-day decision-making.

But then I don't know what related-party cost we are talking about in this context.

Q.     Did you have a discussion with anybody internally before putting together these spreadsheets as to whether or not the costs being incurred by Landhome or Magerick were related-party costs?

A.     No, I never had any discussion around that.

Q.     Were you aware that this was even an issue, that there's a question about whether or not the cost is related or unrelated?

A.     Yeah, I was not even aware that this was an issue.

Q.     Outside of Landhome and Magerick -- actually, scratch that.

The accounting -- as part of the improvement costs, over time in your

# Exhibit 22

SECURED PARTICIPATION AGREEMENT

THIS SECURED PARTICIPATION AGREEMENT made and entered into as of October 7, 2022, by and between Cymbidium Restoration Trust (the "Trust") and Magerick, LLC (the "Participant", together with the Trust, the "Parties").

WHEREAS: the Participant was the beneficial acquirer through the Trust of that certain portfolio of loans (the "Assets") under that certain Mortgage Loan Sale Agreement with Repurchase Obligations dated as of October 7, 2022 (as amended from time to time "the Agreement") by and between U.S. Bank Trust N.A. as trustee of American Homeowner Preservation Trust Series AHP Servicing, a Delaware Statutory Trust and U.S. Bank Trust National Association as Trustee of American Homeowner Preservation Series 2015A+, a Delaware Statutory Trust, collectively as Seller, and Cymbidium Restoration Trust, a Delaware statutory trust, as Purchaser (the "APA").

WHEREAS: the Participant financed a portion of the payment of the purchase price under the APA for the Assets by a draw down under the Participant's credit facility with Western Alliance Bank (the "Bank") whereby the Bank was granted a first perfected security interest in the Assets (the "Security Interest").

WHEREAS, the Trust is a special purpose vehicle established for the purpose of holding Assets for the benefit of the Participant and other entities.

WHEREAS, in furtherance of such purpose, the Trust hereby grants to the Participant an undivided participation interest in all of the Trust's right, title and interest in and to the proceeds and all other beneficial and economic rights and interests that the Trust receives from the Assets, including, but not limited to, the Trust's rights and protections under the APA, as well as all obligations related thereto, and pursuant to such transaction the Trust and the Participant hereby agree as follows:

1. Participation Interest. Subject to all of the terms and conditions hereof, the Trust hereby conveys to the Participant a 100 percent participation interest in all of the Trust's beneficial and economic rights in the Assets and related obligations for which the Trust holds legal title (the "Interest" or the "Participation"), including but not limited to: (i) the right to receive all principal, interest or other proceeds and bear all obligations with respect to the Assets; (ii) to receive the benefit of the Trust's rights and protections under the APA; and (iii) to direct the Trust to exercise its rights under the APA in the Participant's discretion; *provided, however*, that the Interest shall not include the legal title to the designated Assets, which shall continue to be held by the Trust.

2. Security Interests. The Participant and the Trust hereby acknowledge the Bank's first perfected Security Interest in the Assets and agree that the Interest related to the Participation is subordinated in all respects to the Bank's Security Interest. In the event that notwithstanding the intent of this Agreement to create a participation interest in favor of the Participant any or all of the participation rights granted hereunder relating to the Assets are held to continue to be the property of the Trust, then the parties hereto agree that the Trust hereby grants to the Participant a security interest in all of the Trust's right, title and interest in and to the Assets and the participation rights granted hereunder (whether now existing or hereafter created). For such purposes, this Agreement shall

1

 Cymbidium026856

constitute a security agreement under the UCC, to secure the prompt and complete payment of all of the obligations related to the Participation created hereunder and the Parties shall cause the appropriate UCC statements to be filed and maintained at all times in the applicable jurisdictions to perfect such security interest.

3. <u>Concerning the Owner</u>. The following provisions shall apply to the Trust and the conduct of the Trust with respect to the Participation:

   a. <u>Standard of Care</u>. The Trust shall exercise the same degree of care in administering the Assets as it customarily exercises with respect to similar assets in which no participation has been granted or acquired; *provided, however*, that the Trust and its officers, directors, employees and agents shall not be liable to the Participant for any action or failure to act taken or suffered in good faith or in reliance on counsel.

   b. <u>Record Keeping/Asset Segregation</u>. The Trust shall keep careful records related to the Assets segregating them on its books and records solely for the benefit of the Participant and such Assets will not be generally available to the creditors or holders of any other interests in the Trust other than related to the Bank's Security Interest.

   c. <u>Cash Flow</u>. The Trust shall cause all cash proceeds derived from the Assets to flow through to a lock box account designated by and for the benefit of the Participant, which proceeds will be subject to the Bank's Security Interest.

   d. <u>Validity, etc.</u> The Trust makes no representations, warranties, or guarantees, of any kind or type, to the Participant regarding the legality, enforceability, existence or value of any Asset, loan, loan documentation, or collateral related to the Assets.

4. <u>Representations and Warranties</u>. As of the date of this Agreement, each Party, unless otherwise specified, represents and warrants to the other Party as follows:

   a. Such Party has been duly organized and is validly existing and in good standing under the laws of the state of its incorporation or formation;

   b. This Agreement is the valid and binding obligation of such Party and is enforceable against such Party and any successors or assigns, except as may be limited by law or equity;

   c. Such Party has the full power, authority and legal right to execute and deliver this Agreement, to consummate the transactions contemplated hereby and to perform and observe all terms and conditions contained herein applicable to it, and has complied with all laws, rules, regulations, and bylaws to which it may be subject;

   d. This Agreement has been duly and validly authorized, executed and delivered by such Party and (assuming the due authorization, execution and delivery hereof by the other Parties) constitutes a valid, legal and binding agreement of such Party enforceable in accordance with its terms, subject to bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting creditors' rights generally and to general principles of equity (regardless of whether enforcement

2

**CONFIDENTIAL**

**Cymbidium026857**

is sought in a proceeding at law or in equity);

    e.  The execution and delivery of this Agreement and the performance of its obligations hereunder by such Party will not conflict with any provision of any law or regulation to which such Party is subject or conflict with or result in a breach of or constitute a default under any of the terms, conditions or provisions of any agreement or instrument to which such Party is a party or by which it is bound or any order or decree applicable to such Party.

    f.  The transactions contemplated by this Agreement are not intended in any way to constitute the sale of a "security" or "securities" within the meaning of any applicable securities laws, and none of the representations, warranties or agreements of any Party shall create any inference that the transactions involve any "security" or "securities".

5. Preferential Payments. If and to the extent that any amount received by any Party, directly or indirectly, from an obligor related to an Asset (each a "Payment") is subsequently invalidated, declared to be fraudulent or preferential, set aside, or judicially required to be repaid to a trustee or receiver or any other person under any applicable creditors' remedy proceeding, including any bankruptcy proceeding, whichever Party was last to hold such Payment, or any portion thereof, shall return such Payment to the payor of such Payment.

6. Amendments. This Agreement may not be amended, modified, or terminated except by an agreement in writing signed by all Parties.

7. Entire Agreement. This Agreement sets forth the entire understanding of the Parties and supersedes any and all prior agreements, representations, arrangements, and understandings relating to the subject matter hereof.

9. Governing Law and Venue. This Agreement shall be governed by the laws of the State of Delaware, without regard to conflict of law or choice of law principles. Any proceeding to enforce this Agreement may be brought in the courts of the State of Delaware and of the United States of America located in the District of Delaware. The parties waive any right to a jury trial.

10. Headings. Section headings are included for convenience of reference only and are not intended to define or limit the scope of any provision of this Agreement and should not be used to construe or interpret this Agreement.

11. No Waiver. No delay, failure or waiver of a Party's exercise or partial exercise of any right or remedy under this Agreement or applicable law will operate to limit, impair, preclude, cancel, waive or otherwise affect such right or remedy. Any waiver by a Party of any provision of this Agreement will not imply a subsequent waiver of that or any other provision of this Agreement.

12. Severability. If any provision of this Agreement is held invalid, illegal or unenforceable, the validity, legality or enforceability of the remaining provisions will in no way be affected or impaired thereby.

*[Signature Page Follows]*

3

**CONFIDENTIAL**

**Cymbidium026858**

IN WITNESS WHEREOF, each of the undersigned has caused this Agreement to be duly executed.

CYMBIDIUM RESTORATON TRUST                    MAGERICK, LLC

By: Cymbidium Restoration, LLC, its Settlor

By: *Adam Henderson*
Adam Henderson (Jul 25, 2023 15:45 PDT)

      Name: Adam Henderson

      Title: Authorized Representative

By: _____

      Name: William S. Weinstein

      Title: Authorized Representative

4

**CONFIDENTIAL**                                                    **Cymbidium026859**

# PE - Secured Participation Agreement, Magerick and Cymbidium (10-7-22)

Final Audit Report                                                       2023-07-25

| | |
|---|---|
| Created: | 2023-07-25 |
| By: | Gabrielle Ayala-Montgomery (GMontgomery@oakharborcapital.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAArd8Hnw0fnaYCUKopbvgOy5aMLfjGlsPG |

## "PE - Secured Participation Agreement, Magerick and Cymbidium (10-7-22)" History

📄 Document created by Gabrielle Ayala-Montgomery (GMontgomery@oakharborcapital.com)
2023-07-25 - 9:28:24 PM GMT

✉ Document emailed to adam@ahendersonenterprises.com for signature
2023-07-25 - 9:29:16 PM GMT

📄 Email viewed by adam@ahendersonenterprises.com
2023-07-25 - 10:45:37 PM GMT

✍ Signer adam@ahendersonenterprises.com entered name at signing as Adam Henderson
2023-07-25 - 10:45:51 PM GMT

✍ Document e-signed by Adam Henderson (adam@ahendersonenterprises.com)
Signature Date: 2023-07-25 - 10:45:53 PM GMT - Time Source: server

✅ Agreement completed.
2023-07-25 - 10:45:53 PM GMT

 Adobe Acrobat Sign

# Exhibit 23

# FIRST AMENDMENT TO MORTGAGE LOAN SALE AGREEMENT
# WITH REPURCHASE OBLIGATIONS

This first amendment ("Amendment") entered into on this 15th day of March 2023, is to the certain and specific Mortgage Loan Sale Agreement with Repurchase Obligations dated as of October 7, 2022 ("the Agreement") by and between U.S. Bank Trust N.A. as trustee of American Homeowner Preservation Trust Series AHP Servicing, a Delaware Statutory Trust and U.S. Bank Trust National Association as Trustee of American Homeowner Preservation Series 2015A+, a Delaware Statutory Trust (collectively the "Seller") and Cymbidium Restoration Trust, a Delaware statutory trust (the "Purchaser").

WHEREAS, the Seller agrees that it has failed to exercise its repurchase obligations under the Agreement;

WHEREAS, Seller intends to now utilize the Purchaser to maximize the ultimate recovery the Seller will achieve for the Mortgage Loans conveyed under the Agreement (the "Mortgage Loans");

WHEREAS, accordingly, in consideration of the foregoing, the Seller and the Purchaser wish to amend the Agreement.

NOW, THEREFORE, in consideration of the premises and mutual agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Purchaser and Seller agree as follows:

Upon the foregoing, the undersigned agree to the following:

1. The Seller's repurchase obligations provided for in Section 4 of the Agreement are hereby eliminated with respect to all Mortgage Loans in their entirety. Accordingly, the Category A Mortgage Loan and Category B Mortgage Loan distinction made in the Mortgage Loan Schedule is hereby eliminated, with the second sentence of the definition of "Mortgage Loan Schedule" in Section 1 being hereby deleted.

2. The loan schedule attached hereto as Exhibit A is incorporated into the Schedule I of the Agreement as additional Mortgage Loans conveyed under the Agreement.

3. In Section I, the definition of Applicable Pricing Rate is hereby amended to be 16%. Despite the elimination of the repurchase obligations under the Agreement, the Applicable Pricing Rate will continue to accrue and be payable by the Seller to the Purchaser on the sum of the Outstanding Purchase Price of the Mortgage Loans, plus the accrued unpaid interest calculated at Applicable Pricing Rate thereon (the "Accrued Interest"), plus any unreimbursed third-party costs advanced by the Purchaser related to the Mortgage Loans, including without limitation maintaining or improving any underlying Mortgage Property (the "Mortgage Loan Costs").

4. The Purchaser (or its designated affiliate) will receive from the date of this Amendment an annual management fee of 1.75% on the sum of the Outstanding Purchase Price for all Mortgage Loans conveyed under the Agreement, plus the Accrued Interest, plus the Mortgage Loan Costs, currently calculated to be on an amount of approximately $21,000,000 (the "Management Fee"). The fee for each month shall be calculated in arrears at $1/12^{th}$ per month on the last day of each month.

5. The Seller will be entitled to all amounts recovered on the Mortgage Loans in excess of (i) repayment of all debt and interest related to the transactions contemplated under the Agreement, (ii) all unrelated third-party costs and fees related to managing the Mortgage Loans, (iii) the 16% Applicable Pricing Rate and (iv) the Management Fee. Thus, upon payment in full of these amounts, the remaining Mortgage Loans and other assets including excess cash are to be assigned and transferred back to the Seller.

   The typical monthly distribution of available cash from the Mortgage Loans will be made in the following order for each month:

   1. first, to the Purchaser, to pay the Mortgage Loan Costs;

   2. second, to the Purchaser, to pay the Management Fee;

   3. third, to the Purchaser, to pay the Applicable Pricing Rate accrued on the Mortgage Loans;

   4. fourth, to the Consultant, to pay the Consulting Fee;

   5. fifth, to the servicers, including legal, to pay any servicing fees and third-party costs related to the Mortgage Loans;

   6. sixth, to Western Alliance Bank, to pay principal, interest and costs on the Purchaser's financing arrangements for the purchase of the Mortgage Loans; and

   7. seventh, to the Seller, all remaining proceeds.

6. The Purchaser will exercise best efforts in good faith to maximize the recovery on the Mortgage Loans. The Seller acknowledges that Purchaser has to meet its and its affiliates' obligations to Western Alliance Bank, one of the primary funding sources for the transactions contemplated under the Agreement. Mortgage Loan resolutions whether bulk or individual, including without limitation individual REO sales marketed in a traditional manner through real estate agents, as well as individual resolutions of the Mortgage Loans with borrowers and/or titleholders such as short payoffs, short sales, and modifications, will not require approval by the Seller.

7. The Purchaser agrees that AHP Servicing and SN Servicing will remain the servicers of the Mortgage Loans through at least July 1, 2023. Further, to the extent that AHP

Servicing obtains licensure to service loans in the State of New York, the Mortgage Loans serviced by SN Servicing will be promptly service transferred to AHP Servicing.

8. The Purchaser agrees to utilize Caneel Group to assist in resolution of the Mortgage Loans through at least May 31, 2023, per the Master Services Agreement between Caneel and AHP Servicing dated October 11, 2022.

9. The Purchaser agrees to engage or have an affiliate engage Karen Kamphausen as a consultant (the "Consultant") on terms to be agreed to, which will provide for an annual consulting fee of $90,000 (the "Consulting Fee"), from March 16, 2023 through the earlier of a) payment in full of amounts contemplated in Paragraph 5 of this Agreement or b) September 15, 2023. Mrs. Kamphausen's primary role will be to support management and resolution of the Mortgage Loans, and her Consulting Fee will be borne by the Seller. The Consultant will also earn an annual salary of $35,000 plus benefits from AHP Servicing, LLC.

10. This Amendment is effective as of the date first above written.

11. Capitalized terms not otherwise defined herein shall have the meanings ascribed to them under the Agreement.

12. The terms of the Agreement are unchanged other than as expressly provided in this Amendment. The undersigned Guarantor of the Seller's Obligations under the Agreement acknowledges this Amendment and agrees to be bound by its terms with its Guarantee of the Seller's Obligations, as amended, remaining in full force and effect.

*[Signature Page Follows]*

PURCHASER:

Cymbidium Restoration Trust

By: Cymbidium Restoration, LLC,
its Settlor and Sole Beneficiary

By: _____

Name: William S. Weinstein
Title: Authorized Representative

GUARANTOR:

AHP Servicing, LLC

By: _____
Name: Jorge Newbery
Title: CEO

SELLER:

U.S. Bank Trust N.A. as Trustee of American
Homeowner Preservation Trust Series AHP
Servicing

By: AHP Capital Management LLC,
Administrator

By: _____
Name: Jorge Newbery
Title: Manager and CEO

US Bank Trust National Association as Trustee of
American Homeowner Preservation Series
2015A+

By: _____
Name: Jorge Newbery
Title: Manager and CEO

# EXHIBIT A

*[see attached excel spreadsheet entitled "703Loans 3.13.23.xslx"]*

# Exhibit 24

Recording requested by, return to:
Tor Midtskog, Weinstein & Riley, P.S.
2001 Western Avenue, Suite 400
Seattle, WA 98121

# POWER OF ATTORNEY

**Grantor:  U.S. Bank Trust N.A. as Trustee of American Homeowner Preservation Trust Series 2015A+**, 440 S. LaSalle Street, Suite 1110, Chicago, IL 60605

**Grantee: Oak Harbor Capital, LLC**, 2003 Western Avenue, Suite #340, Seattle, WA  98121

Dated: April 19, 2023
Non-expiring

**Prepared by Tor Midtskog, Weinstein & Riley, PS, 2001 Western Avenue, #400, Seattle, WA 98121**

CONFIDENTIAL

Cymbidium138301

## LIMITED POWER OF ATTORNEY

**U.S. Bank Trust NA as Trustee of American Homeowner Preservation Trust Series 2015A+** having an office at 440 S. LaSalle, Suite 1110, Chicago IL 60605 ("Principal"), hereby constitutes and appoints **Oak Harbor Capital, LLC** having an office at 2003 Western Ave, Seattle, WA 98121 ("OHC"), and in its name, aforesaid Attorney-In-Fact, by and through any authorized representatives to execute and acknowledge in writing or by facsimile stamp all documents customarily and reasonably necessary and appropriate for the tasks described in the items below. This Limited Power of Attorney is being issued in connection with OHC's responsibilities to manage mortgage loans (the "Loans") and REO properties ("REO Properties") owned by Principal. These Loans are comprised of Mortgages, Deeds of Trust, Deeds to Secure Debt and other forms of Security instruments (collectively the "Security Instruments") and the Mortgage Notes secured thereby.

This appointment shall apply to the following enumerated transactions and nothing herein or in the Agreement shall be construed to the contrary:

1.      The execution of loan modification documents or re-recording of Security Instruments, where said modification or re-recording is solely for the purpose of correcting the Security Instruments, to conform same to the original intent of the parties thereto or to correct title errors discovered after such title insurance was issued; provided that (i) said modification or re-recording, in either instance, does not adversely affect the lien of the Security Instruments as insured and (ii) otherwise conforms to the provisions of the Agreement.

2.      The execution of subordination agreements of the lien of Security Instruments to an easement in favor of a public utility company of a government agency or unit with powers of eminent domain; this section shall include, without limitation, the execution of partial satisfactions/releases, partial re- conveyances or the execution or requests to trustees to accomplish same.

3.      The conveyance of the properties to the mortgage insurer, or the closing of the title to the property to be acquired as real estate owned, or conveyance of title to real estate owned.

4.      The execution of loan assumption agreements, loan modification agreements, and forbearance agreements related to Security Instruments, promissory note, or any other documents related to any Loan.

5.      The full satisfaction/release of Security instruments or full conveyance upon payment and discharge of all sums secured thereby including without limitation the release of the related Mortgage Note.

6.      The assignment of Security Instruments and the related Mortgage Note, in connection with the repurchase of the mortgage loan secured and evidenced thereby.

7.      The full assignment of Security Instruments upon payment and discharge of all sums secured thereby in conjunction with the refinancing thereof, including, without limitation the assignment of the related Mortgage Note.

Cymbidium138302

8. With respect to Security Instruments, the foreclosure, the taking of a deed in lieu of foreclosure evicting (to the extent allowed by federal, state or local laws), or the completion of judicial or non- judicial foreclosure or termination cancellation or rescission of any such foreclosure, including, without limitation, any and all of the following acts:

   a. the substitution of trustee(s) serving under a Deed of Trust, in accordance with state law and the Deed of Trust;

   b. the preparation and issuance of statements of breach or non-performance;
   c. the preparation and filing of notices of default and/or notices of sale;
   d. attend the foreclosure auction, execute and enter any foreclosure sale documents;
   e. the cancellation/rescission of notices of default and/or notices of sale;
   f. the taking of deed in lieu of foreclosure; and
   g. the preparation and execution of such other documents and performance of such other actions as may be necessary under the terms of the Security Instruments or state law to expeditiously complete said transactions in paragraphs 8.a. through 8.f above.

9. With respect to the sale of property acquired through a foreclosure or deed-in lieu of foreclosure, including, without limitation, the execution of the following documentation:

   a. listing agreements;
   b. purchase and sale agreements;
   c. grant/warranty/quit claim deeds or any other deed causing the transfer of title of the property to a party contracted to purchase same;
   d. escrow instructions; and
   e. any and all documents necessary to effect the transfer of property.

10. Endorse escrow checks received in conjunction with a loss to property. The modification or amendment of escrow agreements established for repairs or restoration of thee the mortgaged property or reserves for replacement of personal property.

All documents and instruments necessary in the appearance and prosecution of suits for possession and unlawful detainer and eviction actions seeking, without limitation possession of any real property acquired through foreclosure and any and all related damages.

The undersigned gives said Attorney-in-Fact full power and authority to execute such instruments and to do and perform all and every act and thing necessary and proper to carry into effect the power or powers granted by or under this Limited Power of Attorney as fully as the undersigned might or could do.

This appointment is to be construed and interpreted as a Limited Power of Attorney. The enumeration of specific items rights, acts or power herein is not intended to, nor does it give rise to, and it is not to be construed as a general power of attorney.

Third parties without actual notice may rely upon the exercise of the power granted under this Limited Power of Attorney; and may be satisfied that this Limited Power of Attorney shall

2

 Cymbidium138303

continue in full force and effect and has not been revoked unless an instrument of revocation has been made in writing by the undersigned .

CONFIDENTIAL

Cymbidium138304

Witness my hand and seal this 19 day of Apl, 2023.

U.S. Bank Trust NA as Trustee of American Homeowner Preservation Trust Series 2015A+ BY: AHP Capital Management LLC, Administrator

By: _____
Jorge Newbery, Manager

Witness: _Amas lopez_

Witness: _Avee Bergante_

State of I L
County of Cook
On this 19th day of April, 2023, before me the undersigned a Notary Public in and for said County and State, personally appeared Jorge Newbery, who is personally known to me (or proved to me on the basis of satisfactory evidence) to be the persons who executed the within instrument as Authorized Representative, respectively of **U.S. Bank Trust NA as Trustee of American Homeowner Preservation Trust Series 2015A+ BY: AHP Capital Management LLC, Administrator** and acknowledged to me that such Principal executed the within instrument pursuant to its by-laws or a resolution of its Board of Directors.

WITNESS my hand and official seal,
Signature: Narita McClennon
My Commission Expires: 3-2-2027 .           (SEAL)



NARITA J MCCLENNON
OFFICIAL SEAL
Notary Public, State of Illinois
My Commission Expires
March 02, 2027

# Exhibit 25
(Submitted in Native Format)

# Exhibit 26

**Instrument # 222598**
POWER COUNTY, IDAHO
12-14-2023   12:44:24 PM     No. of Pages: 1
Recorded for: AMERICAS TRUSTEE SERVICE
SHAREE SPRAGUE          Fee: $10.00
Ex-Officio Recorder Deputy: Cathy Miles
Electronically Recorded by Simplifile

## NOTICE OF REVOCATION OF POWER OF ATTORNEY

American Homeowner Preservation, LLC, of 440 S. LaSalle St., Ste 1110, Chicago, Illinois, 60605, hereby revokes the Limited Power of Attorney dated September 20, 2022, naming Atlantica, LLC, of 2001 Western Ave., Suite 400 Seattle, WA, 98121 as Attorney-In-Fact.

Dated: 12-8-23

U.S. Bank Trust NA as Trustee of American Homeowner Preservation Trust Series 2015A+

BY: AHP Capital Management, LLC, Administrator

By: Jorge Newberry, Manager

State of Illinois       )
                        ) SS
County of Cook          )

On this ___ day of December, 2023, before me, a notary public, personally appeared Jorge Newberry, who is personally known to me (or proved to me on the basis of satisfactory evidence) to be the person who executed the above instrument as Authorized Representative, respectively of U.S. bank Trust NA as Trustee of American Homeowner Preservation Trust Series 2015+A By: AHP Capital Management, LLC, Administrator, and acknowledged to me that such Principal executed the within instrument pursuant to its by-laws or a resolution of its Board of Directors.

Dated: 12/8/23

Notary Public

My commission expires: 3/2/27

OFFICIAL SEAL
KAREN E KAMPHAUSEN
Notary Public, State of Illinois
Commission No. 0967667
My Commission Expires
March 02, 2027

#394504v1

# Exhibit 27



January 4, 2024


William Weinstein
President & CEO
Oak Harbor Capital, LLC
2003 Western Avenue
Seattle, WA 981212

via email & overnight courier

### RE:     Revoked Powers of Attorney

Dear Bill,

We request that Oak Harbor Capital LLC and Atlantica LLC immediately cease signing documents using revoked Powers of Attorney.

On October 23, 2023, I emailed you to advise that "*all Powers of Attorney between AHP entities and Oak Harbor entities are revoked effective immediately, including:*

1. *U.S. Bank Trust N.A. as Trustee of American Homeowner Preservation Trust Series 2015A+ to Oak Harbor Capital;*

2. *U.S. Bank Trust N.A. as Trustee of American Homeowner Preservation Trust Series AHP Servicing to Oak Harbor Capital;*

3. *American Homeowner Preservation LLC to Atlantica LLC dated September 20, 2022."*


For reference, I have attached a copy of the October 23 email, the three POAs and the recorded revocations.

Despite the revocations, we have identified multiple instances in which Oak Harbor and Atlantica have continued to execute documents using the revoked POAs. These documents are invalid.

For maximum clarity, all Powers of Attorney which any AHP entity provided to Oak Harbor and Atlantica have been revoked. As a result, Oak Harbor, Atlantica, and affiliated entities and agents such as SN Trading and Land Home Financial Services are not authorized to take action on behalf of any AHP entity.

On documents signed prior to the revocations, we have identified hundreds of documents on which Oak Harbor utilized the POAs for powers unauthorized. For instance, the POAs to Oak Harbor limit



the execution of assignments to "the repurchase of the mortgage loan secured and evidenced hereby" as well as "upon payment and discharge of all sums secured thereby in conjunction with the refinancing thereof." To be clear, Oak Harbor has never had any authority to execute any assignments in connection with loan sales. Further, despite the limitations, Oak Harbor executed assignments to affiliates Magerick, Eurostylis and Atlantica for no apparent consideration. These documents are all void or voidable, as are all subsequent assignments and transfers.

SN Trading LLC, as agent of Oak Harbor and affiliates, is currently marketing a sale of 197 loans with bids due today. We believe that this offering includes loans on which assignments were executed with Powers of Attorney which were abused or revoked, as well as loans still vested in AHP entities.

Land Home Financial Services Inc., as agent of Oak Harbor and affiliates, is servicing loans owned by AHP entities despite being notified that these POAs have been revoked and having received a Cease and Desist advising that they have no authority to take any action on behalf of U.S. Bank Trust N.A. as Trustee of American Homeowner Preservation Trust Series 2015A+ and U.S. Bank Trust N.A. as Trustee of American Homeowner Preservation Trust Series AHP Servicing. After revocation and without authority, Land Home has been requesting that multiple law firms take action of behalf of AHP's Trust, including assigning foreclosure deeds, bids and judgments out of the Trust and into Magerick.

To reiterate, we request that Oak Harbor and Atlantica immediately cease signing any documents using revoked Powers of Attorney. Further, we request that Oak Harbor and your affiliates and agents, including SN Trading and Land Home, immediately cease taking any action on behalf of any AHP entity.

Sincerely,

Jorge Newbery

Jorge Newbery
Chief Executive Officer
AHP Servicing LLC

cc:
Maxwell Thornton
David Pollio
Rob Arkley
Brad Waite
Teji Singh
David Waite
John Waite
Deborah Robertson
Brenda Usher
Samantha Schechter

# Exhibit 28

2024007463   L: 58626 P: 646   ASG
01/04/2024 12:13:27 PM Total Pages: 2
Bernard J. Youngblood, Register of Deeds - Wayne County, MI
ELECTRONICALLY RECORDED

**48073823**
**Recording requested by, return to:**
Tor Midtskog, Weinstein & Riley, P.S.,
2001 Western Avenue, Suite 400,
Seattle, WA 98121

## ASSIGNMENT OF MORTGAGE

For Value Received, the undersigned **U.S. Bank Trust N.A. as Trustee of American Homeowner Preservation Trust Series 2015A+**, at 440 S. LaSalle Street, Suite 1110, Chicago, IL 60605, hereby conveys, assigns, and transfers to **MAGERICK, LLC**, at 1415 Western Avenue, Suite 700, Seattle, WA 98101, its successors and/or assigns, all right, title and interest together with all moneys due or to become due and all rights accrued or to accrue under that certain Mortgage executed by **429 Campbell Trust, Marcolyn Karpan as trustee** to **US Bank Trust as Trustee of the American Homeowner Preservation Trust Series 2015A+** for $26,000.00 dated 02/24/2020, recorded on 03/11/2020 in Instrument 2020132981, Liber 55684, Page 615, **WAYNE** County, **MI** Records.

**Property Address: 429 CAMPBELL, RIVERROGUE, MI 48218**

**U.S. Bank Trust N.A. as Trustee of American Homeowner Preservation Trust Series 2015A+ by its Attorney-in-Fact Atlantica, LLC**

December 28, 2023

Name: David Edens Hartsell
Title:   Administrative Representative

*NOTARY ACKNOWLEDGMENT IS ON FOLLOWING PAGE*

This instrument prepared by
Tor R Midtskog, Weinstein & Riley, P.S., 2001 Western Avenue, Suite 400, Seattle, WA 98121
Reference: **48073823** / 0312003197

# ACKNOWLEDGMENT

**State of WASHINGTON**
**County of KING**

On  December 28, 2023  before me, LUCAS FRANK, Notary Public, personally appeared David Edens Hartsell, Authorized Representative of Atlantica, LLC, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

Signature _____

Notary Public: Lucas Frank
My Commission Expires: 08-30-2027

Notary Public
State of Washington
LUCAS FRANK
LICENSE # 23032604
MY COMMISSION EXPIRES
AUGUST 30, 2027

Reference: **48073823** / 0312003197

# Exhibit 29

**From:** Adobe Acrobat Sign on behalf of Oak Harbor Capital, LLC <adobesign@adobesign.com>
**Date:** Monday, October 2, 2023 at 7:01 PM
**To:** Gabrielle Ayala-Montgomery <GMontgomery@oakharborcapital.com>, Bill Bymel
<bill@firstliencapital.com>, William Weinstein <wsw@oakharborcapital.com>
**Subject:** Completed: "MLSA, BBNY Mortgage LLC and Magerick (6-30-23)"



## All parties finished
## MLSA, BBNY Mortgage LLC and Magerick (6-30-23)

 **[na4.documents.adobe.com]**

Attached is the final agreement between:

1

- Oak Harbor Capital, LLC
- William Weinstein
- William Bymel

Read it with **Acrobat Reader [adobe.com]**. You can also **open it online [na4.documents.adobe.com]** to review its activity history.



Need your own documents signed? Adobe Acrobat Sign can help save you time. **Learn more [adobe.com]**.

To ensure that you continue receiving our emails, please add adobesign@adobesign.com to your address book or safe list.

**Terms of Use [adobe.com]** | **Report Abuse [na4.documents.adobe.com]**

© 2023 Adobe. All rights reserved.

FL CONFIDENTIAL00131

# MORTGAGE LOAN SALE AGREEMENT

This MORTGAGE LOAN SALE AGREEMENT (this "Agreement"), dated as of June 30, 2023 ("Effective Date") is by and between Magerick, LLC (the "Seller"), having an office at 1415 Western Ave., Suite 700, Seattle, WA 98101, and BBNY Mortgage LLC, (the "Purchaser"), having an office at 4755 Technology Way, Suite 104, Boca Raton, Florida, 33431.

## W I T N E S S E T H:

WHEREAS, the Seller desires to sell to the Purchaser, and the Purchaser desires to purchase from the Sellers, certain residential mortgage loans (the "Mortgage Loans"), as described herein, on a servicing-released basis, and which shall be delivered in a group of whole loans on June 30, 2023 (the "Conveyance Date");

WHEREAS, each Mortgage Loan is secured by a mortgage, deed of trust or other security instrument encumbering a residential dwelling located in the jurisdiction indicated on the schedule annexed hereto as Schedule I (the "Mortgage Loan Schedule"); and

WHEREAS, the Purchaser and the Seller wish to prescribe the manner of the conveyance, interim servicing and control of the Mortgage Loans.

NOW, THEREFORE, in consideration of the premises and mutual agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Purchaser and the Seller agree as follows:

SECTION 1. Definitions. For the purposes of this Agreement the following capitalized terms shall have the respective meanings set forth below, unless otherwise defined herein.

Agreement: This Mortgage Loan Sale Agreement including all exhibits, schedules, amendments and supplements hereto.

Assignment of Mortgage: An individual assignment of the Mortgage, notice of transfer or equivalent instrument in recordable form, sufficient under the laws of the jurisdiction wherein the related Mortgaged Property is located to give record notice of the sale of the Mortgage to the Purchaser.

Business Day: Any day other than a Saturday or Sunday, or a day on which banking and savings and loan institutions are authorized or obligated by law or executive order to be closed.

Closing Documents: The documents required pursuant to Section 8.

Cut-off Date: June 30, 2023.

Interim Servicer: With respect to any Mortgage Loan, the Seller's servicing or asset management designee(s) as specified on the related Mortgage Loan Schedule.

FL CONFIDENTIAL00132

Interim Servicing Period:  The period commencing on the related Conveyance Date and ending on the Servicing Transfer Date.

Modification Agreement:  With respect to each Mortgage Loan, each written agreement modifying, adding, extending or amending the terms of both, or either of, the Note and Mortgage, entered into between the Mortgagor and the owner of the Mortgage Loan at the time such agreement was executed, or its agent.

Monthly Payment:  With respect to any Mortgage Loan, the scheduled combined payment of principal and/or interest payable by a Mortgagor under the related Note on each due date.

Mortgage:  With respect to each Mortgage Loan, the mortgage, deed of trust or other instrument encumbering the Mortgaged Property securing the Note, including any riders and/or addenda thereto, as such Mortgage may be amended, modified or extended by one or more Modification Agreement.

Mortgage File:  The Mortgage Loan Documents pertaining to the related Mortgage Loan and the Servicing File.

Mortgage Loan:  Each residential mortgage loan sold, assigned and transferred to the Purchaser pursuant to this Agreement and identified on the Mortgage Loan Schedule, which Mortgage Loan includes, to the extent available, the Mortgage File, the Monthly Payments and all other rights, benefits, proceeds and obligations arising from or in connection with such Mortgage Loan.

Mortgage Loan Documents:  The documents listed in Exhibit 1 hereto pertaining to any Mortgage Loan.

Mortgage Loan Schedule:  The schedule of Mortgage Loans attached hereto as Schedule I and setting forth certain information regarding each Mortgage Loan.

Mortgaged Property:  With respect to each Mortgage Loan, the Mortgagor's real property encumbered by the Mortgage securing repayment of a related Note.

Note:  The original executed note, or other evidence of the Mortgage Loan indebtedness of a Mortgagor, secured by the related Mortgage, including any riders and/or addenda thereto, as may be amended, modified or extended  by one or more Modification Agreement.

Mortgagor:  The obligor on a Note, the owner of the Mortgaged Property and the grantor or mortgagor named in the related Mortgage and such grantor's or mortgagor's successors in title to the Mortgaged Property.

Person:  An individual, corporation, limited liability company, partnership, joint venture, association, joint-stock company, trust, unincorporated organization or government or any agency or political subdivision thereof.

2

FL CONFIDENTIAL00133

Purchase Price:  The price paid by the Purchaser to the Seller pursuant to Section 3 below.

Servicing File:  With respect to each Mortgage Loan, the file retained by the Interim Servicer that includes all the documents, files, records, servicing documents, servicing records, logs, data tapes, computer records, or other information pertaining to the servicing of the Mortgage Loan during the time such Mortgage Loan was owned by Seller, or pertaining to the past servicing of the Mortgage Loan, to the extent such documents, records and information, are in the Seller's or Interim Servicer's possession.

Servicing Transfer Date:  The date that is ninety (90) days after the Conveyance Date or a later date as determined by the parties.

SECTION 2.  Agreement to Purchase.  The Seller agrees to sell, and the Purchaser agrees to purchase, on the Conveyance Date and on the terms and conditions stated herein, the Mortgage Loans listed on the Mortgage Loan Schedule.

On the Conveyance Date, upon the payment of the Purchase Price and delivery of the documents described herein, the Seller shall sell, transfer, assign, set over, and convey to the Purchaser, without recourse, but subject to the representations, warranties, terms and provisions of this Agreement all the right, title, and interest of the Seller in and to the related Mortgage Loan or Loans, servicing released.

Upon the successful completion of the purchase and sale transactions contemplated herein on the Conveyance Date, the Purchaser shall own and be entitled to receive with respect to each Mortgage Loan all related Monthly Payments and all other payments and recoveries of principal, interest, late payment charges, prepayment premiums and other fees, charges and sums paid or recovered on or with respect to such Mortgage Loans on and after the Cut-off Date.

SECTION 3.  Purchase Price.  The aggregate purchase price (the "Purchase Price") for the Mortgage Loans shall be $2,200,000.00.

The Purchaser shall pay the Purchase Price to the Seller, no later than ninety (90) days after the Conveyance Date, by wire transfer of immediately available funds to the account designated by the Seller pursuant to the wire transfer information attached hereto as Exhibit 2.

SECTION 4.  Examination of Mortgage Files.  The Seller shall make the related Mortgage Files available to the Purchaser for examination at the offices of Seller's document custodian, or such other location where the Mortgage Files are stored, or as shall otherwise be agreed upon by the Purchaser and the Seller in writing, and during normal business hours.  To the extent practicable, the Seller shall request that its custodian make images of the related Mortgage Files available to the Purchaser for examination.  Any examination pursuant to the foregoing two sentences may be made by the Purchaser, or its designee, at Purchaser's sole cost and expense, and at any reasonable time before the related Conveyance Date.

3

FL CONFIDENTIAL00134

SECTION 5.   Conveyance from Seller to Purchaser.

Subsection 5.01.          Possession of Mortgage Files.

The Mortgage Files retained by the Interim Servicer with respect to each Mortgage Loan sold pursuant to this Agreement shall be appropriately identified in the Interim Servicer's computer system to reflect clearly the sale of such related Mortgage Loan to the Purchaser upon the completion of the purchase and sale contemplated by this Agreement.   On the Servicing Transfer Date, the Seller shall release from its custody, or cause its Interim Servicer to release from its custody, the related Mortgage Files, which shall be delivered to the Purchaser's successor servicer. Notwithstanding the forgoing, the Seller and the Interim Servicer shall be entitled to retain copies of the Mortgage Files, as of the Conveyance Date, for such period after the transfer as required by applicable law.

Subsection 5.02.          Delivery of Mortgage Files.

(i)       Upon payment of the Purchase Price on the Conveyance Date, the Seller shall release any interest that it has in the Mortgage Files upon its receipt of the Purchase Price for the Mortgage Loans. Subject to the following paragraph and subparagraphs, the Seller will deliver the Mortgage Files in its possession at the time of closing to the Purchaser's custodian within 30 days after purchase. The Purchaser acknowledges, understands and agrees that the Prior Sellers and their affiliates may possess information regarding the Mortgage Loans that was not and shall not be provided to the Seller or the Purchaser, including information reflected in reports relating to internal or external investigations concerning the Mortgage Loans or that is subject to legal privilege, and the Purchaser hereby waives any and all causes of action arising out of or relating to the non-disclosure of such information.

SECTION 6.   Representations, Warranties and Covenants of the Seller: Remedies for Breach.

Subsection 6.01.          Representations and Warranties Respecting the Seller.

The Seller represents, warrants and covenants to the Purchaser as of the Conveyance Date, that to the best of such Seller's knowledge:

(i)       The Seller is duly organized, validly existing and in good standing under the laws of its state of organization;

(ii)       The Seller has the full power and authority to hold each Mortgage Loan, to sell each Mortgage Loan, and to execute, deliver and perform, and to enter into and consummate, all transactions contemplated by this Agreement.   The Seller has duly authorized the execution, delivery and performance of this Agreement, has duly executed and delivered this Agreement, and this Agreement, assuming due authorization, execution and delivery by the Purchaser, constitutes a legal, valid and binding obligation of the Seller, enforceable against it in accordance with its terms except as the enforceability thereof may be limited by bankruptcy, insolvency or reorganization;

4

(iii)   The execution and delivery of this Agreement by the Seller and the performance of and compliance with the terms of this Agreement will not violate the Seller's organizational documents or constitute a default under or result in a breach or acceleration of, any material contract, agreement or other instrument to which the Seller is a party or which may be applicable to the Seller or its assets;

(iv)   The Seller is not in violation of, and the execution and delivery of this Agreement by the Seller and its performance and compliance with the terms of this Agreement will not constitute a violation with respect to, any order or decree of any court or any order or regulation of any federal, state, municipal or governmental agency having jurisdiction over the Seller or its assets, which violation might have consequences that would materially and adversely affect the condition (financial or otherwise) or the operation of the Seller or its assets or might have consequences that would materially and adversely affect the performance of its obligations and duties hereunder;

Subsection 6.02.      Remedies for Breach of Representations and Warranties.

For the avoidance of doubt, Purchaser acknowledges that Mortgage Loans are being sold on an as-is basis.

For the avoidance of doubt and notwithstanding anything in this Agreement to the contrary, the Purchaser acknowledges understands and agrees that it shall have no remedy with respect to fraud, misrepresentation or omission in the origination or modification (other than modifications performed by the Interim Servicer) of any Mortgage Loan, compliance or non-compliance with underwriting guidelines or other underwriting standards or protocols in the origination or modification (other than modifications performed by the Interim Servicer) of any Mortgage Loan, appraisal or valuation deficiencies in the origination or modification (other than modifications performed by the Interim Servicer) of any Mortgage Loan, or the existence or validity of any mortgage insurance policy related to any Mortgage Loan. The Seller expressly disclaims any liability regarding the aforementioned facts and the Purchasers acknowledge, understand, and agrees to that disclaimer, including in any case where the Seller has constructive or actual knowledge of those facts.

SECTION 7.   Representations, Warranties and Covenants of the Purchaser.

Subsection 7.01.      The Purchaser represents, warrants and covenants to the Seller as of the Conveyance Date:

(i)   The Purchaser is duly organized, validly existing and in good standing under the laws of the state of its organization and is and will remain in compliance with the laws of each state in which any Mortgaged Property is located to the extent necessary to ensure the enforceability of each Mortgage Loan and the servicing of the Mortgage Loan in accordance with the terms of this Agreement.  No licenses or approvals obtained by the Purchaser have been suspended or revoked by any court, administrative agency, arbitrator or governmental body and no proceedings are pending which might result in such suspension or revocation;

(ii)   The Purchaser has the full power and authority to hold each Mortgage Loan, to purchase each Mortgage Loan, and to execute, deliver and perform, and to enter into and

FL CONFIDENTIAL00136

consummate, all transactions contemplated by this Agreement. The Purchaser has duly authorized the execution, delivery and performance of this Agreement, has duly executed and delivered this Agreement, and this Agreement, assuming due authorization, execution and delivery by the Seller, constitutes a legal, valid and binding obligation of the Purchaser, enforceable against it in accordance with its terms except as the enforceability thereof may be limited by bankruptcy, insolvency or reorganization;

(iii)    The execution and delivery of this Agreement by the Purchaser and the performance of and compliance with the terms of this Agreement will not violate the Purchaser's articles of incorporation or by-laws or constitute a default under or result in a breach or acceleration of, any material contract, agreement or other instrument to which the Purchaser is a party or which may be applicable to the Purchaser or its assets;

(iv)    The Purchaser is not in violation of, and the execution and delivery of this Agreement by the Purchaser and its performance and compliance with the terms of this Agreement will not constitute a violation with respect to, any order or decree of any court or any order or regulation of any federal, state, municipal or governmental agency having jurisdiction over the Purchaser or its assets, which violation might have consequences that would materially and adversely affect the condition (financial or otherwise) or the operation of the Seller or its assets or might have consequences that would materially and adversely affect the performance of its obligations and duties hereunder;

(v)    The Purchaser shall submit for recording with the related county recorder, register of deeds or similar office, each Assignment of Mortgage delivered hereunder within the later of sixty (60) days of the Conveyance Date or the date the Purchaser receives the Assignment of Mortgage from the Seller. Upon the Seller's request, the Purchaser shall provide evidence of such submission. The Purchaser acknowledges and agrees that it shall submit, or cause its counsel to submit, with any court, any and all instruments required to transfer the prosecution of any foreclosure or other litigation that any Mortgage Loan is currently subject to from the name of the Seller into the name of the Purchaser.  Such submissions shall be made within sixty (60) days of the Conveyance Date.

(vi)    The Purchaser has not worked with any broker, finder or similar party due any commission or fee in connection with the transactions contemplated herein.

(vii)    The Purchaser has been urged, invited and directed to conduct such due diligence review and analysis of the Mortgage Files, together with such records as are generally available to the public from local, county, state and federal authorities, record-keeping offices and courts (including, without limitation, any bankruptcy courts in which any Mortgagor(s), guarantor or surety, if any, may be subject to any pending bankruptcy proceedings) as the Purchaser deemed necessary, proper or appropriate in order to make a complete informed decision with respect to the purchase and acquisition of the Mortgage Loans.

(viii)    The Purchaser is a sophisticated investor and its bid and decision to purchase the Mortgage Loans is based upon its own comprehensive review and independent expert evaluation and analysis of the Mortgage Loans and Mortgage Files. The Purchaser has made such independent investigation as the Purchaser deems to be warranted into the nature, title, attachment,

6

FL CONFIDENTIAL00137

perfection, priority, validity, enforceability, collectability, and value of the Mortgage Loans, the title, condition and value of any collateral securing the Mortgage Loans, the market conditions and other characteristics of the places where any such collateral is located, and all other facts it deems material to the purchase of the Mortgage Loans.

(ix)    In entering into this Agreement, the Purchaser has not relied upon any oral information from the Seller or any of its employees, agents, attorneys or representatives, other than the representations, warranties and covenants of the Seller contained herein. The Purchaser acknowledges that no employee, agent, attorney or representative of the Seller has been authorized to make, and that the Purchaser has not relied upon, any statements, representations, warranties or covenants other than those specifically contained in this Agreement.

(x)    The transactions contemplated by this Agreement do not involve, nor are they intended in any way to constitute, the sale of a "security" or "securities" within the meaning of any applicable securities laws, and none of the representations, warranties or agreements of the Purchaser shall create any inference that the transactions involve any "security" or "securities".  The Purchaser acknowledges, understands and agrees that the acquisition of these Mortgage Loans involves a high degree of risk and they are suitable only for persons or entities of substantial financial means who have no need for liquidity and who can hold the Mortgage Loans indefinitely or bear the partial or entire loss of the value.

(xi)    The Purchaser understands and agrees that some or all of the Mortgage Loans transferred under this Agreement are or have been non-performing on their original and/or modified terms and that Mortgage, and may be subject to Modification Agreement; some of the Mortgage Loans may also be in involved in a bankruptcy or other litigation.

(xii)    The Purchaser covenants and agrees that it shall not (a) except as required by applicable law, institute any enforcement or legal action or proceeding in the name of the Seller or Interim Servicer or a prior owner of the Mortgage Loan or, except as required by applicable law or to comply with the requirements of this Agreement, make reference to the Seller or the Interim Servicer or a prior owner of the Mortgage Loans in any correspondence to or discussion with any particular obligor regarding enforcement or collection of the Mortgage Loans except for purposes of identifying a Mortgage Loan as originated or previously owned by the Seller or a prior owner, (b) misrepresent, mislead, deceive, or otherwise fail to adequately disclose to any particular Mortgagor or guarantor the identity of the Purchaser as the owner of the Mortgage Loan or (c) with respect to the Mortgage Loans, take any action in the Seller's name or Interim Servicer's name or a prior owner's name or hold itself out as an agent or representative of the Seller or a prior owner. The Seller shall have the right to seek the entry of an order by a court of competent jurisdiction enjoining any violation hereof.

(xiii)    Neither the Purchaser nor its servicer shall initiate any contact with any Mortgagor related to any Mortgage Loan prior to the Conveyance Date, unless otherwise required by applicable law and with prior notice and approval in writing of the Seller.

(xiv)    Purchaser acknowledges and agrees that the Seller, except with respect to the rights and remedies specifically set forth by the Seller herein, has not and does not represent, warrant or covenant the nature, accuracy, completeness, enforceability or validity of any of loan

FL CONFIDENTIAL00138

documents, Mortgage Files, or any information or documents made available to the Purchaser or its counsel, accountants or advisors in connection with the Mortgage Loans and, all documentation, information, analysis and/or correspondence, if any, which is or may be sold, transferred, assigned and conveyed to the Purchaser with respect to any and all Mortgage Loans is sold, transferred, assigned and conveyed to the Purchaser on an "AS IS, WHERE IS" basis, WITH ALL FAULTS.

(xv)    The Purchaser acknowledges and agrees that it is fully aware of the physical condition and state of repair of the Mortgaged Properties and agrees to purchase the Mortgage Loans taking into account the related properties in their "as is" condition "with all faults" as of the date hereof.

Subsection 7.02.    Indemnification.

Each party agrees to pay, or reimburse the other, and to protect, defend, indemnify, save and hold harmless the other, and its agents, assigns, employees, officers, directors and advisors and contractors from and against any losses, liabilities, claims, causes of action, damages, demands, taxes, fees, costs and expenses of whatever kind, arising out of or incurred in connection with a breach of any material term, representation, warranty, or covenant of this Agreement, or failure to comply with applicable laws, or perform obligations under this Agreement. The Purchaser shall also indemnify the Seller and hold it harmless against any losses that it may sustain in any way resulting from any claim, demand, defense or assertion based on or grounded upon, or resulting from, a failure by the Purchaser's servicer to service the Mortgage Loans in accordance with applicable law after the Conveyance Date. The indemnification provided under this Section 7.02 shall be with respect to losses involving third parties and losses between the Seller and the Purchaser. Each party shall immediately notify the other of any such claim or threatened claim that may exist. The provisions of this Section 7.02 shall survive termination of this Agreement.

SECTION 8.  Closing.  The closing for the sale and purchase of the Mortgage Loans shall take place on the Conveyance Date. As mutually agreed between the Sellers and the Purchaser, the closing shall be either by telephone, confirmed by letter or wire as the parties shall agree, or conducted in person, at such place as the parties shall agree.

Subsection 8.01.    Closing Documents.  The Closing Documents for the Mortgage Loans to be purchased on each Conveyance Date shall consist of fully executed originals of the following:

(i)    this Agreement; and

(ii)    the related Mortgage Loan Schedule.

SECTION 9.  Costs.  The Purchaser shall bear any and all costs and expenses it incurs in connection with the transactions contemplated by this Agreement, including, without limitation, (i) legal fees and expenses of its attorneys; (ii) fees and expenses incurred in connection with its due diligence review of the Mortgage Loans and the Mortgage Files ; and (iii) fees incurred in connection with recording any Assignments of Mortgage.

8

FL CONFIDENTIAL00139

SECTION 10. <u>Seller's Interim Servicing Obligations</u>.   The Mortgage Loans are being sold on a servicing-released basis.   On the Servicing Transfer Date, the Purchaser, or its designee, shall assume all servicing responsibilities related to the Mortgage Loans and the Seller (and/or its Interim Servicer) shall cease all servicing responsibilities related to the Mortgage Loans.

During the period between the related Conveyance Date and the related Servicing Transfer Date, the Seller or its Interim Servicer shall interim service the related Mortgage Loans for the benefit of the Purchaser in accordance all applicable laws, rules and regulations.   During the period between the related Conveyance Date and the related Servicing Transfer Date, the Seller or Interim Servicer shall, at their respective cost and expense, take such steps as may be necessary or appropriate to effectuate and evidence the transfer of the servicing of the related Mortgage Loans to the Purchaser, or its designee (other than the recording of any Assignment of Mortgage or similar instrument, the responsibility for and cost of which shall be the Purchaser's).

The Seller shall cause the Interim Servicer to execute or cause to be executed a "good-bye" letter in a form reasonably acceptable to the Purchaser, addressed to the Mortgagor under each Mortgage Loan notifying Mortgagor of the transfer of servicing of the Mortgage Loan to the Purchaser or its designee.   The Purchaser shall, or shall cause its designee to, execute a "hello" letter in a form reasonably acceptable to the Interim Servicer, addressed to the Mortgagor under each Mortgage Loan notifying the Mortgagor of the transfer of servicing of the Mortgage Loan to the Purchaser or its designee and directing Mortgagor to make all payments required under its Mortgage Loan from and after the Servicing Transfer Date to Purchaser or its designee. Except as otherwise stated herein, as of the Conveyance it shall be the Purchaser's obligation and he Purchaser agrees to make all other notices and disclosures required by applicable law in connection with the Mortgage Loans or transfer thereof.

With respect to each Mortgage Loan, the Seller shall cause the Interim Servicer to remit to the Purchaser, or its designee, following the Servicing Transfer Date, the sum of: (a) all amounts received from any source with respect to the Mortgage Loans after the Cut-off Date plus (b) all positive escrow balances, in each case, in the time and manner as the Seller, Interim Servicer and Purchaser shall agree.   The Interim Servicer shall also deliver to the Purchaser, or its designee, a reconciliation of the foregoing.

SECTION 11. <u>Termination of Interim Servicing</u>.   The respective obligations and responsibilities of the Seller (as the same relate to interim servicing) and the Interim Servicer, shall terminate at the expiration of the Interim Servicing Period.   In connection with any such termination, to the extent not already prepared, executed and/or delivered, the Seller shall prepare, execute and deliver any and all documents and other instruments, place in the Purchaser's possession all Mortgage Files, and, to the extent not already done or accomplished, do or accomplish all other acts or things reasonably necessary or appropriate to effect the purposes of such notice of termination, whether to complete the transfer and endorsement or assignment of the Mortgage Loans and related documents, or otherwise, at the Seller's sole expense. The Seller agrees to cooperate with the Purchaser and such successor (and to cause the Interim Servicer to so cooperate) in effecting the termination of the Interim Servicer's responsibilities and obligations hereunder, including, without limitation, the transfer to such successor for administration by it of all cash amounts received after the related Cut-off Date with respect to the Mortgage Loans.

9

SECTION 12. <u>Successor to the Seller</u>.  Prior to termination of the Seller's and/or the Interim Servicer's responsibilities and duties under this Agreement as interim servicer pursuant to this Section 12, the Purchaser shall (i) succeed to and assume all of the responsibilities, rights, duties and obligations as servicer of the Mortgage Loans, or (ii) appoint a successor which shall succeed to all rights and assume all of the responsibilities, duties and liabilities of the servicer of the Mortgage Loans.

Any successor appointed as provided herein shall execute, acknowledge and deliver to the Sellers, the Interim Servicer, and to the Purchaser an instrument accepting such appointment, whereupon such successor shall become fully vested with all the rights, powers, duties, responsibilities, obligations and liabilities of as servicer.

The Seller shall cause the Interim Servicer to execute and deliver such instruments and do such other things all as may reasonably be required to more fully and definitely vest and confirm in the successor all such rights, powers, duties, responsibilities, obligations and liabilities of the Purchaser or its appointed successor as servicer of the Mortgage Loans.  The successor shall make arrangements as it may deem appropriate to reimburse the Seller and/or the Interim Servicer for amounts the Seller or the Interim Servicer, as the case may be, actually expended as interim servicer pursuant to this Agreement which the successor is entitled to retain hereunder and which would otherwise have been recovered by the Seller or the Interim Servicer, as the case may be, pursuant to this Agreement but for the appointment of the successor servicer.

SECTION 13.  <u>Confidentiality</u>.

The Seller and the Purchaser acknowledge and agree that the terms of this Agreement and any information whether oral, written or otherwise provided by the Sellers to the Purchaser pursuant to this Agreement or the transactions contemplated herein shall be kept confidential, shall not be divulged to any party other than those that have a need to know such information in order to complete the transaction contemplated herein, including without limitation, the Interim Servicer, governmental authorities, due diligence service providers and attorneys, without the other parties' consent, and shall be maintained according to applicable privacy laws. Notwithstanding the foregoing, the Purchaser may disclose Mortgage Loan data (excluding non-public personal information regarding the borrowers), but only in the manner authorized by applicable privacy law.

Each party shall hold and use all Confidential Information, as hereinafter defined, in compliance with Subtitle A of Title V of the Gramm-Leach-Bliley Act (codified at 15 U.S.C. § 6801 et seq.), as it may be amended from time to time (the "GLB Act"), the regulations promulgated thereunder, the Fair Credit Reporting Act, 15 U.S.C. § 1681 et seq. (the "FCRA") and all other applicable law. "Confidential Information" shall mean any data or information that is proprietary to the disclosing party and not generally known to the public, whether in tangible or intangible form, including, but not limited to, the following information: inventions, trade secrets, know-how, software, databases, customer lists, all personal information about the Mortgagors that is supplied to the Seller or the Purchaser by or on behalf of the Mortgagors, and other customer or consumer specific data deemed to be "nonpublic personal information" under the GLB Act or the FCRA. Each party shall take all reasonable measures to ensure that the Confidential Information is not disclosed, published, released, transferred, duplicated or otherwise made available to others

10

FL CONFIDENTIAL00141

in contravention of the provisions of this Agreement or of the GLB Act, the regulations promulgated thereunder, the FCRA or other applicable law. If the GLB Act, the regulations promulgated thereunder, the FCRA or other applicable law now or hereafter in effect impose a higher standard of confidentiality to the Confidential Information, such standard shall prevail over the provisions of this Agreement. Each party shall indemnify and hold harmless any other party for all damages incurred by such party arising from such party's failure to comply with the GLB Act and the FCRA.

Notwithstanding anything to the contrary in this Agreement, each party may disclose another party's Confidential Information in a judicial proceeding when required to do so by law when responding to a subpoena or as otherwise required by applicable law or regulatory agency rule or regulation. If any court, governmental agency, or regulatory body demands that a party disclose any information contained in the Confidential Information to the public or to a third party other than the court, governmental agency or regulatory body, the recipient of such demand may, in the absence of a protective order, disclose such information to the extent that it is advised in writing that it must do so by its legal counsel; provided that the recipient of such demand shall, unless restrained by court order, provide written notice of such demand to the party that disclosed the Confidential Information and copies of all notice papers, orders, requests or other documents in order to allow such disclosing party to seek an appropriate protective order, and shall not disclose such information until five (5) Business Days after providing such notice. The recipient of a demand described in the preceding sentence shall cooperate fully with a disclosing party seeking a protective order, at the cost and expense of the party seeking a protective order, should a disclosing party seek such an order.

In addition, notwithstanding anything to the contrary in this Agreement, each party may disclose Confidential Information to the extent that (i) it is reasonably necessary for such party to do so in working with its officers, directors, employees, consultants, legal counsel, auditors, taxing authorities or governmental agencies, (ii) the Purchaser provides this Agreement to banking institutions for diligence purposes in connection with potential financing transactions so long as the Purchaser has a confidentiality agreement in place with each such banking institution that would prohibit each such banking institution from disclosing the information described in this Section 13 to any other party (iii) the Seller is required to disclose the material terms of this Agreement in compliance with any public filing requirements, (iv) information which now or later becomes generally available to the public other than as a result of a disclosure in breach of this Agreement, (v) information already in such party's possession prior to the disclosure under this agreement and such party can demonstrate such possession with written or electronic documentation/evidence; (vi) information which is obtained by such party on a non-confidential basis from a third person who, insofar as is known to such party, is not prohibited from transmitting the information by any contractual, legal, or fiduciary obligation; (vii) information that has been independently developed by such party without using or referring to the information; (viii) information as otherwise agreed by the Seller and the Purchaser from time to time. The terms and provisions of this Section 13 shall survive the termination of this Agreement.

SECTION 14. <u>Notices</u>. All demands, notices and communications hereunder shall be in writing and shall be deemed to have been duly given if mailed, by registered or certified mail,

11

FL CONFIDENTIAL00142

return receipt requested, or, if by other means, when received by the other party at the address as follows:

(i)      if to the Seller:
Magerick, LLC
1415 Western Ave., Suite 700
Seattle, WA 98101
Email: AssetManagementTeam@OakHarborCapital.com

if to the Purchaser:
BBNY Mortgage LLC
4755 Technology Way, Suite 104
Boca Raton, Florida, 33431
Email: bill@firstliencapital.com

or such other address as may hereafter be furnished to the other party by like notice. Any such demand, notice or communication hereunder shall be deemed to have been received on the date delivered to or received at the premises of the addressee (as evidenced, in the case of registered or certified mail, by the date noted on the return receipt).

SECTION 15. <u>Severability Clause</u>. Any part, provision, representation or warranty of this Agreement which is prohibited or which is held to be void or unenforceable shall be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof. Any part, provision, representation or warranty of this Agreement which is prohibited or unenforceable or is held to be void or unenforceable in any jurisdiction shall be ineffective, as to such jurisdiction, to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction as to any Mortgage Loan shall not invalidate or render unenforceable such provision in any other jurisdiction. To the extent permitted by applicable law, the parties hereto waive any provision of law which prohibits or renders void or unenforceable any provision hereof. If the invalidity of any part, provision, representation or warranty of this Agreement shall deprive any party of the economic benefit intended to be conferred by this Agreement, the parties shall negotiate, in good-faith, to develop a structure the economic effect of which is nearly as possible the same as the economic effect of this Agreement without regard to such invalidity. The terms and provisions of this Section 15 shall survive the termination of this Agreement.

SECTION 16. <u>Counterparts</u>. This Agreement may be executed simultaneously in any number of counterparts. Each counterpart shall be deemed to be an original, and all such counterparts shall constitute one and the same instrument. An executed counterpart signature page delivered by facsimile or .pdf attachment to email shall have the same binding effect as an original signature page.

SECTION 17. <u>Governing Law</u>. The Agreement shall be construed in accordance with the laws of the State of Washington without regard to any conflicts of law provisions, except to the extent preempted by Federal law.

<p style="text-align:center">12</p>

FL CONFIDENTIAL00143

SECTION 18. <u>Intention of the Parties</u>.  It is the intention of the parties that the Purchaser is purchasing, and the Seller is selling, the Mortgage Loans and not a debt instrument of the Seller or another security.  Accordingly, the parties hereto each intend to treat the transaction for Federal income tax purposes as a sale by the Seller, and a purchase by the Purchaser, of the Mortgage Loans.

SECTION 19. <u>Waiver of Jury Trial</u>.  To the extent permitted by law, each party hereto hereby waives trial by jury in any judicial proceeding involving, directly or indirectly, any matter (whether sounding in tort, contract or otherwise) in any way arising out of, related to, or connected with this Agreement or the relationships established hereunder.

SECTION 20. <u>Successors and Assigns</u>.  This Agreement shall bind and inure to the benefit of and be enforceable by the Seller and the Purchaser and the respective successors and assigns of the Seller and the Purchaser.  The Purchaser shall not assign this Agreement without the Seller's prior written consent, which consent may be granted or withheld in the Seller's sole discretion.

SECTION 21. <u>Waivers</u>.  No term or provision of this Agreement may be waived or modified unless such waiver or modification is in writing and signed by the party against whom such waiver or modification is sought to be enforced.

SECTION 22. <u>Exhibits</u>.  The exhibits and schedules to this Agreement are hereby incorporated and made a part hereof and are an integral part of this Agreement.

SECTION 23. <u>No Use of Seller's Name</u>.

The Purchaser shall not, without the express prior written consent of the Seller: (i) use or permit the use by any person, the name of the Seller or any of its affiliates; (ii) represent or imply that it is affiliated with, authorized by, or in any way related to the Seller or any of its affiliates; (iii) institute any legal, collection or enforcement proceeding in the name of the Seller or any of its affiliates or continue to prosecute any pending legal, collection or enforcement proceeding in the name of the Seller or any of its affiliates; or (iv) mislead, whether through misrepresentation or nondisclosure or otherwise, a Mortgagor or any other person as to the identity of the owner of any Mortgage Loan.

SECTION 24. <u>General Interpretive Principles</u>.  For purposes of this Agreement, except as otherwise expressly provided or unless the context otherwise requires:

    (a)    the terms defined in this Agreement have the meanings assigned to them in this Agreement and include the plural as well as the singular, and the use of any gender herein shall be deemed to include the other gender;

    (b)    accounting terms not otherwise defined herein have the meanings assigned to them in accordance with generally accepted accounting principles;

    (c)    references herein to "Articles," "Sections," "Subsections," "Paragraphs," and other subdivisions without reference to a document are to designated

<div align="center">13</div>

Articles, Sections, Subsections, Paragraphs and other subdivisions of this Agreement;

(d)     reference to a Subsection without further reference to a Section is a reference to such Subsection as contained in the same Section in which the reference appears, and this rule shall also apply to Paragraphs and other subdivisions;

(e)     the words "herein," "hereof," "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular provision; and

(f)     the term "include", "includes", or "including" shall mean without limitation by reason of enumeration.

SECTION 25. <u>Reproduction of Documents</u>. This Agreement and all documents relating thereto, including, without limitation, (a) consents, waivers and modifications which may hereafter be executed, (b) documents received by any party at the closing, and (c) financial statements, certificates and other information previously or hereafter furnished, may be reproduced by any photographic, photostatic, microfilm, micro-card, miniature photographic or other similar process. The parties agree that any such reproduction shall be admissible in evidence as the original itself in any judicial or administrative proceeding, whether or not the original is in existence and whether or not such reproduction was made by a party in the regular course of business, and that any enlargement, facsimile or further reproduction of such reproduction shall likewise be admissible in evidence.

SECTION 26. <u>Further Agreements; Cooperation</u>. The Seller and the Purchaser each agree to execute and deliver to the other such reasonable and appropriate additional documents, instruments or agreements as may be necessary or appropriate to effectuate the purposes of this Agreement.

The parties agree to act reasonably, in good faith and in accordance with all applicable laws and regulations and to do all things necessary to effect the transactions contemplated hereby including, without limitation, complying with all reasonable requests provided by one party to the other relating to the transactions set forth herein.

Each party agrees to take, or cause to be taken, all such further or other actions as shall reasonably be necessary to make effective, to consummate and to perform the undertakings and obligations contemplated by this Agreement.

**INTENTIONALLY LEFT BLANK**

**SIGNATURE PAGE FOLLOWS**

14

FL CONFIDENTIAL00145

IN WITNESS WHEREOF, the Seller and the Purchaser have caused their names to be signed hereto by their respective officers thereunto duly authorized as of the date first above written.

**Purchaser:**

BBNY Mortgage LLC

By: _William Bymel_
William Bymel (Oct 2, 2023 19:01 PDT)
Name:  Bill Bymel
Title:   Authorized Representative

**Seller:**

Magerick, LLC

By: _____
William Weinstein (Oct 2, 2023 16:44 PDT)
Name: William Weinstein
Title:   Authorized Representative

15

FL CONFIDENTIAL00146

# SCHEDULE I

## MORTGAGE LOAN SCHEDULE

| OI # | Property Address | Property City | Property State | Purchase Price |
|---|---|---|---|---|
| 48051664 | 714 MILTON AVE | ANDERSON | IN | $9,359.55 |
| 48051689 | 102 W RIDGE ST | NANTICOKE | PA | $23,065.58 |
| 48051709 | 1950 N STATE LINE | HUBBARD | OH | $9,901.94 |
| 48051769 | 903 OSCAR CROSS AVE | PADUCAH | KY | $14,237.14 |
| 48051873 | 551 WILSON BRIDGE DR | OXON HILL | MD | $35,375.52 |
| 48051884 | 109 NEW ENGLAND RD | SEARSMONT | ME | $62,505.10 |
| 48051890 | 613 SODERS RD | CARNEYS POINT | NJ | $24,041.10 |
| 48051907 | 13603 S RIDGEWAY AVE | ROBBINS | IL | $7,890.30 |
| 48051915 | 1325 E 141 ST | EAST CLEVELAND | OH | $10,295.39 |
| 48051935 | 496 MARTIN LUTHER KING JR BLVD | TRENTON | NJ | $30,764.74 |
| 48051958 | 14204 S LOWE AVE | RIVERDALE | IL | $29,087.91 |
| 48051965 | 1356 EAGLE BLUFF DR | BOURBONNIS | IL | $13,310.40 |
| 48051983 | 2819 KENNEDY AVE | BALTIMORE | MD | $14,014.25 |
| 48051997 | 1835 N AISQUITH ST | BALTIMORE | MD | $23,487.70 |
| 48052001 | 1000 W COLUMBIA AVE | MONTICELLO | KY | $5,507.23 |
| 48052066 | 716 W SILVER SPRINGS PL | OCALA | FL | $5,259.06 |
| 48052091 | 10603 S LAFAYETTE AVE | CHICAGO | IL | $22,563.12 |
| 48051661 | 320 N TENTH ST | POTTSVILLE | PA | $30,196.13 |
| 48051678 | 21743 CAROL AVE | SAUK VILLAGE | IL | $49,892.33 |
| 48051685 | 1815 MYRTLE ST | ERIE | PA | $9,359.55 |
| 48051746 | 3321 W END HWY | CARLISLE | SC | $18,707.94 |
| 48051783 | 40 CROMMETT ST | SOUTH CHINA | ME | $84,370.66 |
| 48051807 | 627 MARTIN DR | TARBORO | NC | $25,388.74 |
| 48051898 | 16103 EDMORE DR | DETROIT | MI | $24,777.92 |
| 48051899 | 1724 W THIRD ST | PRESCOTT | MI | $26,967.65 |
| 48051908 | 20571 HWY 1 | RODESSA | LA | $3,799.10 |
| 48051940 | 607 S BROTHERTON ST | MUNCIE | IN | $6,920.76 |
| 48051976 | 204 S PLEASANT | GONZALES | LA | $19,079.70 |
| 48052051 | 424 W HOLLIS ST | HOLLIS | OK | $4,481.96 |
| 48052054 | 513 SCHOOL ST | MARTINS FERRY | OH | $14,237.14 |
| 48052063 | 646 S OKLAHOMA AVE | LIBERAL | KS | $35,123.62 |
| 48052073 | 906 & 908 S FARMERVILLE ST | RUSTON | LA | $9,359.55 |
| 48052133 | 556 WIMMER PL | E ST LOUIS | IL | $4,481.96 |
| 48073703 | 11353 BRAILE | DETROIT | MI | $17,163.70 |
| 48073721 | 1216 GULFPORT ST | BIRMINGHAM | AL | $17,863.73 |

FL CONFIDENTIAL00147

| | | | | |
|---|---|---|---|---|
| 48073737 | 1720 E Lake Blvd. | Birmingham | AL | $20,454.29 |
| 48073749 | 538 COMMERCIAL AVE | ATLANTA | GA | $95,648.03 |
| 48073766 | 1176 (fka 1186) DIALS BRANCH | HARDY | KY | $9,359.55 |
| 48073769 | 1402 E 3RD AVE | ALBANY | GA | $6,470.53 |
| 48073770 | 16687 HWY 171 N | WINFIELD | AL | $4,884.47 |
| 48073771 | 1732 SOUTWEST 13TH | LAWTON | OK | $3,506.45 |
| 48073772 | 211 6th Avenue West | Huntington | WV | $3,562.76 |
| 48073802 | 1240 GLENDALE CIR | GREENWOOD | MS | $17,229.30 |
| 48073803 | 1607 N 20TH ST | ESCANABA | MI | $2,769.73 |
| 48073805 | 650 HEARD AVE | ALBANY | GA | $4,884.47 |
| 48073806 | HC 70 BOX 18B AARONS FORK (E-911 419 HAYFIELD DR) | ELKVIEW | WV | $5,033.03 |
| 48073809 | 74 FRIEND ST | ADAMS | MA | $28,701.80 |
| 48073811 | 20 FLORENCE ST (LOT 3 & 2A) | AUGUSTA | ME | $15,458.20 |
| 48073813 | 16736 HEAD AVE | HAZLE CREST | IL | $10,171.34 |
| 48073865 | 1009 ANAYA AVE | SANTA ROSA | NM | $19,114.73 |
| 48073885 | 161 MAPLE VALLEY DR | MT HOPE | WV | $14,237.14 |
| 48073891 | 15492 OHIO ST | DETROIT | MI | $16,675.94 |
| 48051756 | 5057 BAKER BLVD | BAKER | LA | $61,000.00 |
| 48051827 | 164 ATLANTIC HWY | NORTHPORT | ME | $93,000.00 |
| 48051892 | 815 SHERIDAN AVE | BALTIMORE | MD | $27,000.00 |
| 48051698 | 7432 QUEENSTOWN AVE | BIRMINGHAM | AL | $50,000.00 |
| 48052126 | 4831 BOWLAND AVE | BALTIMORE | MD | $68,000.00 |
| 48073691 | 29-37 GILMORE STREET | EAST ELMHURST | NY | $330,000.00 |
| 48046255 | 781 REMSEN AVENUE | BROOKLYN | NY | $235,000.00 |
| 48046264 | 2 FRANKLIN PLACE | MASSAPEQUA | NY | $80,000.00 |
| 48073693 | 2501 MT VERNON ROAD | DUNWOODY | GA | $210,000.00 |
| 48073690 | 184 PUMPKIN HOLLOW ROAD NORTH | HILLSDALE | NY | $25,000.00 |
| **Total** | | | **62** | **$2,200,000.00** |

FL CONFIDENTIAL00148

## EXHIBIT 1

## MORTGAGE LOAN DOCUMENTS

With respect to each Mortgage Loan set forth on a related Mortgage Loan Schedule, the Seller shall deliver and release to the Purchaser's custodian, the following documents:

1. the original Note bearing all original intervening endorsements necessary to show a complete chain of endorsements from the original payee to the Seller, endorsed in blank, "Pay to the order of _____, without recourse", and, if previously endorsed, signed in the name of the last endorsee by a duly qualified officer of the last endorsee, or a copy of the Note (endorsed as provided above) together with a lost note affidavit;

2. for each Mortgage Loan , the original Assignment of Mortgage for each Mortgage Loan, in form and substance acceptable for recording. The Mortgage shall be assigned to Purchaser or Purchaser's designee;

3. the original of any guarantee executed in connection with the Note, if any;

4. the Mortgage with evidence of recording thereon. If the Mortgage with evidence of recording thereon has not been returned by the public recording office where such Mortgage has been delivered for recordation, a copy of such Mortgage;

5. all assumption, consolidation or extension agreements, or Modification Agreements with evidence of recording thereon, if any;

6. all intervening assignments of mortgage evidencing a complete chain of ownership from the originator of the Mortgage Loan to the last assignee, in each case, with to the extent available evidence of recording thereon. If any such intervening assignment of mortgage has not been returned from the applicable public recording office, a copy of such intervening assignment of mortgage;

7. if the Note, the Mortgage, any Assignment of Mortgage, or any other related document has been signed by a Person on behalf of the Mortgagor, the power of attorney or other instrument that authorized and empowered such Person to sign;

8. the lender's title insurance policy in the form of an ALTA mortgage title insurance policy and insuring the Mortgage Loan Purchaser and its successors and assigns as to the lien of the Mortgage in the original principal amount of the Mortgage Loan; and

9. any security agreement, chattel mortgage or equivalent document executed in connection with the Mortgage, if any; or

10. to the extent any of the foregoing have been released for servicing, foreclosure or similar reasons, such assurance and/or documentation as the parties shall mutually agree.

## EXHIBIT 2

## WIRE TRANSFER INFORMATION

WIRE TO:



**WIRE INSTRUCTIONS FOR WEINSTEIN & RILEY, P.S., TRUST**

**MONTHLY REMITTANCES AND LOAN SALES PROCEEDS**

| | |
|---|---|
| BANK: | WESTERN ALLIANCE BANK<br>1 EAST WASHINGTON ST, STE 1400<br>PHOENIX, AZ 85004<br>(602) 389-3500 |
| ACCOUNT: | WEINSTEIN & RILEY, P.S., TRUST |
| ACCOUNT NUMBER: | 8011797191 |
| WIRE ABA: | 122105980 |

For questions about payment, please contact: Sonal
Gupta, Senior Accountant / Treasury Analyst
sgupta@oakharborcapital.com (206) 493-1517

FL CONFIDENTIAL00150

# MLSA, BBNY Mortgage LLC and Magerick (6-30-23)

Final Audit Report                                                    2023-10-03

| | |
|---|---|
| Created: | 2023-10-02 |
| By: | Gabrielle Ayala-Montgomery (GMontgomery@oakharborcapital.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAAixWn7WcqX0WLIWfyIFGDUM_-F7RMO_Z |

## "MLSA, BBNY Mortgage LLC and Magerick (6-30-23)" History

Document created by Gabrielle Ayala-Montgomery (GMontgomery@oakharborcapital.com)
2023-10-02 - 11:42:34 PM GMT

Document emailed to William Weinstein (wsw@oakharborcapital.com) for signature
2023-10-02 - 11:43:52 PM GMT

Email viewed by William Weinstein (wsw@oakharborcapital.com)
2023-10-02 - 11:44:16 PM GMT

Document e-signed by William Weinstein (wsw@oakharborcapital.com)
Signature Date: 2023-10-02 - 11:44:26 PM GMT - Time Source: server

Document emailed to bill@firstliencapital.com for signature
2023-10-02 - 11:44:27 PM GMT

Email viewed by bill@firstliencapital.com
2023-10-03 - 2:00:39 AM GMT

Signer bill@firstliencapital.com entered name at signing as William Bymel
2023-10-03 - 2:01:02 AM GMT

Document e-signed by William Bymel (bill@firstliencapital.com)
Signature Date: 2023-10-03 - 2:01:04 AM GMT - Time Source: server

Agreement completed.
2023-10-03 - 2:01:04 AM GMT

# Exhibit 30

**From:** Adobe Acrobat Sign on behalf of Oak Harbor Capital, LLC <adobesign@adobesign.com>
**Date:** Monday, October 2, 2023 at 7:00 PM
**To:** Gabrielle Ayala-Montgomery <GMontgomery@oakharborcapital.com>, Bill Bymel <bill@firstliencapital.com>, William Weinstein <wsw@oakharborcapital.com>
**Subject:** Completed: "MLSA, BBNY and Bonifera (6-30-23)"



## All parties finished
## MLSA, BBNY and Bonifera (6-30-23)

 **[na4.documents.adobe.com]**

Attached is the final agreement between:

- Oak Harbor Capital, LLC
- William Weinstein
- William J Bymel

1

FL CONFIDENTIAL00109

Read it with **Acrobat Reader [adobe.com]**. You can also **open it online [na4.documents.adobe.com]** to review its activity history.



Need your own documents signed? Adobe Acrobat Sign can help save you time. **Learn more [adobe.com]**.

To ensure that you continue receiving our emails, please add adobesign@adobesign.com to your address book or safe list.

**Terms of Use [adobe.com]** | **Report Abuse [na4.documents.adobe.com]**

© 2023 Adobe. All rights reserved.

FL CONFIDENTIAL00110

# MORTGAGE LOAN SALE AGREEMENT

This MORTGAGE LOAN SALE AGREEMENT (this "Agreement"), dated as of June 30, 2023 ("Effective Date") is by and between BBNY Mortgage LLC (the "Seller"), having an office at 4755 Technology Way, Suite 104, Boca Raton, Florida, 33431, and Bonifera, LLC (the "Purchaser"), having an office at 1415 Western Ave., Suite 700, Seattle, WA 98101.

W I T N E S S E T H:

WHEREAS, the Seller desires to sell to the Purchaser, and the Purchaser desires to purchase from the Sellers, certain residential mortgage loans (the "Mortgage Loans"), as described herein, on a servicing-released basis, and which shall be delivered in a group of whole loans on June 30, 2023 (the "Conveyance Date");

WHEREAS, each Mortgage Loan is secured by a mortgage, deed of trust or other security instrument encumbering a residential dwelling located in the jurisdiction indicated on the schedule annexed hereto as Schedule I (the "Mortgage Loan Schedule"); and

WHEREAS, the Purchaser and the Seller wish to prescribe the manner of the conveyance, interim servicing and control of the Mortgage Loans.

NOW, THEREFORE, in consideration of the premises and mutual agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Purchaser and the Seller agree as follows:

SECTION 1. Definitions. For the purposes of this Agreement the following capitalized terms shall have the respective meanings set forth below, unless otherwise defined herein.

Agreement: This Mortgage Loan Sale Agreement including all exhibits, schedules, amendments and supplements hereto.

Assignment of Mortgage: An individual assignment of the Mortgage, notice of transfer or equivalent instrument in recordable form, sufficient under the laws of the jurisdiction wherein the related Mortgaged Property is located to give record notice of the sale of the Mortgage to the Purchaser.

Business Day: Any day other than a Saturday or Sunday, or a day on which banking and savings and loan institutions are authorized or obligated by law or executive order to be closed.

Closing Documents: The documents required pursuant to Section 8.

Cut-off Date: June 30, 2023.

Interim Servicer: With respect to any Mortgage Loan, the Seller's servicing or asset management designee(s) as specified on the related Mortgage Loan Schedule.

1

FL CONFIDENTIAL00111

Interim Servicing Period:  The period commencing on the related Conveyance Date and ending on the Servicing Transfer Date.

Modification Agreement: With respect to each Mortgage Loan, each written agreement modifying, adding, extending or amending the terms of both, or either of, the Note and Mortgage, entered into between the Mortgagor and the owner of the Mortgage Loan at the time such agreement was executed, or its agent.

Monthly Payment:  With respect to any Mortgage Loan, the scheduled combined payment of principal and/or interest payable by a Mortgagor under the related Note on each due date.

Mortgage:  With respect to each Mortgage Loan, the mortgage, deed of trust or other instrument encumbering the Mortgaged Property securing the Note, including any riders and/or addenda thereto, as such Mortgage may be amended, modified or extended by one or more Modification Agreement.

Mortgage File:  The Mortgage Loan Documents pertaining to the related Mortgage Loan and the Servicing File.

Mortgage Loan:  Each residential mortgage loan sold, assigned and transferred to the Purchaser pursuant to this Agreement and identified on the Mortgage Loan Schedule, which Mortgage Loan includes, to the extent available, the Mortgage File, the Monthly Payments and all other rights, benefits, proceeds and obligations arising from or in connection with such Mortgage Loan.

Mortgage Loan Documents:  The documents listed in Exhibit 1 hereto pertaining to any Mortgage Loan.

Mortgage Loan Schedule:  The schedule of Mortgage Loans attached hereto as Schedule I and setting forth certain information regarding each Mortgage Loan.

Mortgaged Property:  With respect to each Mortgage Loan, the Mortgagor's real property encumbered by the Mortgage securing repayment of a related Note.

Note:  The original executed note, or other evidence of the Mortgage Loan indebtedness of a Mortgagor, secured by the related Mortgage, including any riders and/or addenda thereto, as may be amended, modified or extended  by one or more Modification Agreement.

Mortgagor:  The obligor on a Note, the owner of the Mortgaged Property and the grantor or mortgagor named in the related Mortgage and such grantor's or mortgagor's successors in title to the Mortgaged Property.

Person:  An individual, corporation, limited liability company, partnership, joint venture, association, joint-stock company, trust, unincorporated organization or government or any agency or political subdivision thereof.

2

FL CONFIDENTIAL00112

Purchase Price:  The price paid by the Purchaser to the Seller pursuant to Section 3 below.

Servicing File:  With respect to each Mortgage Loan, the file retained by the Interim Servicer that includes all the documents, files, records, servicing documents, servicing records, logs, data tapes, computer records, or other information pertaining to the servicing of the Mortgage Loan during the time such Mortgage Loan was owned by Seller, or pertaining to the past servicing of the Mortgage Loan, to the extent such documents, records and information, are in the Seller's or Interim Servicer's possession.

Servicing Transfer Date:  The date that is thirty (30) days after the Conveyance Date or a later date which is mutually agreed upon by both parties.

SECTION 2.  Agreement to Purchase.  The Seller agrees to sell, and the Purchaser agrees to purchase, on the Conveyance Date and on the terms and conditions stated herein, the Mortgage Loans listed on the Mortgage Loan Schedule.

On the Conveyance Date, upon the payment of the Purchase Price and delivery of the documents described herein, the Seller shall sell, transfer, assign, set over, and convey to the Purchaser, without recourse, but subject to the representations, warranties, terms and provisions of this Agreement all the right, title, and interest of the Seller in and to the related Mortgage Loan or Loans, servicing released.

Upon the successful completion of the purchase and sale transactions contemplated herein on the Conveyance Date, the Purchaser shall own and be entitled to receive with respect to each Mortgage Loan all related Monthly Payments and all other payments and recoveries of principal, interest, late payment charges, prepayment premiums and other fees, charges and sums paid or recovered on or with respect to such Mortgage Loans on and after the Cut-off Date.

SECTION 3.  Purchase Price.  The aggregate purchase price (the "Purchase Price") for the Mortgage Loans shall be $2,200,000.00.

The Purchaser shall pay the Purchase Price to the Seller, no later than 1:00 p.m. (Central time), within 90 days of the Conveyance Date, by wire transfer of immediately available funds to the account designated by the Seller.

SECTION 4.  Examination of Mortgage Files.  The Seller shall make the related Mortgage Files available to the Purchaser for examination at the offices of Seller's document custodian, or such other location where the Mortgage Files are stored, or as shall otherwise be agreed upon by the Purchaser and the Seller in writing, and during normal business hours.  To the extent practicable, the Seller shall request that its custodian make images of the related Mortgage Files available to the Purchaser for examination.  Any examination pursuant to the foregoing two sentences may be made by the Purchaser, or its designee, at Purchaser's sole cost and expense, and at any reasonable time before the related Conveyance Date.

3

FL CONFIDENTIAL00113

SECTION 5.   Conveyance from Seller to Purchaser.

Subsection 5.01.      Possession of Mortgage Files.

The Mortgage Files retained by the Interim Servicer with respect to each Mortgage Loan sold pursuant to this Agreement shall be appropriately identified in the Interim Servicer's computer system to reflect clearly the sale of such related Mortgage Loan to the Purchaser upon the completion of the purchase and sale contemplated by this Agreement.  On the Servicing Transfer Date, the Seller shall release from its custody, or cause its Interim Servicer to release from its custody, the related Mortgage Files, which shall be delivered to the Purchaser's successor servicer. Notwithstanding the forgoing, the Seller and the Interim Servicer shall be entitled to retain copies of the Mortgage Files, as of the Conveyance Date, for such period after the transfer as required by applicable law.

Subsection 5.02.      Delivery of Mortgage Files.

(i)      Upon payment of the Purchase Price on the Conveyance Date, the Seller shall release any interest that it has in the Mortgage Files upon its receipt of the Purchase Price for the Mortgage Loans. Subject to the following paragraph and subparagraphs, the Seller will deliver the Mortgage Files in its possession at the time of closing to the Purchaser's custodian within 30 days after purchase. The Purchaser acknowledges, understands and agrees that the Prior Sellers and their affiliates may possess information regarding the Mortgage Loans that was not and shall not be provided to the Seller or the Purchaser, including information reflected in reports relating to internal or external investigations concerning the Mortgage Loans or that is subject to legal privilege, and the Purchaser hereby waives any and all causes of action arising out of or relating to the non-disclosure of such information.

SECTION 6.   Representations, Warranties and Covenants of the Seller: Remedies for Breach.

Subsection 6.01.      Representations and Warranties Respecting the Seller.

The Seller represents, warrants and covenants to the Purchaser as of the Conveyance Date, that to the best of such Seller's knowledge:

(i)      The Seller is duly organized, validly existing and in good standing under the laws of its state of organization;

(ii)      The Seller has the full power and authority to hold each Mortgage Loan, to sell each Mortgage Loan, and to execute, deliver and perform, and to enter into and consummate, all transactions contemplated by this Agreement.  The Seller has duly authorized the execution, delivery and performance of this Agreement, has duly executed and delivered this Agreement, and this Agreement, assuming due authorization, execution and delivery by the Purchaser, constitutes a legal, valid and binding obligation of the Seller, enforceable against it in accordance with its terms except as the enforceability thereof may be limited by bankruptcy, insolvency or reorganization;

FL CONFIDENTIAL00114

(iii)　　The execution and delivery of this Agreement by the Seller and the performance of and compliance with the terms of this Agreement will not violate the Seller's organizational documents or constitute a default under or result in a breach or acceleration of, any material contract, agreement or other instrument to which the Seller is a party or which may be applicable to the Seller or its assets;

(iv)　　The Seller is not in violation of, and the execution and delivery of this Agreement by the Seller and its performance and compliance with the terms of this Agreement will not constitute a violation with respect to, any order or decree of any court or any order or regulation of any federal, state, municipal or governmental agency having jurisdiction over the Seller or its assets, which violation might have consequences that would materially and adversely affect the condition (financial or otherwise) or the operation of the Seller or its assets or might have consequences that would materially and adversely affect the performance of its obligations and duties hereunder;

Subsection 6.02.　　Remedies for Breach of Representations and Warranties.

For the avoidance of doubt, Purchaser acknowledges that Mortgage Loans are being sold on an as-is basis.

For the avoidance of doubt and notwithstanding anything in this Agreement to the contrary, the Purchaser acknowledges understands and agrees that it shall have no remedy with respect to fraud, misrepresentation or omission in the origination or modification (other than modifications performed by the Interim Servicer) of any Mortgage Loan, compliance or non-compliance with underwriting guidelines or other underwriting standards or protocols in the origination or modification (other than modifications performed by the Interim Servicer) of any Mortgage Loan, appraisal or valuation deficiencies in the origination or modification (other than modifications performed by the Interim Servicer) of any Mortgage Loan, or the existence or validity of any mortgage insurance policy related to any Mortgage Loan. The Seller expressly disclaims any liability regarding the aforementioned facts and the Purchasers acknowledge, understand, and agrees to that disclaimer, including in any case where the Seller has constructive or actual knowledge of those facts.

SECTION 7.　　Representations, Warranties and Covenants of the Purchaser.

Subsection 7.01.　　The Purchaser represents, warrants and covenants to the Seller as of the Conveyance Date:

(i)　　The Purchaser is duly organized, validly existing and in good standing under the laws of the state of its organization and is and will remain in compliance with the laws of each state in which any Mortgaged Property is located to the extent necessary to ensure the enforceability of each Mortgage Loan and the servicing of the Mortgage Loan in accordance with the terms of this Agreement.　No licenses or approvals obtained by the Purchaser have been suspended or revoked by any court, administrative agency, arbitrator or governmental body and no proceedings are pending which might result in such suspension or revocation;

(ii)　　The Purchaser has the full power and authority to hold each Mortgage Loan, to purchase each Mortgage Loan, and to execute, deliver and perform, and to enter into and

<div align="center">5</div>

FL CONFIDENTIAL00115

consummate, all transactions contemplated by this Agreement. The Purchaser has duly authorized the execution, delivery and performance of this Agreement, has duly executed and delivered this Agreement, and this Agreement, assuming due authorization, execution and delivery by the Seller, constitutes a legal, valid and binding obligation of the Purchaser, enforceable against it in accordance with its terms except as the enforceability thereof may be limited by bankruptcy, insolvency or reorganization;

(iii)    The execution and delivery of this Agreement by the Purchaser and the performance of and compliance with the terms of this Agreement will not violate the Purchaser's articles of incorporation or by-laws or constitute a default under or result in a breach or acceleration of, any material contract, agreement or other instrument to which the Purchaser is a party or which may be applicable to the Purchaser or its assets;

(iv)    The Purchaser is not in violation of, and the execution and delivery of this Agreement by the Purchaser and its performance and compliance with the terms of this Agreement will not constitute a violation with respect to, any order or decree of any court or any order or regulation of any federal, state, municipal or governmental agency having jurisdiction over the Purchaser or its assets, which violation might have consequences that would materially and adversely affect the condition (financial or otherwise) or the operation of the Seller or its assets or might have consequences that would materially and adversely affect the performance of its obligations and duties hereunder;

(v)    The Purchaser shall submit for recording with the related county recorder, register of deeds or similar office, each Assignment of Mortgage delivered hereunder within the later of sixty (60) days of the Conveyance Date or the date the Purchaser receives the Assignment of Mortgage from the Seller. Upon the Seller's request, the Purchaser shall provide evidence of such submission. The Purchaser acknowledges and agrees that it shall submit, or cause its counsel to submit, with any court, any and all instruments required to transfer the prosecution of any foreclosure or other litigation that any Mortgage Loan is currently subject to from the name of the Seller into the name of the Purchaser. Such submissions shall be made within sixty (60) days of the Conveyance Date.

(vi)    The Purchaser has not worked with any broker, finder or similar party due any commission or fee in connection with the transactions contemplated herein.

(vii)    The Purchaser has been urged, invited and directed to conduct such due diligence review and analysis of the Mortgage Files, together with such records as are generally available to the public from local, county, state and federal authorities, record-keeping offices and courts (including, without limitation, any bankruptcy courts in which any Mortgagor(s), guarantor or surety, if any, may be subject to any pending bankruptcy proceedings) as the Purchaser deemed necessary, proper or appropriate in order to make a complete informed decision with respect to the purchase and acquisition of the Mortgage Loans.

(viii)    The Purchaser is a sophisticated investor and its bid and decision to purchase the Mortgage Loans is based upon its own comprehensive review and independent expert evaluation and analysis of the Mortgage Loans and Mortgage Files. The Purchaser has made such independent investigation as the Purchaser deems to be warranted into the nature, title, attachment,

6

perfection, priority, validity, enforceability, collectability, and value of the Mortgage Loans, the title, condition and value of any collateral securing the Mortgage Loans, the market conditions and other characteristics of the places where any such collateral is located, and all other facts it deems material to the purchase of the Mortgage Loans.

(ix)     In entering into this Agreement, the Purchaser has not relied upon any oral information from the Seller or any of its employees, agents, attorneys or representatives, other than the representations, warranties and covenants of the Seller contained herein. The Purchaser acknowledges that no employee, agent, attorney or representative of the Seller has been authorized to make, and that the Purchaser has not relied upon, any statements, representations, warranties or covenants other than those specifically contained in this Agreement.

(x)     The transactions contemplated by this Agreement do not involve, nor are they intended in any way to constitute, the sale of a "security" or "securities" within the meaning of any applicable securities laws, and none of the representations, warranties or agreements of the Purchaser shall create any inference that the transactions involve any "security" or "securities".  The Purchaser acknowledges, understands and agrees that the acquisition of these Mortgage Loans involves a high degree of risk and they are suitable only for persons or entities of substantial financial means who have no need for liquidity and who can hold the Mortgage Loans indefinitely or bear the partial or entire loss of the value.

(xi)     The Purchaser understands and agrees that some or all of the Mortgage Loans transferred under this Agreement are or have been non-performing on their original and/or modified terms and that Mortgage, and may be subject to Modification Agreement; some of the Mortgage Loans may also be in involved in a bankruptcy or other litigation.

(xii)     The Purchaser covenants and agrees that it shall not (a) except as required by applicable law, institute any enforcement or legal action or proceeding in the name of the Seller or Interim Servicer or a prior owner of the Mortgage Loan or, except as required by applicable law or to comply with the requirements of this Agreement, make reference to the Seller or the Interim Servicer or a prior owner of the Mortgage Loans in any correspondence to or discussion with any particular obligor regarding enforcement or collection of the Mortgage Loans except for purposes of identifying a Mortgage Loan as originated or previously owned by the Seller or a prior owner, (b) misrepresent, mislead, deceive, or otherwise fail to adequately disclose to any particular Mortgagor or guarantor the identity of the Purchaser as the owner of the Mortgage Loan or (c) with respect to the Mortgage Loans, take any action in the Seller's name or Interim Servicer's name or a prior owner's name or hold itself out as an agent or representative of the Seller or a prior owner. The Seller shall have the right to seek the entry of an order by a court of competent jurisdiction enjoining any violation hereof.

(xiii)     Neither the Purchaser nor its servicer shall initiate any contact with any Mortgagor related to any Mortgage Loan prior to the Conveyance Date, unless otherwise required by applicable law and with prior notice and approval in writing of the Seller.

(xiv)     Purchaser acknowledges and agrees that the Seller, except with respect to the rights and remedies specifically set forth by the Seller herein, has not and does not represent, warrant or covenant the nature, accuracy, completeness, enforceability or validity of any of loan

7

FL CONFIDENTIAL00117

documents, Mortgage Files, or any information or documents made available to the Purchaser or its counsel, accountants or advisors in connection with the Mortgage Loans and, all documentation, information, analysis and/or correspondence, if any, which is or may be sold, transferred, assigned and conveyed to the Purchaser with respect to any and all Mortgage Loans is sold, transferred, assigned and conveyed to the Purchaser on an "AS IS, WHERE IS" basis, WITH ALL FAULTS.

(xv)     The Purchaser acknowledges and agrees that it is fully aware of the physical condition and state of repair of the Mortgaged Properties and agrees to purchase the Mortgage Loans taking into account the related properties in their "as is" condition "with all faults" as of the date hereof.

Subsection 7.02.     Indemnification.

Each party agrees to pay, or reimburse the other, and to protect, defend, indemnify, save and hold harmless the other, and its agents, assigns, employees, officers, directors and advisors and contractors from and against any losses, liabilities, claims, causes of action, damages, demands, taxes, fees, costs and expenses of whatever kind, arising out of or incurred in connection with a breach of any material term, representation, warranty, or covenant of this Agreement, or failure to comply with applicable laws, or perform obligations under this Agreement.  The Purchaser shall also indemnify the Seller and hold it harmless against any losses that it may sustain in any way resulting from any claim, demand, defense or assertion based on or grounded upon, or resulting from, a failure by the Purchaser's servicer to service the Mortgage Loans in accordance with applicable law after the Conveyance Date.  The indemnification provided under this Section 7.02 shall be with respect to losses involving third parties and losses between the Seller and the Purchaser.  Each party shall immediately notify the other of any such claim or threatened claim that may exist.  The provisions of this Section 7.02 shall survive termination of this Agreement.

SECTION 8.  <u>Closing</u>.  The closing for the sale and purchase of the Mortgage Loans shall take place on the Conveyance Date. As mutually agreed between the Sellers and the Purchaser, the closing shall be either by telephone, confirmed by letter or wire as the parties shall agree, or conducted in person, at such place as the parties shall agree.

Subsection 8.01.     <u>Closing Documents.</u>  The Closing Documents for the Mortgage Loans to be purchased on each Conveyance Date shall consist of fully executed originals of the following:

(i)     this Agreement; and

(ii)     the related Mortgage Loan Schedule.

SECTION 9.  <u>Costs</u>.  The Purchaser shall bear any and all costs and expenses it incurs in connection with the transactions contemplated by this Agreement, including, without limitation, (i) legal fees and expenses of its attorneys; (ii) fees and expenses incurred in connection with its due diligence review of the Mortgage Loans and the Mortgage Files ; and (iii) fees incurred in connection with recording any Assignments of Mortgage.

FL CONFIDENTIAL00118

SECTION 10. <u>Seller's Interim Servicing Obligations</u>. The Mortgage Loans are being sold on a servicing-released basis. On the Servicing Transfer Date, the Purchaser, or its designee, shall assume all servicing responsibilities related to the Mortgage Loans and the Seller (and/or its Interim Servicer) shall cease all servicing responsibilities related to the Mortgage Loans.

During the period between the related Conveyance Date and the related Servicing Transfer Date, the Seller or its Interim Servicer shall interim service the related Mortgage Loans for the benefit of the Purchaser in accordance all applicable laws, rules and regulations. During the period between the related Conveyance Date and the related Servicing Transfer Date, the Seller or Interim Servicer shall, at their respective cost and expense, take such steps as may be necessary or appropriate to effectuate and evidence the transfer of the servicing of the related Mortgage Loans to the Purchaser, or its designee (other than the recording of any Assignment of Mortgage or similar instrument, the responsibility for and cost of which shall be the Purchaser's).

The Seller shall cause the Interim Servicer to execute or cause to be executed a "good-bye" letter in a form reasonably acceptable to the Purchaser, addressed to the Mortgagor under each Mortgage Loan notifying Mortgagor of the transfer of servicing of the Mortgage Loan to the Purchaser or its designee. The Purchaser shall, or shall cause its designee to, execute a "hello" letter in a form reasonably acceptable to the Interim Servicer, addressed to the Mortgagor under each Mortgage Loan notifying the Mortgagor of the transfer of servicing of the Mortgage Loan to the Purchaser or its designee and directing Mortgagor to make all payments required under its Mortgage Loan from and after the Servicing Transfer Date to Purchaser or its designee. Except as otherwise stated herein, as of the Conveyance it shall be the Purchaser's obligation and he Purchaser agrees to make all other notices and disclosures required by applicable law in connection with the Mortgage Loans or transfer thereof.

With respect to each Mortgage Loan, the Seller shall cause the Interim Servicer to remit to the Purchaser, or its designee, following the Servicing Transfer Date, the sum of: (a) all amounts received from any source with respect to the Mortgage Loans after the Cut-off Date plus (b) all positive escrow balances, in each case, in the time and manner as the Seller, Interim Servicer and Purchaser shall agree. The Interim Servicer shall also deliver to the Purchaser, or its designee, a reconciliation of the foregoing.

SECTION 11. <u>Termination of Interim Servicing</u>. The respective obligations and responsibilities of the Seller (as the same relate to interim servicing) and the Interim Servicer, shall terminate at the expiration of the Interim Servicing Period. In connection with any such termination, to the extent not already prepared, executed and/or delivered, the Seller shall prepare, execute and deliver any and all documents and other instruments, place in the Purchaser's possession all Mortgage Files, and, to the extent not already done or accomplished, do or accomplish all other acts or things reasonably necessary or appropriate to effect the purposes of such notice of termination, whether to complete the transfer and endorsement or assignment of the Mortgage Loans and related documents, or otherwise, at the Seller's sole expense. The Seller agrees to cooperate with the Purchaser and such successor (and to cause the Interim Servicer to so cooperate) in effecting the termination of the Interim Servicer's responsibilities and obligations hereunder, including, without limitation, the transfer to such successor for administration by it of all cash amounts received after the related Cut-off Date with respect to the Mortgage Loans.

<center>9</center>

FL CONFIDENTIAL00119

SECTION 12. <u>Successor to the Seller</u>.  Prior to termination of the Seller's and/or the Interim Servicer's responsibilities and duties under this Agreement as interim servicer pursuant to this Section 12, the Purchaser shall (i) succeed to and assume all of the responsibilities, rights, duties and obligations as servicer of the Mortgage Loans, or (ii) appoint a successor which shall succeed to all rights and assume all of the responsibilities, duties and liabilities of the servicer of the Mortgage Loans.

Any successor appointed as provided herein shall execute, acknowledge and deliver to the Sellers, the Interim Servicer, and to the Purchaser an instrument accepting such appointment, whereupon such successor shall become fully vested with all the rights, powers, duties, responsibilities, obligations and liabilities of as servicer.

The Seller shall cause the Interim Servicer to execute and deliver such instruments and do such other things all as may reasonably be required to more fully and definitely vest and confirm in the successor all such rights, powers, duties, responsibilities, obligations and liabilities of the Purchaser or its appointed successor as servicer of the Mortgage Loans.  The successor shall make arrangements as it may deem appropriate to reimburse the Seller and/or the Interim Servicer for amounts the Seller or the Interim Servicer, as the case may be, actually expended as interim servicer pursuant to this Agreement which the successor is entitled to retain hereunder and which would otherwise have been recovered by the Seller or the Interim Servicer, as the case may be, pursuant to this Agreement but for the appointment of the successor servicer.

SECTION 13.  <u>Confidentiality</u>.

The Seller and the Purchaser acknowledge and agree that the terms of this Agreement and any information whether oral, written or otherwise provided by the Sellers to the Purchaser pursuant to this Agreement or the transactions contemplated herein shall be kept confidential, shall not be divulged to any party other than those that have a need to know such information in order to complete the transaction contemplated herein, including without limitation, the Interim Servicer, governmental authorities, due diligence service providers and attorneys, without the other parties' consent, and shall be maintained according to applicable privacy laws. Notwithstanding the foregoing, the Purchaser may disclose Mortgage Loan data (excluding non-public personal information regarding the borrowers), but only in the manner authorized by applicable privacy law.

Each party shall hold and use all Confidential Information, as hereinafter defined, in compliance with Subtitle A of Title V of the Gramm-Leach-Bliley Act (codified at 15 U.S.C. § 6801 et seq.), as it may be amended from time to time (the "GLB Act"), the regulations promulgated thereunder, the Fair Credit Reporting Act, 15 U.S.C. § 1681 et seq. (the "FCRA") and all other applicable law. "Confidential Information" shall mean any data or information that is proprietary to the disclosing party and not generally known to the public, whether in tangible or intangible form, including, but not limited to, the following information: inventions, trade secrets, know-how, software, databases, customer lists, all personal information about the Mortgagors that is supplied to the Seller or the Purchaser by or on behalf of the Mortgagors, and other customer or consumer specific data deemed to be "nonpublic personal information" under the GLB Act or the FCRA. Each party shall take all reasonable measures to ensure that the Confidential Information is not disclosed, published, released, transferred, duplicated or otherwise made available to others

FL CONFIDENTIAL00120

in contravention of the provisions of this Agreement or of the GLB Act, the regulations promulgated thereunder, the FCRA or other applicable law. If the GLB Act, the regulations promulgated thereunder, the FCRA or other applicable law now or hereafter in effect impose a higher standard of confidentiality to the Confidential Information, such standard shall prevail over the provisions of this Agreement. Each party shall indemnify and hold harmless any other party for all damages incurred by such party arising from such party's failure to comply with the GLB Act and the FCRA.

Notwithstanding anything to the contrary in this Agreement, each party may disclose another party's Confidential Information in a judicial proceeding when required to do so by law when responding to a subpoena or as otherwise required by applicable law or regulatory agency rule or regulation. If any court, governmental agency, or regulatory body demands that a party disclose any information contained in the Confidential Information to the public or to a third party other than the court, governmental agency or regulatory body, the recipient of such demand may, in the absence of a protective order, disclose such information to the extent that it is advised in writing that it must do so by its legal counsel; provided that the recipient of such demand shall, unless restrained by court order, provide written notice of such demand to the party that disclosed the Confidential Information and copies of all notice papers, orders, requests or other documents in order to allow such disclosing party to seek an appropriate protective order, and shall not disclose such information until five (5) Business Days after providing such notice. The recipient of a demand described in the preceding sentence shall cooperate fully with a disclosing party seeking a protective order, at the cost and expense of the party seeking a protective order, should a disclosing party seek such an order.

In addition, notwithstanding anything to the contrary in this Agreement, each party may disclose Confidential Information to the extent that (i) it is reasonably necessary for such party to do so in working with its officers, directors, employees, consultants, legal counsel, auditors, taxing authorities or governmental agencies, (ii) the Purchaser provides this Agreement to banking institutions for diligence purposes in connection with potential financing transactions so long as the Purchaser has a confidentiality agreement in place with each such banking institution that would prohibit each such banking institution from disclosing the information described in this Section 13 to any other party (iii) the Seller is required to disclose the material terms of this Agreement in compliance with any public filing requirements, (iv) information which now or later becomes generally available to the public other than as a result of a disclosure in breach of this Agreement, (v) information already in such party's possession prior to the disclosure under this agreement and such party can demonstrate such possession with written or electronic documentation/evidence; (vi) information which is obtained by such party on a non-confidential basis from a third person who, insofar as is known to such party, is not prohibited from transmitting the information by any contractual, legal, or fiduciary obligation; (vii) information that has been independently developed by such party without using or referring to the information; (viii) information as otherwise agreed by the Seller and the Purchaser from time to time. The terms and provisions of this Section 13 shall survive the termination of this Agreement.

SECTION 14. <u>Notices</u>.  All demands, notices and communications hereunder shall be in writing and shall be deemed to have been duly given if mailed, by registered or certified mail,

11

FL CONFIDENTIAL00121

return receipt requested, or, if by other means, when received by the other party at the address as follows:

(i)    if to the Purchaser:
Bonifera, LLC
1415 Western Ave., Suite 700
Seattle, WA 98101
Email: AssetManagementTeam@OakHarborCapital.com

if to the Seller:
BBNY Mortgage LLC
4755 Technology Way, Suite 104
Boca Raton, Florida, 33431
Email:  bill@firstliencapital.com

or such other address as may hereafter be furnished to the other party by like notice.  Any such demand, notice or communication hereunder shall be deemed to have been received on the date delivered to or received at the premises of the addressee (as evidenced, in the case of registered or certified mail, by the date noted on the return receipt).

SECTION 15. <u>Severability Clause</u>.  Any part, provision, representation or warranty of this Agreement which is prohibited or which is held to be void or unenforceable shall be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof.  Any part, provision, representation or warranty of this Agreement which is prohibited or unenforceable or is held to be void or unenforceable in any jurisdiction shall be ineffective, as to such jurisdiction, to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction as to any Mortgage Loan shall not invalidate or render unenforceable such provision in any other jurisdiction.  To the extent permitted by applicable law, the parties hereto waive any provision of law which prohibits or renders void or unenforceable any provision hereof.  If the invalidity of any part, provision, representation or warranty of this Agreement shall deprive any party of the economic benefit intended to be conferred by this Agreement, the parties shall negotiate, in good-faith, to develop a structure the economic effect of which is nearly as possible the same as the economic effect of this Agreement without regard to such invalidity. The terms and provisions of this Section 15 shall survive the termination of this Agreement.

SECTION 16. <u>Counterparts</u>.  This Agreement may be executed simultaneously in any number of counterparts.  Each counterpart shall be deemed to be an original, and all such counterparts shall constitute one and the same instrument.  An executed counterpart signature page delivered by facsimile or .pdf attachment to email shall have the same binding effect as an original signature page.

SECTION 17. <u>Governing Law</u>.  The Agreement shall be construed in accordance with the laws of the State of Washington without regard to any conflicts of law provisions, except to the extent preempted by Federal law.

FL CONFIDENTIAL00122

SECTION 18. <u>Intention of the Parties</u>. It is the intention of the parties that the Purchaser is purchasing, and the Seller is selling, the Mortgage Loans and not a debt instrument of the Seller or another security. Accordingly, the parties hereto each intend to treat the transaction for Federal income tax purposes as a sale by the Seller, and a purchase by the Purchaser, of the Mortgage Loans.

SECTION 19. <u>Waiver of Jury Trial</u>. To the extent permitted by law, each party hereto hereby waives trial by jury in any judicial proceeding involving, directly or indirectly, any matter (whether sounding in tort, contract or otherwise) in any way arising out of, related to, or connected with this Agreement or the relationships established hereunder.

SECTION 20. <u>Successors and Assigns</u>. This Agreement shall bind and inure to the benefit of and be enforceable by the Seller and the Purchaser and the respective successors and assigns of the Seller and the Purchaser. The Purchaser shall not assign this Agreement without the Seller's prior written consent, which consent may be granted or withheld in the Seller's sole discretion.

SECTION 21. <u>Waivers</u>. No term or provision of this Agreement may be waived or modified unless such waiver or modification is in writing and signed by the party against whom such waiver or modification is sought to be enforced.

SECTION 22. <u>Exhibits</u>. The exhibits and schedules to this Agreement are hereby incorporated and made a part hereof and are an integral part of this Agreement.

SECTION 23. <u>No Use of Seller's Name</u>.

The Purchaser shall not, without the express prior written consent of the Seller: (i) use or permit the use by any person, the name of the Seller or any of its affiliates; (ii) represent or imply that it is affiliated with, authorized by, or in any way related to the Seller or any of its affiliates; (iii) institute any legal, collection or enforcement proceeding in the name of the Seller or any of its affiliates or continue to prosecute any pending legal, collection or enforcement proceeding in the name of the Seller or any of its affiliates; or (iv) mislead, whether through misrepresentation or nondisclosure or otherwise, a Mortgagor or any other person as to the identity of the owner of any Mortgage Loan.

SECTION 24. <u>General Interpretive Principles</u>. For purposes of this Agreement, except as otherwise expressly provided or unless the context otherwise requires:

(a) the terms defined in this Agreement have the meanings assigned to them in this Agreement and include the plural as well as the singular, and the use of any gender herein shall be deemed to include the other gender;

(b) accounting terms not otherwise defined herein have the meanings assigned to them in accordance with generally accepted accounting principles;

(c) references herein to "Articles," "Sections," "Subsections," "Paragraphs," and other subdivisions without reference to a document are to designated

13

FL CONFIDENTIAL00123

Articles, Sections, Subsections, Paragraphs and other subdivisions of this Agreement;

(d)     reference to a Subsection without further reference to a Section is a reference to such Subsection as contained in the same Section in which the reference appears, and this rule shall also apply to Paragraphs and other subdivisions;

(e)     the words "herein," "hereof," "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular provision; and

(f)     the term "include", "includes", or "including" shall mean without limitation by reason of enumeration.

SECTION 25. Reproduction of Documents. This Agreement and all documents relating thereto, including, without limitation, (a) consents, waivers and modifications which may hereafter be executed, (b) documents received by any party at the closing, and (c) financial statements, certificates and other information previously or hereafter furnished, may be reproduced by any photographic, photostatic, microfilm, micro-card, miniature photographic or other similar process. The parties agree that any such reproduction shall be admissible in evidence as the original itself in any judicial or administrative proceeding, whether or not the original is in existence and whether or not such reproduction was made by a party in the regular course of business, and that any enlargement, facsimile or further reproduction of such reproduction shall likewise be admissible in evidence.

SECTION 26. Further Agreements; Cooperation. The Seller and the Purchaser each agree to execute and deliver to the other such reasonable and appropriate additional documents, instruments or agreements as may be necessary or appropriate to effectuate the purposes of this Agreement.

The parties agree to act reasonably, in good faith and in accordance with all applicable laws and regulations and to do all things necessary to effect the transactions contemplated hereby including, without limitation, complying with all reasonable requests provided by one party to the other relating to the transactions set forth herein.

Each party agrees to take, or cause to be taken, all such further or other actions as shall reasonably be necessary to make effective, to consummate and to perform the undertakings and obligations contemplated by this Agreement.

**INTENTIONALLY LEFT BLANK**

**SIGNATURE PAGE FOLLOWS**

FL CONFIDENTIAL00124

IN WITNESS WHEREOF, the Seller and the Purchaser have caused their names to be signed hereto by their respective officers thereunto duly authorized as of the date first above written.

**Seller:**

BBNY Mortgage LLC

By: *William J Bymel*
William J Bymel (Oct 2, 2023 19:00 PDT)
Name:  Bill Bymel
Title:   Authorized Representative

**Purchaser:**

Bonifera, LLC

By: 
William Weinstein (Oct 2, 2023 16:50 PDT)
Name: William Weinstein
Title:   Authorized Representative

15

# SCHEDULE I

## MORTGAGE LOAN SCHEDULE

| OI # | Property Address | Property City | Property State | Purchase Price |
|---|---|---|---|---|
| 48051664 | 714 MILTON AVE | ANDERSON | IN | $9,359.55 |
| 48051689 | 102 W RIDGE ST | NANTICOKE | PA | $23,065.58 |
| 48051709 | 1950 N STATE LINE | HUBBARD | OH | $9,901.94 |
| 48051769 | 903 OSCAR CROSS AVE | PADUCAH | KY | $14,237.14 |
| 48051873 | 551 WILSON BRIDGE DR | OXON HILL | MD | $35,375.52 |
| 48051884 | 109 NEW ENGLAND RD | SEARSMONT | ME | $62,505.10 |
| 48051890 | 613 SODERS RD | CARNEYS POINT | NJ | $24,041.10 |
| 48051907 | 13603 S RIDGEWAY AVE | ROBBINS | IL | $7,890.30 |
| 48051915 | 1325 E 141 ST | EAST CLEVELAND | OH | $10,295.39 |
| 48051935 | 496 MARTIN LUTHER KING JR BLVD | TRENTON | NJ | $30,764.74 |
| 48051958 | 14204 S LOWE AVE | RIVERDALE | IL | $29,087.91 |
| 48051965 | 1356 EAGLE BLUFF DR | BOURBONNIS | IL | $13,310.40 |
| 48051983 | 2819 KENNEDY AVE | BALTIMORE | MD | $14,014.25 |
| 48051997 | 1835 N AISQUITH ST | BALTIMORE | MD | $23,487.70 |
| 48052001 | 1000 W COLUMBIA AVE | MONTICELLO | KY | $5,507.23 |
| 48052066 | 716 W SILVER SPRINGS PL | OCALA | FL | $5,259.06 |
| 48052091 | 10603 S LAFAYETTE AVE | CHICAGO | IL | $22,563.12 |
| 48051661 | 320 N TENTH ST | POTTSVILLE | PA | $30,196.13 |
| 48051678 | 21743 CAROL AVE | SAUK VILLAGE | IL | $49,892.33 |
| 48051685 | 1815 MYRTLE ST | ERIE | PA | $9,359.55 |
| 48051746 | 3321 W END HWY | CARLISLE | SC | $18,707.94 |
| 48051783 | 40 CROMMETT ST | SOUTH CHINA | ME | $84,370.66 |
| 48051807 | 627 MARTIN DR | TARBORO | NC | $25,388.74 |
| 48051898 | 16103 EDMORE DR | DETROIT | MI | $24,777.92 |
| 48051899 | 1724 W THIRD ST | PRESCOTT | MI | $26,967.65 |
| 48051908 | 20571 HWY 1 | RODESSA | LA | $3,799.10 |
| 48051940 | 607 S BROTHERTON ST | MUNCIE | IN | $6,920.76 |
| 48051976 | 204 S PLEASANT | GONZALES | LA | $19,079.70 |
| 48052051 | 424 W HOLLIS ST | HOLLIS | OK | $4,481.96 |
| 48052054 | 513 SCHOOL ST | MARTINS FERRY | OH | $14,237.14 |
| 48052063 | 646 S OKLAHOMA AVE | LIBERAL | KS | $35,123.62 |
| 48052073 | 906 & 908 S FARMERVILLE ST | RUSTON | LA | $9,359.55 |
| 48052133 | 556 WIMMER PL | E ST LOUIS | IL | $4,481.96 |
| 48073703 | 11353 BRAILE | DETROIT | MI | $17,163.70 |
| 48073721 | 1216 GULFPORT ST | BIRMINGHAM | AL | $17,863.73 |

FL CONFIDENTIAL00126

| | | | | |
|---|---|---|---|---|
| 48073737 | 1720 E Lake Blvd. | Birmingham | AL | $20,454.29 |
| 48073749 | 538 COMMERCIAL AVE | ATLANTA | GA | $95,648.03 |
| 48073766 | 1176 (fka 1186) DIALS BRANCH | HARDY | KY | $9,359.55 |
| 48073769 | 1402 E 3RD AVE | ALBANY | GA | $6,470.53 |
| 48073770 | 16687 HWY 171 N | WINFIELD | AL | $4,884.47 |
| 48073771 | 1732 SOUTWEST 13TH | LAWTON | OK | $3,506.45 |
| 48073772 | 211 6th Avenue West | Huntington | WV | $3,562.76 |
| 48073802 | 1240 GLENDALE CIR | GREENWOOD | MS | $17,229.30 |
| 48073803 | 1607 N 20TH ST | ESCANABA | MI | $2,769.73 |
| 48073805 | 650 HEARD AVE | ALBANY | GA | $4,884.47 |
| 48073806 | HC 70 BOX 18B AARONS FORK (E-911 419 HAYFIELD DR) | ELKVIEW | WV | $5,033.03 |
| 48073809 | 74 FRIEND ST | ADAMS | MA | $28,701.80 |
| 48073811 | 20 FLORENCE ST (LOT 3 & 2A) | AUGUSTA | ME | $15,458.20 |
| 48073813 | 16736 HEAD AVE | HAZLE CREST | IL | $10,171.34 |
| 48073865 | 1009 ANAYA AVE | SANTA ROSA | NM | $19,114.73 |
| 48073885 | 161 MAPLE VALLEY DR | MT HOPE | WV | $14,237.14 |
| 48073891 | 15492 OHIO ST | DETROIT | MI | $16,675.94 |
| 48051756 | 5057 BAKER BLVD | BAKER | LA | $61,000.00 |
| 48051827 | 164 ATLANTIC HWY | NORTHPORT | ME | $93,000.00 |
| 48051892 | 815 SHERIDAN AVE | BALTIMORE | MD | $27,000.00 |
| 48051698 | 7432 QUEENSTOWN AVE | BIRMINGHAM | AL | $50,000.00 |
| 48052126 | 4831 BOWLAND AVE | BALTIMORE | MD | $68,000.00 |
| 48073691 | 29-37 GILMORE STREET | EAST ELMHURST | NY | $330,000.00 |
| 48046255 | 781 REMSEN AVENUE | BROOKLYN | NY | $235,000.00 |
| 48046264 | 2 FRANKLIN PLACE | MASSAPEQUA | NY | $80,000.00 |
| 48073693 | 2501 MT VERNON ROAD | DUNWOODY | GA | $210,000.00 |
| 48073690 | 184 PUMPKIN HOLLOW ROAD NORTH | HILLSDALE | NY | $25,000.00 |
| **Total** | | | **62** | **$2,200,000.00** |

FL CONFIDENTIAL00127

<u>EXHIBIT 1</u>

MORTGAGE LOAN DOCUMENTS

With respect to each Mortgage Loan set forth on a related Mortgage Loan Schedule, the Seller shall deliver and release to the Purchaser's custodian, the following documents:

1.      the original Note bearing all original intervening endorsements necessary to show a complete chain of endorsements from the original payee to the Seller, endorsed in blank, "Pay to the order of _____, without recourse", and, if previously endorsed, signed in the name of the last endorsee by a duly qualified officer of the last endorsee, or a copy of the Note (endorsed as provided above) together with a lost note affidavit;

2.      for each Mortgage Loan , the original Assignment of Mortgage for each Mortgage Loan, in form and substance acceptable for recording. The Mortgage shall be assigned to Purchaser or Purchaser's designee;

3.      the original of any guarantee executed in connection with the Note, if any;

4.      the Mortgage with evidence of recording thereon. If the Mortgage with evidence of recording thereon has not been returned by the public recording office where such Mortgage has been delivered for recordation, a copy of such Mortgage;

5.      all assumption, consolidation or extension agreements, or Modification Agreements with evidence of recording thereon, if any;

6.      all intervening assignments of mortgage evidencing a complete chain of ownership from the originator of the Mortgage Loan to the last assignee, in each case, with to the extent available evidence of recording thereon. If any such intervening assignment of mortgage has not been returned from the applicable public recording office, a copy of such intervening assignment of mortgage;

7.      if the Note, the Mortgage, any Assignment of Mortgage, or any other related document has been signed by a Person on behalf of the Mortgagor, the power of attorney or other instrument that authorized and empowered such Person to sign;

8.      the lender's title insurance policy in the form of an ALTA mortgage title insurance policy and insuring the Mortgage Loan Purchaser and its successors and assigns as to the lien of the Mortgage in the original principal amount of the Mortgage Loan; and

9.      any security agreement, chattel mortgage or equivalent document executed in connection with the Mortgage, if any; or

10.     to the extent any of the foregoing have been released for servicing, foreclosure or similar reasons, such assurance and/or documentation as the parties shall mutually agree.

FL CONFIDENTIAL00128

# MLSA, BBNY and Bonifera (6-30-23)

Final Audit Report                                    2023-10-03

| | |
|---|---|
| Created: | 2023-10-02 |
| By: | Gabrielle Ayala-Montgomery (GMontgomery@oakharborcapital.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAASX5tpopbTUNrOg-FJCqLaHfTN_WpS6OW |

## "MLSA, BBNY and Bonifera (6-30-23)" History

Document created by Gabrielle Ayala-Montgomery (GMontgomery@oakharborcapital.com)
2023-10-02 - 11:44:34 PM GMT

Document emailed to William Weinstein (wsw@oakharborcapital.com) for signature
2023-10-02 - 11:45:11 PM GMT

Email viewed by William Weinstein (wsw@oakharborcapital.com)
2023-10-02 - 11:50:09 PM GMT

Document e-signed by William Weinstein (wsw@oakharborcapital.com)
Signature Date: 2023-10-02 - 11:50:17 PM GMT - Time Source: server

Document emailed to bill@firstliencapital.com for signature
2023-10-02 - 11:50:18 PM GMT

Email viewed by bill@firstliencapital.com
2023-10-03 - 2:00:10 AM GMT

Signer bill@firstliencapital.com entered name at signing as William J Bymel
2023-10-03 - 2:00:30 AM GMT

Document e-signed by William J Bymel (bill@firstliencapital.com)
Signature Date: 2023-10-03 - 2:00:32 AM GMT - Time Source: server

Agreement completed.
2023-10-03 - 2:00:32 AM GMT

![Adobe Acrobat Sign] **Adobe Acrobat Sign**

# Exhibit 31

## DECLARATION OF WILLIAM BYMEL

I, William Bymel, declare as follows:

1.      I am the founder and Manager of First Lien Capital, LP ("First Lien") and make this declaration and certification based on my personal knowledge and am competent to testify as to the matters set forth herein.

2.      First Lien operates BBNY, LLC ("BBNY").

3.      In September 2023, William Weinstein ("Weinstein") of Oak Harbor Capital, LLC ("Oak Harbor") asked me to execute a mortgage loan sale agreement between BBNY as purchaser and Magerick, LLC ("Magerick") as seller for the purchase of 62 mortgage loans ("Mortgage Loans") for $2.2 Million ("BBNY Sale Agreement") and then execute a mortgage loan sale agreement between BBNY as seller of the same loans and Bonifera, LLC ("Bonifera") as purchaser for $2.2 Million ("Bonifera Sale Agreement").

4.      I understood that the Mortgage Loans were among a portfolio of loans subject to an agreement between AHP Servicing and/or its trusts and Cymbidium Restoration Trust or its affiliates.

5.      I executed the BBNY Sale Agreement on behalf of BBNY on October 2, 2023 at 7:01 p.m. PDT.

6.      William Weinstein, on behalf of Magerick, executed the BBNY Sale Agreement on October 2, 2023 at 4:44 p.m. PDT.

7.      I did not realize it at the time and do not know why the BBNY Sale Agreement is dated June 30, 2023, but that is months before the agreement was actually executed.

8.      I executed the Bonifera Sale Agreement on behalf of BBNY on October 2, 2023 at 7:00 p.m. PDT.

9.      William Weinstein executed the Bonifera Sale Agreement on behalf of Bonifera on October 2, 2023 at 4:50 p.m. PDT on October 2, 2023.

10.     I did not realize it at the time and do not know why the Bonifera Sale Agreement is dated June 30, 2023, but that is months before the agreement was actually executed.

11.     BBNY did not pay $2.2 Million for the Mortgage Loans. No money changed hands as consideration for the BBNY Sale Agreement. BBNY never received the Mortgage Loans from Magerick.

12.     Bonifera did not pay $2.2 Million for the Mortgage Loans. No money changed hands as consideration for the Bonifera Sale Agreement. BBNY never delivered the Mortgage Loans to Bonifera.

13.     Neither BBNY nor First Lien performed any due diligence on the Mortgage Loans, nor was it the intent that BBNY would ever possess the Mortgage Loans.

14.     The $2.2 million purchase price was set by Oak Harbor.

15.     I am not aware of any legitimate business purpose, or any economic substance to this set of transactions.

16.     I received no compensation for signing the agreements. Instead, Weinstein asked me to participate as a favor.

17.     At the time, First Lien was exploring a merger with, or a buyout of Oak Harbor. As we performed due diligence, we concluded that the numbers did not make sense for us. We therefore elected not to pursue a merger or buyout.

I declare under penalty of perjury pursuant to the laws of the United States of America that the foregoing is true and correct.

DATED in Las Vegas, Nevada, this 24 th day of February, 2025.

_____
William Bymel

# Exhibit 32



# MORTGAGES, LLC

1415 WESTERN AVENUE, SUITE 700 • SEATTLE, WA 98101

**For Qualified Purchasers Only**

**October 5, 2023**

Leila and David Centner
Perpetual Love Alternatives LLC – Oak Harbor
3921 Alton Road #465
Miami Beach, FL 33140

**RE: 2023 DLC Fund Second Quarter Investor Letter**

Hello Leila and David,

*"We shape our dwellings, and afterwards our dwellings shape us."*
Winston Churchill

The American economy continues to shiver, shudder, and shake from the impacts of the Pandemic, with rising interest rates, inflation, and international conflicts. The national debt has now risen to a new record of $31.3 trillion dollars,[1] and American consumer debt has also grown to a new record of $17.06 trillion.[2]  Consumer credit card debt just hit a new total of $1.03 trillion,[3] and the greatest source of consumer debt, housing, has now grown to $12.01 trillion in debt.[4]



---

[1] https://www.forbes.com/advisor/investing/nationaldebt/#:~:text=It's%20a%20percentage%20that%20is,country's%20GDP%20for%20one%20year.&text=The%20U.S.%20national%20debt%20is%20%2431.3%20trillion%2C%20and%20the%20current,U.S.%20GDP%20is%20%2425.7%20trillion.
[2] https://www.newyorkfed.org/microeconomics/hhdc
[3] https://www.newyorkfed.org/microeconomics/hhdc
[4] https://www.newyorkfed.org/microeconomics/hhdc

**CONFIDENTIAL** **Cymbidium120845**



Despite the multi-year din of most economists and housing experts predicting that a recession would occur, and housing prices would plummet, Oak Harbor has maintained that neither event would occur. Although there has been some diminution in value of higher value, inner-city, rural, and mobile homes, "starter homes," small, economical houses that young people can make first time purchases, continue to maintain their value. Oak Harbor has purchased nearly 10,000 of these starter homes since 2015 and these starter homes have increased or maintained their value notwithstanding the events of the past few years. As the chart below shows, most Oak Harbor homes have maintained their values during the past year since over 90% of Oak Harbor's homes are in states where home values have increased in value.

## I.     Oak Harbor's assets continue to retain their value.

Even though interest rates have risen 5% points since January 2022,[5] housing prices have largely remained stable or slightly increased for five reasons: an acute housing shortage, locked-in low interest rates, rental market increases, working from home, and housing starts.



One Year Home Price Growth Rate Q2 2023
United States 3.0%

< (5.00)%
(4.99)% to (0.01)%
0.00% to 2.49%
2.50% to 4.99%
> 5.00%

Powered by Bing
© GeoNames, Microsoft, TomTom

## A.     Acute housing shortage.

There has been an acute housing shortage, particularly of starter homes, since 2008. According to MarketWatch, the U.S. is short 6.5 million homes due to a decade of under-building.[6] The housing shortage is a problem that developed in the aftermath of the Great Recession.[7] Mark Zandi, Chief Economist at Moody's Analytics noted; "the housing shortage is a problem that developed over the housing crisis a decade ago, and it's probably going to take a decade to get out of it."[8] Significant political pressure is building to address the housing shortage,

---

[5] https://fred.stlouisfed.org/series/DFF
[6] https://www.marketwatch.com/story/u-s-has-a-shortfall-of-6-5-million-single-family-homes-due-to-a-decade-of-under-building-report-says-2fb86d08#:~:text=A%20decade%20of%20under-building%20has%20led%20to%20a,U.S.%20is%20short%20of%206.5%20million%20single-family%20homes.
[7] https://www.realtor.com/news/trends/the-housing-shortage-has-hit-crisis-levels/#:~:text=The%20problem%20is%20most%20homeowners,substantially%20larger%20monthly%20mortgage%20payments
[8] The Housing Shortage Hits Crisis Levels: What Homebuyers, Sellers Need To Know Before Making a Move (realtor.com)

CONFIDENTIAL                                                                                   Cymbidium120846


particularly for starter homes. U.S. Senators Sherrod Brown, Jack Ree, Ron Wyden, Tina Smith, and Elizabeth Warren have petitioned the Federal Housing Finance Agency and its supervised entities, Fannie Mae and Freddie Mac, to increase affordable housing and to create policies to stimulate the building and sale of affordable housing. They wrote: "with a severe shortage of available and affordable housing for aspiring homeowners, it is critical that the Enterprises remain committed to keeping families in the homes they have and to keep the housing stock in the hands of individual homeowners, not institutional investors." [9]



"The acting was awful; the plot thin. But the 3% mortgage makes it a hit!"

There simply aren't enough new homes to make up for the shortage of previously owned ones on the market. There were fewer than 1.1 million homes for sale or under contract in June 2023, which is nearly 14% below year-earlier levels. [10] As the Wall Street Journal observed, "with existing homes in low supply, buyers have turned to new homes but there still aren't enough new homes to make up for the shortage of previously owned ones on the market." [11]

**B.      Locked-in low interest rates.**

Only 11% of outstanding household debt carried interest rates that fluctuated with benchmark interest rates. Americans who refinanced their mortgages for a better rate since March 2020 have saved approximately $42 billion on their monthly payments. [12] By contrast, today's average mortgage interest rate is over 8%. [13]

Over the course of 2022, existing home sales activity declined 18.9%. [14] As the National Association of Realtors wrote: "existing home sales experienced a brief resurgence, rising 14.5% in February 2023 compared to the previous month. However, existing home sales dropped again in three of the last four months, including a 3.3% decline in June 2023.

---

[9] https://www.banking.senate.gov/imo/media/doc/fhfa_loan_sales_letter.pdf
[10] https://www.wsj.com/podcasts/whats-news/mortgage-rates-top-7/952aba0d-81c5-4e88-b9cb-3c908a0de585#:~:text=Mortgage%20rates%20have%20hit%20their,which%20have%20raised%20borrowing%20costs
[11] The 7% Mortgage Rate Is Back, Thanks to the Federal Reserve - WSJ
[12] https://www.wsj.com/articles/what-fed-hikes-much-of-americas-consumer-debt-is-still-riding-ultralow-rates-e10ab199?mod=consumers_more_article_pos1
[13] https://www.nytimes.com/2023/08/25/opinion/fixed-rate-mortgages-inflation.html
[14] https://www.usbank.com/investing/financial-perspectives/investing-insights/interest-rates-impact-on-housing-market.html#:~:text=With%20significantly%20higher%20mortgage%20rates,higher%20(home)%20prices.%E2%80%9D

**CONFIDENTIAL**                                        **Cymbidium120847**


Many homeowners are unwilling to put their homes on the market, fearful of giving up low-rate mortgages and being forced to take out loans that are much more expensive.[15] Some buyers have given up, deciding to rent for longer than they had planned.[16] Michael Kolomatsky with the New York Times says that the tight-home buying market is forcing many people to stay in their rentals.[17] As the chart below shows, the effective interest rate on outstanding mortgage debt is below 4% today.



**Most Borrowers Still Have Cheap Mortgages**

— Effective interest rate on outstanding mortgage debt

All of these "locked-in" borrowers have a financial disincentive to sell their homes.

### C. Rental market increases.

While the effective interest rates and outstanding debt has dropped, rental rates for homes and apartments continue to increase. A recent study answered the question for renters in the 100 largest U.S. cities, using the local median price per square foot, to find just how much space the local average rent could afford if it were a mortgage payment. The study assumed a 20 percent down payment and a monthly 30-year-fixed-rate mortgage payment at 6.78 percent (the rate at the time the study was published) and factored in local homeowners' insurance and property taxes on the median-priced home. In 63 of 100 cities, the average rent would support the mortgage on a home of less than 1,000 square feet — much smaller than the typical U.S. house.[18]

---

[15] https://www.wsj.com/podcasts/whats-news/mortgage-rates-top-7/952aba0d-81c5-4e88-b9cb-3c908a0de585#:~:text=Mortgage%20rates%20have%20hit%20their,which%20have%20raised%20borrowing%20costs
[16] https://www.wsj.com/podcasts/whats-news/mortgage-rates-top-7/952aba0d-81c5-4e88-b9cb-3c908a0de585#:~:text=Mortgage%20rates%20have%20hit%20their,which%20have%20raised%20borrowing%20costs
[17] Rent Increases Are Softening, but Not Everywhere - The New York Times (nytimes.com)
[18] If Your Rent Went to a Mortgage Instead, How Much Space Would It Buy? - The New York Times (nytimes.com)



## Rent as House Payment

The 15 cities where the average rent would get you the most and the least space if it were a mortgage payment.

| **Most Space** | | | | **Least Space** | | |
|---|---|---|---|---|---|---|
| City | Average monthly rent | How much house that buys you | | City | Average monthly rent | How much house that buys you |
| Detroit | $1,215 | **2,421 sq. ft.** | | New York | $4,454 | **728 sq. ft.** |
| Cleveland | $1,301 | **2,048** | | Oakland, Calif. | $2,813 | **724** |
| Philadelphia | $1,896 | **1,462** | | Long Beach, Calif. | $2,571 | **715** |
| Baltimore | $1,532 | **1,308** | | Irvine, Calif. | $3,069 | **709** |
| Fort Wayne, Ind. | $1,077 | **1,287** | | Austin, Texas | $1,799 | **709** |
| Chesapeake, Va. | $1,577 | **1,253** | | Anaheim, Calif. | $2,307 | **704** |
| Toledo, Ohio | $881 | **1,231** | | San Diego | $2,917 | **698** |
| Milwaukee | $1,369 | **1,215** | | Oklahoma City | $960 | **684** |
| Orlando, Fla. | $1,933 | **1,215** | | Tulsa, Okla. | $909 | **684** |
| Indianapolis | $1,155 | **1,215** | | Laredo, Texas | $866 | **659** |
| Jacksonville, Fla. | $1,522 | **1,189** | | Seattle | $2,233 | **613** |
| Virginia Beach | $1,583 | **1,157** | | San Jose, Calif. | $2,939 | **574** |
| Chicago | $2,215 | **1,156** | | San Francisco | $3,313 | **567** |
| North Las Vegas | $1,522 | **1,142** | | Honolulu | $2,233 | **548** |
| Buffalo | $1,237 | **1,131** | | Fremont, Calif. | $2,758 | **506** |

**CONFIDENTIAL**

**Cymbidium120849**


This study suggests that rental rates won't support the purchase of a large home but would support the purchase of "starter homes," particularly when a family can create equity through a home purchase. Stated differently, for most suburbs of major cities, it still makes more sense to purchase a home than to rent. Moreover, first time purchasers of homes can obtain much more livable and spacious living by buying a "starter home" in the suburbs than renting an apartment in the city.



"I do like this apartment, but I'm ready for my own starter home."

Rent growth has been stalling for months, which is causing lots of people to renew their leases.[19] Any rebound in the housing market is raising questions about how sustained those lower rent increases will be.[20] Supply isn't going to be coming from existing homes, due to the 'lock-in effect.' More than 80% of homeowners have mortgage rates below 5.0% which makes them reluctant to sell their homes.[21]

**D.      Permanent demographic shift in post-Pandemic worker locations.**

The pandemic dramatically altered where American workers worked. While many workers are returning to the workplace, there has been widespread resistance to returning to the office. A survey from researchers at Stanford University utilizing the Census Bureau's household survey showed that remote work remains prevalent, with Stanford's finding that it accounts for over a quarter of paid full-time workdays in the United States (this did drop down from 33% in 2021).[22] The home office is becoming the norm.

During the pandemic, people who worked from home became significantly more likely to move, and more likely to do so than all other workers.[23] This rising mobility was driven by remote workers who sought new housing in their same metro areas, but also by a wave of remote workers decamping to other parts of the country. In the first two years of the pandemic, 1 in 4 workers who moved long-distance was working remotely in a new home, a previously unheard of scale of remote migration.[24] In the pre-pandemic years, about 40,000 remote workers moved away from metro New York. Then in the two years during the pandemic, 200,000 left.[25] This mirrors a

---

[19] https://www.nytimes.com/2023/06/26/business/economy/housing-market-construction-cost.html
[20] https://www.nytimes.com/2023/06/26/business/economy/housing-market-construction-cost.html
[21] https://www.nytimes.com/2023/06/26/business/economy/housing-market-construction-cost.html#:~:text=Home%20prices%20fell%20nationally%20in,whether%20that%20trend%20has%20continued
[22] https://www.nytimes.com/2023/03/30/business/economy/remote-work-measure-surveys.html
[23] The Places Most Affected by Remote Workers' Moves Around the Country - The New York Times (nytimes.com)
[24] The Places Most Affected by Remote Workers' Moves Around the Country - The New York Times (nytimes.com)
[25] The Places Most Affected by Remote Workers' Moves Around the Country - The New York Times (nytimes.com)

**CONFIDENTIAL**                                                        **Cymbidium120850**


pattern identified in an earlier analysis that showed college-educated workers were increasingly migrating away from the most expensive parts of the country and toward relatively more affordable major metros.[26]

This profound workplace shift has placed a greater emphasis on buying better homes in the suburbs than renting a worse apartment in the city. A shift to remote work during the pandemic also has spurred people who might otherwise have stayed with roommates or parents to live on their own. Remote work which means working from home for many people has increased the value of starter homes.[27]

### E.   Housing starts.

Despite mortgage rates hitting multidecade highs, demand for new homes is strong and prices are rising. House prices have been ticking higher across much of the country in recent months, and that trend looks set to continue.[28] With existing homes in low supply, buyers have turned to new homes, creating a boom for builders.[29] Figures showed that national housing starts unexpectedly surged in May, jumping by the most since 2016, as applications to build homes also increases. [30] New home sales have been on a positive trajectory in 2023, but they historically represent a small minority of overall sales; from 2000 to 2019, new homes accounted for only 13% of total home sales.[31]

Since 2018, the average unit size for new housing starts has decreased 10% nationally to 2,420 square feet.[32] Home sizes are shrinking the most in some of the hotter markets of the previous year.[33] Builders are axing dining areas, bathtubs, and separate living rooms and are increasing the size of multiuse rooms like kitchens and great rooms.[34] However, even smaller homes won't make a big enough dent in the purchase price for most entry-level buyers or provide an answer to the nation's severe housing shortage

### II.   Fannie Mae and Freddie Mac are holding more than a billion dollars in non-performing home loans.

As of June 30, 2023, Freddie Mac had a mortgage portfolio of $3.43 trillion (UPB in billions) and Frannie Mae had a mortgage portfolio of $4.1 trillion for a total mortgage portfolio of $7.53 trillion. [35]

[26] The Places Most Affected by Remote Workers' Moves Around the Country - The New York Times (nytimes.com)
[27] https://www.nytimes.com/2023/06/26/business/economy/housing-market-construction-cost.html#:~:text=Home%20prices%20fell%20nationally%20in,whether%20that%20trend%20has%20continued.
[28] https://www.nytimes.com/2023/08/17/business/wall-street-housing-market-mortgages.html#:~:text=Despite%20mortgage%20rates%20hitting%20multidecade,strong%20and%20prices%20are%20rising
[29] https://www.wsj.com/podcasts/whats-news/mortgage-rates-top-7/952aba0d-81c5-4e88-b9cb-3c908a0de585#:~:text=Mortgage%20rates%20have%20hit%20their,which%20have%20raised%20borrowing%20costs
[30] https://www.nytimes.com/2023/06/26/business/economy/housing-market-construction-cost.html#:~:text=Home%20prices%20fell%20nationally%20in,whether%20that%20trend%20has%20continued
[31] https://finance.yahoo.com/news/housing-market-2023-why-hard-160008273.html?guccounter=1&guce_referrer=aHR0cHM6Ly93d3cuZ29vZ2xlLmNvbS8&guce_referrer_sig=AQAAAA-UNaOvWZuDhGOSEsH7NKA4kuivU0l7FrPlWcETTPIG2OXt4DV64vksJORm_PFIztBNZDrQEUIHfSF1Od9QYd5eWvAklw4p4HpUHOzT6JYOIiMNiJSleL43Pwl2ucoe49a2v-kgWY3pULTb_w5kD725hdeg2QF0nFe0tE8o9rwo
[32] Goodbye Bathtub and Living Room. America's Homes Are Shrinking. - WSJ
[33] Goodbye Bathtub and Living Room. America's Homes Are Shrinking. - WSJ
[34] Goodbye Bathtub and Living Room. America's Homes Are Shrinking. - WSJ
[35] https://www.fanniemae.com/media/48561/display





Mortgage Portfolio (UPB in Trillions)
2Q 2023

Freddie Mac NPL $0.06 · Fannie Mae NPL $0.09

Freddie Mac, $3.4 · Fannie Mae, $4.1

|  | Fannie Mae | Freddie Mac |
|---|---|---|
| **Single Family** |  |  |
| 30-59 Days | 0.84% | 0.88% |
| 60-89 Days | 0.21% | 0.21% |
| Seriously (90 days or more) | 0.55% | 0.56% |

Of this $7.53 trillion in mortgages approximately $1.6% of these loans, or over 1 billion dollars in loans, are non-performing and delinquent. These non-performing home loans have been held by Fannie Mae and Freddie Mac, and HUD in many cases for many years. The end of foreclosure and eviction moratoriums, coupled with increasing political pressure to make more homes available to people to buy, will force Fannie Mae and Freddie Mac to sell more NPLs in the months and years ahead. This will offer Oak Harbor attractive opportunities to purchase paper, particularly because Oak Harbor is one of the few qualified buyers to purchase these assets.

### III. There will be more opportunities to purchase Fannie Mae, Freddie Mac, and HUD NPLs through sales set aside for approved not-for-profit bidders.

Fannie Mae, Freddie Mac, and HUD have all increased NPL sales where only not-for-profit enterprises engaged in low-income housing can participate in the sales process. This unique sales process creates a significant and growing opportunities for Oak Harbor, working in connection with not-for-profits, to purchase these NPLs. As noted earlier in this letter, a number of United States senators have urged the Director of the FHFA to review Fannie Mae and Freddie Mac non-performing and reperforming loans sales programs to promote programs that benefit homeowners, communities, and the housing market.[36] These entities need to remain committed to keeping families in the homes they have and keeping the housing stock in the hands of individual homeowners, not institutional investors.[37]

---

[36] https://www.banking.senate.gov/imo/media/doc/fhfa_loan_sales_letter.pdf
[37] https://www.banking.senate.gov/imo/media/doc/fhfa_loan_sales_letter.pdf

**CONFIDENTIAL**                                                                                 **Cymbidium120852**



## IV.    Bankruptcy filings are increasing.

In 2023, there have been 173,362 Chapter 13 bankruptcies filed through June 30, 2023. This is up 27% from June of 2022 and up nearly 46% from June of 2021. However, this June 2023 number of filings is still down approximately 40% from June of 2019.[38]

Federal, state, and local stimulus payments, foreclosure and eviction moratoria, and debt reduction and mitigation programs have allowed many Americans to pay off or reduce their debts. "Full" employment, some increase in wages, wide scale refinancing of loans at lower rates prior to the increase in interest rates, significant increases in home equity, and recent student loan debt forgiveness, have all combined to relieve pressure on consumers. Indeed, bankruptcy attrition rates, dismissals and conversions, remain at historically low rates, which means that Oak Harbor's bankruptcy receivables continue to outperform projected returns.

The many factors discussed above that have benefited American consumers have contributed to delay the long-expected increase in bankruptcy filings. However, the elimination of stimulus programs, foreclosures and eviction moratoria and debt reduction programs, is putting pressure on American consumers. High interest rates, coupled with inflation, are also reducing both savings and disposable income of many Americans. The result is increased bankruptcy filings. Oak Harbor stands by its prediction of approximately 500,000 bankruptcies that will be filed in 2023, and that number will grow to close to a million filings in 2024.[39]

## I.    Form ADV Part 2A Disclosure Brochure

Pursuant to regulatory requirements, Oak Harbor Capital is required to provide you with its updated Form ADV Part 2A Disclosure Brochure on an annual basis. The ADV Part 2A Disclosure Brochure contains information such as our advisory services offered, fee schedule, disciplinary information, and conflicts of interest.

Please note that this document is posted on InvestorVision for you to access. It is purely informational and does not require any action on your part. You are also able to access Part 1 and 2 of Oak Harbor Capital, LLC's Form ADV electronically through Investment Advisor's Public Disclosure (IAPD) website at https://adviserinfo.sec.gov/firm/summary/169089, or by calling our Investor Relations representatives to obtain an electronic or printed copy.

## II.    Audited Financial Statement and K-1s

The 2023 audited financial statement were prepared by your auditors RSM.  The K-1s were prepared by Moss Adams and have been distributed for 2022.

---

[38] https://www.uscourts.gov/news/2023/07/31/bankruptcy-filings-rise-10-percent#:~:text=According%20to%20statistics%20released%20by%20the%20Administrative%20Office,compared%20with%20380%2C634%20cases%20in%20the%20previous%20year.
[39] Bankruptcy Filings Take Sharp Drop | United States Courts (uscourts.gov)

# DLC Mortgages, LLC

**III.    Oak Harbor Capital DLC Update**

Oak Harbor Capital continues to achieve good results in resolving loans: *

| Resolution Status / Loan Status | # of Loans | Property Value | Unpaid Principal Balance | Carrying Value |
|---|---|---|---|---|
| RESOLUTION COMPLETE | 612 | 101,340,395 | 72,724,260 | 51,768,807 |
| Foreclosure Complete | 240 | 29,510,321 | 23,352,363 | 18,165,713 |
| Loan Sale | 308 | 60,366,753 | 42,970,861 | 28,342,832 |
| Settlement/Other | 64 | 11,463,321 | 6,401,035 | 5,260,262 |
| PENDING SALE | 11 | 2,646,400 | 1,484,597 | 1,286,604 |
| Loan Sale | 1 | 780,000 | 289,766 | 276,303 |
| Legal Resolution | 10 | 1,866,400 | 1,194,832 | 1,010,301 |
| UNRESOLVED | 330 | 69,011,452 | 36,403,139 | 35,047,006 |
| Legal Resolution | 313 | $66,304,082 | $34,434,628.98 | $33,506,856 |
| Settlement/Other | 17 | 2,707,370 | 1,968,510 | 1,540,150 |
| Grand Total | 953 | $172,998,247 | $110,611,995.98 | $88,102,417 |

*Past performance is no guarantee of future results.

DLC Mortgages – Portfolio and Performance as of June 30, 2023.

- 612 Loans (approximately 64%) have been fully resolved.
- 341 Loans (approximately 36%) are pending resolution.

**IV.    Pending Sales**

| DLC Pending Sales | Sale Type | Loan Count | Carrying Value ($) | Sale Price ($) |
|---|---|---|---|---|
| 3rd Party Sales | RPL/NPL | 11 | 1,311,428 | 1,437,095 |
| Grand Total | | 11 | 1,311,428 | 1,437,095 |

**CONFIDENTIAL**                                                                 Cymbidium120854



## V.    Second Quarter 2023 Sales Activity and Distributions

Below is a table of NPL loan sales activity in the second quarter of 2023.

| Sale Name | Loan Count | Carrying Value ($) | Sale Price ($) |
|---|---|---|---|
| REO | 11 | 595,175 | 929,127 |
| Goldman Sachs RPL II | 12 | 752,036 | 721,579 |
| Grand Total | 23 | 1,347,211 | 1,650,706 |

*This table represents 2nd quarter 2023 activity only with the exception of 1 REO that was closed in July.
**In addition to the sales above, 3 loans were paid in full in the second quarter of 2023. These loans had a total basis of $303,191.16 and were resolved for a total of $322,274.48.

Through June 2023, DLC Mortgages has paid approximately $17.7 Million in distributions to DLC based on NPL and RPL loan resolutions.

Oak Harbor Capital believes that its NPL continues to generate significant returns on behalf of investors for DLC.

## VI.    Second Quarter 2023 Purchase Activity

During the second quarter, DLC Mortgages bought 62 assets for $2.2 MM from American Homeowner Preservation. The transaction consists of 53 REOs and 9 nonperforming loans (NPLs), with a weighted average IRR at purchase of 201% and a valuation of $4.7 MM, resulting in a great addition to the portfolio.

| Type | # Loans | Purchase price | UPB | Property value | NPV | IRR |
|---|---|---|---|---|---|---|
| NPLs | 9 | $1,118,000 | $2,928,308 | $3,833,600 | $2,498,903 | 72% |
| REOs | 53 | $1,082,000 | - | $2,575,153 | $2,216,658 | 335% |
| Total | 62 | $2,200,000 | $2,928,308 | $6,408,753 | $4,715,561 | 201% |

This purchase increases the valuation to just under $27 Million.

## VII.    Conclusion

Oak Harbor Capital is seeing significant new opportunities for purchasing distressed assets at increasingly attractive prices.  Economic uncertainty diminishes asset values, particularly illiquid distressed assets. The recent purchase of AHP assets substantiates this point. Oak Harbor Capital is seeing more and better opportunities to purchase illiquid distressed assets, particularly in Florida.

Best wishes,

William S. Weinstein

CONFIDENTIAL                                                                                           Cymbidium120855



## MORTGAGES, LLC

1415 WESTERN AVENUE, SUITE 700, SEATTLE • WA 98101

Disclaimer Information:

Each potential investor should carefully consider the risks of the product. Detailed information on risk can be found in the Offering Memorandum. Read the Offering Memorandum carefully before investing. An investment in the Fund involves a significant degree of risk and is not suitable for all investors. There can be no assurance that the Fund's investment objectives will be achieved or that there will be any return of or on capital. The distressed consumer debt market is highly competitive, and involves a high degree of uncertainty. There can be no assurance that the Fund will be able to locate suitable investment opportunities, acquire them at favorable prices, achieve target returns, fully invest committed capital, or that there will be a buyer for such assets. Reductions in U.S. consumer spending and consumer credit may lead to reduced supply of distressed first-lien mortgage loans for acquisition. Assets acquired from counterparty sellers may be subject to legal defenses, or clerical or documentary error. The Fund may not be successful in enforcing recourse rights subject to counterparty risk. Investments made by the Fund will have limited liquidity. The Fund will not be listed on any securities exchange, and does not expect a secondary market to develop. Units in the Fund have not been registered under the Securities Act or state securities laws, and cannot be sold unless registered or an exemption from registration is available. Past performance is no guarantee of future results.

All data in this document is current as of June 30, 2023, unless otherwise noted. The representations herein are subject in their entirety to the description of the offering set forth in the Offering Memorandum.

**CONFIDENTIAL**                                                                                 **Cymbidium120856**

# Exhibit 33

**From:** wsw@oakharborcapital.com
**Sent:** Thursday, October 5, 2023 4:52 PM
**To:** ajay@ridgeleighcap.com
**Cc:** wsw@oakharborcapital.com
**Subject:** RE: urgent DLC question
**Attachments:** 2023 DLC Mortgages Fund Second Quarter Investor Letter.pdf

Dear Ajay,

Attached is the Second Quarter Investor Letter for DLC. As Leila noted, we have continued to make our approximate $350K monthly payments, and those payments have now totaled approximately $18 Million. In addition, the value of the investment has stayed relatively stable at or near the magic $27 Million number. The most recent valuation as of the end of the Second Quarter was approximately $26.6 Million. The challenge has been interest rates in several different contexts.

First, interest rates have increased by more than four points, which translates in the WACC increasing by almost 4 points. This means that the IRR has been compressed significantly. Even with this downdraft, our calculation of the IRR is significantly higher than her calculation.

| Summary Results | 2Q2023 | | Gross | | | Net | |
|---|---|---|---|---|---|---|---|
| Total Investment | LTD Recoveries | FMV @ Valuation Date | MOIC | | XIRR | MOIC | |
| 33,150,097 | 20,050,006 | 26,564,594.38 | 1.38 | | 10.46% | 1.37 | |

Interest rates have also had a large negative impact on what we're paying Goldman Sachs. We're trying to quickly retire that debt, but we've paid almost a million dollars more in interest over the past two years than from the inception of the Fund. Lastly, we continue to be beat up on the Pan Cap purchases, which create an historic drag on everything we've been doing.

Leila can do what she wants, but there are three positive trends that continue in her portfolio. First, we are buying assets at increasingly attractive prices (please note the AHP transaction at page 11 of the Investor letter). As you can see below, the 62 loans purchased for $2 Million will be very lucrative, and we believe based on recent DLC II purchases that this trend will continue. This favorable purchase activity will increase the value of the portfolio above the magic $27 Million mark.

## VI.    Second Quarter 2023 Purchase Activity

During the second quarter, DLC Mortgages bought 62 assets for $2.2 MM from American Homeowner Preservation. The transaction consists of 53 REOs and 9 nonperforming loans (NPLs), with a weighted average IRR at purchase of 201% and a valuation of $4.7 MM, resulting in a great addition to the portfolio.

| Type | # Loans | Purchase price | UPB | Property value | NPV | IRR |
|---|---|---|---|---|---|---|
| NPLs | 9 | $1,118,000 | $2,928,308 | $3,833,600 | $2,498,903 | 72% |
| REOs | 53 | $1,082,000 | - | $2,575,153 | $2,216,658 | 335% |
| Total | 62 | $2,200,000 | $2,928,308 | $6,408,753 | $4,715,561 | 201% |

Second, the retirement of the Goldman Sachs facility should reduce significantly the costs associated with the payment of interest, which should continue to boost IRRs.

Lastly, many of the DLC loans are reperforming, and we expect those loans to be lucrative, particularly as we move towards our first securitization vehicle late this Fall or in early Winter (probably with Goldman Sachs or Nomura as underwriters).

Let me know if you have any questions or comments in the morning.  Again, thank you for all that you do.

Best wishes,

Bill

**From:** Ajay Shroff <ajay@ridgeleighcap.com>
**Sent:** Thursday, October 5, 2023 9:10 AM
**To:** William S. Weinstein <wsw@oakharborcapital.com>
**Subject:** Re: urgent DLC question


Thank you!

On Oct 5, 2023, at 11:52 AM, William S. Weinstein <wsw@oakharborcapital.com> wrote:


Thanks for the email.  We'll be back to you later today or early tomorrow morning.  I don't think Leila's calculations are accurate, but let me get you the correct numbers and she can then assess what she wants to do.

**From:** Ajay Shroff <ajay@ridgeleighcap.com>
**Sent:** Wednesday, October 4, 2023 6:11 PM
**To:** William S. Weinstein <wsw@oakharborcapital.com>
**Subject:** urgent DLC question


Hi Bill,

I'm hoping you can help me respond to Leila:

> Ajay, what's happening with DLC Mortgages. The fund has been making monthly distributions, but the account value is going down with each distribution. For the trailing 12 months, we are showing a small loss. The net IRR since inception on the investment is down to 9% and our base case was 14%. Should we trim or move to liquidate? Please speak to Bill and let us know what's going on and why we should not be worried.

I'm hoping you can help me respond – by email or with some succinct verbal bullet points – before end of day Friday.

If it's easier, I'm available for a call almost any time tomorrow or Friday.

Thanks in advance!
Ajay

Ridgeleigh Capital

Ajay G. Shroff
19 Beechwood Road
3rd Floor
Summit NJ 07901

**CONFIDENTIAL**

(908) 373-2520 – office
(908) 656-1177 – mobile
ajay@ridgeleighcap.com

This communication is for the intended recipient only. This communication may contain information that is privileged, confidential and exempt from disclosure under applicable law and constitutes an electronic communication within the meaning of the Electronic Communications Privacy Act, 18 U.S.C. 2510. If you are not the intended recipient, you are hereby notified that any unauthorized use, dissemination, distribution or copying of this communication is strictly prohibited and may subject you to criminal or civil penalty. If you have received this communication in error, please notify us immediately by email, delete the message, and destroy any copies.

# Exhibit 34

(Omitted)

# Exhibit 35

# Darragh Birkett

# Oak Harbor v. AHP Servicing

# June 9, 2025



1325 Fourth Avenue, Suite 1840  Seattle, Washington 98101
Bellingham | Everett | Tacoma | Olympia | Yakima | Spokane
Seattle 206.287.9066    Tacoma 253.235.0111    Eastern Washington 509.624.3261
**www.buellrealtime.com**
email: info@buellrealtime.com

Page 1

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON

IN AND FOR KING COUNTY

_____

OAK HARBOR CAPITAL SPECIAL          )
OPPORTUNITIES MASTER FUND, LP;      )
OHCSOF GP, LLC; and OAK HARBOR      )
CAPITAL, LLC,                       )
                                    ) No. 23-2-25722-7 SEA
                Plaintiffs,         )
                                    )
        v.                          )
                                    )
AHP SERVICING, LLC, a Delaware      )
limited liability company; and     )
JORGE NEWBERY, an individual,       )
                                    )
                Defendants.         )
_____

VIDEOCONFERENCE DEPOSITION UPON ORAL EXAMINATION OF

DARRAGH BIRKETT
_____

Witness located in:

Dublin, Ireland

* All participants appeared via videoconference *

DATE TAKEN:   June 9, 2025

REPORTED BY:  Tia B. Reidt, Washington RPR, CSR #2798
                        Oregon #22-0001

655e810c-24e0-4df7-a20b-64d8de936afd

A.  Sure.

Q.  And I guess I'll just get started with some questions.

And -- oh, one other thing.  From time to time, either Mr. Greenberg or Mr. Keller, who represents Cymbidium and Oak Harbor and other entities like that, either Mr. Keller or Mr. Keller may have an objection.  That's fine.  They're just doing their job. If that happens, you should answer the question anyway unless Mr. Greenberg instructs you not to answer.

Does that make sense?

A.  Yes.  Understood.

Q.  Okay.  Great.

Okay.  So just to get started, you said already when the court reporter asked you you're currently, as we speak here, in Dublin, Ireland; is that right?

A.  Correct.

Q.  Is that where you live?

A.  Yes, it is.

Q.  Okay.

What is your occupation or profession in Dublin, Ireland?

A.  I own a sandwich shop.

Q.  Okay.

655e810c-24e0-4df7-a20b-64d8de936afd

What is it called?

A.  Honest to Goodness.

Q.  How long have you owned the sandwich shop?

A.  In this entity, for just shy of 12 months.

Q.  Okay.

How about a previous version of the sandwich shop?

A.  I had it for -- in a different location for eight years.

Q.  Okay.

Was it called the same thing?

A.  Yes, it was.

Q.  Okay.

Prior to owning the sandwich shop, did you have some other job or jobs?

A.  Yes.  I used to work in the hotel industry.

Q.  Okay.

Any specific role in the hotel industry?

A.  Yeah, from like a general assistant right through to assistant manager.

Q.  Okay.

What's your level of education?

A.  I beg your pardon?

Q.  What education have you received?

A.  I did the secondary school, which maybe you

655e810c-24e0-4df7-a20b-64d8de936afd

would call high school, and then I went into third-level education, but I didn't complete it.

Q. Is that the equivalent of college or university, the third-level --

A. University.

Q. Okay.

How many years of university did you have or third-level education?

A. Two.

Q. Two?

A. Yeah.

Q. Okay.

(Reporter asks parties to speak one at a time.)

MR. COOPERSMITH: Yeah, the court reporter has trouble getting it down when we talk over each other, so both of us should keep that in mind.

BY MR. COOPERSMITH:

Q. In any event, you said you went two years of third-level education before you left?

A. Correct.

Q. What were you studying before you left the program?

A. Hotel management.

Q. Okay.

655e810c-24e0-4df7-a20b-64d8de936afd

Have you ever worked in the nonperforming loan distressed debt industry?

A. No.

Q. Have you ever worked in the mortgage industry?

A. No.

Q. Have you ever been in business with your brother, Paul Birkett?

A. No.

Q. Okay.

A lot of businesses during Covid during the pandemic experienced, you know, a downturn in business. Did that happen to your sandwich shop when the pandemic was going on?

A. It partially did. It coincided with our building being purchased by a hotel, and we were forced to leave.

Q. Did those two things, the Covid and also the hotel becoming the landlord, did that affect your business in some way?

A. Yes, it did. I had to close it down.

Q. Okay.

When was that?

A. 2019.

Q. Okay.

And what did you do after you closed the

655e810c-24e0-4df7-a20b-64d8de936afd

A. Yes, I do.

Q. Okay.

First of all, do you have any knowledge of whether AHP failed to account for its collection activities?

A. I don't know who AHP is.

Q. Okay.

And do you agree one way or the other with the statement that that failure of AHP was a, quote, major factor in Keydally defaulting under its financing arrangements?

A. I don't really even understand the statement, so I can't say one way or the other.

Q. Okay.

To your knowledge, did Keydally default under its financing arrangements?

A. I'm not aware of any financing arrangements at all. We didn't even have a bank account for Keydally, so I don't know what financing it could be.

Q. Did Keydally have any employees?

A. No.

Q. Did Keydally have any consultants or anyone else working for it?

A. No.

Q. Was Automation Finance the independent manager

655e810c-24e0-4df7-a20b-64d8de936afd

of Keydally?

A. I don't know.

Q. Do you know what Automation Finance is?

A. Yes, I do.

Q. What is it?

A. It's Paul Birkett's company.

Q. Okay.

MR. COOPERSMITH: Let's go to Exhibit 16.

(Exhibit 16 marked for identification.)

THE COURT REPORTER: Exhibit 16 is marked.

BY MR. COOPERSMITH:

Q. This document is "Secured" -- well, let's wait for it.

Okay. This document on the screen, Exhibit 16, is called "Secured Demand Promissory Note."

Do you see that?

A. Yes, I do.

Q. Dated July 20th, 2023.

Do you know what this is?

A. No, I don't.

Q. Do you understand that there was a transaction where Keydally purchased certain mortgage loans from a company called Cymbidium?

A. No, I don't.

MR. KELLER: Leading.

655e810c-24e0-4df7-a20b-64d8de936afd

THE WITNESS:  Sorry.

BY MR. COOPERSMITH:

Q.  Do you have any understanding of that?

You can answer.

A.  No.

Q.  To the extent that Keydally acquired any assets, did, to your knowledge, Keydally ever have to go out-of-pocket to actually pay for those assets?

MR. KELLER:  Lack of foundation.

BY MR. COOPERSMITH:

Q.  You can answer.

A.  I don't see how because there was no finance. There was no money.

Q.  Did Keydally have any banking relationship or any lending relationship with anyone at all --

A.  No.

Q.  -- in order to pay for any assets?

A.  No.

Q.  Do you understand that -- you mentioned before that you thought the transaction was supposed to take two days.  Do you have any understanding of what the purpose of a two-day transaction would be or was?

A.  No.

Q.  Did --

A.  No, I don't.

655e810c-24e0-4df7-a20b-64d8de936afd

Q.   Did Mr. Weinstein ever explain that to you?

A.   No.

Q.   Did Paul Birkett ever explain that to you?

A.   No.

Q.   Do you know -- ever hear the phrase "Nominee company"?

A.   No, I don't -- no, I didn't.

Q.   How much in total did you receive for your whole involvement in the Keydally Pallida matter?

A.   Well, I don't know what Pallida is, like I said.  But for Keydally, it was  6,000 in total.

Q.   Okay.

And you'd mentioned  3,000.  What was the other  3,000 for?

A.   Like I say, this was supposed to last a couple of days.  And then I went to Paul maybe a year later going -- it was getting a bit frustrating that this is dragging on too long.  I don't really know what's happening.  This is an awful lot more than what I was expecting, and this is when a further  3,000 was issued as some sort of compensation, I suppose you would call it.

Q.   Okay.

MR. COOPERSMITH:  Let's look at Exhibit 17.

655e810c-24e0-4df7-a20b-64d8de936afd

(Exhibit 17 marked for identification.)

THE COURT REPORTER:  Exhibit 17 is marked.

BY MR. COOPERSMITH:

Q.  Okay.

Do you know what this document is, Exhibit 17?

A.  No, I don't.

Q.  Okay.

MR. COOPERSMITH:  Let's take a look at Exhibit 19.

(Exhibit 19 marked for identification.)

THE COURT REPORTER:  Exhibit 19 is marked.

BY MR. COOPERSMITH:

Q.  This document's titled "Option Exercise With Assignment of Interests."

Do you see that?

A.  Yes, I do.

Q.  And then it looks like there's some signatures at the bottom, and then under Keydally, there's a signature.  Is that your signature?

A.  It doesn't look like my signature, no.

655e810c-24e0-4df7-a20b-64d8de936afd

Q.   It does not?   Okay.

A.   No.

Q.   Who could have signed this document for you if you didn't sign it?

A.   I don't know.

Q.   Okay.

Do you remember a time when that certain financing in the amount of $10 million was canceled in exchange for your signing rights back to lenders?

MR. KELLER:   Leading.

BY MR. COOPERSMITH:

Q.   You can answer.

A.   I don't really even understand the question.

Q.   Okay.   That's fine.

MR. COOPERSMITH:   Let's take a look at Exhibit 1.

(Exhibit 1 marked for identification.)

THE COURT REPORTER:   Exhibit 1 is marked.

BY MR. COOPERSMITH:

Q.   Okay.

Do you see that there's an email from darabirkett@gmail.com to Brian Benoit with a copy -- or also to, rather, Mr. Weinstein.

Do you see that?

A.   Yes, I do.

655e810c-24e0-4df7-a20b-64d8de936afd

Q.   Okay.

And you remember you had a conversation with a lawyer named Brian Benoit?

A.   No, I have never spoken to him.

Q.   Okay.

You don't remember that or you're sure you have never spoken to him?

A.   I have never spoken to a lawyer about this.

Q.   Okay.

But do you see that there's an email that says "Hi Brian," and at the end, it's typed "Thanks, Darragh Birkett"?

A.   That's not from me.

Q.   This email is not from you?

A.   No.   I have no recollection of it.

Q.   Okay.

I mean, if there's -- if it's not from you, is there anyone else -- I think we asked this, but at this time, November 4th, 2024, is there anyone else who could have been using this email account other than yourself?

A.   No.

Q.   Okay.

Could Paul Birkett have sent this email, for example?

655e810c-24e0-4df7-a20b-64d8de936afd

A. He could.

Q. Because you say he sometimes has access to darabirkett@gmail.com as an address.

A. That's correct.

Q. Does this email, this Gmail address, do you use that for all kinds of business, like personal emails, anything like that?

A. Not really, no.

Q. What do you use this Gmail address for?

A. Not a great deal. I don't -- I haven't used it in quite a while.

Q. Okay.

Let's just look at the document, though. It says "Hi Brian, This whole thing has gotten totally out of control. It was supposed to be a few signatures on documents for a few weeks in return for money that I needed badly after my cafe closed thanks to Covid."

Do you see that?

A. Yes, I do.

Q. Okay.

And it's true that your cafe closed -- well, let me ask it this way:

Did your cafe close thanks to Covid?

A. Yes. Partially.

MR. KELLER: Sorry, what was that?

655e810c-24e0-4df7-a20b-64d8de936afd

MR. COOPERSMITH: He said "partially," I think.

BY MR. COOPERSMITH:

Q. Right?

A. Correct.

Q. What were the other reasons besides thanks to Covid?

MR. GREENBERG: I'm going to object. You asked that question earlier, and he answered it.

I object. It's been asked and answered.

MR. COOPERSMITH: I understand the objection.

BY MR. COOPERSMITH:

Q. Mr. Birkett, what were the other reasons besides the -- Covid for the cafe closing?

A. Our building was purchased by a neighboring hotel.

Q. Okay.

A. And it was closing us -- closing us down.

Q. Okay.

This first paragraph that we're looking at in Exhibit 1 also says "It was supposed to be a few signatures on documents for a few weeks."

Is that the case? Was it correct that you thought this would be a few signatures for a few weeks,

655e810c-24e0-4df7-a20b-64d8de936afd

and it turned out to go on longer; is that right?

A.  Correct.  Yes.

MR. KELLER:  Leading.

BY MR. COOPERSMITH:

Q.  Okay.

The next paragraph says "I was supposed to have no work to do, or risk or exposure to legal problems but now I have a lot of legal letters, accounting audit letters, and the whole thing feels like a set-up."

Is that a true statement in terms of your involvement with the Keydally matters?

A.  Yes.

Q.  It goes on to say "I wish I had never gotten involved in the first place."

Is that true?  Is that how you feel?

A.  Yes, I do.

Q.  The next sentence says "I know nothing about state court judgments or loans or finance or any business apart from my cafe in Dublin."

Is that a correct statement?

A.  A correct statement.

Q.  It says "Bill - please confirm all of what I say here."

Do you see that?

655e810c-24e0-4df7-a20b-64d8de936afd

A.  Yes, I do.

Q.  Did Mr. Weinstein, Bill Weinstein, ever respond to this or confirm anything?

A.  No.

Q.  It says, the next paragraph, "I was paid 3,000 dollars in 2023 and 3,000 in 2024 in return for my signature on various documents."

Do you see that?

A.  Yes, I do.

Q.  Is that a true and correct statement?

A.  That's a correct statement.

Q.  Okay.

It says "I set up an Irish company Keydally and used it to sign an agreement to buy the judgments and an agreement where Bill loaned me the money to buy them."

Is that a correct statement?

A.  I believe so, yes.

Q.  And it says "It was just a paper transaction - Keydally never had a bank account."

Is that a correct statement?

A.  That's a correct statement, yes.

Q.  Okay.

Next paragraph says "The loans were supposed

655e810c-24e0-4df7-a20b-64d8de936afd

to be sold to someone else very quickly....but that never happened."

Is that a correct statement?

A.  I'm unaware.

Q.  Okay.

It goes on:  "Initially I was happy because I got another 3000 dollars the following year.  But then I started getting letters from Bills auditor asking me to confirm the value of the loans I bought and confirming the balance on my loan."

Is that a correct statement?

A.  That's a correct statement, yes.

Q.  And then it says "I signed those letters because that is what I was paid to do"; is that correct?

A.  That's correct.

Q.  It goes on to say "I don't know who Jorge is and I don't know what Pallida is either"; is that correct?

A.  Correct.

Q.  "I just signed what I was asked to in return for the 3,000 dollars."

Is that a correct statement?

A.  Correct.

Q.  Okay.

655e810c-24e0-4df7-a20b-64d8de936afd

Next -- or the last paragraph, "So no, there are no millions."

Is that correct with respect to Keydally's finances?

A. That's correct.

Q. "If I can give the 2x3,000 back and put an end to all of this, please let me know where to send the money."

Is that how you feel?

A. Yes, I do.

Q. "This has ended up as a fiasco and very different to what Bill told me at the beginning."

Do you see that?

A. Yes, I do.

Q. So is that a correct statement, that it's different from what Bill told you at the beginning?

A. Well, it's different to the scenario or to the situation I thought I was getting into. Not a conversation with Bill because I never spoke to Bill about it.

Q. I see. Okay.

MR. COOPERSMITH: Okay.

Can we go off the record for just a few minutes?

THE COURT REPORTER: We are off the

# Exhibit 36

| From: | peter.fitzpatrick@OakHarborCapital.com |
|---|---|
| Sent: | Thursday, July 6, 2023 9:57 AM |
| To: | wsw@oakharborcapital.com; GMontgomery@oakharborcapital.com |
| Cc: | EBrookman@oakharborcapital.com; GValenzuela@oakharborcapital.com; MBasile@OakHarborCapital.com; SGupta@oakharborcapital.com; AaronEdwards@oakharborcapital.com |
| Subject: | RE: Closings in July-Keydally III Transaction |
| Attachments: | AHP-Keydally-Mortgage Loan Sale Agreement-7.6.23.docx; Cymbidium Restoration Trust Participation Agreement with KeydallyCapital Ltd-7.6.23.doc; Keydally-Secured Demand Promissory Note to WSW-7.6.23.docx; Keydally-Secured Demand Promissory Note to Brad Waite-7.6.23.docx |

With regard to No. 3 below, please find attached first drafts of the:

1. AHP-Cymbidium Restoration Trust Mortgage Loan Sale Agreement;
2. Cymbidium Restoration Trust Participation Agreement with Keydally Capital;
3. Keydally Secured Demand Promissory Note in favor of WSW; and
4. Keydally Secured Demand Promissory Note in favor of Brad Waite.

Bill and Gonzalo, please confirm the documents reflect the business terms you instructed Gabrielle and me to draft.  Gabrielle, after that confirmation, please work with Gonzalo to finalize and attach the Mortgage Loan Schedule to the MLSA and to address the blanks and brackets in the Notes.  Then please forward the documents to Dara Birkett for his review and sign off.  Bill has instructed that the transaction needs to be completed by close of business tomorrow.

Many thanks,

Peter

...................................................................................................................................................................

**From:** William S. Weinstein <wsw@oakharborcapital.com>
**Sent:** Wednesday, July 5, 2023 2:25 PM
**To:** Gabrielle Ayala-Montgomery <GMontgomery@oakharborcapital.com>
**Cc:** Peter Fitzpatrick <peter.fitzpatrick@OakHarborCapital.com>; William S. Weinstein <wsw@oakharborcapital.com>; Emma Brookman <EBrookman@oakharborcapital.com>; Gonzalo M. Bozo Valenzuela <GValenzuela@oakharborcapital.com>; Michael Basile <MBasile@OakHarborCapital.com>; Sonal Gupta <SGupta@oakharborcapital.com>; Aaron Edwards <AaronEdwards@oakharborcapital.com>
**Subject:** Closings in July

1) <u>Two Texas transactions</u>.  It looks like there will be only one buyer, but for both NPLs and RPLs.  We want to try to get this deal signed this week.

2) <u>Two New York Adolph transactions</u>.  I have a call in to Adolph to get the contracts signed this week.

3) <u>Keydally III</u>.  This transaction needs to be completed this week.  Peter should be taking the lead on this project.

4) <u>Erick Vallely</u>. We have a small loan pool (two loans) and potentially a larger New York loan pool we're looking at.

**OakHarbor001612**

5) <u>Pollio Sales</u>.  We have 400 NPLs that are on the market that should be back with pricing next week.

6) <u>Headlands</u>.  Apparently we have one agreed deal (coming through today) and may have a second deal regarding the AHP portfolio.

# Exhibit 37

PARTICIPATION AGREEMENT

THIS PARTICIPATION AGREEMENT is made and entered into as of July 20, 2023, by and between Cymbidium Restoration Trust, a Delaware statutory trust, with Wilmington Savings Fund Society, a federal savings bank, acting as its UTI Trustee, Administrative Trustee and Delaware Trustee (the "Trust") and Keydally Capital Ltd., an Irish registered company, which is being issued the participation interest hereunder (the "Participant").

WHEREAS: the Trust acquired that certain portfolio of residential mortgage loans under that certain Mortgage Loan Sale Agreement dated as of July 20, 2023, made by and between Magerick, LLC, as the Seller, and the Trust, as the Purchaser (the "MLSA"), which loans are listed on Schedule I to the MLSA (the "Loans").

NOW THEREFORE: For value received, including providing the funds necessary to acquire the Loans, the Trust hereby conveys to the Participant a 100 percent participation interest in all of the Trust's beneficial and economic rights in the Loans and related obligations, including but not limited to: (i) the right to receive all principal, interest or other proceeds and bear all obligations with respect to the Loans; (ii) to receive the benefit of the Trust's rights and protections under the MLSA; and (iii) to direct the Trust to exercise the Trust's rights under the MLSA for the benefit of the Participant.

IN WITNESS WHEREOF, each of the undersigned has caused this Agreement to be duly executed as of the date first above written.

KEYDALLY CAPITAL LTD.
the Participant

CYMBIDIUM RESTORATION TRUST
the Trust

By: Cymbidium Restoration, LLC, its Settlor and
     Sole Beneficiary

By: _____

    Name: _____

    Title: _____

By: _____

    Name: _____

    Title: _____

# Exhibit 38

## SECURED DEMAND PROMISSORY NOTE

Amount: $5,000,000.00                                    Dated: July 20, 2023

WHEREAS, Keydally Capital Ltd., an Irish registered company ("Maker") and William S. Weinstein, an individual ("Lender"), have agreed to the terms of a loan, pursuant to which Maker makes this Secured Demand Promissory Note in favor of Lender (the "Note").

NOW, THEREFORE, FOR VALUE RECEIVED, the undersigned Maker promises to pay to the order of Lender the principal sum of five million dollars ($5,000,000.00) (the "Principal Amount"), together with interest, on demand, and in the absence of any demand, six (6) months from the date hereof (the "Maturity Date").

From time to time it may be necessary for Lender to advance additional amounts hereunder to Maker for the payment of fees and costs related to the Collateral (as defined below), in which case such additional amounts shall be added to the Principal Amount hereunder.

Lender is jointly providing this loan with his co-lender, Brad Waite, who is advancing an equivalent amount to Maker through a separate Secured Demand Promissory Note on identical terms. Lender, in collaboration with his co-lender, has the authority to cancel and consider this Note fully settled by exercising an option hereby granted by the Maker to the Lender and his co-lender. This option allows them to acquire all of the Maker's interests in the Collateral (as defined below) at any time during the Note's duration, in exchange for forgiving any remaining unpaid principal and accrued interest under this Note upon exercise. Maker agrees to undertake all necessary actions to transfer ownership of the Collateral to the lenders upon the exercise of the option.

1.  INTEREST RATE.

The Principal Amount under this Note shall bear interest at a rate of six percent (6%) per annum payable in accordance with the terms hereof.

2.  PAYMENTS AND SECURITY

2.1 General.  All proceeds of the Collateral received by Maker are to be immediately applied to the payment of the Principal Amount and accrued interest under this Note.  If Maker does not repay the Principal Amount, together with any and all accrued interest thereon, on demand or on the Maturity Date, or payments or otherwise not made in accordance with this Section 2.1, Lender may, in his sole discretion, at any time thereafter proceed against any and all of the Collateral that has been defined and pledged under Section 2.2 hereto.

2.2  Security. Maker hereby pledges the following rights and/or assets as collateral (the "Collateral") to secure the obligations of Maker under this Note:

> All right, title and interest, including without limitation proceeds, Maker has in those certain residential mortgage loans which are being contemporaneously purchased with the proceeds of this Note under that

certain Mortgage Loan Sale Agreement dated as of July 20, 2023, made by and between Magerick, LLC, a Delaware limited liability company, as the Seller, and the Cymbidium Restoration Trust, a Delaware statutory trust, as the Purchaser (the "Mortgage Loan Sale Agreement").

2.3   Mandatory Payments.  At the option of Lender, the entire unpaid Principal Amount and accrued interest thereon shall become immediately due and payable upon demand made by Lender.

3.      LOAN FUNDING DIRECTION.

Maker hereby authorizes Lender to apply the original Principal Amount of the Note directly to funding the payment of the purchase price under the Mortgage Loan Sale Agreement.

4.      LAWFUL MONEY; DESIGNATED PLACES OF PAYMENT.

All amounts due hereunder are payable in lawful money of the United States of America, in immediately available funds, at the Lender's designated address not later than 6:00 p.m., Pacific time, on the day of payment.

5.      WAIVERS.

Except as set forth elsewhere herein, Maker, for itself and its legal representatives, successors, and assigns, expressly waives presentment, protest, demand, notice of dishonor, notice of nonpayment, notice of maturity, notice of protest, notice of intent to accelerate, notice of acceleration, presentment for the purpose of accelerating maturity, and diligence in collection.

6.      FEES AND EXPENSES.

In the event it should become necessary to employ counsel to collect any amounts owed by Maker under this Note, Maker agrees to pay the reasonable attorneys' fees and costs of Lender, incurred in connection with Lender's collection efforts, irrespective of whether suit is brought.

7.      COVENANTS. Maker hereby agrees and covenant to the following:

7.1. No Liens. Maker agrees not to create or incur or suffer to be incurred or to exist, any pledge, security interest, encumbrance, lien or charge of any kind, superior to any such pledge, security interest, encumbrance, lien or charge of any kind created by this Note upon the Collateral or upon any income or proceeds therefrom.

7.2. Further Assurance.  Maker will do, execute, acknowledge and deliver, or cause to be done, executed, acknowledged and delivered, all such further acts, documents, deeds, conveyances, mortgages, assignments, transfers and assurances as may be necessary or desirable or as Lender reasonably may require for the completion of the transactions contemplated by this Note.

7.3. No Transfer.  Maker may not sell, transfer, pledge or convey title or interest in any of

2

the Collateral without the prior written consent of Lender, which consent may be withheld for any reason or no reason.

8. SECTION HEADINGS.

Headings and numbers have been set forth for convenience only. Unless the contrary is compelled by the context, everything contained in each paragraph applies equally to this entire Note.

9.     AMENDMENTS IN WRITING.

Subject to applicable law, this Note may be amended, modified, or supplemented only by a written agreement signed by Lender and Maker.

10.     NOTICES.

Any notice, demand or other communication required or permitted to be given pursuant to this Note shall have been sufficiently given for all purposes if (i) delivered personally or by overnight courier service to the party to whom such notice, demand or other communication is directed or (ii) sent by registered or certified mail, postage prepaid, addressed to the parties at their addresses set forth in this Note.  Any such notice shall be deemed to be given (i) when received if delivered personally or by overnight courier and (ii) three (3) business days after the date on which it was deposited in a regularly maintained receptacle for the deposit of United States mail, addressed and sent as set forth in this section.

11. CHOICE OF LAW AND USURY.

This Note shall be deemed to have been executed under and shall be construed and enforced in accordance with the laws of the State of Washington without regard to its conflicts of law principles. It is expressly stipulated and agreed to be the intent of Maker, Lender and their respective affiliates at all times to comply strictly with the applicable usury laws now or hereafter governing consideration received under this Note. If the applicable law is ever interpreted so as to render usurious any consideration called for, contracted for, charged, taken, reserved or received with respect to this Note, or if any prepayment by Maker or Lender's exercise of the option herein contained to accelerate the maturity of this Note, results in Maker having paid any interest in excess of that permitted by law, then notwithstanding anything to the contrary in this Note, it is Maker's and Lender's express intent and agreement that all excess amounts theretofore collected by Lender be credited on the principal balance of this Note (or, if this Note has been paid in full, refunded to Maker) and the provisions of this Note shall immediately be deemed reformed and the amounts thereafter collectible hereunder reduced, without the necessity of the execution of any new documents, so as to comply with the then applicable law, but so as to permit the recovery of the fullest amount otherwise called for hereunder.

*[SIGNATURE PAGE FOLLOWS]*

3

IN WITNESS WHEREOF, each of the undersigned has caused its duly authorized representative to execute this Note as of the date first written above.

Maker:

KEYDALLY CAPITAL LTD.

By:_____
   Name:
   Title:

   Address:

   Keydally Capital Ltd.

█████████████████

Lender:

_____
WILLIAM S. WEINSTEIN

Address:

████████████████

# Exhibit 39

SECURED DEMAND PROMISSORY NOTE

Amount: $5,000,000.00                                    Dated: July 20, 2023

WHEREAS, Keydally Capital Ltd., an Irish registered company ("Maker") and Brad Waite, an individual ("Lender"), have agreed to the terms of a loan, pursuant to which Maker makes this Secured Demand Promissory Note in favor of Lender (the "Note").

NOW, THEREFORE, FOR VALUE RECEIVED, the undersigned Maker promises to pay to the order of Lender the principal sum of five million dollars ($5,000,000.00) (the "Principal Amount"), together with interest, on demand, and in the absence of any demand, six (6) months from the date hereof (the "Maturity Date").

From time to time it may be necessary for Lender to advance additional amounts hereunder to Maker for the payment of fees and costs related to the Collateral (as defined below), in which case such additional amounts shall be added to the Principal Amount hereunder.

Lender is jointly providing this loan with his co-lender, Brad Waite, who is advancing an equivalent amount to Maker through a separate Secured Demand Promissory Note on identical terms. Lender, in collaboration with his co-lender, has the authority to cancel and consider this Note fully settled by exercising an option hereby granted by the Maker to the Lender and his co-lender. This option allows them to acquire all of the Maker's interests in the Collateral (as defined below) at any time during the Note's duration, in exchange for forgiving any remaining unpaid principal and accrued interest under this Note upon exercise. Maker agrees to undertake all necessary actions to transfer ownership of the Collateral to the lenders upon the exercise of the option.

1.  INTEREST RATE.

The Principal Amount under this Note shall bear interest at a rate of six percent (6%) per annum payable in accordance with the terms hereof.

2.  PAYMENTS AND SECURITY

2.1 General.  All proceeds of the Collateral received by Maker are to be immediately applied to the payment of the Principal Amount and accrued interest under this Note. If Maker does not repay the Principal Amount, together with any and all accrued interest thereon, on demand or on the Maturity Date, or payments or otherwise not made in accordance with this Section 2.1, Lender may, in his sole discretion, at any time thereafter proceed against any and all of the Collateral that has been defined and pledged under Section 2.2 hereto.

2.2  Security. Maker hereby pledges the following rights and/or assets as collateral (the "Collateral") to secure the obligations of Maker under this Note:

All right, title and interest, including without limitation proceeds, Maker has in those certain residential mortgage loans which are being

contemporaneously purchased with the proceeds of this Note under that certain Mortgage Loan Sale Agreement dated as of July 20, 2023, made by and between Magerick, LLC, a Delaware limited liability company, as the Seller, and the Cymbidium Restoration Trust, a Delaware statutory trust, as the Purchaser (the "Mortgage Loan Sale Agreement").

   2.3   Mandatory Payments.  At the option of Lender, the entire unpaid Principal Amount and accrued interest thereon shall become immediately due and payable upon demand made by Lender.

3.   **LOAN FUNDING DIRECTION.**

   Maker hereby authorizes Lender to apply the original Principal Amount of the Note directly to funding the payment of the purchase price under the Mortgage Loan Sale Agreement.

4.   **LAWFUL MONEY; DESIGNATED PLACES OF PAYMENT.**

   All amounts due hereunder are payable in lawful money of the United States of America, in immediately available funds, at the Lender's designated address not later than 6:00 p.m., Pacific time, on the day of payment.

5.   **WAIVERS.**

   Except as set forth elsewhere herein, Maker, for itself and its legal representatives, successors, and assigns, expressly waives presentment, protest, demand, notice of dishonor, notice of nonpayment, notice of maturity, notice of protest, notice of intent to accelerate, notice of acceleration, presentment for the purpose of accelerating maturity, and diligence in collection.

6.   **FEES AND EXPENSES.**

   In the event it should become necessary to employ counsel to collect any amounts owed by Maker under this Note, Maker agrees to pay the reasonable attorneys' fees and costs of Lender, incurred in connection with Lender's collection efforts, irrespective of whether suit is brought.

7.   **COVENANTS.** Maker hereby agrees and covenant to the following:

   7.1. No Liens. Maker agrees not to create or incur or suffer to be incurred or to exist, any pledge, security interest, encumbrance, lien or charge of any kind, superior to any such pledge, security interest, encumbrance, lien or charge of any kind created by this Note upon the Collateral or upon any income or proceeds therefrom.

   7.2. Further Assurance.  Maker will do, execute, acknowledge and deliver, or cause to be done, executed, acknowledged and delivered, all such further acts, documents, deeds, conveyances, mortgages, assignments, transfers and assurances as may be necessary or desirable or as Lender reasonably may require for the completion of the transactions contemplated by this Note.

2

7.3. <u>No Transfer</u>.  Maker may not sell, transfer, pledge or convey title or interest in any of the Collateral without the prior written consent of Lender, which consent may be withheld for any reason or no reason.

8. <u>SECTION HEADINGS</u>.

Headings and numbers have been set forth for convenience only. Unless the contrary is compelled by the context, everything contained in each paragraph applies equally to this entire Note.

9. <u>AMENDMENTS IN WRITING</u>.

Subject to applicable law, this Note may be amended, modified, or supplemented only by a written agreement signed by Lender and Maker.

10. <u>NOTICES.</u>

Any notice, demand or other communication required or permitted to be given pursuant to this Note shall have been sufficiently given for all purposes if (i) delivered personally or by overnight courier service to the party to whom such notice, demand or other communication is directed or (ii) sent by registered or certified mail, postage prepaid, addressed to the parties at their addresses set forth in this Note. Any such notice shall be deemed to be given (i) when received if delivered personally or by overnight courier and (ii) three (3) business days after the date on which it was deposited in a regularly maintained receptacle for the deposit of United States mail, addressed and sent as set forth in this section.

11. <u>CHOICE OF LAW AND USURY</u>.

This Note shall be deemed to have been executed under and shall be construed and enforced in accordance with the laws of the State of Washington without regard to its conflicts of law principles. It is expressly stipulated and agreed to be the intent of Maker, Lender and their respective affiliates at all times to comply strictly with the applicable usury laws now or hereafter governing consideration received under this Note. If the applicable law is ever interpreted so as to render usurious any consideration called for, contracted for, charged, taken, reserved or received with respect to this Note, or if any prepayment by Maker or Lender's exercise of the option herein contained to accelerate the maturity of this Note, results in Maker having paid any interest in excess of that permitted by law, then notwithstanding anything to the contrary in this Note, it is Maker's and Lender's express intent and agreement that all excess amounts theretofore collected by Lender be credited on the principal balance of this Note (or, if this Note has been paid in full, refunded to Maker) and the provisions of this Note shall immediately be deemed reformed and the amounts thereafter collectible hereunder reduced, without the necessity of the execution of any new documents, so as to comply with the then applicable law, but so as to permit the recovery of the fullest amount otherwise called for hereunder.

*[SIGNATURE PAGE FOLLOWS]*

IN WITNESS WHEREOF, each of the undersigned has caused its duly authorized representative to execute this Note as of the date first written above.

Maker:

KEYDALLY CAPITAL LTD.

By:_____

Name:
Title:

Address:

Keydally Capital Ltd.

██████████████
██████████████
██████████████

Lender:

_____

BRAD WAITE

Address:

██████████████

# Exhibit 40

# Paul Birkett

# Oak Harbor v. AHP Servicing

# June 11, 2025



1325 Fourth Avenue, Suite 1840  Seattle, Washington 98101
Bellingham | Everett | Tacoma | Olympia | Yakima | Spokane
Seattle 206.287.9066    Tacoma 253.235.0111    Eastern Washington 509.624.3261
**www.buellrealtime.com**
email: info@buellrealtime.com

Page 1

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON

IN AND FOR KING COUNTY

_____

OAK HARBOR CAPITAL SPECIAL          )
OPPORTUNITIES MASTER FUND, LP;      )
OHCSOF GP, LLC; and OAK HARBOR      )
CAPITAL, LLC,                       )
                                    ) No. 23-2-25722-7 SEA
                Plaintiffs,         )
                                    )
        v.                          )
                                    )
AHP SERVICING, LLC, a Delaware      )
limited liability company; and     )
JORGE NEWBERY, an individual,       )
                                    )
                Defendants.         )
_____

VIDEOCONFERENCE DEPOSITION UPON ORAL EXAMINATION OF

PAUL BIRKETT

_____

Witness located in:

Dublin, Ireland

* All participants appeared via videoconference *

DATE TAKEN:    June 11, 2025

REPORTED BY:   Tia B. Reidt, Washington RPR, CSR #2798
                          Oregon #22-0001

91387042-faea-46eb-8452-16866eba2a7c

Q. Okay.

Does he own a cafe in Dublin?

A. He does.

Q. Has he -- does he have any experience in the mortgage loan industry?

A. No.

Q. Does he have experience in any other type of debt -- distressed debt type purchasing?

A. No.

Q. Okay.

Are you familiar with a company called Keydally Capital?

A. Yes.

Q. What is that?

A. It's a company I set up for my brother.

Q. Did you have any role in Keydally Capital?

A. Apart from setting it up? No.

Q. Did you manage any assets on behalf of Keydally Capital?

A. No.

Q. Did you advise your brother or anybody else on how to manage assets with respect to Keydally Capital?

A. No.

Q. Are you familiar with the term "nominee entity"?

91387042-faea-46eb-8452-16866eba2a7c

A.   Yes.

Q.   Does that describe Keydally Capital?

A.   Yes.

Q.   What is, in your words, a nominee entity?

A.   It is an entity that exists for no particular executive function.

Q.   So if it doesn't exist for any particular executive function, what is, in general, the function of a nominee company as you understand it?

A.   It's usually -- as far as I know -- I don't use them, but as far as I know, it's to do -- they're used for legal protection and privacy and such reasons as that.

Q.   Okay.

But we'll get into more detail about that.

At some point in time, do you recall having the opportunity to purchase a portfolio of state court litigation judgments from one of Mr. Weinstein's entities?

A.   Yes.

Q.   Do you remember which entity it was?

A.   No.

Q.   Okay.

What was the nature of that asset or group of assets?

91387042-faea-46eb-8452-16866eba2a7c

Q.   Any idea of how the $10 million value was established?

A.   I don't recall.

Q.   Did Keydally ever actually pay any actual cash for this mortgage loan portfolio?

A.   No.

Q.   If you know, how was the purchase arranged?

A.   Oak Harbor and/or its affiliates offered 100 percent financing on the same structure as the prior state court litigation agreement.

Q.   Okay.

MR. COOPERSMITH:   Can we take a look at Exhibit 16.

(Exhibit 16 marked for identification.)

THE COURT REPORTER:   Exhibit 16 is marked.

BY MR. COOPERSMITH:

Q.   And this at the top says "Execution Version, Secured Demand and Promissory Note" dated July 20, 2023, $5 million --

A.   Yes.

Q.   $5 million.

Do you see that?

A.   I do.

91387042-faea-46eb-8452-16866eba2a7c

Q. Are you familiar with this document?

A. I am.

Q. Is this the financing or part of it that we just talked about?

A. Yes.

Q. And this is a note that Keydally is making in favor of an individual named Brad Waite.

Do you see that?

A. I do.

Q. Who is Brad Waite?

A. He is the CEO of Land Home Financial Services, a loan servicer.

Q. To your knowledge, does he have any relationship with Mr. Weinstein?

A. Oh, I believe he's also an investor in some way with Oak Harbor.

MR. COOPERSMITH: Go to Exhibit 17.

(Exhibit 17 marked for identification.)

THE COURT REPORTER: Exhibit 17 is marked.

BY MR. COOPERSMITH:

91387042-faea-46eb-8452-16866eba2a7c

Do you see that?

A. Yes.

No.

Q. At the very top.

A. Oh, yes.

Q. Okay.

Are you familiar with this document?

A. Yes.

Q. Okay.

So between the note from Keydally to Mr. Waite and the note from Keydally to Mr. Weinstein, $5 million each, that equals $10 million; right?

A. Correct.

Q. And is that the way that Keydally purchased these mortgage loan assets?

A. Yes.

Q. Any idea where the $10 million value came from?

A. Not specifically, no.

Q. Did you tell Mr. Weinstein you thought they

91387042-faea-46eb-8452-16866eba2a7c

were worth less?

A. Yes.

Q. Did he disagree with you?

A. He did.

Q. Did he give you any basis or data that supported his view of the value?

A. No. Just opinions.

Q. Did, to your knowledge, Keydally or anyone acting on its behalf do any due diligence work to establish that they were getting a good deal for $10 million?

A. No.

Q. While Keydally owned the loans, did you do anything to actively manage them?

A. No.

Q. Did you do anything to manage them at all?

A. No.

MR. COOPERSMITH: Let's take a look at Exhibit 18.

(Exhibit 18 marked for identification.)

THE COURT REPORTER: Exhibit 18 is marked.

BY MR. COOPERSMITH:

Q. Okay.

91387042-faea-46eb-8452-16866eba2a7c

This document is titled "Execution Version, Participation Agreement" dated July 20th, 2023.

Do you see that?

A.   Yes.

Q.   Have you ever seen this before?

A.   I don't recall.

Q.   Do you know what a participation agreement is?

A.   Yes.

Q.   What is it?

A.   It is a vehicle or agreement that allows a party to participate in the economics of a transaction without having to become a title owner in that transaction.

Q.   Okay.

If you look at the third paragraph --

A.   Yeah.

Q.   -- it reads "Now therefore:  For value received, including providing the funds necessary to acquire the loans, the Trust hereby conveys to the Participant a 100 percent participation interest in all of the Trust's beneficial and economic rights in the Loans and related obligations, including but not limited to:"  And then it has three things.

Do you see that?

A.   Yes.

91387042-faea-46eb-8452-16866eba2a7c

Q.   And the first is "The right to receive all principal, interest or other proceeds and bear all obligations with respect to the Loans."

Do you see that?

A.   Yes.

Q.   And then the second one is "To receive the benefit of the Trust's rights and protections on the MLSA."

Do you see that?

A.   Yes.

Q.   And then the third is "To direct the Trust to exercise the Trust's rights under the MLSA for the benefit of the Participant."

Do you see that?

A.   Yes.

Q.   So as you understand participation agreements, Mr. Birkett, would the participant generally be directing the business while it was in participation?

A.   No.

Q.   What would happen?

A.   It would be a nonexecutive role.

Q.   And what does that mean?

A.   They don't do anything.

MR. COOPERSMITH:  Let's look at Exhibit 32.

91387042-faea-46eb-8452-16866eba2a7c

Q.  Okay.

MR. COOPERSMITH:  Let's go to
Exhibit 20.

(Exhibit 20 marked for
identification.)

THE COURT REPORTER:  Exhibit 20 is
marked.

BY MR. COOPERSMITH:

Q.  This is an email string where the top one is
from Darragh Birkett's email to Mr. Weinstein with a
copy to Paul Birkett dated January 5th, 2024.

If you scroll down to the email at 5:33 p.m.,
this is an email from Mr. Weinstein.  The second
paragraph says, writing to Darragh Birkett,

So let's stop there for a minute.  Was there a
point in time when Keydally basically signed over all
rights and interest in the mortgage loans?

A.  Yes.

Q.  Okay.

And is it true that other than the 3,000 Euros
that Mr. Darragh Birkett got as a fee, was, as you
understand it, Keydally or Darragh Birkett giving up

91387042-faea-46eb-8452-16866eba2a7c

expectations of profits?

A. Yes.

Q. Okay.

Did you or your brother Darragh have an expectation of profits for Keydally?

A. No.

Q. So then you weren't giving them up; right?

A. In theory, we're giving them up. If there were any, we would have been entitled to them.

Q. On paper, you were giving up profits. Is that --

A. Yes.

MR. KELLER: Objection. Leading.

BY MR. COOPERSMITH:

Q. Is it the case, Mr. Birkett, that you were only -- or Keydally was only giving up the expectation of profits on paper?

MR. KELLER: Same objection. Leading.

BY MR. COOPERSMITH:

Q. You can answer.

A. That was our opinion.

MR. COOPERSMITH: Let's take a look at Exhibit 31.

MR. GREENBERG: Jeff, we have been

91387042-faea-46eb-8452-16866eba2a7c

THE COURT REPORTER:  Exhibit 9 is marked.

BY MR. COOPERSMITH:

Q.  Okay.

This document is called "Relinquishment of Interests in AHP Related Loans."

Are you familiar with this, Mr. Birkett?

A.  Yes.

Q.  What is it?

A.  It is the undoing of the purchase by Keydally of the AHP loans -- mortgage loans.

Q.  Okay.

Is it just basically severing all connection between Keydally and Oak Harbor?

A.  Yes.

Q.  If you go to the second page, if you scroll down, there's an electronic signature of Darragh Birkett.

A.  Yeah.

Q.  There's actually two electronic signatures on the page.

A.  Yeah.

Q.  Did you put this electronic signature on the document or did your brother Darragh put it on?

A.  I did.

Q.   Okay.

If you go to the first page, there's a recital there or a set of recitals.  And one of them, Number 2, says "The threat and distraction of litigation from AHP seriously interfered with Keydally's ability to own and manage the loans."

Do you see that?

A.   Yes.

Q.   Was Keydally managing the loans?

A.   No.

Q.   Then it says "Moreover, the failure of AHP to account for its collection activities and failure to make any interest payments on the loans was a major factor in Keydally defaulting under its financing arrangements."

Did -- as far as you understood it, did Keydally default under its financing arrangements?

A.   I don't believe so.

Q.   And did -- as far as you understood it, did the failure of AHP to account for its collection activities cause some kind of default by Keydally?

A.   I didn't know that Keydally had, in fact, defaulted.

Q.   Okay.

So is that -- in that case, then, nothing that

91387042-faea-46eb-8452-16866eba2a7c

AHP did would have caused a default as far as you understood it?  Is that --

MR. KELLER:  Objection.  Leading.

BY MR. COOPERSMITH:

Q.  You can answer.

A.  There was no default.  There was no schedule against which Keydally had to perform.

Q.  Okay.

Do you know why there are things on this document that aren't true, Mr. Birkett?

A.  No.

Q.  Who wrote it?

A.  I don't know.

Q.  Did you write it?

A.  No.

Q.  Who were the other candidates?

A.  Someone in Oak Harbor's legal apparatus.

Q.  But you don't know for sure?

A.  No.

Q.  Who presented this to you or Mr. Birkett to sign?

A.  I don't recall.  I mean, there's quite --

Q.  I mean --

(Speaking simultaneously.

Unreportable crosstalk.)

91387042-faea-46eb-8452-16866eba2a7c

A.  -- a lot of staff turnover at Oak Harbor, but it could be one of many people.

Q.  Okay.

I'm just asking, did you get this document from Mr. Weinstein or someone else at Oak Harbor?

A.  Someone at Oak Harbor.  I don't know who.

Q.  Could it have been Mr. Weinstein?

MR. KELLER:  Objection to form.  Leading and calls for speculation.

BY MR. COOPERSMITH:

Q.  Do you know?

A.  I don't recall.  Someone at Oak Harbor for certain.

Q.  In any event, if we look at the signature pages...

MR. COOPERSMITH:  Please scroll down.

BY MR. COOPERSMITH:

Q.  Who signed on behalf of Oak Harbor?

A.  Bill.

Q.  Bill Weinstein?

A.  Yes.

MR. COOPERSMITH:  Let's go to Exhibit 34.

(Exhibit 34 marked for identification.)

91387042-faea-46eb-8452-16866eba2a7c

Q.   What is it?

A.   It's an email to Brian Benoit about the mess that the transaction became, the Keydally transaction became.

Q.   And this is coming from Darragh Birkett's Gmail account.

Do you see that?

A.   Yes.

Q.   Did Darragh Birkett write this email or did you write it?

A.   He wrote an original draft, which was -- required significant editing.

Q.   And did you do that editing?

A.   Yes.

Q.   And when it was actually sent to Mr. -- and I think he -- his name is pronounced Benoit.

A.   Okay.

Q.   But in any event, when this email was sent from Darragh Birkett's Gmail account to Mr. Benoit and Mr. Weinstein, did you send it or did Darragh Birkett send it?

A.   I rewrote what he wrote, read it to him, and then I sent it from his account.

Q.   Did Darragh express any disagreement with anything in there -- in here?

91387042-faea-46eb-8452-16866eba2a7c

A. No.

Q. And if you want to take a minute to read it, that's fine, Mr. Birkett. But is there anything in here that's not true?

A. No. All of that is true.

Q. Okay.

So the entire email, Exhibit 1, is a true statement; is that right?

A. Yes.

Q. And you agreed with it; correct?

A. Yes.

Q. And your brother read it and he didn't have any disagreement with it either; is that right?

A. Correct.

Q. Okay.

MR. COOPERSMITH: Let's go to Exhibit 37.

(Exhibit 37 marked for identification.)

THE COURT REPORTER: Exhibit 37 is marked.

BY MR. COOPERSMITH:

Q. Do you recognize this email?

A. Yes.

Q. And did you send this email to me?

91387042-faea-46eb-8452-16866eba2a7c

# Exhibit 41

█████████████████████████████████

**From:** Paul Birkett <paul@automationfinance.com>
**Date:** November 13, 2024 at 06:16:23 PST
**To:** "Coopersmith, Jeffrey" <jcoopersmith@corrcronin.com>
**Subject: RE: Keydally/Pallida**

Dear Jeffrey,

Thank you for the opportunity to set the record straight. I am very concerned that OH and parties related may be attempting to attach me or my family to the various litigations with AHP. See my answers in italics below:

1. <u>What role, if any, do you or did you ever have with Keydally?</u> I had no role with Keydally (i) *I formed the entity for my brother Darragh Birkett. (ii) I reviewed the various documents submitted to Darragh by OH with a view to avoiding any liability for Darragh in the event the transaction did not pan out as represented by Bill Weinstein: Keydally was to be a nominee entity to take ownership of the SCLs for a few months before they were re-sold to a 3rd party. Darragh was to receive a $3,000 fee plus any profits from the portfolio.*

2. <u>What role, if any, do you or did you ever have with Pallida?</u> *None.*

3. <u>Did you ever tell William Weinstein or anyone else at Oak Harbor that you would have a role with Keydally or Pallida</u>? *No.*

4. <u>Did you review the portfolio of State Court Litigation Claims (SCLs) that Keydally had ownership of and were purchased by AHP Servicing at the end of 2022?</u> *Yes, I performed a cursory review for 2-3 minutes.*

5. <u>If so, what did you conclude, if anything, about the value of these SCLs?</u> *Such portfolios are difficult to value. Most of the claims were relatively old and located in Florida and Texas. We have had very little success with aged receivables in such homestead states.*

6. <u>Did you ever perform any work to recover or collect funds on these SCLs</u>? *No.*



06.11.2025
Birkett

**37**

Buell Realtime Reporting

7. <u>Did you ever tell William Weinstein or anyone else at Oak Harbor that you would perform such work</u>? *No.*

8. <u>As you understand it, under the arrangement with William Weinstein would Keydally ever actually have to pay money to the Oak Harbor Master Fund, Oak Harbor Capital, Pallida, or any other person or entity based on the promissory notes it signed</u>? *No.*

I, Paul Birkett, declare under penalty of perjury under the laws of the State of Washington that the foregoing is true and correct.

Signed this the _13___ day of November, 2024 at 22 Rua Gil Leonel, Lagos Portugal 8600

Paul Birkett

_____

Paul Birkett

---

**From:** Coopersmith, Jeffrey <jcoopersmith@corrcronin.com>
**Sent:** Tuesday, November 12, 2024 4:16 PM
**To:** Paul Birkett <paul@automationfinance.com>
**Subject:** Keydally/Pallida

Dear Mr. Birkett:

I am lawyer representing AHP Servicing and Jorge Newbery. We would appreciate it you would answer the following questions (and at the bottom mark the signature line with your name indicating that you are stating your answers under oath, and put in the date and place of signature). Thank you.

1. What role, if any, do you or did you ever have with Keydally?

2. What role, if any, do you or did you ever have with Pallida?

3. Did you ever tell William Weinstein or anyone else at Oak Harbor that you would have a role with Keydally or Pallida?

4. Did you review the portfolio of State Court Litigation Claims (SCLs) that Keydally had ownership of and were purchased by AHP Servicing at the end of 2022?

5. If so, what did you conclude, if anything, about the value of these SCLs?

6. Did you ever perform any work to recover or collect funds on these SCLs?

7. Did you ever tell William Weinstein or anyone else at Oak Harbor that you would perform such work?

8. What does the term "patsy company" mean?

9. Was Keydally a "patsy company?"

10. Was Pallida a "patsy company?"

11. As you understand it, under the arrangement with William Weinstein would Keydally ever actually have to pay money to the Oak Harbor Master Fund, Oak Harbor Capital, Pallida, or any other person or entity based on the promissory notes it signed?

I, Paul Birkett, declare under penalty of perjury under the laws of the State of Washington that the foregoing is true and correct.

Signed this the _____ day of November, 2024 at _____, Republic of Ireland.


_____

Paul Birkett

# Exhibit 42

 **Outlook**

## FW: AHP Servicing/Jorge Newbery

**From** Brian J. Benoit <bbenoit@kmazuckert.com>

**Date** Mon 11/4/2024 12:19 PM

**To** Jorge Newbery <jnewbery@ahpservicing.com>; Coopersmith, Jeffrey <jcoopersmith@corrcronin.com>; Lindberg, Eric <elindberg@corrcronin.com>

Well, he cc'd Bill.

Totally out of control is right. Still helpful.

**Brian J. Benoit**
KMA Zuckert LLP
227 West Monroe Street, Suite 3650
Chicago, Illinois 60606
+1.312.345.3065 Direct
+1.312.345.3000 Main
bbenoit@kmazuckert.com
www.kmazuckert.com



**From:** Dara Birkett <darabirkett@gmail.com>
**Sent:** Monday, November 4, 2024 12:17 PM
**To:** Brian J. Benoit <bbenoit@kmazuckert.com>; William S. Weinstein <wsw@oakharborcapital.com>
**Subject:** Re: AHP Servicing/Jorge Newbery

Hi Brian,

This whole thing has gotten totally out of control. It was supposed to be a few signatures on documents for a few weeks in return for money that I needed badly after my cafe closed thanks to Covid.

I was supposed to have no work to do, or risk or exposure to legal problems but now I have a lot of legal letters, accounting audit letters and the whole thing feels like a set-up. I wish I had never gotten involved in the first place. I know nothing about state court judgements or loans or finance or any business apart from my cafe in dublin. Bill - please confirm all of what I say here.

I was paid 3000 dollars in 2023 and 3000 in 2024 in return for my signature on various documents.

I set up an Irish company Keydally and used it to sign an agreement to buy the judgements and an agreement where Bill loaned me the money to buy them. It was just a paper transaction - Keydally never had a bank account.

The loans were supposed to be sold to someone else very quickly.....but that never happened. Initially I was happy because I got another 3000 dollars the following year. But then I started getting letters from Bills auditor asking me to confirm the value of the loans I bought and confirming the balance on my loan. I signed those letters because that is what I was paid to do.

I don't know who Jorge is and I don't know what Pallida is either. I just signed what I was asked to in return for the 3,000 dollars. I cant tell you anything more than that.

So no, there are no millions. If I can give the 2x3,000 back and put an end to all of this, please let me know where to send the money. This has ended up as a fiasco and very different to what Bill told me at the beginning. I just hope this is the end of it

thanks


Darragh Birkett



On Mon, Nov 4, 2024 at 10:23 AM Brian J. Benoit <bbenoit@kmazuckert.com> wrote:

> Dara,
>
> Following up on my previous email to you, could you please respond to the below as soon as possible?
>
> Thanks.
>
> --Brian
>
> **Brian J. Benoit**
> KMA Zuckert LLP
> 227 West Monroe Street, Suite 3650
> Chicago, Illinois 60606
> +1.312.345.3065 Direct
> +1.312.345.3000 Main
> bbenoit@kmazuckert.com
> www.kmazuckert.com
>
>
>
> ---
>
> **From:** Brian J. Benoit
> **Sent:** Friday, November 1, 2024 1:48 PM
> **To:** darabirkett@gmail.com
> **Subject:** AHP Servicing/Jorge Newbery
>
> Dara,

My name is Brian Benoit, I represent Jorge. We really appreciate you taking the time to answer some questions about Keydally.  Please let us know the following:

What do you do for a living?

Are you knowledgeable or involved in the business of buying and selling portfolios of state court judgments or mortgage loans?

Prior to having Keydally enter into any transactions with Pallida, did you or anyone else at Keydally do any due diligence or work on ascertaining the value the assets being purchased?

Do you know what Pallida is and who owns it?

How much did Keydally receive for entering into the transaction to purchase state court judgments from Pallida?

How many millions of dollars did Keydally receive from the state court judgments while owning these assets?

When was Keydally formed?

Why was Keydally formed?

At any time did Keydally have, or have access to, millions of dollars to purchase state court judgments or any other assets?

Did William Weinstein offer to represent you or Keydally in connection with litigation involving AHP Servicing or Jorge Newbery?

Did William Weinstein ever tell you to ignore or not communicate with Jorge Newbery and/or his attorneys?

Thanks,

Brian

**Brian J. Benoit**
KMA Zuckert LLP
227 West Monroe Street, Suite 3650
Chicago, Illinois 60606
+1.312.345.3065 Direct
+1.312.345.3000 Main
bbenoit@kmazuckert.com
www.kmazuckert.com



IMPORTANT NOTICE: This electronic mail message and any attached files contain information intended for the exclusive use of the individual or entity to whom it is addressed

and may contain information that is proprietary, privileged, confidential and/or exempt from disclosure under applicable law. In no event shall inadvertent transmission constitute a waiver of confidentiality or privilege. If you are not the intended recipient, you are hereby notified that any viewing, copying, direct or indirect disclosure or distribution of this information is strictly prohibited and may be subject to legal restriction or sanction. Please notify the sender or postmaster@kmazuckert.com by electronic mail or telephone (+1.312.345.3000) of any unintended recipients and kindly delete the original message without making any copies. Thank you.

IMPORTANT NOTICE: This electronic mail message and any attached files contain information intended for the exclusive use of the individual or entity to whom it is addressed and may contain information that is proprietary, privileged, confidential and/or exempt from disclosure under applicable law. In no event shall inadvertent transmission constitute a waiver of confidentiality or privilege. If you are not the intended recipient, you are hereby notified that any viewing, copying, direct or indirect disclosure or distribution of this information is strictly prohibited and may be subject to legal restriction or sanction. Please notify the sender or postmaster@kmazuckert.com by electronic mail or telephone (+1.312.345.3000) of any unintended recipients and kindly delete the original message without making any copies. Thank you.

# Exhibit 43

| From: | SGupta@oakharborcapital.com |
|---|---|
| Sent: | Friday, October 27, 2023 2:01 PM |
| To: | wsw@oakharborcapital.com; CPonte@reo-consult.com; |
|  | GValenzuela@oakharborcapital.com; GMontgomery@oakharborcapital.com |
| Cc: | MBasile@OakHarborCapital.com; NSam@oakharborcapital.com |
| Subject: | RE: 48046242 - 2101 BELLEVUE AVENUE, SYRACUSE, NY-13219/2887851 |

Hi Bill,

As discussed, I would need balance $35K from GCT to complete below sales.

We have $35K sitting in LB which is from Cliff and same will be moved to Magerick once we have $70k in full.

Regards,
Sonal

**From:** William S. Weinstein <wsw@oakharborcapital.com>
**Sent:** Friday, October 27, 2023 10:33 AM
**To:** Sonal Gupta <SGupta@oakharborcapital.com>; Cliff Ponte <CPonte@reo-consult.com>; Gonzalo M. Bozo Valenzuela <GValenzuela@oakharborcapital.com>; Gabrielle Ayala-Montgomery <GMontgomery@oakharborcapital.com>
**Cc:** Michael Basile <MBasile@OakHarborCapital.com>; Noune Sam <NSam@oakharborcapital.com>
**Subject:** RE: 48046242 - 2101 BELLEVUE AVENUE, SYRACUSE, NY-13219/2887851

When we meet, let's add this to our agenda.

**From:** Sonal Gupta <SGupta@oakharborcapital.com>
**Sent:** Friday, October 27, 2023 10:21 AM
**To:** William S. Weinstein <wsw@oakharborcapital.com>; Cliff Ponte <CPonte@reo-consult.com>; Gonzalo M. Bozo Valenzuela <GValenzuela@oakharborcapital.com>; Gabrielle Ayala-Montgomery <GMontgomery@oakharborcapital.com>
**Cc:** Michael Basile <MBasile@OakHarborCapital.com>; Noune Sam <NSam@oakharborcapital.com>
**Subject:** FW: 48046242 - 2101 BELLEVUE AVENUE, SYRACUSE, NY-13219/2887851
**Importance:** High

Hi Bill,

Following up on below as we didn't receive $35K from GCT for below.

The lien cost of **$8,854 is already reflecting in AHP recon but if this transaction is coming through …..we need to give credit for $70k to AHP (cash sales) - this is a pending item for discussion. Attached prior mails on this one.**

**Cliff's contribution of $35K is outstanding in NPL LB.**

Regards,
Sonal

**From:** Sonal Gupta <SGupta@oakharborcapital.com>
**Sent:** Friday, October 27, 2023 10:05 AM

**CONFIDENTIAL**

**Cymbidium132176**

**To:** Noune Sam <NSam@oakharborcapital.com>
**Subject:** FW: 48046242 - 2101 BELLEVUE AVENUE, SYRACUSE, NY-13219/2887851

**From:** William S. Weinstein <wsw@oakharborcapital.com>
**Sent:** Friday, September 29, 2023 5:44 PM
**To:** Cliff Ponte <CPonte@reo-consult.com>; Sonal Gupta <SGupta@oakharborcapital.com>
**Cc:** Russell Wilde <rwilde@reo-consult.com>; Lindsey LoGudice <lindsey@reo-consult.com>
**Subject:** RE: 48046242 - 2101 BELLEVUE AVENUE, SYRACUSE, NY-13219/2887851

Great. Please proceed.

**From:** Cliff Ponte <CPonte@reo-consult.com>
**Sent:** Friday, September 29, 2023 4:29 PM
**To:** William S. Weinstein <wsw@oakharborcapital.com>; Sonal Gupta <SGupta@oakharborcapital.com>
**Cc:** Russell Wilde <rwilde@reo-consult.com>; Lindsey LoGudice <lindsey@reo-consult.com>
**Subject:** FW: 48046242 - 2101 BELLEVUE AVENUE, SYRACUSE, NY-13219/2887851

Dear Bill,

I am thrilled to share some exciting news regarding the property. This property was acquired from AHP/Magerick to MWPNP, LLC (via Participation) and had a significant lien attached, totaling $33,000. ( This was the file I wired my 35,000.00 this past week)

**Our Title Curative Asset Manager, Lindsey LoGudice, in collaboration with Russ, successfully negotiated this lien down to a much more manageable amount of $8,854.00 from 33,000.00+**

With your approval, we can proceed by including this expense and adjusting the purchase price to $61,146.00 for our basis. Alternatively, we can maintain the original purchase price of $70,000.00 and provide a credit of $8,854.00.

This arrangement benefits both AHP and Magerick, as the original plan would have required us to reduce the price to $37,000.00 to make the deal feasible.

Best regards,
Cliff Ponte

**From:** Lindsey LoGudice <lindsey@reo-consult.com>
**Sent:** Friday, September 29, 2023 3:08 PM
**To:** Cliff Ponte <CPonte@reo-consult.com>; Russell Wilde <rwilde@reo-consult.com>
**Subject:** RE: 48046242 - 2101 BELLEVUE AVENUE, SYRACUSE, NY-13219/2887851

Hi Cliff-
I was able to get an updated payoff but Corporate Counsel stated that the best that they could do was $8,854.00 which is 15% of the current balance. I did call back after getting this demand and tried to negotiate the balance down further but was unsuccessful. The manager did state that if he gets the check on Monday that he would immediately file the release of the lien. Do we have approval to proceed?

Lindsey LoGudice | **Title Curative Manager | Asset Manager**
Email: Lindsey@reo-consult.com

Email communication does not constitute in any way acceptance of offers. Our office does not have the authority to bind a buyer or seller to a contract via written or verbal communication. An offer is considered accepted when the seller signs a purchase contract.

**CONFIDENTIAL**                                                                                                 **Cymbidium132177**

Pursuant to the Fair Debt Collection Practices Act, please be advised that we assist in attempting to collect a debt and any information will be obtained will be used for that purpose. However, if the debt is in active bankruptcy or has been discharged through bankruptcy, this communication is not intended as and does not constitute an attempt to collect a debt.

The information in this e-mail and any attached document(s) is confidential and/or privileged. It is intended solely for the use of the addressee(s) named within the e-mail. Unauthorized disclosure, photocopying, distribution or use of the information contained herein is prohibited. If you believe that you have received this e-mail in error, please notify the sender by reply transmission and delete the message without reviewing, copying or disclosing the message, any attachments or any contents thereof. **Buyer's Agent take full responsibility for protecting their client's confidential matters such as social security numbers, banking information and personal information**.

---

**From:** Cliff Ponte <CPonte@reo-consult.com>
**Sent:** Friday, September 29, 2023 10:55 AM
**To:** Russell Wilde <rwilde@reo-consult.com>; Lindsey LoGudice <lindsey@reo-consult.com>
**Subject:** RE: 48046242 - 2101 BELLEVUE AVENUE, SYRACUSE, NY-13219/2887851

Thanks so much. I'd like to give Bill some good news today that we were able to negotiate this down. Thanks.

---

**From:** Russell Wilde <rwilde@reo-consult.com>
**Sent:** Thursday, September 28, 2023 3:57 PM
**To:** Cliff Ponte <CPonte@reo-consult.com>; Lindsey LoGudice <lindsey@reo-consult.com>
**Subject:** RE: 48046242 - 2101 BELLEVUE AVENUE, SYRACUSE, NY-13219/2887851

We are still waiting on the county to confirm the payoff for $3k is still valid. If we don't hear from them by end of day today, we will send Carleigh to the county offices to confirm in person.

Russell Wilde | Senior Asset Manager
Phone: 503-855-7252

Email communication does not constitute in any way acceptance of offers. Our office does not have the authority to bind a buyer or seller to a contract via written or verbal communication. An offer is considered accepted when the seller signs a purchase contract.

Pursuant to the Fair Debt Collection Practices Act, please be advised that we assist in attempting to collect a debt and any information will be obtained will be used for that purpose. However, if the debt is in active bankruptcy or has been discharged through bankruptcy, this communication is not intended as and does not constitute an attempt to collect a debt.

The information contained within this e-mail and any attached document(s) is confidential and/or privileged. It is intended solely for the use of the addressee(s) named within the e-mail. Unauthorized disclosure, photocopying, distribution or use of the information contained herein is prohibited. If you believe that you have received this e-mail in error, please notify the sender by reply transmission and delete the message without reviewing, copying or disclosing the message, any attachments or any contents thereof. Buyers Agent take full responsibility for protecting their clients confidential matters such as social security numbers, banking information and personal information.

---

**From:** Cliff Ponte <CPonte@reo-consult.com>
**Sent:** Thursday, September 28, 2023 12:53 PM
**To:** Russell Wilde <rwilde@reo-consult.com>; Lindsey LoGudice <lindsey@reo-consult.com>
**Subject:** FW: 48046242 - 2101 BELLEVUE AVENUE, SYRACUSE, NY-13219/2887851

Anything new?

---

**From:** Sonal Gupta <SGupta@oakharborcapital.com>
**Sent:** Wednesday, September 27, 2023 10:56 AM
**To:** Cliff Ponte <CPonte@reo-consult.com>; William S. Weinstein <wsw@oakharborcapital.com>
**Cc:** Russell Wilde <rwilde@reo-consult.com>
**Subject:** RE: 48046242 - 2101 BELLEVUE AVENUE, SYRACUSE, NY-13219/2887851

Noted

---

**From:** Cliff Ponte <CPonte@reo-consult.com>
**Sent:** Wednesday, September 27, 2023 7:53 AM

**To:** William S. Weinstein <wsw@oakharborcapital.com>
**Cc:** Russell Wilde <rwilde@reo-consult.com>; Sonal Gupta <SGupta@oakharborcapital.com>
**Subject:** RE: 48046242 - 2101 BELLEVUE AVENUE, SYRACUSE, NY-13219/2887851

Good Morning Sonal,
Please hold on returning the wire. Bill and I discussed last night that if we can't get the lien reduced which we are working on - we will reduce the price by the cost of the lien, taxes owed., etc and still move forward. There will be some accounting to clean-up once we have a correct price.    Be back with you later today.

---

**From:** William S. Weinstein <wsw@oakharborcapital.com>
**Sent:** Tuesday, September 26, 2023 12:56 PM
**To:** Cliff Ponte <CPonte@reo-consult.com>
**Cc:** Russell Wilde <rwilde@reo-consult.com>; Sonal Gupta <SGupta@oakharborcapital.com>
**Subject:** RE: 48046242 - 2101 BELLEVUE AVENUE, SYRACUSE, NY-13219/2887851

Agreed. Have Sonal please wire the money back to you.

---

**From:** Cliff Ponte <CPonte@reo-consult.com>
**Sent:** Tuesday, September 26, 2023 9:37 AM
**To:** William S. Weinstein <wsw@oakharborcapital.com>
**Cc:** Russell Wilde <rwilde@reo-consult.com>; Sonal Gupta <SGupta@oakharborcapital.com>
**Subject:** RE: 48046242 - 2101 BELLEVUE AVENUE, SYRACUSE, NY-13219/2887851

Dear Bill,

As a result of finding out that we have a 35,000.00 lien on this property and tying up all this money doesn't make sense, I'd suggest we return the money back.   In the case that we can clear this lien and move forward -  we can revisit that then.

---

**From:** William S. Weinstein <wsw@oakharborcapital.com>
**Sent:** Tuesday, September 26, 2023 12:00 PM
**To:** Cliff Ponte <CPonte@reo-consult.com>
**Cc:** Russell Wilde <rwilde@reo-consult.com>
**Subject:** RE: 48046242 - 2101 BELLEVUE AVENUE, SYRACUSE, NY-13219/2887851

I need to talk through this with you.  Dealing with Jorge is increasingly difficult, and the more issues with him makes extrication from him more problematic.

---

**From:** Cliff Ponte <CPonte@reo-consult.com>
**Sent:** Tuesday, September 26, 2023 7:46 AM
**To:** William S. Weinstein <wsw@oakharborcapital.com>
**Cc:** Russell Wilde <rwilde@reo-consult.com>
**Subject:** 48046242 - 2101 BELLEVUE AVENUE, SYRACUSE, NY-13219/2887851

Bill,

This is the property that was purchased for 70,000.00 -  this is another problem AHP property where Caneel Group should have addressed this.   I do not think the current buyer should have to pay this 35K lien on this property.   While my staff is working today to see if we can negotiate this down.   I think this is something that should be charged to AHP and not assumed by this buyer.   If we would have gone under contract any other way,  it would have needed to be paid on the closing/HUD before we would get clear title.

Please let me know if you agree to have this charged to AHP so these buyers can move forward.   This would need to paid at some point, no matter who buys this.

Best,
Cliff Ponte

**From:** Russell Wilde <rwilde@reo-consult.com>
**Sent:** Monday, September 25, 2023 5:02 PM
**To:** Joan Schwartz <jschwartz@mortgageconnectlp.com>; Cole Strati <cstrati@mortgageconnectlp.com>; Violet Musgrave <vmusgrave@mortgageconnectlp.com>
**Cc:** Cliff Ponte <CPonte@reo-consult.com>; Laitim Wong <LWong@OakHarborCapital.com>; Lindsey LoGudice <lindsey@reo-consult.com>
**Subject:** RE: 48046242 - 2101 BELLEVUE AVENUE, SYRACUSE, NY-13219/2887851

Joan, can you please provide any more information on this judgment? How does this attach to the property?

**Russell Wilde | Senior Asset Manager**
Phone: 503-855-7252

Email communication does not constitute in any way acceptance of offers. Our office does not have the authority to bind a buyer or seller to a contract via written or verbal communication.   An offer is considered accepted when the seller signs a purchase contract.

Pursuant to the Fair Debt Collection Practices Act, please be advised that we assist in attempting to collect a debt and any information will be obtained will be used for that purpose. However, if the debt is in active bankruptcy or has been discharged through bankruptcy, this communication is not intended as and does not constitute an attempt to collect a debt.

The information contained within this e-mail and any attached document(s) is confidential and/or privileged. It is intended solely for the use of the addressee(s) named within the e-mail. Unauthorized disclosure, photocopying, distribution or use of the information contained herein is prohibited. If you believe that you have received this e-mail in error, please notify the sender by reply transmission and delete the message without reviewing, copying or disclosing the message, any attachments or any contents thereof.  Buyers Agent take full responsibility for protecting their clients confidential matters such as social security numbers, banking information and personal information.

**From:** Joan Schwartz <jschwartz@mortgageconnectlp.com>
**Sent:** Thursday, September 21, 2023 1:20 PM
**To:** Russell Wilde <rwilde@reo-consult.com>; Cole Strati <cstrati@mortgageconnectlp.com>; Violet Musgrave <vmusgrave@mortgageconnectlp.com>
**Cc:** Cliff Ponte <CPonte@reo-consult.com>; Laitim Wong <LWong@OakHarborCapital.com>
**Subject:** RE: 48046242 - 2101 BELLEVUE AVENUE, SYRACUSE, NY-13219/2887851

Good afternoon, Russell.
Is there a reason that this was not resolved with a QCD?  I'm just curious if this is a new process.
There is a City Judgment that should have been paid in the DIL process.  I have confirmed with our underwriting that it would attach to our property.

Thank you.

**Joan Schwartz**
**Team Lead, REO Curative**
Mortgage Connect
600 Clubhouse Drive
Moon Township, PA 15108
Phone: (866) 789-1814
Auto Attendant: (855) 595-3563 x22292
Fax: (866) 789-1845

jschwartz@MortgageConnectLP.com
https://www.MortgageConnectLP.com



**CONFIDENTIAL**

**Cymbidium132180**

As our customer or our client's customer, you deserve outstanding service 100% of the time! If you experience anything less, please contact my manager Cole Strati (cstrati@mortgageconnectlp.com).

This e-mail may contain data that is confidential, proprietary or non-public personal information, as that term is defined in the Gramm-Leach-Bliley Act (collectively, Confidential Information). The Confidential Information is disclosed conditioned upon your agreement that you will treat it confidentially and in accordance with applicable law, ensure that such data isn't used or disclosed except for the limited purpose for which it's being provided and will notify and cooperate with us regarding any requested or unauthorized disclosure or use of any Confidential Information. By accepting and reviewing the Confidential information, you agree to indemnify us against any losses or expenses, including attorney's fees that we may incur as a result of any unauthorized use or disclosure of this data due to your acts or omissions. If a party other than the intended recipient receives this e-mail, he or she is requested to instantly notify us of the erroneous delivery and return to us all data so delivered.

**WARNING! - WIRE FRAUD ADVISORY**
**MORTGAGE CONNECT <u>DOES NOT</u> ALTER ITS WIRING INSTRUCTIONS. IF YOU RECEIVE NEW WIRE INSTRUCTIONS ON THIS CLOSING,**
**PLEASE NOTIFY YOUR MORTGAGE CONNECT REPRESENTATIVE IMMEDIATELY VIA <u>PHONE ONLY</u> TO CONFIRM.**
**<u>DO NOT</u> RESPOND TO THE EMAIL THAT PROVIDED THE NEW INSTRUCTIONS.**

This communication is for the intended recipient only. This communication may contain information that is privileged, confidential and exempt from disclosure under applicable law and constitutes an electronic communication within the meaning of the Electronic Communications Privacy Act, 18 U.S.C. 2510. If you are not the intended recipient, you are hereby notified that any unauthorized use, dissemination, distribution or copying of this communication is strictly prohibited and may subject you to criminal or civil penalty. If you have received this communication in error, please notify us immediately by email, delete the message, and destroy any copies.

This communication is for the intended recipient only. This communication may contain information that is privileged, confidential and exempt from disclosure under applicable law and constitutes an electronic communication within the meaning of the Electronic Communications Privacy Act, 18 U.S.C. 2510. If you are not the intended recipient, you are hereby notified that any unauthorized use, dissemination, distribution or copying of this communication is strictly prohibited and may subject you to criminal or civil penalty. If you have received this communication in error, please notify us immediately by email, delete the message, and destroy any copies.

This communication is for the intended recipient only. This communication may contain information that is privileged, confidential and exempt from disclosure under applicable law and constitutes an electronic communication within the meaning of the Electronic Communications Privacy Act, 18 U.S.C. 2510. If you are not the intended recipient, you are hereby notified that any unauthorized use, dissemination, distribution or copying of this communication is strictly prohibited and may subject you to criminal or civil penalty. If you have received this communication in error, please notify us immediately by email, delete the message, and destroy any copies.

# Exhibit 44

| From: | SGupta@oakharborcapital.com |
|---|---|
| **Sent:** | Thursday, December 14, 2023 4:48 PM |
| **To:** | wsw@oakharborcapital.com |
| **Cc:** | MBasile@OakHarborCapital.com |
| **Subject:** | FW: Outstanding requests - AHP - 12.14.2023 |
| **Attachments:** | AHP recon_12.14.2023-SG.xlsx |

Hi Bill,

Pls. see latest AHP recon...

- Nov & Dec numbers are not finalized yet
- Earlier we gave credit of $70K on 48046242 - 2101 BELLEVUE AVENUE NY property – since this is still outstanding I have removed the manual adjustment

**CONFIDENTIAL**   **Cymbidium133778**

| | # | Date | Pending debt | Improvement cost | Payment | Numl |
|---|---|---|---|---|---|---|
| | | Annual Return requirement | | | | 16% |
| 10/31/2022 | 1 | 10/7/2022 | 19,750,000.00 | - | - | |
| 11/30/2022 | 2 | 11/30/2022 | 19,750,000.00 | 30,600.00 | - | |
| 12/31/2022 | 3 | 12/31/2022 | 20,248,106.85 | 69,899.10 | - | |
| 1/31/2023 | 4 | 1/31/2023 | 20,593,158.31 | 618.08 | 3,200,000.00 | |
| 2/28/2023 | 5 | 2/28/2023 | 17,673,617.66 | 2,000.00 | 300,000.00 | |
| 3/31/2023 | 6 | 3/31/2023 | 17,592,543.16 | 14,439.62 | 125,000.00 | |
| 4/30/2023 | 7 | 4/30/2023 | 17,733,793.16 | 42,287.02 | 1,594,029.05 | |
| 5/31/2023 | 8 | 5/31/2023 | 16,438,873.65 | 95,103.12 | 560,812.59 | |
| 6/30/2023 | 9 | 6/30/2023 | 16,220,625.67 | 107,938.86 | 12,599,089.57 | |
| 7/31/2023 | 10 | 7/31/2023 | 3,948,458.43 | 145,327.62 | 1,062,319.96 | |
| 8/30/2023 | 11 | 8/31/2023 | 3,089,707.27 | 262,150.13 | 1,303,575.18 | |
| 3/30/2023 | 12 | 9/30/2023 | 2,093,375.15 | 236,715.90 | 1,908,617.07 | |
| 10/31/2023 | 13 | 10/31/2023 | 449,649.13 | 181,485.97 | 615,739.95 | |
| 11/30/2023 | 14 | 11/30/2023 | 21,537.41 | 12,004.47 | - | |
| 12/14/2023 | 15 | 12/14/2023 | 33,873.76 | (540.86) | - | |
| | | Total | | 1,200,029.03 | 23,269,183.37 | |

| Notes |
|---|
| Nov '23 and dec'23 numbers are not finalized yet |

1 Insurance
2 Putbacks
  48051212 ·
  48046258 ·
  48068776

3 KeyDaily l

4 Activist Le

Amount o

Regards,
Sonal

**From:** William S. Weinstein <wsw@oakharborcapital.com>
**Sent:** Friday, October 27, 2023 2:27 PM
**To:** Jorge Newbery <jnewbery@ahpservicing.com>; Sarah Brink <SBrink@OakHarborCapital.com>
**Cc:** Michael Basile <MBasile@OakHarborCapital.com>; Gonzalo M. Bozo Valenzuela <GValenzuela@oakharborcapital.com>; Emma Brookman <EBrookman@oakharborcapital.com>; Gabrielle Ayala-Montgomery <GMontgomery@oakharborcapital.com>; Peter Fitzpatrick <peter.fitzpatrick@OakHarborCapital.com>; William S. Weinstein <wsw@oakharborcapital.com>; Sonal Gupta <SGupta@oakharborcapital.com>
**Subject:** FW: Outstanding requests

Dear Jorge,

Enclosed as promised please find the promised reconciliation. Please note that it understates the expenses and the insurance (only calculated through September 30), doesn't count any interest on the Keydally note, and doesn't include

**CONFIDENTIAL**

**Cymbidium133779**

money collected on the SCLs for the past year (assuming you exercise the put-back on January 1. It overstates the loan putbacks and counts the $2 Million obligation that will be expunged on the put-back. Bottom line: I think you owe us between $1.75 and $2.0 Million to resolve the issues, and we can pick out some loans to close that gap. Please review and set a time with Sarah for us to talk Sunday.

Best wishes,

Bill

# Exhibit 45



February 9, 2024

Via E-Mail

Cliff Ponte
Member
MWPNP LLC

### RE: Unlawful Deed Transfers

Dear Cliff,

I appreciate your response. Let me address each of your statements individually:

*1. I have no knowledge of any federal litigation, nor have I received any legal documents. Therefore, I'm completely unaware of the matter you're referring to.*

South Watuppa LP, of which you are a Member, has been named as a Third Party Defendant in the federal court action in Washington State. If South Watuppa has not been served yet, then I expect that this will occur soon.

*2. Payments were indeed made for each of these items, so your assertion of inaccuracy is incorrect.*

No payments were received by AHP. Further, the most recent Cymbidium recon dated 10/27/2023 does not reflect credits to AHP's debt for either 2101 Bellevue, Syracuse, NY or 94-555 Alapoai, Unit 151,Mililani HI.

*3. Your persistent comments and demands for items* <u>**I don't possess**</u> *like I have told you on more than one occasion ( even when I saw you at a conference and you referred me to your title company you apparently own)* <u>**are becoming increasingly bothersome, stressful, and detrimental to both my personal well-being and business. I will internally assess this situation. Furthermore, your team's apparent intention to tarnish my hard-earned reputation is unacceptable and will not be tolerated**</u>. *I have all the records.*

My counsel Brian Benoit and I have asked you for information and documents multiple times. I have attached Brian's most recent letter to you, dated December 31, 2023. You have not responded to any of these requests. If you have records which would be helpful, please share.



*4. I anticipate receiving a subpoena, as it would afford me the opportunity to showcase the extensive efforts, I've dedicated to this, despite receiving minimal recognition from you.*

As South Watuppa LP is a defendant, you will have the opportunity to answer the complaint and respond to discovery requests.

Our focus from the first day we were told our numbers differed from Cymbidium's was and still is to obtain an accurate accounting. This objective, however, has been stonewalled at every turn.

The actions that have transpired since October have disrupted all parties involved. Our requests to you have sought to obtain information to stop the disruption. In spite of the extraordinary and unlawful actions taken against AHP, we want to justly conclude this matter. This requires full disclosure and cooperation from all sides.

Sincerely,

Jorge Newbery

Jorge Newbery
Chief Executive Officer

cc:
Willaim Weinstein
Jeff Coury
Katie Meehan
Maxwell Thornton
Mercedez Long
David Edens Hartsell
Paul Birkett
Carleigh Austin
Russel Wilde
Brad Waite
Teji Singh
David Waite
John Waite
Deborah Robertson
Brenda Usher
Samantha Schechter
Adam Yeazal
Glenn Smith
Kevin Chai
Linda Gilbert
Kelly Neumann



Vincent DiMaiolo Jr.

# Exhibit 46

F23-47774                    JJE/as:kf                    February 23, 2024

## IN THE COURT OF COMMON PLEAS
## CLARK COUNTY, OHIO

Magerick LLC
3611 South Harbor Boulevard
Suite 100
Santa Ana, CA 92704;

                    Plaintiff


            -vs-


AQRE Properties LLC
30 North Gould Street Road
Sheridan, WY 82801;

Justin M. Randolph
956 Bank Street
East Liverpool, OH 43920;

U.S. Bank Trust N.A. as Trustee of American
Homeowner Preservation Trust Series AHP
Servicing
440 South LaSalle Street, Suite 1110
Chicago, IL 60605;

Treasurer of Clark County
31 North Limestone Street
P.O. Box 1305
Springfield, Ohio 45501;

                    Defendants

Clark County, Ohio
**FILED**
MAR 11 2024
Common Pleas Court
Melissa M. Tuttle, Clerk

CASE NO. **24 CV 215**

PPN: 3400600004225016

JUDGE


**COMPLAINT FOR FORECLOSURE
WITH DECLARATORY JUDGMENT**

## FIRST COUNT

1.      Plaintiff says that it is the holder of and/or entitled to enforce the promissory note, that the whereabouts of said note is unknown and has been either misplaced or lost by the maker and Plaintiff; that by reason of default in payment of the said note and mortgage securing same, it has declared said debt due; that there is due and unpaid thereon the sum of $17,984.32 plus interest at the rate of 9.90% per annum from May 1, 2023. Plaintiff further says that it has complied with all conditions precedent as set forth in the note and mortgage.

## SECOND COUNT

2.      Plaintiff incorporates herein by reference all of the allegations contained in its first count, and further says that it is the holder of a certain mortgage deed, securing the payment of said promissory note, a copy of which is attached hereto, marked EXHIBIT "A", and being Permanent Parcel #34006000004225016, and made a part hereof; and has been assigned to Plaintiff as evidenced by the assignment of mortgage, a copy of which is attached hereto and marked as EXHIBIT "B"; that said mortgage is a valid and first lien upon said premises.

3.      Plaintiff says that the conditions of said mortgage have been broken by reason of default in payment, and the same has become absolute; that the Defendants named in the Complaint, claim or may claim an interest in the premises described in EXHIBIT "A".

4.      Plaintiff says that pursuant to the covenants and conditions of said mortgage deed it may, from time to time during the pendency of this action, advance sums to pay real estate taxes, hazard insurance premiums and property protection and maintenance.

5.      Plaintiff says that the conditions of said mortgage have been broken by reason of default in payment, and the same has become absolute; that the Defendants named in the

Complaint, have or claim to have an interest in the premises as referenced in the attached Preliminary Judicial Report, marked as EXHIBIT "C". The original Preliminary Judicial Report has been filed herewith.

<u>THIRD COUNT</u>

6.     Plaintiff incorporates herein by reference all of the allegations contained in its first two counts, as if fully rewritten herein.

7.     Plaintiff says that as a result of the mutual mistake of the parties to the Assignment of Mortgage as filed in Instrument 202400000083 of Clark County, Ohio Records, a copy of which is attached hereto marked as EXHIBIT "B", Atlantica, LLC signed as the attorney in fact for U.S. Bank Trust N.A. as Trustee of American Homeowner Preservation Trust Series AHP Servicing, however, there is no power of attorney of record.

8.     Plaintiff further says that the parties to the Assignment of Mortgage as filed in Instrument 202400000083 of Clark County, Ohio Records intended to have the assignor assign all their interest, so that Plaintiff is entitled to a declaration by the Court that despite no recorded power of attorney by the assignor thereto, the Assignment of Mortgage as filed in Instrument 202400000083 of Clark County, Ohio Records is valid.


WHEREFORE Plaintiff asks for a declaration by the Court that despite no recorded power of attorney by the assignor thereto, the Assignment of Mortgage as filed in Instrument 202400000083 of Clark County, Ohio Records is valid; Plaintiff demands judgment against the Defendant AQRE Properties LLC in the sum of $17,984.32 plus interest at the rate of 9.90% per annum from May 1, 2023; that the Defendants named herein be required to answer and set up any claim that they may have in said premises or be forever barred; that the Plaintiff be found to have

a valid and first lien on said premises for this amount so owing together with its advances made

pursuant to the terms of the mortgage for real estate taxes and, hazard insurance premiums, and

the premises be ordered appraised, advertised, and sold according to law, and that from the

proceeds the Plaintiff be paid the amount found due it, and for such other and further relief as

equity entitled it to receive.



REIMER LAW CO.
Joshua J. Epling (0079568)
Douglas A. Haessig (0079200)   3-8-24
P.O. Box 39696
Solon, OH 44139
Phone: (440) 600-5500
Fax: 440-600-5520
Email: jepling@reimerlaw.com

# Exhibit A

202000003524          03/10/2020 10:00 AM
Filed for Record in CLARK County, Ohio
Nancy Pence, Recorder   Rec Fees: $190.00
MORT OR Vol 2169 Pgs 1243 - 1261

Record and Return to:
Boston National Title Agency, LLC
400 Rouser Rd Bldg 2 Suite 101
Coraopolis, PA 15108

I hereby certify the foregoing instrument was prepared by me or under my direction:

Jay A. Rosenberg, Attorney at Law, Kentucky Bar No: 81584, 3805 Edwards Road, Suite 550, CINCINNATI, OHIO 45209 (513) 247-9605. File Number ███████

## MORTGAGE

### DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) "Security Instrument" means this document, which is dated February 26th, 2020, together with all Riders to this document.

(B) "Borrower" is AQRE PROPERTIES LLC. Borrower is the mortgagor under this Security Instrument.

(C) "Lender" is U. S. Brank Trust N.A. as Trustee of American Homeowner Preservation Trust Series AHP Servicing. Lender is a corporation organized and existing under the laws of the United States. Lender's address is 440 S. LaSalle St., Suite 1110, Chicago, IL 60605. Lender is the mortgagee under this Security Instrument.

(D) "Note" means the promissory note signed by Borrower and dated February 26th, 2020. The Note states that Borrower owes Lender Twenty Three Thousand and 00/100 Dollars (U.S. $23,000.00) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than April 1st, 2030.

(E) "Property" means the property that is described below under the heading "Transfer of Rights in the Property."

(F) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

(G) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| ☐ Adjustable Rate Rider | ☐ Condominium Rider | ☐ Second Home Rider |
| ☐ Balloon Rider | ☐ Planned Unit Development Rider | ☀ Other(s) AOR |
| ☐ 1-4 Family Rider | ☐ Biweekly Payment Rider | |

OHIO--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Form 3036          1/01 (page 1 of 16 pages)

BOSTON NATIONAL TITLE AGENCY LLC
BUILDING 2 SUITE 101
400 ROUSER RD
COROAPOLIS, PA 15108

CLARK COUNTY, OH          03/10/2020 10:00:35 AM          OR 2169  1243          202000003524          Page: 1 of 19

202000003524
BK 2169 PG 1244

(H) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(I) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(J) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(K) "Escrow Items" means those items that are described in Section 3.

(L) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(M) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(N) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(O) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(P) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby

202000003524
BK 2169    PG 1245

mortgage, grant and convey to Lender the following described property located in the
County                           of                      Clark
[Type of Recording Jurisdiction]             [Name of Recording Jurisdiction]

Situated in the County of Clark, City of Springfield and State of Ohio and bounded and
described as follows:

Being 55 feet off the north end of Lot No. 1606 as the same is numbered and designated on the
recorded plat of George Spence's Addition to the City of Springfield between Race and Shaffer
Streets.

Property Tax ID #340-06-00004-225-016

which currently has the address of        417-419 S. Light St., Springfield, OH 45506

TOGETHER WITH all the improvements now or hereafter erected on the property, and
all easements, appurtenances, and fixtures now or hereafter a part of the property. All
replacements and additions shall also be covered by this Security Instrument. All of the
foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seized of the estate hereby
conveyed and has the right to mortgage, grant and convey the Property and that the Property is
unencumbered, except for encumbrances of record. Borrower warrants and will defend generally
the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and
non-uniform covenants with limited variations by jurisdiction to constitute a uniform security
instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:
1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late
Charges. Borrower shall pay when due the principal of, and interest on, the debt evidenced by
the Note and any prepayment charges and late charges due under the Note. Borrower shall also
pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this
Security Instrument shall be made in U.S. currency. However, if any check or other instrument
received by Lender as payment under the Note or this Security Instrument is returned to Lender
unpaid, Lender may require that any or all subsequent payments due under the Note and this
Security Instrument be made in one or more of the following forms, as selected by Lender:
(a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's
check, provided any such check is
drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or
entity; or (d) Electronic Funds Transfer.

OHIO--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT           Form 3036   1/01  (page 3 of 16 pages)

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's

OHIO—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Form 3036   1/01  *(page 4 of 16 pages)*

obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

202000003524
BK 2169   PG 1248

4. **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5. **Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

OHIO--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Form 3036   1/01   *(page 6 of 16 pages)*

CLARK COUNTY, OH       03/10/2020 10:00:35 AM       OR 2169 1248       202000003524       Page: 6 of 19

202000003524
BK 2169    PG 1249

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. Occupancy. Buyer acknowledges that this loan is made for investment purposes and Buyer does not intend to occupy the property for a period of 6 months from the execution date.

7. Preservation, Maintenance and Protection of the Property; Inspections. Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further

OHIO--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Form 3036   1/01  *(page 7 of 16 pages)*

deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. **Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9. **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

OHIO--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT     Form 3036   1/01  (page 8 of 16 pages)

10. Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

OHIO--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT                Form 3036   1/01   *(page 9 of 16 pages)*

202000003524
BK 2169 PG 1252

(b) Any such agreements will not affect the rights Borrower has – if any – with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then

OHIO--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT     Form 3036  1/01  (page 10 of 16 pages)

CLARK COUNTY, OH     03/10/2020 10:00:35 AM     OR 2169 1252     202000003524     Page: 10 of 19

due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

12. **Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

13. **Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

14. **Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed

OHIO—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT                    Form 3036    1/01  *(page 11 of 16 pages)*

as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

15. Notices. All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

16. Governing Law; Severability; Rules of Construction. This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

17. Borrower's Copy. Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the

OHIO--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT        Form 3036  1/01  *(page 13 of 16 pages)*

address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. Hazardous Substances. As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any

OHIO--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Form 3036   1/01   *(page 14 of 16 pages)*

Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. Acceleration; Remedies.   Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, costs of title evidence.

23. Release.  Upon payment of all sums secured by this Security Instrument, Lender shall discharge this Security Instrument.  Borrower shall pay any recordation costs.   Lender may charge
Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

24. Certain Other Advances.  In addition to any other sum secured hereby, this Security Instrument shall also secure the unpaid principal balance of, plus accrued interest on, any amount of money loaned, advanced or paid by Lender to or for the account and benefit of Borrower, after this Security Instrument is delivered to and filed with the Recorder's Office, _____ County, Ohio, for recording. Lender may make such advances in order to pay any real estate taxes and assessments, insurance premiums plus all other costs and expenses incurred in connection with the operation, protection or preservation of the Property, including to cure Borrower's defaults by making any such payments which Borrower should have paid as provided in this Security Instrument, it being intended by this Section 24 to acknowledge, affirm and comply with the provision of § 5301.233 of the Revised Code of Ohio.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

Salah Alabbas.

AQRE PROPERTIES LLC

_____(Seal)
by: RONICE HARRISON, PRESIDENT  Borrower

_____ [Space   Below   This   Line   For   Acknowledgment]

STATE OF ____ Mi
COUNTY OF ____ Wayne

The foregoing instrument was acknowledged before me on ___Feb 26___, 2020 by ___Ronice Harrison___ its ___President___ on behalf of AQRE PROPERTIES LLC who is personally known to me or has produced ___Passport___ as identification, and furthermore, the aforementioned person has acknowledged that his/her signature was his/her free and voluntary act for the purposes set forth in this instrument.

SALAH ALABBASI
Notary Public, State of Michigan
County of Wayne
My Commission Expires Oct. 19, 2023
Acting in the County of __Wayne__

Notary Public

OHIO--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT            Form 3036   1/01   (page 16 of 16 pages)

202000003524
BK 2169    PG 1259

## 1-4 FAMILY RIDER
### (Assignment of Rents)

THIS 1-4 FAMILY RIDER is made this 26th day of February, 2020, and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Note to US Bank Trust N.A. as Trustee of the American Homeowner Preservation Trust Series AHP Servicing (the "Lender") of the same date and covering the Property described in the Security Instrument and located at:

417-419 S Light Street, Springfield, OH 45506
[Property Address]

1-4 FAMILY COVENANTS. In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

A.   ADDITIONAL PROPERTY SUBJECT TO THE SECURITY INSTRUMENT. In addition to the Property described in Security Instrument, the following items now or hereafter attached to the Property to the extent they are fixtures are added to the Property description, and shall also constitute the Property covered by the Security Instrument: building materials, appliances and goods of every nature whatsoever now or hereafter located in, on, or used, or intended to be used in connection with the Property, including, but not limited to, those for the purposes of supplying or distributing heating, cooling, electricity, gas, water, air and light, fire prevention and extinguishing apparatus, security and access control apparatus, plumbing, bath tubs, water heaters, water closets, sinks, ranges, stoves, refrigerators, dishwashers, disposals, washers, dryers, awnings, storm windows, storm doors, screens, blinds, shades, curtains and curtain rods, attached mirrors, cabinets, paneling and attached floor coverings, all of which, including replacements and additions thereto, shall be deemed to be and remain a part of the Property covered by the Security Instrument. All of the foregoing together with the Property described in the Security Instrument (or the leasehold estate if the Security Instrument is on a leasehold) are referred to in this 1-4 Family Rider and the Security Instrument as the "Property."

B.   USE OF PROPERTY; COMPLIANCE WITH LAW. Borrower shall not seek, agree to or make a change in the use of the Property or its zoning classification, unless Lender has agreed in writing to the change. Borrower shall comply with all laws, ordinances, regulations and requirements of any governmental body applicable to the Property.

C.   SUBORDINATE LIENS. Except as permitted by federal law, Borrower shall not allow any lien inferior to the Security Instrument to be perfected against the Property without Lender's prior written permission.

D.   RENT LOSS INSURANCE. Borrower shall maintain insurance against rent loss in addition to the other hazards for which insurance is required by Section 5.

E.   "BORROWER'S RIGHT TO REINSTATE" DELETED. Section 19 is deleted.

F.   BORROWER'S OCCUPANCY. Unless Lender and Borrower otherwise agree in writing, Section 6 concerning Borrower's occupancy of the Property is deleted.

G.   ASSIGNMENT OF LEASES. Upon Lender's request after default, Borrower shall assign to Lender all leases of the Property and all security deposits made in connection with leases of the Property. Upon the assignment, Lender shall have the right to modify, extend or terminate the existing leases and to execute new leases, in Lender's sole discretion. As used in this paragraph G, the word "lease" shall mean "sublease" if the Security Instrument is on a leasehold.

H.   ASSIGNMENT OF RENTS; APPOINTMENT OF RECEIVER; LENDER IN POSSESSION. Borrower absolutely and unconditionally assigns and transfers to Lender all the rents and revenues ("Rents") of the Property, regardless of to whom the Rents of the Property are payable. Borrower authorizes Lender or Lender's agents to collect the Rents, and agrees that each tenant of the Property shall pay the Rents to Lender or Lender's agents. However, Borrower shall receive the Rents until (i) Lender has given Borrower notice of default pursuant to Section 22 of the Security Instrument and (ii) Lender has given notice to the tenant(s) that the Rents are to be paid to Lender or Lender's agent. This assignment of Rents constitutes an absolute assignment and not an assignment for additional security only.

If Lender gives notice of default to Borrower: (i) all Rents received by Borrower shall be held by Borrower as trustee for the benefit of Lender only, to be applied to the sums secured by the Security Instrument; (ii) Lender shall
be entitled to collect and receive all of the Rents of the Property; (iii) Borrower agrees that each tenant of the Property shall pay all Rents due and unpaid to Lender or Lender's agents upon Lender's written demand to the

MULTISTATE 1-4 FAMILY RIDER–Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Form 3170   1/01 (page 1 of 2 pages)

CLARK COUNTY, OH          03/10/2020 10:00:35 AM          OR 2169 1259          202000003524          Page: 17 of 19



tenant; (iv) unless applicable law provides otherwise, all Rents collected by Lender or Lender's agents shall be applied first to the costs of taking control of and managing the Property and collecting the Rents, including, but not limited to, attorney's fees, receiver's fees, premiums on receiver's bonds, repair and maintenance costs, insurance premiums, taxes, assessments and other charges on the Property, and then to the sums secured by the Security Instrument; (v) Lender, Lender's agents or any judicially appointed receiver shall be liable to account for only those Rents actually received; and (vi) Lender shall be entitled to have a receiver appointed to take possession of and manage the Property and collect the Rents and profits derived from the Property without any showing as to the inadequacy of the Property as security.

If the Rents of the Property are not sufficient to cover the costs of taking control of and managing the Property and of collecting the Rents any funds expended by Lender for such purposes shall become indebtedness of Borrower to Lender secured by the Security Instrument pursuant to Section 9.

Borrower represents and warrants that Borrower has not executed any prior assignment of the Rents and has not performed, and will not perform, any act that would prevent Lender from exercising its rights under this paragraph.

Lender, or Lender's agents or a judicially appointed receiver, shall not be required to enter upon, take control of or maintain the Property before or after giving notice of default to Borrower. However, Lender, or Lender's agents or a judicially appointed receiver, may do so at any time when a default occurs. Any application of Rents shall not cure or waive any default or invalidate any other right or remedy of Lender. This assignment of Rents of the Property shall terminate when all the sums secured by the Security Instrument are paid in full.

**I. CROSS-DEFAULT PROVISION.** Borrower's default or breach under any note or agreement in which Lender has an interest shall be a breach under the Security Instrument and Lender may invoke any of the remedies permitted by the Security Instrument.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this 1-4 Family Rider.

AQRE PROPERTIES LLC,

_____(Seal)

by: RONICE HARRISON, PRESIDENT          -Borrower

MULTISTATE 1-4 FAMILY RIDER--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Form 3170   1/01 *(page 2 of 2 pages)*

202000003524
BK 2169    PG 1261

Escrow File No.: ███████

## EXHIBIT "A"

Situated in the County of Clark, City of Springfield, and State of Ohio and bounded and described as follows:

Being 55 feet off the North end of Lot No. 1606 as the same is numbered and designated on the recorded plat of George Spence's Addition to the City of Springfield between Race and Shaffer Streets.

PARCEL NUMBER(S): 340-06-00004-225-016

# Exhibit B

Filed for record in CLARK County, Ohio
202400000083         01/03/2024  3:40PM
Nancy Pence, Recorder Rec Fees: $38.00
ASSG OR Vol 2232 Pgs 375 - 376
ERECORDING

Recording requested by, return to:
Tor R Midtskog
Weinstein & Riley, P.S.
1415 Western Avenue, Suite 700
Seattle, WA 98101

## ASSIGNMENT OF MORTGAGE

For Value Received, the undersigned **U.S. Bank Trust N.A. as Trustee of American Homeowner Preservation Trust Series AHP Servicing**, at 440 S. LaSalle Street, Suite 1110, Chicago, IL 60605, hereby conveys, assigns, and transfers to **MAGERICK, LLC**, at 1415 Western Avenue, Suite 700, Seattle, WA 98101, its successors and/or assigns, all right, title and interest together with all moneys due or to become due and all rights accrued or to accrue under that certain Mortgage executed by **AQRE PROPERTIES LLC** to **U.S. Bank Trust N.A. as Trustee of American Homeowner Preservation Trust Series AHP Servicing** in the amount of **$23,000.00** dated **02/26/2020** and recorded on **03/17/2000** in Instrument No. **202000003524**, Book (MORT OR Vol) **2169**, Page **1243**, Records of **CLARK** County, **OHIO**

**Property Address: 417-419 S LIGHT STREET, SPRINGFIELD, OH, 45506**
**APN: 340-06-00004-225-016**

**U.S. Bank Trust N.A. as Trustee of American Homeowner Preservation Trust Series AHP Servicing by its Attorney-in Fact Atlantica, LLC**

Dated: **January 2, 2024**

Name: Maxwell Thornton
Title:    Administrative Representative

### NOTARY ACKNOWLEDGMENT IS ON FOLLOWING PAGE

This instrument was prepared by **Tor R Midtskog** for
Weinstein & Riley, PS, 1415 Western Avenue, Suite 700, Seattle WA 98101
Reference: ▓▓▓▓▓ / ▓▓▓▓▓ / LHFS ▓▓▓▓▓

# ACKNOWLEDGMENT

**State of WASHINGTON**
**County of KING**

On January 2, 2024 before me, LUCAS FRANK, Notary Public, personally appeared MAXWELL THORNTON, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person whose name is subscribed to the within instrument, and who, being by me duly sworn, did depose and say that he/she is an Authorized Representative of Atlantica, LLC and acknowledged to me that he/she executed said instrument in his/her authorized capacity, and that by his/her signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument, and that such individual made such appearance before the undersigned.

WITNESS my hand and official seal.

Signature _____
Notary Public: Lucas Frank
Commission Expires: 08-30-2027

Notary Public
State of Washington
LUCAS FRANK
LICENSE # 23032604
MY COMMISSION EXPIRES
AUGUST 30, 2027

# LEGAL DESCRIPTION

Situated in the County of Clark, City of Springfield, and State of Ohio and bounded and described as follows:
Being 55 feet off the North end of Lot No. 1606 as the same is numbered and designated on the recorded plat of George Spence's Addition to the City of Springfield between Race and Shaffer Streets.



# EXHIBIT C

REPORT NO: 7248435-231295919

## PRELIMINARY JUDICIAL REPORT

 **Chicago Title Insurance Company**

Order No. P23-2330 / F23-47774

**Guaranteed Party Name:** Magerick LLC

Pursuant to your request for a Preliminary Judicial Report (hereinafter "the Report") for use in judicial proceedings, **CHICAGO TITLE INSURANCE COMPANY** (hereinafter "the Company") hereby guarantees in an amount not to exceed **$17,984.32** that it has examined the public records in **Clark** County, Ohio as to the land described in Schedule A, that the record title to the land is at the date hereof vested in **AQRE Properties LLC, by deed recorded March 10, 2020 in OR Volume 2169, Page 1241** of **Clark** County Records and free from all encumbrances, liens or defects of record, except as shown in Schedule B.

This is a guarantee of the record title only and is made for the use and benefit of the Guaranteed Party and the purchaser at judicial sale thereunder and is subject to the Exclusions from Coverage, the Exceptions contained in Schedule B and the Conditions and Stipulations contained herein.

This Report shall not be valid or binding until it has been signed by either an authorized agent or representative of the Company and Schedules A and B have been attached hereto.

Effective Date: **December 4, 2023 @ 7:00 a.m.**

Issued By:
Nova Title Agency, Inc.
6001 Cochran Road
Suite 302
Solon, OH 44139
(440)-600-5550

CHICAGO TITLE INSURANCE COMPANY

By:

ATTEST          President

Secretary

Signed By: _John J Dyer, III_

Authorized Signatory or Agent, John J Dyer III, Esq.

Preliminary Judicial Report – (04/15/2010)

Requested by: Reimer Law Co.

# CHICAGO TITLE INSURANCE COMPANY

ORDER NO. P23-2330 / F23-47774

## PRELIMINARY JUDICIAL REPORT
## SCHEDULE A

## DESCRIPTION OF LAND

Situated in the City of Springfield, County of Clark, and State of Ohio, and bounded and described as follows:

Being 55 feet off the north end of Lot No. 1606 as the same is numbered and designated on the recorded plat of George Spence's Addition, recorded in Volume 4, Page 54 of the Clark County Plat Records, to the City of Springfield between Race and Shaffer Streets.

---

# CHICAGO TITLE INSURANCE COMPANY

## SCHEDULE B

The matters shown below are exceptions to this Preliminary Judicial Report and the Company assumes no liability arising therefrom.

1. Plat items, Easements, Restrictions, Declarations, Amendments to Declarations and Mineral Leases which are filed for record.

2. Mortgage from **AQRE Properties LLC** to **U.S. Bank Trust N.A. as Trustee of American Homeowner Preservation Trust Series AHP Servicing** in the amount of $23,000.00, dated February 26, 2020 and filed March 10, 2020 in OR Volume 2169, Page 1243 of Clark County Records.

   **NOTE: The mortgage legal description is incomplete. The legal description in Schedule A is correct.**

3. The following entries are set forth on the docket in the Bankruptcy Court for the United States District Court Northern District of Ohio, Case No. 22-30962. (Chapter 7)

   In the matter of:
   **Justin L. Randolph**
   619 Selby Street
   Sandusky, OH 44870

   **June 30, 2022:** Voluntary petition, schedules, statement affairs filed and referred to Judge. Petition lists an interest in premises described in Schedule A.
   **October 26, 2022:** Order of Discharge.
   **November 1, 2022:** Case Closed.

4. The records of the Clark County Auditor for **Parcel No. 3400600004225016** show the following real estate tax information:

   Taxes for the Last Half of 2022 in the amount of $542.42, which includes penalties and interest, are a lien due and payable.

   | VALUATION: | LAND | BUILDING | TOTAL |
   |---|---|---|---|
   | | 1490 | 18000 | 19490 |

   **Property Address is known as: 417-419 South Light Street, Springfield, Ohio (as per Clark County Tax Auditor)**

# CONDITIONS AND STIPULATIONS
## OF THIS PRELIMINARY JUDICIAL REPORT

1.Definition of Terms
"Guaranteed Party": The party or parties named herein or the purchaser at judicial sale.
"Guaranteed Claimant": Guaranteed Party claiming loss or damage hereunder.
"Land": The land described specifically or by reference in Schedule A, and improvements affixed thereto, which by law constitute real property; provided however the term "land" does not include any property beyond the lines of the area specifically described or referred to in Schedule A, nor any right, title, interest, estate, or easement in abutting streets, roads, avenues, lanes, ways or waterways.
"Public Records": Those records under state statute and, if a United States District Court resides in the county in which the Land is situated, the records of the clerk of the United States District Court, which impart constructive notice of matters relating to real property to purchasers for value without knowledge and which are required to be maintained in certain public offices in the county in which the land is situated.

2. Determination of Liability
This Report together with any Final Judicial Report or any Supplement thereto, issued by the Company is the entire contract between the Guaranteed Party and the Company.
Any claim of monetary loss or damage, whether or not based on negligence, and which arises out of the status of the title to the estate or interest guaranteed hereby or any action asserting such claim, shall be restricted to this Report.

3. Liability of Company
This Report is a guarantee of the record title of the land only, as disclosed by an examination of the Public Records herein defined in the chain of title ownership.

4. Notice of Claim to be given by Guaranteed Claimant
In case knowledge shall come to the Guaranteed Party of any lien, encumbrance, defect, or other claim of title guaranteed against and not excepted in this Report, whether in a legal proceeding or otherwise, the Guaranteed Party shall notify Company promptly in writing and secure to the Company the right to oppose such proceeding or claim, or to remove said lien, encumbrance or defect at its own cost. Any action for the payment of any loss under this Report must be commenced within one year after such loss is sustained. A failure to furnish a statement of loss or damage and to commence such action within the time herein before specified shall be a conclusive bar against the maintenance of any action under this Report.

5. Extent of Liability
The liability of the Company shall in no case exceed in all the amount stated herein and shall in all cases be limited to the actual loss, including but not limited to attorneys fees and costs of defense, only of the Guaranteed Party. Any and all payments under this Report shall reduce the amount of this Report pro tanto and the Company's liability shall terminate when the total amount of the Report has been paid.

6. Options to Pay or Otherwise Settle Claims; Termination of Liability
The Company in its sole discretion shall have the following options:
   a.) To pay or tender to the Guaranteed Claimant the amount of the Report or the balance remaining thereof, less any attorneys fees, costs or expenses paid by the Company to the date of tender. If this option is exercised all liability of the Company under this Report terminates including but not limited to any liability for attorneys fees or any costs of defense or prosecution of any litigation.
   b.) To pay or otherwise settle with other parties for or in the name of the Guaranteed Claimant any claims guaranteed by this Report.
   c.) To continue, re-open or initiate any judicial proceeding in order to adjudicate any claim covered by this Report. The Company shall have the right to select counsel of its choice (subject to the right of the Guaranteed Claimant to object for reasonable cause) to represent the Guaranteed Claimant and will not pay the fees of any other counsel.
   d.) To pay or tender to the Guaranteed Claimant the difference between the value of the estate or interest as guaranteed and the value of the estate or interest subject to the defect, lien, or encumbrance guaranteed against by this Report.

7. Notices
All notices required to be given the Company shall be given promptly and any statements in writing required to be furnished to the Company shall be addressed to the Company at its office, P.O. Box 45023, Jacksonville, Florida 32232-5023.

## EXCLUSIONS FROM COVERAGE

1. The Company assumes no liability under this Report for any loss, cost or damage resulting from any physical condition of the Land

2. The Company assumes no liability under this Report for any loss, cost or damage resulting from any typographical, clerical or other errors in the Public Records, including but not limited to: mis-indexing, misspellings or any other misinformation contained therein.

3. The Company assumes no liability under this Report for matters affecting title subsequent to the date of the Report or the Final Judicial Report or any supplement thereto.

4. The Company assumes no liability under this Report for the proper form or execution of any pleadings or other documents to be filed in any judicial proceedings

5. The Company assumes no liability under this Report for any loss, cost or damage resulting from the failure to complete service on any parties shown in Schedule B of the Preliminary Judicial Report and the Final Judicial Report or any Supplemental Report issued thereto.

SUPPLEMENTAL PRELIMINARY JUDICIAL REPORT
*Issued by*

CHICAGO TITLE INSURANCE COMPANY

**Report Number 7248435-231295919**

Guaranteed Party Name:**Magerick LLC**

File No.: **P23-2330 / F23-47774 /**

The Preliminary Judicial Report dated December 11, 2023 @ 7:00 a.m. is amended to extend the effective date to February 14, 2024 @ 7:00 a.m. and we find no changes except as follows:

1.  Assignment of mortgage as recorded in OR Volume 2169, Page 1243 to **Magerick, LLC, (by U.S. Bank Trust N.A. as Trustee of American Homeowner Preservation Trust Series AHP Servicing by its Attorney-in Fact Atlantica, LLC)**, by separate instrument dated January 2, 2024 and filed January 3, 2024 in OR Volume 2232, Page 375 of Clark County Records. **(NOTE: There is no Power of Attorney of record between said parties in Clark County Records.)**

2.  The records of the Clark County Auditor for **Parcel No. 3400600004225016** show the following real estate tax information:

    Taxes for the First Half of 2023 in the amount of $1,184.22, which includes delinquencies, penalties, and interest, are a lien due and payable.

    | VALUATION: | LAND | BUILDING | TOTAL |
    |---|---|---|---|
    | | 1490 | 18000 | 19490 |

    **Property Address is known as: 417-419 South Light Street, Springfield, Ohio (as per Clark County Tax Auditor)**

This examination is made for the use and benefit of the Guaranteed Party to said proceedings and the purchaser at judicial sale thereunder and is further subject to the Exclusions from coverage, the Exceptions contained in Schedule B and the Conditions and Stipulations of the Preliminary Judicial Report and any supplements related hereto.

Effective Date: **February 14, 2024 @ 7:00 a.m.**

*John J. Dyer, III*

Authorized Signature, John J Dyer III, Esq.
Nova Title Agency, Inc.
6001 Cochran Road
Suite 302
Solon, OH 44139
(440)-600-5550

Prepared for: **Magerick LLC, as Requested by: Reimer Law Co.**

# Exhibit 47

24-01346

<div align="center">

IN THE COURT OF COMMON PLEAS
MAHONING COUNTY, OHIO

</div>

| | |
|---|---|
| Magerick, LLC | CASE NO. 2024 CV 00569 |
|     Plaintiff | JUDGE R. SCOTT KRICHBAUM |
|     -vs- | |
| U.S. Bank National Association as Trustee of American Homeowner Preservation Series 2015 A+, et al. | |
|     Defendants | **AMENDED COMPLAINT FOR FORECLOSURE FOR LAND CONTRACT, DECLARATORY JUDGMENT, AND OTHER EQUITABLE RELIEF** |
|     -and- | |
| U.S. Bank Trust National Association as Trustee of American Homeowner Preservation Series 2015A+<br>440 S. LaSalle St., Ste. 1110<br>Chicago, IL  60605 | |
|     -and- | |
| City of Youngstown, Demolition Supervisor<br>Lower Level, City Hall<br>26 South Phelps Street<br>Youngstown, OH  44503 | |
|     New Party Defendants | |

1.	Plaintiff, Magerick, LLC, is and at all relevant times was, the owner in fee simple of the real estate described in EXHIBIT A attached to this Complaint.

2.	The Property is improved by a dwelling.

3.	Plaintiff is entitled to enforce a certain promissory note pursuant to Ohio Revised Code §1303.31, a copy of which note is attached hereto, marked as EXHIBIT B  and made a part

hereof, upon which there remains unpaid the sum of $28,215.48 plus interest at the rate of 9.9% per annum from September 1, 2023, and at such interest rate as may change from time to time pursuant to the terms of said note, plus late charges, any deferred non interest/interest bearing amounts, advances for taxes and insurance, and all other expenditures recoverable under the note and Land Contract and/or Ohio law.

4. On September 16, 2013, Harbour Portfolio VII, LP entered into a written land contract with Defendant Juan Laviena, by which Harbour Portfolio VII, LP agreed to sell and Defendant Juan Laviena agreed to purchase the Property. A copy of the Land Contract, recorded in the Mahoning County Recorder's Office as Book 6055, Page 2312 on October 21, 2013, is attached to this Amended Complaint as EXHIBIT C.

5. The purchase price for the Property as set forth in the Purchase Money Note and Land Contract was the sum of $31,440.00, payable, together with interest at the rate of 9.9% percent per annum, payable in monthly installments of $273.59 each, commencing on October 1, 2013, and on the 1st day of each subsequent month until September 1, 2043, at which time the unpaid principal balance and any accrued interest would become due and payable in full. Defendant also agreed to pay the real estate taxes on the Property, and to maintain and insure the improvements of the Property.

6. Plaintiff says that on September 21, 2018, the Land Contract was assigned via Assignment of Seller's Interest in an Agreement for Deed/Land Contract from Harbour Portfolio VII, LP to US Bank Trust National Association as Trustee of American Homeowner Preservation Series 2015A+, filed of record December 4, 2018, as Book 6305, Page 1756, of Mahoning County, Ohio Records. A copy of the Assignment of Land Contract is attached hereto and marked as EXHIBIT D.

7. Plaintiff says that on July 18, 2023, the Land Contract was assigned via Assignment of Agreement for Deed from U.S. Bank Trust N.A. as Trustee of American Homeowner Preservation Trust Series 2015A+ to Magerick, LLC, filed of record August 10, 2023, as Book 6584 at Page 1537 of Mahoning County, Ohio Records. A copy of the Assignment of Land Contract is attached hereto and marked as EXHIBIT E.

8. Plaintiff further says that U.S. Bank Trust N.A. as Trustee of American Homeowner Preservation Trust Series 2015A+, sold, transferred and assigned all its right, title, claim and interest in the Land Contract attached hereto as EXHIBIT C. However, Plaintiff is unable to obtain a deed to memorialize the transfer of interest in the property in the county records.

9. Plaintiff is entitled to a declaratory judgment finding that it is the party entitled to enforce the aforesaid Land Contract and that it is the equitable owner of the subject property, and that Defendant U.S. Bank Trust N.A. as Trustee of American Homeowner Preservation Trust Series 2015A+ is barred from claiming any interest in the subject real estate or Land Contract.

10. The Defendant, Juan Laviena, failed to make the payments due on October 1, 2023, and all payments, fees, and charges for which they are liable subsequent to that date.

11. On January 19, 2024, Plaintiff served notice on Defendant, Juan Laviena, by mailing to him, by certified mail, a written notice pursuant to Section 5313.06 of the Ohio Revised Code. This notice identified the Land Contract, described the Property, specified the terms and conditions of the Land Contract that have not been complied with, and notified the Defendant that the Land Contract would be forfeited unless payment was received on or before February 22, 2024. A copy of the written notice is attached to this Complaint as EXHIBIT F.

12. The Defendant, Juan Laviena, failed to comply with the terms and conditions of the notice.

13. Plaintiff says that the Defendants, Juan Laviena, Treasurer of Mahoning County, and New Party Defendants, U.S. Bank Trust National Association as Trustee of American Homeowner Preservation Series 2015A+, and City of Youngstown, Demolition Supervisor have or claim to have an interest in the premises.

WHEREFORE, Plaintiff demands that it be found to be the proper party in interest and that it is the equitable owner of the subject property, and that Defendant U.S. Bank Trust N.A. as Trustee of American Homeowner Preservation Trust Series 2015A+ be barred from claiming any interest in the subject real estate or said Land Contract; Plaintiff demands judgment against Defendant, Juan Laviena, for the sum of $28,215.48 plus interest at the rate of 9.9% per annum from September 1, 2023, plus late charges, any deferred non interest/interest bearing amounts, advances for taxes and insurance, and all other expenditures recoverable under the Land Contract and/or Ohio law; unless said Defendant's personal liability for said indebtedness has previously been discharged in a bankruptcy or is discharged in a bankruptcy during the course of these proceedings; that the Defendants named herein be required to answer and set up any claim that they may have in the premises described in the Land Contract attached hereto or be forever barred; that the Plaintiff's Land Contract be found to be a valid and enforceable first lien on said premises for the amount so owing together with its advances made pursuant to the terms of the Land Contract for real estate taxes, hazard insurance premiums and property protection and maintenance; that Plaintiff's Land Contract and the equity of redemption be foreclosed and said premises ordered appraised, advertised and sold according to law; that from the proceeds of sale the Plaintiff's be paid the amount found due it, and for such other and further relief as equity entitles it to receive.

CLUNK, HOOSE CO., LPA

/s/ Ethan J. Clunk
Ethan J. Clunk #0095546
Attorney for Plaintiff
495 Wolf Ledges Pkwy
Akron, Ohio  44311
(330) 436-0300 - telephone
(330) 436-0301 - facsimile
requests@clunkhoose.com
File No. 24-01346

### PROOF OF SERVICE

Plaintiff served a copy of the foregoing Amended Complaint on all defendants and/or their attorneys by ordinary U.S. Mail, this 12th day of August, 2024.

Thomas N. Michaels, Esq.
21 W. Boardman Street, 6th Floor

Youngstown, OH 44503

Rick D. DeBlasis, Esq.
201 East Fifth Street, Suite 800
Cincinnati, OH 45202

<div style="margin-left:50%">

CLUNK, HOOSE CO., LPA

/s/ Ethan J. Clunk
Ethan J. Clunk #0095546
Attorney for Plaintiff
495 Wolf Ledges Pkwy
Akron, OH 44311
(330) 436-0300 - telephone
(330) 436-0301 - facsimile
notice@clunkhoose.com
File No. 24-01346

</div>

**This law firm is deemed to be a debt collector attempting to collect a debt on behalf of our client and any information obtained will be used for that purpose.**

# EXHIBIT A

This Conveyance has Complied with Section 315.202
Fee $ _15·00_ Receipt # _4606_
Permissive Tax _45·00_
_____ Date _12-4-18_
_____ Deputy
_____ FOR

201800028681
Filed for Record in
MAHONING COUNTY, OHIO
NORALYNN PALERMO, RECORDER
12-04-2018 At 02:31 pm.
DEED              36.00
OR Book     6305 Page 1759 - 1761

**After Recording Return To**
Jennifer D. Wingard
KDK Services, LLC
PO Box 290909
Columbia, SC 29229

**Grantee Address/Mail Tax Bills To:**
US Bank Trust National Association as Trustees of American Homeowner Preservation Series 2015 A+
440 S. LaSalle St., Ste. 1110
Chicago, Illinois 60605

## QUIT CLAIM DEED

**Harbour Portfolio VII, LP,** a Limited Partnership organized and existing under the laws of the State of Texas ("Grantor"), **US Bank Trust National Association as Trustee of American Homeowner Preservation Series 2015 A+,** a Trust organized and existing under the laws of the State of Illinois.

For value received, Grantor hereby grants, remises, aliens and conveys unto Grantee, and to Grantee's heir and assign forever, but without recourse, representation or warranty, except as expressed herein, all of grantor's right, title and interest in and to that certain tract or parcel of land commonly known as 517 Miller Street and situated in the City of Youngstown, County of Mahoning, State of Ohio, described as follows (the "Premises"):

See Exhibit "A"

Subject to easements and restrictions of record.

Property Address: 517 Miller Street, Youngtown, Ohio 44502

Permanent Parcel: 53-115-0-063.00-0

Prior Instrument Reference: Recorded on February 4, 2013, Book #: 6009, Pages 1073-1075, Instrument #: 201300003169

Dated this 21st day of September 2018

Harbour Portfolio VII, LP.

By: Charles A. Vose, III
Its: Manager

STATE OF TEXAS            )
                                SS
COUNTY OF DALLAS         )

**BE IT REMEMBERED,** That on this 21st day of September, 2018, before me, the subscriber, a Notary Public in and for said County and State, personally came Charles A. Vose, III, Manager of Harbour Portfolio VII, LP, the Grantor in the foregoing Deed, and acknowledged the signing thereof to be his/her voluntary act and deed and the voluntary act and deed on behalf of the corporation.

**IN TESTIMONY THEREOF,** I have hereunto subscribed my name and affixed my Official seal on the day and year last aforesaid.

Printed: Juliana Majure
Notary Public for ____ Texas
My commission expires: ____ 5-6-20

**Prepared By:**
Jennifer D. Wingard
KDK Services, LLC
PO Box 290909
Columbia, SC 29229



JULIANA MAJURE
NOTARY PUBLIC - STATE OF TEXAS
ID# 130645630
COMM. EXP. 05-06-2020

EXHIBIT "A"
LEGAL DESCRIPTION

Situated in the City of Youngstown, County of Mahoning and State of Ohio:

And known as being Youngstown City Lot No. 38439 according to the latest enumeration of Lots in said City, in Plat Number 4 of Gibson Grove Subdivision of Youngstown City Out Lot Number 1192, as shown by the recorded plat of said subdivision is Volume 19 of Maps, Page 94 of Mahoning County Records and being 40 feet front on the Southerly side of Miller Avenue and extending back 118.10 feet on the Easterly line, 117.59 feet on the Westerly line, and having a rear line 40 feet as appears by said plat, be the same more or less, but subject to all legal highways.

PROPERTY ADDRESS: 517 Miller Street, Youngstown, Ohio 44502

PARCEL # 53-115-0-063.00-0

## PURCHASE MONEY NOTE

16th Day of **September, 2013**                                     **$31,440.00**

*FOR VALUE RECEIVED*, the undersigned promises to pay to the order of Harbour Portfolio VII, LP or its assigns:

SEND PAYMENT TO:        **National Asset Advisors, LLC**
                        **P.O. Box 1996**
                        **Irmo, SC 29063**

*THE PRINCIPAL SUM* of Thirty One Thousand Four Hundred Forty Dollars and **no**/cents **($31,440.00)** as follows:

*BEARING INTEREST* at the rate of Nine and 90/100 percent (9.9%) per annum from date hereof in monthly installments of Two Hundred Seventy Three Dollars and 59/100 Cents **($273.59)** each **payment beginning the 1st day of each month** beginning on **October 1, 2013** each payment shall be applied first to any late fees or other fees associated with this promissory note, then the accrued interest will be calculated from payment to payment on the unpaid principal balance at the rate of Nine and 90/100 percent (9.9%) the remainder thereof to the unpaid principal balance, and the entire remaining unpaid principal balance together with accrued interest to date shall become due and payable in full on the 1st day of **September**, in the year **2043** **All payments not received on or before the 10th of the month will be subject to a 10% late fee.** If a check is returned for ANY REASON a charge of $ 30.00 will be applied.

*THIS NOTE*, is secured by an **"AGREEMENT FOR DEED"** on the following property:

Address: 517 Miller St.
City, State, Zip: Youngstown, OH, 44502
County: Mahoning        Tax Map: # 53-115-0-063.00-0

*THE PURCHASER ALSO AGREES* that the seller has the right to sale his/her/their agreement or mortgage to another party.

*IT IS SPECIFICALLY AGREED* that the makers hereof shall have the right of prepayment at any time without the penalty of additional interest so long as accrued interest on the unpaid principal is paid as herein provided.

*AND THAT UPON FAILURE* to make the payment or any part thereof, at the time when due, then the unpaid principal balance hereof plus interest shall, at the option of the holder of this note, at once becomes due and payable.

**If this note is placed in the hands of an attorney for collection by suit or otherwise, I/We will pay, on demand, any attorney's fees and related expenses that the holder of this note incurs.**

*ALL PARTIES HERETO*, makers, endorsers, sureties, Guarantors, or otherwise, severally waive protest, demand, presentment and notice of dishonor and the holder may grant extensions of the time of payment of this note, or a part thereof, without any release of liability as to parties secondarily liable, who hereby waive notice, as to such extension, and against whom recourse is, in such event, expressly reserved.

_____Elizabeth DeG___
Witness
Print Name: Elizabeth De Jesus

_____Juan Laviena_____
Juan Laviena

_____Robert Berry_____
Witness
Print Name: Robert Berry

(NOTARY SECTION)

**STATE OF** Ohio    )
                     )        **ACKNOWLEDGEMENT**
**COUNTY OF** Mahoning )

    I, the undersigned, a Notary Public, do hereby certify that the purchaser, Juan Laviena, herein appeared before me this day and acknowledged the due execution of the foregoing instrument.

**SWORN** and subscribed before me on this 25 day of Sept _____, 2013

_____Carol A Irwin_____
Notary's Signature
Notary Public for the State of Ohio
My Commission Expires: June 1, 2016 (Seal)

# ATTACHMENT "A" – LEGAL DESCRIPTION

***THIS AGREEMENT*** is secured by the property listed below between Harbour Portfolio VII, LP, and Juan Laviena:


Street Address: 517 Miller St.
                Youngstown, OH, 44502

Description:

Situated in the City of Youngstown, County of Mahoning and State of Ohio: And known as being Youngstown City Lot No. 38439 according to the latest enumeration of lots in said City, in Plat Number 4 of Gibson Grove Subdivision of Youngtown City Out Lot Number 1192, as shown by the recorded plat of said subdivision in Volume 19 of Maps, Page 94 of Mahoning County Records and being 40 feet front on the southerly side of Miller Avenue and extending back 118.10 feet on the easterly line, 117.59 feet on the westerly line, and having a rear line 40 feet as appears by said plat, be the same more or less, but subject to all legal highways.

TMS: #    53-115-0-063.00-0

Initial J. L

## *"CERTIFICATION"*

*I/WE, THE PURCHASER*, hereby certify that I/We have been informed by the Seller that it is advisable when entering into an **"Agreement for Deed"** for real estate to obtain legal advice from an attorney. I/We the Purchaser have decided not to consult an attorney and I/We have made that decision outside the presence of the Seller. I/We further certify this **"Certification"** *was signed* outside the presence of Seller.

(PURCHASER SIGNATURES)
(Acct# 45007783)

_Elizabeth DeJesus_
Witness
Print Name: _Elizabeth DeJesus_

_Juan Laviena_
/Juan Laviena

_Robert Berry_
Witness
Print Name: _Berry Robert_

(NOTARY SECTION)

STATE OF _Ohio_ )
)                    **ACKNOWLEDGEMENT**
COUNTY OF _Mahoning_ )

    I, the undersigned, a Notary Public, do hereby certify that the purchaser, Juan Laviena, herein appeared before me this day and acknowledged the due execution of the foregoing instrument.

SWORN and subscribed before me on this _25_ day of _Sept_, 2013

_Carol A Irwin_
Notary's Signature
Notary Public for the State of _Ohio_
My Commission Expires: _June 1 2016_ (Seal)

# LEAD BASED PAINT RIDER

*RIDER TO THE "AGREEMENT FOR DEED"* dated the 16th day of September, **2013** between the *Purchaser* and *Seller* for the property located at: 517 Miller St., Youngstown in the County of Mahoning, State of OH

*SELLER AND THE PURCHASER AGREE* that the following additions and/or modifications are hereby made to the above referenced Contract:

1 – *AGREEMENT FOR DEED CONTINGENCY.* Pursuant to Federal Regulations, the provisions of this Rider must be satisfied before the Purchaser are obligated under this Agreement for Deed.

2 – *LEAD WARNING STATEMENT.* The Seller, as owners of an interest in residential real property of which a residential dwelling was built prior to 1978, are notified that such property may present exposure to lead from lead-based paint that may place young children at risk of developing lead poisoning. Lead poisoning in young children may produce permanent neurological damage, including learning disabilities; reduce intelligence quotient, behavioral problems, and impairing memory. Lead poisoning also poses a particular risk to pregnant women. The Seller, as owners of an interest in the residential real property, are required to provide any Purchaser with whom the Seller enter into an Agreement for Deed with any information on lead-based paint hazards from risk assessments or inspections in the possession of the Seller and notify the Purchaser of any known lead-based paint hazards. A risk assessment or inspection for possible lead-based paint hazards in recommended prior to purchase.

3 – *LEAD HAZARD INFORMATION PAMPHLET.* Seller shall deliver to the Purchaser an EPA approved lead hazard information pamphlet (For example, Protect Your Family From Lead In Your Home). Intact lead-based that is in good condition is not necessarily a hazard.

4 – *SELLER'S DISCLOSURE.* (Check all applicable boxes)

,    (A) Presence of Lead-Based Paint and/or Lead Based Paint Hazards.    (Check either (1) or (2) below)

__ (1) *Hazards Known.* Attached hereto is a statement signed by Seller disclosing the presence of known lead-based paint and /or lead-based hazards at the Property, including but not limited to the basis of the determination that lead-based paint and /or lead–based paint hazards exist, the location of the lead-based paint and/or lead-based paint hazards and the condition of the painted surfaces.

**X** (2) *Hazards Unknown.* Seller has no actual knowledge of the presence of lead-based and/or lead-based paint hazards at the property.

   (B) Records and reports available to Seller.    (Check either (1) or (2) below)

__ (1) *Records Provided.* The following is a list of all records and/or reports available to the Seller pertaining to lead-based paint and/or lead-based paint hazards at the property.

**X** (2) *No Records.* The Seller has no records or reports pertaining to lead-based paint hazard risk assessment or inspection.

5 – *RISK ASSESSMENT.*

# (INITIAL either (A) OR (B) below)

_ᘔ_ **(A)** *PURCHASER* hereby waive/waives the opportunity to conduct a lead-based paint hazard risk assessment or inspection.

___ **(B)** *THIS CONTRACT IS CONTINGENT* upon a risk assessment or inspection of the Property for the presence of lead-based paint and/or lead-based paint hazards being obtained by the Purchaser at the expense of the Purchaser before 5:00 pm on the tenth calendar day after full execution of the Contract by all parties (the "Lead Paint Inspection Period"). If the results of such inspection are unacceptable to the Purchaser for any reason whatsoever, the Purchaser shall notify the Seller of the attorney of the Seller in writing within two business days after the end of the Lead Paint Inspection Period, together with a copy of the inspection and/or risk assessment report In such case, either party may cancel the Contract upon written notice to the other party or the other party's attorney. A copy of such notice(s) should be delivered to the real estate brokers. If the notice of unacceptable results by the Purchaser's is not received by the Seller or the attorney of the Seller within two business days after the end of the Lead Paint Inspection Period, this Inspection contingency is deemed waived by the Purchaser. The definitions in Paragraph 1.B and C of Form 1.1 Contract Rider (1995) shall be used to determine whether or not the notice of unacceptable results by the Purchaser has/have been received by the Seller before the end of the Lead Paint Inspection Period. The Seller will cooperate with the inspection made by the Purchaser in such fashion as may be reasonably requested by the Purchaser. The Purchaser may remove this contingency at any time without cause.

*6 – ACKNOWLEDGEMENT BY THE PURCHASER.*

# (INITIAL AND DATE EACH OF THE FOLLOWING)

| Initial | Date | |
|---|---|---|
| _ᘔ_ | _9-25-13_ | **PURCHASER HAS/HAVE** received copies of all information, records and/or reports set forth in Paragraph 4 of this Rider or attached to this contract. |
| _ᘔ_ | _9-25-13_ | **PURCHASER HAS/HAVE** received an EPA approved lead hazard information pamphlet. |
| _ᘔ_ | _9-25-13_ | **PURCHASER HAS/HAVE** received a 10-day opportunity (or mutual agreed upon period) or has/have waived the opportunity to conduct a risk assessment or inspection for the presence of and/or lead-based paint hazards. |

*7 – CERTIFICATION OF ACCURACY.* The undersigned have reviewed the information above and certify to the best of their knowledge, that the statement they have provided is true and accurate.

517 Miller St., Youngstown OH 44502

███████████████

## MOLD DISCLOSURE

*Print Name(s) of Seller: Harbour Portfolio VII, LP*

*Print Name(s) of Buyer: Juan Laviena*

*Property Address: 517 Miller St., Youngstown OH 44502*

1. **Seller Disclosure.** To the best of Sellers' actual knowledge, Sellers represent:
   A. The Property described herein ____ has **XX** has not been previously tested for molds.
      *If answer to (A) is "has not," then skip (B) and (C) and go to Section 2.*
      *If answer to (A) is "has" then complete (B) and (C).*
   B. The molds found ____ were ____ were not identified as toxic molds.
   C. With regards to any molds that were found, measures ____ were ____ were not taken to remove those molds.

2. **Mold Inspections.** Molds, funguses, mildew and similar organisms may exist in the Property of which the Seller is unaware and has no actual knowledge. These contaminants generally grow in places where there is excessive moisture, such as where leakage may have occurred in roofs, pipes, walls and plant pots , or where there has been flooding. A professional home inspection may not disclose molds. Buyer, may wish to obtain an inspection specifically for molds to more fully determine the condition of the Property and its environmental status. Neither Sellers' agent nor Buyers' agents are experts in the field of mold. The Buyers are strongly encouraged to satisfy themselves as to the Property condition.

*Buyers' Initials:* ___ ' ___

3. **Hold Harmless.** Buyers make the decision to purchase the Property independent of any representation of the Agents, Brokers or Attorneys involved in the transaction regarding mold. Accordingly, Buyers agree to indemnify and hold

   _____

   *(print names of Brokers, Designated Agents and Attorneys)* harmless in the event any mold is present on the Property.

4. **Receipt of Copy.** Sellers and Buyers have read this Mold Disclosure, and by their signatures hereon acknowledge receipt of a copy thereof.

5. **Professional Advice.** Sellers and Buyers execute this Disclosure with the understanding that they should consult with a professional of their choice regarding any questions or concerns before its execution.

BUYER(S):                           SELLER(S): Harbour Portfolio VII, LP

*[signature]*                       _____
Juan Laviena                        David W. Campbell, Attorney in Fact

*(SELLER SIGNATURES}*

**SIGNED**, sealed and delivered in the presence of:

Harbour Portfolio VII, LP

*Arlene Edwards*
Witness
Print Name: _Arlene Edwards_

By: _____

David W. Campbell, Attorney-In-Fact

*Laurie Devansky*
Witness
Print Name: _Laurie Devansky_

| STATE OF SOUTH CAROLINA | ) | |
|---|---|---|
| | ) | **ACKNOWLEDGMENT** |
| COUNTY OF LEXINGTON | ) | |

     I, the undersigned, a Notary Public, do hereby certify that David W. Campbell, Attorney-In-Fact for Harbour Portfolio VII, LP, the seller, herein appeared before me this day and acknowledged the due execution of the foregoing instrument.

**SWORN** and subscribed before me on this
30th day of September, 2013

_____
Notary's Signature
Notary Public for the State of **South Carolina**
My Commission Expires: _____ (Seal)

(PURCHASER SIGNATURE)

___Elizabeth DeJesus___
Witness
Print Name: Elizabeth De Jesus

_____ Juan Laviena

___Robert Berry.___
Witness
Print Name: Robert Berry.

(NOTARY SECTION)

STATE OF OHiO ___ )
                   )          **ACKNOWLEDGEMENT**
COUNTY OF Mahoning ___ )

I, the undersigned, a Notary Public, do hereby certify that the purchaser, Juan Laviena, herein appeared before me this day and acknowledged the due execution of the foregoing instrument.

**SWORN** and subscribed before me on this
25 day of Sept ___, 2013

___Carol A Irwin___
Notary's Signature
Notary Public for the State of OHiO
My Commission Expires: June 1, 2016 (Seal)

# ALLONGE

FOR PURPOSES OF FURTHER ENDORSEMENT OF THE FOLLOWING DESCRIBED NOTE, THE ALLONGE IS AFFIXED AND BECOMES A PERMANENT PART OF SAID NOTE.

PAY TO THE ORDER OF **US Bank Trust National Association as Trustee of American Homeowner Preservation Series 2015 A+**, without warranty representation or recourse of any kind, that certain note dated September 16, 2013 in the original principal amount of $31,440.00 executed by Juan Laviena with a property address 517 Miller Street, Youngstown, Ohio 44502.

By: **Harbour Portfolio VII, LP**

Name: Charles A. Vose, III

Title: Manager

# Allonge to Note

FOR PURPOSES OF FURTHER ENDORSEMENT OF THE NOTE REFERRED TO BELOW:

Loan #

OI #

NOTE AMOUNT:        $31,440.00

BORROWER NAME(S):   **Juan Laviena**

ORIGINAL LENDER:    Harbour Portfolio VII, LP

NOTE DATE:          09/16/2013

PROPERTY ADDRESS:   517 MILLER ST, YOUNGSTOWN, OH, 44502

PAY TO THE ORDER OF:

**MAGERICK, LLC**

WITHOUT RECOURSE:

**U.S. Bank Trust N.A. as Trustee of American Homeowner Preservation Trust Series 2015A+ by its Attorney-in-Fact Oak Harbor Capital, LLC**

By: _____

Name: MARCELLE HELE

Title:   AUTHORIZED REPRESENTATIVE

# EXHIBIT C

OR 6055 PG.2312

201300030295
Filed for Record in
MAHONING COUNTY, OHIO
NORALYNN PALERMO, RECORDER
10-21-2013 At 09:01 am.
LAND CONT       60.00
OR Book    6055 Page 2312 - 2317

**Type of Document:**    Land Contract

**Preparer Information:**

Heather Penny, PO Box 1996, Irmo, SC 29063  803-750-1196

**Taxpayer Information:**

Harbour Portfolio VII, LP, PO Box 1996, Irmo, SC 29063  803-750-1196

**Return Document to:**

National Asset Advisors, LLC, PO Box 1996, Irmo, SC 29063  803-750-1196

**Grantors:**                                **Grantee:**

Harbour Portfolio VII, LP              Juan Laviena
8214 Westchester, Suite 635        517 Miller Street
Dallas, TX 75225                         Youngstown, OH 44502

**Legal Description:**

See "Attachment A – Legal Description" in Land Contract.

TAX MAP OR PARCEL ID NO.: 53-115-0-063.00-0

PROPERTY ADDRESS IS: 517 Miller St, Youngstown, OH 44502

Return To:
National Asset Advisors, LLC
P.O. Box 1996
Irmo, SC 29063

Prepared By:
Harbour Portfolio VII, LP
P.O. Box 1996
Irmo, SC 29063
(803) 798-4666

Contract Expiration : 09/01/2043
If payments are made in accordance
with the terms of this Agreement.

## AGREEMENT FOR DEED
### (Land Contract)

### CONTRACT SUBJECT TO ARBITRATION

    **THIS AGREEMENT FOR DEED** is entered into on this 16th day of September, 2013 between Harbour Portfolio VII, LP hereafter known as the "Seller" and Juan Laviena hereafter known as the "Purchaser". Current Address: 367 Coitsville Rd, Campbell, OH 44505

**WITNESSETH** that if Purchaser shall first make the payments and perform the covenant(s) hereafter described:

1. **SELLER** hereby covenant(s) and agree(s) to convey and assure to the Purchaser and his/hers/their heirs, executors, administrators or assigns, in fee simple, clear of all encumbrances, by a good and sufficient deed, the lot and piece of land, situated at: 517 Miller St., in the County of Mahoning, the city of Youngstown, the State of OH and further known and described as follows, to-wit:

### SEE Attachment "A" FOR LEGAL DESCRIPTION OF PROPERTY

2. **PURCHASER** hereby covenant(s) and agree(s) to pay to the Seller the sum of Thirty Two Thousand Seven Hundred Dollars and no/cents, (**$32,700.00**) in the manner as follows: One Thousand Two Hundred Sixty Dollars and no/cents, (**$1,260.00**);

### THIS DOWN PAYMENT IS NON-REFUNDABLE JoL _____ (initial)

has been paid (prior to the release of this contract) on **09/16/2013** and the remaining Thirty One Thousand Four Hundred Forty Dollars and no cents (**$31,440.00**) shall be paid according to the terms of a "Promissory Note" of even date with interest at the rate of Nine and 90/100 percent (9.9%) per annum, payable monthly on the whole sum remaining from time to time unpaid;

3. **AND TO PAY ALL TAXES, assessments or impositions that may be legally levied or imposed upon said land and improvements and/or personal property as of the date of this Agreement for Deed (Land Contract).**

4. **AND TO KEEP THE BUILDINGS UPON SAID PREMISES INSURED BY SOME COMPANY SATISFACTORY TO THE SELLER,** and payable to the parties, respectively as their interest may appear in the sum not less than Thirty One Thousand Four Hundred Forty Dollars and no/cents (**$31,440.00**) during the term of this agreement.

5. **AND IF ANY TAXES, INSURANCE OR OTHER ASSESSMENTS** are not paid then this agreement is in default, and *at the option of the Seller,* the seller can pay said taxes, insurance or

other assessments and add the payments made plus up to *50%* of that payment as penalty to the principal balance due.

6. *THE SALE OF THE PROPERTY* (and the term "Property") shall include all buildings and improvements on the property and all rights, title and interest of Seller in and to adjacent streets, roads, alleys and rights-of-way, but no mineral interests.

*IT IS MUTUALLY AGREED*, by and between the parties hereto, that the Seller transfers the said property to the Purchaser in strictly *"AS IS"* **condition without any condition disclosure statement.** ___ (initial)

and the *Purchaser(s)* are solely responsible for bringing the building and premises to a habitable condition within a reasonable period of time not exceeding *Four months* **(4),** and maintaining the property in good state of repairs during the term of this agreement. Purchaser(s) may request an extension from the Seller by contacting prior to the four months deadline. *The purchaser(s) agrees to keep the premises neat and orderly and not conduct or allow to be conducted any illegal or offensive activities which might constitute a nuisance.*

7. *AND IN CASE OF FAILURE OF THE PURCHASER* to make any of the payments or any part thereof, or to perform any of the covenants hereby made and entered into, **or transfer of any ownership interest in this "Agreement"** by Purchaser, this contract, *at the option of the Seller,* may be forfeited and terminated, and the Purchaser shall forfeit all payments made by him/her/them on this contract; and such payments may be retained by the Seller in full satisfaction and liquidation of all damages sustained by them, and the premises aforesaid without being liable to any action therefore. And if agreement is placed with an attorney or other agent for collection by suit or otherwise due to default, Purchaser(s) will pay, on demand, any of said fees and related expenses that the Seller incurs. ___ (initial)

8. *CONVERSION TO "MONTH TO MONTH"* TENANCY; upon the Seller exercising its right of termination as provided herein, all rights and interest hereby created and then existing in the Purchaser and in all claiming Lender(s), the Purchaser shall wholly cease and terminate, and the Purchaser shall be deemed a "month to month" tenant. The Purchaser now known as "Tenant", agrees to surrender the said property to the Seller without demand, peaceful possession of said property in as good condition as it is now. Reasonable wear and tear alone accepted within thirty (30) days after notice of termination. After termination by the Seller pursuant to this paragraph; ___ (initial)

9. *THE PURCHASER SHALL* then pay rent in an amount equal to the principal and the interest payment, in addition to any other agreed upon monthly assessments stated herein and the Purchaser acknowledges that the **Seller can initiate an action to evict the Purchaser immediately.** In the event the Purchaser neglects or refuses to surrender such possession it shall be lawful for the Seller to enter upon and take possession of the said property without notice and remove all persons and their personal property. Seller may, at their own option, cause a written declaration to be recorded in the office of the Clerk of Court of Mahoning County, to evidence the existence of his/hers/theirs election to terminate all rights hereunder in accordance herewith. Such declaration when so recorded shall be, as to all subsequent Purchasers or Tenants or encumbrances of the property or any part thereof, conclusive proof of default by the Purchaser and the Seller election to terminate all rights in the said property existing by reason of this agreement. All moneys paid by the Purchaser and all improvements constructed in or upon the said property shall be retained by the Seller as compensation for the use and occupancy thereof by the Purchaser, consideration for the execution of this Agreement and liquidation damages to the Seller for such default. The Seller in the event of default by the Purchaser, and both Parties hereto agree that these forfeitures are reasonable and are not intended as a penalty. ___ (initial)

10. *THE PURCHASER ACKNOWLEDGES* that upon termination of this agreement by the Seller and Purchaser becomes a "month to month" tenant with a monthly rent equal to Two Hundred Seventy Three Dollars and 59/100 Cents **($273.59).**

11. **IT IS MUTUALLY AGREED**, by and between the Parties hereto, that the time of each payment is essential part of this contract and that all covenants and agreements herein contained shall extend to and be obligatory upon the heirs, executors, administrators and assigns of respective parties. *At the option of the Seller, Purchaser* further agrees to convert these documents to a Deed and Mortgage and provide the seller updated financial information. *And it is further understood that the Deed will exclude any and all mineral interests.* The purchaser

also agrees that the seller has the right to sale his/her/their agreement or mortgage to another party.

*ARBITRATION: ANY dispute between these parties shall be decided by an arbitrator to be chosen by the parties or if the parties' cannot agree on an arbitrator, them assigned by a court of competent jurisdiction, and such arbitration is mandatory and the judgment of the arbitrator shall be final and will be entered as judgment in a court of law of competent jurisdiction. The parties expressly and knowingly waive their right to a jury trial. Arbitration does not apply to eviction and or foreclosure.*

*VENUE AND JURISDICTION: IN THE event that any suit or claim may arise concerning this contract or the obligation there under the suit or claim shall be brought in Lexington County, state of South Carolina, and the parties agree to waive any and all objections they or it may have to such venue or personal or subject matter jurisdiction or **Forum non conveniens** and agree further to be bound and governed by South Carolina law.*

*IN WITNESS WHEREOF*, the Parties to these present have hereunto set their hands and seals the day and year first written above.

(SELLERS' SIGNATURE)

Harbour Portfolio VII, LP

Aline Edwards
Witness
Print Name: Alene Edwards

By: _____

David W. Campbell, Attorney-In-Fact

Laurie Devansky
Witness
Print Name: Laurie Devansky

STATE OF SOUTH CAROLINA )
)  ACKNOWLEDGMENT
COUNTY OF LEXINGTON )

I, the undersigned, a Notary Public, do hereby certify that David W. Campbell, Attorney-In-Fact for Harbour Portfolio VII, LP, the seller, herein appeared before me this day and acknowledged the due execution of the foregoing instrument.

SWORN and subscribed before me on this
30th day of September, 2013
_____
Notary's Signature
Notary Public for the State of **South Carolina**
My Commission Expires: _____ (Seal)

_Elizabeth DeJesus_
Witness
Print Name: _Elizabeth DeJesus_

_Juan Laviena_
Juan Laviena

_Robert Berry_
Witness
Print Name: _Robert Berry_

(NOTARY SECTION)

STATE OF _OHiO_ )
)
COUNTY OF _Mahoning_ )

**ACKNOWLEDGEMENT**

    I, the undersigned, a Notary Public, do hereby certify that the purchaser, Juan Laviena, herein appeared before me this day and acknowledged the due execution of the foregoing instrument.

SWORN and subscribed before me on this
_25_ day of _Sept_ , 2013

_Carol A Irwin_
Notary's Signature
Notary Public for the State of _OHiO_
My Commission Expires: _June 1, 2016_ (Seal)

OR 6055 PG.2317

## ATTACHMENT "A" – LEGAL DESCRIPTION

**THIS AGREEMENT** is secured by the property listed below between Harbour Portfolio VII, LP, and Juan Laviena:

Street Address: 517 Miller St.
Youngstown, OH, 44502

Description:

Situated in the City of Youngstown, County of Mahoning and State of Ohio: And known as being Youngstown City Lot No. 38439 according to the latest enumeration of lots in said City, in Plat Number 4 of Gibson Grove Subdivision of Youngtown City Out Lot Number 1192, as shown by the recorded plat of said subdivision in Volume 19 of Maps, Page 94 of Mahoning County Records and being 40 feet front on the southerly side of Miller Avenue and extending back 118.10 feet on the easterly line, 117.59 feet on the westerly line, and having a rear line 40 feet as appears by said plat, be the same more or less, but subject to all legal highways.

TMS: #    53-115-0-063.00-0

Initial J.L

Prepared By/Return To:
Jennifer D. Wingard
KDK Services, LLC
PO Box 290909
Columbia, SC 29229

201800028680
Filed for Record in
MAHONING COUNTY, OHIO
NORALYNN PALERMO, RECORDER
12-04-2018 At 02:31 pm.
ASGT LD CNT      40.00
OR Book   6305 Page 1756 - 1758

## ASSIGNMENT OF SELLER'S INTEREST IN AN AGREEMENT FOR DEED/LAND CONTRACT

This Assignment of Agreement for Deed (the "Assignment") is made and entered into this 21ˢᵗ day of September, 2018, by and

**BETWEEN:**  Harbour Portfolio VII, LP (the "Assignor"), a Limited Partnership organized and existing under the laws of the State of Texas, with its principal office located at 8214 Westchester Drive, Suite 635, Dallas, TX 75225;

**AND:**  US Bank Trust National Association as Trustee of American Homeowner Preservation Series 2015 A+ (the "Assignee"), with its principal office located at 440 S. LaSalle St., Ste. 1110, Chicago, IL 60605;

WHEREAS, Assignor entered into a certain Agreement for Deed ("Contract"), also known as a Land Contract, dated September 16, 2013 with Juan Laviena as "Purchaser(s)" and Assignor as "Seller" of certain real property whose street address 517 Miller Street, Youngstown, Ohio 44502 and is more particularly described in said Contract; Exhibit A – Legal Description;

WHEREAS, Assignor desires to assign, transfer, sell and convey to Assignee all of Assignor's right, title and interest in, to and under said Agreement for Deed; and Assignee desires to receive and accept such Assignment and assume all of Assignor's right, title and interest in, to and under said Contract, referenced above; **Agreement for Deed was recorded on October 21, 2013, Document #: 201300030295, Book #: 6055, Pages 2312-2317;**

NOW, THEREFORE, in consideration of the foregoing and other good and valuable consideration, receipt of which is hereby acknowledged, and in accordance with the terms of the Contract, Assignor and Assignee mutually agree as follows:

1. Assignor hereby assigns, transfers, sells and conveys to Assignee all of Assignor's right, title and interest in, to and under said Contract.

2. Assignee hereby assumes all of Assignor's duties and obligations under said Contract. Assignee agrees to perform all covenants, conditions and obligations required by Assignor under said Contract and agrees to defend, indemnify and hold Assignor harmless from any liability or obligation under said Contract. Assignee further agrees to hold Assignor harmless from any deficiency or defect in the legality or enforceability of the terms of said Contract.

3. This Assignment shall be binding upon Assignor and shall inure to the benefit of Assignee and its successors, heirs and assigns.

IN WITNESS WHEREOF, the parties hereto have caused this Assignment to be executed as of the day and year first above written.

ASSIGNOR:
HARBOUR PORTFOLIO VII, LP

Witness: Phet Mixayvanh

By: Charles A. Vose, III
Its: Manager

Witness: Farzana Giga

STATE OF TEXAS }
}    ACKNOWLEDGMENT
COUNTY OF DALLAS }

I, the undersigned Notary Public, do hereby certify that the foregoing Assignment was acknowledged before me this 21st day of September, 2018 by Charles A. Vose, III, Manager of Harbour Portfolio VII, LP, a Limited Partnership organized and existing under the laws of the State of Texas.

Witness my hand and seal this 21st day of September, 2018.

Notary Public for ___Lucas___
My commission expires: 5.6.20

JULIANA MAJURE
NOTARY PUBLIC - STATE OF TEXAS
ID# 130645630
COMM. EXP. 05-06-2020

Page 2 of 3

OR6305 PG1758

## Exhibit "A"
## Legal Description

Situated in the City of Youngstown, County of Mahoning and State of Ohio:
And known as being Youngstown City Lot No. 38439 according to the latest enumeration of Lots in said

City, in Plat Number 4 of Gibson Grove Subdivision of Youngstown City Out Lot Number 1192, as shown by the recorded plat of said subdivision is Volume 19 of Maps, Page 94 of Mahoning County Records and being 40 feet front on the Southerly side of Miller Avenue and extending back 118.10 feet on the Easterly line, 117.59 feet on the Westerly line, and having a rear line 40 feet as appears by said plat, be the same more or less, but subject to all legal highways.

PROPERTY ADDRESS: 517 Miller Street, Youngstown, Ohio 44502

PARCEL # 53-115-0-063.00-0

# EXHIBIT E

OR 6584 PG 1537

202300014942
Filed for Record in
MAHONING COUNTY, OHIO
NORALYNN PALERMO, RECORDER
08/10/2023 03:15 PM
ASGN AGREEMENT 38.00
OR Book 6584 Page 1537

Recording requested by, return to:
Tor R Midtskog
Weinstein & Riley, P.S.
2001 Western Avenue, Suite 400
Seattle, WA 98121

## ASSIGNMENT OF AGREEMENT FOR DEED

For Value Received, the undersigned **U.S. Bank Trust N.A. as Trustee of American Homeowner Preservation Trust Series 2015A+**, at 440 S. LaSalle Street, Suite 1110, Chicago, IL 60605, hereby conveys, assigns, and transfers to **MAGERICK, LLC**, at 2003 Western Avenue, Suite #340, Seattle, WA 98121, its successors and/or assigns, all right, title and interest together with all moneys due or to become due and all rights accrued or to accrue under that certain Agreement for Deed executed by **Juan Laviena** to **Harbour Portfolio VII, LP for $31,440.00** dated **09/16/2013** and recorded on **10/21/2013** in OR Book **6055**, Page **2312**, Document No. **201300030259** in the Records of **MAHONING** County, **OHIO**

**Property Address: 517 MILLER ST, YOUNGSTOWN, OH, 44502**
**APN: 53-115-0-063.00-0**

**U.S. Bank Trust N.A. as Trustee of American Homeowner Preservation Trust Series 2015A+ by its Attorney-In Fact Oak Harbor Capital, LLC**

**Dated: July 18, 2023**

Name: Marcelle Hele
Title: Collateral Manager

POWER OF ATTORNEY RECORDED IN MAHONING COUNTY
2023-05-01 IN 202300007822, BOOK 6569 PAGE 1553

NOTARY ACKNOWLEDGMENT IS ON FOLLOWING PAGE

This instrument was prepared by **Tor R Midtskog** for
Weinstein & Riley, PS, 2001 Western Avenue, Suite 400, Seattle WA 98121
Reference:

1

## ACKNOWLEDGMENT

**State of WASHINGTON**
**County of KING**

On July 18, 2023 before me, MERCEDEZ LONG, Notary Public, personally appeared MARCELLE HELE, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person whose name is subscribed to the within instrument, and who, being by me duly sworn, did depose and say that he/she is an Authorized Representative of Oak Harbor Capital, LLC and acknowledged to me that he/she executed said instrument in his/her authorized capacity, and that by his/her signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument, and that such individual made such appearance before the undersigned.

WITNESS my hand and official seal.

Signature _____
Notary Public: Mercedez Long
Commission Expires: 01-12-2027

Notary Public
State of Washington
MERCEDEZ LONG
LICENSE # 23001487
MY COMMISSION EXPIRES
JANUARY 12, 2027

## LEGAL DESCRIPTION

Situated in the City of Youngstown, County of Mahoning and State of Ohio: And known as being Youngstown City Lot No. 38439 according to the latest enumeration of Lots in said City, in Plat Number 4 of Gibson Grove Subdivision of Youngstown City Out Lot Number 1192, as shown by the recorded plat of said subdivision is Volume 19 of Maps, Page 94 of Mahoning County Records and being 40 feet front on the Southerly side of Miller Avenue and extending back 118.10 feet on the Easterly line, 117.59 feet on the Westerly line, and having a rear line 40 feet as appears by said plat, be the same more or less, but subject to all legal highways.

2

# EXHIBIT F

**R**

Reimer Law

**Reimer Law Co.**
PO Box 39696 • Solon, OH 44139
Phone: (440) 600-5500
Email: OHassignment@reimerlaw.com

January 19, 2024

VIA CERTIFIED MAIL and FIRST CLASS MAIL TO:

Juan Laviena
517 Miller Street
Youngstown, OH 44502

RE:     NOTICE PRIOR TO ACCELERATION
        ██████████ ("Loan")

Dear Juan Laviena:

In regards to the above-referenced Loan and pursuant to the terms of your Note and Mortgage securing the real property at 517 Miller Street, Youngstown, OH 44502 ("Property"), Land Home Financial Services, the servicer and/or lender of the Loan hereby provides notice of the following:

1.      The Loan is in default for failure to pay the required monthly installments, late charges and any other amounts due pursuant to the terms of the Note and Mortgage. To cure the default you must remit payment in the amount of $9,312.31 via certified funds ("Payment"), on or before February 22, 2024, ("Cure Date") to either the return address listed on the top of this letter, or to the payment address previously provided to you by the servicer/lender.

2.      Failure to make the Payment on or before the Cure Date may result in acceleration of the sums secured by the Mortgage, foreclosure by judicial proceeding and sale of the Property.

3.      You will have the right to reinstate the loan after acceleration and the right to assert in the foreclosure proceedings the non-existence of a default or any other defense to acceleration and foreclosure.

4.      Should the default not be cured as set forth herein, Land Home Financial Services, at its option may require immediate payment in full of all sums secured by its Mortgage without further demand and may foreclose its Mortgage by judicial proceeding.

5.    Because of interest, late charges and other charges that may vary from day-to-day, the amount due on the day you pay may be greater than the amount listed herein. Therefore, prior to any such payment being made, we ask that you contact our office to confirm this amount.

6.    If you are unable to pay the sum to bring this loan current, loss mitigation options may be available to you. Please reach out directly to Bruce Skinner at Land Home Financial Services, Inc., by way of telephone 844.625.6226 or email Loss.Mitigation@lhfs.com, to see what options you qualify for and work for you.


Sincerely,
Reimer Law Co.

Douglas A. Haessig
DAH/ack


Cc:    Land Home Financial Services
       Attn:


### NOTICE UNDER FAIR DEBT COLLECTION PRACTICES ACT

**THIS COMMUNICATION IS FROM A DEBT COLLECTOR ATTEMPTING TO COLLECT A DEBT. ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE .**

**However, if this debt is in active bankruptcy or has been discharged through bankruptcy, this communication is for informational purposes only and is not intended as, and does not constitute, an attempt to collect a debt or as an act to collect, assess, or recover all or any portion of the debt from you personally.**

# Exhibit 48

# LUCAS COUNTY COMMON PLEAS COURT

CORNER ADAMS & ERIE STREETS
TOLEDO, OHIO 43604

## SUMMONS
## CIVIL ACTION

FILING TYPE:            **FORECLOSURE**

US BANK TRUST AS TRUSTEE OF THE
AMERICAN HOMEOWNER PRESERVATION
TRUST SERIES 2015A+
440 SOUTH LASALLE STREET
SUITE 1110
CHICAGO, IL 60605

G-4801-CI-0202402085-000
JUDGE: LORI L OLENDER

You have the right to seek legal counsel. If you cannot afford a lawyer, you may contact the Legal Services of Northwest Ohio. If you do not qualify for services by the Legal Services of Northwest Ohio and do not know an attorney you may contact the Toledo Bar Association's Lawyer Referral Service (419) 242-2000.

You have been named as a defendant in a Complaint filed in this Court by the plaintiff named below. A copy of the Complaint is attached to this Summons.

You are hereby summoned and required to serve upon the plaintiff's attorney, or upon the plaintiff, if he has no attorney of record, a copy of an answer to the complaint, within twenty-eight (28) days after you receive this Summons, exclusive of the of the day of service or to an amended complaint within the remaining response time to the complaint or 14 days, whichever period may be longer. Your answer must be filed with the Clerk of Court of Common Pleas within three (3) days after the service of a copy of the Answer on the plaintiff's attorney.

If you fail to serve and file your Answer, judgment by default will be rendered against you for the relief demanded in the Complaint.

| PLAINTIFF (S) | ATTORNEY FOR PLAINTIFF(S) |
|---|---|
| EROSTYLIS LLC | JOSHUA J EPLING |
| 3611 SOUTH HARBOR BOULEVARD | P O BOX 39696 |
| SUITE 100 | 31500 BAINBRIDGE ROAD STE 100 |
| SANTA ANA, CA 92704 | SOLON, OH 44139 |

BERNIE QUILTER
CLERK OF COURTS

Date: April 16, 2024

_J Bernie Quilter_ _____ , Clerk

---

### ARE YOU THE HOMEOWNER IN THIS CIVIL ACTION?

#### INTERESTED IN MEDIATION?

Call: 419-213-4731

Homeowner/complete and return the enclosed form

#### HAVE OTHER QUESTIONS?

Visit www.savethedream.ohio.gov to obtain information on actions you may take when you are facing foreclosure

---



# LUCAS COUNTY COURT OF COMMON PLEAS

Notice to the **DEFENDANT/HOMEOWNER ONLY** :
(Please disregard this page if you are NOT the Homeowner named in this Civil Action)

A complaint for foreclosure has been filed against you under case number **G-4801-CI-0202402085-000**.

If you take no action, the foreclosure case will proceed on the court's docket, a default judgment will be taken against you, your property sold at Sheriff's sale, and you will be evicted from your home. If the sale price of the property at Sheriff's Sale is insufficient to pay the balance(s) due to the mortgage company and any other lienholders, you may also be held responsible for the payment of those deficiencies.

You have three options to avoid foreclosure:

1.  Seek assistance from an attorney. A number of volunteer attorneys are available to provide free legal assistance to borrowers in foreclosure cases. If you wish to obtain legal assistance in understanding and protecting your legal rights please call: the office of the Foreclosure Magistrate at 419-213-4731.

2.  Participate in mediation at the courthouse. Mediation is a meeting between the borrower and a representative of the lender with the participation of the Court's Foreclosure Magistrate. The purpose of the mediation is to discuss available options for settlement and to reach an agreement that will avoid foreclosure. The borrower is not required to have a lawyer at the mediation, but the lender will most likely have a lawyer present. If you wish to have a lawyer represent you at the mediation, contact the office of the Foreclosure Magistrate at 419-213-4731. Enclosed is a Request for Mediation form and Request for Extension of Time Form. If you wish to participate in the mediation without an attorney, please fill out the form and follow the mailing instructions contained on the form.

3.  Contact the lender directly. Foreclosures can be avoided by a settlement agreement negotiated between the borrower and the Loss Mitigation Department of the Lender.

**It is important to note that regardless of which of the options to avoid foreclosure that you select, YOU OR YOUR LAWYER MUST RESPOND TO THE COMPLAINT WITHIN TWENTY-EIGHT (28) DAYS FROM THE DATE YOU WERE SERVED WITH THE FORECLOSURE COMPLAINT or a judgment for foreclosure may be entered against you.**

# REQUEST FOR MEDIATION AND FOR EXTENSION OF TIME
## FOR THE DEFENDANT/HOMEOWNER ONLY
### (Please disregard this page if you are NOT the homeowner named in this civil action)

Case No.     G-4801-CI-0202402085-000

Judge:     LORI L OLENDER

Plaintiff name:     EROSTYLIS LLC

I/We request a mediation and a twenty-eight (28) day extension of time to file an Answer to the complaint. This request is not made for the sole purpose of delaying this case.

_____
(Printed name(s) of Defendant(s)/Borrower(s))

_____
(Address)

Telephone # _____

Email: _____

*Local Rule 5.05 H. SERVICE BY CLERK'S OFFICE: Once journalized, the Clerk of Courts Office will transmit the entries to the email address submitted by the parties. Counsel for a party or Pro Se litigant representing themselves who do not have an email address may, by motion, request ordinary mail service of entries by the Clerk of Courts Office (Note: You may opt to sign and return the "Request and Order for service by ordinary mail" if you have no email and are not hiring an attorney but wish to receive notification)*

## MAIL THE SIGNED ORIGINAL AND ONE (1) COPY OF THIS REQUEST TO:

MAIL SIGNED ORIGINAL TO:
Lucas County Common Pleas Court
Attn: Foreclosure Mediation
700 Adams Street
Toledo, Ohio 43604-5658

MAIL (1) COPY OF SIGNED ORIGINAL TO:
JOSHUA J EPLING
P O BOX 39696
31500 BAINBRIDGE ROAD STE 100
SOLON, OH 44139
(Attorney for Plaintiff-Lender as shown on the Summons)

**VERIFY THAT YOU HAVE MAILED A COPY TO THE PLAINTIFF'S ATTORNEY BY SIGNING THE PROOF OF SERVICE BELOW.**

PROOF OF SERVICE

I have sent a copy of the above Request for Mediation to the Attorney for the Plaintiff (lender) at the address stated on the Summons on __X_____ (date).

__X_____
(Signature of Defendant/Borrower)

REQUEST FOR EXTENSION OF TIME APPROVED TO: _____ (date).

_____
Judge or Foreclosure Magistrate

IN THE COURT OF COMMON PLEAS FOR LUCAS COUNTY, OHIO

EROSTYLIS LLC

      Plaintiff

vs

US BANK TRUST AS TRUSTEE OF THE
AMERICAN HOMEOWNER

      Defendant

:

:

:

:

:

:

:

Case No. G-4801-CI-0202402085-000

**REQUEST AND ORDER FOR SERVICE BY
ORDINARY MAIL**

**JUDGE LORI L OLENDER**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Pursuant to Local Rule 5.05, the undersigned US BANK TRUST AS TRUSTEE OF THE
AMERICAN HOMEOWNER, a pro se litigant in this matter, represents to the court that I do not have an e-
mail address and, therefore, move the court for an order directing the Clerk of Courts to serve upon the
undersigned copies of all orders and entries issued by the court via U. S. Mail service.

 

signature of US BANK TRUST AS TRUSTEE OF
THE AMERICAN HOMEOWNER

Mailing address:    PRESERVATION TRUST SERIES 2015A+
440 SOUTH LASALLE STREET SUITE 1110
CHICAGO, IL 60605

(please correct if inaccurate)

IT IS SO ORDERED.

JUDGE LORI L OLENDER

F24-48234                           JJE/as:kf                          April 10, 2024

## IN THE COURT OF COMMON PLEAS
## LUCAS COUNTY, OHIO

Erostylis LLC
3611 South Harbor Boulevard
Suite 100
Santa Ana, CA 92704;

               Plaintiff

-vs-

Aqre Properties LLC
30 North Gould Street, Suite R
Sheridan, WY 82801;

Ronice Harrison
945 Roger Street
Toledo, OH 43605;

U.S. Bank Trust as Trustee of the American
Homeowner Preservation Trust Series 2015A+
440 South LaSalle Street, Suite 1110
Chicago, IL 60605;

               Defendants

CASE NO. G-4801-CI-0202402085-000

PPN: 1618637

JUDGE     Judge Lori L. Olender

## COMPLAINT FOR FORECLOSURE
## WITH DECLARATORY JUDGMENT

## FIRST COUNT

1.     Plaintiff says that it is the holder of and/or entitled to enforce the promissory note, a copy of which is hereto attached, marked EXHIBIT "A" and made a part hereof; that by reason of default in payment of the said note and mortgage securing same, it has declared said debt due; that there is due and unpaid thereon the sum of $17,830.02 plus interest at the rate of 9.90% per annum from June 1, 2023. Plaintiff further says that it has complied with all conditions precedent as set forth in the note and mortgage.

## SECOND COUNT

2.     Plaintiff incorporates herein by reference all of the allegations contained in its first count, and further says that it is the holder of a certain mortgage deed, securing the payment of said promissory note, a copy of which is attached hereto, marked EXHIBIT "B", and being Permanent Parcel #1618637, and made a part hereof; that said mortgage is a valid and first lien upon said premises.

3.     Plaintiff says that the conditions of said mortgage have been broken by reason of default in payment, and the same has become absolute; that the Defendants named in the Complaint, claim or may claim an interest in the premises described in EXHIBIT "B".

4.     Plaintiff says that pursuant to the covenants and conditions of said mortgage deed it may, from time to time during the pendency of this action, advance sums to pay real estate taxes, hazard insurance premiums and property protection and maintenance.

5.     Plaintiff says that the conditions of said mortgage have been broken by reason of default in payment, and the same has become absolute; that the Defendants named in the

Complaint, have or claim to have an interest in the premises as referenced in the attached Preliminary Judicial Report, marked as EXHIBIT "C". The original Preliminary Judicial Report has been filed herewith.

<div align="center">THIRD COUNT</div>

6. Plaintiff incorporates herein by reference all of the allegations contained in its first two counts, as if fully rewritten herein.

7. Plaintiff says that it is the owner and holder of the promissory note and mortgage deed referred to herein.

8. Plaintiff says that it has been unable to obtain an assignment of the note and mortgage from U.S. Bank Trust as Trustee of the American Homeowner Preservation Trust Series 2015A+ to Plaintiff; however, U.S. Bank Trust as Trustee of the American Homeowner Preservation Trust Series 2015A+ intended to assign its interest in the note and mortgage to Plaintiff.

9. Plaintiff therefore requests a judicial declaration finding that the Plaintiff is the current holder of the note and mortgage at issue herein.

W H E R E F O R E Plaintiff demands that the Plaintiff is the current holder of the note and mortgage at issue herein; Plaintiff demands judgment against the Defendant Aqre Properties LLC in the sum of $17,830.02 plus interest at the rate of 9.90% per annum from June 1, 2023; that the Defendants named herein be required to answer and set up any claim that they may have in said premises or be forever barred; that the Plaintiff be found to have a valid and first lien on said premises for this amount so owing together with its advances made pursuant to the terms of the mortgage for real estate taxes and, hazard insurance premiums, and the premises be ordered

appraised, advertised, and sold according to law, and that from the proceeds the Plaintiff be paid

the amount found due it, and for such other and further relief as equity entitled it to receive.

REIMER LAW CO.
Joshua J. Epling (0079568)
Douglas A. Haessig (0079200)
P.O. Box 39696
Solon, OH 44139
Phone: (440) 600-5500
Fax: 440-600-5520
Email: jepling@reimerlaw.com

# Exhibit A

## NOTE

February 26th, 2020                                                                                   Toledo, Ohio
[Date]

945 Rogers St., Toledo, OH 43605
[Property Address]

**1. BORROWER'S PROMISE TO PAY**

In return for a loan that I have received, I promise to pay U.S. $23,000.00 (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is U.S. Bank Trust as Trustee of the American Homeowner Preservation Trust Series 2015A+ . I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

**2. INTEREST**

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of 9.9%.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B) of this Note.

**3. PAYMENTS**

(A)  Time and Place of Payments

I will pay principal and interest by making a payment every month.

I will make my monthly payment on the 1st day of each month beginning on April, 2020. I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on April 1st, 2030, I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at 440 S. LaSalle St., Suite 1110, Chicago, IL 60605 or at a different place if required by the Note Holder.

(B)  Amount of Monthly Payments

My monthly payment will be in the amount of U.S. $302.67.

**4. BORROWER'S RIGHT TO PREPAY**

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the Note Holder agrees in writing to those changes.

**5. LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

## 6. BORROWER'S FAILURE TO PAY AS REQUIRED

### (A) Late Charge for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of 10 calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be 5% of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

### (B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

### (C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

### (D) No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

### (E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

## 7. GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 8. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

## 9. WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

## 10. UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

> If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

AQRE PROPERTIES LLC

_____(Seal)
by: RONICE HARRISON, PRESIDENT          - Borrower

*[Sign Original Only]*

# Exhibit B



20200310-0010098
3/10/2020                    10:36 AM
Pages:20                   Fee:$178.00
T20200007275
Phil Copeland
Lucas County Recorder          MORT

Record and Return To:
Boston National Title Agency, LLC
400 Rouser Road, Suite 101
Coraopolis, PA 15108

SEE ENV

_____ [Space Above This Line For Recording Data] _____

## MORTGAGE

DEFINITIONS                                          File: ▮▮▮▮▮▮

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

**(A) "Security Instrument"** means this document, which is dated February 26th, 2020, together with all Riders to this document.

**(B) "Borrower"** is AQRE PROPERTIES LLC. Borrower is the mortgagor under this Security Instrument.

**(C) "Lender"** is U.S. Bank Trust as Trustee of the American Homeowner Preservation Trust Series 2015A+. Lender is a National Bank organized and existing under the laws of The United States. Lender's address is 440 S. LaSalle St., Suite 1110, Chicago, IL 60605. Lender is the mortgagee under this Security Instrument.

**(D) "Note"** means the promissory note signed by Borrower and dated February 26th, 2020. The Note states that Borrower owes Lender Twenty Three Thousand and 00/100 Dollars (U.S. $23,000.00) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than April 1st, 2030.

**(E) "Property"** means the property that is described below under the heading "Transfer of Rights in the Property."

**(F) "Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

**(G) "Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| ☐ Adjustable Rate Rider | ☐ Condominium Rider | ☐ Second Home Rider |
| ☐ Balloon Rider | ☐ Planned Unit Development Rider | ✱ Other(s) AOR |
| ☐ 1-4 Family Rider | ☐ Biweekly Payment Rider | |

**(H) "Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

OHIO--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Form 3036  1/01 (page 1 of 16 pages)

(I) **"Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(J) **"Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(K) **"Escrow Items"** means those items that are described in Section 3.

(L) **"Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(M) **"Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(N) **"Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(O) **"RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(P) **"Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby

mortgage, grant and convey to Lender the following described property:

**The following described premises situated in Lucas County, State of Ohio, to-wit: Lot number Nineteen (19) in White's Subdivision of part of Berry's Subdivision of the East one-half (1/2) of the Northwest one-fourth (1/4) of Section 7, Town 10 South, Range 8 East, in the City of Toledo, Lucas County, Ohio, EXCEPTING THEREFROM the East six (6) feet thereof, conveyed to the City of Toledo, for alley purposes, in accordance with Volume 6 of Plats, Page 28A.**

which currently has the address of 945 Rogers St.
[Street]

Toledo, Ohio 43605 ("Property Address"):
[City] [Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1. **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the

Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. **Occupancy.** Intentionally Deleted

7. **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage

to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from

OHIO--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT                          Form 3036   1/01  *(page 8 of 16 pages)*

the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has – if any – with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain

cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender. ·

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with

the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

15. **Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

16. **Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

17. **Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

18. **Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but**

not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, costs of title evidence.

23. Release. Upon payment of all sums secured by this Security Instrument, Lender shall discharge this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

24. Certain Other Advances. In addition to any other sum secured hereby, this Security Instrument shall also secure the unpaid principal balance of, plus accrued interest on, any amount of money loaned, advanced or paid by Lender to or for the account and benefit of Borrower, after this Security Instrument is delivered to and filed with the Recorder's Office, Lucas County, Ohio, for recording. Lender may make such advances in order to pay any real estate taxes and assessments, insurance premiums plus all other costs and expenses incurred in connection with the operation, protection or preservation of the Property, including to cure Borrower's defaults by making any such payments which Borrower should have paid as provided in this Security Instrument, it being intended by this Section 24 to acknowledge, affirm and comply with the provision of § 5301.233 of the Revised Code of Ohio.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Buyer acknowledges that this loan is made for investment purposes and Buyer does not intend to occupy the property for a period of 6 months from the execution date.

Witnesses:

AQRE PROPERTIES LLC

_____ (Seal)
by: Ronice Harrison, President - Borrower

_____ (Seal)
- Borrower

_____ [Space Below This Line For Acknowledgment] _____

STATE OF _____ Mi
COUNTY OF _____ Wayne

The foregoing instrument was acknowledged before me on Feb 26, 2019 by Ronice Harrison its President on behalf of AQRE PROPERTIES LLC who is personally known to me or has produced Passport as identification, and furthermore, the aforementioned person has acknowledged that his/her signature was his/her free and voluntary act for the purposes set forth in this instrument.

_____
Notary Public

SALAH ALABBASI
Notary Public, State of Michigan
County of Wayne
My Commission Expires Oct. 19, 2023
Acting In the County of Wayne

OHIO--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT    Form 3036   1/01  *(page 16 of 16 pages)*

This instrument prepared by Jay A.
Rosenberg, Attorney at Law; 3805 Edwards
Road Suite 550, Cincinnati, Ohio 45209

# 1-4 FAMILY RIDER
### (Assignment of Rents)

THIS 1-4 FAMILY RIDER is made this 26th day of February, 2020, and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Note to U.S. Bank Trust as Trustee of the American Homeowner Preservation Trust Series 2015A+ (the "Lender") of the same date and covering the Property described in the Security Instrument and located at:

945 Rogers St., Toledo, OH 43605
[Property Address]

1-4 FAMILY COVENANTS. In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

A. ADDITIONAL PROPERTY SUBJECT TO THE SECURITY INSTRUMENT. In addition to the Property described in Security Instrument, the following items now or hereafter attached to the Property to the extent they are fixtures are added to the Property description, and shall also constitute the Property covered by the Security Instrument: building materials, appliances and goods of every nature whatsoever now or hereafter located in, on, or used, or intended to be used in connection with the Property, including, but not limited to, those for the purposes of supplying or distributing heating, cooling, electricity, gas, water, air and light, fire prevention and extinguishing apparatus, security and access control apparatus, plumbing, bath tubs, water heaters, water closets, sinks, ranges, stoves, refrigerators, dishwashers, disposals, washers, dryers, awnings, storm windows, storm doors, screens, blinds, shades, curtains and curtain rods, attached mirrors, cabinets, paneling and attached floor coverings, all of which, including replacements and additions thereto, shall be deemed to be and remain a part of the Property covered by the Security Instrument. All of the foregoing together with the Property described in the Security Instrument (or the leasehold estate if the Security Instrument is on a leasehold) are referred to in this 1-4 Family Rider and the Security Instrument as the "Property."

B. USE OF PROPERTY; COMPLIANCE WITH LAW. Borrower shall not seek, agree to or make a change in the use of the Property or its zoning classification, unless Lender has agreed in writing to the change. Borrower shall comply with all laws, ordinances, regulations and requirements of any governmental body applicable to the Property.

C. SUBORDINATE LIENS. Except as permitted by federal law, Borrower shall not allow any lien inferior to the Security Instrument to be perfected against the Property without Lender's prior written permission.

D. RENT LOSS INSURANCE. Borrower shall maintain insurance against rent loss in addition to the other hazards for which insurance is required by Section 5.

E. "BORROWER'S RIGHT TO REINSTATE" DELETED. Section 19 is deleted.

F. BORROWER'S OCCUPANCY. Unless Lender and Borrower otherwise agree in writing, Section 6 concerning Borrower's occupancy of the Property is deleted.

G. ASSIGNMENT OF LEASES. Upon Lender's request after default, Borrower shall assign to Lender all leases of the Property and all security deposits made in connection with leases of the Property. Upon the assignment, Lender shall have the right to modify, extend or terminate the existing leases and to execute new leases, in Lender's sole discretion. As used in this paragraph G, the word "lease" shall mean "sublease" if the Security Instrument is on a leasehold.

H. ASSIGNMENT OF RENTS; APPOINTMENT OF RECEIVER; LENDER IN POSSESSION. Borrower absolutely and unconditionally assigns and transfers to Lender all the rents and revenues ("Rents") of the Property, regardless of to whom the Rents of the Property are payable. Borrower authorizes Lender or Lender's agents to collect the Rents, and agrees that each tenant of the Property shall pay the Rents to Lender or Lender's agents. However, Borrower shall receive the Rents until (i) Lender has given Borrower notice of default pursuant to Section 22 of the Security Instrument and (ii) Lender has given notice to the tenant(s) that the Rents are to be paid to Lender or Lender's agent. This assignment of Rents constitutes an absolute assignment and not an assignment for additional security only.

If Lender gives notice of default to Borrower: (i) all Rents received by Borrower shall be held by Borrower as trustee for the benefit of Lender only, to be applied to the sums secured by the Security Instrument; (ii) Lender shall be entitled to collect and receive all of the Rents of the Property; (iii) Borrower agrees that each tenant of the Property shall pay all Rents due and unpaid to Lender or Lender's agents upon Lender's written demand to the tenant; (iv) unless applicable law provides otherwise, all Rents collected by Lender or Lender's agents shall be applied first to the costs of taking control of and managing the Property and collecting the Rents, including, but not limited to, attorney's fees,

receiver's fees, premiums on receiver's bonds, repair and maintenance costs, insurance premiums, taxes, assessments and other charges on the Property, and then to the sums secured by the Security Instrument; (v) Lender, Lender's agents or any judicially appointed receiver shall be liable to account for only those Rents actually received; and (vi) Lender shall be entitled to have a receiver appointed to take possession of and manage the Property and collect the Rents and profits derived from the Property without any showing as to the inadequacy of the Property as security.

If the Rents of the Property are not sufficient to cover the costs of taking control of and managing the Property and of collecting the Rents any funds expended by Lender for such purposes shall become indebtedness of Borrower to Lender secured by the Security Instrument pursuant to Section 9.

Borrower represents and warrants that Borrower has not executed any prior assignment of the Rents and has not performed, and will not perform, any act that would prevent Lender from exercising its rights under this paragraph.

Lender, or Lender's agents or a judicially appointed receiver, shall not be required to enter upon, take control of or maintain the Property before or after giving notice of default to Borrower. However, Lender, or Lender's agents or a judicially appointed receiver, may do so at any time when a default occurs. Any application of Rents shall not cure or waive any default or invalidate any other right or remedy of Lender. This assignment of Rents of the Property shall terminate when all the sums secured by the Security Instrument are paid in full.

I.   **CROSS-DEFAULT PROVISION.** Borrower's default or breach under any note or agreement in which Lender has an interest shall be a breach under the Security Instrument and Lender may invoke any of the remedies permitted by the Security Instrument.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this 1-4 Family Rider.

AQRE PROPERTIES LLC

_____(Seal)
by: RONICE HARRISON, PRESIDENT        -Borrower

_____(Seal)
                                      -Borrower

MULTISTATE 1-4 FAMILY RIDER--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT                Form 3170   1/01 *(page 2 of 2 pages)*

Escrow File No.: DEF1920321

## EXHIBIT "A"

The following described premises situated in Lucas County, State of Ohio, to-wit:

Lot number Nineteen (19) in White's Subdivision of part of Berry's Subdivision of the East one-half (1/2) of the Northwest one-fourth (1/4) of Section 7, Town 10 South, Range 8 East, in the City of Toledo, Lucas County, Ohio, EXCEPTING THEREFROM the East six (6) feet thereof, conveyed to the City of Toledo, for alley purposes, in accordance with Volume 6 of Plats, Page 28A.

PARCEL NUMBER(S): 16-18637

# Exhibit C

REPORT NO: 7248435-231691809

## PRELIMINARY JUDICIAL REPORT

 **Chicago Title Insurance Company**

**Order No. P24-1140 / F24-48234**

**Guaranteed Party Name: Erostylis LLC**

Pursuant to your request for a Preliminary Judicial Report (hereinafter "the Report") for use in judicial proceedings, **CHICAGO TITLE INSURANCE COMPANY** (hereinafter "the Company") hereby guarantees in an amount not to exceed **$17,830.02** that it has examined the public records in **Lucas** County, Ohio as to the land described in Schedule A, that the record title to the land is at the date hereof vested in **Aqre Properties LLC, by deed recorded March 10, 2020 in File No. 20200310-0010097** of **Lucas** County Records and free from all encumbrances, liens or defects of record, except as shown in Schedule B.

This is a guarantee of the record title only and is made for the use and benefit of the Guaranteed Party and the purchaser at judicial sale thereunder and is subject to the Exclusions from Coverage, the Exceptions contained in Schedule B and the Conditions and Stipulations contained herein.

This Report shall not be valid or binding until it has been signed by either an authorized agent or representative of the Company and Schedules A and B have been attached hereto.

Effective Date: **February 16, 2024 @ 7:00 a.m.**

CHICAGO TITLE INSURANCE COMPANY

Issued By:
Nova Title Agency, Inc.
6001 Cochran Road
Suite 302
Solon, OH 44139
(440)-600-5550

By:

ATTEST     President

Secretary

Signed By:    *John J Dyer, III*

Authorized Signatory or Agent, John J Dyer III, Esq.

# CHICAGO TITLE INSURANCE COMPANY

**ORDER NO. P24-1140 / F24-48234**

## PRELIMINARY JUDICIAL REPORT
## SCHEDULE A

## DESCRIPTION OF LAND

Lot Number 19 in White's Subdivision of part of Berry's Subdivision of the East Half of the Northwest Quarter of Section 1, Town 10 South, Range 8 East, in the City of Toledo, Lucas County, Ohio, excepting therefrom the east 6 feet thereof conveyed to the City of Toledo for alley purposes, in accordance with Volume 6 of Plats, Page 28A.

# CHICAGO TITLE INSURANCE COMPANY

**ORDER NO. P24-1140 / F24-48234**

## SCHEDULE B

The matters shown below are exceptions to this Preliminary Judicial Report and the Company assumes no liability arising therefrom.

1.  Plat items, Easements, Restrictions, Declarations, Amendments to Declarations and Mineral Leases which are filed for record.

2.  Mortgage from **Aqre Properties LLC** to **U.S. Bank Trust as Trustee of the American Homeowner Preservation Trust Series 2015A+** in the amount of $23,000.00, dated February 26, 2020 and filed March 10, 2020 in File No. 20200310-0010098 of Lucas County Records.

    Mortgage assigned to **Magerick, LLC, (by U.S. Bank Trust N.A. as Trustee of American Homeowner Preservation Trust Series 2015A+ by its Attorney-in-Fact Atlantica, LLC),** by separate instrument dated January 8, 2024 and filed January 11, 2024 in File No. 20240111-0001299 of Lucas County Records. **(NOTE: There is no Power of Attorney between said parties of record in Lucas County.)**

3.  Affidavit of Scrivener's Error filed March 26, 2020 in File No. 20200326-0012320 of Lucas County Records.

4.  **NOTE: Liens in favor of the State of Ohio filed but not yet indexed in the dockets of the Lucas County Common Pleas Court.**

5.  The records of the Lucas County Auditor for **Parcel No. 1618637** show the following real estate tax information:

    Taxes for the First Half of 2023 in the amount of $4,309.60, which includes delinquencies, penalties, and interest, are a lien due and payable.

    | VALUATION: | LAND | BUILDING | TOTAL |
    |---|---|---|---|
    | | 3260 | 7040 | 10300 |

    **Property Address is known as: 945 Rogers Street, Toledo, Ohio (as per Lucas County Tax Auditor)**

# CONDITIONS AND STIPULATIONS
# OF THIS PRELIMINARY JUDICIAL REPORT

1.Definition of Terms
"Guaranteed Party": The party or parties named herein or the purchaser at judicial sale.
"Guaranteed Claimant": Guaranteed Party claiming loss or damage hereunder.
"Land": The land described specifically or by reference in Schedule A, and improvements affixed thereto, which by law constitute real property; provided however the term "land" does not include any property beyond the lines of the area specifically described or referred to in Schedule A, nor any right, title, interest, estate, or easement in abutting streets, roads, avenues, lanes, ways or waterways.
"Public Records": Those records under state statute and, if a United States District Court resides in the county in which the Land is situated, the records of the clerk of the United States District Court, which impart constructive notice of matters relating to real property to purchasers for value without knowledge and which are required to be maintained in certain public offices in the county in which the land is situated.

2. Determination of Liability
This Report together with any Final Judicial Report or any Supplement thereto, issued by the Company is the entire contract between the Guaranteed Party and the Company.
Any claim of monetary loss or damage, whether or not based on negligence, and which arises out of the status of the title to the estate or interest guaranteed hereby or any action asserting such claim, shall be restricted to this Report.

3. Liability of Company
This Report is a guarantee of the record title of the land only, as disclosed by an examination of the Public Records herein defined in the chain of title ownership.

4. Notice of Claim to be given by Guaranteed Claimant
In case knowledge shall come to the Guaranteed Party of any lien, encumbrance, defect, or other claim of title guaranteed against and not excepted in this Report, whether in a legal proceeding or otherwise, the Guaranteed Party shall notify Company promptly in writing and secure to the Company the right to oppose such proceeding or claim, or to remove said lien, encumbrance or defect at its own cost. Any action for the payment of any loss under this Report must be commenced within one year after such loss is sustained. A failure to furnish a statement of loss or damage and to commence such action within the time herein before specified shall be a conclusive bar against the maintenance of any action under this Report.

5. Extent of Liability
The liability of the Company shall in no case exceed in all the amount stated herein and shall in all cases be limited to the actual loss, including but not limited to attorneys fees and costs of defense, only of the Guaranteed Party. Any and all payments under this Report shall reduce the amount of this Report pro tanto and the Company's liability shall terminate when the total amount of the Report has been paid.

6. Options to Pay or Otherwise Settle Claims; Termination of Liability
The Company in its sole discretion shall have the following options:
  a.) To pay or tender to the Guaranteed Claimant the amount of the Report or the balance remaining thereof, less any attorneys fees, costs or expenses paid by the Company to the date of tender. If this option is exercised all liability of the Company under this Report terminates including but not limited to any liability for attorneys fees or any costs of defense or prosecution of any litigation.
  b.) To pay or otherwise settle with other parties for or in the name of the Guaranteed Claimant any claims guaranteed by this Report.
  c.) To continue, re-open or initiate any judicial proceeding in order to adjudicate any claim covered by this Report. The Company shall have the right to select counsel of its choice (subject to the right of the Guaranteed Claimant to object for reasonable cause) to represent the Guaranteed Claimant and will not pay the fees of any other counsel.
  d.) To pay or tender to the Guaranteed Claimant the difference between the value of the estate or interest as guaranteed and the value of the estate or interest subject to the defect, lien, or encumbrance guaranteed against by this Report.

7. Notices
All notices required to be given the Company shall be given promptly and any statements in writing required to be furnished to the Company shall be addressed to the Company at its office, P.O. Box 45023, Jacksonville, Florida 32232-5023.

## EXCLUSIONS FROM COVERAGE

1. The Company assumes no liability under this Report for any loss, cost or damage resulting from any physical condition of the Land

2. The Company assumes no liability under this Report for any loss, cost or damage resulting from any typographical, clerical or other errors in the Public Records, including but not limited to: mis-indexing, misspellings or any other misinformation contained therein.

3. The Company assumes no liability under this Report for matters affecting title subsequent to the date of the Report or the Final Judicial Report or any supplement thereto.

4. The Company assumes no liability under this Report for the proper form or execution of any pleadings or other documents to be filed in any judicial proceedings

5. The Company assumes no liability under this Report for any loss, cost or damage resulting from the failure to complete service on any parties shown in Schedule B of the Preliminary Judicial Report and the Final Judicial Report or any Supplemental Report issued thereto.

SUPPLEMENTAL PRELIMINARY JUDICIAL REPORT
*Issued by*

## CHICAGO TITLE INSURANCE COMPANY

### Report Number 7248435-231691809

Guaranteed Party Name: **Erostylis LLC**

File No.: **P24-1140 / F24-48234 /**

The Preliminary Judicial Report dated February 16, 2024 @ 7:00 a.m. is amended to extend the effective date to March 22, 2024 @ 7:00 a.m. and we find no changes except as follows:

1.  The records of the Lucas County Auditor for **Parcel No. 1618637** show the following real estate tax information:

    Taxes for the First Half of 2023 in the amount of $4,309.60, which includes delinquencies, penalties, and interest, are a lien due and payable.

    | VALUATION: | LAND | BUILDING | TOTAL |
    |---|---|---|---|
    | | 3260 | 7040 | 10300 |

    **Property Address is known as: 945 Rogers Street, Toledo, Ohio (as per Lucas County Tax Auditor)**

This examination is made for the use and benefit of the Guaranteed Party to said proceedings and the purchaser at judicial sale thereunder and is further subject to the Exclusions from coverage, the Exceptions contained in Schedule B and the Conditions and Stipulations of the Preliminary Judicial Report and any supplements related hereto.

Effective Date: **March 22, 2024 @ 7:00 a.m.**

# John J. Dyer, *III*

Authorized Signature, John J Dyer III, Esq.
Nova Title Agency, Inc.
6001 Cochran Road
Suite 302
Solon, OH 44139
(440)-600-5550

Prepared for: Erostylis LLC, as Requested by: Reimer Law Co.

# Exhibit 49

**Department of State: Division of Corporations**

Allowable Characters

HOME

## Entity Details

THIS IS NOT A STATEMENT OF GOOD STANDING

| | | | |
|---|---|---|---|
| File Number: | **6458605** | Incorporation Date / Formation Date: | **6/27/2017** (mm/dd/yyyy) |
| Entity Name: | **AHP SERVICING LLC** | | |
| Entity Kind: | **Limited Liability Company** | Entity Type: | **General** |
| Residency: | **Domestic** | State: | **DELAWARE** |

**REGISTERED AGENT INFORMATION**

| | | | |
|---|---|---|---|
| Name: | **A REGISTERED AGENT, INC.** | | |
| Address: | **8 THE GREEN, STE A** | | |
| City: | **DOVER** | County: | **Kent** |
| State: | **DE** | Postal Code: | **19901** |
| Phone: | **302-288-0670** | | |

Additional Information is available for a fee. You can retrieve Status for a fee of $10.00 or more detailed information including current franchise tax assessment, current filing history and more for a fee of $20.00.

Would you like ○ Status ○ Status,Tax & History Information

Submit

View Search Results                    New Entity Search

For help on a particular field click on the Field Tag to take you to the help area.

site map  |  privacy  |  about this site  |  contact us  |  translate  |  delaware.gov

## IN THE CHANCERY COURT OF LEFLORE COUNTY, MISSISSIPPI

EROSTYLIS, LLC                                                                                    PLAINTIFF

VS.                                                                    CAUSE NO. 25-CV-26

AHP SERVICING, LLC                                                                      DEFENDANT

---

### SUMMONS

STATE OF MISSISSIPPI
COUNTY OF LEFLORE

TO:    AHP SERVICING, LLC

### NOTICE TO DEFENDANT
### THE COMPLAINT WHICH IS ATTACHED TO THIS SUMMONS IS IMPORTANT AND YOU MUST TAKE IMMEDIATE ACTION TO PROTECT YOUR RIGHTS.

You are required to mail or hand deliver a copy of a written response to the Complaint to Steven Price Nixon, Esq., McCalla Raymer Leibert Pierce, LLC, Attorneys for the Plaintiff, whose address is 1022 Highland Colony Pkwy., Ste. 304, Ridgeland, MS 39157.  Your response must be mailed or delivered within thirty (30) days from the date of delivery of this Summons and Complaint or a judgment by default will be entered against you for the money or other things demanded in the Complaint.

You must also file the original of your response with the Clerk of this Court within a reasonable time afterward.

ISSUED UNDER MY HAND AND THE SEAL OF SAID COURT, this the 25th day of March , 2025.

DEBRA TATE HIBBLER, CHANCERY CLERK OF LEFLORE COUNTY, MISSISSIPPI

BY: DW Spes , D.C.

(SEAL)



FILED March 25, 2025

BY DW Spells Debra Tate Hibbler D.C.

Date Served: 3/21/2025
Time Served: 2:50
Server: SB 12971339

## IN THE CHANCERY COURT OF LEFLORE COUNTY, MISSISSIPPI

EROSTYLIS, LLC                                                                    PLAINTIFF

VS.                                                          CAUSE NO. 25 CV-26

AHP SERVICING, LLC                                                               DEFENDANT

## COMPLAINT FOR DECLARATORY JUDGMENT AND OTHER RELIEF

NOW COMES Plaintiff, EROSTYLIS, LLC, by and through counsel, and files this its Complaint for Declaratory Judgment and Other Relief, and in support thereof would show unto the Court as follows:

### Introduction

1.     This action seeks a declaratory judgment that Plaintiff is the true and lawful holder/owner of the subject Note described herein and the true and lawful owner/beneficiary of the subject Deed of Trust described herein, notwithstanding the absence of a formal Assignment of record for the subject Deed of Trust.

### Jurisdiction and Venue

2.     This Court has jurisdiction of the parties to and subject matter of this action under Article VI, §159 of the Mississippi Constitution and under Miss. Code Ann. §9-5-81.

3.     Venue is proper in Leflore County, Mississippi, pursuant to Miss. Code Ann. §11-5-1, in that the real property in question in located here.

### Parties

4.     Plaintiff, Erostylis, LLC (hereinafter sometimes referred to as "Plaintiff"), is a Delaware limited liability company, having a principal office address of 1415 Western Ave., Suite 700, Seattle, WA 98101, and doing business in Mississippi at the times relevant to this matter.

FILED March 25, 2025

BY _____ D.C
Debra Tate Hibbler

5.    Defendant, AHP Servicing, LLC (hereinafter "AHP"), is a Delaware limited liability company, having a principal office address of 440 South LaSalle Street, Suite 1110, Chicago, IL 60605. AHP can be served with process through its registered agent, A Registered Agent, Inc., at 8 The Green, Suite A, Dover, DE 19901.

## Facts

6.    The real property that is secured by the subject Deed of Trust in this action is commonly known as 205 N Stone Avenue, Greenwood, MS 38935, and more particularly described as:

> The following real property situated in the County of Leflore and State of Mississippi, to wit:
>
> Lot Ten (10) in Block Seventeen (17) of the Madison Jones East Greenwood Addition to the City of Greenwood as shown by map recorded in Book 2m Page 41, of the records of maps in the Office of the Chancery Clerk of said County and State.
>
> Property Address: 205 N Stone Ave., Greenwood, MS 38935
> Tax ID#08411031800500

7.    Guardpro, LLC, a Louisiana limited liability company, acquired the subject property by Special Warranty Deed recorded March 16, 2022, in Book 2022 at Page 732 in the office of the Chancery Clerk of Leflore County, Mississippi, a copy of which is attached as *Exhibit A*.

8.    Guardpro, LLC executed a Deed of Trust secured by the above-described real property, which was recorded on March 16, 2022, in Book 2022 at Page 2144, to Boston National Title, LLC, as Trustee for AHP Servicing, LLC, and a Note of even date therewith. A copy of the subject Note is attached hereto as *Exhibit B*; and a copy of the Deed of Trust is attached hereto as *Exhibit C*.

9.    The Deed of Trust was assigned from Defendant to Plaintiff and the Note was endorsed and transferred from Defendant to Plaintiff, however there is no formal Assignment recorded in the land records. Despite the absence of the formal Assignment, Plaintiff is the true

2

and lawful owner and holder of the Note and Deed of Trust, having purchased the loan from Defendant.

10.    In that the loan was purchased and transferred to Plaintiff, Defendant has no further right or interest in the loan, the property, and/or the Deed of Trust.

11.    Plaintiff has attempted to obtain the missing assignment; however, the Defendant appears to either no longer be operational and/or has not responded to any of Plaintiff's requests for the missing assignment.

## COUNT ONE – DECLARATORY JUDGMENT

12.    As a result of the missing assignment, there is a break in the chain of assignments, and it is necessary and proper that the rights and status between Plaintiff and Defendant be declared so that Plaintiff and others will not be uncertain of the rights and duties under the subject Note and Deed of Trust.

13.    Plaintiff is entitled to and seeks a declaration that (1) the subject Deed of Trust be declared to have been validly assigned from Defendant to Plaintiff and that Defendant has conveyed all of its right, title and interest in and to the subject Note and Deed of Trust to Plaintiff; (2) that Plaintiff is the true and lawful owner and current holder of the subject Note and Deed of Trust, and (3) that Plaintiff may exercise all the rights and privileges afforded the owner and holder of the Note and Deed of Trust under the terms of the Note and Deed of Trust and Mississippi law.

WHEREFORE, PREMISES CONSIDERED, Plaintiff respectfully prays that:

1.    This Complaint be filed and received and that process issue against Defendant herein in the manner and within the time allowed and provided by law;

2.    This Court find that it has jurisdiction over the subject matter and parties to this action, and venue is proper in Leflore County;

3

3.    This Court will issue and order declaring that (1) the Deed of Trust dated March 16, 2022 and recorded in Book 2022 at Page 2144 was validly assigned from Defendant, AHP Servicing, LLC, to Plaintiff, Erostylis, LLC, and that AHP Servicing, LLC has conveyed all of its right, title and interest in and to the subject Note of even date with the Deed of Trust, and the subject Deed of Trust, to Plaintiff, Erostylis, LLC; (2) that Plaintiff, Erostylis, LLC, is the true and lawful current owner and holder of the subject Note and Deed of Trust, and (3) that Plaintiff may exercise all the rights and privileges afforded the owner/holder of the subject Note and Deed of Trust under the terms of the Note and Deed of Trust and Mississippi law.

4.    A copy of the Decree entered in this action be filed of record in and spread upon the Land Records of the Chancery Clerk of Leflore County, Mississippi, and all necessary marginal notations thereof be made; and

5.    Plaintiff prays for such other and further relief, both general and specific, to which this Court determines just and proper under the circumstances.

RESPECTFULLY SUBMITTED, this the 19th day of ___March___, 2025.

EROSTYLIS, LLC

By: _____
Steven Price Nixon, Attorney for Plaintiff

MCCALLA RAYMER LEIBERT PIERCE, LLC
Steven Price Nixon (MSB 101663)
Attorney for Plaintiff
1022 Highland Colony Pkwy., Ste. 304
Ridgeland, MS  39157
Office:  (662) 478-3200
Steven.Nixon@mccalla.com

4

Exhibit A

State of Mississippi
County of Leflore
I certify this document was filed &
recorded on
03/16/2022  11:04:00 AM
In DEED BOOK
SPEC. WARRANTY DEED
Book 2022 Page 732  Pages 732-734
Johnny L. Gary Jr., Chancery Clerk

By: _____ D.C.

Commitment Number: MS22102337

After Recording, Return To:
Fleur De Lis Title Company
41601 Veterans Avenue
Suite 200
Hammond, LA 70403
985-277-5550

GRANTOR:
U.S. Bank Trust N.A., as Trustee for
American Homeowner Preservation Trust
Series 2015A+
440 South LaSalle Street
Chicago, IL 60605
716-708-4018

GRANTEE:
Guardpro, LLC
1520 South Jahncke Avenue
Covington, LA 70433
(985) 415-2929

Indexing Instructions: LOT 10 BLK 17 of the Madison Jones East Greenwood
Addition to the City of Greenwood

Instrument Prepared by:
Rosenberg LPA LLC, Attorneys at Law, 101 South Reid Street, Suite 307, Sioux Falls, South
Dakota 57103 (513) 247-9605, AND BY Matthew Vitart, Esq., Miss. Bar# 103552, Randall,
Segrest, Weeks, Reeves & Sones, PLLC, 992 Northpark Drive, Ste. A, Ridgeland MS 39157,
(601) 956-2615

## SPECIAL WARRANTY DEED
TAX PARCEL NUMBER: 0841103180050

For and in consideration of the sum of Twenty Three Thousand Seven Hundred Dollars and Zero
Cents ($23,700.00), cash in hand paid, and other good and valuable consideration, the receipt,
adequacy and sufficiency of which is hereby acknowledged, US Bank Trust National
Association as Trustee of American Homeowner Preservation Series 2015A+ ("Grantor") do
hereby sell, convey and specially warrant, subject to the exceptions and reservations set forth
below, unto Guardpro LLC ("Grantee") that certain parcel of property lying and being situated
in Leflore County, Mississippi, and being more particularly described as follows, to-wit:

The following real property situated in the County of Leflore and State of Mississippi, to wit:
Lot Ten (10) in Block Seventeen (17) of the Madison Jones East Greenwood Addition to the
City of Greenwood as shown by map recorded in Book 2m Page 41, of the records of maps
in the Office of the Chancery Clerk of said County and State.
Property Address: 205 N Stone Ave, Greenwood, MS 38935
Tax ID: 0841103180050

And being the same property described in Instrument recorded in book 0469, at page 238.

The Property is conveyed subject to, and there is excepted from the special warranty of this
conveyance, those certain recorded oil, gas or mineral leases, royalty reservations or other mineral
conveyances, all recorded restrictive covenants, building restrictions, rights-of-way, zoning
ordinances or easements affecting the Property.

Ad valorem taxes for the current year, which are not yet due and payable, have been pro-

Page 1 of 3

Book 2022 Page 733  Pages 732-734

rated on an estimated basis by the Grantors and the Grantees as of the date of this conveyance. If actual taxes differ from the estimate, Grantors and Grantees agree to adjust the pro-ration and the party owing taxes shall pay such amount to the other party.

WITNESS THE SIGNATURE OF THE GRANTORS as of the day first herein acknowledged.

US Bank Trust National Association as Trustee of American Homeowner Preservation Series 2015A+

By: _____
Karen Kamphausen

Its: __Director of Asset Recovery_____

STATE OF ___Illinois___
COUNTY OF ___Cook___

Personally appeared before me, the undersigned authority in and for the said county and state, on this 10 day of __March__ 2022, within my jurisdiction, the within named __Karen Kamphausen__ its __Director of Asset Recovery__ on behalf of US Bank Trust National Association as Trustee of American Homeowner Preservation Series 2015A+, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed in the above and foregoing instrument and acknowledged that he/she/they executed the same in his/her/their representative capacity(ies), and that by his/her/their signature(s) on the instrument, and as the act and deed of the person(s) or entity(ies) upon behalf of which he/she/they acted, executed the above and foregoing instrument, after first having been duly authorized so to do.

_____
Notary Public
Printed Name: __Mihaela Tigu__

My commission expires: __10-14-2025__

(Affix official seal, if applicable)

Official Seal
Mihaela Tigu
Notary Public State of Illinois
My Commission Expires 10/14/2025

Page 2 of 3

Ad valorem taxes for the current year, which are not yet due and payable, have been pro-rated on an estimated basis by the Grantors and the Grantees as of the date of this conveyance. If actual taxes differ from the estimate, Grantors and Grantees agree to adjust the pro-ration and the party owing taxes shall pay such amount to the other party.

WITNESS THE SIGNATURE OF THE GRANTORS as of the day first herein acknowledged.

_____
Guardpro, LLC

By: _____
Jeremy Ferguson

Its: Manager _____

STATE OF ___Louisiana___
PARISH OF ___St. Tammany___

Personally appeared before me, the undersigned authority in and for the said county and state, on this ___ day of ___March___ 2022, within my jurisdiction, the within named __Jeremy Ferguson__ its __Manager__ on behalf of Guardpro, LLC who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed in the above and foregoing instrument and acknowledged that he/she/they executed the same in his/her/their representative capacity(ies), and that by his/her/their signature(s) on the instrument, and as the act and deed of the person(s) or entity(ies) upon behalf of which he/she/they acted, executed the above and foregoing instrument, after first having been duly authorized so to do.

_____
Notary Public
Printed Name: _____

My commission expires: _____

(Affix official seal, if applicable)

AUDREY GITZ
Notary Public
State of Louisiana
Notary ID # 158578
My Commission is for Life

Page 3 of 3

2337

## NOTE

March 2, 2022
205 N. Stone Ave.
Greenwood, MS 38935

### 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $17,775.00 (the amount is called "Principal"), plus interest, to the order of the Lender. The Lender is AHP Servicing LLC. I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

### 2. INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of 9.90%.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B) of this Note.

### 3. PAYMENTS

#### (A) Time and Place of Payments

I will pay interest by making a payment every month.

I will make my monthly payment on the first day of each month in the month 30 days after funds are disbursed, after funds are disbursed. I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If on May 1, 2032, I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at 440 S. LaSalle Street, Suite 1110, Chicago, Il 60605 or at a different place if required by the Note Holder.

#### (B) Amount of Monthly Payments

My monthly payment will be in the amount $233.91.

#### BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal in full at any time.

### 4. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

## 5. BORROWER'S FAILURE TO PAY AS REQUIRED

### (A) Late Charge for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of ten calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be 5% of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

### (B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

### (C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

### (D) No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

### (E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

## 6. GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 7. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

## 8. WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

## 9. UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

> If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

Guardpro LLC

By _____

Its _____

MULTISTATE FIXED RATE NOTE—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Form 3200   1/01  (page 3 of 3 pages)

Exhibit C

State of Mississippi
County of Leflore
I certify this document was filed &
recorded on
03/16/2022  11:05:00 AM
In DEED OF TRUST
DEED OF TRUST
Book 2022 Page 2144  Pages 2144-216
0
Johnny L. Gary Jr., Chancery Clerk

By: ~~~~~~~~~~~ D.C.

After Recording Return To:
Fleur De Lis Title Company
41601 Veterans Avenue
Suite 200
Hammond, LA 70403
985-277-5550

**GRANTOR:**
U.S. Bank Trust N.A., as Trustee for
American Homeowner Preservation Trust
Series 2015A+
440 South LaSalle Street
Chicago, IL 60605
716-708-4018

**GRANTEE:**
Guardpro, LLC
1520 South Jahncke Avenue
Covington, LA 70433
(985) 415-2929

Indexing Instructions: LOT 10 BLK 17 of the Madison Jones East Greenwood
Addition to the City of Greenwood

Instrument Prepared by:
Rosenberg LPA LLC, Attorneys at Law, 101 South Reid Street, Suite 307, Sioux Falls, South
Dakota 57103, *AND BY* Matthew Vitart, Esq., Miss. Bar#103552, Randall, Segrest, Weeks,
Reeves &Sones, PLLC, 992 Northpark Drive, Ste. A, Ridgeland MS 39157, (601) 956-2615

_____[Space Above This Line For Recording Data]_____

## DEED OF TRUST

DEFINITIONS
MS22102337

Words used in multiple sections of this document are defined below and other words are defined in
Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document
are also provided in Section 16.

MISSISSIPPI--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT    Form 3025  1/01 *(page 1 of 16 pages)*

Book 2022 Page 2145  Pages 2144~216
0

(A) **"Security Instrument"** means this document, which is dated March 2, 2022, together with all Riders to this document.

(B) **"Borrower"** is Guardpro LLC. Borrower is the trustor under this Security Instrument.

(C) **"Lender"** is AHP Servicing LLC. Lender's address is 440 S. LaSalle Street, Suite 1110 Chicago, IL 60605. Lender is the beneficiary under this Security Instrument.

(D) **"Trustee"** is Boston National Title LLC.

(E) **"Note"** means the promissory note signed by Borrower and dated March 2, 2022. The Note states that Borrower owes Lender Seventeen Thousand Seven Hundred Seventy-Five Dollars (U.S. $17,775.00) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than May 1, 2032.

(F) **"Property"** means the property that is described below under the heading "Transfer of Rights in the Property."

(G) **"Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

(H) **"Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

☐ Adjustable Rate Rider     ☐ Condominium Rider              ☐ Second Home Rider
☐ Balloon Rider             ☐ Planned Unit Development Rider ☐ Other(s) [specify] _____
☐ 1-4 Family Rider          ☐ Biweekly Payment Rider

(I) **"Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(J) **"Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(K) **"Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(L) **"Escrow Items"** means those items that are described in Section 3.

(M) **"Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(N) **"Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(O) **"Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

MISSISSIPPI—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Form 3025  1/01 (page 2 of 16 pages)

Book 2022 Page 2146   Pages 2144-216
0

(P)    "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (12 C.F.R. Part 1024), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(Q)    "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note.   For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property

The following real property situated in the County of Leflore and State of Mississippi, to wit:

Lot Ten (10) in Block Seventeen (17) of the Madison Jones East Greenwood Addition to the City of Greenwood as shown by map recorded in Book 2m Page 41, of the records of maps in the Office of the Chancery Clerk of said County and State.

Property Address: 205 N Stone Ave, Greenwood, MS 38935 Tax ID: 08411031800500

Being that parcel of land conveyed to US Bank Trust National Association as Trustee of American Homeowner Preservation Series 2015A+ from Harbour Portfolio VII, LP. by that Deed dated 9/21/2018 and recorded 12/26/2018 in deed book 0469, at page 238 of the Leflore County, MS public registry.

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record.  Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

Book 2022 Page 2147  Pages 2144-216
0

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1. **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

MISSISSIPPI—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT    Form 3025   1/01  (page 4 of 16 pages)

Book 2022 Page 2148   Pages 2144-216
0

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender

Book 2022 Page 2149  Pages 2144~216
0

can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5. **Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees

Book 2022 Page 2150 Pages 2144-216 0

imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle

MISSISSIPPI--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Form 3025    1/01 (page 7 of 16 pages)

Book 2022 Page 2151   Pages 2144-216
0

the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. **Occupancy.** BUYER ACKNOWQEDGES THAT THIS LOAN IS MADE FOR INVESTMENT PURPOSES AND BUYER DOES NOT INTEND TO OCCUPY THE PROPERTY FOR A PERIOD OF 6 MONTHS FROM THE EXECUTION DATE.

7. **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. **Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9. **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but

Book 2022 Page 2152  Pages 2144-216 0

are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Book 2022 Page 2153  Pages 2144-216
0

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has – if any – with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. **Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

Book 2022 Page 2154  Pages 2144-216 0

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

12. **Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's

Book 2022 Page 2155  Pages 2144-216
0

acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

13. **Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

14. **Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

15. **Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only

MISSISSIPPI—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Form 3425  1/01 (page 12 of 16 pages)

Book 2022 Page 2156  Pages 2144-216
0

report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment

Book 2022 Page 2157 Pages 2144-216
0

enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

20. **Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

Book 2022 Page 2156  Pages 2144-216
0

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in

Book 2022 Page 2159  Pages 2144-216
0

the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall give Borrower, in the manner provided in Section 15, notice of Lender's election to sell the Property. Trustee shall give notice of sale by public advertisement for the time and in the manner prescribed by Applicable Law. Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder for cash at such time and place in _____ County as Trustee designates in the notice of sale in one or more parcels and in any order Trustee determines. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

23. Release. Upon payment of all sums secured by this Security Instrument, Lender shall cancel this Security Instrument. If Trustee is requested to cancel this Security Instrument, all notes evidencing debt secured by this Security Instrument shall be surrendered to Trustee. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

24. Substitute Trustee. Lender, at its option, may from time to time remove Trustee and appoint a successor trustee to any Trustee appointed hereunder by an instrument recorded in the county in which this Security Instrument is recorded. Without conveyance of the Property, the successor trustee shall succeed to all the title, power and duties conferred upon Trustee herein and by Applicable Law.

Book 2022 Page 2160  Pages 2144-216
0

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

GUARDPRO LLC

BY _____
Jeromy Ferguson

ITS Manager

Witness _____    Tracy L. Gerhardt

 Caroline Carruth

STATE OF Louisiana          COUNTY OF St. Tammany

The foregoing instrument was acknowledged this __15th__ day of __March__, 2022 before me, a Notary Public, by Jeromy Ferguson the Manger of Guardpro LLC.

_____
Notary Public

AUDREY GITZ
Notary Public
State of Louisiana
Notary ID # 158578
My Commission is for Life

MISSISSIPPI--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Form 3025  1/01  (page 17 of 16 pages)

# Exhibit 50
(Submitted in Native Format)

# Exhibit 51



November 14, 2023

Brad Waite
President
Land Home Financial Services
Brad.Waite@lhfs.com

### RE:     AHP's transaction with Cymbidium Restoration Trust

Dear Mr. Waite,

I am writing this with a heavy heart. I have held off contacting you for weeks in hopes that Oak Harbor and William Weinstein would provide an accurate accounting of AHP's transaction with Cymbidium Restoration Trust.  So far, however, Mr. Weinstein has failed to provide an accounting and is unable or unwilling to concede that AHP's obligation to Cymbidium has been fully satisfied. It has become increasingly clear that Mr. Weinstein has engaged in related party transactions to enrich Oak Harbor's investors at the expense of AHP's investors.

Our accounting shows AHP Servicing LLC's $19,750,000 obligation was satisfied in full in September 2023. Despite numerous requests, Mr. Weinstein has refused to provide an accurate accounting. Rather, he has offered assorted excuses as to why a complete accounting and back-up records cannot be provided.  As both Oak Harbor and AHP file our audits with the SEC, all records must be available, and monies properly accounted for. There is little doubt that the SEC will review this transaction.

Mr. Weinstein has threatened to stop returning my calls and alleges that AHP has converted proceeds from dispositions of pledged assets without forwarding to Cymbidium.  Our accounting shows that AHP collected $1,997,501.90 on the Cymbidium assets and wired $1,238,000 to Oak Harbor, a difference of $759,501.90. However, this has been superseded by $26,018,197.05 in payments paid directly to  Cymbidium from loan and REO sales as well as other dispositions. The net effect is that AHP has overpaid Cymbidium by at least $3,356,640.17. Worse, Cymbidium holds millions of dollars in AHP assets and continues to sell those assets by abusing revoked POAs to sell them at below market prices to related parties and keep the gains for themselves. The transaction documents dictate that the excess cash and remaining assets are to be returned to AHP once the obligation is fulfilled.

We have taken Oak Harbor's October 27, 2023 reconciliation and adjusted to reflect transactions that were missed by Oak Harbor. As you will see in the attachments, with the adjustments applied, $3,356,640.17 is due to AHP from Cymbidium. We believe that this is understated as we have prepared our compilation based on limited access to records, plus no adjustment has been made yet for the below market sales to Oak Harbor affiliates.

To corroborate AHP's accounting and/or make any adjustments, AHP has offered to pay for a third-party auditor to compile all financial records in this transaction and evaluate the documents to provide numbers which are audit-ready. Cherry Beckert, the auditor for both Oak Harbor and AHP,



introduced Elliott Davis to assist. Despite AHP's willingness to bear the cost, Mr. Weinstein indicated that such an audit would put too great a burden on Oak Harbor's internal resources. Instead, he shared an analogy that we should both jump together over a crevasse and trust that his numbers are close enough that we would make it to the other side. However, as we have tried to reconstruct the accounting on our own, the evidence suggests that such a jump would be catastrophic for AHP. It would be irresponsible to AHP's investors for me to knowingly agree to an incomplete accounting which would result in unnecessary losses to AHP's investors to the benefit of Oak Harbor, Mr. Weinstein and his investors. Like many, I once held Mr. Weinstein in high esteem, but my view has changed based on what we have recently discovered:

1. More than half of the assets AHP pledged were sold to Oak Harbor-affiliated entities at below-market prices. This is despite representations that these were being sold to <u>unrelated</u> third-parties. This is a breach of the March 2023 Amendment which provides that "The Purchaser will exercise best efforts in good faith to maximize the recovery on the (pledged) Mortgage Loans."

   For example, on June 29, Mr. Weinstein emailed "Here is the tape that Paul Birkett and his brother Dara Birkett propose to buy for $10 Million, largely financed by Brad Waite and me." The tape included 231 loans with a total UPB of $14,006,607 and total property values of $33,108,676. I asked that 33 assets with a total UPB of $2,989,533 and total property values of $4,379,000 be removed as they were REO or close to disposition and it did not make sense to sell at a discount. Weeks later, Mr. Weinstein advised that the 33 loans were removed, but 120 loans were substituted in with a UPB of $6,162,364 and total property values of $12,759,974, almost triple the population which was removed. I objected and Bill responded that "that ship has sailed." He represented that he had no say in this anymore and that I needed to talk to Paul.

   A few weeks ago, I learned that the buyer was really Keydally Capital Ltd., an Oak Harbor affiliate. When my attorney reached out to Mr. Birkett, Mr. Birkett emailed me and Mr. Weinstein to state that Keydally "has nothing to do with me."

2. Hundreds of thousands of dollars in invoices have been paid or are payable to Oak Harbor-related entities. This is a breach of the March amendment specifically limiting payments to only "unrelated third-party costs and fees." For example, 313 invoices were paid to Weinstein & Riley.

3. Hundreds of thousands in REO expenses and management fees were overbilled, double billed, and paid to related parties. Last week, we discovered that a $1,500 management fee has been paid from each AHP REO closing to WWR Management, LLC (an Oak Harbor-affiliated entity); <u>on top of</u> a management fee on each AHP REO to South Watuppa LLC, an entity ran by Mr. Weinstein's associate Cliff Ponte; <u>on top of</u> the agreed-upon 1.75% management fee



to Cymbidium; <u>on top of</u> multiple invoices paid directly to Mr. Ponte, who refuses to provide any explanation of the services rendered or back-up documentation despite multiple requests. To have so many hands grabbing at seller proceeds for purportedly "managing" the same REO sales is highly irregular and unheard of in our industry, especially when a real estate agent is also charging a commission.

For its 1.75% management fee, Cymbidium appears to have looted AHP for over $10 million.

4. We have also identified potential Power of Attorney abuse by Oak Harbor in which the POAs have been utilized for powers unauthorized, including the conveyance of assets to affiliated parties such as Magerick LLC without consideration. To the extent those transfers were effectuated fraudulently, any subsequent conveyances from Magerick LLC are invalid. Hundreds of loans appear to have been conveyed without authority and many of these are now being serviced by Land Home for parties such as Keydally and Magerick who do not appear to have rightful ownership.

   Please think about this for a moment: we pledged our assets to Cymbidium and paid them a management fee to "exercise best efforts in good faith to maximize the recovery on the (pledged) Mortgage Loans." Instead, Cymbidium then assigns assets to Magerick for no consideration, which then sells the assets at below-market prices to related parties such as Keydally and Eurostylus and in cozy deals with groups like BBNY and Cliff Ponte. Instead of maximizing the recovery for AHP, Cymbidium maximized the gains for Oak Harbor and affiliates. This amounts to much more than simply a breach of our agreements.

5. The POAs were all revoked on October 23, 2023. Oak Harbor, in spite of the revocations, has continued to execute documents using the revoked POAs, including signing closing documents prepared on October 25 to close the REO sale of 1176 Dials Branch in Hardy KY on October 26 and the sale of 716 W. Silver Springs Pl in Ocala FL on October 31, 2023. Oak Harbor then directed that the seller proceeds be wired to themselves rather than AHP. This could be construed as wire fraud. We believe that both of these REOs are serviced at Land Home.

6. Oak Harbor appears to be repeating history as evidenced by an SEC cease-and-desist order against Ophrys LLC, an Oak Harbor- affiliated entity, in part regarding undisclosed related party transactions between Oak Harbor-affiliated entities:
   https://www.sec.gov/files/litigation/admin/2018/ia-5041.pdf

In the end, despite the unauthorized related-party transactions, below-market sales, and excessive expenses, AHP has satisfied the Cymbidium obligation and has requested a return of the remaining assets and excess cash. Thus far, Cymbidium has refused.



In spite of the foregoing, I have shared with Mr. Weinstein that the desire is for all of us to perform on the deal which we agreed to. Thus, we remain ready and willing to pay Elliott Davis or any mutually agreeable accounting firm to audit this transaction.

To assist all involved in the transaction and its accounting, we request the following from Land Home:

1. Copies of all remittances for the Cymbidium_AHP assets;

2. Service transfer of all remaining Cymbidium_AHP assets to Capital Mortgage Services, except for New York assets which are to be transferred to AHP's account at Land Home;

3. Copy of the signed servicing agreement pertaining to the Cymbidium_AHP assets; and

4. Cessation of Land Home's management of foreclosures in the name of AHP entities on behalf of Oak Harbor entities. This is a breach of the October 2022 MLSA, which provides that "Purchaser shall not, without the express written consent of Seller...continue to prosecute any pending legal, collection or enforcement proceeding in the name of Seller or any of its affiliates." Land Home has no authority to manage a foreclosure on an asset vested in any AHP entity, excepting loans held in AHP's Land Home account.

I would like to schedule a call with you, Mr. Weinstein, and/or any other investors in Cymbidium this Thursday, November 16th at 2:00 pm Central in order to review the accounting I have shared, answer any questions, and start working towards a resolution.

Thank you for your consideration.

Sincerely,

*Jorge Newbery*

Jorge Newbery
Chief Executive Officer
AHP Servicing LLC

cc: Teji Singh
David Waite
John Waite
Deboarah Robertson
Brenda Usher

# Exhibit 52

## Re: Cymbidium_AHP Example #1: 571 Rocky Run, New Bern, NC 28562

**Jorge Newbery** <jnewbery@ahpservicing.com>
Wed 1/17/2024 8:00 AM

To:William S. Weinstein <wsw@oakharborcapital.com>
Cc:Maxwell Thornton <MThornton@oakharborcapital.com>;Mercedez Long <MLong@oakharborcapital.com>;David Hartsell <DHartsell@oakharborcapital.com>;Sonal Gupta <SGupta@oakharborcapital.com>;Cliff Ponte <CPonte@reo-consult.com>;Brad Waite <brad.waite@lhfs.com>;Teji Singh <teji.singh@lhfs.com>;david.waite@lhfs.com <david.waite@lhfs.com>; john.waite@lhfs.com <john.waite@lhfs.com>;deborah.robertson@lhfs.con <deborah.robertson@lhfs.com>;brenda.usher@lhfs.com <brenda.usher@lhfs.com>;Samantha Schechter <Samantha.Schechter@LHFS.com>;adam.yeazel@westernalliancebank.com <adam.yeazel@westernalliancebank.com>;gsmith02@westernalliancebank.com <gsmith02@westernalliancebank.com>; kevin.chai@westernalliancebank.com <kevin.chai@westernalliancebank.com>

Dear Bill -

I am compelled to address certain falsehoods in your email dated January 10, 2024, and then address your comment regarding resolution in the hopes that we can amicably conclude this dispute.

**"you continue to send communications to many people that are both misleading and false"**
What is noticeably absent from your response is any mention of 571 Rocky Run, the loan which was the subject of my January 8 letter If you dispute any of my representations or documents, please do so specifically. If you, Land Home, and Western Alliance all disregard my communications, then at least I have put you all on notice of wrongs that have occurred.

The January 8 letter you responded to was accompanied by supporting documentation which can readily be checked. In summary, Oak Harbor approved the loan sale of 571 Rocky Run; confirmed receipt of the wire of the $28,000 purchase price; gave AHP no credit for the $28,000; used a revoked Power of Attorney to assign the mortgage out of AHP's Trust and into Magerick; and presumably is collecting the monthly payments from this loan which Magerick does not own.

You can readily check with your employee Sonal Gupta to verify that the email I shared from her is accurate in that your office received the $28,000 sales price for this asset. You can also verify with your employee Maxwell Thornton to verify that, in spite of him being an attorney, he knowingly signed the Assignment of this loan using a Power of Attorney which was revoked. You can then check with Land Home to verify that they are forwarding the borrower payments to Magerick instead of the mortgage holder Colin Whitenack. If you verify these three items, the wrongs should become apparent. There is nothing misleading and false in what I shared. Rather, your statement that my communication is both misleading and false is itself **FALSE**.

**"you misquoted me on the use of the word 'incinerate'"**
You have a penchant for animated language, often painting searing mental pictures with your words, a talent which I have often found impressive. On our December 8 call, you shared that you were going to file legal actions against AHP in dozens of states and file lis pendens on the subject properties. You then followed with your intention "to bury me in litigation and incinerate me." I remember the visual, and I thought it odd that you were proposing a compromise on the Bowman property and following it with threatening language.

Your explanation that you really meant that our cost of defending ever-expanding legal actions would lead to incineration does not seem fitting. Also, the only litigation at AHP that is ever-expanding is with your entities and affiliates. Thus, your representation that I misquoted you on your use of the word "incinerate" is **FALSE**.

**"I once more encourage you to reconsider your actions and mediate a resolution"**
I am very open to mediation. I have advised you of this multiple times, and my counsel has advised your counsel of this. However, in order to ensure that a mediation is productive, I have offered to pay for an auditor to review the accounting. We can use Elliott Davis, the firm introduced by Cherry Bekaert, the same audit firm which we both use. Our accounting shows a balance owed by Cymbidium owed to AHP of at least $3,356,640.17 in cash and tens of millions in assets. Your October 27 recon reflects that the remaining repurchase price is $281,612.01. We are far apart, and an auditor's report would give us an accurate number to maximize the likelihood of a prompt resolution. Again, AHP will pay for the auditor. Until we can agree on the accounting, I do not believe that a mediation will be productive.

I want to end with a quote from Alaric Hutchinson which I read recently that made me think of our situation: "Bravery is the choice to show up and listen to another person, be it a loved one or perceived foe, even when it is uncomfortable, painful, or the last thing you want to do." Even though we are perceived foes right now, my communications with you are intended to be constructive and will continue until this matter is concluded. Likewise, I encourage you to communicate directly with me and share any information which may be helpful in moving us towards a resolution.

In hopes that we can both be brave,


**Jorge Newbery**
**FOUNDER AND CEO**


AHP Servicing LLC
440 S. LaSalle St., Suite 1110, Chicago, IL 60605
312.651.4325
jnewbery@ahpservicing.com
ahpservicing.com
NMLS# 1651788




  

AHP Servicing LLC is a debt collector. Unless you are in bankruptcy or received a bankruptcy discharge of this debt, AHP Servicing is attempting to collect a debt and any information obtained will be used for that purpose. If you are in bankruptcy or received bankruptcy discharge of this debt, this communication is not an attempt to collect the debt against you personally.

This e-mail and any files transmitted with it are confidential and intended solely for the use of the individual or entity to whom they are addressed. If you are not the named addressee, you should not disseminate, distribute or copy this e-mail. Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail from your system. AHP Servicing LLC accepts no liability for any damage caused by any antivirus transmitted by this e-mail.

**From:** William S. Weinstein <wsw@oakharborcapital.com>
**Sent:** Wednesday, January 10, 2024 5:22 PM
**To:** Jorge Newbery <jnewbery@ahpservicing.com>
**Cc:** Maxwell Thornton <MThornton@oakharborcapital.com>; Mercedez Long <MLong@oakharborcapital.com>; David Hartsell <DHartsell@oakharborcapital.com>; Sonal Gupta <SGupta@oakharborcapital.com>; Cliff Ponte <CPonte@reo-consult.com>; Brad Waite <brad.waite@lhfs.com>; Teji Singh <teji.singh@lhfs.com>; david.waite@lhfs.com <david.waite@lhfs.com>; john.waite@lhfs.com <john.waite@lhfs.com>; deborah.robertson@lhfs.con <deborah.robertson@lhfs.con>; brenda.usher@lhfs.com <brenda.usher@lhfs.com>; Samantha Schechter <Samantha.Schechter@LHFS.com>; adam.yeazel@westernalliancebank.com <adam.yeazel@westernalliancebank.com>; gsmith02@westernalliancebank.com <gsmith02@westernalliancebank.com>; kevin.chai@westernalliancebank.com <kevin.chai@westernalliancebank.com>
**Subject:** RE: Cymbidium_AHP Example #1: 571 Rocky Run, New Bern, NC 28562

Dear Jorge,

I am in receipt of your letter dated January 8, 2024.  Both my attorney and me have repeatedly asked you to communicate through your attorney, but you continue to send communications to many people that are both misleading and false, and which continue to increase the measure of damages against AHP and you for liability arising from conversion, misrepresentations and omissions, breach of contract, tortious contractual interference, and other causes of action.  Your failure to pay taxes, meet legal obligations, and your foreclosing upon and/or selling assets that are either owned by Oak Harbor funds or third parties or pledged to Magerick simply amplifies your legal problems and liability.  Moreover, you misquoted me on the use of the word "incinerate," which I used in the context of the cost of your defending an ever-expanding array of legal actions against you and AHP from your investors and from both secured and unsecured creditors.

I once more encourage you to reconsider your actions and mediate a resolution.  However, asserting legal rights to prevent your conversion of our assets is not bullying, it's sensible and rational behavior. I don't intend to communicate with you again personally except through legal counsel and I would encourage you to cease and desist from your communication except through your legal counsel.

Sincerely,

Bill Weinstein

**From:** Jorge Newbery <jnewbery@ahpservicing.com>
**Sent:** Monday, January 8, 2024 12:25 PM
**To:** William S. Weinstein <wsw@oakharborcapital.com>
**Cc:** Maxwell Thornton <MThornton@oakharborcapital.com>; Mercedez Long <MLong@oakharborcapital.com>; David Hartsell <dhartsell@oakharborcapital.com>; Sonal Gupta <SGupta@oakharborcapital.com>; Cliff Ponte <CPonte@reo-consult.com>; Brad Waite <brad.waite@lhfs.com>; Teji Singh <teji.singh@lhfs.com>; david.waite@lhfs.com; john.waite@lhfs.com; deborah.robertson@lhfs.con; brenda.usher@lhfs.com; Samantha Schechter <Samantha.Schechter@LHFS.com>; adam.yeazel@westernalliancebank.com; gsmith02@westernalliancebank.com; kevin.chai@westernalliancebank.com
**Subject:** Cymbidium_AHP Example #1: 571 Rocky Run, New Bern, NC 28562

Bill -

Please see attached correspondence.

Best wishes.

**Jorge Newbery**
**FOUNDER AND CEO**

AHP Servicing LLC
440 S. LaSalle St., Suite 1110, Chicago, IL 60605
312.651.4325
jnewbery@ahpservicing.com
ahpservicing.com
NMLS# 1651788



  

AHP Servicing LLC is a debt collector. Unless you are in bankruptcy or received a bankruptcy discharge of this debt, AHP Servicing is attempting to collect a debt and any information obtained will be used for that purpose. If you are in bankruptcy or received bankruptcy discharge of this debt, this communication is not an attempt to collect the debt against you personally.

This e-mail and any files transmitted with it are confidential and intended solely for the use of the individual or entity to

whom they are addressed. If you are not the named addressee, you should not disseminate, distribute or copy this e-mail. Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail from your system. AHP Servicing LLC accepts no liability for any damage caused by any antivirus transmitted by this e-mail.

This communication is for the intended recipient only. This communication may contain information that is privileged, confidential and exempt from disclosure under applicable law and constitutes an electronic communication within the meaning of the Electronic Communications Privacy Act, 18 U.S.C. 2510. If you are not the intended recipient, you are hereby notified that any unauthorized use, dissemination, distribution or copying of this communication is strictly prohibited and may subject you to criminal or civil penalty. If you have received this communication in error, please notify us immediately by email, delete the message, and destroy any copies.

# Exhibit 53
(Submitted in Native Format)

# Exhibit 54

(Submitted in Native Format)

# Exhibit 55

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON

CYMBIDIUM RESTORATION TRUST,

Plaintiff,

v.

AMERICAN HOMEOWNER
PRESERVATION TRUST SERIES AHP
SERVICING; its Trustee, U.S. BANK TRUST
N.A.; AHP CAPITAL MANAGEMENT, LLC;
AMERICAN HOMEOWNER
PRESERVATION SERIES 2015A+; its Trustee,
U.S. BANK TRUST NATIONAL
ASSOCIATION; AHP SERVICING, LLC; and
JORGE NEWBERY,

Defendants.

AMERICAN HOMEOWNER
PRESERVATION TRUST SERIES AHP
SERVICING; AHP CAPITAL
MANAGEMENT, LLC; AMERICAN
HOMEOWNER PRESERVATION SERIES
2015A+; and AHP SERVICING, LLC,

Third-Party Plaintiffs,

v.

OAK HARBOR CAPITAL, LLC;
ATLANTICA, LLC; LAND HOME
FINANCIAL SERVICES, INC.; WWR
MANAGEMENT, LLC; SOUTH WATUPPA,
LP; MAGERICK, LLC; and WEINSTEIN &
RILEY, PS,

Third-Party Defendants.

NO. 2:24-cv-00025-JNW

PLAINTIFF'S INITIAL DISCLOSURES

PLAINTIFF'S INITIAL DISCLOSURES
(NO. 2:24-cv-00025-JNW) - 1

Pursuant to Fed. R. Civ. P. 26(a)(1), plaintiff submits the following Initial Disclosures. Plaintiff reserves its right to supplement the following with additional information that may subsequently be learned through discovery or other means.

**A.** **Individuals Likely to Have Discoverable Information.**

    1.     Jorge Newbery
             540 South Summit
             Barrington, Illinois 60010
             (540) 570-7863

Mr. Newbery has knowledge regarding the negotiations and circumstances concerning the October 7, 2022, Mortgage Loan Sale Agreement With Repurchase Obligation ("Mortgage Sale Agreement") and the First Amendment to Mortgage Loan Sale Agreement With Repurchase Obligations entered into effective March 15, 2023 (the "First Amendment"). The Mortgage Sale Agreement and the First Amendment are collectively the "MLSA." Mr. Newbery also has knowledge regarding the circumstances related to the Trusts[1] providing certain powers of attorney ("POAs"); the Trusts breaches of the MLSA; and the conversion of loans (and their related security interests and REO properties) by Newbery, the Trusts, AHP Capital Management LLC ("AHP Capital"), and AHP Servicing, LLC (AHP Servicing").

    2.     Mellisa Stawicki
             Last known address:
             440 S. LaSalle Street
             Suite 1110
             Chicago, Illinois 60605
             (716) 998-2387

Ms. Stawicki has knowledge regarding defendants' communications and dealings with plaintiff concerning the MLSA; defendants' dealings with plaintiff and others concerning the loans (and their related security interests and REO properties); and defendants' misappropriation and conversion of loans, security interests, REOs, and their proceeds.

---

[1] The "Trusts" refers to both (i) defendant American Homeowner Preservation Trust Series AHP Servicing, and (ii) defendant American Homeowner Preservation Series 2015A+.

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

3. Karen Kamphausen
Last known address:
440 S. LaSalle Street
Suite 1110
Chicago, Illinois 60605
(312) 763-6360

Ms. Kamphausen has knowledge regarding defendants' communications and dealings with plaintiff concerning the MLSA; defendants' dealings with plaintiff and others concerning the loans (and their related security interests and REO properties); and defendants' misappropriation and conversion of loans, security interests, REO properties, and their proceeds.

4. Becky Flig
330 East 46th Street, PH-B
New York, NY 10017
(516) 641-6098

Ms. Flig has knowledge regarding defendants' communications and dealings with plaintiff; defendants' dealings with plaintiff and others concerning the loans (and their related security interests and REO properties); defendants' deficiencies in loan due diligence, documentation, and administration of the loans, defendants' failure to disclose those loan deficiencies to plaintiff, and defendants' misappropriation and conversion of loans, security interests, REO properties, and their proceeds. Ms. Flig also has knowledge of the Mission Capital lawsuit involving loans sold to plaintiff and their relative value of those loans.

5. Erick Seabrook
Last known address:
440 S. LaSalle Street
Suite 1110
Chicago, Illinois 60605
(480) 540-5125

Mr. Seabrook has knowledge regarding defendants' communications and dealings with plaintiff; defendants' dealings with plaintiff and others concerning the loans (and their related security interests and REO properties); defendants' deficiencies in loan due diligence, documentation, and administration of the loans, defendants' failure to disclose those loan

PLAINTIFF'S INITIAL DISCLOSURES
(NO. 2:24-cv-00025-JNW) - 3

deficiencies to plaintiff, and defendants' misappropriation and conversion of loans, security interests, REO properties, and their proceeds.

      6.     Cliff Ponte
           951 Plymouth Ave
           Fall River, MA 02721
           (508) 567-8604

      Mr. Ponte has knowledge regarding South Watuppa's effort to sell REO properties; defendants' interference with those efforts; defendants' conversion; and defendants' efforts to sell REO properties that had been security for loans the Trusts sold to plaintiff.

      7.     Maxwell Thornton
           1415 Western Ave, Suite 700
           Seattle, WA 98101
           (206) 438-1024
           c/o Brad Keller

      Mr. Thornton has knowledge regarding AHP loan documentation and deficiencies, plaintiff's efforts to sell properties, defendants' interference with those efforts, defendants' conversion, and defendants' efforts to sell plaintiff's properties.

      8.     William Weinstein
           c/o Brad Keller

      Mr. Weinstein has knowledge regarding the circumstances leading up to and the negotiations concerning the MLSA; plaintiff's other dealings with defendants; defendants' misappropriation and conversion of assets sold to plaintiff (and proceeds from those assets).

      9.     Title company representatives (identities currently unknown).

      10.    Escrow company representatives (identities currently unknown).

      11.    Purchaser from defendants of loans or REOs covered by the MLSA (identities currently unknown).

**B.**     **<u>Categories of Type of Documents and Location.</u>**

      1.     MLSA and email and other communications concerning it.

PLAINTIFF'S INITIAL DISCLOSURES
(NO. 2:24-cv-00025-JNW) - 4

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

2. Documentation regarding all recoveries defendants (or their affiliates) realized from loans sold under the MLSA.

3. Email and other communications between William Weinstein and Newbery.

4. Emails and other communications to or from defendants regarding any of the MLSA loans, their related security interests, or related REO sales.

5. Documents regarding expenses plaintiff incurred regarding collections concerning the MLSA loans, related foreclosures, property maintenance, mortgage servicing, REO sales, and legal and other services.

6. Documents regarding communications between defendants and others regarding the loans and related security interests sold under the MLSA and related REOs.

**C.** **Computation of Damages.**

The plaintiff believes the defendants jointly and severally owe approximately $2.6 million, which includes but is not limited to principal, interest, bank fees, management fees, advanced expenses, including but not limited to closing fees, legal fees, insurance fees, taxes, HOA fees, loss mitigation costs, and other categories of expenses, and "put-backs" or recourse loans.

**D.** **Insurance.**

None applicable to counterclaims being made against plaintiff.

DATED this 4th day of April, 2024.

BYRNES KELLER CROMWELL LLP

By _____
Bradley S. Keller, WSBA # 10665
1000 Second Avenue, 38th Floor
Seattle, Washington 98104
Telephone: (206) 622-2000
Facsimile: (206) 622-2522
Email: bkeller@byrneskeller.com
***Attorneys for Plaintiff/Third-Party Defendants***

PLAINTIFF'S INITIAL DISCLOSURES
(NO. 2:24-cv-00025-JNW) - 5

## CERTIFICATE OF SERVICE

The undersigned attorney certifies that on the 4th day of April, 2024, a true copy of the foregoing was served on each and every attorney of record herein via email:

> Daniel P. Harris, WSBA #16778
> HARRIS SLIWOSKI
> 600 Stewart Street, Suite 1200
> Seattle, WA 98101
> dan@harris-sliwoski.com
>
> Brian J. Benoit (*pro hac vice*)
> MILLER BERGER
> 20 North Clark Street, Suite 525
> Chicago, IL 60602
> brian@millerberger.com
> ***Attorneys for Defendants***

I declare under penalty of perjury under the laws of the State of Washington that the foregoing is true and correct.

DATED in Seattle, Washington, this 4th day of April, 2024.

_____
Bradley S. Keller
Byrnes Keller Cromwell LLP
1000 Second Avenue, 38th Floor
Seattle, WA  98104
Telephone:  (206) 622-2000
Facsimile:   (206) 622-2522

PLAINTIFF'S INITIAL DISCLOSURES
(NO. 2:24-cv-00025-JNW) - 6

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON  98104
(206) 622-2000

# Exhibit 56
(Submitted in Native Format)

# Exhibit 57
(Submitted in Native Format)

# Exhibit 58

| From: | EBrookman@oakharborcapital.com |
|---|---|
| **Sent:** | Friday, December 8, 2023 11:20 AM |
| **To:** | GMontgomery@oakharborcapital.com |
| **Cc:** | wsw@oakharborcapital.com; GValenzuela@oakharborcapital.com |
| **Subject:** | Lis Pendens AHP List |
| **Attachments:** | Lis Pendens AHP.xlsx |

Hi Gabrielle,

Bill asked me to pass along this list to you of the over 200 AHP loans that need lis penden.

Best,



OAK HARBOR CAPITAL

**Emma Brookman** | Investment Analyst
Phone: 206-403-1700
ebrookman@oakharborcapital.com

1415 Western Ave., Suite 700 | Seattle, WA 98101
http://oakharborcapital.com/

# Exhibit 59

## (Submitted in Native Format)

# Exhibit 60

**FILED**
KING COUNTY, WASHINGTON

OCT 2 8 2025

SUPERIOR COURT CLERK
BY Josephina Pech
DEPUTY

SUPERIOR COURT OF THE STATE OF WASHINGTON
IN AND FOR KING COUNTY

OAK HARBOR CAPITAL SPECIAL
OPPORTUNITIES MASTER FUND, LP;
OHCSOF GP, LLC; And OAK HARBOR
CAPITAL, LLC,

Plaintiffs,

v.

AHP SERVICING, LLC, a Delaware limited
liability company; and JORGE NEWBERY, an
individual,

Defendants.

No. 23-2-25722-7 SEA

**COURT'S FINDINGS OF FACT
AND CONCLUSIONS OF LAW**

*Clerk's Action Required*

This matter came before the Court for a bench trial before the Honorable Samuel Chung on September 2, 3, 4, and 8, 2025, on claims brought by Plaintiffs Oak Harbor Capital Special Opportunities Master Fund, LP ("OHCSOMF"), OHCSOF GP, LLC ("OHCSOF"), and Oak Harbor Capital LLC ("Oak Harbor Capital") for breach of contract, conversion, and turnover of assets against Defendants AHP Servicing, LLC ("AHP") and Jorge Newbery. Plaintiffs appeared by counsel Bradley S. Keller and M. Victoria Molina of Byrnes Keller Cromwell LLP. Defendants appeared by counsel Jeffrey B. Coopersmith, Eric A. Lindberg, and Rachel E. Hay of Corr Cronin LLP. The Court considered the testimony of the witnesses at trial, the exhibits admitted into evidence, the arguments of counsel, and the records and files herein. On September

FINDING OF FACTS AND CONCLUSIONS OF LAW - 1

26, 2025, the Court issued its oral ruling finding in favor of Defendants, which is incorporated by reference herein.

## I. <u>FINDINGS OF FACT</u>

Based on the evidentiary record presented at trial, the Court finds as follows:

**A.**     <u>**Background**</u>

1.     This action concerns two written agreements executed in December 2022 between Plaintiffs ("Oak Harbor Entities") and Defendant AHP Servicing, LLC ("AHP"): (a) a Demand Promissory Note, and (b) a State Court Litigation Claims Purchase Agreement ("SCLC or Purchase Agreement"). Plaintiffs' Exhibits 1 and 2. Regarding the transactions at issue in this case, defendant Jorge Newbery was at all times acting on behalf of AHP, and William Weinstein was at all times acting on behalf of the Oak Harbor entities.

2.     Plaintiffs, the Oak Harbor entities, are controlled by William Weinstein, an attorney and an experienced purchaser of distressed assets. Mr. Weinstein purchases consumer debts from banks who have written off these debts and sell them for a small percentage of the loan face value. In 2007, he purchased a portfolio of consumer debts for $41 million dollars with a face of $2 billion dollars. Mr. Weinstein has institutional investors who provide funds to his companies. Oak Harbor is one of about 40 funds that Mr. Weinstein has created.

3.     Defendant AHP is a mortgage loan servicing company managed by CEO Jorge Newbery, a resident of Barrington, Illinois. Mr. Newbery testified that he started his business American Homeowners Preservation as a non-profit to give back some money to homeowners but that AHP is now a for profit company focusing on default mortgages.

4.     Prior to the transactions at issue in this case, Mr. Newbery and Mr. Weinstein had conducted some business together relating to debt collections and were familiar with each other.

FINDING OF FACTS AND CONCLUSIONS OF LAW - 2

However, they had not previously contracted with each other for the sale and purchase of state court litigation claims ("SCLCs"), which are judgments obtained against consumers for credit card debts and enforceable against real property.

5.      In December 2022, Mr. Weinstein asked Mr. Newbery whether AHP would be interested in purchasing a portfolio of SCLCs. Earlier in 2022, Mr. Weinstein had tried to market about 10,000 of these SCLCs for $10,000,000 but was not successful in finding a buyer. *See* Defendants' Exs. 29-31.

6.      Mr. Newberry was interested in the SCLCs due to a promise of steady flow of cash recoveries from these judgments. Still, Mr. Newberry was concerned about AHP's potential exposure and financial risk, so he asked and received a "put back" remedy provision as a part of the contract. Under the put back clause, AHP would be able to return the SCLCs that AHP did not realize. Mr. Weinstein also promised that the SCLCs represent at least $100,000,000 in valid and enforceable claims. Mr. Newberry did not have much time to conduct extensive due diligence and largely relied on Mr. Weinstein who was eager to close the transaction before the end of the year. *See* Defendants' Ex. 45. Some of the material terms, like the cash down payment, were not finalized and left for the parties to resolve at a later time.

**B.      The Purchase Agreement and Secured Demand Note**

7.      On December 30, 2022, Mr. Newberry signed the Purchase Agreement and Promissory Note. *See* Plaintiffs' Exs. 1-2. The Note is between OHCSOMF LP and AHP. Mr. Newbery individually was not a party to the Purchase Agreement or Note. Mr. Newbery also did not personally guarantee the Note.

FINDING OF FACTS AND CONCLUSIONS OF LAW - 3

8. Under the Purchase Agreement, the sellers of the SCLCs were not the Oak Harbor entities, but instead Keydally Capital Ltd. ("Keydally"), an Irish-registered company, and Pallida, LLC, ("Pallida"), a Delaware company. Keydally is a nominee entity controlled by Mr. Weinstein and Keydally is the sole member of Pallida. Oak Harbor Capital manages Pallida. Defendants' Ex. 9. Evidence showed that Mr. Newberry was unfamiliar with these entities but did not ask about them to Mr. Weinstein.[1]

9. The total contract purchase price was $12,153,885.85, to be financed by a $2,000,000 cash contribution from the Buyer and a Promissory Note, "which the Buyer is issuing to Oak Harbor in the amount of $10,153,885.85." The Purchase Agreement contained a "Put Remedy." It stated:

> 4. Put Remedy. The Buyer may at any time within the twenty fourth month following the Closing Date, and only within that limited window, put all and not part of the unrealized SCLs back to the Seller for their Purchase Price, as reduced for any realizations made on the SCLs following the Closing.

10. The Promissory Note is between OHCSOMF LP and AHP. Mr. Newbery individually was not a party to the Purchase Agreement or Note. Mr. Newbery also did not personally guarantee the Note.

11. The Promissory Note provided for a specific priority order of payments from the proceeds of the SCLCs. Section 2.1 stated:

> 2.1 General. Maker shall make monthly payments of the Principal Amount and accrued interest thereon to Lender and apply all proceeds of the Collateral (as defined below) in accordance with the following waterfall order of payment:

---

[1] Mr. Newberry admitted on cross examination that he was familiar with Paul Birkett, and that Paul Birkett maybe be involved in some way because the signor for Keydally was Darrah Birkett. However, he did not inquire this further with Mr. Weinstein.

FINDING OF FACTS AND CONCLUSIONS OF LAW - 4

a.    First, to pay the fees and out of pocket costs of Maker in servicing and managing the Collateral, which shall include without limitation a $100,000 per annum servicing fee and all collection agency and legal fees and costs related to the Collateral;
b.    Second, to Lender, all accrued unpaid interest under the Note;
c.    Third, to Maker, Maker's $2,000,000 cash contribution to fund the acquisition of the Collateral;
d.    Fourth, 80% to Lender to be applied toward the unpaid principal balance under the Note and 20% to Maker; and
e.    Fifth, the remainder, 80% to Maker and 20% to Lender.

Plaintiffs' Ex. 1.

12.    After the parties executed the two agreements, Mr. Weinstein and his managers provided training to AHP's representatives on how to work the SCLCs. Ms. Dodd testified that she gave them access to Oak Harbor's specialized collection program called "Blossom."

13.    While AHP worked on recovering on these SCLCs through its lawyers, Mr. Weinstein's companies also kept working on many of these claims despite the fact that they had been sold to AHP. There was no formal assignment of specific SCLCs to the buyer, and Ms. Dodd testified that she and her team had continued their recoveries on claims which had started prior to the sale. Ms. Dodd admitted that she never saw the Promissory Note provision requiring the seller to transfer 80% of the proceeds from the Collateral to AHP.

14.    Similarly, to fulfill the $2 million "cash contribution" under the Purchase Agreement and the Promissory Note, Mr. Weinstein and Mr. Newberry negotiated to transfer certain debts between them based on their other business deals. However, they were never able to come to a final agreement.[2]

---

[2] Mr. Newberry admitted that in his company's accounting system, he recorded this $2 Million as a short term liability, meaning that it was to be paid within 1 year.

FINDING OF FACTS AND CONCLUSIONS OF LAW - 5

15.    After the purchase of the SCLCs, AHP did not obtain the types of returns from its collection efforts AHP had expected.  Evidence showed that AHP lacked local lawyers, especially in Texas, to work on the SCLCs and that AHP was also not paying the lawyers who withdrew from AHP collection work.  Mr. Weinstein testified that Mr. Newberry was personally taking millions of dollars from the recoveries on SCLCs. However, there was no proof or evidence presented supporting Mr. Weinstein's assertions.

16.    In May 2023, Mr. Weinstein requested Mr. Newberry to amend the Purchase Agreement to allow Mr. Weinstein to take back some of the SCLCs that he had sold to AHP. Mr. Newberry testified that Mr. Weinstein told him that this would be only about 30 SCLCs amounting to $10,000.  Mr. Newberry agreed to the amendment but discovered that Mr. Weinstein was taking back far more SCLCs and that recoveries from these SCLs would not be shared with AHP.  Mr. Newberry felt betrayed by Mr. Weinstein and combined with the low rate of returns from the SCLCs, he regretted this transaction.

17.    In September 2023, Mr. Newberry wanted to "put back" the remaining SCLCs under the Purchase Agreement's "Put Remedy" provision.[3] However, Mr. Weinstein refused to accept the put back and in October 2023, Mr. Weinstein told Mr. Newbery that AHP should wait until January 1, 2023 to exercise the Put Remedy, stating that the $2,000,000.00 owed would be "expunged" upon exercise of it. *See* Def. Ex. 78.

18.    Mr. Weinstein and Mr. Newberry continued their negotiations.  Then, in December 2023, Plaintiffs filed the current lawsuit demanding payments on the Promissory Note.

---

[3] Mr. Newberry testified that he did not know that the "Put Back" provision language stated that it can only be exercised during the "24th" month after the sale and not "within" 24 months.  Mr. Newberry admitted that he had not read the provision carefully.

FINDING OF FACTS AND CONCLUSIONS OF LAW - 6

Until this time, Plaintiffs had not made any formal demand for payment under the Promissory Note, and AHP made no separate payments for principal or interests under the Note.

19.     On December 26, 2024, AHP again exercised the Put Remedy, this time within the twenty-fourth month following the Closing Date. AHP provided an accounting of recoveries on the SCLCs along with its exercise of the Put Remedy.

## II. <u>CONCLUSIONS OF LAW</u>

Based on the records contained in the above reference matter and the evidence presented to the Court, the Court enters the following conclusions of law:

### A.     <u>Plaintiffs' Claims for Breach of Contract, Conversion, and Turnover</u>

21.     The Court has jurisdiction over the parties and subject matter. Venue is proper in King County Superior Court.

22.     The Court finds that the Promissory Notes and the Purchase Agreement are integrated agreements which must be construed together.  Where two or more contracts are part of the same transaction and relate to the same subject-matter, are known to all the parties, and are delivered at the same time to accomplish an agreed purpose, such contracts must be construed together as parts of the same transaction; and this is so even though the contracts are not executed between the same parties.  <u>American Pipe & Const. Co., v. Harbor Const. Co.</u>, 51 Wash. 2d. 258, 265 (1957).

23.     Plaintiffs claimed breach of contract, conversion, and sought turnover of the SCLCs. Plaintiffs alleged that AHP breached the agreement by realizing millions in the SCLCs and failing to make payments to Plaintiffs under the waterfall, and that interest is due under the Note.

FINDING OF FACTS AND CONCLUSIONS OF LAW - 7

24. Under Washington law, a demand note is payable on demand unless a contrary intent appears from the face of the instrument. See, GMAC v. Everett Chevrolet, Inc., 179 Wn. App. 126, 317 P.3d 1074 (2014). If there is no contrary intention that appears either expressly or impliedly on the face of the note that the note must be paid or is otherwise "payable immediately on the date of its execution." Id., at 136.

25. The Court interprets the "waterfall" provision in the Note as establishing the contrary intent under GMAC v. Everett Chevrolet. It set the priority of payments, with the first payment due to AHP for its fees, costs, and $100,000.00 per annum management fee. AHP never received $200,000.00 for the two years spent servicing the SCLCs, as the agreement provided, or for its costs and fees.

26. Instead, applying the service fee of $100,000.00 due to AHP on an annual basis, there was a net loss of $85,938.60 that AHP should have received before any payment on interest was due under the Note.

27. Plaintiffs presented evidence that they collected approximately $773,000.00 on the SCLCs from late December 2022 to present. Plaintiff's Ex. 79. Plaintiffs did not share the proceeds of this collection with AHP under the waterfall to pay AHP's servicing fees and other costs, as they were required to and as was first in priority under the waterfall schedule. Plaintiffs did not disclose their collection of these funds until trial. Based on the waterfall provision in the Note, the Court finds that AHP therefore had no obligation to pay Plaintiffs interest on the Note unless and until the prior waterfall levels were satisfied.

28. Finally, the Court finds that the parties did not reach an agreement on the payment of $2,000,000 cash contribution. As stated above, at the time the two agreements were entered,

FINDING OF FACTS AND CONCLUSIONS OF LAW - 8

Mr. Weinstein and Mr. Newberry agreed that they would agree to complete this provision by exchanging other debts to which the parties were never able.

29. The Court further finds that AHP could and did exercise the put under the Purchase Agreement on December 23, 2024, within the contractual 24th-month window. The Court finds that the term "unrealized" in the put remedy means judgments on which no recovery or collections had been made. It does not require a showing that such judgments were not enforceable. The Court rejects Mr. Weinstein's argument that this meant claims which <u>cannot</u> be realized and finds his testimony on this issue not credible. The Court will not read ambiguity into a contract where there is none. <u>See</u>, <u>Mut. of Enumclaw v. USF Ins. Co.</u>, 164 Wn.2d 411, 424 n.9 (2008) (when a contract presents no ambiguity and no extrinsic evidence is required to make sense of the contract terms, contract interpretation is a question of law). Accordingly, the Court concludes that AHP properly exercised the Put Remedy and put back all SCLCs which had not been collected.

**C.     Defendants' Fraud Defense**

32. Much of the evidence at trial centered around Defendants' claims of fraud. Defendants presented evidence, including deposition testimony, which established that Keydally, one of the sellers, was owned by Darragh Birkett, an Irish sandwich shop owner with no experience in managing distressed assets, and that Mr. Weinstein had paid Mr. Birket 6,000 Euros to sign documents related to Keydally which Mr. Birkett had no understanding of. *See* Defendants' Exs. 84; 86.

33. Defendants presented evidence that the Keydally transaction was for the purpose of inflating the value of the SCLCs and inducing Mr. Newbery into believing he was purchasing the assets from a legitimate third-party seller as opposed to Oak Harbor.

FINDING OF FACTS AND CONCLUSIONS OF LAW - 9

34. Mr. Newbery testified he did not know Pallida and Keydally were shell companies with nominee figureheads when he entered the transaction with Plaintiffs.

35. Defendants presented evidence that Plaintiffs' purported sale of the SCLCs to Keydally prior to the sale to AHP was used by Plaintiffs to increase the sales price of the SCLCs' price from approximately $10 million to approximately $12 million after Plaintiffs' effort to sell the SCLCs through Mission Capital was unsuccessful. *See* Plaintiffs' Exhibit 22.

36. Defendants did not prove all nine elements of fraud particularly AHP's claim that it reasonably relied on any representations by the Oak Harbor entities. Both parties' representatives were experienced businesspeople and Mr. Newbery's cursory reading of contracts and overall lack of due diligence do not support reasonable reliance under the clear, cogent, and convincing standard.

### III. ORDER

37. Accordingly, it is hereby ORDERED that judgment shall be entered in favor of Defendants AHP Servicing, LLC and Jorge Newbery. All other claims and defenses are denied.

IT IS SO ORDERED.

DATED this 16 day of October 2025.

The Honorable Samuel Chung
King County Superior Court

FINDING OF FACTS AND CONCLUSIONS OF LAW - 10

# Exhibit 61

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
IN AND FOR KING COUNTY

| | |
|---|---|
| OAK HARBOR CAPITAL SPECIAL OPPORTUNITIES MASTER FUND, LP; OHCSOF GP, LLC; and OAK HARBOR CAPITAL, LLC, | No. 23-2-25722-7 SEA |
| Plaintiffs, | FINDINGS OF FACT AND CONCLUSIONS OF LAW REGARDING AWARD OF ATTORNEYS' FEES, EXPENSES, COSTS, AND DISBURSEMENTS TO DEFENDANTS |
| v. | *Clerk's Action Required* |
| AHP SERVICING, LLC, a Delaware limited liability company; and JORGE NEWBERY, an individual, | |
| Defendants. | |

This matter came before the Court on Defendants' Motion for Attorneys' Fees, Expenses, Costs, and Disbursements ("Motion").

## I.    FINDINGS OF FACT

Based on the Motion and the documents filed in support of and opposition to the Motion, the Court finds as follows:

1.    This case was filed on December 29, 2023.  In March 2024, the Court granted Plaintiffs' Motion for Preliminary Injunction.  Defendant Newberry moved to dismiss personal claims against him, but the Court denied Newberry's Motion in October 2024.  The parties filed several discovery motions including motions to compel and motions for letters rogatory to conduct

FINDINGS OF FACT AND
CONCLUSIONS OF LAW AWARDING
ATTORNEY'S FEES AND COSTS - 1

Judge Samuel S. Chung
King County Superior Court
516 Third Avenue
Seattle, Washington 98104

depositions in Ireland and Portugal. Defendants moved for Summary Judgment which the Court denied in February 2025. The trial was continued twice and concluded in four-day bench trial in September 2025.

2. As described in the Court's Findings of Fact and Conclusions of Law entered October 28, 2025, the Court rejected Plaintiffs' claim that Defendant had defaulted on the Promissory Note and ordered that judgment be entered in favor of Defendants.

3. In their current Motion, Defendants request $898,447.55 in attorneys' fees, expenses, costs, and disbursements as the prevailing party in this lawsuit. In support, Defendants provided contemporaneous billing records, invoices, and declarations.

4. Defendants submitted contemporaneous billing records from the following attorneys and paralegals (billing rate in parentheses): Jeffrey B. Coopersmith ($850), Eric A. Lindberg ($550), T. Jeffrey Bone ($575), Rachel E. Hay ($400), Theresa Lapke (Paralegal) ($230), Brian J. Benoit ($350), Myles R. Carroll ($275), Yucheng Wang ($275), Dan Harris ($550), Ethan Minkin ($500), and Staci Black ($250).

5. Defendants' billing records claim a total of 1,244.1 hours expended on this case by the Corr Cronin LLP lawyers. Additional hours from the attorneys at Miller Berger, LLC, KMA Zuckert LLP, and Harris Slowaski LLP are included in the billing records.

6. Plaintiffs assert that the fees and expenses requested are excessive and should be reduced significantly. Plaintiffs argue that the hourly rates for the Corr Cronin lawyers are high and that Defendants overstaffed the case with excessive number of lawyers on a routine contract case. Plaintiffs also point out that the Court rejected Defendants' "fraud" defense therefore the Court should not award fees related to presenting the fraud arguments.

FINDINGS OF FACT AND
CONCLUSIONS OF LAW AWARDING
ATTORNEY'S FEES AND COSTS - 2

Judge Samuel S. Chung
King County Superior Court
516 Third Avenue
Seattle, Washington 98104

7. The Court has reviewed the time records submitted by Corr Cronin and other firms who represented the Defendants. Each timekeeper itemized his or her entries based on specific tasks performed with the corresponding time spent, thereby avoided block billing.

8. The billing records show that attorneys often engaged in team meetings and time conferring with one another. Time entries show that several attorneys prepared for the same witness depositions, and that more than one attorney billed his and her time for attending the same depositions. For example, on November 7, 2024, three attorneys billed time for attending the Weinstein deposition. Similar billing practice appears for the June 11, 2025 Paul Birkett deposition as well. While such billings are understandable when more than one attorney works on a matter, the Court still finds that these multiple billings are not reasonable should be adjusted.

## II. CONCLUSIONS OF LAW

Based on the records contained in the above reference matter and the evidence presented to the Court, the Court enters the following conclusions of law:

1. Defendants were the prevailing party in this litigation.

2. An award of fees and expenses is required under the reciprocal fee statute, RCW 4.84.330, and because of the attorneys' fees provisions in the Secured Demand Promissory Note ("Note") and the SCLC Purchase Agreement ("Purchase Agreement") that were at issue in this case.

3. A reasonable fee is based on the Lodestar figure, which is the market value of the attorney's services calculated by multiplying the number of hours reasonably expended in the litigation by the reasonable rate of compensation. *Perry v. Costco Wholesale, Inc.*, 123 Wn. App. 783, 98 P.3d 1264 (2004). The Lodestar figure represents the presumptively reasonable amount of the prevailing party's attorney's fees. *See Gracie v. Gracie*, 217 F. 3d 1060, 1070 (9th Cir. 2000). A court may then adjust the presumptively reasonable Lodestar amount based on a variety

FINDINGS OF FACT AND
CONCLUSIONS OF LAW AWARDING
ATTORNEY'S FEES AND COSTS - 3

Judge Samuel S. Chung
King County Superior Court
516 Third Avenue
Seattle, Washington 98104

of factors; such as time expended, the difficulty of the questions involved, the skill required, customary charges of other attorneys, the amount involved, the benefit resulting to the client, and the contingency or certainty in collecting the fee. *Herring v. Dep't of Social and Health Servs.*, 81 Wn. App 1, 33, 914 P.2d 67 (1996).

4. When attorneys have an established rate for billing clients, that rate will likely be a reasonable rate. *Bowers v. Transamerica Title Ins. Co.*, 100 Wn 2d 581, 597, 675 P.2d 193 (1983). The rates charged to Defendants by their attorneys at the Law Firm of Corr Cronin are their normal, non-contingent, hourly rates, charged to all clients. These rates are consistent with those charged by similarly situated law firms in the Seattle area. Although Plaintiffs claim that Defendants' lawyers' rates are higher than their own, the Court concludes that the rates charged are reasonable based on their practice and experience.

5. The Lodestar fee equals $677,801.50 for Corr Cronin and in addition, prior counsels for Defendants billed $47,269.83, $92,813.30, and $13,529. This represents 1,244.10 attorney and paralegal hours devoted to this case, at their regular, non-contingent hourly rates. This fee is presumptively reasonable, and is objectively reasonable for the most part, subject to modification as stated below. The Court has also reviewed the expenses, costs and disbursements and find these amounts reasonable.

6. The court has discretion to adjust the presumptively reasonable Lodestar amount based on a variety of factors, such as time expended, the difficulty of the questions involved, the skill required, customary charges of other attorneys, the amount involved, the benefit resulting to the client, and the contingency or certainty in collecting the fee. *Herring*, 81 Wn. App at 33.

7. First, the billing records show multiple occasions where three attorneys are working on overlapping tasks such as preparing and attending the same witness depositions. As noted above, there are number of entries for team meeting and conferring with one another. Similarly,

FINDINGS OF FACT AND
CONCLUSIONS OF LAW AWARDING
ATTORNEY'S FEES AND COSTS - 4

Judge Samuel S. Chung
King County Superior Court
516 Third Avenue
Seattle, Washington 98104

at the 4-day trial, Defendants were represented by three attorneys. Comparatively, as Plaintiffs point out, Plaintiffs were represented by two attorneys, one senior partner, and one associate attorney.

8. The Court has considered the remaining factors for adjustments and concludes that a moderate decrease is appropriate. Again, this litigation concerned the interpretation of two written agreements that was complicated by the business dealings between Mr. Weinstein and Mr. Newberry. The Court also dismissed Defendants' fraud arguments, although this was based on the fact that Mr. Newberry, with many years of experience in the debt/loan industry, admitted that he largely relied on Mr. Bill Weinstein, despite having significant reservations about the transaction. The amount in dispute, $12,000,000, was significant especially considering potential personal liability that Plaintiffs were seeking.

9. Therefore, the Court reduces the Defendant's requests for attorney's fees by 15 percent to account for the overlapping billings and also for dismissing Defendant's fraud defense. The 15 percent would apply to the fees requested by the Corr Cronin firm attorneys, excluding the paralegal.

10. The Court awards as follows:

| Firm | Requested | Adjusted |
|---|---|---|
| Corr Cronin Fees | $677,801.50 | $580,040.13[1] |
| Corr Cronin Costs | 65,273.67 | $65,273.67 |
| Corr Cronin Total | $743,075.17 | $645,313.80 |
| | | |
| Miller Berger | $47,269.83 | $47,269.83 |
| KMA Zuckert | $92,813.30 | $92,813.30 |
| KMA Zuckert and Miller Berger Costs | $1,760.25 | $1,760.25 |
| Harris Slowaski | $13,529.00 | $13,529.00 |
| Total Fees and Costs Awarded | | $800,686.18 |

[1] Corr Cronin's total requested fees and costs was $743,075.17 (page 4 of Defendants' Motion for Fees). Fees requested was $677,801.50. Of this amount, the Court adjusted the fees billed by 4 attorneys $651,742.50 by 15 percent ($533,981.13) and added paralegal Ms. Lapke's fees $26,059.00 for total fees award of $645,313.80.

FINDINGS OF FACT AND
CONCLUSIONS OF LAW AWARDING
ATTORNEY'S FEES AND COSTS - 5

Judge Samuel S. Chung
King County Superior Court
516 Third Avenue
Seattle, Washington 98104

### III. ORDER

Accordingly, it is hereby ORDERED that $800,686.18 in attorneys' fees, expenses, costs, and disbursements is awarded to Defendants as the prevailing party in this action.

IT IS SO ORDERED.

DATED this _5th_ day of _December_, 2025.

_____
The Honorable Samuel Chung
King County Superior Court

Presented by:

CORR CRONIN LLP

_s/ Jeffrey B. Coopersmith_
Jeffrey B. Coopersmith, WSBA No. 30954
Eric A. Lindberg, WSBA No. 43596
1015 Second Avenue, Floor 10
Seattle, WA 98104-1001
Ph: (206) 625-8600
jcoopersmith@corrcronin.com
elindberg@corrcronin.com

Brian J. Benoit (_pro hac vice_)
KMA Zuckert LLP
227 West Monroe Street, Suite 3650
Chicago, Illinois 60606
Ph: (312) 345-3065
bbenoit@kmazuckert.com

_Attorneys for Defendants_

FINDINGS OF FACT AND
CONCLUSIONS OF LAW AWARDING
ATTORNEY'S FEES AND COSTS - 6

Judge Samuel S. Chung
King County Superior Court
516 Third Avenue
Seattle, Washington 98104

# Exhibit 62

Farha Ahmed, Esquire (Attorney ID # 01062-2009)
Patric Morris, Esquire (Attorney ID # 08641-1992)
Waldman & Kaplan, P.A.
174 Nassau Street, Suite 313
Princeton, NJ 08542
Telephone: (844) 899-4162
Facsimile: (844) 882-4703
Primary Email: farha@dwaldmanlaw.com
Secondary Email: patric@dwaldmanlaw.com
Email: njforeclosures@dwaldmanlaw.com
Attorneys for Plaintiff

---

| | |
|---|---|
| **MAGERICK, LLC,** | **SUPERIOR COURT OF NEW JERSEY** |
| | **LAW DIVISION** |
| **Plaintiff,** | **OCEAN COUNTY** |
| VS. | **DOCKET NO.: OCN-L-2937-23** |
| | |
| **AMERICAN HOMEOWNER** | |
| **PRESERVATION TRUST SERIES AHP** | |
| **SERVICING; U.S. BANK TRUST N.A.; AHP** | **CIVIL ACTION** |
| **CAPITAL MANAGEMENT, LLC;** | |
| **AMERICAN HOMEOWNER** | **CERTIFICATION OF PLAINTIFF** |
| **PRESERVATION SERIES 2015A+; U.S. BANK** | |
| **TRUST NATIONAL ASSOCIATION; AHP** | |
| **SERVICING, LLC,** | |
| | |
| **Defendants.** | |

---

I, William Weinstein, of Oak Harbor Capital, LLC, of full age, hereby certify as follows:

1. I am the Chief Executive Officer for Oak Harbor Capital, LLC, which manages Magerick, LLC, the Plaintiff in this action. As such, I am fully familiar with the facts and circumstances set forth herein. I make this Certification in support of Plaintiff's Amended Complaint and for the relief demanded in the Amended Complaint.

2. I make this Certification based upon personal knowledge unless otherwise specified. More particularly, I am familiar with the systems of record that are used to record and create information related to the mortgage loans that Plaintiff owns, including the processes by

which Plaintiff obtains the loan information in those systems. The information in this affidavit is taken from business records of the Plaintiff. The entries in those records are: (a) made at or near the time of the occurrence of the matters recorded by persons with personal knowledge of the information in the business record, or from information transmitted by persons with personal knowledge: (b) kept in the course of Plaintiff's regularly conducted business activities; and (c) it is the regular practice of the Plaintiff to make such records.

3. Plaintiff's business records are true and correct to the best of my knowledge and belief.

4. I obtained from Plaintiff's systems of record, as discussed above, information relating to the mortgage loan and property at issue in this action.

5. Oak Harbor Capital, LLC ("Oak Harbor") manages Plaintiff, Magerick, LLC. Oak Harbor also manages Cymbidium Restoration, LLC, which is the settlor and sole beneficiary of Cymbidium Restoration Trust.

6. Cymbidium Restoration Trust purchased a large pool of loans from Defendant AHP Trust Servicing which AHP Trust Servicing was to repurchase on or before January 7, 2024, as is described in Section 4 of a certain Mortgage Loan and Sale Agreement dated October 7, 2022 ("Cymbidium Agreement").

7. When AHP Trust Servicing defaulted on the repurchase obligation, the Cymbidium Agreement was amended on or about March 15, 2023, which resulted in AHP Trust Servicing owing a debt to Cymbidium.

8. A separate agreement, the Mortgage Loan Purchase and Sale Agreement dated January 31, 2023, was executed between Plaintiff, Magerick, LLC, as Purchaser, and U.S. Bank Trust

N.A. as Trustee of American Homeowner Preservation Trust Series AHP Servicing, as Seller ("Magerick Agreement").

9. As part of the Magerick Agreement, Plaintiff purchased several loans from Defendant, including the subject Mortgage which encumbered 835 Bowman Road, Jackson, NJ 08527 (the "Property").

10. The Mortgage was assigned to Plaintiff via an Assignment of Mortgage dated February 23, 2023.

11. By Quitclaim Deed dated May 9, 2023, the Property was deeded to Plaintiff.

12. The Mortgage and the Quitclaim Deed was assigned and deeded, respectively, to Plaintiff as part of the Magerick Agreement.

13. The Magerick Agreement required Plaintiff to pay $2,700,000.00.

14. Pursuant to the Magerick Agreement, the purchase price of the subject loan was $277,177.36.

15. Plaintiff made the entire payment in the form of a reduction of $2,700,000.00 from the outstanding balance owed by Defendant AHP Trust Servicing to Plaintiff.

16. I hereby certify the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

Dated: August 6, 2024

William Weinstein
Oak Harbor Capital, LLC, as Manager of Magerick, LLC

# Exhibit 63

# PARTICIPATION AGREEMENT

*CP*

THIS PARTICIPATION AGREEMENT is made and entered into as of __12th__ day of September by and between and the Barbara Levine Weinstein Grandchildren's Trust, a statutory trust, (the "Trust") and MWPNP, LLC, a limited liability company being issued the participation interest hereunder (the "Participant").

WHEREAS, the Participant and the Trust pooled together $70,000.00 to Magerick, LLC in order for the Trust to purchase a certain residential mortgage Loan (the "Purchase").

WHEREAS, to fund the Purchase, MWPNP, LLC contributed $35,000.00, and the Barbara Levine Weinstein Grandchildren's Trust contributed $35,000.00.

WHEREAS, in order to fund the repair and sell the property, MWPNP, LLC will contribute $43,000.00, and Barbara Levine Weinstein Grandchildren's Trust contributed $43,000.00

NOW THEREFORE, once the property is sold the Trust and the Participant will be entitled to split 50% of the profits after all expenses are paid. Proceeds from a sale of the Property, if any, shall be distributed in the following order of priority:

(a) first, to reimburse any properly documented expenses incurred by the Trust and the Participant related to the Property, including without limitation all taxes, insurance, and other costs; then

(b) second, to the Trust and the Participant the amount of **$70,000.00** representing its basis in the Property; then

(c) third, to the Trust and the Participant to reimburse any expenses incurred for the repair and renovation of the Property, which expenses shall not exceed **$86,000.00**; and then

(d) fouth, the Trust and the Participant will split any proceeds available.

IN WITNESS WHEREOF, each of the undersigned has caused this Agreement to be duly executed as of the date first above written.

MWPNP, LLC
Participant

By: _____
Name: __Cliff Ponte__
Title: __Authorized Representative__

BARBARA LEVINE WEINSTEIN
GRANDCHILDREN'S TRUST
The Trust

By: _____
Name: _William S. Weinstein_
Title: _Trustee_

**CONFIDENTIAL**

**Cymbidium132370**

## EXHIBIT A

*[see attached Assignment Agreement]*

**CONFIDENTIAL**

# Exhibit 64

Prepared by Tor Midtskog for
Weinstein & Riley, P.S.
2001 Western Avenue, Suite 400
Seattle, WA 98121

# Limited Power of Attorney

**Grantor:**    **American Homeowner Preservation, LLC (Neighborhoods United LLC)**
440 S. LaSalle Street, Suite 1110, Chicago, IL 60605

**Grantee:**    **Atlantica, LLC**
2001 Western Avenue, Suite 400, Seattle, WA 98121

Dated:    September 20, 2022

Prepared by Tor Midtskog for
Weinstein & Riley, P.S.
2001 Western Avenue, Suite 400
Seattle, WA 98121

# Limited Power of Attorney

Known all persons by these present, that American Homeowner Preservation, LLC (Parent Company: Neighborhoods United LLC), ("AHP") hereby designates the following individuals set forth below (the "Attorney(s)-in-Fact") for the sole purpose of executing any and all documents relating to the creation and recording of Assignments of Mortgage, the endorsement of Notes or creation of appropriate Allonges, Listings for Sale, execution of Contracts of Sale, closing of Contracts for Sale, or any and all other actions relating to the disposition of real estate or real estate-backed assets owned by AHP.

**Atlantica, LLC**

WHEREAS, the undersigned has the full authority to execute this instrument on behalf of AHP;

NOW THEREFORE, AHP grants the above-named Attorney(s)-in-fact the authority as follows:

1. To execute, acknowledge, seal and deliver on behalf of AHP (and the AHP-owned entities listed in Schedule A, attached) all instruments of transfer and conveyance including but not limited to deeds, assignments, satisfactions and transfers appropriately completed with all ordinary or necessary endorsements, acknowledgments, affidavits and supporting documents that may be necessary or appropriate to the listing for sale, sale or otherwise transfer the beneficial interest and ownership of the assets owned by AHP to a third party.
2. Further, authority is granted to the Attorney(s)-in-fact to execute, acknowledge, seal and deliver on behalf of AHP any and all documents to effect the release of any lien attached to any subject property related to the assets owned by AHP through the ownership of a Note or Notes secured by a mortgage on the subject property.

This Limited Power of Attorney shall be effective from September 20, 2022 and shall continue in full force in perpetuity unless otherwise terminated by an official of AHP. At such time this Limited Power of Attorney will be automatically revoked. Any third party may rely upon this document as the named individuals authority to continue to exercise the powers herein granted, unless a revocation hereof has been recorded in the public records of the jurisdiction where the Limited Power of Attorney has been recorded, or unless a third party has received actual notice such revocation.

IN WITNESS WHEREOF, AHP by its duly authorized officer has caused these present to be subscribed in their names on this 20th day of September, 2022.

**AMERICAN HOMEOWNER PRESERVATION, LLC**

By: Jorge Newbery, Chief Executive Officer

*NOTARY ACKNOWLEDGMENT PAGE TO FOLLOW*

# ACKNOWLEDGMENT

**The State of ILLINOIS**

**The County of COOK**

On September 20, 2022 before me, Philippa Curry, Notary Public, personally appeared Jorge Newbery, Authorized Signatory for American Homeowner Preservation, LLC, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

Signature _Philippa Curry_

Notary Public: (Type Notary Public Name) PHILIPPA CURRY
My Commission Expires: (Type Commission Expiration Date) 05|18|2025

Official Seal
Philippa Curry
Notary Public State of Illinois
My Commission Expires 05/18/2025

## <u>SCHEDULE A</u>

- US Bank Trust National Association as Trustee of American Homeowner Preservation Trust Series AHP Servicing
- US Bank Trust National Association as Trustee of American Homeowner Preservation Trust Series 2015 A+

# Exhibit 65

| | |
|---|---|
| **From:** | GValenzuela@oakharborcapital.com |
| **Sent:** | Friday, October 13, 2023 4:42 PM |
| **To:** | MBasile@OakHarborCapital.com |
| **Cc:** | wsw@oakharborcapital.com; EBrookman@oakharborcapital.com |
| **Subject:** | Magerick Valuation |
| **Attachments:** | AHP 3Q23 Valuation.xlsx |

Hello Mike

I'm attaching the valuation of Magerick. Please see the summary below:

| Row Labels | Count of OI | Sum of UPB | Sum of Estimated Legal Balance | Sum of Latest Property Value |
|---|---|---|---|---|
| FNMAE/Freddie/HUD | 208 | $ 29,397,091.16 | $ 39,952,348.90 | $ 73,319,657.0 |
| FC | 103 | $ 15,298,648.33 | $ 21,819,232.54 | $ 36,059,173.0 |
| REO | 12 | $ 2,282,454.04 | $ 4,461,977.20 | $ 4,259,984.0 |
| RPL | 93 | $ 11,815,988.79 | $ 13,671,139.16 | $ 33,000,500.0 |
| Keydally | 277 | $ 15,390,475.62 | $ 23,056,532.18 | $ 36,990,814.6 |
| FC | 263 | $ 14,668,417.74 | $ 22,214,151.67 | $ 35,517,914.6 |
| REO | 7 | $ 279,777.85 | $ 355,431.89 | $ 654,200.0 |
| RPL | 7 | $ 442,280.03 | $ 486,948.62 | $ 818,700.0 |
| Paul B. NY Loans | 7 | $ 1,433,038.37 | $ 1,862,949.88 | $ 2,694,173.0 |
| FC | 7 | $ 1,433,038.37 | $ 1,862,949.88 | $ 2,694,173.0 |
| Remaining AHP | 231 | $ 22,653,693.02 | $ 27,184,431.63 | $ 43,243,155.5 |
| FC | 166 | $ 17,511,984.29 | $ 21,014,381.15 | $ 34,578,781.5 |
| REO | 60 | $ 3,985,944.88 | $ 4,783,133.86 | $ 6,796,374.0 |
| RPL | 5 | $ 1,155,763.85 | $ 1,386,916.62 | $ 1,868,000.0 |
| Grand Total | 723 | $ 68,874,298.17 | $ 92,056,262.58 | $ 156,247,800.1 |

Feel free to let us know if you have any questions or comments.

Best,



OAK HARBOR CAPITAL

Gonzalo M. Bozo Valenzuela | Investment Analyst
Phone: 206-493-1755
gvalenzuela@oakharborcapital.com

2001 Western Ave., Suite 430 | Seattle, WA 98121
http://oakharborcapital.com/

# Exhibit 66
(Submitted in Native Format)

# Exhibit 67

| Monthly Settlement Report |
|---|
| Magerick LLC |
| As of July 25, 2024 |
| Loan Tape Date as of: 07/19/2024 |

### I.  Computation of Unpaid Principal Balance

| | | |
|---|---|---|
| Unpaid Principal Balance of Pledged Assets | $ | 72,279,289.28 |
| Unpaid Principal Balance of Ineligible Pledged Assets | $ | (12,160,517.47) |
| Unpaid Principal Balance of Eligible Pledged Assets | $ | 60,118,771.81 |

### II.  Computation of Real Estate Value

| | | |
|---|---|---|
| Real Estate Value of Pledged Assets | $ | 123,408,881.00 |
| Real Estate Value of Ineligible Pledged Assets | $ | (12,895,236.00) |
| Real Estate Value of Eligible Pledged Assets | $ | 110,513,645.00 |

### III.  Computation of Borrowing Limit

| | | |
|---|---|---|
| Unrestricted Advance on Eligible Assets | $ | 37,795,143.25 |
| Over Collateralization due to Property Type Sublimit | $ | - |
| Over Collateralization due to Ground-up Construction Sublimit | $ | - |
| Over Collateralization due to Single Loan Limits | $ | - |
| Over Collateralization due to REO Sublimits | $ | - |
| Over Collateralization due to NPL Sublimits | $ | - |
| Over Collateralization due to Cost Basis | $ | (161,273.39) |
| Over Collateralization due to Commitment Limitation | $ | - |
| Total Over Collateralization | $ | (161,273.39) |
| Borrowing Limit | $ | 37,633,869.86 |

### IV.  Computation of Facility Availability

| | | |
|---|---|---|
| Commitment | $ | 40,000,000.00 |
| Withheld Commitment | $ | 2,366,130.14 |
| Approved but not Active | $ | - |
| Adjusted Borrowing Limit | $ | 37,633,869.86 |
| | | |
| Facility Balance | $ | 36,800,700.48 |
| | | |
| Availability (Adjusted Borrowing Limit Less Facility Balance) | $ | 833,169.38 |

| | |
|---|---|
| WAB Loan Maximum Advance to Maximum Unpaid Principal Balance (LTB) | 63.09% |
| WAB Loan Maximum Advance to Real Estate Value (LTV) | 34.16% |
| Borrower Loan Maximum Advance to Real Estate Value | 54.14% |

The undersigned represents and warrants that this Borrowing Base Certificate is true and correct statement of the Borrowing Base, and that the information contained herein is true and correct in all material respects. The undersigned further represents and warrants that (i) there is no Default or Event of Default occurring or continuing under any of the Facility Documents, (ii) all representations and warranties contained in the Facility Documents are true and correct in all material respects, and (iii) all amounts reflected herein have been determined and calculated in strict compliance with the provisions of the Facility Documents and the Exhibits and Schedules thereto. Capitalized terms used herein and not otherwise defined herein shall have the meanings specified in the Facility Documents.

| Magerick LLC | WAB Reviewer |
|---|---|
| Signed: _William Weinstein (Jul 29, 2024 12:32 PDT)_ | Signed: |
| Title: **Authorized Representative** | Title: |

| WAB Approval | WAB Additional Approval |
|---|---|
| Signed: | Signed: |
| Title: | Title: |

| Collateral Loan Number | External ID | Collateral Loan Borrower Name | Property Street | Property City | Property State | REO/Forbearance | Collateral Loan Cost Basis | Collateral Loan UPB | Collateral Loan Commitment | Collateral Loan Issuance Date | Collateral Loan Maturity Date | Collateral Loan Interest Rate | Lien Position | Days Past Due | Collateral Loan Performance Status | Dwell Time | Aggregate sageas Property Value | LTB Advance Rate | LTV Advance Rate | LTB Advance | LTV Advance | Amount Eligible to be Advanced |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

| Loan ID | | | City | State | Type | | Amount | | Amount | | Amount | | Date | Date | Rate | | | Status | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2000001055 | 48051770 | | SKOWHEGAN | ME | REO | $ | 70,179.00 | $99,248.88 | $ | | | | | | | 1 | 0 | Non-Performing | 202 | | 0% | 0% | $ | - | $ | - |
| 280055 | 48046225 | | Middleport | NY | | $ | 40,373.92 | $51,761.43 | $ | 51,761.43 | 3/9/2002 | 3/1/2032 | 9.90% | 1 | 0 | Non-Performing | 202 | $ | - | 0% | 0% | $ | - | $ | - |
| 323091 | 48046268 | | CATO | NY | REO | $ | 43,307.32 | $103,792.70 | $ | 103,792.70 | 3/15/2010 | 4/1/2040 | 5.25% | 1 | 0 | Non-Performing | 202 | $ | - | 0% | 0% | $ | - | $ | - |
| 10200022 | 48051655 | | CLAIRTON | PA | REO | $ | | | | | | | | | | Non-Performing | | | | 0% | 0% | $ | - | $ | - |
| 10200058 | 48051685 | | ERIE | PA | REO | $ | 34,618.25 | $41,024.88 | $ | 41,024.88 | 1/27/2003 | 2/1/2033 | 9.85% | 1 | 0 | Non-Performing | 202 | $ | - | 0% | 0% | $ | - | $ | - |
| 10400002 | 48051695 | | EASTON | SC | REO | $ | | | | | | | | | | Non-Performing | | | | 0% | 0% | $ | - | $ | - |
| 19962830 | 48025511 | | YOUNGSTOWN | FL | REO | $ | 25,657.28 | $23,178.11 | $ | 23,178.11 | 9/19/2002 | | 9.30% | 1 | 0 | Non-Performing | 202 | $ | - | 0% | 0% | $ | - | $ | - |
| 27812336 | 48025549 | | DELVAN | NJ | | $ | | | | | | | | | | Non-Performing | | | | 0% | 0% | $ | - | $ | - |
| 312000970 | 48073740 | | Akron | OH | REO | $ | 19,000.00 | $83,500.51 | $ | 83,500.51 | 10/2/2003 | 10/1/2033 | 5.00% | 1 | 0 | Non-Performing | 202 | $ | - | 0% | 0% | $ | - | $ | - |
| 312000920 | 48052016 | | PINEWOOD | SC | REO | $ | 18,615.47 | $40,453.66 | $ | 40,453.66 | | | 6.17% | 1 | 0 | Non-Performing | | | | 0% | 0% | $ | - | $ | - |
| 312002169 | 48073782 | | Pryor | OK | | $ | 15,200.00 | $17,145.55 | $ | 17,145.55 | 4/30/2009 | 7/1/2024 | 10.69% | 1 | 0 | Non-Performing | 202 | $ | - | 0% | 0% | $ | - | $ | - |
| 312002671 | 48025279 | | American Falls | ID | | $ | 13,181.81 | $16,899.76 | $ | 16,899.76 | 11/25/1996 | 5/1/2025 | 11.00% | 1 | 0 | Non-Performing | 202 | $ | - | 0% | 0% | $ | - | $ | - |
| 400496625B | 48051685 | | VINE GROVE | KY | REO | $ | | | | | | | | | | Non-Performing | | | | 0% | 0% | $ | - | $ | - |
| 093-G84831 | 48043084 | | SEBRING | FL | REO | $ | 275,400.00 | $149,448.58 | $ | 149,448.58 | 8/26/2009 | 9/1/2050 | 5.16% | 1 | 0 | Non-Performing | 202 | $ | - | 0% | 0% | $ | - | $ | - |
| 241-968464 | 48046792 | | BALTIMORE | MD | REO | $ | 102,038.00 | $98,285.52 | $ | 98,285.52 | 8/1/2012 | 8/1/2042 | 5.00% | 1 | 0 | Non-Performing | 202 | $ | - | 0% | 0% | $ | - | $ | - |
| 271-925258 | 48043071 | | GRAND RAPIDS | MN | REO | $ | 242,426.00 | $242,716.00 | $ | 242,716.00 | 9/1/2002 | 9/1/2032 | 2.66% | 1 | 0 | Non-Performing | 202 | $ | - | 0% | 0% | $ | - | $ | - |
| 308852 | 48073692 | | Millbri | FL | REO | $ | 222,421.13 | $285,155.29 | $ | 285,155.29 | 12/17/2005 | 12/1/2035 | 6.38% | 1 | 0 | Non-Performing | 91 | $ | - | 0% | 0% | $ | - | $ | - |
| 315588 | 48046254 | | Greenwich | NY | REO | $ | | | | | | | | | | Non-Performing | | | | 0% | 0% | $ | - | $ | - |
| 10200132 | 48073703 | | Detroit | MI | REO | $ | 33,082.80 | $70,154.82 | $ | 70,154.82 | 11/14/2001 | 9/1/2034 | 4.88% | 1 | 0 | Non-Performing | - | | | 0% | 0% | $ | - | $ | - |
| 312002915 | 48073769 | | Albany | GA | REO | $ | 50,267.76 | $34,341.18 | $ | 34,341.18 | 2/1/2002 | 4/1/2007 | 11.88% | 1 | 0 | Non-Performing | - | $ | - | 0% | 0% | $ | - | $ | - |
| 312002963 | 48073803 | | Escanaba | MI | REO | $ | 31,895.68 | $25,299.44 | $ | 25,299.44 | 1/30/2002 | 11/1/2032 | 8.00% | 1 | 0 | Non-Performing | - | $ | - | 0% | 0% | $ | - | $ | - |
| 312002996 | 48073805 | | Albany | GA | REO | $ | 37,381.24 | $50,666.60 | $ | 50,666.60 | 6/26/2008 | 8/1/2040 | 5.00% | 1 | 0 | Non-Performing | - | $ | - | 0% | 0% | $ | - | $ | - |
| 312002937 | 48073806 | | Elkview | WV | REO | $ | 15,124.00 | $42,549.00 | $ | 42,549.00 | 5/7/1999 | 6/1/2029 | 11.50% | 1 | 0 | Non-Performing | - | $ | - | 0% | 0% | $ | - | $ | - |
| 312002936 | 48073809 | | Adams | MA | REO | $ | 31,302.06 | $19,922.61 | $ | 19,922.61 | 4/24/2006 | 5/1/2028 | 10.73% | 1 | 0 | Non-Performing | - | $ | - | 0% | 0% | $ | - | $ | - |
| 312002989 | 48073811 | | Augusta | ME | REO | $ | 103,981.68 | $97,379.19 | $ | 97,379.19 | 10/1/2007 | 11/1/2037 | 11.49% | 1 | 0 | Non-Performing | - | $ | - | 0% | 0% | $ | - | $ | - |
| 2000001281 | 48068776 | | SEATTLE | WA | REO | $ | 623,988.32 | $466,823.99 | $ | 466,823.99 | 8/2/2007 | 9/1/2007 | 6.50% | 1 | 0 | Non-Performing | - | $ | - | 0% | 0% | $ | - | $ | - |
| **Total Eligible** | | | | | | | | $ 60,118,771.81 | $ | 59,837,215 | | | | | | | | $ 110,513,645 | | | | 40,380,228 | 75,840,406 | 37,633,869.86 | |
| | | | | | | | | | | | | | | | | | | | | | | | | | |
| **Total Pledged** | | (Both Eligible and Ineligible) | | | | $ | | 70,279,289.28 | $ | 71,997,752 | | | | | | | | $ 110,513,645 | | | | 40,380,228 | 75,840,406 | 37,633,869.86 | |

| Property Type Category | Advance Rate | | Recreation Subfactors ($000's) | Amount Eligible to be Advanced | | Construction Subfactors ($000's) | Amount Eligible to be Advanced | | Total Amount Eligible to be Advanced | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | LTB | LTV | | ($000's) | (% Pledged) | | ($000's) | (% Pledged) | Property Type Category | ($000's) | (% Pledged) |
| SFR Owner Occupied REO | 75% | 75% | 5,000 | $ 1,100 | 3% | $ | $ | 0% | SFR Owner Occupied REO | $ 1,100 | 3% |
| SFR Owner Occupied NPL | 80% | 80% | 40,000 | $ 23,638 | 62% | $ | $ | 0% | SFR Owner Occupied NPL | $ 23,638 | 62% |
| SFR Owner Occupied NPL | 75% | 75% | 40,000 | $ 12,892 | 34% | $ | $ | 0% | SFR Owner Occupied NPL | $ 12,892 | 34% |
| SFR Investor | 0% | 0% | | $ - | 0% | $ | $ | 0% | SFR Investor | $ - | 0% |
| SFR Developer | 0% | 0% | | $ - | 0% | $ | $ | 0% | SFR Developer | $ - | 0% |
| Commercial Multi Family | 0% | 0% | | $ - | 0% | $ | $ | 0% | Commercial Multi Family | $ - | 0% |
| Commercial Mixed Use | 0% | 0% | | $ - | 0% | $ | $ | 0% | Commercial Mixed Use | $ - | 0% |
| Commercial Office | 0% | 0% | | $ - | 0% | $ | $ | 0% | Commercial Office | $ - | 0% |
| Commercial Retail | 0% | 0% | | $ - | 0% | $ | $ | 0% | Commercial Retail | $ - | 0% |
| Commercial Industrial | 0% | 0% | | $ - | 0% | $ | $ | 0% | Commercial Industrial | $ - | 0% |
| Commercial Hospitality | 0% | 0% | | $ - | 0% | $ | $ | 0% | Commercial Hospitality | $ - | 0% |
| Commercial Special Purpose | 0% | 0% | | $ - | 0% | $ | $ | 0% | Commercial Special Purpose | $ - | 0% |
| Commercial Land | 0% | 0% | | $ - | 0% | $ | $ | 0% | Commercial Land | $ - | 0% |
| **Amount Eligible To Be Advanced** | | | | $ 37,634 | 100% | **Amount Eligible To Be Advanced** | $ - | | **Total Amount Eligible To Be Advanced** | $ 37,634 | 34% |
| | | | | | | | | | Over Collateralization Amount | | |
| | | | | | | | | | Total Available Advance | $ | 37,634 |

# Magerick BBC 2024.07.25 Updated

Final Audit Report                                        2024-07-29

| | |
|---|---|
| Created: | 2024-07-29 |
| By: | Emma Brookman (EBrookman@oakharborcapital.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAANBL2Q-4yAfbZXr7VBUMdBr65y_GjIT-p |

## "Magerick BBC 2024.07.25 Updated" History

📄 Document created by Emma Brookman (EBrookman@oakharborcapital.com)
2024-07-29 – 7:20:42 PM GMT

✉ Document emailed to William Weinstein (wsw@oakharborcapital.com) for signature
2024-07-29 – 7:21:14 PM GMT

📄 Email viewed by William Weinstein (wsw@oakharborcapital.com)
2024-07-29 – 7:32:21 PM GMT

✒ Document e-signed by William Weinstein (wsw@oakharborcapital.com)
Signature Date: 2024-07-29 – 7:32:53 PM GMT - Time Source: server

✅ Agreement completed.
2024-07-29 – 7:32:53 PM GMT

📕 **Adobe Acrobat Sign**

# Exhibit 68

## Monthly Settlement Report
## Magerick LLC
## As of August 29, 2023
### Loan Tape Date as of: 08/15/2023

### I. Computation of Unpaid Principal Balance

| | | |
|---|---|---|
| Unpaid Principal Balance of Pledged Assets | $ | 77,568,074.81 |
| Unpaid Principal Balance of Ineligible Pledged Assets | $ | (1,701,987.27) |
| Unpaid Principal Balance of Eligible Pledged Assets | $ | 75,866,087.54 |

### II. Computation of Real Estate Value

| | | |
|---|---|---|
| Real Estate Value of Pledged Assets | $ | 120,611,560.95 |
| Real Estate Value of Ineligible Pledged Assets | $ | (2,155,900.00) |
| Real Estate Value of Eligible Pledged Assets | $ | 118,455,660.95 |

### III. Computation of Borrowing Limit

| | | |
|---|---|---|
| Unrestricted Advance on Eligible Assets | $ | 47,727,462.11 |
| Over Collateralization due to Property Type Sublimit | $ | - |
| Over Collateralization due to Ground-up Construction Sublimit | $ | - |
| Over Collateralization due to Single Loan Limits | $ | (9,053.08) |
| Over Collateralization due to REO Sublimits | $ | - |
| Over Collateralization due to NPL Sublimits | $ | (698,909.03) |
| Over Collateralization due to Commitment Limitation | $ | (19,500.00) |
| Total Over Collateralization | $ | (727,462.11) |
| Borrowing Limit | $ | 47,000,000.00 |

### IV. Computation of Facility Availability

| | | |
|---|---|---|
| Commitment | $ | 47,000,000.00 |
| Withheld Commitment | $ | - |
| Approved but not Active | $ | - |
| Adjusted Borrowing Limit | $ | 47,000,000.00 |
| Facility Balance | $ | 46,410,263.92 |
| **Availability (Adjusted Borrowing Limit Less Facility Balance)** | $ | **589,736.08** |

| | |
|---|---|
| WAB Loan Maximum Advance to Maximum Unpaid Principal Balance (LTB) | 63.10% |
| WAB Loan Maximum Advance to Real Estate Value (LTV) | 39.68% |
| Borrower Loan Maximum Advance to Real Estate Value | 62.88% |

The undersigned represents and warrants that this Borrowing Base Certificate is true and correct statement of the Borrowing Base, and that the information contained herein is true and correct in all material respects. The undersigned further represents and warrants that (i) there is no Default or Event of Default occurring or continuing under any of the Facility Documents, (ii) all representations and warranties contained in the Facility Documents are true and correct in all material respects, and (iii) all amounts reflected herein have been determined and calculated in strict compliance with the provisions of the Facility Documents and the Exhibits and Schedules thereto. Capitalized terms used herein and not otherwise defined herein shall have the meanings specified in the Facility Documents.

| Magerick LLC | WAB Reviewer |
|---|---|
| Signed: *[signature]* | Signed: |
| Title: CFO, OMW, its Manager | Title: |

| WAB Approval | WAB Additional Approval |
|---|---|
| Signed: | Signed: |
| Title: | Title: |

## Monthly Settlement Report
## Magerick LLC
## As of August 29, 2023
## Loan Tape Date as of: 08/15/2023

### I. Computation of Unpaid Principal Balance

| | | |
|---|---|---:|
| Unpaid Principal Balance of Pledged Assets | $ | 77,568,074.81 |
| Unpaid Principal Balance of Ineligible Pledged Assets | $ | (1,701,987.27) |
| Unpaid Principal Balance of Eligible Pledged Assets | $ | 75,866,087.54 |

### II. Computation of Real Estate Value

| | | |
|---|---|---:|
| Real Estate Value of Pledged Assets | $ | 120,611,560.95 |
| Real Estate Value of Ineligible Pledged Assets | $ | (2,155,900.00) |
| Real Estate Value of Eligible Pledged Assets | $ | 118,455,660.95 |

### III. Computation of Borrowing Limit

| | | |
|---|---|---:|
| Unrestricted Advance on Eligible Assets | $ | 47,727,462.11 |
| Over Collateralization due to Property Type Sublimit | $ | - |
| Over Collateralization due to Ground-up Construction Sublimit | $ | - |
| Over Collateralization due to Single Loan Limits | $ | (9,053.08) |
| Over Collateralization due to REO Sublimits | $ | - |
| Over Collateralization due to NPL Sublimits | $ | (698,909.03) |
| Over Collateralization due to Commitment Limitation | $ | (19,500.00) |
| Total Over Collateralization | $ | (727,462.11) |
| Borrowing Limit | $ | 47,000,000.00 |

### IV. Computation of Facility Availability

| | | |
|---|---|---:|
| Commitment | $ | 47,000,000.00 |
| Withheld Commitment | $ | - |
| Approved but not Active | $ | - |
| Adjusted Borrowing Limit | $ | 47,000,000.00 |
| | | |
| Facility Balance | $ | 46,410,263.92 |
| | | |
| **Availability (Adjusted Borrowing Limit Less Facility Balance)** | $ | 589,736.08 |

| | |
|---|---:|
| WAB Loan Maximum Advance to Maximum Unpaid Principal Balance (LTB) | 63.10% |
| WAB Loan Maximum Advance to Real Estate Value (LTV) | 39.68% |
| Borrower Loan Maximum Advance to Real Estate Value | 62.88% |

The undersigned represents and warrants that this Borrowing Base Certificate is true and correct statement of the Borrowing Base, and that the information contained herein is true and correct in all material respects. The undersigned further represents and warrants that (i) there is no Default or Event of Default occurring or continuing under any of the Facility Documents, (ii) all representations and warranties contained in the Facility Documents are true and correct in all material respects, and (iii) all amounts reflected herein have been determined and calculated in strict compliance with the provisions of the Facility Documents and the Exhibits and Schedules thereto. Capitalized terms used herein and not otherwise defined herein shall have the meanings specified in the Facility Documents.

| **Magerick LLC** | **WAB Reviewer** |
|---|---|
| Signed: | Signed: *Thomas Skripps* |
| Title: | Title: Credit Analyst - 08/30/23 |

| **WAB Approval** | **WAB Additional Approval** |
|---|---|
| Signed: *Kevin Chai* | Signed: *M.C. Englert* |
| Title: VP - 08/29/23 | Title: VP 08/29/23 |

| Collateral Loan Number | Collateral Loan Borrower Name | Property Street | Property City | Property State | REO/Forbearance | Collateral Loan Cost Basis | Collateral Loan UPB | Collateral Loan Commitment | Collateral Loan Issuance Date | Collateral Loan Maturity Date | Collateral Loan Interest Rate | Lien Position | Days Past Due | Collateral Loan Performance Status | Dwell Time | Aggregate Eligible Property Value | LTB Advance Rate | LTV Advance Rate | LTB Advance | LTV Advance | Amount Eligible to be Advanced |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 19103803 | | | ASBURY | NJ | | $ 48,439.34 | $45,936.53 | 45,937 | 3/4/1994 | 10/1/2055 | 8.00% | 1 | D | Non-Performing | 575 | $ 246,000 | 15% | 95% | $ 29,859 | $ 159,900 | $ 48,439.34 |
| 22355945 | | | SPRING HILL | FL | | $ 253,628.19 | $249,027.15 | 249,027 | 3/26/2007 | 6/1/2055 | 6.38% | 1 | D | Non-Performing | 575 | $ 334,000 | 15% | 95% | $ 161,868 | $ 217,100 | $ 217,100.00 |
| 22424956 | | | PLEASANTVILLE | NJ | | $ 70,857.27 | $174,982 | 174,982 | 6/15/2007 | 6/1/2052 | 6.50% | 1 | D | Non-Performing | 575 | $ 123,000 | 15% | 95% | $ 46,057 | $ 79,300 | $ 70,857.27 |
| 23533755 | | | COLLINGSWOOD | NJ | | $ 59,101.37 | $34,747.32 | 34,747 | 1/4/1993 | 3/1/2036 | 8.13% | 1 | D | Non-Performing | 575 | $ 343,000 | 15% | 95% | $ 22,584 | $ 232,950 | $ 59,101.37 |
| 23552730 | | | ENGLISHTOWN | NJ | | $ 507,605.73 | $449,936.12 | 451,312 | 5/20/2005 | 7/1/2055 | 5.88% | 1 | D | Non-Performing | 575 | $ 784,000 | 15% | 95% | $ 292,458 | $ 509,600 | $ 500,000.00 |
| 23788094 | | | JERSEY CITY | NJ | | $ 267,374.32 | $319,817.59 | 317,171 | 11/27/2007 | 6/1/2059 | 7.88% | 1 | D | Non-Performing | 575 | $ 316,000 | 15% | 95% | $ 173,793 | $ 205,400 | $ 205,400.00 |
| 23872161 | | | EDISON | NJ | | $ 331,082.97 | $319,129.24 | 305,503 | 1/9/2007 | 2/1/2060 | 5.88% | 1 | D | Non-Performing | 575 | $ 394,000 | 15% | 95% | $ 198,577 | $ 256,100 | $ 256,100.00 |
| 23873375 | | | PATERSON | NJ | | $ 287,934.87 | $269,848.51 | 268,465 | 9/11/2007 | 5/1/2059 | 7.75% | 1 | D | Non-Performing | 575 | $ 405,000 | 15% | 95% | $ 174,503 | $ 263,250 | $ 263,250.00 |
| 23962830 | | | YOUNGSTOWN | FL | | $ 25,657.38 | $23,179.11 | 23,179 | 9/19/2002 | 10/1/2032 | 6.50% | 1 | D | Non-Performing | 575 | $ 124,000 | 15% | 95% | $ 15,066 | $ 80,600 | $ 25,657.38 |
| 24025025 | | | WINSLOW TOWNSHIP | NJ | | $ 157,078.63 | $145,146.59 | 145,147 | 8/26/2004 | 3/1/2056 | 6.63% | 1 | D | Non-Performing | 575 | $ 262,000 | 15% | 95% | $ 94,349 | $ 170,300 | $ 157,078.63 |
| 24755167 | | | HASBROUCK HEIGHTS | NJ | | $ 416,413.08 | $492,522 | 492,522 | 3/31/2010 | 11/1/2057 | 5.88% | 1 | D | Non-Performing | 575 | $ 513,000 | 15% | 95% | $ 270,669 | $ 333,450 | $ 333,450.00 |
| 24797904 | | | ESTERO | FL | | $ 326,802.01 | $394,491.63 | 339,587 | 7/18/2003 | 1/1/2057 | 6.63% | 1 | D | Non-Performing | 575 | $ 742,000 | 15% | 95% | $ 212,421 | $ 482,300 | $ 326,802.01 |
| 24803926 | | | ENGLISHTOWN | NJ | | $ 257,474.04 | $252,445 | 252,445 | 2/15/2011 | 5/1/2058 | 4.75% | 1 | D | Non-Performing | 575 | $ 585,000 | 15% | 95% | $ 164,089 | $ 380,250 | $ 257,474.04 |
| 25069790 | | | WEST MILFORD | NJ | | $ 206,885.83 | $197,166.94 | 197,167 | 10/5/2006 | 7/1/2053 | 6.63% | 1 | D | Non-Performing | 575 | $ 297,000 | 15% | 95% | $ 128,159 | $ 193,050 | $ 193,050.00 |
| 25109349 | | | IRVINGTON | NJ | | $ 247,396.39 | $253,909.73 | 255,461 | 6/21/2007 | 1/1/2053 | 5.88% | 1 | D | Non-Performing | 575 | $ 366,000 | 15% | 95% | $ 160,808 | $ 237,900 | $ 237,900.00 |
| 25466798 | | | MIAMI | FL | | $ 356,229.72 | $318,839.14 | 318,839 | 12/15/2006 | 3/1/2055 | 6.25% | 1 | D | Non-Performing | 575 | $ 465,000 | 15% | 95% | $ 207,245 | $ 302,250 | $ 302,250.00 |
| 25470915 | | | DELRAN | NJ | | $ 249,447.76 | $375,548.56 | 375,549 | 5/1/2006 | 10/1/2057 | 7.25% | 1 | D | Non-Performing | 575 | $ 318,000 | 15% | 95% | $ 162,141 | $ 206,700 | $ 206,700.00 |
| 25472564 | | | BRICK TOWNSHIP | NJ | | $ 292,149.16 | $427,049.00 | 427,049 | 12/5/2007 | 7/1/2056 | 6.88% | 1 | D | Non-Performing | 575 | $ 368,000 | 15% | 95% | $ 189,897 | $ 239,200 | $ 239,200.00 |
| 25476334 | | | SELUN | NJ | | $ 423,023.99 | $562,153.92 | 562,154 | 8/1/2007 | 5/1/2058 | 6.25% | 1 | D | Non-Performing | 575 | $ 484,000 | 15% | 95% | $ 274,966 | $ 314,600 | $ 314,600.00 |
| 26810515 | | | MELBOURNE | FL | | $ 115,685.63 | $114,935.06 | 119,773 | 12/19/2013 | 7/1/2058 | 5.00% | 1 | D | Non-Performing | 575 | $ 255,000 | 15% | 95% | $ 74,708 | $ 165,750 | $ 115,685.63 |
| 26836197 | | | MIDDLE TOWNSHIP | NJ | | $ 163,073.89 | $159,118.74 | 150,906 | 9/21/2005 | 5/1/2060 | 6.63% | 1 | D | Non-Performing | 575 | $ 201,000 | 15% | 95% | $ 96,089 | $ 130,650 | $ 130,650.00 |
| 26840419 | | | EGG HARBOR TOWNSHIP | NJ | | $ 307,630.66 | $229,838.65 | 239,839 | 10/26/2006 | 7/1/2058 | 6.88% | 1 | D | Non-Performing | 575 | $ 228,000 | 15% | 95% | $ 134,960 | $ 148,200 | $ 148,200.00 |
| 26859975 | | | NEWTON | NJ | | $ 178,216.98 | $245,463.50 | 245,464 | 11/30/2006 | 11/1/2057 | 6.38% | 1 | D | Non-Performing | 575 | $ 225,000 | 15% | 95% | $ 115,841 | $ 146,250 | $ 146,250.00 |
| 26877712 | | | JACKSONVILLE | FL | | $ 145,858.86 | $142,157.31 | 146,561 | 7/24/2013 | 8/1/2058 | 4.63% | 1 | D | Non-Performing | 575 | $ 258,000 | 15% | 95% | $ 92,403 | $ 167,700 | $ 145,858.86 |
| 26884305 | | | ORLANDO | FL | | $ 213,471.84 | $223,362.36 | 223,362 | 10/4/2006 | 3/1/2058 | 6.00% | 1 | D | Non-Performing | 575 | $ 380,000 | 15% | 95% | $ 138,757 | $ 247,000 | $ 213,471.84 |
| 26892646 | | | PORT SAINT LUCIE | FL | | $ 217,071.79 | $201,649.19 | 201,780 | 9/20/2007 | 1/1/2058 | 6.75% | 1 | D | Non-Performing | 575 | $ 348,000 | 15% | 95% | $ 131,072 | $ 226,200 | $ 217,071.79 |
| 27852334 | | | DELRAN | NJ | | $ 90,379.86 | $91,957.97 | 91,958 | 5/8/2007 | 6/1/2037 | 6.50% | 1 | D | Non-Performing | 575 | $ 123,000 | 15% | 95% | $ 58,747 | $ 79,950 | $ 79,950.00 |
| 29144342 | | | EWING | NJ | | $ 162,706.50 | $178,445.68 | 178,446 | 9/3/2016 | 10/1/2046 | 6.38% | 1 | D | Non-Performing | 575 | $ 214,000 | 15% | 95% | $ 105,759 | $ 139,100 | $ 139,100.00 |
| 29277119 | | | OCALA | FL | | $ 106,168.69 | $99,071.71 | 99,071 | 2/13/2013 | 1/1/2043 | 4.38% | 1 | D | Non-Performing | 575 | $ 225,000 | 15% | 95% | $ 64,981 | $ 146,250 | $ 106,168.69 |
| 29344249 | | | BOROUGH OF PITMAN | NJ | | $ 109,687.87 | $102,762.75 | 102,763 | 12/27/2006 | 2/1/2060 | 6.13% | 1 | D | Non-Performing | 575 | $ 216,000 | 15% | 95% | $ 66,794 | $ 140,400 | $ 109,687.87 |
| 093-684831 | | | SEBRING | FL | | $ 275,400.00 | $149,449.54 | 325,341 | 10/16/2009 | 3/1/2050 | 5.50% | 1 | D | Non-Performing | 387 | $ 329,200 | 15% | 95% | $ 97,143 | $ 213,980 | $ 213,980.00 |
| 094-518109 | | | KISSIMMEE | FL | | $ 218,700.00 | $144,611.65 | 243,254 | 7/21/2006 | 11/1/2058 | 2.08% | 1 | D | Non-Performing | 387 | $ 358,300 | 15% | 95% | $ 91,658 | $ 231,595 | $ 218,700.00 |
| 094-518942 | | | DAYTONA BEACH | FL | | $ 215,055.00 | $144,218.21 | 234,340 | 7/18/2006 | 11/1/2046 | 2.08% | 1 | D | Non-Performing | 387 | $ 379,400 | 15% | 95% | $ 93,742 | $ 246,610 | $ 215,055.00 |
| 094-519764 | | | ORMOND BEACH | FL | | $ 225,990.00 | $154,243.75 | 244,305 | 11/9/2006 | 5/1/2055 | 2.08% | 1 | D | Non-Performing | 387 | $ 370,300 | 15% | 95% | $ 100,258 | $ 240,695 | $ 225,990.00 |
| 095-031930 | | | MIAMI | FL | | $ 346,680.00 | $237,637.95 | 387,122 | 10/25/2006 | 8/1/2052 | 2.08% | 1 | D | Non-Performing | 387 | $ 581,300 | 15% | 95% | $ 154,465 | $ 377,780 | $ 346,680.00 |
| 095-061292 | | | LAUDERDALE LAKES | FL | | $ 251,100.00 | $196,546.98 | 291,685 | 5/16/2008 | 9/1/2056 | 2.08% | 1 | D | Non-Performing | 387 | $ 360,000 | 15% | 95% | $ 127,756 | $ 234,000 | $ 234,000.00 |
| 271-925258 | | | GRAND RAPIDS | MN | | $ 100,500.00 | $73,173.02 | 123,559 | 4/12/2006 | 6/1/2054 | 2.08% | 1 | D | Non-Performing | 387 | $ 138,200 | 15% | 95% | $ 46,913 | $ 89,830 | $ 89,830.00 |
| 371-356850 | | | ROME | NY | | $ 33,870.00 | $78,233.62 | 135,588 | 5/11/2006 | 8/1/2054 | 2.08% | 1 | D | Non-Performing | 387 | $ 197,300 | 15% | 95% | $ 22,018 | $ 128,245 | $ 33,870.00 |
| 381-804217 | | | NEWPORT | NC | | $ 172,500.00 | $131,316.99 | 197,416 | 4/13/2007 | 1/1/2052 | 2.08% | 1 | D | Non-Performing | 387 | $ 283,700 | 15% | 95% | $ 85,356 | $ 184,405 | $ 172,500.00 |
| 381-826469 | | | CONOVER | NC | | $ 142,500.00 | $101,348.89 | 168,299 | 5/11/2009 | 6/1/2059 | 3.11% | 1 | D | Non-Performing | 387 | $ 199,900 | 15% | 95% | $ 65,877 | $ 129,935 | $ 129,935.00 |
| 137-590664 | | | CHICAGO | IL | | $ 199,193.41 | $154,056.95 | 311,725 | 8/10/2010 | 3/1/2050 | 5.49% | 1 | D | Non-Performing | 387 | $ 284,562 | 15% | 95% | $ 100,137 | $ 184,965 | $ 184,965.31 |
| 241-823068 | | | STREET | MD | | $ 80,960.00 | $175,396.10 | 271,183 | 7/17/2008 | 10/1/2055 | 2.33% | 1 | D | Non-Performing | 345 | $ 88,000 | 15% | 95% | $ 52,624 | $ 57,200 | $ 57,200.00 |
| 241-968464 | | | BALTIMORE | MD | | $ 133,038.00 | $98,385.52 | 193,608 | 2/27/2012 | 3/1/2050 | 5.00% | 1 | D | Non-Performing | 345 | $ 190,000 | 15% | 95% | $ 63,953 | $ 123,500 | $ 123,500.00 |
| 277-029787 | | | ISLE | MN | | $ 438,400.00 | $419,747.00 | 869,840 | 11/3/2009 | 11/1/2058 | 5.50% | 1 | D | Non-Performing | 345 | $ 548,000 | 15% | 95% | $ 272,836 | $ 356,200 | $ 356,200.00 |
| 411-481310 | | | ARCANUM | OH | | $ 64,400.00 | $80,846.30 | 167,586 | 11/2/2010 | 11/1/2046 | 5.25% | 1 | D | Non-Performing | 345 | $ 92,000 | 15% | 95% | $ 41,860 | $ 59,800 | $ 59,800.00 |
| 412-581330 | | | CLEVELAND HTS | OH | | $ 69,700.00 | $102,957.52 | 159,133 | 4/25/2008 | 6/1/2055 | 2.08% | 1 | D | Non-Performing | 345 | $ 85,300 | 15% | 95% | $ 45,309 | $ 55,250 | $ 55,250.00 |
| 442-184868 | | | AMBRIDGE | PA | | $ 53,944.00 | $83,938.30 | 155,820 | 1/17/1997 | 3/1/2052 | 1.78% | 1 | D | Non-Performing | 345 | $ 61,300 | 15% | 95% | $ 35,064 | $ 39,845 | $ 39,845.00 |
| 290585 | | | NIAGARA FALLS | NY | | $ 6,924.68 | $21,844.85 | 16,634 | 5/31/2002 | 6/1/2032 | 10.38% | 1 | D | Non-Performing | 323 | $ 30,000 | 15% | 95% | $ 4,501 | $ 19,500 | $ 6,924.68 |
| 290606 | | | MADISON | NY | | $ 11,591.35 | $56,885.41 | 27,845 | 9/22/2000 | 9/27/2020 | 11.50% | 1 | D | Non-Performing | 323 | $ 50,000 | 15% | 95% | $ 7,534 | $ 32,500 | $ 11,591.35 |
| 290607 | | | JAMESTOWN | NY | | $ 10,910.11 | $61,424.05 | 26,208 | 4/20/2001 | 5/1/2031 | 3.63% | 1 | D | Non-Performing | 323 | $ 43,000 | 15% | 95% | $ 7,092 | $ 27,950 | $ 10,910.11 |
| 303194 | | | WARSAW | NY | | $ 35,611.31 | $83,244.51 | 85,546 | 8/8/2017 | 9/1/2047 | 4.88% | 1 | D | Non-Performing | 323 | $ 164,800 | 15% | 95% | $ 23,147 | $ 107,120 | $ 35,611.31 |
| 308842 | | | CLAYTON | NY | | $ 3,647.77 | $17,627.88 | 1,763 | 3/14/2002 | 4/15/2022 | 9.76% | 1 | D | Non-Performing | 323 | $ 50,000 | 15% | 95% | $ 2,371 | $ 32,500 | $ 3,647.77 |
| 308843 | | | BUFFALO | NY | | $ 7,301.15 | $23,553.56 | 17,539 | 12/28/2007 | 2/1/2032 | 3.63% | 1 | D | Non-Performing | 323 | $ 53,500 | 15% | 95% | $ 4,746 | $ 34,775 | $ 7,301.15 |
| 308848 | | | NICHOLS | NY | | $ 13,726.60 | $31,564.45 | 32,979 | 9/27/2006 | 2/1/2037 | 4.50% | 1 | D | Non-Performing | 323 | $ 36,000 | 15% | 95% | $ 8,924 | $ 23,400 | $ 13,726.60 |
| 308849 | | | WYNANTSKILL | NY | | $ 5,901.33 | $27,735.72 | 14,176 | 4/28/2003 | 4/12/2026 | 3.00% | 1 | D | Non-Performing | 323 | $ 9,800 | 15% | 95% | $ 3,836 | $ 6,370 | $ 5,901.33 |
| 308850 | | | GLOVERSVILLE | NY | | $ 9,434.38 | $55,987.19 | 22,663 | 12/7/2009 | 2/1/2041 | 11.81% | 1 | D | Non-Performing | 323 | $ 25,000 | 15% | 95% | $ 6,132 | $ 16,250 | $ 9,434.38 |
| 310670 | | | LIBERTY | NY | | $ 27,424.75 | $97,935.56 | 65,880 | 11/16/2006 | 11/16/2031 | 3.49% | 1 | D | Non-Performing | 323 | $ 45,000 | 15% | 95% | $ 17,826 | $ 29,250 | $ 27,424.75 |
| 311023 | | | BALLSTON LAKE | NY | | $ 56,977.47 | $107,150.74 | 136,871 | 9/30/2003 | 10/1/2033 | 3.38% | 1 | D | Non-Performing | 323 | $ 230,000 | 15% | 95% | $ 37,035 | $ 149,500 | $ 56,977.47 |
| 311024 | | | CORTLAND | NY | | $ 42,889.54 | $103,029.34 | 103,029 | 9/1/2005 | 8/1/2048 | 4.75% | 1 | D | Non-Performing | 323 | $ 98,000 | 15% | 95% | $ 27,878 | $ 63,700 | $ 42,889.54 |
| 314321 | | | BROOKLYN | NY | | $ 133,063.53 | $820,796.79 | 319,645 | 5/5/2006 | 6/1/2036 | 8.95% | 1 | D | Non-Performing | 323 | $ 620,000 | 15% | 95% | $ 86,491 | $ 403,000 | $ 133,063.53 |
| 315581 | | | SELDEN | NY | | $ 122,654.74 | $294,641.64 | 294,641 | 2/20/2007 | 3/1/2052 | 5.00% | 1 | D | Non-Performing | 323 | $ 325,000 | 15% | 95% | $ 79,726 | $ 211,250 | $ 122,654.74 |
| 315582 | | | SANDY CREEK | NY | | $ 44,804.84 | $107,630.27 | 107,630 | 9/1/2007 | 10/1/2052 | 6.50% | 1 | D | Non-Performing | 323 | $ 94,900 | 15% | 95% | $ 29,113 | $ 61,685 | $ 44,804.84 |
| 315590 | | | BROOKLYN | NY | | $ 234,133.99 | $1,617,350.93 | 562,437 | 8/1/2007 | 8/31/2037 | 10.06% | 1 | D | Non-Performing | 323 | $ 805,000 | 15% | 95% | $ 152,187 | $ 523,250 | $ 234,133.99 |
| 315596 | | | BRONX | NY | | $ 34,997.09 | $84,612.93 | 84,070 | 10/31/2006 | 11/1/2036 | 4.25% | 1 | D | Non-Performing | 323 | $ 160,000 | 15% | 95% | $ 22,748 | $ 104,000 | $ 34,997.09 |
| 315812 | | | EAST MEADOW | NY | | $ 139,200.89 | $334,389.12 | 334,389 | 12/30/2008 | 3/1/2039 | 5.50% | 1 | D | Non-Performing | 323 | $ 670,000 | 15% | 95% | $ 90,481 | $ 435,500 | $ 139,200.89 |
| 315813 | | | MASSAPEQUA | NY | | $ 169,292.59 | $1,081,617.43 | 406,675 | 4/2/2004 | 5/1/2034 | 6.34% | 1 | D | Non-Performing | 323 | $ 560,000 | 15% | 95% | $ 110,040 | $ 364,000 | $ 364,000.00 |
| 321449 | | | SMITHTOWN | NY | | $ 172,966.32 | $647,284.73 | 415,500 | 7/19/2018 | 1/1/2019 | 9.99% | 1 | D | Non-Performing | 323 | $ 585,000 | 15% | 95% | $ 112,428 | $ 380,250 | $ 380,250.00 |
| 10200004 | | | FRIENDSVILLE | MD | | $ 85,092.50 | $207,085.61 | 204,409 | 4/9/2010 | 5/20/2028 | 5.50% | 1 | D | Non-Performing | 323 | $ 125,000 | 15% | 95% | $ 55,310 | $ 81,250 | $ 81,250.00 |
| 10200006 | | | HULBERT | OK | | $ 69,233.35 | $167,944.11 | 166,312 | 10/7/1998 | 5/15/2028 | 3.22% | 1 | D | Non-Performing | 323 | $ 50,000 | 15% | 95% | $ 45,002 | $ 32,500 | $ 32,500.00 |
| 10200017 | | | JACKSONVILLE | FL | | $ 60,109.62 | $144,395.43 | 144,395 | 8/1/2001 | 7/1/2031 | 8.10% | 1 | D | Non-Performing | 323 | $ 105,000 | 15% | 95% | $ 39,071 | $ 68,250 | $ 60,109.62 |
| 10200019 | | | SIMOAKS | SC | | $ 33,382.29 | $28,288.51 | 80,191 | 10/29/1999 | 11/3/2014 | 10.49% | 1 | D | Non-Performing | 323 | $ 100,000 | 15% | 95% | $ 18,388 | $ 65,000 | $ 33,382.29 |
| 10200022 | | | CLAIRTON | PA | | $ 33,726.69 | $73,164.41 | 81,326 | 5/20/1998 | 6/1/2028 | 9.80% | 1 | D | Non-Performing | 323 | $ 81,000 | 15% | 95% | $ 21,924 | $ 52,650 | $ 33,726.69 |
| 10200033 | | | PRATTVILLE | AL | | $ 23,808.50 | $57,192.82 | 57,193 | 5/18/1999 | 6/1/2049 | 5.00% | 1 | D | Non-Performing | 323 | $ 50,000 | 15% | 95% | $ 15,476 | $ 32,500 | $ 23,808.50 |
| 10200034 | | | AMERICUS | GA | | $ 31,366.97 | $60,125.59 | 75,350 | 11/27/2002 | 12/1/2005 | 5.83% | 1 | D | Non-Performing | 323 | $ 50,000 | 15% | 95% | $ 20,389 | $ 32,500 | $ 31,366.97 |
| 10200064 | | | ANADARKO | OK | | $ 17,258.69 | $14,890.67 | 41,459 | 4/20/2002 | 12/1/2059 | 4.50% | 1 | D | Non-Performing | 323 | $ 68,000 | 15% | 95% | $ 9,679 | $ 44,200 | $ 17,258.69 |
| 10200073 | | | BALTIMORE | MD | | $ 17,631.76 | $109,847.47 | 81,875 | 3/24/1989 | 3/14/2004 | 10.00% | 1 | D | Non-Performing | 323 | $ 170,000 | 15% | 95% | $ 11,331 | $ 110,500 | $ 17,631.76 |
| 10200086 | | | EAST SAINT LOUIS | IL | | $ 48,121.67 | $31,314.53 | 115,598 | 2/20/2006 | 2/15/2006 | 9.94% | 1 | D | Non-Performing | 323 | $ 42,000 | 15% | 95% | $ 20,354 | $ 27,300 | $ 27,300.00 |
| 10200096 | | | AKRON | OH | | $ 38,942.76 | $67,201.95 | 93,548 | 4/6/2005 | 5/1/2035 | 7.69% | 1 | D | Non-Performing | 323 | $ 59,000 | 15% | 95% | $ 25,313 | $ 38,350 | $ 38,350.00 |
| 10200099 | | | JACKSONVILLE | FL | | $ 36,531.09 | $89,719.45 | 93,755 | 5/8/2004 | 3/1/2034 | 5.99% | 1 | D | Non-Performing | 323 | $ 130,000 | 15% | 95% | $ 23,745 | $ 84,500 | $ 36,531.09 |
| 10200108 | | | LOS LUNAS | NM | | $ 21,551.77 | $56,733.24 | 52,751 | 5/24/2002 | 6/1/2032 | 2.00% | 1 | D | Non-Performing | 323 | $ 145,000 | 15% | 95% | $ 14,008 | $ 94,250 | $ 21,551.77 |
| 10200109 | | | CAMBRIDGE | OH | | $ 27,282.31 | $70,761.28 | 65,538 | 3/1/2004 | 3/15/2034 | 8.75% | 1 | D | Non-Performing | 323 | $ 110,000 | 15% | 95% | $ 17,734 | $ 44,200 | $ 27,282.31 |
| 10200112 | | | LOUISVILLE | KY | | $ 8,124.28 | $30,144.15 | 19,516 | 8/1/2001 | 8/20/2031 | 10.38% | 1 | D | Non-Performing | 323 | $ 45,000 | 15% | 95% | $ 5,281 | $ 29,250 | $ 8,124.28 |
| 10200119 | | | COLUMBIA | SC | | $ 23,797.72 | $57,166.91 | 57,167 | 9/9/2002 | 10/1/2052 | 7.28% | 1 | D | Non-Performing | 323 | $ 118,000 | 15% | 95% | $ 15,468 | $ 76,700 | $ 23,797.72 |
| 10200119 | | | DONNA | TX | | $ 10,140.21 | $25,379.03 | 24,359 | 7/21/2003 | 8/1/2033 | 4.63% | 1 | D | Non-Performing | 323 | $ 50,000 | 15% | 95% | $ 6,591 | $ 32,500 | $ 10,140.21 |
| 10200120 | | | WAVERLY | OH | | $ 27,186.15 | $71,443.22 | 65,307 | 5/16/2002 | 5/21/2022 | 9.99% | 1 | D | Non-Performing | 323 | $ 57,000 | 15% | 95% | $ 7,438 | $ 37,050 | $ 27,186.15 |
| 10200126 | | | NEW CASTLE | IN | | $ 28,136.08 | $71,177.18 | 67,589 | 2/15/2002 | 2/26/2017 | 9.90% | 1 | D | Non-Performing | 323 | $ 30,000 | 15% | 95% | $ 18,288 | $ 19,500 | $ 19,500.00 |
| 10200127 | | | MERIDIAN | MS | | $ 11,607.62 | $26,030.43 | 27,884 | 2/21/2002 | 3/1/2032 | 3.00% | 1 | D | Non-Performing | 323 | $ 17,000 | 15% | 95% | $ 7,545 | $ 11,050 | $ 11,050.00 |
| 10200135 | | | SPRINGFIELD | MO | | $ 14,688.27 | $27,521.74 | 28,284 | 11/19/2001 | 3/1/2032 | 8.00% | 1 | D | Non-Performing | 323 | $ 72,000 | 15% | 95% | $ 9,547 | $ 47,125 | $ 14,688.27 |
| 10200138 | | | ROCKY MOUNT | NC | | $ 10,602.75 | $25,469.94 | 25,470 | 4/25/2005 | 12/1/2054 | 4.50% | 1 | D | Non-Performing | 323 | $ 37,000 | 15% | 95% | $ 6,892 | $ 24,050 | $ 10,602.75 |
| 10200139 | | | DAYTON | OH | | $ 18,376.51 | $46,801.00 | 44,144 | 6/28/2002 | 7/1/2017 | 6.68% | 1 | D | Non-Performing | 323 | $ 94,000 | 15% | 95% | $ 11,945 | $ 32,500 | $ 18,376.51 |
| 10200141 | | | RANDOLPH | ME | | $ 99,631.40 | $241,968.13 | 239,335 | 6/8/2007 | 3/1/2037 | 7.50% | 1 | D | Non-Performing | 323 | $ 111,000 | 15% | 95% | $ 64,760 | $ 58,900 | $ 58,900.00 |
| 10200152 | | | BIRMINGHAM | AL | | $ 10,648.75 | $3,477.71 | 25,580 | 11/2/2012 | 10/1/2027 | 5.27% | 1 | D | Non-Performing | 323 | $ 45,000 | 15% | 95% | $ 3,261 | $ 29,250 | $ 10,648.75 |
| 10200183 | | | WOODVILLE | ME | | $ 54,559.33 | $133,164.50 | 131,063 | 10/13/2006 | 11/1/2006 | 7.88% | 1 | D | Non-Performing | 323 | $ 30,000 | 15% | 95% | $ 35,464 | $ 19,500 | $ 19,500.00 |
| 10200187 | | | HIAWASSEE | GA | | $ 23,986.40 | $37,620.17 | 57,620 | 2/9/2005 | 3/1/2035 | 5.52% | 1 | D | Non-Performing | 323 | $ 140,000 | 15% | 95% | $ 15,591 | $ 91,000 | $ 23,986.40 |
| 10200190 | | | MOSES LAKE | WA | | $ 51,881.62 | $133,210.24 | 124,630 | 8/9/2004 | 4/5/2024 | 5.00% | 1 | D | Non-Performing | 323 | $ 211,400 | 15% | 95% | $ 33,723 | $ 137,410 | $ 51,881.62 |
| 10200222 | | | BALTIMORE | MD | | $ 62,292.66 | $149,429.53 | 149,640 | 9/20/2016 | 9/15/2020 | 5.00% | 1 | D | Non-Performing | 323 | $ 220,000 | 15% | 95% | $ 40,490 | $ 143,000 | $ 62,292.66 |
| 10200228 | | | EASTON | CT | | $ 396,562.60 | $485,255.34 | 498,884 | 5/30/1996 | 5/15/2028 | 5.00% | 1 | D | Non-Performing | 323 | $ 603,100 | 15% | 95% | $ 257,766 | $ 392,015 | $ 392,015.00 |
| 10300006 | | | QUINCY | MI | | $ 92,805.96 | $137,876.97 | 138,145 | 7/21/2005 | 7/21/2005 | 3.25% | 1 | D | Non-Performing | 323 | $ 231,200 | 15% | 95% | $ 60,324 | $ 151,580 | $ 92,805.96 |

| ID | City | State | | Amount | Balance | Num | Date1 | Date2 | Rate | | | Status | | Value | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 10400002 | GASTON | SC | | 38,716.00 | $151,499.13 | 93,004 | 10/26/2005 | 11/1/2025 | 8.59% | 1 | D | Non-Performing | 323 | 75,000 | 15% | 05% | 25,162 | 48,750 | 38,716.00 |
| 12500003 | SANFORD | FL | | 276,184.98 | $656,482.19 | 663,452 | 11/20/2007 | 12/1/2019 | 7.50% | 1 | D | Non-Performing | 323 | 485,000 | 15% | 05% | 179,520 | 315,250 | 276,184.98 |
| 312000078 | GADSDEN | AL | | 9,117.77 | $20,869.80 | 21,903 | 3/4/2000 | 2/4/2015 | 13.74% | 1 | D | Non-Performing | 323 | 49,900 | 15% | 05% | 5,927 | 32,435 | 9,117.77 |
| 312000079 | BRIDGETON | NJ | | 30,531.06 | $59,365.44 | 72,342 | 1/27/2005 | 2/20/2020 | 6.87% | 1 | D | Non-Performing | 323 | 135,000 | 15% | 05% | 19,845 | 87,750 | 30,531.06 |
| 312000080 | LAKE CHARLES | LA | | 15,553.73 | $37,362.20 | 37,343 | 4/15/1996 | 1/13/2029 | 6.00% | 1 | D | Non-Performing | 323 | 12,000 | 15% | 05% | 10,110 | 7,800 | 7,800.00 |
| 312000099 | KINGSTREE | SC | | 11,216.93 | $26,945.33 | 26,945 | 9/17/1996 | 9/18/2034 | 5.00% | 1 | D | Non-Performing | 323 | 84,900 | 15% | 05% | 7,291 | 55,185 | 11,216.93 |
| 312000102 | SAINT LOUIS | MO | | 24,406.10 | $59,948.26 | 58,628 | 12/2/2001 | 10/1/2029 | 5.32% | 1 | D | Non-Performing | 323 | 24,000 | 15% | 05% | 15,864 | 15,600 | 15,600.00 |
| 312000114 | WILLIAMSPORT | PA | | 42,654.08 | $102,463.71 | 102,464 | 4/13/1999 | 11/1/2037 | 2.00% | 1 | D | Non-Performing | 323 | 102,000 | 15% | 05% | 27,725 | 66,300 | 42,654.08 |
| 312000118 | PANAMA CITY | FL | | 22,102.63 | $53,064.97 | 53,095 | 1/20/2003 | 4/1/2034 | 2.00% | 1 | D | Non-Performing | 323 | 43,000 | 15% | 05% | 14,367 | 27,950 | 22,102.63 |
| 312000128 | CAPTAIN COOK | HI | | 11,614.20 | $16,341.24 | 27,900 | 10/9/1997 | 11/24/2017 | 6.00% | 1 | D | Non-Performing | 323 | 255,000 | 15% | 05% | 7,549 | 165,750 | 11,614.20 |
| 312000140 | CICERO | IL | | 130,306.82 | $321,182.79 | 313,033 | 1/7/2007 | 6/1/2051 | 5.50% | 1 | D | Non-Performing | 323 | 230,000 | 15% | 05% | 84,698 | 149,500 | 130,306.82 |
| 312000143 | ALEXANDRIA | LA | | 29,472.47 | $145,451.18 | 70,799 | 4/25/2008 | 3/1/2035 | 2.12% | 1 | D | Non-Performing | 323 | 35,000 | 15% | 05% | 19,157 | 22,750 | 22,750.00 |
| 312000173 | KANSAS CITY | MO | | 11,546.31 | $52,546.66 | 27,737 | 8/24/2001 | 8/25/2026 | 6.13% | 1 | D | Non-Performing | 323 | 46,000 | 15% | 05% | 7,505 | 29,900 | 11,546.31 |
| 312000181 | BINGHAMTON | NY | | 15,336.38 | $49,957.13 | 36,841 | 12/4/2007 | 12/4/2022 | 8.44% | 1 | D | Non-Performing | 323 | 113,700 | 15% | 05% | 9,969 | 73,905 | 15,336.38 |
| 312000196 | GLOVERSVILLE | NY | | 32,561.99 | $140,736.79 | 78,220 | 7/27/2009 | 4/1/2039 | 5.10% | 1 | D | Non-Performing | 323 | 40,000 | 15% | 05% | 21,165 | 26,000 | 26,000.00 |
| 312000208 | TEMPLE HILLS | MD | | 65,850.24 | $26,321.92 | 158,186 | 6/4/2009 | 7/1/2039 | 5.00% | 1 | D | Non-Performing | 323 | 75,000 | 15% | 05% | 17,106 | 48,750 | 48,750.00 |
| 312000216 | TRENTON | NJ | | 29,716.91 | $72,363.66 | 71,386 | 3/17/2005 | 3/1/2018 | 6.87% | 1 | D | Non-Performing | 323 | 95,000 | 15% | 05% | 19,316 | 61,750 | 29,716.91 |
| 312000244 | STAFFORD | NY | | 37,276.03 | $89,549.36 | 89,549 | 4/27/2007 | 5/1/2037 | 8.25% | 1 | D | Non-Performing | 323 | 48,700 | 15% | 05% | 24,231 | 31,655 | 31,655.00 |
| 312000264 | BALTIMORE | MD | | 57,786.08 | $138,811.81 | 138,814 | 3/19/2007 | 6/1/2037 | 7.50% | 1 | D | Non-Performing | 323 | 110,000 | 15% | 05% | 37,561 | 71,500 | 57,786.08 |
| 312000267 | TAMPA | FL | | 101,777.31 | $176,250.15 | 244,490 | 5/23/2006 | 6/1/2036 | 5.13% | 1 | D | Non-Performing | 323 | 138,000 | 15% | 05% | 66,155 | 89,700 | 89,700.00 |
| 312000282 | OCALA | FL | | 215,473.96 | $3,280.01 | 517,612 | 10/15/2008 | 7/1/2036 | 6.75% | 1 | D | Non-Performing | 323 | 400,000 | 15% | 05% | 3,132 | 260,000 | 215,473.96 |
| 312000321 | CLEVELAND | OH | | 32,773.27 | $7,589.16 | 78,738 | 2/22/2002 | 3/1/2032 | 7.25% | 1 | D | Non-Performing | 323 | 58,000 | 15% | 05% | 4,933 | 37,700 | 32,773.27 |
| 312000338 | LANSING | MI | | 49,556.50 | $120,850.53 | 119,045 | 6/28/2007 | 7/1/2037 | 7.88% | 1 | D | Non-Performing | 323 | 61,000 | 15% | 05% | 32,213 | 39,650 | 39,650.00 |
| 312000529 | HAZELCREST | IL | | 14,652.06 | $25,504.88 | 35,197 | 7/5/1979 | 7/1/2009 | 10.75% | 1 | D | Non-Performing | 323 | 150,000 | 15% | 05% | 9,524 | 97,500 | 14,652.06 |
| 312000531 | PAULINE | SC | | 40,057.03 | $96,225.00 | 96,225 | 4/18/1997 | 5/1/2027 | 8.00% | 1 | D | Non-Performing | 323 | 53,000 | 15% | 05% | 26,037 | 34,450 | 34,450.00 |
| 312000610 | MERRITT ISLAND | FL | | 27,048.66 | $66,676.08 | 64,976 | 1/28/2000 | 2/1/2030 | 9.00% | 1 | D | Non-Performing | 323 | 50,000 | 15% | 05% | 17,582 | 32,500 | 27,048.66 |
| 312000628 | COLUMBUS | OH | | 65,058.25 | $156,283.04 | 156,283 | 8/20/2002 | 9/1/2022 | 6.50% | 1 | D | Non-Performing | 323 | 242,500 | 15% | 05% | 42,288 | 157,625 | 65,058.25 |
| 312000694 | MOUNTAINAIR | NM | | 24,556.91 | $59,994.13 | 58,991 | 3/2/2004 | 4/1/2034 | 6.81% | 1 | D | Non-Performing | 323 | 32,000 | 15% | 05% | 15,962 | 20,800 | 20,800.00 |
| 312000697 | NORTH VERNON | IN | | 28,267.91 | $68,572.41 | 67,905 | 3/27/2004 | 3/1/2034 | 5.75% | 1 | D | Non-Performing | 323 | 40,000 | 15% | 05% | 18,374 | 26,000 | 26,000.00 |
| 312000710 | ALTONA | NY | | 37,008.78 | $157,369.62 | 88,903 | 1/9/2007 | 2/1/2037 | 7.00% | 1 | D | Non-Performing | 323 | 22,500 | 15% | 05% | 24,056 | 14,625 | 14,625.00 |
| 312000720 | KANSAS CITY | KS | | 30,114.97 | $72,342.22 | 72,342 | 8/24/2007 | 8/1/2037 | 2.00% | 1 | D | Non-Performing | 323 | 13,000 | 15% | 05% | 19,575 | 8,450 | 8,450.00 |
| 312000726 | CHICAGO | IL | | 94,709.04 | $251,569.99 | 227,510 | 1/9/2008 | 2/1/2038 | 4.98% | 1 | D | Non-Performing | 323 | 40,000 | 15% | 05% | 61,561 | 26,000 | 26,000.00 |
| 312000749 | AKRON | OH | | 36,818.40 | $91,145.43 | 88,445 | 10/1/2010 | 10/1/2030 | 10.00% | 1 | D | Non-Performing | 323 | 54,000 | 15% | 05% | 23,932 | 35,100 | 35,100.00 |
| 312000761 | BALLVILLE TOWNSHIP | OH | | 33,163.17 | $81,328.70 | 79,645 | 2/23/1999 | 3/1/2029 | 7.30% | 1 | D | Non-Performing | 323 | 121,100 | 15% | 05% | 21,556 | 78,715 | 33,163.17 |
| 312000782 | SAINT LOUIS | MO | | 21,076.12 | $51,069.36 | 50,629 | 2/12/2002 | 3/1/2017 | 7.88% | 1 | D | Non-Performing | 323 | 12,500 | 15% | 05% | 13,699 | 8,125 | 8,125.00 |
| 312000815 | CLEVELAND | OH | | 28,061.25 | $67,408.78 | 67,409 | 9/29/1999 | 10/5/2029 | 8.45% | 1 | D | Non-Performing | 323 | 68,000 | 15% | 05% | 18,240 | 44,200 | 28,061.25 |
| 312000884 | PITTSBURGH | PA | | 9,817.37 | $118,674.17 | 23,583 | 2/1/2020 | 3/1/2027 | 4.50% | 1 | D | Non-Performing | 323 | 40,000 | 15% | 05% | 6,381 | 26,000 | 9,817.37 |
| 312000892 | WALTERBORO | SC | | 25,327.73 | $62,447.31 | 60,842 | 4/29/2005 | 5/1/2044 | 4.50% | 1 | D | Non-Performing | 323 | 126,000 | 15% | 05% | 16,463 | 81,900 | 25,327.73 |
| 312000907 | BELOIT | WI | | 13,881.84 | $102,251.97 | 33,347 | 3/14/2003 | 4/1/2018 | 5.25% | 1 | D | Non-Performing | 323 | 14,500 | 15% | 05% | 9,023 | 43,875 | 13,881.84 |
| 312000922 | MAPLE HEIGHTS | OH | | 53,904.92 | $25,055.86 | 129,490 | 6/23/2006 | 7/1/2036 | 5.00% | 1 | D | Non-Performing | 323 | 115,000 | 15% | 05% | 16,286 | 74,750 | 53,904.92 |
| 312000943 | MACON | MO | | 12,966.17 | $31,147.34 | 31,147 | 5/22/2007 | 6/1/2037 | 6.50% | 1 | D | Non-Performing | 323 | 23,000 | 15% | 05% | 8,408 | 14,950 | 12,966.17 |
| 312000951 | LITTLE ROCK | AR | | 33,279.90 | $82,373.85 | 79,945 | 12/20/1999 | 7/9/2029 | 14.99% | 1 | D | Non-Performing | 323 | 14,500 | 15% | 05% | 21,632 | 9,425 | 9,425.00 |
| 312000952 | ANDERSON | IN | | 46,304.74 | $111,333.14 | 111,333 | 3/19/2004 | 4/1/2034 | 5.50% | 1 | D | Non-Performing | 323 | 30,000 | 15% | 05% | 30,098 | 19,500 | 19,500.00 |
| 312000960 | MORGANFIELD | KY | | 38,503.95 | $93,934.17 | 92,494 | 12/29/2000 | 1/6/2016 | 10.79% | 1 | D | Non-Performing | 323 | 19,900 | 15% | 05% | 25,028 | 12,935 | 12,935.00 |
| 312000981 | WARRENSVILLE HEIGHTS | OH | | 52,391.29 | $117,822.64 | 125,854 | 2/24/2005 | 3/1/2035 | 6.88% | 1 | D | Non-Performing | 323 | 35,000 | 15% | 05% | 34,054 | 22,750 | 22,750.00 |
| 312000983 | MILWAUKEE | WI | | 133,855.97 | $80,318.87 | 321,549 | 8/16/2005 | 9/15/2035 | 8.00% | 1 | D | Non-Performing | 323 | 91,000 | 15% | 05% | 52,209 | 59,150 | 59,150.00 |
| 312001012 | PHILADELPHIA | PA | | 54,573.27 | $133,633.97 | 131,096 | 4/23/2008 | 5/1/2038 | 7.00% | 1 | D | Non-Performing | 323 | 67,000 | 15% | 05% | 35,473 | 43,550 | 43,550.00 |
| 312001050 | EDENTON | NC | | 14,627.20 | $35,568.58 | 35,137 | 8/1/1999 | 8/16/2014 | 7.88% | 1 | D | Non-Performing | 323 | 9,500 | 15% | 05% | 9,508 | 31,200 | 14,627.20 |
| 312001108 | HOLIDAY | FL | | 74,056.89 | $180,455.52 | 177,900 | 9/4/2002 | 3/1/2032 | 8.00% | 1 | D | Non-Performing | 323 | 48,000 | 15% | 05% | 48,137 | 31,200 | 31,200.00 |
| 312001123 | ST LOUIS | MO | | 50,467.09 | $123,569.96 | 121,232 | 7/23/1997 | 8/1/2021 | 10.13% | 1 | D | Non-Performing | 323 | 17,000 | 15% | 05% | 32,804 | 11,050 | 11,050.00 |
| 312001143 | MONSEY | NY | | 1,993.82 | $4,789.56 | 4,790 | 3/5/1998 | 6/1/2013 | 7.50% | 1 | D | Non-Performing | 323 | 462,000 | 15% | 05% | 1,296 | 300,300 | 1,993.82 |
| 312001190 | COVINGTON | KY | | 33,744.02 | $5,682.51 | 81,060 | 8/24/2001 | 8/1/2031 | 7.75% | 1 | D | Non-Performing | 323 | 72,000 | 15% | 05% | 3,694 | 46,800 | 33,744.02 |
| 312001275 | MILWAUKEE | WI | | 51,260.08 | $125,029.91 | 123,137 | 6/21/2006 | 7/1/2036 | 8.88% | 1 | D | Non-Performing | 323 | 47,000 | 15% | 05% | 33,319 | 30,550 | 30,550.00 |
| 312001277 | MIDDLETOWN | OH | | 26,417.61 | $69,005.41 | 63,460 | 12/6/1992 | 1/1/2023 | 7.50% | 1 | D | Non-Performing | 323 | 62,000 | 15% | 05% | 17,171 | 40,300 | 26,417.61 |
| 312001330 | SOUTH BEND | IN | | 55,191.67 | $129,137.10 | 132,583 | 12/13/2007 | 1/1/2038 | 6.75% | 1 | D | Non-Performing | 323 | 54,000 | 15% | 05% | 35,875 | 35,100 | 35,100.00 |
| 312001376 | LAKEVIEW | OH | | 20,561.81 | $332,146.52 | 49,394 | 10/26/2005 | 11/1/2025 | 6.75% | 1 | D | Non-Performing | 323 | 35,000 | 15% | 05% | 13,365 | 22,750 | 20,561.81 |
| 312001417 | GRAY | KY | | 33,860.69 | $82,374.80 | 81,340 | 10/12/2000 | 11/1/2015 | 10.25% | 1 | D | Non-Performing | 323 | 37,000 | 15% | 05% | 22,009 | 24,050 | 24,050.00 |
| 312001426 | COLUMBUS | OH | | 53,338.11 | $126,344.83 | 128,129 | 6/26/2002 | 7/1/2032 | 5.88% | 1 | D | Non-Performing | 323 | 79,000 | 15% | 05% | 34,670 | 51,350 | 51,350.00 |
| 312001434 | PHILADELPHIA | PA | | 12,150.48 | $29,187.91 | 29,188 | 8/30/1996 | 1/28/2022 | 12.74% | 1 | D | Non-Performing | 323 | 75,000 | 15% | 05% | 7,898 | 48,750 | 12,150.48 |
| 312001452 | FORT LAUDERDALE | FL | | 40,474.93 | $97,228.95 | 97,229 | 5/19/2005 | 6/1/2044 | 1.10% | 1 | D | Non-Performing | 323 | 110,000 | 15% | 05% | 26,309 | 71,500 | 40,474.93 |
| 312001457 | NORTH CHICAGO | IL | | 46,670.51 | $19,682.64 | 112,592 | 6/10/2005 | 7/1/2035 | 2.00% | 1 | D | Non-Performing | 323 | 32,000 | 15% | 05% | 12,794 | 20,800 | 20,800.00 |
| 312001461 | BLUFFTON | IN | | 34,642.19 | $83,217.52 | 83,218 | 4/27/2004 | 3/1/2044 | 3.11% | 1 | D | Non-Performing | 323 | 121,900 | 15% | 05% | 22,517 | 79,235 | 34,642.19 |
| 312001462 | LOUISVILLE | KY | | 32,338.46 | $77,683.50 | 77,684 | 9/29/2006 | 3/1/2054 | 2.80% | 1 | D | Non-Performing | 323 | 152,000 | 15% | 05% | 21,020 | 98,800 | 32,338.46 |
| 312001465 | COLUMBIA | SC | | 48,776.26 | $121,706.81 | 117,170 | 4/6/2001 | 3/1/2057 | 4.62% | 1 | D | Non-Performing | 323 | 31,700 | 15% | 05% | 31,705 | 81,250 | 48,776.26 |
| 312001472 | SALEM | OH | | 26,933.99 | $47,611.67 | 64,701 | 11/1/2010 | 12/1/2040 | 8.38% | 1 | D | Non-Performing | 323 | 65,000 | 15% | 05% | 17,507 | 42,250 | 26,933.99 |
| 312001473 | AUSTIN | IN | | 19,320.04 | $47,144.30 | 46,411 | 4/25/2002 | 5/1/2022 | 11.50% | 1 | D | Non-Performing | 323 | 10,000 | 15% | 05% | 12,558 | 6,500 | 6,500.00 |
| 312001476 | DAVISBORO | GA | | 22,365.92 | $53,727.46 | 53,727 | 2/29/2000 | 11/1/2032 | 4.25% | 1 | D | Non-Performing | 323 | 80,000 | 15% | 05% | 14,538 | 52,000 | 22,365.92 |
| 312001491 | NAPLES | ME | | 30,716.90 | $76,914.38 | 73,788 | 11/24/2006 | 11/24/2031 | 3.24% | 1 | D | Non-Performing | 323 | 68,000 | 15% | 05% | 19,966 | 44,200 | 30,716.90 |
| 312001508 | BRIGANTINE | NJ | | 79,459.64 | $190,878.09 | 190,878 | 10/18/2006 | 10/1/2031 | 3.35% | 1 | D | Non-Performing | 323 | 165,000 | 15% | 05% | 51,649 | 107,250 | 79,459.64 |
| 312001510 | STETSON | ME | | 49,264.08 | $120,700.38 | 118,342 | 9/12/2005 | 9/12/2020 | 4.00% | 1 | D | Non-Performing | 323 | 100,000 | 15% | 05% | 32,022 | 66,450 | 49,264.08 |
| 312001512 | TRENTON | NJ | | 34,748.81 | $85,515.50 | 83,474 | 2/14/1996 | 3/1/2026 | 7.50% | 1 | D | Non-Performing | 323 | 68,000 | 15% | 05% | 22,587 | 44,200 | 34,748.81 |
| 312001520 | LOCKPORT | IL | | 344,767.45 | $427,879.94 | 507,837 | 9/1/2006 | 3/1/2032 | 6.00% | 1 | D | Non-Performing | 323 | 422,980 | 15% | 05% | 224,099 | 274,937 | 274,924.96 |
| 312001526 | PRIDE | LA | | 5,162.31 | $14,450.18 | 12,402 | 4/5/2005 | 5/1/2025 | 9.00% | 1 | D | Non-Performing | 323 | 205,000 | 15% | 05% | 3,355 | 133,250 | 5,162.31 |
| 312001528 | PHILADELPHIA | PA | | 5,235.96 | $12,577.83 | 12,578 | 9/24/1999 | 12/1/2029 | 10.00% | 1 | D | Non-Performing | 323 | 20,000 | 15% | 05% | 3,403 | 14,300 | 5,235.96 |
| 312001551 | PHILADELPHIA | PA | | 23,483.14 | $56,411.24 | 56,411 | 7/29/2005 | 6/1/2033 | 6.19% | 1 | D | Non-Performing | 323 | 75,000 | 15% | 05% | 15,264 | 48,750 | 23,483.14 |
| 312001552 | FROSTPROOF | FL | | 63,100.21 | $157,530.90 | 151,579 | 3/8/2006 | 3/1/2036 | 9.20% | 1 | D | Non-Performing | 323 | 123,000 | 15% | 05% | 41,015 | 79,950 | 63,100.21 |
| 312001560 | JACKSON | MS | | 40,931.51 | $98,306.53 | 98,307 | 6/10/1998 | 7/1/2028 | 13.74% | 1 | D | Non-Performing | 323 | 67,000 | 15% | 05% | 26,600 | 43,550 | 40,931.51 |
| 312001584 | ORRUM | NC | | 19,752.64 | $20,851.90 | 47,450 | 7/8/2013 | 6/1/2027 | 9.00% | 1 | D | Non-Performing | 323 | 50,000 | 15% | 05% | 12,839 | 32,500 | 19,752.64 |
| 312001585 | EVERGREEN PARK | IL | | 33,473.26 | $80,409.53 | 80,410 | 10/23/2015 | 11/1/2035 | 7.00% | 1 | D | Non-Performing | 323 | 230,000 | 15% | 05% | 21,758 | 149,500 | 33,473.26 |
| 312001587 | EUCLID | OH | | 123,207.58 | $36,554.19 | 296,282 | 9/30/2005 | 10/1/2035 | 8.00% | 1 | D | Non-Performing | 323 | 85,000 | 15% | 05% | 25,710 | 55,250 | 55,250.00 |
| 312001589 | BROOKLYN | NY | | 47,042.11 | $245,251.71 | 113,005 | 7/30/1998 | 1/1/2035 | 7.25% | 1 | D | Non-Performing | 323 | 350,000 | 15% | 05% | 30,577 | 227,500 | 227,500.00 |
| 312001607 | ERIE | PA | | 21,294.90 | $10,179.34 | 51,155 | 5/19/2005 | 6/1/2041 | 7.50% | 1 | D | Non-Performing | 323 | 65,000 | 15% | 05% | 6,682 | 42,250 | 21,294.90 |
| 312001612 | CLINTON | IN | | 61,761.56 | $149,366.14 | 148,364 | 10/26/2005 | 11/1/2035 | 6.00% | 1 | D | Non-Performing | 323 | 40,000 | 15% | 05% | 13,063 | 26,000 | 26,000.00 |
| 312001627 | PUNXSUTAWNEY | PA | | 18,366.11 | $44,110.10 | 44,119 | 11/22/2000 | 1/1/2040 | 5.13% | 1 | D | Non-Performing | 323 | 29,000 | 15% | 05% | 11,938 | 26,000 | 18,366.11 |
| 312001637 | CINCINNATI | OH | | 15,741.90 | $40,064.13 | 27,815 | 8/24/2007 | 3/1/2037 | 8.25% | 1 | D | Non-Performing | 323 | 90,000 | 15% | 05% | 10,223 | 58,500 | 15,741.90 |
| 312001639 | MILWAUKEE | WI | | 16,391.07 | $13,271.51 | 39,375 | 1/14/2003 | 3/1/2042 | 7.50% | 1 | D | Non-Performing | 323 | 43,000 | 15% | 05% | 8,826 | 27,950 | 16,391.07 |
| 312001645 | BARBOURVILLE | KY | | 46,051.46 | $133,184.44 | 110,627 | 1/23/2004 | 7/1/2038 | 5.00% | 1 | D | Non-Performing | 323 | 102,000 | 15% | 05% | 29,934 | 61,750 | 46,051.46 |
| 312001651 | TOLEDO | OH | | 54,213.43 | $130,231.61 | 130,232 | 7/28/2005 | 3/1/2062 | 5.00% | 1 | D | Non-Performing | 323 | 80,000 | 15% | 05% | 35,239 | 52,000 | 52,000.00 |
| 312001658 | CLEVELAND | OH | | 59,354.00 | $142,580.29 | 142,580 | 11/28/2005 | 12/1/2035 | 8.93% | 1 | D | Non-Performing | 323 | 54,000 | 15% | 05% | 38,580 | 35,750 | 35,750.00 |
| 312001687 | MILWAUKEE | WI | | 57,359.27 | $91,917.96 | 137,789 | 9/26/2006 | 7/1/2042 | 7.50% | 1 | D | Non-Performing | 323 | 89,000 | 15% | 05% | 37,284 | 58,500 | 57,359.27 |
| 312001719 | NEWBURY | OH | | 25,482.17 | $128,746.62 | 61,213 | 6/3/1996 | 9/2/2026 | 11.25% | 1 | D | Non-Performing | 323 | 75,000 | 15% | 05% | 16,563 | 48,750 | 25,482.17 |
| 312001723 | HARRISBURG | PA | | 17,212.25 | $46,750.05 | 41,347 | 5/2/2002 | 5/19/2020 | 6.00% | 1 | D | Non-Performing | 323 | 55,000 | 15% | 05% | 11,188 | 31,200 | 17,212.25 |
| 312001731 | FORT WHITE | FL | | 20,895.30 | $50,194.71 | 50,195 | 12/6/2006 | 12/10/2031 | 4.24% | 1 | D | Non-Performing | 323 | 65,000 | 15% | 05% | 13,582 | 42,250 | 20,895.30 |
| 312001732 | TOLEDO | OH | | 21,147.29 | $51,091.46 | 50,900 | 6/5/1998 | 6/10/2028 | 9.99% | 1 | D | Non-Performing | 323 | 40,000 | 15% | 05% | 12,344 | 26,000 | 21,147.29 |
| 312001751 | THOMASVILLE | NC | | 12,223.95 | $29,361.99 | 29,362 | 6/3/1998 | 5/1/2029 | 9.00% | 1 | D | Non-Performing | 323 | 47,000 | 15% | 05% | 7,945 | 52,520 | 12,223.95 |
| 312001782 | MASARDIS | ME | | 81,103.85 | $197,428.28 | 194,828 | 8/4/2007 | 9/15/2037 | 11.50% | 1 | D | Non-Performing | 323 | 70,000 | 15% | 05% | 52,718 | 45,500 | 45,500.00 |
| 312001785 | BRIDGETON | NJ | | 56,085.97 | $134,729.81 | 134,730 | 3/24/2008 | 4/1/2045 | 5.21% | 1 | D | Non-Performing | 323 | 96,000 | 15% | 05% | 36,456 | 62,400 | 56,085.97 |
| 312001790 | SYRACUSE | NY | | 5,154.63 | $57,882.44 | 12,546 | 3/1/2016 | 7/17/2016 | 10.30% | 1 | D | Non-Performing | 323 | 28,900 | 15% | 05% | 1,351 | 18,785 | 5,154.63 |
| 312001795 | RACINE | WI | | 46,919.14 | $114,063.52 | 112,709 | 3/3/2004 | 4/1/2034 | 5.50% | 1 | D | Non-Performing | 323 | 60,000 | 15% | 05% | 30,497 | 37,700 | 37,700.00 |
| 312001803 | CALUMET CITY | IL | | 54,954.51 | $132,011.82 | 132,012 | 2/3/2006 | 3/1/2056 | 5.00% | 1 | D | Non-Performing | 323 | 83,000 | 15% | 05% | 35,720 | 53,950 | 53,950.00 |
| 312001829 | JACKSONVILLE | FL | | 16,288.26 | $26,637.92 | 39,128 | 12/23/2013 | 2/1/2024 | 7.86% | 1 | D | Non-Performing | 323 | 110,000 | 15% | 05% | 10,587 | 71,500 | 16,288.26 |
| 312001847 | EVARTS | KY | | 4,803.80 | $104,772.22 | 11,540 | 5/5/2004 | 7/10/2030 | 6.00% | 1 | D | Non-Performing | 323 | 45,000 | 15% | 05% | 3,122 | 29,250 | 4,803.80 |

| ID | City | State | | Amount 1 | Amount 2 | Num | Date 1 | Date 2 | Rate | | | Status | Code | Value | | | V1 | V2 | V3 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 312001850 | NEW ZION | SC | | $40,592.03 | $54,214.05 | 97,510 | 3/19/2007 | 3/23/2027 | 9.07% | 1 | D | Non-Performing | 323 | $54,000 | 15% | 05% | 26,385 | 35,100 | 35,100.00 |
| 312001851 | GRAND BAY | AL | | $6,499.34 | $47,305.32 | 15,613 | 7/28/2000 | 7/1/2015 | 5.45% | 1 | D | Non-Performing | 323 | $86,000 | 15% | 05% | 4,225 | 55,900 | 6,499.34 |
| 312001852 | HORNELL | NY | | $20,957.95 | $50,345.23 | 50,345 | 6/21/2001 | 6/1/2031 | 10.02% | 1 | D | Non-Performing | 323 | $51,000 | 15% | 05% | 13,623 | 33,150 | 20,957.95 |
| 312001864 | TUSCALOOSA | AL | | $20,290.19 | $50,345.98 | 48,741 | 3/17/1999 | 3/5/2041 | 5.00% | 1 | D | Non-Performing | 323 | $62,000 | 15% | 05% | 13,189 | 40,300 | 20,290.19 |
| 312001867 | WINCHESTER | KY | | $36,460.00 | $89,384.81 | 87,584 | 7/8/2003 | 7/8/2003 | 5.00% | 1 | D | Non-Performing | 323 | $91,000 | 15% | 05% | 23,698 | 59,150 | 36,460.00 |
| 312001871 | NEWARK | NY | | $7,799.27 | $57,610.38 | 18,735 | 4/30/2002 | 5/6/2022 | 7.58% | 1 | D | Non-Performing | 323 | $30,000 | 15% | 05% | 5,070 | 19,500 | 7,799.27 |
| 312001879 | ROBINSONVILLE | MS | | $13,132.46 | $34,353.25 | 31,547 | 1/15/1999 | 12/20/2036 | 6.00% | 1 | D | Non-Performing | 323 | $144,000 | 15% | 05% | 8,536 | 93,600 | 13,132.46 |
| 312001880 | WESLACO | TX | | $10,372.41 | $42,305.90 | 24,917 | 6/9/2004 | 6/1/2014 | 11.02% | 1 | D | Non-Performing | 323 | $65,000 | 15% | 05% | 6,742 | 42,250 | 10,372.41 |
| 312001895 | SARDIS | MS | | $11,978.93 | $30,999.69 | 28,776 | 5/3/2002 | 5/8/2022 | 5.00% | 1 | D | Non-Performing | 323 | $123,000 | 15% | 05% | 7,786 | 79,950 | 11,978.93 |
| 312001897 | WINCHESTER | KY | | $33,383.51 | $80,193.93 | 80,194 | 2/22/2008 | 12/1/2047 | 4.00% | 1 | D | Non-Performing | 323 | $115,000 | 15% | 05% | 21,699 | 74,750 | 33,383.51 |
| 312001900 | OKLAHOMA CITY | OK | | $23,818.98 | $57,218.01 | 57,218 | 5/12/1998 | 11/15/2029 | 11.62% | 1 | D | Non-Performing | 323 | $260,000 | 15% | 05% | 15,482 | 169,000 | 23,818.98 |
| 312001916 | BRUCETON | TN | | $8,435.50 | $20,263.77 | 20,264 | 2/6/2008 | 7/1/2028 | 6.00% | 1 | D | Non-Performing | 323 | $43,500 | 15% | 05% | 5,483 | 28,275 | 8,435.50 |
| 312001920 | PINEWOOD | SC | | $18,475.47 | $45,453.66 | 44,382 | 5/5/2006 | 9/10/2030 | 9.23% | 1 | D | Non-Performing | 323 | $133,000 | 15% | 05% | 12,009 | 86,450 | 18,475.47 |
| 312001936 | CHICORA | PA | | $39,779.35 | $95,558.03 | 95,558 | 8/31/2006 | 3/6/2036 | 10.12% | 1 | D | Non-Performing | 323 | $50,000 | 15% | 05% | 25,857 | 32,500 | 32,500.00 |
| 312001944 | SHREVEPORT | LA | | $13,081.23 | $29,166.62 | 31,424 | 1/4/2006 | 6/11/2037 | 11.16% | 1 | D | Non-Performing | 323 | $39,000 | 15% | 05% | 8,503 | 25,350 | 13,081.23 |
| 312001954 | SAN BENITO | TX | | $13,189.45 | $28,351.70 | 21,684 | 3/1/2007 | 3/1/2029 | 5.47% | 1 | D | Non-Performing | 323 | $59,900 | 15% | 05% | 8,573 | 38,935 | 13,189.45 |
| 312001957 | HICKORY | MS | | $7,915.10 | $18,272.44 | 19,014 | 5/30/2000 | 6/1/2015 | 6.00% | 1 | D | Non-Performing | 323 | $65,000 | 15% | 05% | 5,145 | 42,250 | 7,915.10 |
| 312001967 | BRUNSWICK | GA | | $22,616.76 | $56,546.81 | 54,330 | 10/14/2005 | 6/1/2050 | 4.50% | 1 | D | Non-Performing | 323 | $94,000 | 15% | 05% | 14,701 | 61,100 | 22,616.76 |
| 312001968 | CROSSVILLE | TN | | $38,706.88 | $90,053.81 | 90,054 | 12/14/2006 | 6/1/2047 | 6.38% | 1 | D | Non-Performing | 323 | $152,000 | 15% | 05% | 25,179 | 98,800 | 38,706.88 |
| 312001992 | PIEDMONT | AL | | $9,971.97 | $21,885.48 | 22,955 | 1/27/2004 | 6/2/2024 | 9.55% | 1 | D | Non-Performing | 323 | $130,000 | 15% | 05% | 6,482 | 84,500 | 9,971.97 |
| 312002002 | SYLACAUGA | AL | | $17,661.03 | $42,425.35 | 42,425 | 4/12/2006 | 6/1/2041 | 6.65% | 1 | D | Non-Performing | 323 | $85,000 | 15% | 05% | 11,480 | 55,250 | 17,661.03 |
| 312002010 | HEMINGWAY | SC | | $10,141.48 | $24,361.89 | 24,362 | 10/17/2006 | 12/1/2021 | 10.45% | 1 | D | Non-Performing | 323 | $52,000 | 15% | 05% | 6,592 | 33,800 | 10,141.48 |
| 312002022 | SLIPPERY ROCK | PA | | $22,725.89 | $36,231.54 | 54,592 | 3/5/2004 | 1/10/2034 | 9.30% | 1 | D | Non-Performing | 323 | $49,500 | 15% | 05% | 14,773 | 32,500 | 22,725.89 |
| 312002024 | MILWAUKEE | WI | | $22,358.36 | $65,084.12 | 53,709 | 1/26/2007 | 2/8/2037 | 11.59% | 1 | D | Non-Performing | 323 | $51,000 | 15% | 05% | 14,533 | 33,150 | 22,358.36 |
| 312002037 | MEMPHIS | TN | | $14,131.66 | $30,947.09 | 33,947 | 5/20/2003 | 1/5/2036 | 12.44% | 1 | D | Non-Performing | 323 | $72,000 | 15% | 05% | 9,186 | 46,800 | 14,131.66 |
| 312002045 | BATTLE CREEK | MI | | $23,702.13 | $53,246.08 | 56,937 | 4/30/1999 | 6/1/2040 | 4.50% | 1 | D | Non-Performing | 323 | $53,600 | 15% | 05% | 15,406 | 34,840 | 23,702.13 |
| 312002051 | HUBBARD | OH | | $33,408.31 | $12,978.25 | 80,254 | 9/12/2003 | 6/1/2035 | 8.56% | 1 | D | Non-Performing | 323 | $110,000 | 15% | 05% | 8,436 | 71,500 | 33,408.31 |
| 312002052 | SALINEVILLE | OH | | $48,516.25 | $13,954.91 | 116,546 | 8/8/2007 | 6/1/2051 | 5.07% | 1 | D | Non-Performing | 323 | $130,000 | 15% | 05% | 9,071 | 84,500 | 48,516.25 |
| 312002059 | HOMER | LA | | $31,541.57 | $106,565.02 | 75,769 | 6/16/2006 | 6/21/2036 | 11.10% | 1 | D | Non-Performing | 323 | $64,500 | 15% | 05% | 20,502 | 41,925 | 31,541.57 |
| 312002060 | KAPLAN | LA | | $20,388.14 | $36,346.06 | 48,976 | 2/3/2006 | 5/8/2035 | 10.88% | 1 | D | Non-Performing | 323 | $29,000 | 15% | 05% | 13,252 | 18,850 | 18,850.00 |
| 312002061 | VANDALIA | MO | | $14,110.40 | $116,808.00 | 33,896 | 1/12/2006 | 1/5/2036 | 5.00% | 1 | D | Non-Performing | 323 | $63,500 | 15% | 05% | 9,173 | 41,275 | 14,110.40 |
| 312002062 | ROYSTON | GA | | $24,327.78 | $58,440.23 | 58,440 | 3/27/2006 | 1/1/2038 | 5.00% | 1 | D | Non-Performing | 323 | $155,000 | 15% | 05% | 15,813 | 100,750 | 24,327.78 |
| 312002077 | LAKE CITY | SC | | $28,692.73 | $72,076.60 | 68,926 | 5/16/2003 | 5/5/2021 | 11.33% | 1 | D | Non-Performing | 323 | $46,000 | 15% | 05% | 18,650 | 29,900 | 28,692.73 |
| 312002085 | PINEVILLE | LA | | $35,537.25 | $87,172.23 | 85,368 | 6/11/1999 | 2/11/2030 | 7.24% | 1 | D | Non-Performing | 323 | $140,000 | 15% | 05% | 23,099 | 91,000 | 35,537.25 |
| 312002088 | GARY | IN | | $39,889.48 | $95,822.57 | 95,823 | 11/14/2005 | 6/1/2057 | 3.00% | 1 | D | Non-Performing | 323 | $149,000 | 15% | 05% | 25,928 | 96,850 | 39,889.48 |
| 312002092 | NEW CASTLE | DE | | $42,103.19 | $101,140.36 | 101,140 | 5/28/1993 | 2/3/2019 | 8.00% | 1 | D | Non-Performing | 323 | $345,000 | 15% | 05% | 27,367 | 224,250 | 42,103.19 |
| 312002102 | BROWNSVILLE | TX | | $9,152.19 | $21,985.40 | 21,985 | 5/29/2008 | 1/15/2029 | 6.00% | 1 | D | Non-Performing | 323 | $64,900 | 15% | 05% | 5,949 | 42,185 | 9,152.19 |
| 312002107 | RAYNE | LA | | $14,134.17 | $50,526.72 | 33,953 | 10/4/2007 | 3/15/2031 | 4.00% | 1 | D | Non-Performing | 323 | $70,000 | 15% | 05% | 9,187 | 45,500 | 14,134.17 |
| 312002111 | BENNETTSVILLE | SC | | $77,839.02 | $110,329.89 | 186,985 | 10/31/2005 | 12/1/2045 | 5.16% | 1 | D | Non-Performing | 323 | $60,000 | 15% | 05% | 50,595 | 39,000 | 39,000.00 |
| 312002140 | POLO | IL | | $36,839.87 | $29,655.25 | 88,497 | 3/31/2008 | 6/1/2038 | 8.99% | 1 | D | Non-Performing | 323 | $90,630 | 15% | 05% | 19,276 | 58,910 | 36,839.87 |
| 312002154 | COSHOCTON | OH | | $18,968.80 | $48,417.37 | 45,547 | 8/23/1999 | 6/1/2032 | 4.50% | 1 | D | Non-Performing | 323 | $38,000 | 15% | 05% | 12,330 | 24,700 | 18,968.80 |
| 312002165 | NEW BERN | NC | | $23,013.58 | $42,794.72 | 55,283 | 7/21/2005 | 12/5/2040 | 4.60% | 1 | D | Non-Performing | 323 | $85,000 | 15% | 05% | 14,959 | 55,250 | 23,013.58 |
| 312002182 | BASTROP | LA | | $28,010.41 | $54,366.92 | 67,287 | 7/29/2008 | 8/17/2045 | 11.06% | 1 | D | Non-Performing | 323 | $43,500 | 15% | 05% | 18,207 | 28,275 | 28,010.41 |
| 312002202 | SCIOTOVILLE | OH | | $13,778.46 | $79,924.70 | 33,099 | 4/27/2006 | 6/10/2021 | 9.97% | 1 | D | Non-Performing | 323 | $35,000 | 15% | 05% | 8,956 | 22,750 | 13,778.46 |
| 312002203 | HAWESVILLE | KY | | $20,860.79 | $39,059.23 | 50,112 | 10/31/2006 | 12/10/2021 | 10.76% | 1 | D | Non-Performing | 323 | $125,000 | 15% | 05% | 13,560 | 81,250 | 20,860.79 |
| 312002215 | AMERICUS | GA | | $14,898.56 | $36,500.28 | 35,789 | 11/2/2010 | 11/15/2040 | 11.38% | 1 | D | Non-Performing | 323 | $64,500 | 15% | 05% | 9,684 | 41,925 | 14,898.56 |
| 312002233 | DERBY | VT | | $43,371.41 | $106,328.48 | 104,187 | 12/29/2005 | 6/10/2035 | 6.95% | 1 | D | Non-Performing | 323 | $140,000 | 15% | 05% | 28,191 | 91,000 | 43,371.41 |
| 312002243 | WAIMANAE | HI | | $34,226.08 | $82,344.13 | 82,344 | 11/5/2007 | 7/9/2038 | 5.57% | 1 | D | Non-Performing | 323 | $22,254 | 15% | 05% | 22,254 | 84,500 | 34,226.08 |
| 312002246 | JEMISON | AL | | $22,932.63 | $55,088.80 | 55,089 | 4/13/2006 | 3/1/2033 | 5.85% | 1 | D | Non-Performing | 323 | $130,000 | 15% | 05% | 14,906 | 84,500 | 22,932.63 |
| 312002249 | MOUNT PLEASANT | TX | | $44,826.33 | $55,454.06 | 107,706 | 6/27/2008 | 7/11/2023 | 8.99% | 1 | D | Non-Performing | 323 | $155,000 | 15% | 05% | 29,144 | 100,750 | 44,826.33 |
| 312002255 | KENANSVILLE | NC | | $14,583.64 | $162,434.01 | 35,033 | 11/26/1997 | 6/1/2014 | 13.74% | 1 | D | Non-Performing | 323 | $122,000 | 15% | 05% | 9,479 | 79,300 | 14,583.64 |
| 312002266 | OGDENSBURG | WI | | $60,838.88 | $150,080.84 | 146,147 | 7/27/2005 | 8/15/2035 | 8.00% | 1 | D | Non-Performing | 323 | $10,000 | 15% | 05% | 39,545 | 6,500 | 6,500.00 |
| 312002278 | SPRINGFIELD | IL | | $29,559.81 | $75,029.26 | 71,009 | 1/18/2001 | 1/23/2016 | 11.00% | 1 | D | Non-Performing | 323 | $15,000 | 15% | 05% | 19,214 | 8,450 | 8,450.00 |
| 312002455 | LINCOLNTON | GA | | $26,746.71 | $113,418.55 | 64,251 | 7/23/2002 | 6/1/2058 | 6.00% | 1 | D | Non-Performing | 323 | $175,000 | 15% | 05% | 9,044 | 113,750 | 26,746.71 |
| 312002466 | RIVERDALE | IL | | $118,745.77 | $35,006.45 | 285,251 | 8/3/2006 | 3/1/2036 | 10.40% | 1 | D | Non-Performing | 323 | $99,000 | 15% | 05% | 22,754 | 64,350 | 64,350.00 |
| 312002647 | CLINTON | SC | | $23,893.26 | $62,018.55 | 57,396 | 1/3/2001 | 6/3/2029 | 6.00% | 1 | D | Non-Performing | 323 | $13,000 | 15% | 05% | 15,533 | 9,750 | 9,750.00 |
| 312002668 | KNOXVILLE | IL | | $24,344.74 | $14,302.30 | 58,481 | 5/23/2008 | 6/5/2049 | 6.00% | 1 | D | Non-Performing | 323 | $125,000 | 15% | 05% | 9,290 | 81,250 | 24,344.74 |
| 312002669 | MONROE | LA | | $11,065.85 | $36,582.30 | 26,582 | 10/31/1996 | 11/5/2016 | 12.35% | 1 | D | Non-Performing | 323 | $75,000 | 15% | 05% | 7,193 | 48,750 | 11,065.85 |
| 312002677 | CHINA | TX | | $23,597.44 | $97,048.52 | 54,284 | 2/22/2007 | 3/2/2032 | 9.98% | 1 | D | Non-Performing | 323 | $146,688 | 15% | 05% | 14,688 | 71,500 | 23,597.44 |
| 312002683 | ITHACA | NY | | $19,052.83 | $45,768.74 | 45,769 | 6/17/2003 | 7/17/2033 | 9.39% | 1 | D | Non-Performing | 323 | $81,000 | 15% | 05% | 12,384 | 52,650 | 19,052.83 |
| 312002688 | EAST SAINT | IL | | $15,831.18 | $19,360.64 | 38,030 | 12/6/2004 | 8/19/2042 | 10.00% | 1 | D | Non-Performing | 323 | $38,000 | 15% | 05% | 10,290 | 18,300 | 15,831.18 |
| 312002690 | INDEPENDENCE | LA | | $32,570.72 | $76,241.64 | 78,241 | 4/16/1997 | 7/1/2029 | 6.00% | 1 | D | Non-Performing | 323 | $110,000 | 15% | 05% | 21,171 | 71,500 | 32,570.72 |
| 312002695 | FORT FAIRFIELD | ME | | $14,405.80 | $35,497.84 | 34,606 | 9/30/2008 | 11/1/2055 | 2.40% | 1 | D | Non-Performing | 323 | $72,000 | 15% | 05% | 9,364 | 46,800 | 14,405.80 |
| 312002703 | DALLAS | TX | | $21,683.97 | $50,242.76 | 52,089 | 8/1/2006 | 8/10/2036 | 10.00% | 1 | D | Non-Performing | 323 | $155,000 | 15% | 05% | 14,093 | 100,750 | 21,683.97 |
| 312002703 | PINEVILLE | LA | | $11,300.11 | $37,525.77 | 28,659 | 4/17/2002 | 1/5/2032 | 12.00% | 1 | D | Non-Performing | 323 | $85,000 | 15% | 05% | 7,755 | 55,250 | 11,300.11 |
| 312002704 | INDEPENDENCE | LA | | $22,145.05 | $69,328.05 | 52,197 | 9/5/1986 | 12/3/2015 | 7.89% | 1 | D | Non-Performing | 323 | $72,000 | 15% | 05% | 14,394 | 46,800 | 22,145.05 |
| 312002707 | CHIMAYO | NM | | $30,712.53 | $75,233.64 | 73,778 | 6/5/2000 | 11/10/2029 | 8.49% | 1 | D | Non-Performing | 323 | $19,963 | 15% | 05% | 19,963 | 37,050 | 30,712.53 |
| 312002845 | ALPINE | AL | | $9,662.66 | $23,283.77 | 23,212 | 10/10/2007 | 11/15/2022 | 9.48% | 1 | D | Non-Performing | 323 | $90,000 | 15% | 05% | 6,281 | 58,500 | 9,662.66 |
| 312002848 | LACKAWANNA | NY | | $19,688.85 | $47,761.00 | 47,297 | 4/24/1997 | 5/1/2027 | 6.00% | 1 | D | Non-Performing | 323 | $88,000 | 15% | 05% | 12,798 | 57,200 | 19,688.85 |
| 312002861 | OLEAN | NY | | $26,186.36 | $87,762.20 | 62,905 | 8/12/1996 | 6/1/2037 | 6.00% | 1 | D | Non-Performing | 323 | $54,300 | 15% | 05% | 17,021 | 35,230 | 26,186.36 |
| 312002862 | PALMVIEW | TX | | $31,075.26 | $43,516.43 | 74,649 | 5/18/2010 | 6/20/2020 | 10.38% | 1 | D | Non-Performing | 323 | $145,000 | 15% | 05% | 20,190 | 94,250 | 31,075.26 |
| 312002880 | ALTON | IL | | $13,723.93 | $63,141.99 | 32,948 | 3/26/2011 | 4/1/2035 | 6.00% | 1 | D | Non-Performing | 323 | $36,000 | 15% | 05% | 8,921 | 24,050 | 13,723.93 |
| 312002885 | NEW IBERIA | LA | | $14,535.04 | $34,916.10 | 34,916 | 5/23/2007 | 10/1/2031 | 10.70% | 1 | D | Non-Performing | 323 | $75,000 | 15% | 05% | 9,448 | 48,750 | 14,535.04 |
| 312002885 | SHERRILL | NY | | $19.37 | $46.54 | 47 | 11/22/2002 | 7/1/2029 | 6.00% | 1 | D | Non-Performing | 323 | $167,800 | 15% | 05% | 11 | 109,070 | 19.37 |
| 312002890 | AUBURN | KY | | $10,157.97 | $25,871.29 | 24,401 | 10/31/2002 | 12/15/2022 | 9.75% | 1 | D | Non-Performing | 323 | $42,500 | 15% | 05% | 6,603 | 27,300 | 10,157.97 |
| 312002897 | TROUTMAN | NC | | $14,639.91 | $34,933.35 | 35,162 | 2/9/2006 | 4/14/2021 | 10.82% | 1 | D | Non-Performing | 323 | $46,000 | 15% | 05% | 9,541 | 29,900 | 14,639.91 |
| 312002903 | ATLANTA | GA | | $56,743.78 | $136,310.01 | 136,310 | 1/31/2006 | 2/1/2036 | 3.74% | 1 | D | Non-Performing | 323 | $195,000 | 15% | 05% | 36,883 | 126,750 | 56,743.78 |
| 312002910 | LAURINBURG | NC | | $24,644.17 | $61,312.35 | 59,200 | 1/3/2008 | 2/17/2040 | 12.41% | 1 | D | Non-Performing | 323 | $35,000 | 15% | 05% | 16,019 | 22,750 | 22,750.00 |
| 312002911 | TIMMONSVILLE | SC | | $8,598.18 | $57,942.29 | 20,655 | 3/27/2006 | 5/1/2029 | 6.63% | 1 | D | Non-Performing | 323 | $110,000 | 15% | 05% | 5,589 | 71,500 | 8,598.18 |
| 312002916 | OAKDALE | LA | | $4,258.36 | $10,217.42 | 10,217 | 11/6/2001 | 6/1/2023 | 5.00% | 1 | D | Non-Performing | 323 | $140,000 | 15% | 05% | 2,769 | 91,000 | 4,258.36 |
| 312002917 | TICKFAW | LA | | $8,458.30 | $19,511.38 | 20,319 | 3/31/2003 | 3/4/2029 | 9.00% | 1 | D | Non-Performing | 323 | $89,000 | 15% | 05% | 5,494 | 57,850 | 8,458.30 |
| 312002932 | NEWBERN | AL | | $4,512.02 | $13,746.33 | 10,839 | 8/24/2001 | 2/1/2023 | 5.00% | 1 | D | Non-Performing | 323 | $60,000 | 15% | 05% | 2,933 | 39,000 | 4,512.02 |
| 312002933 | ST ALBANS | WV | | $7,551.28 | $17,633.39 | 18,140 | 7/10/2000 | 12/15/2046 | 3.00% | 1 | D | Non-Performing | 323 | $83,000 | 15% | 05% | 4,908 | 53,950 | 7,551.28 |
| 312002942 | FAIR OAKS | IN | | $12,332.79 | $29,766.17 | 29,626 | 5/5/2004 | 7/15/2025 | 6.67% | 1 | D | Non-Performing | 323 | $8,016 | 15% | 05% | 8,016 | 81,250 | 12,332.79 |
| 312002947 | BLACKSTONE | VA | | $24,298.95 | $58,619.01 | 58,371 | 10/20/2009 | 7/1/2050 | 4.50% | 1 | D | Non-Performing | 323 | $89,000 | 15% | 05% | 15,794 | 57,850 | 24,298.95 |
| 312002948 | DEL RIO | TX | | $12,962.78 | $31,139.23 | 31,139 | 9/2/2010 | 3/1/2028 | 6.00% | 1 | D | Non-Performing | 323 | $8,426 | 15% | 05% | 8,426 | 33,800 | 12,962.78 |
| 312002954 | BALTIMORE | MD | | $132,362.59 | $321,964.36 | 317,962 | 7/1/2008 | 9/8/2038 | 7.13% | 1 | D | Non-Performing | 323 | $210,000 | 15% | 05% | 86,034 | 136,500 | 132,362.59 |
| 312002961 | CLEVELAND | OH | | $30,966.86 | $74,388.64 | 74,389 | 1/20/2010 | 1/1/2015 | 6.50% | 1 | D | Non-Performing | 323 | $50,000 | 15% | 05% | 20,128 | 32,500 | 30,966.86 |
| 312002978 | NEWHEBRON | MS | | $29,767.86 | $93,833.50 | 71,508 | 8/30/2006 | 3/1/2036 | 8.40% | 1 | D | Non-Performing | 323 | $120,000 | 15% | 05% | 19,349 | 78,000 | 29,767.86 |
| 312002983 | CHICAGO | IL | | $52,587.16 | $124,325.68 | 126,325 | 4/2/2007 | 6/1/2057 | 4.45% | 1 | D | Non-Performing | 323 | $208,000 | 15% | 05% | 34,182 | 135,200 | 52,587.16 |
| 312002985 | MIDDLETOWN | IL | | $49,640.59 | $34,348.96 | 119,247 | 4/23/2006 | 6/1/2029 | 6.00% | 1 | D | Non-Performing | 323 | $140,000 | 15% | 05% | 26,812 | 91,000 | 49,640.59 |
| 312002987 | IRVINE | KY | | $22,024.41 | $139,438.43 | 52,907 | 2/3/2006 | 6/1/2042 | 5.00% | 1 | D | Non-Performing | 323 | $70,000 | 15% | 05% | 14,316 | 45,500 | 22,024.41 |
| 312002991 | SWANNANOA | NC | | $12,511.54 | $30,055.24 | 30,055 | 5/26/2000 | 5/1/2044 | 5.00% | 1 | D | Non-Performing | 323 | $100,000 | 15% | 05% | 8,132 | 65,000 | 12,511.54 |
| 312002995 | MERCER | PA | | $80,411.08 | $193,653.63 | 193,164 | 9/7/2006 | 6/1/2028 | 10.31% | 1 | D | Non-Performing | 323 | $52,267 | 15% | 05% | 52,267 | 34,000 | 80,411.08 |
| 312002996 | APPOMATTOX | VA | | $35,391.58 | $114,634.55 | 85,018 | 9/20/2001 | 12/16/2002 | 7.97% | 1 | D | Non-Performing | 323 | $23,005 | 15% | 05% | 23,005 | 84,500 | 35,391.58 |
| 312003005 | BALTIMORE | MD | | $124,900.06 | $75,467.13 | 300,035 | 6/6/2008 | 7/1/2038 | 6.00% | 1 | D | Non-Performing | 323 | $70,000 | 15% | 05% | 49,379 | 45,500 | 45,500.00 |
| 312003020 | BAY ST LOUIS | MS | | $16,081.72 | $41,473.59 | 38,632 | 3/8/2013 | 6/1/2043 | 8.65% | 1 | D | Non-Performing | 323 | $79,000 | 15% | 05% | 10,453 | 51,350 | 16,081.72 |
| 312003021 | BON AQUA | TN | | $16,094.50 | $43,350.19 | 38,942 | 1/7/2013 | 10/1/2041 | 10.00% | 1 | D | Non-Performing | 323 | $70,000 | 15% | 05% | 10,461 | 45,500 | 16,094.50 |
| 312003028 | EUCLID | OH | | $15,961.37 | $37,509.07 | 38,342 | 7/20/2011 | 7/15/2041 | 10.00% | 1 | D | Non-Performing | 323 | $47,000 | 15% | 05% | 10,375 | 30,550 | 15,961.37 |
| 312003030 | LANSING | MI | | $15,658.35 | $37,614.52 | 37,615 | 9/6/2011 | 3/1/2041 | 10.00% | 1 | D | Non-Performing | 323 | $95,000 | 15% | 05% | 10,178 | 61,750 | 15,658.35 |
| 312003040 | CONCEPTION JUNCTION | MO | | $8,401.89 | $19,284.90 | 20,183 | 5/1/2012 | 5/1/2032 | 4.25% | 1 | D | Non-Performing | 323 | $65,000 | 15% | 05% | 5,461 | 42,250 | 8,401.89 |
| 312003044 | WHEELERSBURG | OH | | $13,491.29 | $37,376.95 | 32,409 | 6/24/2011 | 6/15/2041 | 10.00% | 1 | D | Non-Performing | 323 | $125,000 | 15% | 05% | 8,769 | 81,250 | 13,491.29 |

| ID | City | State | | Amount 1 | Amount 2 | Number | Date 1 | Date 2 | Rate | | | Status | | Amount 3 | | | Amount 4 | Amount 5 | Amount 6 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 312003045 | EAST LIVERPOOL | OH | | $14,603.27 | $13,435.66 | 35,080 | 1/26/2016 | 1/15/2046 | 9.90% | 1 | D | Non-Performing | 323 | $56,900 | 15% | 05% | $8,733 | $36,985 | $14,603.27 |
| 312003049 | LUCASVILLE | OH | | $17,217.09 | $48,338.14 | 41,359 | 3/25/2014 | 6/1/2044 | 9.90% | 1 | D | Non-Performing | 323 | $52,500 | 15% | 05% | $11,191 | $34,125 | $17,217.09 |
| 312003054 | SPAVINAW | OK | | $11,905.52 | $27,491.53 | 28,599 | 11/15/2012 | 7/1/2039 | 4.50% | 1 | D | Non-Performing | 323 | $37,500 | 15% | 05% | $7,739 | $24,375 | $11,905.52 |
| 312003057 | JACKSON | MI | | $10,826.00 | $78,334.54 | 26,006 | 2/15/2013 | 2/1/2036 | 6.50% | 1 | D | Non-Performing | 323 | $115,000 | 15% | 05% | $7,037 | $74,750 | $10,826.00 |
| 312003064 | MIFFLIN | PA | | $15,750.53 | $69,004.01 | 37,836 | 5/19/2016 | 6/15/2046 | 9.00% | 1 | D | Non-Performing | 323 | $30,000 | 15% | 05% | $10,238 | $19,500 | $15,750.53 |
| 312003066 | PEORIA | IL | | $14,687.45 | $34,787.88 | 35,282 | 1/5/2012 | 1/1/2039 | 6.00% | 1 | D | Non-Performing | 323 | $30,000 | 15% | 05% | $9,547 | $19,500 | $14,687.45 |
| 312003102 | RACELAND | KY | | $16,691.00 | $40,095.15 | 40,095 | 11/3/2015 | 11/1/2029 | 9.28% | 1 | D | Non-Performing | 323 | $85,000 | 15% | 05% | $10,849 | $55,250 | $16,691.00 |
| 312003103 | WEST TERRE HAUTE | IN | | $8,660.65 | $34,451.92 | 20,805 | 5/27/2015 | 5/1/2045 | 8.37% | 1 | D | Non-Performing | 323 | $25,000 | 15% | 05% | $5,629 | $16,250 | $8,660.65 |
| 312003105 | YOUNGSTOWN | OH | | $14,953.57 | $35,954.21 | 35,921 | 9/16/2013 | 3/1/2043 | 9.90% | 1 | D | Non-Performing | 323 | $24,500 | 15% | 05% | $9,720 | $15,925 | $14,953.57 |
| 312003109 | ANTON | TX | | $8,726.16 | $21,375.78 | 20,962 | 4/21/2014 | 3/1/2043 | 9.90% | 1 | D | Non-Performing | 323 | $50,000 | 15% | 05% | $5,672 | $32,500 | $8,726.16 |
| 312003112 | HOOPESTON | IL | | $13,386.75 | $31,138.38 | 31,917 | 4/8/2013 | 4/1/2043 | 10.00% | 1 | D | Non-Performing | 323 | $27,000 | 15% | 05% | $8,636 | $17,550 | $13,386.75 |
| 312003124 | ROSELAND | LA | | $15,865.79 | $39,570.71 | 38,113 | 3/19/2014 | 6/1/2039 | 9.90% | 1 | D | Non-Performing | 323 | $103,000 | 15% | 05% | $10,313 | $66,950 | $15,865.79 |
| 312003133 | TOLEDO | OH | | $18,239.82 | $43,815.74 | 43,816 | 6/2/2014 | 5/1/2044 | 7.97% | 1 | D | Non-Performing | 323 | $45,000 | 15% | 05% | $11,856 | $29,250 | $18,239.82 |
| 312003162 | BURLINGTON | NC | | $28,186.04 | $67,708.56 | 67,709 | 3/24/2004 | 5/1/2041 | 3.98% | 1 | D | Non-Performing | 323 | $160,000 | 15% | 05% | $18,321 | $104,000 | $28,186.04 |
| 312003167 | QUEENSBURY | NY | | $29,185.74 | $177,876.09 | 70,134 | 9/3/2008 | 10/1/2023 | 9.49% | 1 | D | Non-Performing | 323 | $39,000 | 15% | 05% | $18,977 | $25,350 | $25,350.00 |
| 312003189 | BENNETTSVILLE | SC | | $23,312.61 | $55,077.56 | 56,002 | 11/17/1999 | 9/1/2054 | 4.00% | 1 | D | Non-Performing | 323 | $98,000 | 15% | 05% | $15,153 | $63,700 | $23,312.61 |
| 2000000156 | BIRMINGHAM | AL | | $22,333.89 | $55,281.38 | 53,651 | 7/5/2016 | 9/1/2021 | 8.00% | 1 | D | Non-Performing | 323 | $67,500 | 15% | 05% | $14,517 | $43,875 | $22,333.89 |
| 2000000157 | BIRMINGHAM | AL | | $40,032.05 | $97,539.09 | 96,145 | 7/5/2016 | 9/1/2021 | 8.00% | 1 | D | Non-Performing | 323 | $62,500 | 15% | 05% | $26,021 | $40,625 | $40,032.05 |
| 2000000158 | BESSEMER | AL | | $15,152.56 | $37,079.11 | 36,399 | 7/5/2016 | 9/1/2021 | 8.00% | 1 | D | Non-Performing | 323 | $20,000 | 15% | 05% | $9,849 | $13,000 | $13,000.00 |
| 2000000350 | LUCEDALE | MS | | $12,659.54 | $30,410.76 | 30,411 | 9/22/2000 | 5/1/2061 | 8.04% | 1 | D | Non-Performing | 323 | $65,000 | 15% | 05% | $8,229 | $42,250 | $12,659.54 |
| 2000000354 | PRENTISS | MS | | $40,383.36 | $98,830.23 | 97,009 | 11/17/2006 | 5/1/2061 | 4.63% | 1 | D | Non-Performing | 323 | $100,000 | 15% | 05% | $26,249 | $65,000 | $40,383.36 |
| 2000000367 | EMPORIA | VA | | $20,247.56 | $49,562.41 | 48,639 | 8/17/2009 | 3/1/2051 | 5.13% | 1 | D | Non-Performing | 323 | $127,500 | 15% | 05% | $13,161 | $82,875 | $20,247.56 |
| 2000000371 | EXETER | ME | | $24,220.54 | $17,694.55 | 58,183 | 8/29/2007 | 3/1/2053 | 3.50% | 1 | D | Non-Performing | 323 | $80,000 | 15% | 05% | $11,501 | $52,000 | $24,220.54 |
| 2000000372 | MONTGOMERY | AL | | $38,935.50 | $5,857.21 | 93,531 | 7/14/2007 | 7/1/2050 | 7.00% | 1 | D | Non-Performing | 323 | $59,900 | 15% | 05% | $3,807 | $38,935 | $38,935.50 |
| 2000000382 | SAN BENITO | TX | | $7,761.66 | $18,645.07 | 18,245 | 7/29/2005 | 10/10/2042 | 10.44% | 1 | D | Non-Performing | 323 | $62,000 | 15% | 05% | $5,043 | $40,300 | $7,761.66 |
| 2000000387 | NEW PORT RICHEY | FL | | $8,420.30 | $20,227.26 | 20,227 | 5/6/2008 | 1/1/2060 | 3.75% | 1 | D | Non-Performing | 323 | $160,070 | 15% | 05% | $5,473 | $104,000 | $8,420.30 |
| 2000000392 | PITTSTON | ME | | $71,011.14 | $177,418.33 | 170,583 | 2/20/2008 | 10/1/2058 | 5.00% | 1 | D | Non-Performing | 323 | $136,000 | 15% | 05% | $46,157 | $88,400 | $71,011.14 |
| 2000000398 | HARRISON | GA | | $57,343.48 | $5,757.73 | 137,751 | 11/19/2007 | 10/1/2057 | 3.88% | 1 | D | Non-Performing | 323 | $73,059 | 15% | 05% | $3,743 | $47,486 | $47,486.40 |
| 2000000399 | FOXHOME | MN | | $27,709.26 | $65,156.44 | 66,563 | 10/31/2006 | 9/16/2050 | 2.00% | 1 | D | Non-Performing | 323 | $99,678 | 15% | 05% | $18,011 | $64,791 | $27,709.26 |
| 2000000429 | CHERAW | SC | | $9,316.20 | $21,687.33 | 22,379 | 7/10/2002 | 10/1/2032 | 4.63% | 1 | D | Non-Performing | 323 | $16,000 | 15% | 05% | $6,056 | $10,400 | $9,316.20 |
| 2000000440 | AUTAUGAVILLE | AL | | $9,795.11 | $20,709.43 | 23,530 | 7/16/2002 | 3/5/2019 | 13.50% | 1 | D | Non-Performing | 323 | $75,000 | 15% | 05% | $6,367 | $48,750 | $9,795.11 |
| 2000000442 | SELMA | AL | | $22,621.91 | $56,727.23 | 54,823 | 7/10/2008 | 5/1/2039 | 4.50% | 1 | D | Non-Performing | 323 | $55,000 | 15% | 05% | $4,373 | $35,750 | $22,621.91 |
| 2000000444 | BULLOCK | NC | | $14,199.87 | $34,863.63 | 34,111 | 6/26/2001 | 5/1/2027 | 4.63% | 1 | D | Non-Performing | 323 | $146,952 | 15% | 05% | $9,230 | $95,518 | $14,199.87 |
| 2000000445 | PHILADELPHIA | MS | | $24,612.78 | $21,059.08 | 59,125 | 2/13/2001 | 6/20/2027 | 6.00% | 1 | D | Non-Performing | 323 | $160,000 | 15% | 05% | $13,662 | $104,000 | $24,612.78 |
| 2000000447 | ZEPHYRHILLS | FL | | $43,430.56 | $104,328.96 | 104,329 | 7/13/2007 | 10/18/2041 | 5.00% | 1 | D | Non-Performing | 323 | $146,000 | 15% | 05% | $28,230 | $94,900 | $43,430.56 |
| 2000000453 | LINCOLNTON | GA | | $32,351.08 | $77,713.81 | 77,714 | 9/20/2007 | 1/1/2061 | 3.25% | 1 | D | Non-Performing | 323 | $75,000 | 15% | 05% | $21,028 | $48,750 | $32,351.08 |
| 2000000464 | CYR PLANTATION | ME | | $66,925.10 | $160,767.60 | 160,768 | 5/4/2007 | 1/18/2043 | 5.00% | 1 | D | Non-Performing | 323 | $55,000 | 15% | 05% | $43,501 | $35,750 | $35,750.00 |
| 2000000485 | ERIE | PA | | $13,099.62 | $33,790.07 | 31,468 | 11/3/2003 | 2/7/2022 | 11.70% | 1 | D | Non-Performing | 323 | $35,000 | 15% | 05% | $8,515 | $22,750 | $13,099.62 |
| 2000000488 | CAMDEN | SC | | $7,410.56 | $52,070.11 | 17,802 | 10/19/2004 | 5/15/2020 | 9.46% | 1 | D | Non-Performing | 323 | $175,000 | 15% | 05% | $4,817 | $113,750 | $7,410.56 |
| 2000000490 | COLUMBIA | SC | | $26,387.89 | $66,304.13 | 63,389 | 10/8/2008 | 2/1/2047 | 9.50% | 1 | D | Columbia | 323 | $68,500 | 15% | 05% | $17,152 | $44,525 | $26,387.89 |
| 2000000494 | UVALDE | TX | | $35,399.36 | $85,415.59 | 85,036 | 10/7/2008 | 11/1/2040 | 3.63% | 1 | D | Non-Performing | 323 | $110,000 | 15% | 05% | $23,010 | $71,500 | $35,399.36 |
| 2000000504 | LUBBOCK | TX | | $36,962.74 | $55,420.81 | 88,792 | 12/28/2005 | 8/1/2060 | 3.25% | 1 | D | Non-Performing | 323 | $105,000 | 15% | 05% | $24,026 | $68,250 | $36,962.74 |
| 2000000508 | PINITAS | TX | | $26,189.28 | $62,912.00 | 62,912 | 9/28/2006 | 3/1/2028 | 5.26% | 1 | D | Non-Performing | 323 | $105,000 | 15% | 05% | $17,023 | $68,250 | $26,189.28 |
| 2000000514 | LAWRENCEVILLE | VA | | $20,625.70 | $25,826.75 | 49,547 | 4/18/2008 | 6/1/2042 | 3.75% | 1 | D | Non-Performing | 323 | $68,000 | 15% | 05% | $13,407 | $44,200 | $20,625.70 |
| 2000000518 | DENMARK | SC | | $13,260.34 | $32,137.89 | 31,854 | 7/28/2006 | 9/5/2036 | 11.22% | 1 | D | Non-Performing | 323 | $25,000 | 15% | 05% | $8,619 | $16,250 | $13,260.34 |
| 2000000529 | NORTH ADAMS | MA | | $34,045.90 | $81,785.13 | 81,785 | 3/26/2007 | 1/1/2061 | 4.88% | 1 | D | Non-Performing | 323 | $90,000 | 15% | 05% | $22,130 | $58,500 | $34,045.90 |
| 2000000532 | REIDSVILLE | NC | | $10,361.86 | $24,891.29 | 24,891 | 6/1/2009 | 8/5/2024 | 11.47% | 1 | D | Non-Performing | 323 | $10,500 | 15% | 05% | $6,735 | $59,150 | $10,361.86 |
| 2000000536 | LAURINBURG | NC | | $23,576.23 | $18,930.60 | 56,635 | 7/21/2008 | 8/9/2038 | 11.46% | 1 | D | Non-Performing | 323 | $67,500 | 15% | 05% | $12,305 | $43,875 | $23,576.23 |
| 2000000542 | CHURCH POINT | LA | | $28,251.78 | $65,730.18 | 67,866 | 4/25/2006 | 2/1/2038 | 7.88% | 1 | D | Non-Performing | 323 | $88,000 | 15% | 05% | $18,364 | $57,200 | $28,251.78 |
| 2000000544 | ADAIR | PA | | $5,882.00 | $13,533.51 | 14,130 | 11/30/2001 | 3/1/2029 | 3.75% | 1 | D | Non-Performing | 323 | $20,000 | 15% | 05% | $3,823 | $13,000 | $5,882.00 |
| 2000000548 | JEFFERSONVILLE | KY | | $22,120.98 | $54,488.46 | 53,139 | 10/23/2003 | 10/5/2033 | 7.84% | 1 | D | Non-Performing | 323 | $104,000 | 15% | 05% | $14,379 | $67,600 | $22,120.98 |
| 2000000550 | SAN ANTONIO | TX | | $5,399.61 | $8,948.50 | 12,971 | 7/2/2002 | 3/1/2031 | 4.00% | 1 | D | Non-Performing | 323 | $91,000 | 15% | 05% | $3,510 | $59,150 | $5,399.61 |
| 2000000559 | SHREVEPORT | LA | | $7,754.21 | $29,768.38 | 18,627 | 9/19/2008 | 10/1/2028 | 3.75% | 1 | D | Non-Performing | 323 | $28,000 | 15% | 05% | $5,040 | $18,200 | $7,754.21 |
| 2000000565 | BATON ROUGE | LA | | $28,375.85 | $67,305.09 | 68,165 | 7/22/2005 | 7/1/2038 | 4.00% | 1 | D | Non-Performing | 323 | $57,450 | 15% | 05% | $18,444 | $37,343 | $28,375.85 |
| 2000000583 | JASPER | FL | | $19,700.42 | $48,154.50 | 47,324 | 11/14/2005 | 11/20/2030 | 4.75% | 1 | D | Non-Performing | 323 | $100,000 | 15% | 05% | $12,805 | $65,000 | $19,700.42 |
| 2000000584 | O FALLON | IL | | $57,814.72 | $117,434.39 | 138,883 | 8/10/2006 | 3/1/2036 | 7.75% | 1 | D | Non-Performing | 323 | $85,000 | 15% | 05% | $37,580 | $55,250 | $55,250.00 |
| 2000000587 | HELENA | GA | | $27,454.33 | $65,950.83 | 65,951 | 1/3/2003 | 5/1/2058 | 3.38% | 1 | D | Non-Performing | 323 | $78,900 | 15% | 05% | $17,845 | $51,285 | $27,454.33 |
| 2000000603 | BAKER | LA | | $61,029.78 | $99,726.58 | 146,606 | 12/27/2006 | 1/1/2037 | 6.88% | 1 | D | Non-Performing | 323 | $39,669 | 15% | 05% | $39,669 | $139,490 | $61,029.78 |
| 2000000680 | NEW ORLEANS | LA | | $49,751.60 | $119,513.39 | 119,513 | 8/2/2017 | 3/1/2019 | 10.50% | 1 | D | Non-Performing | 323 | $280,000 | 15% | 05% | $32,339 | $182,000 | $49,751.60 |
| 2000001014 | ALLENDALE | IL | | $14,699.47 | $36,510.45 | 35,311 | 4/10/2006 | 7/14/2036 | 4.00% | 1 | D | Non-Performing | 323 | $45,000 | 15% | 05% | $9,555 | $29,250 | $14,699.47 |
| 2000001015 | LUCAMA | NC | | $16,031.25 | $38,486.27 | 38,486 | 5/25/2007 | 5/15/2007 | 4.63% | 1 | D | Non-Performing | 323 | $79,000 | 15% | 05% | $10,414 | $51,350 | $16,031.25 |
| 2000001022 | HOLDEN | WV | | $9,921.72 | $23,833.97 | 23,834 | 12/9/2005 | 4/1/2022 | 4.50% | 1 | D | Non-Performing | 323 | $12,000 | 15% | 05% | $6,449 | $7,800 | $7,800.00 |
| 2000001024 | LACROSS | VA | | $12,059.61 | $183,539.02 | 28,970 | 5/21/1998 | 12/1/2024 | 3.88% | 1 | D | Non-Performing | 323 | $48,000 | 15% | 05% | $7,839 | $31,200 | $12,059.61 |
| 2000001027 | GREENSBURG | KY | | $14,090.84 | $33,849.03 | 33,849 | 10/31/2009 | 11/1/2025 | 5.81% | 1 | D | Non-Performing | 323 | $150,000 | 15% | 05% | $9,159 | $97,500 | $14,090.84 |
| 2000001033 | MONTGOMERY | AL | | $4,878.58 | $11,719.34 | 11,719 | 10/9/2008 | 11/1/2023 | 3.50% | 1 | D | Non-Performing | 323 | $10,000 | 15% | 05% | $3,171 | $6,500 | $4,878.58 |
| 2000001046 | GREENWOOD | FL | | $8,325.64 | $23,648.24 | 19,999 | 6/3/1996 | 3/15/2026 | 7.01% | 1 | D | Non-Performing | 323 | $99,000 | 15% | 05% | $5,412 | $64,350 | $8,325.64 |
| 2000001048 | WILMINGTON | NC | | $7,067.24 | $16,460.63 | 16,977 | 5/1/1998 | 5/1/2029 | 2.00% | 1 | D | Non-Performing | 323 | $84,000 | 15% | 05% | $4,594 | $54,600 | $7,067.24 |
| 2000001056 | WINDSOR | NC | | $37,559.99 | $36,629.85 | 90,227 | 11/10/2004 | 4/17/2042 | 8.00% | 1 | D | Non-Performing | 323 | $51,000 | 15% | 05% | $23,809 | $33,150 | $33,150.00 |
| 2000001057 | TARBORO | NC | | $21,539.98 | $47,927.74 | 51,743 | 9/24/2007 | 5/4/2037 | 8.00% | 1 | D | Non-Performing | 323 | $74,000 | 15% | 05% | $14,001 | $54,600 | $21,539.98 |
| 2000001058 | GATE CITY | VA | | $15,067.55 | $36,195.30 | 36,195 | 8/24/2006 | 2/10/2028 | 4.63% | 1 | D | Non-Performing | 323 | $9,794 | 15% | 05% | $9,794 | $51,25 | $15,067.55 |
| 2000001064 | NEWTON | IL | | $23,264.86 | $2,879.13 | 55,887 | 4/29/1999 | 1/1/2061 | 3.25% | 1 | D | Non-Performing | 323 | $30,000 | 15% | 05% | $1,871 | $19,500 | $19,500.00 |
| 2000001067 | APOPKA | FL | | $29,212.79 | $70,175.01 | 70,175 | 4/11/2000 | 6/1/2036 | 4.00% | 1 | D | Non-Performing | 323 | $25,000 | 15% | 05% | $18,988 | $16,250 | $16,250.00 |
| 2000001070 | ROBERTSDALE | AL | | $6,240.32 | $65,825.25 | 15,038 | 8/27/2001 | 1/16/2026 | 6.00% | 1 | D | Non-Performing | 323 | $4,069 | 15% | 05% | $4,069 | $61,750 | $6,240.32 |
| 2000001072 | OTIS | MA | | $41,555.80 | $59,624.61 | 99,825 | 4/23/2009 | 5/24/2052 | 5.00% | 1 | D | Non-Performing | 323 | $120,000 | 15% | 05% | $6,386 | $78,000 | $41,555.80 |
| 2000001077 | EFFINGHAM | SC | | $28,183.73 | $65,731.46 | 67,703 | 6/20/2010 | 10/6/2030 | 6.00% | 1 | D | Non-Performing | 323 | $170,000 | 15% | 05% | $18,319 | $110,500 | $28,183.73 |
| 2000001088 | MACON | GA | | $15,111.22 | $36,300.83 | 36,300 | 1/21/2009 | 12/1/2036 | 3.25% | 1 | D | Non-Performing | 323 | $59,900 | 15% | 05% | $9,822 | $38,935 | $15,111.22 |
| 2000001097 | CAMDEN | MS | | $5,892.09 | $332,250.45 | 14,154 | 12/1/2005 | 12/1/2020 | 10.74% | 1 | D | Non-Performing | 323 | $44,000 | 15% | 05% | $3,830 | $28,600 | $5,892.09 |
| 2000001110 | LEVELLAND | TX | | $7,172.23 | $17,229.14 | 17,229 | 11/30/2007 | 2/1/2025 | 3.25% | 1 | D | Non-Performing | 323 | $34,000 | 15% | 05% | $4,662 | $87,100 | $7,172.23 |
| 2000001119 | CLIERO | TX | | $15,701.99 | $37,584.17 | 37,719 | 11/19/2007 | 3/1/2051 | 3.25% | 1 | D | Non-Performing | 323 | $78,000 | 15% | 05% | $10,206 | $50,700 | $15,701.99 |
| 2000001122 | PHARR | TX | | $11,698.61 | $97,287.22 | 28,102 | 11/25/2009 | 12/22/2024 | 9.83% | 1 | D | Non-Performing | 323 | $62,000 | 15% | 05% | $40,300 | $40,300 | $11,698.61 |
| 2000001130 | THOMSON | GA | | $13,175.16 | $45,049.29 | 31,649 | 8/3/2008 | 5/17/2020 | 11.38% | 1 | D | Non-Performing | 323 | $8,564 | 15% | 05% | $8,564 | $48,358 | $13,175.16 |
| 2000001146 | DENHAM SPRINGS | LA | | $11,614.29 | $26,919.19 | 27,900 | 4/13/2015 | 6/17/2025 | 4.49% | 1 | D | Non-Performing | 323 | $137,000 | 15% | 05% | $7,549 | $89,050 | $11,614.29 |
| 2000001149 | BROWNSVILLE | TX | | $13,482.65 | $23,119.98 | 32,388 | 11/20/2007 | 1/1/2026 | 3.00% | 1 | D | Non-Performing | 323 | $8,764 | 15% | 05% | $8,764 | $43,550 | $13,482.65 |
| 2000001199 | FRANKLINTON | LA | | $17,870.98 | $42,929.71 | 42,930 | 9/20/2011 | 1/1/2032 | 3.50% | 1 | D | Non-Performing | 323 | $85,000 | 15% | 05% | $11,616 | $22,750 | $17,870.98 |
| 2000001203 | TAUNTON | MA | | $262,520.62 | $326,327.62 | 341,096 | 11/30/2007 | 10/18/2022 | 4.88% | 1 | D | Non-Performing | 323 | $371,700 | 15% | 05% | $170,638 | $242,905 | $242,905.00 |
| 2000001206 | JEFFERSON | TX | | $17,835.22 | $42,843.80 | 42,844 | 11/2/2000 | 11/7/2030 | 10.74% | 1 | D | Non-Performing | 323 | $95,000 | 15% | 05% | $11,593 | $61,752 | $17,835.22 |
| 2000001207 | MEMPHIS | TN | | $26,536.01 | $359,799.34 | 66,348 | 9/6/2007 | 5/1/2036 | 10.00% | 1 | D | Non-Performing | 323 | $55,000 | 15% | 05% | $17,248 | $35,750 | $26,536.01 |
| 2000001215 | RICHMOND | IN | | $25,240.79 | $96,857.31 | 60,633 | 3/4/2002 | 7/1/2028 | 10.16% | 1 | D | Non-Performing | 323 | $65,000 | 15% | 05% | $16,407 | $48,750 | $25,240.79 |
| 2000001219 | MILTON | PA | | $39,276.39 | $104,412.38 | 94,350 | 3/29/2004 | 8/1/2052 | 4.63% | 1 | D | Non-Performing | 323 | $109,000 | 15% | 05% | $25,530 | $70,850 | $39,276.39 |
| 2000001234 | LYNCHBURG | VA | | $20,855.41 | $25,397.68 | 50,099 | 8/19/2005 | 10/1/2040 | 4.00% | 1 | D | Non-Performing | 323 | $65,000 | 15% | 05% | $13,556 | $42,250 | $20,855.41 |
| 2000001244 | MAYWOOD | IL | | $167,467.57 | $131,068.16 | 402,291 | 3/18/2009 | 3/1/2051 | 3.86% | 1 | D | Non-Performing | 323 | $228,000 | 15% | 05% | $85,181 | $148,200 | $148,200.00 |
| 2000001246 | WEST SPRINGFIELD | MA | | $93,637.17 | $227,396.92 | 224,935 | 6/1/2010 | 2/1/2059 | 3.88% | 1 | D | Non-Performing | 323 | $60,844 | 15% | 05% | $60,844 | $162,500 | $93,637.17 |
| 2000001252 | NEW BEDFORD | MA | | $129,092.83 | $45,014.42 | 310,107 | 11/17/2003 | 1/1/2058 | 4.50% | 1 | D | Non-Performing | 323 | $260,000 | 15% | 05% | $29,259 | $169,000 | $129,092.83 |
| 2000001253 | MEMPHIS | TN | | $12,183.49 | $30,065.77 | 29,247 | 6/3/2000 | 10/26/2035 | 7.25% | 1 | D | Non-Performing | 323 | $45,250 | 15% | 05% | $7,919 | $42,250 | $12,183.49 |
| 2000001254 | DALTON | MA | | $261,729.84 | $321,387.59 | 659,138 | 7/1/2005 | 11/1/2045 | 5.53% | 1 | D | Non-Performing | 323 | $303,675 | 15% | 05% | $170,124 | $197,389 | $197,388.75 |
| 2000001256 | BALTIMORE | MD | | $29,936.58 | $1,029.07 | 71,914 | 2/8/2007 | 2/10/2032 | 4.24% | 1 | D | Non-Performing | 323 | $110,000 | 15% | 05% | $669 | $71,500 | $29,936.58 |
| 2000001257 | UNION | MO | | $11,694.38 | $34,685.53 | 28,093 | 5/1/1998 | 5/1/2024 | 10.70% | 1 | D | Non-Performing | 323 | $7,601 | 15% | 05% | $7,601 | $74,750 | $11,694.38 |
| 2000001259 | DAYHOIT | KY | | $5,524.04 | $82,848.55 | 13,270 | 12/6/2007 | 1/1/2026 | 4.38% | 1 | D | Non-Performing | 323 | $60,000 | 15% | 05% | $3,591 | $39,000 | $5,524.04 |
| 2000001268 | THOMASVILLE | GA | | $17,910.52 | $43,024.69 | 43,025 | 8/3/2001 | 5/1/2031 | 5.00% | 1 | D | Non-Performing | 323 | $85,000 | 15% | 05% | $11,642 | $55,250 | $17,910.52 |
| 2000001269 | JACKSONVILLE | FL | | $42,468.54 | $102,018.01 | 102,018 | 5/1/1998 | 5/1/2029 | 7.25% | 1 | D | Non-Performing | 323 | $195,000 | 15% | 05% | $27,605 | $126,750 | $42,468.54 |
| 2000001270 | BOWIE | MD | | $478,756.77 | $581,624.55 | 598,943 | 10/18/2007 | 12/1/2059 | 5.05% | 1 | D | Non-Performing | 323 | $859,600 | 15% | 05% | $311,192 | $558,740 | $478,756.77 |
| 2000001273 | SANTEE | SC | | $33,557.87 | $7,338.84 | 80,613 | 1/8/2008 | 8/14/2051 | 5.00% | 1 | D | Non-Performing | 323 | $80,000 | 15% | 05% | $4,770 | $52,000 | $33,557.87 |

| ID | City | State | | Balance | UPB | Value | Orig Date | Maturity | Rate | | | Status | Code | Amt1 | % | % | Amt2 | Amt3 | Amt4 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2000001274 | LAS CRUCES | NM | | 82 812.38 | $21 928.15 | 198 932 | 6/19/2006 | 5/2/2041 | 9.49% | 1 | D | Non-Performing | 323 | 60 000 | 15% | 05% | 14 253 | 39 000 | 39 000.00 |
| 2000001275 | BALTIMORE | MD | | 57 084.09 | $137 644.61 | 137 128 | 4/11/2006 | 4/11/2008 | 4.88% | 1 | D | Non-Performing | 323 | 130 000 | 15% | 05% | 27 105 | 84 500 | 57 084.09 |
| 2000001285 | TOCCOA | GA | | 9 905.63 | $23 794.85 | 23 795 | 10/17/2005 | 1/20/2021 | 8.50% | 1 | D | Non-Performing | 323 | 62 000 | 15% | 05% | 6 439 | 40 300 | 9 905.63 |
| 2000001289 | WESTOVER | MD | | 33 850.63 | $56 803.06 | 57 294 | 12/11/2007 | 10/1/2051 | 3.25% | 1 | D | Non-Performing | 323 | 604 000 | 15% | 05% | 15 503 | 67 600 | 23 850.63 |
| 2000001293 | ST STEPHENS | SC | | 33 313.00 | $76 292.23 | 80 025 | 12/12/2007 | 10/1/2030 | 3.25% | 1 | D | Non-Performing | 323 | 177 000 | 15% | 05% | 21 653 | 115 050 | 33 313.00 |
| 2000001295 | RICHBURG | SC | | 161 101.70 | $197 758.22 | 198 086 | 6/9/1997 | 8/1/2034 | 3.00% | 1 | D | Non-Performing | 323 | 315 000 | 15% | 05% | 104 716 | 204 750 | 161 101.70 |
| 2000001299 | WARDSBORO | VT | | 14 270.85 | $48 306.68 | 34 281 | 5/28/1993 | 3/10/2036 | 9.40% | 1 | D | Non-Performing | 323 | 165 000 | 15% | 05% | 9 276 | 107 250 | 14 270.85 |
| 2000001302 | HEATH | OH | | 45 226.76 | $12 539.44 | 108 644 | 7/26/2003 | 3/1/2049 | 3.00% | 1 | D | Non-Performing | 323 | 229 890 | 15% | 05% | 8 144 | 149 429 | 45 226.76 |
| 2000001307 | DYERSBURG | TN | | 5 582.56 | $13 410.44 | 13 410 | 8/4/2000 | 6/19/2023 | 0.38% | 1 | D | Non-Performing | 323 | 51 000 | 15% | 05% | 3 629 | 33 150 | 5 582.56 |
| 2000001311 | READING | PA | | 10 418.90 | $35 884.10 | 25 028 | 12/18/2006 | 5/5/2032 | 7.00% | 1 | D | Non-Performing | 323 | 89 000 | 15% | 05% | 6 772 | 57 850 | 10 418.90 |
| 2000001314 | PATERSON | NJ | | 178 868.48 | $443 772.24 | 506 592 | 2/15/2008 | 5/1/2032 | 4.00% | 1 | D | Non-Performing | 323 | 217 500 | 15% | 05% | 116 265 | 141 375 | 141 375.00 |
| 2000001318 | WATERFORD | MS | | 6 105.34 | $17 870.01 | 14 666 | 10/29/2005 | 12/10/2020 | 9.00% | 1 | D | Non-Performing | 323 | 199 000 | 15% | 05% | 3 968 | 129 350 | 6 105.34 |
| 2000001343 | BURGAW | NC | | 28 550.72 | $68 053.29 | 68 585 | 2/7/2000 | 10/1/2036 | 3.25% | 1 | D | Non-Performing | 323 | 121 000 | 15% | 05% | 18 558 | 79 950 | 28 550.72 |
| 2000001345 | NORTHPORT | ME | | 134 711.14 | $16 795.44 | 323 603 | 3/15/2007 | 12/1/2048 | 4.15% | 1 | D | Non-Performing | 323 | 190 000 | 15% | 07% | 10 417 | 123 500 | 123 500.00 |
| 2000001346 | GEORGIANA | AL | | 2 787.89 | $41 830.91 | 1 697 | 7/8/2003 | 9/14/2020 | 10.94% | 1 | D | Non-Performing | 323 | 65 000 | 15% | 05% | 1 812 | 42 250 | 2 787.89 |
| 2000001349 | MORGAN CITY | LA | | 18 760.67 | $45 066.91 | 45 067 | 8/13/1999 | 5/1/2031 | 3.25% | 1 | D | Non-Performing | 323 | 130 000 | 15% | 05% | 12 194 | 84 500 | 18 760.67 |
| 2000001354 | POINT PLEASANT BEACH | NJ | | 450 513.96 | $551 591.40 | 821 809 | 7/19/2007 | 8/20/2031 | 3.63% | 1 | D | Non-Performing | 323 | 516 750 | 15% | 05% | 292 834 | 335 888 | 335 887.50 |
| 2000001356 | LONG GROVE | IL | | 501 447.35 | $610 347.85 | 615 358 | 6/6/2006 | 11/3/2014 | 3.25% | 1 | D | Non-Performing | 323 | 900 400 | 15% | 05% | 325 000 | 585 260 | 590 000.00 |
| 2000001318 | DEMING | NM | | 39 418.26 | $41 227.08 | 94 691 | 11/17/2009 | 11/5/2026 | 5.50% | 1 | D | Non-Performing | 323 | 82 000 | 15% | 05% | 25 622 | 53 300 | 39 418.26 |
| 2000001619 | BAY CITY | OR | | 68 691.53 | $95 046.80 | 165 011 | 10/18/2006 | 10/5/2026 | 6.53% | 1 | D | Non-Performing | 323 | 169 000 | 15% | 05% | 44 649 | 109 850 | 68 691.53 |
| 2300008776 | COUNTRY CLUB HILLS | IL | | 24 386.10 | $56 569.28 | 58 580 | 5/6/2022 | 6/1/2052 | 4.63% | 1 | D | Non-Performing | 323 | 85 000 | 15% | 05% | 15 851 | 55 250 | 24 386.10 |
| 2300010358 | WAYNESBORO | ME | | 30 492.75 | $75 408.90 | 73 250 | 3/21/2022 | 3/1/2052 | 4.50% | 1 | D | Non-Performing | 323 | 130 000 | 15% | 05% | 19 820 | 84 500 | 30 492.75 |
| 1659641761 | BATON ROUGE | LA | | 36 979.18 | $44 331.75 | 20 916 | 2/22/1993 | 3/1/2033 | 7.88% | 1 | D | Non-Performing | 283 | 198 000 | 15% | 05% | 13 594 | 128 700 | 36 979.18 |
| 1661311990 | MECHANICSVILLE | VA | | 31 786.83 | $30 795.35 | 25 204 | 11/16/1993 | 12/1/2033 | 7.00% | 1 | D | Non-Performing | 283 | 518 000 | 15% | 05% | 16 383 | 336 700 | 31 786.83 |
| 1664821280 | URBANA | IL | | 20 600.02 | $17 040.63 | 21 460 | 7/19/1996 | 9/1/2026 | 9.00% | 1 | D | Non-Performing | 283 | 57 500 | 15% | 05% | 11 077 | 37 375 | 20 600.02 |
| 1665344133 | ST. CLAIR | PA | | 37 325.57 | $43 958.39 | 28 690 | 10/15/1993 | 10/1/2052 | 6.75% | 1 | D | Non-Performing | 283 | 129 000 | 15% | 05% | 18 590 | 83 850 | 37 325.57 |
| 1665752098 | FAR ROCKAWAY | NY | | 69 209.24 | $108 964.96 | 93 197 | 5/1/1997 | 5/1/2027 | 8.25% | 1 | D | Non-Performing | 283 | 661 000 | 15% | 05% | 44 984 | 429 650 | 69 209.24 |
| 1667475005 | WINTER HAVEN | FL | | 1 877.71 | $3 760.18 | 873 | 8/31/1994 | 3/1/2024 | 8.75% | 1 | D | Non-Performing | 283 | 310 000 | 15% | 05% | 567 | 201 500 | 1 877.71 |
| 1669743629 | POCATELLO | ID | | 86 685.55 | $105 323.36 | 71 466 | 11/10/1998 | 2/1/2055 | 6.88% | 1 | D | Non-Performing | 283 | 300 000 | 15% | 05% | 46 453 | 195 000 | 86 685.55 |
| 1672344390 | OPELIKA | AL | | 23 712.78 | $25 204.66 | 22 608 | 2/5/1999 | 3/1/2029 | 7.00% | 1 | D | Non-Performing | 283 | 213 900 | 15% | 05% | 14 695 | 139 035 | 23 712.78 |
| 1673712948 | RANDLEMAN | NC | | 88 514.34 | $94 374.54 | 85 660 | 10/8/1999 | 2/1/2051 | 4.88% | 1 | D | Non-Performing | 283 | 140 000 | 15% | 05% | 55 679 | 91 000 | 88 514.34 |
| 1675507887 | WILMINGTON | NC | | 135 207.63 | $141 953.40 | 125 626 | 10/25/2000 | 3/1/2056 | 3.00% | 1 | D | Non-Performing | 283 | 210 000 | 15% | 05% | 81 657 | 136 500 | 135 207.63 |
| 1675832954 | PHILADELPHIA | PA | | 65 481.09 | $85 688.63 | 50 953 | 10/5/2000 | 11/1/2030 | 8.88% | 1 | D | Non-Performing | 283 | 345 000 | 15% | 05% | 33 119 | 224 250 | 65 481.09 |
| 1676013285 | LYNCHBURG | OH | | 101 211.50 | $110 134.19 | 89 045 | 1/22/2001 | 3/1/2056 | 8.88% | 1 | D | Non-Performing | 283 | 224 000 | 15% | 05% | 57 879 | 145 600 | 101 211.50 |
| 1676590383 | MABLETON | GA | | 64 868.81 | $77 863.81 | 56 405 | 3/27/2001 | 6/1/2031 | 7.25% | 1 | D | Non-Performing | 283 | 265 000 | 15% | 05% | 36 663 | 172 250 | 64 868.81 |
| 1679405413 | STATESBORO | GA | | 7 774.21 | $9 462.27 | 1 110 | 11/16/1994 | 12/1/2024 | 7.75% | 1 | D | Non-Performing | 283 | 155 000 | 15% | 05% | 3 971 | 100 750 | 7 774.21 |
| 1680320853 | HOUSTON | TX | | 83 473.68 | $92 477.32 | 68 040 | 1/4/2002 | 1/1/2054 | 4.63% | 1 | D | Non-Performing | 283 | 150 000 | 15% | 05% | 44 226 | 97 500 | 83 473.68 |
| 1681412078 | WATKINSVILLE | GA | | 107 395.62 | $125 647.97 | 103 170 | 4/29/2002 | 5/1/2054 | 6.25% | 1 | D | Non-Performing | 283 | 500 000 | 15% | 05% | 67 060 | 325 000 | 107 395.62 |
| 1682125838 | YADKINVILLE | NC | | 12 533.65 | $13 885.99 | 11 823 | 6/24/2002 | 8/1/2052 | 6.75% | 1 | D | Non-Performing | 283 | 170 000 | 15% | 05% | 7 685 | 110 500 | 12 533.65 |
| 1683204174 | ROYSE CITY | TX | | 78 681.74 | $82 434.02 | 75 073 | 5/28/2002 | 6/1/2050 | 4.63% | 1 | D | Non-Performing | 283 | 287 000 | 15% | 05% | 48 798 | 186 550 | 78 681.74 |
| 1684477681 | WILLIAMSPORT | PA | | 50 825.14 | $59 281.22 | 51 168 | 12/4/2002 | 12/1/2052 | 6.13% | 1 | D | Non-Performing | 283 | 135 000 | 15% | 05% | 33 036 | 87 750 | 50 825.14 |
| 1686467071 | O-FALLON | MO | | 76 742.98 | $92 556.42 | 80 758 | 2/10/2003 | 3/1/2033 | 5.63% | 1 | D | Non-Performing | 283 | 350 000 | 15% | 05% | 49 883 | 227 500 | 76 742.98 |
| 1686513459 | COLUMBUS | OH | | 76 767.70 | $85 473.16 | 66 030 | 3/10/2003 | 4/1/2057 | 5.88% | 1 | D | Non-Performing | 283 | 185 000 | 15% | 05% | 42 913 | 120 250 | 76 767.70 |
| 1687124159 | BREMERTON | WA | | 82 354.85 | $96 276.73 | 85 482 | 4/30/2002 | 12/1/2058 | 7.13% | 1 | D | Non-Performing | 283 | 345 000 | 15% | 05% | 53 531 | 224 250 | 82 354.85 |
| 1687347126 | WILMINGTON | DE | | 107 941.43 | $126 173.25 | 95 097 | 3/26/2003 | 2/1/2055 | 6.00% | 1 | D | Non-Performing | 283 | 215 000 | 15% | 05% | 61 813 | 139 750 | 107 941.43 |
| 1687542901 | BETHEL | OH | | 75 574.72 | $79 071.60 | 68 962 | 4/8/2003 | 5/1/2033 | 5.88% | 1 | D | Non-Performing | 283 | 250 000 | 15% | 05% | 44 823 | 162 500 | 75 574.72 |
| 1688100228 | INDEPENDENCE | MO | | 31 068.95 | $36 907.04 | 32 137 | 4/15/2003 | 5/1/2033 | 6.75% | 1 | D | Non-Performing | 283 | 98 000 | 15% | 05% | 20 195 | 63 700 | 31 068.95 |
| 1688850492 | MIAMI | FL | | 265 762.60 | $279 640.20 | 247 922 | 4/15/2003 | 7/1/2056 | 3.88% | 1 | D | Non-Performing | 283 | 465 000 | 15% | 05% | 161 149 | 302 250 | 265 762.60 |
| 1689225652 | CHICAGO | IL | | 34 040.07 | $41 440.65 | 20 126 | 5/30/2003 | 1/1/2057 | 5.38% | 1 | D | Non-Performing | 283 | 220 000 | 15% | 05% | 13 042 | 143 000 | 34 040.07 |
| 1689461570 | PISCATAWAY | NJ | | 168 661.05 | $213 903.38 | 188 343 | 6/27/2003 | 8/1/2055 | 5.38% | 1 | D | Non-Performing | 283 | 344 000 | 15% | 05% | 109 630 | 223 600 | 168 661.05 |
| 1689809689 | HORTON | MI | | 55 592.40 | $58 971.62 | 50 714 | 6/27/2003 | 9/1/2050 | 5.00% | 1 | D | Non-Performing | 283 | 225 000 | 15% | 05% | 32 964 | 146 250 | 55 592.40 |
| 1692216032 | SYLACAUGA | AL | | 56 784.34 | $66 636.38 | 58 317 | 7/22/2003 | 1/1/2059 | 6.00% | 1 | D | Non-Performing | 283 | 216 400 | 15% | 05% | 36 910 | 140 660 | 56 784.34 |
| 1692394411 | LOWELL | MA | | 307 386.40 | $331 064.61 | 284 496 | 8/1/2003 | 2/1/2058 | 4.63% | 1 | D | Non-Performing | 283 | 580 000 | 15% | 05% | 184 922 | 377 000 | 307 386.40 |
| 1692809522 | EVERETT | WA | | 173 560.46 | $182 463.98 | 153 613 | 7/25/2003 | 9/1/2052 | 5.38% | 1 | D | Non-Performing | 283 | 670 000 | 15% | 05% | 99 848 | 435 500 | 173 560.46 |
| 1693418488 | DAWSON | PA | | 73 773.78 | $87 451.66 | 70 421 | 8/25/2003 | 7/1/2053 | 4.00% | 1 | D | Non-Performing | 283 | 233 000 | 15% | 05% | 45 774 | 151 450 | 73 773.78 |
| 1693672787 | COLONIA | NJ | | 141 051.93 | $146 838.36 | 136 031 | 8/15/2002 | 1/1/2042 | 3.00% | 1 | D | Non-Performing | 283 | 468 000 | 15% | 05% | 88 420 | 304 200 | 141 051.93 |
| 1694484845 | ELLENWOOD | GA | | 105 763.27 | $113 530.73 | 105 563 | 12/23/2003 | 3/1/2047 | 3.50% | 1 | D | Non-Performing | 283 | 275 000 | 15% | 05% | 68 616 | 178 750 | 105 763.27 |
| 1694637692 | PHILADELPHIA | PA | | 58 249.50 | $61 636.48 | 54 818 | 1/28/2004 | 7/1/2059 | 4.88% | 1 | D | Non-Performing | 283 | 175 000 | 15% | 05% | 35 642 | 113 750 | 58 249.50 |
| 1695141624 | MEMPHIS | TN | | 60 668.04 | $62 824.58 | 58 917 | 2/20/2004 | 5/1/2056 | 3.75% | 1 | D | Non-Performing | 283 | 150 000 | 15% | 05% | 38 296 | 88 400 | 60 668.04 |
| 1695499671 | PRINCETON | NJ | | 75 802.11 | $85 998.83 | 64 790 | 4/5/2004 | 5/1/2034 | 5.88% | 1 | D | Non-Performing | 283 | 160 000 | 15% | 05% | 42 114 | 104 000 | 75 802.11 |
| 1695728097 | GRAHAM | GA | | 61 456.26 | $64 226.43 | 59 017 | 4/21/2004 | 5/1/2034 | 5.75% | 1 | D | Non-Performing | 283 | 465 000 | 15% | 05% | 38 361 | 302 250 | 61 456.26 |
| 1695777330 | DECATUR | GA | | 121 878.67 | $127 986.51 | 121 274 | 4/30/2004 | 11/1/2052 | 4.63% | 1 | D | Non-Performing | 283 | 342 000 | 15% | 05% | 78 828 | 222 300 | 121 878.67 |
| 1695953818 | SUWANEE | GA | | 343 797.71 | $386 430.55 | 339 612 | 5/5/2004 | 5/1/2053 | 2.00% | 1 | D | Non-Performing | 283 | 566 000 | 15% | 05% | 220 746 | 367 900 | 343 797.71 |
| 1696912135 | BALTIMORE | MD | | 85 350.35 | $89 130.92 | 81 559 | 8/30/2004 | 3/1/2054 | 4.25% | 1 | D | Non-Performing | 283 | 233 000 | 15% | 05% | 53 013 | 151 450 | 85 350.35 |
| 1697306721 | HOPE MILLS | NC | | 85 290.96 | $101 316.37 | 86 647 | 10/8/2004 | 9/1/2057 | 5.88% | 1 | D | Non-Performing | 283 | 205 000 | 15% | 05% | 55 439 | 133 250 | 85 290.96 |
| 1697869792 | NAPLES | FL | | 328 425.94 | $380 875.88 | 284 187 | 11/23/2004 | 5/1/2056 | 5.88% | 1 | D | Non-Performing | 283 | 880 000 | 15% | 05% | 184 723 | 572 000 | 328 425.94 |
| 1698046380 | CINCINNATI | OH | | 92 231.54 | $96 458.51 | 85 143 | 2/24/2005 | 7/1/2036 | 4.50% | 1 | D | Non-Performing | 283 | 190 000 | 15% | 05% | 55 343 | 122 850 | 92 231.54 |
| 1698604852 | SWANSEA | ME | | 70 267.66 | $82 617.13 | 59 980 | 2/28/2005 | 5/1/2057 | 5.88% | 1 | D | Non-Performing | 283 | 119 000 | 15% | 05% | 38 987 | 77 350 | 70 267.66 |
| 1698592293 | SANFORD | ME | | 106 632.90 | $125 153.69 | 110 962 | 2/14/2005 | 6/1/2056 | 3.88% | 1 | D | Non-Performing | 283 | 376 000 | 15% | 05% | 69 311 | 244 400 | 106 632.90 |
| 1699592220 | PHILADELPHIA | PA | | 168 850.31 | $212 995.16 | 183 699 | 4/1/2005 | 4/1/2060 | 5.88% | 1 | D | Non-Performing | 283 | 713 000 | 15% | 05% | 109 753 | 463 450 | 168 850.31 |
| 1699653078 | SUITLAND | MD | | 151 291.01 | $158 885.20 | 146 895 | 8/12/2005 | 4/1/2053 | 3.63% | 1 | D | Non-Performing | 283 | 408 250 | 15% | 05% | 95 482 | 265 363 | 151 291.01 |
| 1700079300 | PLUMSTEAD TWNSP | NJ | | 413 430.01 | $487 112.73 | 391 680 | 11/11/2005 | 9/1/2055 | 4.00% | 1 | D | Non-Performing | 283 | 745 000 | 15% | 05% | 254 542 | 484 250 | 413 430.01 |
| 1700316903 | BOTHELL | WA | | 143 642.36 | $181 007.30 | 113 195 | 11/7/2005 | 9/1/2046 | 3.88% | 1 | D | Non-Performing | 283 | 445 000 | 15% | 05% | 73 577 | 289 250 | 143 642.36 |
| 1700321742 | REBECCA | GA | | 173 814.05 | $189 809.12 | 167 917 | 10/31/2005 | 4/1/2038 | 3.00% | 1 | D | Non-Performing | 283 | 145 000 | 15% | 05% | 109 146 | 94 250 | 94 250.00 |
| 1700394000 | MANTECA | CA | | 308 404.75 | $335 303.00 | 297 847 | 11/9/2005 | 6/1/2038 | 3.88% | 1 | D | Non-Performing | 283 | 617 000 | 15% | 05% | 193 600 | 401 050 | 308 404.75 |
| 1700685253 | MILFORD | OH | | 104 345.67 | $111 900.40 | 94 612 | 11/16/2005 | 11/1/2053 | 3.88% | 1 | D | Non-Performing | 283 | 210 000 | 15% | 05% | 61 381 | 136 500 | 104 345.67 |
| 1701071533 | STOCKBRIDGE | GA | | 149 946.91 | $161 810.40 | 144 642 | 2/23/2006 | 2/1/2053 | 4.00% | 1 | D | Non-Performing | 283 | 320 000 | 15% | 05% | 94 017 | 208 000 | 149 946.91 |
| 1701870872 | SOUTHBRIDGE | MA | | 160 643.25 | $187 101.78 | 161 134 | 7/24/2006 | 12/1/2046 | 4.88% | 1 | D | Non-Performing | 283 | 340 000 | 15% | 05% | 104 418 | 221 000 | 160 643.25 |
| 1702534250 | SPRING HILL | FL | | 131 277.55 | $137 609.85 | 124 551 | 10/19/2006 | 12/1/2049 | 6.75% | 1 | D | Non-Performing | 283 | 200 000 | 15% | 05% | 80 958 | 130 000 | 130 000.00 |
| 1702725320 | OCALA | FL | | 209 632.75 | $243 754.50 | 209 361 | 11/28/2006 | 1/1/2057 | 3.25% | 1 | D | Non-Performing | 283 | 460 000 | 15% | 05% | 136 085 | 299 000 | 209 632.75 |
| 1702764847 | REIDSVILLE | NC | | 11 480.34 | $14 357.22 | 10 227 | 12/14/2006 | 3/1/2038 | 6.88% | 1 | D | Non-Performing | 283 | 64 000 | 15% | 05% | 6 646 | 39 650 | 11 480.34 |
| 1703609055 | FRANKLIN | MA | | 180 724.04 | $276 779.34 | 221 941 | 3/30/2007 | 6/1/2037 | 3.63% | 1 | D | Non-Performing | 283 | 525 000 | 15% | 05% | 117 471 | 341 250 | 180 724.04 |
| 1703738162 | HAMPTON | VA | | 175 918.77 | $183 649.89 | 165 272 | 7/14/2006 | 12/1/2046 | 4.88% | 1 | D | Non-Performing | 283 | 365 000 | 15% | 05% | 107 427 | 237 250 | 175 918.77 |
| 1703794946 | TEWKSBURY | MA | | 309 057.46 | $326 440.99 | 289 352 | 1/2/2007 | 5/1/2057 | 2.00% | 1 | D | Non-Performing | 283 | 470 000 | 15% | 05% | 188 079 | 432 250 | 309 057.46 |
| 1704163248 | DES MOINES | IA | | 114 242.96 | $138 736.60 | 121 829 | 6/8/2007 | 7/1/2037 | 6.00% | 1 | D | Non-Performing | 283 | 285 000 | 15% | 05% | 74 258 | 185 250 | 114 242.96 |
| 1704171260 | PRAGUE | OK | | 111 683.80 | $142 323.40 | 120 883 | 5/4/2007 | 5/1/2037 | 6.25% | 1 | D | Non-Performing | 283 | 264 000 | 15% | 05% | 72 594 | 171 600 | 111 683.80 |
| 1704292891 | NEPTUNE | NJ | | 309 225.90 | $350 409.77 | 262 105 | 5/3/2007 | 6/1/2056 | 3.75% | 1 | D | Non-Performing | 283 | 439 900 | 15% | 05% | 170 368 | 285 935 | 309 225.90 |
| 1704428782 | NAPLES | FL | | 230 584.95 | $342 908.90 | 230 542 | 6/3/2007 | 8/1/2058 | 3.75% | 1 | D | Non-Performing | 283 | 535 000 | 15% | 05% | 149 852 | 367 250 | 230 584.95 |
| 1704673979 | GERMANTOWN | MD | | 237 709.60 | $298 889.23 | 271 985 | 7/1/2007 | 4/1/2037 | 4.25% | 1 | D | Non-Performing | 283 | 437 500 | 15% | 05% | 154 511 | 311 350 | 237 709.60 |
| 1704803993 | MENOMONEE FALLS | WI | | 237 486.74 | $279 207.19 | 233 799 | 8/27/2007 | 5/1/2056 | 3.88% | 1 | D | Non-Performing | 283 | 415 000 | 15% | 05% | 151 969 | 269 750 | 237 486.74 |
| 1705776666 | BLUE BELL | PA | | 233 959.99 | $288 832.96 | 238 118 | 11/20/2007 | 12/1/2037 | 3.88% | 1 | D | Non-Performing | 283 | 515 000 | 15% | 05% | 152 074 | 324 300 | 233 959.99 |
| 1706000904 | TUMWATER | WA | | 245 803.82 | $258 482.58 | 210 271 | 1/7/2008 | 4/1/2053 | 4.25% | 1 | D | Non-Performing | 283 | 470 000 | 15% | 05% | 136 676 | 305 500 | 245 803.82 |
| 1706612662 | HOBART | IN | | 101 619.64 | $117 650.58 | 90 313 | 2/7/2008 | 4/1/2038 | 6.25% | 1 | D | Non-Performing | 283 | 200 000 | 15% | 05% | 58 703 | 130 000 | 101 619.64 |
| 1706716467 | BETHANY | OK | | 82 327.73 | $102 556.30 | 70 798 | 3/8/2008 | 9/1/2053 | 4.63% | 1 | D | Non-Performing | 283 | 165 000 | 15% | 05% | 46 019 | 107 250 | 82 327.73 |
| 1706738446 | GREENSBURG | PA | | 152 496.36 | $161 937.94 | 136 192 | 3/31/2008 | 2/1/2038 | 5.88% | 1 | D | Non-Performing | 283 | 250 000 | 15% | 05% | 88 525 | 162 500 | 152 496.36 |
| 1706922612 | BETHLEHEM | PA | | 41 290.07 | $54 031.27 | 49 108 | 4/9/2008 | 11/1/2059 | 5.13% | 1 | D | Non-Performing | 283 | 245 000 | 15% | 05% | 26 838 | 159 250 | 41 290.07 |
| 1706991119 | SANTEE | CA | | 286 387.85 | $316 101.96 | 283 005 | 4/18/2008 | 3/1/2057 | 3.50% | 1 | D | Non-Performing | 283 | 655 000 | 15% | 05% | 183 953 | 425 750 | 286 387.85 |
| 1707164231 | MONCTON | ME | | 17 067.00 | $40 890.83 | 22 436 | 3/3/2003 | 5/1/2057 | 3.50% | 1 | D | Non-Performing | 283 | 490 000 | 15% | 05% | 11 094 | 549 250 | 17 067.00 |
| 1707678880 | HIALEAH | FL | | 250 947.57 | $346 550.80 | 236 316 | 8/7/2008 | 11/1/2058 | 4.63% | 1 | D | Non-Performing | 283 | 490 000 | 15% | 05% | 153 605 | 318 500 | 250 947.57 |
| 1708201542 | PUYALLUP | WA | | 197 804.38 | $207 067.36 | 180 410 | 12/18/2008 | 4/1/2056 | 3.50% | 1 | D | Non-Performing | 283 | 580 000 | 15% | 05% | 117 267 | 351 000 | 197 804.38 |
| 1708355607 | PAXINOS | PA | | 34 556.63 | $44 074.51 | 41 143 | 1/26/2009 | 2/1/2024 | 4.63% | 1 | D | Non-Performing | 283 | 199 000 | 15% | 05% | 22 463 | 129 350 | 34 556.63 |
| 1708450066 | ELKHART | IN | | 56 130.61 | $66 183.51 | 54 854 | 1/6/2009 | 2/1/2039 | 6.38% | 1 | D | Non-Performing | 283 | 205 000 | 15% | 05% | 35 655 | 133 250 | 56 130.61 |

| ID | City | State | Type | Amount 1 | Amount 2 | Amount 3 | Date 1 | Date 2 | Rate | | | Status | Days | Value | Pct 1 | Pct 2 | Amount 4 | Amount 5 | Amount 6 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1708967019 | WARMINSTER | PA | | $ 227,882.21 | $276,761.48 | 207,834 | 3/31/2009 | 6/1/2039 | 6.38% | 1 | D | Non-Performing | 283 | $ 550,000 | 15% | 95% | $ 135,092 | 357,500 | $ 227,882.21 |
| 1709563070 | EGG HARBOR TWP | NJ | | $ 203,244.12 | $242,070.19 | 210,325 | 6/11/2009 | 8/1/2058 | 4.50% | 1 | D | Non-Performing | 283 | $ 415,000 | 15% | 95% | $ 132,109 | 269,750 | $ 203,244.12 |
| 1709784387 | MASSAPEQUA | NY | | $ 413,357.21 | $447,030.79 | 312,573 | 6/1/2009 | 7/1/2039 | 4.63% | 1 | D | Non-Performing | 283 | $ 1,250,000 | 15% | 95% | $ 203,173 | 813,500 | $ 413,357.21 |
| 1711694185 | PENNSAUKEN | NJ | | $ 83,563.31 | $98,433.80 | 71,645 | 6/30/2010 | 5/1/2054 | 6.13% | 1 | D | Non-Performing | 283 | $ 290,000 | 15% | 95% | $ 46,568 | 188,500 | $ 83,563.31 |
| 1711702801 | JERSEY CITY | NJ | | $ 372,838.96 | $440,704.68 | 333,455 | 6/17/2010 | 3/1/2057 | 3.50% | 1 | D | Non-Performing | 283 | $ 660,000 | 15% | 95% | $ 216,746 | 429,000 | $ 372,838.96 |
| 1713306199 | MASSILLON | OH | | $ 79,428.48 | $83,112.61 | 69,074 | 1/7/2011 | 3/1/2057 | 4.50% | 1 | D | Non-Performing | 283 | $ 145,000 | 15% | 95% | $ 44,898 | 94,250 | $ 79,428.48 |
| 1713362910 | MIDDLEBURG | FL | | $ 152,117.19 | $173,545.86 | 158,920 | 1/31/2011 | 11/1/2041 | 5.38% | 1 | D | Non-Performing | 283 | $ 250,000 | 15% | 95% | $ 98,876 | 162,500 | $ 152,117.19 |
| 1714186292 | BALTIMORE | MD | | $ 47,197.49 | $56,586.96 | 45,158 | 6/30/2011 | 7/1/2026 | 3.88% | 1 | D | Non-Performing | 283 | $ 200,000 | 15% | 95% | $ 29,352 | 130,000 | $ 47,197.49 |
| 1714274206 | ROCKVILLE | MD | | $ 251,098.10 | $293,842.18 | 264,522 | 6/29/2011 | 6/1/2057 | 4.88% | 1 | D | Non-Performing | 283 | $ 620,000 | 15% | 95% | $ 163,214 | 403,000 | $ 251,098.10 |
| 1714550480 | RAVENNA | OH | | $ 60,380.67 | $66,879.20 | 56,363 | 8/26/2011 | 3/1/2041 | 4.88% | 1 | D | Non-Performing | 283 | $ 105,000 | 15% | 95% | $ 36,638 | 68,250 | $ 60,380.67 |
| 1714846992 | SPARTANBURG | SC | | $ 93,548.80 | $104,150.38 | 89,276 | 9/20/2011 | 10/1/2041 | 4.75% | 1 | D | Non-Performing | 283 | $ 280,000 | 15% | 95% | $ 58,030 | 182,000 | $ 93,548.80 |
| 1714967691 | ORLANDO | FL | | $ 120,791.64 | $129,126.00 | 99,721 | 9/7/2011 | 10/1/2041 | 5.25% | 1 | D | Non-Performing | 283 | $ 421,000 | 15% | 95% | $ 64,819 | 273,650 | $ 120,791.64 |
| 1715076947 | TARENTUM | PA | | $ 99,319.40 | $103,260.75 | 96,253 | 11/14/2011 | 12/1/2041 | 4.25% | 1 | D | Non-Performing | 283 | $ 250,000 | 15% | 95% | $ 62,564 | 162,500 | $ 99,319.40 |
| 1715098999 | WHITE STONE | VA | | $ 96,394.82 | $112,604.70 | 100,746 | 10/12/2011 | 11/1/2041 | 5.50% | 1 | D | Non-Performing | 283 | $ 220,000 | 15% | 95% | $ 62,657 | 143,000 | $ 96,394.82 |
| 1715323723 | GAINESVILLE | KY | | $ 32,452.26 | $33,914.00 | 32,107 | 12/13/2011 | 1/1/2042 | 5.50% | 1 | D | Non-Performing | 283 | $ 202,000 | 15% | 95% | $ 20,870 | 131,300 | $ 32,452.26 |
| 1715594417 | Corpus Christi | TX | | $ 36,431.25 | $48,653.82 | 40,234 | 1/24/2012 | 2/1/2027 | 3.50% | 1 | D | Non-Performing | 283 | $ 175,000 | 15% | 95% | $ 23,680 | 113,750 | $ 36,431.25 |
| 1715632067 | KINGS PARK | NY | | $ 167,150.47 | $205,884.23 | 107,070 | 1/11/2012 | 2/1/2032 | 4.63% | 1 | D | Non-Performing | 283 | $ 760,000 | 15% | 95% | $ 69,593 | 494,000 | $ 167,150.47 |
| 1716402751 | DOUGLASVILLE | GA | | $ 201,694.22 | $237,336.46 | 205,032 | 5/1/2012 | 1/1/2059 | 3.88% | 1 | D | Non-Performing | 283 | $ 385,000 | 15% | 95% | $ 131,101 | 250,250 | $ 201,694.22 |
| 1716833676 | WILMINGTON | DE | | $ 104,864.80 | $110,341.96 | 94,593 | 6/25/2012 | 1/1/2057 | 4.25% | 1 | D | Non-Performing | 283 | $ 217,000 | 15% | 95% | $ 61,485 | 141,050 | $ 104,864.80 |
| 1716923474 | Des Plaines | IL | | $ 239,456.01 | $258,672.58 | 216,120 | 6/29/2012 | 7/1/2042 | 4.25% | 1 | D | Non-Performing | 283 | $ 470,000 | 15% | 95% | $ 140,478 | 305,500 | $ 239,456.01 |
| 1717047450 | LANCASTER | PA | | $ 66,760.86 | $72,980.83 | 66,531 | 6/25/2012 | 7/1/2027 | 3.38% | 1 | D | Non-Performing | 283 | $ 250,000 | 15% | 95% | $ 43,245 | 162,500 | $ 66,760.86 |
| 1717169926 | DEARBORN HEIGHTS | MI | | $ 106,508.94 | $137,373.82 | 88,954 | 8/6/2012 | 8/1/2042 | 4.13% | 1 | D | Non-Performing | 283 | $ 270,000 | 15% | 95% | $ 57,820 | 175,500 | $ 106,508.94 |
| 1730011367 | GARFIELD | WA | | $ 160,337.26 | $200,237.16 | 179,069 | 9/4/2012 | 10/1/2042 | 3.88% | 1 | D | Non-Performing | 283 | $ 318,000 | 15% | 95% | $ 104,219 | 206,700 | $ 160,337.26 |
| 1730762870 | DEMOTTE | IN | | $ 96,972.53 | $103,456.44 | 81,821 | 12/5/2012 | 10/1/2058 | 3.50% | 1 | D | Non-Performing | 283 | $ 240,000 | 15% | 95% | $ 53,184 | 156,000 | $ 96,972.53 |
| 1730796277 | DOTHAN | AL | | $ 53,289.00 | $63,066.08 | 51,031 | 12/13/2012 | 4/1/2059 | 4.13% | 1 | D | Non-Performing | 283 | $ 115,000 | 15% | 95% | $ 33,150 | 74,750 | $ 53,289.00 |
| 1730809798 | HUNTINGTON | NY | | $ 223,402.41 | $233,782.85 | 227,852 | 12/13/2012 | 1/1/2043 | 3.13% | 1 | D | Non-Performing | 283 | $ 2,850,000 | 15% | 95% | $ 145,212 | 1,852,500 | $ 223,402.41 |
| 1731490795 | WAILUKU | HI | | $ 314,997.10 | $344,808.48 | 307,783 | 3/8/2013 | 3/1/2058 | 3.75% | 1 | D | Non-Performing | 283 | $ 825,000 | 15% | 95% | $ 200,059 | 536,250 | $ 314,997.10 |
| 1732278335 | BISHOPVILLE | MD | | $ 318,372.66 | $340,544.61 | 318,258 | 5/24/2013 | 6/1/2043 | 4.00% | 1 | D | Non-Performing | 283 | $ 869,000 | 15% | 95% | $ 206,867 | 564,850 | $ 318,372.66 |
| 1732308026 | ENOLA | PA | | $ 151,430.33 | $157,790.71 | 146,274 | 6/1/2013 | 3/1/2055 | 3.75% | 1 | D | Non-Performing | 283 | $ 330,000 | 15% | 95% | $ 95,076 | 214,500 | $ 151,430.33 |
| 1732510609 | JENSEN BEACH | FL | | $ 216,949.39 | $233,154.37 | 210,946 | 6/9/2013 | 2/1/2058 | 3.65% | 1 | D | Non-Performing | 283 | $ 680,000 | 15% | 95% | $ 137,115 | 442,000 | $ 216,949.39 |
| 1732805504 | PHILLIPSBURG | NJ | | $ 151,358.94 | $162,874.48 | 149,209 | 7/29/2013 | 1/1/2059 | 3.88% | 1 | D | Non-Performing | 283 | $ 340,000 | 15% | 95% | $ 96,988 | 221,000 | $ 151,358.94 |
| 1732985257 | JONESBORO | AR | | $ 52,641.64 | $56,254.98 | 49,289 | 9/1/2013 | 5/1/2058 | 5.00% | 1 | D | Non-Performing | 283 | $ 90,000 | 15% | 95% | $ 32,038 | 58,500 | $ 52,641.64 |
| 1733057298 | LINCOLN | NE | | $ 27,421.51 | $34,938.15 | 25,701 | 9/13/2013 | 10/1/2023 | 3.75% | 1 | D | Non-Performing | 283 | $ 220,000 | 15% | 95% | $ 16,705 | 143,000 | $ 27,421.51 |
| 1733202711 | EDGERTON | WI | | $ 36,043.34 | $44,878.24 | 36,326 | 10/4/2013 | 11/1/2043 | 5.25% | 1 | D | Non-Performing | 283 | $ 115,000 | 15% | 95% | $ 23,428 | 74,750 | $ 36,043.34 |
| 1733319460 | PENDLETON | SC | | $ 97,519.27 | $115,094.47 | 90,666 | 11/22/2013 | 12/1/2043 | 4.75% | 1 | D | Non-Performing | 283 | $ 188,000 | 15% | 95% | $ 58,933 | 122,200 | $ 97,519.27 |
| 1733623611 | CROWN POINT | IN | | $ 153,949.47 | $181,604.09 | 150,445 | 2/12/2014 | 4/1/2058 | 6.75% | 1 | D | Non-Performing | 283 | $ 465,000 | 15% | 95% | $ 97,788 | 302,250 | $ 153,949.47 |
| 1733997941 | OAKDALE | CA | | $ 127,716.72 | $133,312.44 | 123,027 | 5/2/2014 | 6/1/2044 | 5.25% | 1 | D | Non-Performing | 283 | $ 367,000 | 15% | 95% | $ 79,967 | 238,550 | $ 127,716.72 |
| 1734137253 | ALTAMONTE SPRINGS | FL | | $ 55,367.32 | $59,957.90 | 54,971 | 7/2/2014 | 4/1/2024 | 3.63% | 1 | D | Non-Performing | 283 | $ 380,000 | 15% | 95% | $ 35,733 | 247,000 | $ 55,367.32 |
| 1734155018 | GLENSHAW | PA | | $ 124,186.74 | $145,652.38 | 119,080 | 6/3/2014 | 5/1/2056 | 5.38% | 1 | D | Non-Performing | 283 | $ 300,000 | 15% | 95% | $ 77,402 | 195,000 | $ 124,186.74 |
| 1734434924 | LAURELVILLE | OH | | $ 126,024.93 | $137,517.50 | 122,426 | 8/29/2014 | 9/1/2044 | 4.63% | 1 | D | Non-Performing | 283 | $ 240,000 | 15% | 95% | $ 79,577 | 156,000 | $ 126,024.93 |
| 1734432378 | ENTERPRISE | AL | | $ 75,897.29 | $94,322.68 | 80,951 | 10/14/2014 | 11/1/2044 | 4.25% | 1 | D | Non-Performing | 283 | $ 220,000 | 15% | 95% | $ 49,333 | 143,000 | $ 75,897.29 |
| 1734570077 | TREVOR | WI | | $ 141,233.90 | $166,212.57 | 126,645 | 10/27/2014 | 11/1/2044 | 4.75% | 1 | D | Non-Performing | 283 | $ 265,000 | 15% | 95% | $ 82,319 | 172,250 | $ 141,233.90 |
| 1734571516 | NORTH CHESTERFIELD | VA | | $ 132,791.80 | $139,637.96 | 127,406 | 10/11/2014 | 4/1/2057 | 4.75% | 1 | D | Non-Performing | 283 | $ 325,000 | 15% | 95% | $ 82,814 | 211,250 | $ 132,791.80 |
| 1735329288 | SPARTA | NJ | | $ 309,877.79 | $405,186.80 | 282,948 | 4/10/2015 | 5/1/2045 | 4.75% | 1 | D | Non-Performing | 283 | $ 675,000 | 15% | 95% | $ 183,916 | 438,750 | $ 309,877.79 |
| 1735406483 | WINCHESTER | VA | | $ 62,545.27 | $68,054.41 | 60,982 | 6/23/2015 | 7/1/2030 | 3.88% | 1 | D | Non-Performing | 283 | $ 223,000 | 15% | 95% | $ 39,638 | 144,950 | $ 62,545.27 |
| 1735728881 | GARLAND | TX | | $ 175,689.13 | $199,565.24 | 171,480 | 7/17/2015 | 2/1/2057 | 3.50% | 1 | D | Non-Performing | 283 | $ 350,000 | 15% | 95% | $ 111,462 | 227,500 | $ 175,689.13 |
| 1736856005 | MORRISTOWN | MN | | $ 65,907.41 | $72,255.16 | 60,322 | 2/24/2016 | 4/1/2058 | 5.00% | 1 | D | Non-Performing | 283 | $ 160,000 | 15% | 95% | $ 39,209 | 107,900 | $ 65,907.41 |
| 1739422876 | LAKE CORMORANT | MS | | $ 168,138.32 | $177,149.63 | 167,011 | 8/4/2016 | 3/1/2046 | 3.88% | 1 | D | Non-Performing | 283 | $ 321,000 | 15% | 95% | $ 107,990 | 209,950 | $ 168,138.32 |
| 1739511928 | WAIALUA | HI | | $ 450,739.06 | $486,840.01 | 455,975 | 8/11/2016 | 3/1/2046 | 3.38% | 1 | D | Non-Performing | 283 | $ 930,000 | 15% | 95% | $ 292,980 | 604,500 | $ 450,739.06 |
| 1740325983 | NORTHFIELD | NJ | | $ 164,556.78 | $175,814.53 | 154,849 | 9/19/2016 | 10/1/2046 | 4.50% | 1 | D | Non-Performing | 283 | $ 295,000 | 15% | 95% | $ 100,652 | 191,750 | $ 164,556.78 |
| 1740483881 | BRIDGETON | NJ | | $ 91,741.59 | $142,682.85 | 128,018 | 10/21/2016 | 11/1/2046 | 4.38% | 1 | D | Non-Performing | 283 | $ 221,000 | 15% | 95% | $ 59,632 | 143,650 | $ 91,741.59 |
| 1740795765 | MCKEESPORT | PA | | $ 45,419.43 | $57,657.50 | 51,235 | 1/3/2017 | 2/1/2047 | 4.25% | 1 | D | Non-Performing | 283 | $ 120,000 | 15% | 95% | $ 29,523 | 78,000 | $ 45,419.43 |
| 4002154655 | BREWTON | AL | | $ 55,359.64 | $65,687.15 | 46,827 | 2/6/2002 | 2/1/2051 | 4.75% | 1 | D | Non-Performing | 283 | $ 70,000 | 15% | 95% | $ 30,433 | 45,500 | $ 45,500.00 |
| 4002719498 | PITTSBURGH | PA | | $ 54,318.26 | $66,652.49 | 52,471 | 12/17/2002 | 11/1/2053 | 5.88% | 1 | D | Non-Performing | 283 | $ 165,000 | 15% | 95% | $ 34,106 | 107,250 | $ 54,318.26 |
| 4002968869 | HIALEAH | FL | | $ 69,049.21 | $94,676.32 | 70,055 | 3/1/2003 | 1/1/2054 | 3.00% | 1 | D | Non-Performing | 283 | $ 260,000 | 15% | 95% | $ 45,536 | 169,000 | $ 69,049.21 |
| 4003258074 | TEANECK TOWNSHIP | NJ | | $ 278,440.43 | $295,877.53 | 247,840 | 6/16/2003 | 12/1/2054 | 3.00% | 1 | D | Non-Performing | 283 | $ 410,000 | 15% | 95% | $ 161,096 | 266,500 | $ 266,500.00 |
| 4004365935 | NORTH GARDEN | VA | | $ 162,099.12 | $170,599.81 | 156,990 | 3/9/2005 | 2/1/2059 | 4.00% | 1 | D | Non-Performing | 283 | $ 350,000 | 15% | 95% | $ 102,044 | 227,500 | $ 162,099.12 |
| 4004739030 | TOBYHANNA | PA | | $ 55,178.47 | $67,757.76 | 40,044 | 12/28/2005 | 5/1/2046 | 7.81% | 1 | D | Non-Performing | 283 | $ 211,000 | 15% | 95% | $ 26,049 | 137,150 | $ 55,178.47 |
| 4004966359 | VINE GROVE | KY | | $ 89,333.20 | $106,984.33 | 79,217 | 3/29/2006 | 4/1/2036 | 7.63% | 1 | D | Non-Performing | 283 | $ 95,000 | 15% | 95% | $ 51,491 | 61,750 | $ 61,750.00 |
| 4005444009 | RAMER | TN | | $ 21,062.23 | $25,604.64 | 17,423 | 5/30/2007 | 11/1/2057 | 6.88% | 1 | D | Non-Performing | 283 | $ 75,000 | 15% | 95% | $ 11,324 | 48,750 | $ 21,062.23 |
| 4005457242 | CHERRY HILL | NJ | | $ 196,543.50 | $246,557.42 | 199,348 | 4/11/2007 | 4/1/2050 | 2.00% | 1 | D | Non-Performing | 283 | $ 365,000 | 15% | 95% | $ 127,753 | 237,250 | $ 196,543.50 |
| 4005504742 | RANCHO CORDOVA | CA | | $ 257,008.59 | $275,941.68 | 244,784 | 5/2/2007 | 12/1/2055 | 4.00% | 1 | D | Non-Performing | 283 | $ 560,000 | 15% | 95% | $ 159,110 | 364,000 | $ 257,008.59 |
| 4005528026 | ELKHART | IN | | $ 147,120.40 | $157,073.06 | 133,303 | 6/15/2007 | 9/1/2057 | 3.13% | 1 | D | Non-Performing | 283 | $ 306,000 | 15% | 95% | $ 86,647 | 198,900 | $ 147,120.40 |
| 4008968729 | PUYALLUP | WA | | $ 155,385.16 | $188,692.35 | 164,751 | 12/7/2012 | 1/1/2043 | 3.88% | 1 | D | Non-Performing | 283 | $ 585,000 | 15% | 95% | $ 101,000 | 380,250 | $ 155,385.16 |
| 4010262064 | CUMMING | GA | | $ 266,529.51 | $311,769.79 | 283,552 | 6/23/2014 | 4/1/2058 | 4.88% | 1 | D | Non-Performing | 283 | $ 675,000 | 15% | 95% | $ 173,244 | 438,750 | $ 266,529.51 |
| 4012496222 | HILLIARD | OH | | $ 72,227.53 | $84,867.72 | 71,401 | 12/15/2016 | 4/1/2058 | 4.88% | 1 | D | Non-Performing | 283 | $ 165,000 | 15% | 95% | $ 46,411 | 107,250 | $ 72,227.53 |
| 4013070419 | ORLANDO | FL | | $ 215,140.25 | $247,724.47 | 211,610 | 4/12/2017 | 5/1/2047 | 5.25% | 1 | D | Non-Performing | 283 | $ 460,000 | 15% | 95% | $ 137,547 | 299,000 | $ 215,140.25 |
| 4013819129 | DURHAM | NC | | $ 88,042.44 | $93,374.61 | 86,871 | 10/3/2017 | 11/1/2047 | 5.38% | 1 | D | Non-Performing | 283 | $ 275,000 | 15% | 95% | $ 56,468 | 178,750 | $ 88,042.44 |
| 4014263236 | ASTON | PA | | $ 203,235.24 | $227,460.00 | 202,535 | 12/6/2017 | 1/1/2048 | 4.63% | 1 | D | Non-Performing | 283 | $ 336,000 | 15% | 95% | $ 131,648 | 218,400 | $ 203,235.24 |
| 4014503996 | GORDONSVILLE | TN | | $ 142,942.85 | $167,706.67 | 144,655 | 5/15/2018 | 6/1/2048 | 5.75% | 1 | D | Non-Performing | 283 | $ 366,000 | 15% | 95% | $ 92,913 | 244,920 | $ 142,942.85 |
| 4015396508 | GREENWOOD | IN | | $ 72,373.17 | $93,455.76 | 78,178 | 6/25/2018 | 7/1/2048 | 5.75% | 1 | D | Non-Performing | 283 | $ 259,000 | 15% | 95% | $ 47,043 | 168,350 | $ 72,373.17 |
| 4015584396 | LA PORTE | IN | | $ 80,556.79 | $97,872.84 | 88,658 | 9/4/2018 | 8/1/2048 | 5.50% | 1 | D | Non-Performing | 283 | $ 150,000 | 15% | 95% | $ 52,362 | 97,500 | $ 80,556.79 |
| 4015719700 | JACKSONVILLE | FL | | $ 45,889.17 | $55,310.95 | 45,834 | 9/4/2018 | 10/1/2048 | 6.63% | 1 | D | Non-Performing | 283 | $ 155,000 | 15% | 95% | $ 29,792 | 100,750 | $ 45,889.17 |
| 4015733414 | OLALLA | WA | | $ 249,626.49 | $267,828.50 | 252,961 | 8/30/2018 | 9/1/2048 | 5.63% | 1 | D | Non-Performing | 283 | $ 335,000 | 15% | 95% | $ 162,259 | 217,750 | $ 217,750.00 |
| 4015736264 | GOOSE CREEK | SC | | $ 159,947.44 | $194,982.69 | 166,938 | 8/31/2018 | 3/1/2048 | 5.38% | 1 | D | Non-Performing | 283 | $ 351,000 | 15% | 95% | $ 103,966 | 228,150 | $ 159,947.44 |
| 4015746149 | TELFORD | PA | | $ 42,216.50 | $53,033.64 | 49,513 | 7/6/2018 | 8/1/2048 | 5.38% | 1 | D | Non-Performing | 283 | $ 215,000 | 15% | 95% | $ 27,441 | 139,750 | $ 42,216.50 |
| 4015753291 | TACOMA | WA | | $ 183,419.32 | $190,838.92 | 183,119 | 7/30/2018 | 8/1/2048 | 5.50% | 1 | D | Non-Performing | 283 | $ 440,000 | 15% | 95% | $ 119,028 | 286,000 | $ 183,419.32 |
| 4016236459 | WINSTON SALEM | NC | | $ 49,604.12 | $58,666.46 | 55,028 | 12/27/2018 | 1/1/2034 | 5.00% | 1 | D | Non-Performing | 283 | $ 165,000 | 15% | 95% | $ 32,243 | 107,250 | $ 49,604.12 |
| 4016324320 | ELYRIA | OH | | $ 116,363.31 | $123,689.85 | 114,863 | 1/3/2019 | 2/1/2049 | 4.88% | 1 | D | Non-Performing | 283 | $ 194,000 | 15% | 95% | $ 74,661 | 126,100 | $ 116,363.31 |
| 4017822389 | NORTH PORT | FL | | $ 176,550.48 | $188,690.63 | 176,247 | 8/27/2019 | 9/1/2049 | 4.63% | 1 | D | Non-Performing | 283 | $ 369,900 | 15% | 95% | $ 114,411 | 240,435 | $ 176,592.48 |
| 4018572487 | MARCUS HOOK | PA | | $ 104,227.11 | $111,055.29 | 104,117 | 11/13/2019 | 12/1/2049 | 3.63% | 1 | D | Non-Performing | 283 | $ 150,000 | 15% | 95% | $ 67,676 | 97,500 | $ 97,500.00 |
| 312000372 | DETROIT | MI | REO | $ 31,686.78 | $77,562.17 | 76,118 | 8/14/2001 | 3/1/2016 | 5.88% | 1 | D | Non-Performing | 121 | $ 65,900 | 15% | 95% | $ 20,596 | 42,835 | $ 31,686.78 |
| 312000009 | EAST CLEVELAND | OH | REO | $ 84,152.99 | $207,050.51 | 202,132 | 6/1/2005 | 7/1/2035 | 8.75% | 1 | D | Non-Performing | 121 | $ 10,000 | 15% | 95% | $ 54,699 | 6,500 | $ 6,500.00 |
| 312000029 | OLIVE HILL | KY | REO | $ 40,532.20 | $102,164.98 | 97,267 | 2/1/2007 | 3/1/2037 | 7.25% | 1 | D | Non-Performing | 121 | $ 40,200 | 15% | 95% | $ 26,346 | 13,300 | $ 13,300.00 |
| 312001494 | SUNRISE | FL | REO | $ 31,048.48 | $76,681.67 | 74,585 | 3/1/2007 | 3/14/2012 | 2.00% | 1 | D | Non-Performing | 121 | $ 79,900 | 15% | 95% | $ 20,182 | 51,935 | $ 31,048.48 |
| 312001626 | GONZALES | LA | REO | $ 21,039.15 | $58,101.11 | 50,540 | 8/21/2002 | 3/1/2032 | 7.88% | 1 | D | Non-Performing | 121 | $ 56,400 | 15% | 95% | $ 13,675 | 36,400 | $ 21,039.15 |
| 312001965 | CHARLESTON | SC | REO | $ 44,897.54 | $113,877.87 | 111,872 | 9/30/2008 | 7/4/2028 | 2.00% | 1 | D | Non-Performing | 121 | $ 85,000 | 15% | 95% | $ 29,183 | 55,250 | $ 44,897.54 |
| 312002120 | HOLLIS | OK | REO | $ 19,362.82 | $48,455.40 | 46,513 | 9/4/2008 | 7/4/2028 | 13.20% | 1 | D | Non-Performing | 121 | $ 19,000 | 15% | 95% | $ 12,586 | 12,935 | $ 12,935.00 |
| 312002147 | MARTINS FERRY | OH | REO | $ 26,457.75 | $67,145.28 | 63,557 | 10/28/2002 | 12/30/2032 | 9.51% | 1 | D | Non-Performing | 121 | $ 33,000 | 15% | 95% | $ 17,198 | 21,450 | $ 21,450.00 |
| 312002204 | LIBERAL | KS | REO | $ 26,229.33 | $65,399.45 | 63,008 | 6/3/1999 | 3/1/2029 | 6.50% | 1 | D | Non-Performing | 121 | $ 79,000 | 15% | 95% | $ 17,049 | 51,350 | $ 26,229.33 |
| 312002251 | RUSTON | LA | REO | $ 24,098.45 | $67,465.75 | 57,849 | 12/30/2003 | 5/1/1998 | 6.75% | 1 | D | Non-Performing | 121 | $ 24,000 | 15% | 95% | $ 15,277 | 15,600 | $ 15,600.00 |
| 312003014 | SAEGERTOWN | PA | REO | $ 18,996.42 | $67,465.75 | 57,849 | 12/30/2003 | 10/29/2003 | 10.29% | 1 | D | Non-Performing | 121 | $ 30,000 | 15% | 95% | $ 15,664 | 19,500 | $ 19,500.00 |
| 312003041 | E ST LOUIS | IL | REO | $ 18,996.42 | $50,117.19 | 45,633 | 12/28/2010 | 12/15/2040 | 10.00% | 1 | D | Non-Performing | 121 | $ 7,000 | 15% | 95% | $ 12,348 | 4,550 | $ 4,550.00 |
| 200001131 | BASTROP | LA | REO | $ 13,923.46 | $38,949.42 | 33,447 | 9/26/2005 | 5/1/2036 | 5.00% | 1 | D | Non-Performing | 121 | $ 8,500 | 15% | 95% | $ 9,035 | 5,525 | $ 5,525.00 |
| 200001258 | TARBORO | NC | REO | $ 31,299.36 | $77,346.97 | 75,187 | 12/8/2009 | 3/1/2026 | 9.00% | 1 | D | Non-Performing | 94 | $ 30,345 | 15% | 95% | $ 20,345 | 35,750 | $ 31,299.36 |
| 312000246 | CARNEYS POINT | NJ | REO | $ 82,373.75 | $202,779.65 | 197,878 | 2/15/2007 | 1/1/2050 | 6.00% | 1 | D | Non-Performing | 94 | $ 55,000 | 15% | 95% | $ 53,543 | 35,750 | $ 35,750.00 |
| 312000835 | CAMDEN | NJ | REO | $ 65,346.49 | $130,524.84 | 156,975 | 2/19/2008 | 3/1/2038 | 7.00% | 1 | D | Non-Performing | 94 | $ 45,000 | 15% | 95% | $ 42,475 | 29,250 | $ 29,250.00 |
| 312000486 | RIVERDALE | IL | REO | $ 52,463.34 | $130,405.72 | 126,878 | 9/25/1997 | 3/1/2015 | 3.24% | 1 | D | Non-Performing | 94 | $ 40,000 | 15% | 95% | $ 34,101 | 26,000 | $ 26,000.00 |
| 312001636 | COUNTRY CLUB HILLS | IL | REO | $ 46,985.52 | $115,852.79 | 112,820 | 11/8/2004 | 5/15/2033 | 9.00% | 1 | D | Non-Performing | 94 | $ 55,000 | 15% | 95% | $ 30,541 | 35,750 | $ 35,750.00 |
| 312001649 | BALTIMORE | MD | REO | $ 18,315.90 | $46,656.42 | 43,998 | 11/24/1999 | 10/1/2036 | 10.49% | 1 | D | Non-Performing | 94 | $ 23,100 | 15% | 95% | $ 11,905 | 15,015 | $ 15,015.00 |
| 312001796 | BALTIMORE | MD | REO | $ 21,475.62 | $61,371.63 | 51,589 | 9/18/2006 | 10/1/2036 | 6.50% | 1 | D | Non-Performing | 94 | $ 35,000 | 15% | 95% | $ 13,958 | 22,750 | $ 21,475.62 |
| 312002721 | CHICAGO | IL | REO | $ 73,102.85 | $179,663.43 | 175,608 | 5/15/2006 | 6/14/2036 | 7.88% | 1 | D | Non-Performing | 94 | $ 25,000 | 15% | 95% | $ 47,517 | 16,250 | $ 16,250.00 |

| Loan ID | City | State | Status | Amount 1 | Amount 2 | Amount 3 | Date 1 | Date 2 | Rate | | | Performance | Col | | Amount | % | % | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 312003071 | FLINT | MI | REO | $ 16,076.47 | $39,555.45 | 28,619 | 4/4/2012 | 6/1/2042 | 10.00% | 1 | D | Non-Performing | 94 | $ | 3,000 | 15% | 95% | $ 10,450 | $ 1,950 | $ 1,950.00 |
| 2000000386 | HUBBARD | OH | REO | $ 9,379.16 | $24,443.80 | 22,531 | 6/25/2002 | 8/15/2032 | 0.00% | 1 | D | Non-Performing | 94 | $ | 20,000 | 15% | 95% | $ 6,090 | $ 13,000 | $ 9,379.16 |
| 102000076 | POTTSVILLE | PA | REO | $ 25,696.75 | $87,479.16 | 61,734 | 2/3/1999 | 2/19/2014 | 16.50% | 1 | D | Non-Performing | 62 | $ | 60,000 | 15% | 95% | $ 16,704 | $ 39,000 | $ 25,696.75 |
| 23690589 | EAST BRUNSWICK | NJ | REO | $ 464,223.50 | $442,723.96 | 442,724 | 2/28/2001 | 1/1/2058 | 7.13% | 1 | D | Non-Performing | 62 | $ | 530,000 | 15% | 95% | $ 287,771 | $ 344,500 | $ 344,500.00 |
| 23788599 | NEWFIELD | NJ | REO | $ 171,495.03 | $243,952.44 | 243,952 | 11/30/2007 | 6/1/2056 | 6.88% | 1 | D | Non-Performing | 62 | $ | 175,000 | 15% | 95% | $ 111,472 | $ 113,750 | $ 113,750.00 |
| 24006223 | HAWTHORNE | NJ | REO | $ 290,303.84 | $366,083.52 | 366,084 | 6/6/2006 | 2/1/2054 | 6.88% | 1 | D | Non-Performing | 62 | $ | 305,000 | 15% | 95% | $ 188,697 | $ 198,250 | $ 198,250.00 |
| 25470865 | WHITEHOUSE STAT | NJ | REO | $ 352,883.51 | $477,138.94 | 463,136 | 10/20/2005 | 7/1/2056 | 5.88% | 1 | D | Non-Performing | 62 | $ | 535,000 | 15% | 95% | $ 329,374 | $ 347,750 | $ 347,750.00 |
| 26843367 | ENGLEWOOD | NJ | REO | $ 340,678.56 | $379,224.92 | 379,225 | 4/27/2007 | 7/1/2056 | 5.88% | 1 | D | Non-Performing | 62 | $ | 389,000 | 15% | 95% | $ 221,441 | $ 252,850 | $ 252,850.00 |
| 26861732 | BRADENTON | FL | REO | $ 474,971.78 | $395,834.08 | 395,834 | 4/20/2006 | 5/1/2036 | 6.13% | 1 | D | Non-Performing | 62 | $ | 449,000 | 15% | 95% | $ 257,292 | $ 291,850 | $ 291,850.00 |
| 312000067 | DIXON HILL | MD | REO | $ 72,357.61 | $7,099.80 | 173,818 | 11/27/2007 | 12/1/2059 | 6.43% | 1 | D | Non-Performing | 62 | $ | 60,000 | 15% | 95% | $ 4,615 | $ 39,000 | $ 39,000.00 |
| 312000149 | SEARSMONT | ME | REO | $ 80,673.33 | $195,624.59 | 193,794 | 1/18/2007 | 2/1/2037 | 6.75% | 1 | D | Non-Performing | 62 | $ | 115,000 | 15% | 95% | $ 52,438 | $ 74,750 | $ 74,750.00 |
| 312000219 | TRENTON | NJ | REO | $ 103,936.91 | $28,360.85 | 249,677 | 4/13/2007 | 5/1/2047 | 7.63% | 1 | D | Non-Performing | 62 | $ | 45,000 | 15% | 95% | $ 18,435 | $ 29,250 | $ 29,250.00 |
| 312000709 | RODESSA | LA | REO | $ 26,788.51 | $71,471.63 | 64,351 | 1/12/2006 | 2/1/2036 | 10.05% | 1 | D | Non-Performing | 62 | $ | 3,000 | 15% | 95% | $ 17,413 | $ 1,950 | $ 1,950.00 |
| 312001209 | TRENTON | NJ | REO | $ 58,026.14 | $39,533.50 | 139,390 | 12/28/2006 | 1/1/2037 | 8.13% | 1 | D | Non-Performing | 62 | $ | 40,000 | 15% | 95% | $ 19,197 | $ 26,000 | $ 26,000.00 |
| 312001236 | YOUNGSTOWN | OH | REO | $ 36,735.05 | $190,150.30 | 88,245 | 4/12/2000 | 11/9/2029 | 11.54% | 1 | D | Non-Performing | 62 | $ | 5,000 | 15% | 95% | $ 23,878 | $ 3,250 | $ 3,250.00 |
| 312001281 | MUNCIE | IN | REO | $ 51,637.05 | $18,828.50 | 124,043 | 2/6/2002 | 6/1/2032 | 12.25% | 1 | D | Non-Performing | 62 | $ | 15,000 | 15% | 95% | $ 12,239 | $ 9,750 | $ 9,750.00 |
| 312001518 | BOURBONNAIS | IL | REO | $ 25,805.81 | $89,626.06 | 61,991 | 7/1/2006 | 5/2/2010 | 1.00% | 1 | D | Non-Performing | 62 | $ | 30,000 | 15% | 95% | $ 16,774 | $ 19,500 | $ 19,500.00 |
| 312001610 | LESTER PRAIRIE | MN | REO | $ 102,822.65 | $262,676.50 | 247,001 | 7/13/2006 | 8/1/2036 | 7.13% | 1 | D | Non-Performing | 62 | $ | 64,888 | 15% | 95% | $ 66,835 | $ 42,177 | $ 42,177.20 |
| 312001646 | FORT WAYNE | IN | REO | $ 54,114.14 | $26,541.04 | 129,993 | 11/21/2007 | 12/1/2037 | 8.13% | 1 | D | Non-Performing | 62 | $ | 49,000 | 15% | 95% | $ 17,252 | $ 31,850 | $ 31,850.00 |
| 312002187 | KENTON | OH | REO | $ 34,351.14 | $15,596.96 | 82,518 | 3/16/2005 | 6/1/2028 | 7.00% | 1 | D | Non-Performing | 62 | $ | 26,000 | 15% | 95% | $ 10,138 | $ 16,900 | $ 16,900.00 |
| 2000000403 | PLEASANTVILLE | PA | REO | $ 30,474.39 | $37,312.00 | 73,206 | 5/12/2006 | 3/1/2039 | 3.75% | 1 | D | Non-Performing | 62 | $ | 55,900 | 15% | 95% | $ 19,808 | $ 36,335 | $ 30,474.39 |
| 2000000552 | CARLISLE | SC | REO | $ 9,110.70 | $392,956.82 | 21,686 | 11/26/2003 | 3/1/2057 | 4.33% | 1 | D | Non-Performing | 62 | $ | 30,000 | 15% | 95% | $ 5,922 | $ 19,500 | $ 7,536.53 |
| 2000001094 | SOUTH CHINA | ME | REO | $ 41,859.60 | $12,344.65 | 100,553 | 5/7/2007 | 6/11/2022 | 8.75% | 1 | D | Non-Performing | 62 | $ | 99,900 | 15% | 95% | $ 7,959 | $ 64,935 | |
| 40051653992 | SAN ANGELO | TX | REO | $ 118,603.75 | $138,856.36 | 84,976 | 10/9/2006 | 11/1/2056 | 7.50% | 1 | D | Non-Performing | 62 | $ | 165,000 | 15% | 95% | $ 55,234 | $ 107,250 | |
| 541-022239 | WOODFORD | VA | REO | $ 126,000.00 | $99,348.77 | 145,797 | 12/17/2008 | 4/1/2056 | 2.58% | 1 | D | Non-Performing | 62 | $ | 150,000 | 15% | 95% | $ 64,577 | $ 97,500 | |
| 10200130 | SAUK VILLAGE | IL | REO | $ 45,587.02 | $62,282.83 | 109,509 | 5/14/2003 | 6/1/2033 | 5.63% | 1 | D | Non-Performing | 34 | $ | 75,000 | 15% | 95% | $ 29,633 | $ 48,750 | |
| 23609225 | EGG HARBOR CITY | NJ | REO | $ 426,335.16 | $588,900.83 | 588,901 | 8/26/2006 | 8/1/2054 | 7.25% | 1 | D | Non-Performing | 34 | $ | 325,000 | 15% | 95% | $ 277,118 | $ 211,250 | |
| 312000393 | PRESCOTT | MI | REO | $ 44,799.43 | $44,786.03 | 107,617 | 9/21/2007 | 10/1/2037 | 8.38% | 1 | D | Non-Performing | 34 | $ | 30,000 | 15% | 95% | $ 29,111 | $ 19,500 | $ 19,500.00 |
| 312001836 | MONTICELLO | KY | REO | $ 16,165.63 | $37,498.33 | 38,833 | 1/6/1998 | 2/6/2039 | 6.00% | 1 | D | Non-Performing | 34 | $ | 12,000 | 15% | 95% | $ 10,508 | $ 7,800 | |
| 2000000553 | SANTOLII | IL | REO | $ 21,177.94 | $56,046.35 | 50,674 | 7/31/1999 | 7/21/2029 | 6.75% | 1 | D | Non-Performing | 34 | $ | 20,000 | 15% | 95% | $ 13,766 | $ 13,000 | |
| 311021 | SYRACUSE | NY | REO | $ 33,571.31 | $337,906.85 | 80,645 | 1/16/2003 | 2/1/2033 | 6.50% | 1 | D | Non-Performing | 14 | $ | 89,900 | 15% | 95% | $ 21,823 | $ 58,435 | |
| 10200091 | ANDERSON | IN | REO | $ 13,184.50 | $20,057.65 | 31,696 | 6/23/2003 | 7/1/2018 | 6.81% | 1 | D | Non-Performing | 14 | $ | 70,000 | 15% | 95% | $ 8,576 | $ 45,500 | |
| 312000707 | ROBBINS | IL | REO | $ 41,822.43 | $103,538.96 | 100,468 | 9/20/1999 | 10/1/2029 | 10.75% | 1 | D | Non-Performing | 14 | $ | 128,000 | 15% | 95% | $ 27,185 | $ 83,200 | |
| 2000001050 | PADUCAH | KY | REO | $ 29,351.20 | $73,699.54 | 70,508 | 3/27/2004 | 4/10/2034 | 5.00% | 1 | D | Non-Performing | 14 | $ | 45,000 | 15% | 95% | $ 19,078 | $ 29,250 | |
| 2000001055 | SKOWHEGAN | ME | REO | $ 73,774.60 | $91,818.84 | 177,221 | 6/9/2009 | 4/14/2039 | 10.48% | 1 | D | Non-Performing | 14 | $ | 85,000 | 15% | 95% | $ 47,953 | $ 55,250 | |
| 312002223 | OCALA | FL | REO | $ 14,965.23 | $37,361.79 | 35,949 | 12/7/2005 | 1/13/2021 | 11.34% | 1 | D | Non-Performing | 62 | $ | - | 15% | 95% | $ 9,727 | $ - | |
| 10200199 | NANTICOKE | PA | REO | $ 50,320.37 | $77,756.84 | 120,880 | 8/27/2007 | 9/15/2042 | 9.20% | 1 | D | Non-Performing | 62 | $ | - | 15% | 95% | $ 32,708 | $ - | |
| 12500002 | IRVINGTON | NJ | | $ 335,917.26 | $996,340.41 | 1,023,182 | 7/20/2007 | 3/1/2039 | 8.09% | 1 | D | Non-Performing | 62 | $ | - | 5% | 3% | $ - | $ - | |
| 22139398 | HOLLYWOOD | FL | REO | $ 147,340.00 | $178,467.08 | 178,467 | 10/13/2006 | 11/1/2046 | 6.63% | 1 | D | Non-Performing | 62 | $ | - | 15% | 95% | $ 95,771 | $ - | |
| 27880756 | HAINESPORT | NJ | REO | $ 144,377.57 | $142,810.95 | 142,811 | 11/29/2007 | 3/1/2056 | 6.38% | 1 | D | Non-Performing | 62 | $ | - | 15% | 95% | $ 92,827 | $ - | |
| 2000001294 | CHESTERFIELD | SC | REO | $ 115,606.33 | $144,586.80 | 212,590 | 2/16/2007 | 7/1/2018 | 3.02% | 1 | D | Non-Performing | 62 | $ | - | 15% | 95% | $ 75,145 | $ - | |
| 571-067832 | PRINCETON | WV | REO | $ 108,150.00 | $124,763.40 | 177,981 | 12/1/2008 | 5/1/2059 | 2.33% | 1 | D | Non-Performing | 62 | $ | - | 15% | 95% | $ 70,298 | $ - | |
| **Total Eligible** | | | | | | | | | | | | | | $ | | | | $ 118,455,661 | $ 30,713,445 | $ 76,996,180 | $ 67,019,500.00 |
| | | | | $ 75,866,887.54 | 74,463,574 | | | | | | | | | | | | | | | | |

| **Total Pledged** | (Both Eligible and Ineligible) | | | | | | | | | | | | | | | | | $ 118,455,661 | $ 31,089,921 | $ 76,996,180 | $ 67,019,500.00 |
| | | | | $ 77,568,074.81 | 76,375,435 | | | | | | | | | | | | | | | | |

| Property Type Category | Advance Rate | | | Amount Eligible to be Advanced | | | | Amount Eligible to be Advanced | | Total Amount Eligible to be Advanced | Property Type Category | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | LTV | LTV | | ($000's) | (% Pledged) | | | ($000's) | (% Pledged) | | | ($000's) | |
| BPR Owner Occupied/REO | 70% | 75% | $ 6,000 | 3,403 | 0% | $ - | | | 0% | BPR Owner Occupied REO | $ 3,403 | |
| BPR Owner Occupied/NPL | 65% | 60% | $ 67,000 | 44,818 | 80% | $ - | | | 0% | BPR Owner Occupied NPL | $ 44,818 | |
| BPR Owner Occupied/RPL | 70% | 60% | $ 67,000 | - | 0% | $ - | | | 0% | BPR Owner Occupied RPL | $ - | |
| BPR Investor | 0% | 0% | $ - | - | 0% | $ - | | | 0% | BPR Investor | $ - | |
| BPR Developer | 0% | 0% | $ - | - | 0% | $ - | | | 0% | BPR Developer | $ - | |
| Commercial Multi Family | 0% | 0% | $ - | - | 0% | $ - | | | 0% | Commercial Multi Family | $ - | |
| Commercial Mixed Use | 0% | 0% | $ - | - | 0% | $ - | | | 0% | Commercial Mixed Use | $ - | |
| Commercial Office | 0% | 0% | $ - | - | 0% | $ - | | | 0% | Commercial Office | $ - | |
| Commercial Retail | 0% | 0% | $ - | - | 0% | $ - | | | 0% | Commercial Retail | $ - | |
| Commercial Industrial | 0% | 0% | $ - | - | 0% | $ - | | | 0% | Commercial Industrial | $ - | |
| Commercial Hospitality | 0% | 0% | $ - | - | 0% | $ - | | | 0% | Commercial Hospitality | $ - | |
| Commercial Special Purpose | 0% | 0% | $ - | - | 0% | $ - | | | 0% | Commercial Special Purpose | $ - | |
| Commercial Land | 0% | 0% | $ - | - | 0% | $ - | | | 0% | Commercial Land | $ - | |
| **Amount Eligible To Be Advanced** | | | $ | | 100% | | | | 0% | **Advanced** | $ | 0% |
| | | | | | | | | | | Over Collateralization Amount | | |
| | | | | | | | | | | **Total Available Advance** | $ | 67,000 |

# Exhibit 69

**From:** Dara Birkett <darabirkett@gmail.com>
**Sent:** Monday, November 4, 2024 12:17 PM
**To:** Brian J. Benoit <bbenoit@kmazuckert.com>; William S. Weinstein <wsw@oakharborcapital.com>
**Subject:** Re: AHP Servicing/Jorge Newbery

Hi Brian,

This whole thing has gotten totally out of control. It was supposed to be a few signatures on documents for a few weeks in return for money that I needed badly after my cafe closed thanks to Covid.

I was supposed to have no work to do, or risk or exposure to legal problems but now I have a lot of legal letters, accounting audit letters and the whole thing feels like a set-up. I wish I had never gotten involved in the first place. I know nothing about state court judgements or loans or finance or any business apart from my cafe in dublin. Bill - please confirm all of what I say here.

I was paid 3000 dollars in 2023 and 3000 in 2024 in return for my signature on various documents.

I set up an Irish company Keydally and used it to sign an agreement to buy the judgements and an agreement where Bill loaned me the money to buy them. It was just a paper transaction - Keydally never had a bank account.

The loans were supposed to be sold to someone else very quickly.....but that never happened. Initially I was happy because I got another 3000 dollars the following year. But then I started getting letters from Bills auditor asking me to confirm the value of the loans I bought and confirming the balance on my loan. I signed those letters because that is what I was paid to do.

I don't know who Jorge is and I don't know what Pallida is either. I just signed what I was asked to in return for the 3,000 dollars. I cant tell you anything more than that.

So no, there are no millions. If I can give the 2x3,000 back and put an end to all of this, please let me know where to send the money. This has ended up as a fiasco and very different to what Bill told me at the beginning. I just hope this is the end of it

thanks


Darragh Birkett

On Mon, Nov 4, 2024 at 10:23 AM Brian J. Benoit <bbenoit@kmazuckert.com> wrote:

Dara,

Following up on my previous email to you, could you please respond to the below as soon as possible?

Thanks.

--Brian

**Brian J. Benoit**
KMA Zuckert LLP
227 West Monroe Street, Suite 3650
Chicago, Illinois 60606
+1.312.345.3065 Direct
+1.312.345.3000 Main
bbenoit@kmazuckert.com
www.kmazuckert.com



**From:** Brian J. Benoit
**Sent:** Friday, November 1, 2024 1:48 PM
**To:** darabirkett@gmail.com
**Subject:** AHP Servicing/Jorge Newbery

Dara,

My name is Brian Benoit, I represent Jorge. We really appreciate you taking the time to answer some questions about Keydally.  Please let us know the following:

What do you do for a living?

Are you knowledgeable or involved in the business of buying and selling portfolios of state court judgments or mortgage loans?

Prior to having Keydally enter into any transactions with Pallida, did you or anyone else at Keydally do any due diligence or work on ascertaining the value the assets being purchased?

Do you know what Pallida is and who owns it?

How much did Keydally receive for entering into the transaction to purchase state court judgments from Pallida?

How many millions of dollars did Keydally receive from the state court judgments while owning these assets?

When was Keydally formed?

Why was Keydally formed?

At any time did Keydally have, or have access to, millions of dollars to purchase state court judgments or any other assets?

Did William Weinstein offer to represent you or Keydally in connection with litigation involving AHP Servicing or Jorge Newbery?

Did William Weinstein ever tell you to ignore or not communicate with Jorge Newbery and/or his attorneys?

Thanks,

Brian

**Brian J. Benoit**
KMA Zuckert LLP
227 West Monroe Street, Suite 3650
Chicago, Illinois 60606
+1.312.345.3065 Direct
+1.312.345.3000 Main
bbenoit@kmazuckert.com
www.kmazuckert.com



IMPORTANT NOTICE: This electronic mail message and any attached files contain information intended for the exclusive use of the individual or entity to whom it is addressed and may contain information that is proprietary, privileged, confidential and/or exempt from disclosure under applicable law. In no event shall inadvertent transmission constitute a waiver of confidentiality or privilege. If you are not the intended recipient, you are hereby notified that any viewing, copying, direct or indirect disclosure or distribution of this information is strictly prohibited and may be subject to legal restriction or sanction. Please notify the sender or postmaster@kmazuckert.com by electronic mail or telephone (+1.312.345.3000) of any unintended recipients and kindly delete the original message without making any copies. Thank you.

# Exhibit 70

Magerick_AHP transaction

Jorge Newbery <jnewbery@ahpservicing.com>
Wed 10/18/2023 2:35 PM
To:William S. Weinstein <wsw@oakharborcapital.com>

2 attachments (50 KB)
MEL Copy of AHP Expense Report 9-15-23 (2).xlsx; Skid Row AHP amounts due 10.18.2023.xlsx;

Hi Bill -

**Prepare for Audit and Investor/SEC Scrutiny**.
We want to prepare for scrutiny of AHP's transaction with Magerick now rather than waiting until next year when it will be more difficult to fill in any accounting gaps. Thus, I propose that Cherry Beckert audits the Magerick/AHP transaction at AHP's expense.

As we are regulated by the SEC, we need to have the income and expenses from this transaction fully accounted for and transparent. AHP's largest investor has been reviewing the Magerick transaction. I have shared the agreements, the draft reconciliations and other reports, and he is having difficulty tying everything out, as am I. The longer that AHP defers distributions to our investors, the greater the likelihood of an SEC complaint. AHP needs to prepare for this and be able to demonstrate that the Magerick transaction has been fair and  transparent. I agreed to the terms, which were expensive but justifiable. However, as expenses were incurred and sales completed by Magerick independent of AHP, we need to document that the expenses were incurred by "unrelated third parties" in conformity with Section 3 of our March 15 Amendment. We also want to evidence that sales were made at market prices and dispel any concerns of insider self-dealing.

**Loan Appears to be Paid Off/Repurchase Agreement Fulfilled**
Based on the AHP_recon_9.30.2023 which you forwarded on September 29, AHP's outstanding repurchase price was $825,111.78. The September sales amount did not appear to include the $339,389.77 for 1429 E. 100th in Brooklyn which was wired on September 1st  and did not include the $73,846.34 in credits identified on the attached AHP Expense Report ($71,999.98 typo on row 89, $1,515 duplicate payment on row 111, and $331.36 on row 164), plus the $400,000 wired on Friday from 39 Whittier Hills. These total $813,236.11. When subtracted from the $825,111.78, the remaining repurchase price is $11,875.67.

I have previously requested an updated AHP Expense Report. We may find that additional corrections are needed, such as we found on the July version.  In addition, please provide a comprehensive list of sold assets including sales prices.  Karen has advised that she has heard of additional assets which have been sold although details have not been shared. We also need the Land Home remittances as these will help evidence additional income and expenses.

We have previously requested detail for the $48,664.52 for "WAB closing fees," $28,100 "Collateral fees," and $69,899.10 for "Dec'21" identified on the "Improvement and cash sales" tab of the AHP_recon_9.30.2023.  An expense from December 2021 would predate the initial Magerick transaction and should likely be removed.

**Unsold Collateral**
I requested a comprehensive list of unsold assets last week so that we can start marketing. We have some investors who can likely close promptly at fair prices and provide urgently needed capital to AHP as well as help fund the agreed-upon buybacks from Magerick.  In the interim, as the loan appears to be paid off or very close to it,  we request that any further sales are completed only with AHP's approval.

**Insurance**
Once you provide evidence of insurance, we can forward to our forced placed insurer SWBC which has indicated the willingness to promptly process refunds. Note that the March amendment specifies that only unrelated third-party costs are to be reimbursed to Magerick and this likely applies to self-insurance. However, I believe that we can justify payment to you to the extent that your self-insurance is similar in cost and coverage to what we obtained through SWBC.

**Putbacks**
AHP acknowledges the putback requests on 519 Kirchner in Dalton MA, 247 Morningglow in Winnsboro SC, and 9519 4th in Seattle, and we intend to fulfill these buybacks promptly. However, the putbacks are not collateralized by the Magerick transaction and should not delay the return of the unsold Magerick assets.

AHP has rejected the putback of 87 West Pine in Staatsburg NY as this asset was pledged as collateral and never purchased by Magerick.  Similarly, both 259 Moore Rd. in Leedsville LA and 1123-24 N. 24th St. in Milwaukee, WI were pledged as additional collateral in March 2023 and never purchased by Magerick. Thus, both of these requests are also denied. The net effect is that AHP does not receive credit towards the loan/repurchase price from the disposition of these assets. Instead, these assets will simply be included in the assets returned to AHP.

**Keydally**
We want to proceed with the putback on this. We need cash today more than we need these judgments, which have proven challenging to generate significant collections on. At your option, we can defer the putback until January 31, 2024 and AHP could retain 15% of any net amounts recovered after costs and fees, with the remainder being paid to Keydally.  Either way, the judgment purchase is not collateralized by the Magerick transaction  and should not delay the return of the unsold Magerick assets.

**Activist Legal unpaid invoices on Blossom**
Once unsold assets are freed up, AHP can pay Activist on delinquent invoices and this will enable Activist to bring their outstanding Blossom fees current. The Blossom invoices are not collateralized by the Magerick transaction  and should not delay the return of the unsold Magerick assets.

**Skid Row AHP**
Attached is the accounting of Skid Row AHP expenses. Per our agreement, Oak Harbor is to reimburse 50% of these to AHP.

**Summary of Outstanding Requests**

1. Update of the attached AHP Expense report identifying additionalexpenses and advances
2. Comprehensive list of sold assets with sales prices

3. LandHome remittances for Maerick/AHP portfolio from April forward
4. Detail for the $48,664.52 for "WAB closing fees," $28,100 "Collateral fees," and $69,899.10 for "Dec'21" identified on the "Improvement and cash sales" tab of the AHP_recon_9.30.2023
5. Comprehensive all unsold assets
6. Evidence of insurance.

Thanks.

**Jorge Newbery**
**FOUNDER AND CEO**

AHP Servicing LLC
440 S. LaSalle St., Suite 1110, Chicago, IL 60605
312.651.4325
jnewbery@ahpservicing.com
ahpservicing.com
NMLS# 1651788



 

AHP Servicing LLC is a debt collector. Unless you are in bankruptcy or received a bankruptcy discharge of this debt, AHP Servicing is attempting to collect a debt and any information obtained will be used for that purpose. If you are in bankruptcy or received bankruptcy discharge of this debt, this communication is not an attempt to collect the debt against you personally.

This e-mail and any files transmitted with it are confidential and intended solely for the use of the individual or entity to whom they are addressed. If you are not the named addressee, you should not disseminate, distribute or copy this e-mail. Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail from your system. AHP Servicing LLC accepts no liability for any damage caused by any antivirus transmitted by this e-mail.

# Exhibit 71

| From: | Jorge Newbery <jnewbery@ahpservicing.com> |
|---|---|
| Sent: | Thursday, October 19, 2023 3:50 PM |
| To: | William S. Weinstein |
| Subject: | Re: Magerick_AHP transaction |

Hi Bill -

I just noticed that #5 in the Summary of Outstanding Requests below may be unclear. To clarify, we are requesting a comprehensive list of unsold assets which were part of the Magerick_AHP transaction. I requested on our call this late last week and you had expected to share early this week. I believe that we can promptly sell some of the remaining assets in order to infuse funds into AHP as well as fund accepted putbacks.

Also, I have a follow-up call tomorrow at 3:30pm CT with Cherry Beckert to discuss the potential audit of the Magerick_AHP transaction. Let me know if you would like to join and I will forward invite.

Thanks.

**Jorge Newbery**
**FOUNDER AND CEO**

AHP Servicing LLC
440 S. LaSalle St., Suite 1110, Chicago, IL 60605
312.651.4325
jnewbery@ahpservicing.com
ahpservicing.com
NMLS# 1651788





AHP Servicing LLC is a debt collector. Unless you are in bankruptcy or received a bankruptcy discharge of this debt, AHP Servicing is attempting to collect a debt and any information obtained will be used for that purpose. If you are in bankruptcy or received bankruptcy discharge of this debt, this communication is not an attempt to collect the debt against you personally.

This e-mail and any files transmitted with it are confidential and intended solely for the use of the individual or entity to whom they are addressed. If you are not the named addressee, you should not disseminate, distribute or copy this e-mail. Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail from your system. AHP Servicing LLC accepts no liability for any damage caused by any antivirus transmitted by this e-mail.

**From:** Jorge Newbery
**Sent:** Wednesday, October 18, 2023 2:35 PM
**To:** William S. Weinstein <wsw@oakharborcapital.com>
**Subject:** Magerick_AHP transaction

Hi Bill -

**Prepare for Audit and Investor/SEC Scrutiny.**
We want to prepare for scrutiny of AHP's transaction with Magerick now rather than waiting until next year when it will be more difficult to fill in any accounting gaps. Thus, I propose that Cherry Beckert audits the Magerick/AHP transaction at AHP's expense.

As we are regulated by the SEC, we need to have the income and expenses from this transaction fully accounted for and transparent. AHP's largest investor has been reviewing the Magerick transaction. I have shared the agreements, the draft reconciliations and other reports, and he is having difficulty tying everything out, as am I. The longer that AHP defers distributions to our investors, the greater the likelihood of an SEC complaint. AHP needs to prepare for this and be able to demonstrate that the Magerick transaction has been fair and  transparent. I agreed to the terms, which were expensive but justifiable. However, as expenses were incurred and sales completed by Magerick independent of AHP, we need to document that the expenses were incurred by "unrelated third parties" in conformity with Section 3 of our March 15 Amendment. We also want to evidence that sales were made at market prices and dispel any concerns of insider self-dealing.

**Loan Appears to be Paid Off/Repurchase Agreement Fulfilled**
Based on the AHP_recon_9.30.2023 which you forwarded on September 29, AHP's outstanding repurchase price was $825,111.78. The September sales amount did not appear to include the $339,389.77 for 1429 E. 100th in Brooklyn which was wired on September 1st  and did not include the $73,846.34 in credits identified on the attached AHP Expense Report ($71,999.98 typo on row 89, $1,515 duplicate payment on row 111, and $331.36 on row 164), plus the $400,000 wired on Friday from 39 Whittier Hills. These total $813,236.11. When subtracted from the $825,111.78, the remaining repurchase price is $11,875.67.

I have previously requested an updated AHP Expense Report. We may find that additional corrections are needed, such as we found on the July version.  In addition, please provide a comprehensive list of sold assets including sales prices.  Karen has advised that she has heard of additional assets which have been sold although details have not been shared. We also need the Land Home remittances as these will help evidence additional income and expenses.

We have previously requested detail for the $48,664.52 for "WAB closing fees," $28,100 "Collateral fees," and $69,899.10 for "Dec'21" identified on the "Improvement and cash sales" tab of the AHP_recon_9.30.2023.  An expense from December 2021 would predate the initial Magerick transaction and should likely be removed.

**Unsold Collateral**
I requested a comprehensive list of unsold assets last week so that we can start marketing. We have some investors who can likely close promptly at fair prices and provide urgently needed capital to AHP as well as help fund the agreed-upon buybacks from Magerick.  In the interim, as the loan appears to be paid off or very close to it,  we request that any further sales are completed only with AHP's approval.

**Insurance**
Once you provide evidence of insurance, we can forward to our forced placed insurer SWBC which has indicated the willingness to promptly process refunds. Note that the March amendment specifies that only unrelated third-party costs are to be reimbursed to Magerick and this likely applies to self-insurance. However, I believe that we can justify payment to you to the extent that your self-insurance is similar in cost and coverage to what we obtained through SWBC.

**Putbacks**
AHP acknowledges the putback requests on 519 Kirchner in Dalton MA, 247 Morningglow in Winnsboro SC, and 9519 4th in Seattle, and we intend to fulfill these buybacks promptly. However, the putbacks are not collateralized by the Magerick transaction and should not delay the return of the unsold Magerick assets.

AHP has rejected the putback of 87 West Pine in Staatsburg NY as this asset was pledged as collateral and never purchased by Magerick.  Similarly, both 259 Moore Rd. in Leedsville LA and 1123-24 N. 24th St. in Milwaukee, WI were pledged as additional collateral in March 2023 and never purchased by Magerick. Thus, both of these requests are also denied. The net effect is that AHP does not receive credit towards the loan/repurchase price from the disposition of these assets. Instead, these assets will simply be included in the assets returned to AHP.

**Keydally**
We want to proceed with the putback on this. We need cash today more than we need these judgments, which have proven challenging to generate significant collections on. At your option, we can defer the putback until January 31, 2024 and AHP could retain 15% of any net amounts recovered after costs and fees, with the remainder being paid to Keydally.  Either way, the judgment purchase is not collateralized by the Magerick transaction  and should not delay the return of the unsold Magerick assets.

**Activist Legal unpaid invoices on Blossom**
Once unsold assets are freed up, AHP can pay Activist on delinquent invoices and this will enable Activist to bring their outstanding Blossom fees current. The Blossom invoices are not collateralized by the Magerick transaction  and should not delay the return of the unsold Magerick assets.

**Skid Row AHP**
Attached is the accounting of Skid Row AHP expenses. Per our agreement, Oak Harbor is to reimburse 50% of these to AHP.

**Summary of Outstanding Requests**

1. Update of the attached AHP Expense report identifying additionalexpenses and advances
2. Comprehensive list of sold assets with sales prices


3. LandHome remittances for Maerick/AHP portfolio from April forward
4. Detail for the $48,664.52 for "WAB closing fees," $28,100 "Collateral fees," and $69,899.10 for "Dec'21" identified on the "Improvement and cash sales" tab of the AHP_recon_9.30.2023
5. Comprehensive all unsold assets
6. Evidence of insurance.

Thanks.

## Jorge Newbery

**FOUNDER AND CEO**

AHP Servicing LLC

440 S. LaSalle St., Suite 1110, Chicago, IL 60605

312.651.4325

jnewbery@ahpservicing.com

ahpservicing.com

NMLS# 1651788





AHP Servicing LLC is a debt collector. Unless you are in bankruptcy or received a bankruptcy discharge of this debt, AHP Servicing is attempting to collect a debt and any information obtained will be used for that purpose. If you are in bankruptcy or received bankruptcy discharge of this debt, this communication is not an attempt to collect the debt against you personally.

This e-mail and any files transmitted with it are confidential and intended solely for the use of the individual or entity to whom they are addressed. If you are not the named addressee, you should not disseminate, distribute or copy this e-mail. Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail from your system. AHP Servicing LLC accepts no liability for any damage caused by any antivirus transmitted by this e-mail.

# Exhibit 72

**From:** Jorge Newbery <jnewbery@ahpservicing.com>
**Sent:** Monday, October 23, 2023 5:23:11 PM
**To:** William S. Weinstein <wsw@oakharborcapital.com>
**Subject:** Fw: Magerick_AHP transaction

Hi Bill -

We have fulfilled the Cymbidium loan/repurchase agreement and calculate a remaining repurchase price of $11,875.67 based on the reconciliation you provided on 9/29/2023. Further, as that reconciliation was incomplete, we believe that Cymbidium has been overpaid as we are aware of assets sold which were not included.

We require a return of all unsold assets by Wednesday, October 25, 2023. If not returned, we will directly contact LandHome to transfer the assets and Western Alliance Bank to return our collateral.

Further, all Powers of Attorney between AHP entities and Oak Harbor entities are revoked effective immediately, including:

1. U.S. Bank Trust N.A. as Trustee of American Homeowner Preservation Trust Series 2015A+ to Oak Harbor Capital;

2. U.S. Bank Trust N.A. as Trustee of American Homeowner Preservation Trust Series AHP Servicing to Oak Harbor Capital;

3. American Homeowner Preservation LLC to Atlantica LLC dated September 20, 2022.

We look forward to a speedy and amicable conclusion.

Thank you.

**Jorge Newbery**

FOUNDER AND CEO

AHP Servicing LLC

440 S. LaSalle St., Suite 1110, Chicago, IL 60605

312.651.4325

jnewbery@ahpservicing.com

ahpservicing.com

NMLS# 1651788







AHP Servicing LLC is a debt collector. Unless you are in bankruptcy or received a bankruptcy discharge of this debt, AHP Servicing is attempting to collect a debt and any information obtained will be used for that purpose. If you are in bankruptcy or received bankruptcy discharge of this debt, this communication is not an attempt to collect the debt against you personally.

This e-mail and any files transmitted with it are confidential and intended solely for the use of the individual or entity to whom they are addressed. If you are not the named addressee, you should not disseminate, distribute or copy this e-mail. Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail from your system. AHP Servicing LLC accepts no liability for any damage caused by any antivirus transmitted by this e-mail.

# Exhibit 73

| From: | Jorge Newbery <jnewbery@ahpservicing.com> |
|---|---|
| **Sent:** | Monday, October 30, 2023 12:36 PM |
| **To:** | William S. Weinstein; Sarah Brink |
| **Cc:** | Michael Basile; Gonzalo M. BozoValenzuela; Emma Brookman; Gabrielle Ayala-Montgomery; Peter Fitzpatrick; Sonal Gupta |
| **Subject:** | Re: Outstanding requests |

Hi Bill -

Thanks for the reconciliation.

We have reviewed the recon along with the October 2022 MLSA and the March 2023 Amendment and have identified issues which need to be resolved:

Section 5 of the Amendment states that the "Seller is entitled to all amounts recovered on the Mortgage Loans in excess of...(ii) all *unrelated* third-party costs and fees related to managing the Mortgage Loans (emphasis added)." This indicates that the *related* third-party costs such as the 313 payments to Weinstein & Riley and the $300,358.57 claimed for "self-insurance" may not be offset against the funds due to AHP.

Also, as Gabrielle recently identified, Section 1 of the Amendment indicates that "the Category A Mortgage Loan and Category B Mortgage Loan distinction made in the Mortgage Loan Schedule is hereby eliminated." Thus, please add the revenue and expenses from the 22 Schedule A assets to the accounting.

Once the recon is adjusted for 1 and 2, we believe that the outstanding repurchase price will yield "excess cash...to be assigned and transferred back to the Seller" per Section 5 of the Amendment.

However, even if we utilize the outstanding repurchase price of $281,612.20 identified on Friday's recon and deduct the $400,000 (39 Whittier wired on 10/13/2023) and $339,389.77 (1429 E 100th wired on 9/1/2023), then AHP has overpaid by at least $457,777.57.

We are prepared to repurchase 519 Kirchner tomorrow and Karen is preparing the Repurchase Contract. The putback on 87 West Pine was denied as this was never purchased, although we realize that the credit we received when you sold will be reversed.

The repurchase of 9519 4th is between AHP and Magerick, which is not a party to the Cymbidium_AHP transaction. AHP will honor this buyback, but in the interim this cannot interfere with the Cymbidium_AHP resolution.

Likewise, Activist Legal intends to pay the $40,000 for Blossom as soon as AHP pays Activist, but in the interim this cannot interfere with the Cymbidium_AHP resolution.

Finally, AHP has exercised the put on the Keydally purchase and the $2,000,000 is not due.

As a result, AHP has more than fully repaid/satisfied the loan/repurchase transaction and we need Cymbidium to return our unsold assets and excess cash.

The primary outstanding question is how much excess cash is Cymbidium to return to AHP and this can only be determined once Cymbidium provides the reports requested. Ideally, we can both commit internal resources to resolve this promptly. If not, Cherry Beckert has introduced the audit firm of ElliottDavis to review the accounting and make it audit-ready at AHP's expense.

Thank you.

---

**From:** William S. Weinstein <wsw@oakharborcapital.com>
**Sent:** Friday, October 27, 2023 4:26 PM
**To:** Jorge Newbery <jnewbery@ahpservicing.com>; Sarah Brink <SBrink@OakHarborCapital.com>
**Cc:** Michael Basile <MBasile@OakHarborCapital.com>; Gonzalo M. Bozo Valenzuela <GValenzuela@oakharborcapital.com>; Emma Brookman <EBrookman@oakharborcapital.com>; Gabrielle Ayala-Montgomery <GMontgomery@oakharborcapital.com>; Peter Fitzpatrick <peter.fitzpatrick@OakHarborCapital.com>; William S. Weinstein <wsw@oakharborcapital.com>; Sonal Gupta <SGupta@oakharborcapital.com>
**Subject:** FW: Outstanding requests

Dear Jorge,

Enclosed as promised please find the promised reconciliation. Please note that it understates the expenses and the insurance (only calculated through September 30), doesn't count any interest on the Keydally note, and doesn't include money collected on the SCLs for the past year (assuming you exercise the put-back on January 1. It overstates the loan putbacks and counts the $2 Million obligation that will be expunged on the put-back. Bottom line: I think you owe us between $1.75 and $2.0 Million to resolve the issues, and we can pick out some loans to close that gap. Please review and set a time with Sarah for us to talk Sunday.

Best wishes,

Bill

---

This communication is for the intended recipient only. This communication may contain information that is privileged, confidential and exempt from disclosure under applicable law and constitutes an electronic communication within the meaning of the Electronic Communications Privacy Act, 18 U.S.C. 2510. If you are not the intended recipient, you are hereby notified that any unauthorized use, dissemination, distribution or copying of this communication is strictly prohibited and may subject you to criminal or civil penalty. If you have received this communication in error, please notify us immediately by email, delete the message, and destroy any copies.

# Exhibit 74

## RE: 519 Kirchner Road, Dalton MA 01226 Putback

William S. Weinstein <wsw@oakharborcapital.com>
Tue 10/31/2023 9:05 AM
To:Jorge Newbery <jnewbery@ahpservicing.com>

All communication must now occur between your attorney and Brad Keller, Cymbidium's attorney.

Sent from Mail for Windows

---

**From:** Jorge Newbery
**Sent:** Tuesday, October 31, 2023 6:00 AM
**To:** William S. Weinstein
**Subject:** 519 Kirchner Road, Dalton MA 01226 Putback

Hi Bill -

Please review the attached. If agreeable, please sign and return.

Thanks.


**Jorge Newbery**
**FOUNDER AND CEO**

AHP Servicing LLC
440 S. LaSalle St., Suite 1110, Chicago, IL 60605
312.651.4325
jnewbery@ahpservicing.com
ahpservicing.com
NMLS# 1651788

---

AHP Servicing LLC is a debt collector. Unless you are in bankruptcy or received a bankruptcy discharge of this debt, AHP Servicing is attempting to collect a debt and any information obtained will be used for that purpose. If you are in bankruptcy or received bankruptcy discharge of this debt, this communication is not an attempt to collect the debt against you personally.

This e-mail and any files transmitted with it are confidential and intended solely for the use of the individual or entity to whom they are addressed. If you are not the named addressee, you should not disseminate, distribute or copy this e-mail. Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail from your system. AHP Servicing LLC accepts no liability for any damage caused by any antivirus transmitted by this e-mail.

This communication is for the intended recipient only. This communication may contain information that is privileged, confidential and exempt from disclosure under applicable law and constitutes an electronic communication within the meaning of the Electronic Communications Privacy Act, 18 U.S.C. 2510. If you are not the intended recipient, you are hereby notified that any unauthorized use, dissemination, distribution or copying of this communication is strictly prohibited and may subject you to criminal or civil penalty. If you have received this communication in error, please notify us immediately by email, delete the message, and destroy any copies.

# Exhibit 75

Farha Ahmed Esquire (Attorney ID # 01062-2009)
Waldman & Kaplan, PA
174 Nassau Street, Suite 313
Princeton, NJ 08542
Telephone: (844) 899-4162
Facsimile: (844) 882-4703
Secondary Email: farha@dwaldmanlaw.com
Email: njforeclosures@dwaldmanlaw.com
Attorneys for Plaintiff
Collateral Account Number (for filing fee): 143296

| | | |
|---|---|---|
| **MAGERICK, LLC,** | : | **SUPERIOR COURT OF NEW JERSEY** |
| | : | **LAW DIVISION** |
| **Plaintiff,** | : | **OCEAN COUNTY** |
| VS. | : | **DOCKET NO.: OCN-L-2937-23** |
| | : | |
| **AMERICAN HOMEOWNER** | : | |
| **PRESERVATION TRUST SERIES AHP** | : | |
| **SERVICING; et al.,** | : | **CIVIL ACTION** |
| | : | |
| | : | **CERTIFICATION IN SUPPORT OF** |
| **Defendants.** | : | **MOTION TO STAY CASE** |
| | x | |

I, Farha Ahmed, Esq. of full age, hereby certify as follows:

1. I am an attorney-at-law of the State of New Jersey and associated with the firm of Waldman & Kaplan, P.A. attorneys for Plaintiff in the above-captioned matter. In this capacity, I have personal knowledge of the facts stated herein.

2. I make this Certification in support of Plaintiff's Motion to Stay Case.

3. As stated in the Amended Complaint, Cymbidium Restoration Trust purchased a large pool of loans from Defendant AHP Trust Servicing which AHP Trust Servicing was to repurchase on or before January 7, 2024, as is described in Section 4 of a certain Mortgage Loan and Sale Agreement dated October 7, 2022 ("Cymbidium Agreement").

4. When AHP Trust Servicing defaulted on the repurchase obligation, the Cymbidium Agreement was amended on or about March 15, 2023, which resulted in AHP Trust Servicing owing a debt to Cymbidium.

5. A separate agreement, the Mortgage Loan Purchase and Sale Agreement dated January 31, 2023, was executed between Plaintiff, Magerick, LLC, as Purchaser, and U.S. Bank Trust N.A. as Trustee of American Homeowner Preservation Trust Series AHP Servicing, as Seller ("Magerick Agreement"). A copy of this Magerick Agreement has been filed under seal with this Court.

6. As part of the Magerick Agreement, Plaintiff purchased several loans from Defendant, including the subject loan.

7. There is litigation in the State of Washington related to the Cymbidium Agreement. Please see copy of Washington Complaint, attached as Exhibit K to Plaintiff's Amended Complaint.

8. While the subject Loan and the subject Property are not a part of the Cymbidium Agreement, the parties had agreed that the purchase price in the Magerick Agreement would be paid in the form of a reduction in debt owed by Defendant from the Cymbidium Agreement.

9. The Washington litigation is largely a dispute over which party defaulted under the Cymbidium Agreement, and Cymbidium Restoration Trust (the plaintiff in that action, which is an entity related to Plaintiff in this action) argues that Defendants failed to pay their debt under the Cymbidium Agreement.

10. Plaintiff contends that the Washington litigation should not have an effect on Plaintiff's ability to sell the subject Property, particularly as Defendants do not have any current

interest in the Property and the delivery of the deed sufficiently gave Plaintiff ownership rights, and necessarily evidences that consideration was paid.

11. However, Plaintiff understands that Defendants are asserting in the Washington litigation, and in this action, that consideration was not paid for the subject Quit Claim Deed and related loan, and that the subject Property and loan are actually owned by Defendants.

12. While Plaintiff vehemently denies these assertions, Plaintiff also believes that the outcome of the Washington litigation will definitively determine whether consideration was paid or not.

13. Currently, the Washington litigation is in its discovery phase, with a discovery cutoff date of January 10, 2025, dispositive motion deadline of February 10, 2025, and a trial date of June 9, 2025.

14. To avoid the litigation expenses of multiple cases (there are related actions in Illinois and New York), to particularly avoid engaging in extensive discovery in multiple venues, and to allow the Washington court to make a definitive decision regarding the Cymbidium Agreement and consideration paid, Plaintiff respectfully requests that this Court stay the current action at least until the Washington litigation is completed.

15. "Although efficient judicial management may be more complex when a related case is pending in a federal court or in the court of another state, our courts also have appropriate means to address those situations. For example, 'the New Jersey action may, as a matter of sound discretion, be stayed by our courts until the prior action has been adjudicated.'" Kaselaan & D'Angelo Assocs. V. Soffian, 290 N.J. Super, 293, 300 (App. Div. 1996) quoting American Home Prods. v. Adriatic Ins., supra, 286 N.J.Super. 24, 33 (App. Div. 1995).

16. Therefore, Plaintiff is requesting that this Court, in its sound discretion, stay this matter until the conclusion of the Washington litigation. Plaintiff seeks to move forward with this action once the Washington litigation is completed; it does not want to dismiss this action as it is particularly worried about Defendants' attempts to sell the property should this action be dismissed (see allegations and exhibits attached to Amended Complaint, showing Defendants have attempted to previously sell the subject Property without Plaintiff's knowledge).[1]

17. For the foregoing reasons, the Court should grant Plaintiff's Motion to Stay Case.

18. I hereby certify the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

Respectfully submitted,

WALDMAN & KAPLAN, P.A.

By: _/s/ Farha Ahmed_
Farha Ahmed, Esq.

Dated: November 7, 2024

---

[1] To be sure, there is no requirement to dismiss this action under the entire controversy doctrine, as "[t]he fact that an action pending in another State involves the same parties and the same or substantially similar claims does not bar prosecution of a subsequent action here in New Jersey." American Home Prods. v. Adriatic Ins., supra, 286 N.J. Super. 24, 33 (App. Div. 1995); the entire controversy doctrine does not require dismissal when multiple actions involving the same or related claims are pending simultaneously. Kaselaan & D'Angelo Assocs. V. Soffian, 290 N.J. Super, 293, 299 (App. Div. 1996)