HONORABLE KYMBERLY K. EVANSON

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

CYMBIDIUM RESTORATION TRUST,

Plaintiff,

v.

AMERICAN HOMEOWNER PRESERVATION TRUST SERIES AHP SERVICING; ITS TRUSTEE, U.S. BANK TRUST N.A.; AHP CAPITAL MANAGEMENT, LLC; AMERICAN HOMEOWNER PRESERVATION SERIES 2015A+; ITS TRUSTEE, U.S. BANK TRUST NATIONAL ASSOCIATION; AHP SERVICING, LLC; AND JORGE NEWBERY,

Defendants.

AMERICAN HOMEOWNER PRESERVATION TRUST SERIES AHP SERVICING; AHP CAPITAL MANAGEMENT, LLC; AMERICAN HOMEOWNER PRESERVATION SERIES 2015A+; AHP SERVICING, LLC,

Counter-Plaintiffs / Third-Party Plaintiffs,

v.

CYMBIDIUM RESTORATION TRUST; MAGERICK LLC,

Counter-Defendant / Third-Party Defendant.

Case No. 2:24-cv-00025-KKE

AHP DEFENDANTS / COUNTER-PLAINTIFFS' AMENDED TRIAL BRIEF



BAILEY DUQUETTE P.C.
800 FIFTH AVENUE, SUITE 101-800
SEATTLE, WASHINGTON 98104
T 206.225.2250 | F 888.233.5869

# TABLE OF CONTENTS

I. INTRODUCTION ..... 1

II. FACTUAL BACKGROUND ..... 8

A. Cymbidium, Magerick, and the Weinstein-Related Entities. ..... 8

B. The March 2023 Amendment Changed the Parties' Bargain, but Preserved AHP's Right to the Remaining Value. ..... 9

C. Insider Transactions Raise Questions About the Value Actually Realized from the Mortgage Loans. ..... 11

D. Cymbidium's Claimed Balance Grew from Approximately $1.75 Million Pre-Suit to Nearly $27 Million Post-Filing of Suit ..... 14

E. The Court's Order Appointing David Solis and Subsequent Narrowing of the Scope to "First Sales." ..... 16

F. Solis's Investigation Has Narrowed the Financial Dispute but Identified Questions the Court Must Resolve, Including Regarding "First Sale". ..... 18

III. LEGAL ISSUES ..... 21

A. Cymbidium Breached Its Express Obligation to Exercise Best Efforts in Good Faith to Maximize AHP's Recovery. ..... 21

B. The Court Must Determine the Proper Waterfall and Require a Complete Accounting of the Mortgage Loans. ..... 35

C. Magerick Is Independently Liable for Its Assumed Obligations and Retention of Contractual Benefits. ..... 44

D. Cymbidium Cannot Turn Alleged Warranty Breaches Into Millions in Additional Waterfall Debt. ..... 46

E. AHP's Surviving Defenses and Counterclaims Require a Net Determination of the Parties' Rights. ..... 49

F. The Court Should Determine When the Waterfall Was Satisfied and Enforce AHP's Reversionary Rights. ..... 50



BAILEY DUQUETTE P.C.
800 FIFTH AVENUE, SUITE 101-800
SEATTLE, WASHINGTON 98104
T 206.225.2250 | F 888.233.5869

# I. INTRODUCTION

*"The Purchaser will exercise best efforts in good faith to maximize the recovery on the Mortgage Loans."*

Amended MLSARO, ¶ 6.

The parties' agreement has an endpoint. The March 2023 amendment to the Mortgage Loan Sale Agreement with Repurchase Obligation ("**Amended MLSARO**") eliminated AHP's mandatory repurchase obligation and established a recovery waterfall. Cymbidium Restoration Trust ("**Cymbidium**"), as "Purchaser", was entitled to receive specified amounts from the Mortgage Loans, including outstanding principal, interest, permitted expenses, and a management fee. But once those amounts were paid in full, the agreement expressly required that the remaining Mortgage Loans, other assets, and excess cash be returned to AHP. *See* Amended MLSARO, ¶ 5 (Dkt. 238-1 at 232–33).

Thus, this trial presents two possible outcomes. Either (a) Cymbidium has already received everything it was entitled to, in which case the remaining assets and excess cash must return to AHP; or (b) a balance remains, in which case AHP is entitled to a proper accounting establishing what is owed and how the contractual obligations can be satisfied. What the agreement does not permit is a perpetually moving target—one in which Cymbidium and its affiliates continue to monetize the Mortgage Loans *ad infinitum*, and prevent AHP from obtaining the remaining value it was promised.



BAILEY DUQUETTE P.C.
800 FIFTH AVENUE, SUITE 101-800
SEATTLE, WASHINGTON 98104
T 206.225.2250 | F 888.233.5869

That is why Cymbidium's obligations, express and implied, are central to this case. The Amended MLSARO states that AHP would "utilize the Purchaser to maximize the ultimate recovery the Seller will achieve" from the Mortgage Loans. *Id.* at 1. Cymbidium accordingly promised that it "will exercise **best efforts in good faith to maximize the recovery** on the Mortgage Loans." *Id.* ¶ 6. Washington law likewise prohibits a party from exercising contractual discretion to deprive another party of the benefit of its bargain. *See Badgett v. Sec. State Bank*, 116 Wn.2d 563, 569 (1991); *Rekhter v. Dep't of Soc. & Health Servs.*, 180 Wn.2d 102, 112–13 (2014). Cymbidium could decide how to monetize the Mortgage Loans. It could not use that discretion to undercut or defeat the agreement's express purpose of maximizing AHP's ultimate recovery.

Yet that is precisely what the evidence in this case overwhelmingly shows. Rather than pursuing the best recoveries through genuine, arm's-length transactions, Cymbidium and its affiliates moved Mortgage Loans among entities controlled or financed by the same insiders who set their prices, obscuring the amounts collected on each loan, the value ultimately realized, and the recoveries that should have been credited to AHP. Some purported "sales" involved no actual payment. Others used sham intermediaries that never acquired the loans before transferring them to Oak Harbor-related individuals or entities. In still other transactions, loans were transferred to affiliates at depressed prices and then resold to independent purchasers for substantially more, without crediting AHP for the additional value. Meanwhile,



BAILEY DUQUETTE P.C.
800 FIFTH AVENUE, SUITE 101-800
SEATTLE, WASHINGTON 98104
T 206.225.2250 | F 888.233.5869

affiliated entities pledged and double-pledged the loans to banks to secure their own borrowing, restricting their marketability and complicating their return to AHP. Throughout, the same loans continued generating collections, sale proceeds, and other benefits within the affiliated group, while Cymbidium charged additional expenses and reversed previously recognized credits, driving the claimed outstanding balance higher and higher.

Those practices also created a fundamental conflict of interest. Cymbidium's affiliates had pledged and double-pledged loans that the Amended MLSARO required to be returned to AHP upon repayment in full. Cymbidium could not admit that the balance had been satisfied without its affiliates first addressing their lenders' rights and potentially surrendering or refinancing collateral securing their own borrowing. Every additional recovery credited to AHP brought Cymbidium closer to having to return the remaining assets; every uncredited recovery, additional expense, or reversed credit postponed that obligation. This conflict provides an economic explanation for the insider transactions and the continued growth of Cymbidium's claimed balance.

The Court has ruled that the MLSARO did not prohibit Cymbidium from transferring or pledging the Mortgage Loans. Dkt. 274 at 9–10. But that ruling does not resolve whether Cymbidium exercised its authority in good faith. The right to sell or pledge an asset does not excuse Cymbidium from its express promise to maximize



BAILEY DUQUETTE P.C.
800 FIFTH AVENUE, SUITE 101-800
SEATTLE, WASHINGTON 98104
T 206.225.2250 | F 888.233.5869

recoveries for AHP's ultimate benefit. The issue at trial is whether Cymbidium fulfilled that promise and, if not, what value AHP lost as a result.

The Court-appointed neutral's work has brought those questions into sharper focus. As of February 28, 2026, Cymbidium's last identified reconciliation asserted that AHP owed $26,922,390.11—more than the original $19.75 million Category B price, notwithstanding years of payments and recoveries. Yet the Court-appointed expert David Solis's October 16, 2026 Second Supplemental Report calculates $4,559,017.25 owed by AHP as of August 31, 2026, under Base Case 1. Dkt. 390.

That number is Cymbidium's best-case scenario. Base Case 1 is a calculation under specified assumptions, not a determination of the parties' ultimate contractual rights. Thus, once the non-cash credits and cost combinations that Solis modeled are properly factored in, the actual number moves dramatically in AHP's favor.

For example:

Base Case 1 assumes the validity of the credits Cymbidium gave AHP for its non-cash and insider transactions. Consider Keydally: Cymbidium credited AHP just $10 million for the purported sale of 298 loans. Yet, shortly after that sale, Oak Harbor documented, internally and to third parties, the net present value of 277 of those loans at $15.18 million, while Magerick's year-end valuation supporting its audited financial statements valued just 273 of those loans at $16.09 million. Dkt. 369 at 56. Thus, Cymbidium's own affiliates valued fewer loans at $5.18 million to $6.09 million more than the price credited to AHP. Those differences alone exceed the entire $4.56



BAILEY DUQUETTE P.C.
800 FIFTH AVENUE, SUITE 101-800
SEATTLE, WASHINGTON 98104
T 206.225.2250 | F 888.233.5869

million Base Case 1 balance. Keydally is not the only sham transaction warranting a credit adjustment.

But there is more. Base Case 1 also includes all recorded costs across six disputed cost classes. Even retaining its first-sale cutoff, Solis's 192 cost combinations produce balances ranging from $3.01 million to $4.56 million owed by AHP—a fraction of Cymbidium's claimed $26.92 million. Dkt. 390 at 14. Thus, both the failure to maximize the value of insider transactions and the inclusion of disputed costs provide grounds to eliminate even Solis's most Cymbidium-favorable calculated balance.

<u>And that is before addressing Base Case 1's most fundamental limitation:</u> its undefined "first sale" cutoff. What constitutes a "first sale" when loans move among affiliates without actual payment; when an intermediary never acquires the loans; or when the supposed seller continues to receive their economic benefits? Indeed, Solis himself acknowledged at his October 20 deposition that he did not "know for certain what the definition is for first or second generation sales in this case." More fundamentally, the Amended MLSARO contains no such cutoff. Rather, it entitles AHP to " all amounts recovered on the Mortgage Loans" in excess of the specified contractual obligations—not merely amounts recovered through the first sale. Amended MLSARO, ¶ 5. And the Court's August 3 order limited Solis's assignment, not AHP's contractual rights, expressly preserving consideration of subsequent transactions in calculating the final waterfall. Dkt. 323 at 1.



BAILEY DUQUETTE P.C.
800 FIFTH AVENUE, SUITE 101-800
SEATTLE, WASHINGTON 98104
T 206.225.2250 | F 888.233.5869

AHP therefore has several paths to establishing payment in full and an affirmative recovery: proving damages from Cymbidium's failure to maximize value, excluding unauthorized costs, and requiring an accounting that captures all recoveries the contract requires (not one limited to an artificial "first sale"). Solis's work supplies much of the financial foundation, but the Court must determine the governing contractual rules and allow for a full accounting before accepting a final balance. Important records also remain missing, including certain Land Home remittance documentation necessary to verify the full movement of funds. These unresolved issues confirm why AHP's accounting counterclaim remains necessary.

Cymbidium's separate "Atrocity List" cannot be allowed to obscure that accounting. Cymbidium seeks to reverse millions of dollars in previously recognized credits for loans it claims were impaired or could not be monetized. Solis excluded those reversals from his calculations, noting in his deposition that this constituted "double counting" and leaving their contractual basis for the Court to decide. Even if some reversals are permissible, Cymbidium must prove them loan by loan. Realistically speaking, that will take much longer than a five-day bench trial.

AHP acknowledges its own difficult facts. Unable to obtain a reliable accounting and facing severe financial distress, AHP retained certain proceeds and stopped executing transfer documents based on the good-faith belief that the balance had been paid. The hostility surrounding the dispute was underscored on December 8, 2023, when William Weinstein told Jorge Newbery that he would bury AHP in



BAILEY DUQUETTE P.C.
800 FIFTH AVENUE, SUITE 101-800
SEATTLE, WASHINGTON 98104
T 206.225.2250 | F 888.233.5869

litigation and "incinerate" it. The Court has determined that AHP owed contractual delivery and remittance duties, and AHP does not seek to revisit those rulings. But the context matters. AHP repeatedly requested an independent accounting and offered to pay for one while Cymbidium's claimed balance continued to grow. Cymbidium must still establish the actual damages caused by AHP's conduct, without double-counting losses or disregarding recoveries already received. Any recovery must be limited to proven losses caused by AHP's conduct, after accounting for applicable credits and recoveries.

This trial should bring the parties to the endpoint their agreement requires. AHP contends that the waterfall was satisfied years ago and that Cymbidium owes AHP the remaining assets and excess proceeds. Alternatively, if a balance remains, the Court should determine the governing accounting rules, establish what is owed, and provide an enforceable means of satisfying that balance and preserving the residual assets. If necessary, the Court may order independent servicing or appropriate court supervision of the remaining portfolio so that collections and dispositions continue under a transparent, court-approved process. Either way, the parties' rights must be determined from the actual recoveries and the agreement's terms—not from successive reconciliations and evolving, litigation-generated "atrocities" that continually move the contractual finish line.



BAILEY DUQUETTE P.C.
800 FIFTH AVENUE, SUITE 101-800
SEATTLE, WASHINGTON 98104
T 206.225.2250 | F 888.233.5869

## II. FACTUAL BACKGROUND

### A. Cymbidium, Magerick, and the Weinstein-Related Entities.

Although Cymbidium Restoration Trust is the contractual "Purchaser" of the Mortgage Loans, much of the financing, servicing, monetization, and accounting was carried out through other entities associated with William Weinstein. Cymbidium is a Delaware statutory trust managed through Cymbidium Restoration LLC, which is managed by Oak Harbor Capital LLC, an entity associated with Weinstein. Cymbidium did not itself maintain the principal accounting records for the Mortgage Loans. Indeed, Sonal Gupta testified that Cymbidium had no bank account and that the transaction was funded and administered through Magerick LLC ("**Magerick**").

Magerick is owned by Oak Harbor Management LLC and Land Home Financial Services, Inc. ("**Land Home**"), whose president, Bradley Waite, participated in several transactions at issue here. Magerick financed the acquisition of the Mortgage Loans through a credit facility with Western Alliance Bank ("**WAB**"). Under a Secured Participation Agreement with Cymbidium, Magerick received a 100% participation interest in the beneficial and economic rights associated with the loans, including the right to receive their proceeds, direct Cymbidium's exercise of its contractual rights, and "bear all obligations" associated with those interests. Dkt. 238-1 at 226–29. The same agreement expressly excluded legal title from that participation interest, providing that legal title "shall continue to be held by [Cymbidium]."



BAILEY DUQUETTE P.C.
800 FIFTH AVENUE, SUITE 101-800
SEATTLE, WASHINGTON 98104
T 206.225.2250 | F 888.233.5869

Land Home serviced Mortgage Loans and maintained borrower-level payment records. Collections and other funds were received through Magerick's operating accounts and a Weinstein & Riley, P.S. lockbox account ending in 7191 (the "**7191 Account**"). Weinstein & Riley is Weinstein's law firm. Oak Harbor and other affiliated entities participated in loan dispositions, servicing, and financing.

Thus, while Cymbidium remained the contracting party, Magerick held the beneficial and economic participation interest, maintained much of the underlying accounting, and received or controlled substantial proceeds from the Mortgage Loans. This division of responsibilities is central to understanding the transactions and accounting at issue. *See* Dkt. 369 at 16–32; Dkt. 374 at 20-21 (¶¶ 35–42).

### B. The March 2023 Amendment Changed the Parties' Bargain, but Preserved AHP's Right to the Remaining Value.

The relationship between Jorge Newbery and William Weinstein, and the circumstances leading to the October 2022 Mortgage Loan Sale Agreement with Repurchase Obligation ("**MLSARO**"), are well documented in the parties' prior briefing.

In short, AHP sought financing against its mortgage-loan portfolio, and Weinstein arranged approximately $19.75 million in funding through Cymbidium and its affiliates for the Category B portion of the transaction. The original MLSARO required AHP to repurchase certain loans by January 2023. When AHP could not do so, the parties negotiated the March 15, 2023 First Amendment.



BAILEY DUQUETTE P.C.
800 FIFTH AVENUE, SUITE 101-800
SEATTLE, WASHINGTON 98104
T 206.225.2250 | F 888.233.5869

The Amended MLSARO eliminated AHP's mandatory repurchase obligation, added Mortgage Loans to the covered portfolio, eliminated the prior Category A and Category B distinction, and established a waterfall governing recoveries. Critically, it preserved AHP's reversionary rights, namely the right to amounts recovered beyond Cymbidium's contractual entitlement and to the remaining Mortgage Loans and other assets upon payment in full.

Paragraph 5 expressly provides that AHP is entitled to "**all amounts recovered on the Mortgage Loans**" beyond four specified categories: debt and interest, unrelated third-party costs and fees related to managing the loans, the 16% Applicable Pricing Rate, and the Management Fee. It then requires the remaining Mortgage Loans and other assets, including excess cash to be returned to AHP upon payment in full.

The Amended MLSARO separately defines "Mortgage Loan Costs" in paragraph 3 to include unreimbursed third-party costs advanced by the **Purchaser**—Cymbidium—related to the loans, including costs of maintaining or improving the underlying properties. The distinction between costs advanced by the contractual Purchaser, costs incurred by affiliated entities, and the unrelated third-party costs identified in paragraph 5 remains disputed.

Finally, the Amended MLSARO expressly recognized that AHP intended to use Cymbidium to maximize AHP's ultimate recovery from the Mortgage Loans. To that end, Cymbidium agreed to exercise "**best efforts in good faith to maximize the recovery**" on those loans.



BAILEY DUQUETTE P.C.
800 FIFTH AVENUE, SUITE 101-800
SEATTLE, WASHINGTON 98104
T 206.225.2250 | F 888.233.5869

The Mortgage Loans, however, were already being used to support financing arrangements involving Magerick. On October 6, 2022, before the MLSARO became effective, Magerick pledged Mortgage Loans to WAB as first-priority collateral for its borrowing. The record shows that, while these loans remained pledged to WAB, a subset was also double-pledged to Banner Bank as purported first-priority collateral to secure a loan in Weinstein's own name. Other Oak Harbor affiliates likewise pledged the same loans to banks to procure financing. In this regard, the Court has determined that the MLSARO did not prohibit pledges. Dkt. 274 at 9–10. However, the financial consequences of those arrangements—including their effect on loan dispositions, impact on Cymbidium's ability to exercise "best efforts" to maximize recovery, and AHP's remaining economic interest—are among the issues to be presented at trial.

**C. Insider Transactions Raise Questions About the Value Actually Realized from the Mortgage Loans.**

The record contains numerous transactions in which Mortgage Loans were transferred among related entities, sometimes without independent consideration or price-setting, and subsequently monetized through additional transactions.

One example, as noted, is the July 2023 Keydally transaction. Magerick purportedly sold 298 Mortgage Loans to Cymbidium for $10 million, which Cymbidium credited to AHP. It is unclear how Magerick obtained legal title to those loans to sell in the first place, and there is no evidence of any cash exchanging hands between Magerick and Cymbidium. Be that as it may, Cymbidium then transferred a



BAILEY DUQUETTE P.C.
800 FIFTH AVENUE, SUITE 101-800
SEATTLE, WASHINGTON 98104
T 206.225.2250 | F 888.233.5869

100% participation interest to Keydally Capital Ltd. But Keydally did not pay cash for that participation interest either; rather, its acquisition was financed through two $5 million notes involving Weinstein and Waite, who retained the option to acquire Keydally's interests by cancelling the debt. Keydally's representatives testified that it had no bank account and paid no money for the loans; instead, its agent was paid to sign the transaction documents. Solis found that Magerick never recorded the purported $10 million sale in its general ledger and never removed the 298 loans from its books.

Critical to the resolution of the waterfall are the valuations that Oak Harbor contemporaneously placed on these Keydally loans. Oak Harbor's October 2023 records placed the net present value of 277 of those loans at $15.18 million. Magerick's year-end valuation, supporting its audited financial statements, valued 273 loans at $16.09 million. Thus, within months of crediting AHP $10 million for 298 loans, the affiliated enterprise valued smaller subsets of the same portfolio at substantially higher amounts.

The BBNY and Bonifera transactions present another example. William Bymel declared that Weinstein asked him as a favor to execute two purported $2.2 million sale agreements involving 62 Mortgage Loans, first from Magerick to BBNY and then from BBNY to Bonifera, an Oak Harbor affiliate. According to Bymel, neither purchaser paid the stated consideration, BBNY never received the loans or conducted independent due diligence, and Oak Harbor determined the price. Although the



BAILEY DUQUETTE P.C.
800 FIFTH AVENUE, SUITE 101-800
SEATTLE, WASHINGTON 98104
T 206.225.2250 | F 888.233.5869

agreements were dated June 30, 2023, they were not executed until October. Dkt. 238-1 at 298–300 (Bymel Decl. ¶¶ 3–16). Yet in an October 5, 2023 investor letter signed by Weinstein, DLC (another affiliate) represented that it had purchased those 62 assets "from American Homeowner Preservation" during the second quarter for $2.2 million, while reporting a net present value of $4,715,561—more than twice the stated purchase price—and a weighted-average IRR at purchase of 201%. *Id.* at 311. The result: the loans moved from one Oak Harbor affiliate (Magerick) to another Oak Harbor affiliate (Bonifera), without AHP being credited for the full value of that transfer.

Meanwhile, loans purportedly transferred out of Magerick continued generating economic activity within the affiliated enterprise. Solis identified approximately $4.02 million in receipts on Keydally-schedule loans after the July 2023 transaction, including approximately $2.38 million that Magerick received from later sales of 39 of those loans. Magerick also continued recording expenses against the same loan population and charging them to AHP in its ledger. Dkt. 390 at 7-9.

These transactions require the Court to determine the consideration actually exchanged, who set the prices, which entities retained the economic interests after the purported sales, and how subsequent recoveries and expenses affected AHP's contractual entitlement.



BAILEY DUQUETTE P.C.
800 FIFTH AVENUE, SUITE 101-800
SEATTLE, WASHINGTON 98104
T 206.225.2250 | F 888.233.5869

### D. Cymbidium's Claimed Balance Grew from Approximately $1.75 Million Pre-Suit to Nearly $27 Million Post-Filing of Suit.

The accounting dispute began well before this litigation. Weinstein's October 27, 2023 reconciliation reflected $3,745,343.47 outstanding, including a separate, disputed $2 million "KeyDally loan" item (which was later resolved at trial in AHP's favor). In his accompanying email, Weinstein told Newbery: "Bottom line: I think you owe us between $1.75 and $2.0 Million to resolve the issues." Dkt. 369 at 41 (¶ 131) & App. I-2.

Newbery disagreed and repeatedly sought an independent accounting. On October 18, 2023, he proposed that Cherry Bekaert audit the transaction at AHP's expense. He reiterated that offer and demanded the return of the remaining Mortgage Loans and excess proceeds, maintaining that Cymbidium had already been paid. On November 14, he again requested an independent audit, this time writing to Land Home president Bradley Waite and copying Weinstein. Cymbidium filed suit three days later.

Over the next three years, Cymbidium's claimed balance escalated dramatically:

| Cymbidium's Reconciliations and Initial Disclosures | Claimed Balance |
|---|---|
| October 27, 2023 Reconciliation (Pre-Suit) | $3,745,343.47[1] |

[1] The $3,745,343.47 balance included $2 million associated with a separate alleged "loan" that the King County Superior Court since determined was invalid. Removing that amount, the claimed balance was $1,745,343.47 as of October 2023.



BAILEY DUQUETTE P.C.
800 FIFTH AVENUE, SUITE 101-800
SEATTLE, WASHINGTON 98104
T 206.225.2250 | F 888.233.5869

| | |
|---|---|
| December 14, 2023 Reconciliation | $3,497,311.14 |
| March 29, 2024 Reconciliation | $2,642,259.53 |
| April 4, 2024 Initial Disclosures | $2.6 million |
| December 14, 2024 Reconciliation | $12,174,819.06 |
| January 6, 2026 Reconciliation | $24,648,553.97 |
| February 28, 2026 Reconciliation | $26,922,390.11 |

One of the principal drivers was a growing schedule of credit reversals. Cymbidium initially described certain adjustments as "Putbacks." On March 21, 2024—four months after filing suit—its reconciliation first introduced a tab labeled "AHP Atrocity list," containing approximately $3 million in claimed adjustments. Significantly, Solis observed that the list first appeared when "the running balance was briefly negative." The claimed credit reversals grew to $9.25 million by December 2024 and approximately $14.66 million in the reconciliation furnished for the January 2026 trial. Dkt. 369 at 41-42, 44 (¶¶ 132, 140) & App. I-2.

By February 28, 2026, Cymbidium's reconciliation recognized approximately $29.46 million in credits, including $14.21 million in cash and $15.25 million in noncash credits, yet asserted that AHP owed $26.92 million. The calculation included approximately $14.66 million in Atrocity List adjustments and $4.24 million in claimed improvement costs, with interest continuing to accrue. Dkt. 369 at 42 (¶ 135) & App. I-2.



BAILEY DUQUETTE P.C.
800 FIFTH AVENUE, SUITE 101-800
SEATTLE, WASHINGTON 98104
T 206.225.2250 | F 888.233.5869

Solis traced 13 versions of Cymbidium's reconciliation and found that the increase after March 2024 resulted principally from retroactive credit reversals and continued accruals, rather than new cash activity. He also found that the reconciliations applied the Amended MLSARO's 16% Applicable Pricing Rate beginning October 7, 2022, even though the original agreement provided for 12% and the Amended MLSARO rate was not effective until March 15, 2023. *Id.* at 41-42 (¶¶ 131–34).

Meanwhile, AHP faced severe financial distress without the return of its remaining Mortgage Loans and other assets it maintained were due back under the Amended MLARO. Believing that the waterfall had already been satisfied, AHP disputed Cymbidium's entitlement to additional proceeds or documents while pressing for an accounting. Separately, AHP had shipped at least 539 original collateral files to WAB as custodian in December 2022, and disputes remain concerning the custody and disposition of those documents. Dkt. 354 at 4-5 (¶¶ 12–18); Dkt. 374 at 4-5 (¶ 23).

### E. The Court's Order Appointing Solis and Subsequent Narrowing of the Scope to "First Sales."

The Court appointed David Solis, pursuant to FRE 706, to conduct an independent loan-level financial investigation. As noted, the Amended MLSARO contemplated that "all amounts recovered on the Mortgage Loans" be calculated as part of the waterfall, and, consistent with that language, the Court originally directed Solis to, among other things, "determine what funds were remitted, by whom and



BAILEY DUQUETTE P.C.
800 FIFTH AVENUE, SUITE 101-800
SEATTLE, WASHINGTON 98104
T 206.225.2250 | F 888.233.5869

from whom, and what costs were incurred with respect to each Mortgage Loan" and "determine when transactions occurred and how credits, offsets, and application of funds were recorded and applied." Dkt. 291 at 2.

Later, however, Cymbidium sought to limit the scope of Solis's review to "first generation sales," claiming that only "the recoveries relevant to the waterfall are those amounts realized from the sales made by Cymbidium, or by Magerick on behalf of Cymbidium, and by AHP." Dkt. 317 at 3. The Court accepted Cymbidium's formulation, finding that Solis should have information to trace the Mortgage Loans through their "first sale (if any)" but leaving open the option to "consider subsequent transactions to make its final waterfall calculation." Dkt. 323 at 1. Cymbidium steered the Court into limiting Solis's review to "first sales" by presenting those transactions as the endpoint of the recoveries relevant to the contractual waterfall. The Amended MLSARO contains no such categorical cutoff, and labeling an affiliate transfer a "sale" does not establish that subsequent recoveries fall outside the agreement.

Indeed, AHP raised ambiguity concerning the definition of "first sale" when the Court first adopted the limitation. In its August 7 and August 12, 2026 correspondence with Solis and Cymbidium, AHP specifically asked how Solis would determine whether a transaction actually qualified as a first sale given some of the related party and non-cash transfers, rather than simply accepting Cymbidium's characterization, and whether the underlying records were sufficient to verify that determination. Dkt. 332 at 18–19, 21–22. AHP also raised the issue with the Court and



BAILEY DUQUETTE P.C.
800 FIFTH AVENUE, SUITE 101-800
SEATTLE, WASHINGTON 98104
T 206.225.2250 | F 888.233.5869

proposed a joint conference with Solis before issuance of his preliminary report. Dkt. 326 at 1–3. Cymbidium opposed that request, insisting that any joint call occur after the preliminary report and acknowledging that it had declined to participate in another call proposed by AHP. Dkt. 332 at 6, 14. The Court's order did not define the term, and the parties never obtained a judicial ruling establishing what transactions qualified as a "first sale."

**F. Solis's Investigation Has Narrowed the Financial Dispute but Identified Questions the Court Must Resolve, Including Regarding "First Sale".**

Solis's work has materially advanced the accounting. He examined Magerick's general ledger, bank statements, loan-sale agreements, affiliated transactions, claimed expenses, and servicing records. Additional records produced through October 2026 enabled him to trace transactions that earlier reports could not fully identify.

The results differ markedly from Cymbidium's last reconciliation. In his October 16, 2026 Second Supplemental Report, based on a "first sale" limitation, Solis calculated $4,559,017.25 owed by AHP under Base Case 1, assuming all recorded costs and generally excluding receipts and expenses after loans were purportedly sold or transferred by Magerick. Across 192 alternative cost combinations, the calculated balance falls as low as approximately $3.01 million owed by AHP. These calculations use a later measurement date and assumptions different from Cymbidium's February 2026 reconciliation. Dkt. 369 ¶¶ 8–11, 39–43.

But Solis also identified material limitations in the accounting. Base Case 1 generally accepts the stated consideration for a sale or transfer and excludes



BAILEY DUQUETTE P.C.
800 FIFTH AVENUE, SUITE 101-800
SEATTLE, WASHINGTON 98104
T 206.225.2250 | F 888.233.5869

subsequent receipts and costs on the affected loans. His investigation nevertheless identified continuing economic activity after purported dispositions, including Keydally. He expressly left to the Court whether the Amended MLSARO permits the first-sale cutoff employed in his calculations. *Id.* ¶¶ 8–10. And, in that regard, Solis testified at his October 20th deposition that **"I don't know for certain what the definition is for first or second generation sales in this case.**"

His calculations also do not determine whether Cymbidium maximized the value of the loans. The $10 million Keydally credit, for example, is included without a determination whether that price reflected the recovery reasonably obtainable through good-faith efforts. Similarly, his scenarios test different treatments of recorded expenses without deciding their contractual allowability.

Other discrepancies remain. Solis found that Magerick's general ledger reflected approximately $1.24 million in credits for transfers of 37 Mortgage Loans among related entities that were not fully incorporated into Cymbidium's reconciliation, as well as a disputed $2.7 million January 2023 transaction whose proper treatment could materially affect the balance. Dkt. 369 ¶¶ 133, 136 ¶ 141(w); *see also id.* ¶ 47. He further identified deficiencies in Cymbidium's certified bank-account inventory, including the omission of accounts associated with entities that received millions of dollars from the Weinstein & Riley 7191 Account. Dkt. 369 ¶ 141(aa).



BAILEY DUQUETTE P.C.
800 FIFTH AVENUE, SUITE 101-800
SEATTLE, WASHINGTON 98104
T 206.225.2250 | F 888.233.5869

Solis also substantially reconciled the Land Home loan-level reports produced late stage in September and October 2026, including comparisons of 47 monthly reports. But he identified remaining limits in tracing actual remittances. In particular, the underlying Land Home remittance advices remain missing, preventing him from fully determining whether certain differences between bank remittances and reported activity concern the Mortgage Loans. Dkt. 369 ¶¶ 85–93. Finally, he identified proceeds associated with the Mortgage Loans that were directed to affiliated entities without corresponding entries in Magerick's receipts. *Id*. ¶ 141(ff). These findings raise concrete questions about the completeness of Cymbidium's accounting and whether all recoveries have been properly recognized in the contractual waterfall.

The disputed costs are substantial. In his Second Supplemental Report, Solis found that limiting recoverable costs to those supported by third-party documentation reduced the amount purportedly owed by AHP under Base Case 1 from $4,559,017.25 to $3,748,995.08, while under Base Case 2, the same limitation resulted in a balance of $758,365.84 owed to AHP, demonstrating the material effect of disputed expense documentation on the parties' ultimate accounting. Dkt. 390 ¶¶ 39–41.

Finally, Solis excluded Cymbidium's Atrocity List adjustments from all accounting scenarios, leaving their contractual basis and any resulting damages for the Court to determine. *Id.* ¶ 120.



BAILEY DUQUETTE P.C.
800 FIFTH AVENUE, SUITE 101-800
SEATTLE, WASHINGTON 98104
T 206.225.2250 | F 888.233.5869

Solis's work has therefore narrowed the financial issues. But the final balance still depends on decisions about the treatment of related-party transactions, the first-sale limitation, permissible costs, disputed credits, and the recoveries Cymbidium should have obtained under the Amended MLSARO.

## III. LEGAL ISSUES

### A. Cymbidium Breached Its Express Obligation to Exercise Best Efforts in Good Faith to Maximize AHP's Recovery.

The Amended MLSARO did more than give Cymbidium control over the Mortgage Loans. It imposed an express obligation governing how Cymbidium was required to exercise that control. Paragraph 6 states that Cymbidium "will exercise best efforts in good faith to maximize the recovery on the Mortgage Loans." Amended MLSARO, ¶ 6 (Dkt. 238-1 at 233). The Amended MLSARO's opening provisions likewise recognize that AHP was relying on Cymbidium to maximize AHP's ultimate recovery. *Id.* at 1.

That promise was central to the parties' bargain. AHP surrendered control over the disposition of the Mortgage Loans, but retained the right to all recoveries beyond Cymbidium's contractual entitlement and to the remaining loans and assets upon payment in full. Amended MLSARO, ¶ 5. Thus, Cymbidium's decisions concerning sales, prices, costs, interest, and collections directly determined when the reversionary right would trigger and how much AHP would ultimately recover.

The evidence supports a finding that Cymbidium did not exercise best efforts in good faith. It failed to do so—not only through transactions that placed valuable



BAILEY DUQUETTE P.C.
800 FIFTH AVENUE, SUITE 101-800
SEATTLE, WASHINGTON 98104
T 206.225.2250 | F 888.233.5869

loans into affiliated entities at questionable prices, but also through the manner in which it accounted for those transactions, allocated costs, reversed credits, and resisted AHP's repeated demands for an accurate accounting.

(1) The express best-efforts covenant required Cymbidium to exercise its discretion for the purpose the parties agreed upon.

Washington law recognizes that parties must exercise contractual discretion consistently with the agreement's purposes and the other party's justified expectations. *Badgett v. Sec. State Bank*, 116 Wn.2d 563, 569–70 (1991); *Rekhter v. Dep't of Soc. & Health Servs.*, 180 Wn.2d 102, 112–13 (2014). Although the implied duty of good faith cannot create obligations inconsistent with express contract terms, it governs how a party exercises discretion conferred by the agreement. *See Goodyear Tire & Rubber Co. v. Whiteman Tire, Inc.*, 86 Wn. App. 732, 738–40 (1997). Citing Ninth Circuit authority, the Washington Supreme Court has explained that "good faith *limits* the authority of a party retaining discretion to interpret contract terms; it does not provide a blank check for that party to define terms however it chooses." *Rekhter*, 180 Wn.2d at 113 (citing *Scribner v. WorldCom, Inc.*, 249 F.3d 902, 910 (9th Cir. 2001)).

Here, AHP need not rely on an implied obligation alone. The Amended MLSARO imposes on Cymbidium a duty to exercise "best efforts," which courts have noted constitutes a "more exacting" duty than the usual contractual duty of good faith. *Dialog4 Sys. Eng'g GmbH v. Circuit Research Labs, Inc.*, 622 F. Supp. 2d 814, 821 (D. Ariz. 2009) (citing cases). Best efforts require meaningful diligence in pursuing the contractual objective, measured against the party's capabilities, available means, and



BAILEY DUQUETTE P.C.
800 FIFTH AVENUE, SUITE 101-800
SEATTLE, WASHINGTON 98104
T 206.225.2250 | F 888.233.5869

the other party's justified expectations. *See R.B. Matthews, Inc. v. Transamerica Transp. Servs., Inc.*, 945 F.2d 269, 273–74 (9th Cir. 1991); *see also Radical Invs. Ltd. V. Good Vibrations Ent. LLC*, 22-cv-02752-SVW-AFM 2023 WL 2372387, at * 47 (C. D. Cal. Feb. 10, 2023). Moreover, the original MLSARO further required the parties to act reasonably, in good faith, and cooperatively to effectuate their contractual undertakings. MLSARO § 26 (Dkt. 238-1 at 268). The Amended MLSARO preserved that obligation. Amended MLSARO, ¶ 12.

In *Scribner v. WorldCom, Inc.*, the Ninth Circuit, applying Washington law, rejected a company's attempt to exercise contractual discretion in a manner that defeated the counterparty's expected benefit. The court explained that affirmative malice or dishonesty was not required; a party could breach its duty by disregarding the other party's justified contractual expectations. 249 F.3d at 910.

Nor is compliance with a best-efforts covenant established merely because the party undertook some activity toward the contractual objective. In *R.B. Matthews*, the Ninth Circuit affirmed a finding of breach where the defendant failed to take reasonably available steps to perform, including using brokers and incentives that could have facilitated performance at minimal cost. 945 F.2d at 273–74. The court examined the efforts actually made, not merely whether the defendant possessed contractual discretion or achieved some measure of performance.



BAILEY DUQUETTE P.C.
800 FIFTH AVENUE, SUITE 101-800
SEATTLE, WASHINGTON 98104
T 206.225.2250 | F 888.233.5869

The same principle applies here. Cymbidium could choose how to resolve the Mortgage Loans. It could not exercise that discretion in a manner that deprived AHP of the recovery the agreement expressly required Cymbidium to maximize.

The Second Circuit's decision in *Bloor v. Falstaff Brewing Corp.*, 601 F.2d 609, 613–15 (2d Cir. 1979), further illustrates the point. There, the purchaser of a beer business promised to use best efforts to maintain sales, which generated royalties for the seller. The purchaser instead pursued business decisions that benefited its larger enterprise while disregarding the seller's royalty interest. The court affirmed liability for breach of the best-efforts covenant. It recognized that the purchaser could consider its own financial interests, but could not sacrifice the contractually promised objective simply because doing so benefited its other operations. Importantly, the court considered the defendant's overall course of conduct, including its failure to pursue available distribution opportunities and its preference for promoting its own products rather than those generating royalties for the seller. *Id.* at 614–15.

The parallel is apparent. Cymbidium was entitled to consider the financing obligations contemplated by the Amended MLSARO, including obligations to WAB. But those interests did not eliminate its obligation to maximize recoveries for AHP. The issue is whether Cymbidium made commercially justified decisions consistent with that objective or instead used the Mortgage Loans to preserve value for its affiliates at AHP's expense. That question turns on what Cymbidium actually did to obtain the best reasonably available recoveries, including whether it tested the



BAILEY DUQUETTE P.C.
800 FIFTH AVENUE, SUITE 101-800
SEATTLE, WASHINGTON 98104
T 206.225.2250 | F 888.233.5869

market, sought independent purchasers, evaluated competing offers, and exercised independent judgment in setting prices. The evidence supports a finding that Cymbidium failed to exercise best efforts in good faith to maximize recoveries for AHP.

(2) <u>The insider transactions provide concrete evidence that Cymbidium did not maximize recovery.</u>

Washington courts have identified practical considerations for evaluating whether a party responsible for disposing of assets used adequate efforts to obtain their value. In *Swanson v. May*, 40 Wn. App. 148, 155 (1985), the court examined the sale price compared with recognized market value, conformity with commercially accepted practices, use of an available market, and the overall reasonableness of the method of disposition. Although *Swanson* involved a secured creditor's sale of collateral, its analysis is instructive here because Cymbidium expressly promised to maximize recovery from the Mortgage Loans. The issue is not simply whether a sale occurred or whether its price was low, but what steps Cymbidium took to obtain a reasonable price.

The Keydally transaction provides the clearest example.

As explained above, Cymbidium/Magerick used a nominee entity in a purported $10 million disposition of 298 Mortgage Loans involving Weinstein and Waite, who financed the arrangement through secured demand notes and retained the ability to acquire Keydally's interests through debt cancellation. In exchange, Cymbidium/Magerick gave AHP a credit of $10 million for that transaction. Yet



BAILEY DUQUETTE P.C.
800 FIFTH AVENUE, SUITE 101-800
SEATTLE, WASHINGTON 98104
T 206.225.2250 | F 888.233.5869

Magerick never recorded the purported $10 million sale in its general ledger, continued carrying the loans on its books, and subsequently monetized loans from the same portfolio. The record therefore eviscerates any notion that Keydally was an independent purchaser that acquired the loans for genuine consideration.

The price is also difficult to reconcile with the affiliated enterprise's own assessments of value. Oak Harbor valued 277 of those loans at $15.18 million in October 2023 and its 2023 year-end audited financial statements valued 273 loans at $16.09 million. Both valuations covered fewer loans than the 298 supposedly sold for $10 million.

Applying the considerations identified in *Swanson*, the Court should examine whether Cymbidium tested the market, sought competing offers, obtained an independent valuation, or otherwise attempted to determine the recovery reasonably obtainable from the portfolio. The comparison with Oak Harbor's and Magerick's valuations matters not because every internal valuation must equal a sale price, but because the gap calls for a commercially supported explanation.

Nor did the purported Keydally sale end the affiliated enterprise's economic activity involving those loans. Solis subsequently identified approximately $4.02 million in receipts on Keydally-schedule loans after the transaction, including approximately $2.38 million received by Magerick from later sales of 39 loans. Dkt. 390, ¶¶ 12–18. In other words, although Magerick purportedly "sold" the loans to Keydally, it continued generating millions on those same loans in the aftermath. That



BAILEY DUQUETTE P.C.
800 FIFTH AVENUE, SUITE 101-800
SEATTLE, WASHINGTON 98104
T 206.225.2250 | F 888.233.5869

continued activity raises further questions concerning what Keydally actually acquired, what interests Magerick retained, and whether the purported disposition achieved the recovery Cymbidium was obligated to maximize.

Other transactions raise similar concerns. With respect to the purported BBNY/Bonifera transactions, BBNY's principal, Bymel, declared that BBNY, as the purported buyer, neither paid Magerick the stated $2.2 million purchase price nor received the stated resale consideration from Bonifera. BBNY never received the Mortgage Loans from Magerick or delivered them to Bonifera, performed no due diligence, and did not determine the price; Oak Harbor did. Dkt. 238-1 at 298–300 (Bymel Decl. ¶¶ 3–16). Solis subsequently traced funding associated with Oak Harbor affiliate / related party Bonifera, underscoring the need to assess who actually paid the consideration, how the price was determined, and whether BBNY's involvement contributed anything to maximizing the recovery of those loans.

These circumstances closely implicate the concern in *Bloor*: a party entrusted with generating value for its counterparty cannot simply favor its own affiliated enterprise while disregarding the contractual recovery objective. And under *R.B. Matthews*, the relevant question includes what reasonable steps were available but not taken.

AHP need not establish fraud or the broader misconduct alleged in related litigation to prevail on this claim. The issue here is narrower: whether Cymbidium exercised the diligence and good faith it expressly promised in monetizing the



BAILEY DUQUETTE P.C.
800 FIFTH AVENUE, SUITE 101-800
SEATTLE, WASHINGTON 98104
T 206.225.2250 | F 888.233.5869

Mortgage Loans for AHP's ultimate benefit. The insider transactions, their pricing, and the subsequent economic activity bear directly on that question.

Indeed, Cymbidium has already acknowledged that AHP may challenge a first-sale price as artificially depressed. In opposing AHP's request for phased trial procedures, Cymbidium stated that AHP could present evidence of a higher value and argue that it should be used for waterfall purposes. Dkt. 360 at 7. The Court should hold Cymbidium to its express obligation and determine whether these dispositions produced the recovery that compliant performance reasonably could have achieved.

(3) <u>Cymbidium's failure to provide a reliable accounting is part of the same breach.</u>

Cymbidium's obligation to maximize AHP's recovery is also inextricably interwoven with its obligation to account for the proceeds and expenses that determine AHP's entitlement. Although Cymbidium was the contractual Purchaser, Magerick maintained the principal accounting records, and the proceeds flowed through Magerick's operating accounts, the Weinstein & Riley 7191 Account, and affiliated accounts. Determining AHP's entitlement to the remaining Mortgage Loans and other assets therefore requires identifying which entity received each recovery, the capacity in which it acted, which receipts must be credited under the Amended MLSARO, and which expenses may properly be deducted. Those questions cannot be resolved by treating Cymbidium, Magerick, and the other entities as interchangeable.



BAILEY DUQUETTE P.C.
800 FIFTH AVENUE, SUITE 101-800
SEATTLE, WASHINGTON 98104
T 206.225.2250 | F 888.233.5869

Washington law recognizes the importance of reliable accounting where one party controls the records determining the other's financial entitlement. In *Gauthier v. Dickerson*, 41 Wn.2d 419, 421–23 (1952), the Washington Supreme Court addressed an agreement entitling a salesperson to a share of profits calculated from records controlled by the business owners. The contract required proper books. The Court held that the owners' obligations required honesty and good faith, and that the invoices, reports, and debit-credit statements furnished did not constitute an adequate accounting because they did not permit the salesperson to determine the receipts, costs, deductions, and resulting profits. *Id.* at 421–22.

Although *Gauthier* involved an express recordkeeping provision, its principle applies here. Cymbidium's express promise to maximize recovery, the waterfall governing AHP's residual entitlement, and MLSARO § 26's good-faith and cooperation covenants made a meaningful accounting essential to performance. AHP could not determine whether Cymbidium had been paid—or whether AHP was entitled to the remaining assets—without an accurate accounting affecting recoveries and charges under the Amended MLSARO.

*Aventa Learning, Inc. v. K12, Inc.*, 830 F. Supp. 2d 1083 (W.D. Wash. 2011), is particularly instructive. There, sellers alleged that a buyer used discretionary accounting changes and charges from related entities to reduce the financial measure determining their earnout. The court denied summary judgment on the good-faith



BAILEY DUQUETTE P.C.
800 FIFTH AVENUE, SUITE 101-800
SEATTLE, WASHINGTON 98104
T 206.225.2250 | F 888.233.5869

claim, recognizing that the buyer's discretion over accounting decisions affecting the sellers' recovery remained subject to its duty of good faith.

The circumstances here are even more compelling. Cymbidium expressly promised to maximize AHP's recovery while controlling both sides of the calculation: the proceeds credited to AHP and the expenses deducted before AHP received anything. Yet it furnished repeatedly changing reconciliations, reversed previously recognized credits, imposed disputed affiliate charges, and ultimately claimed nearly $27 million remained owing despite recognizing approximately $30 million in credits. AHP repeatedly sought an independent accounting, at its own expense, to determine what remained owed.

Under *Aventa*, Cymbidium could not exercise its accounting discretion in a manner inconsistent with AHP's contractual rights. Under *Gauthier*, furnishing spreadsheets and statements does not necessarily constitute a meaningful accounting if they fail to establish the financial entitlement. And under *Scribner*, contractual discretion cannot be used to defeat the other party's justified expectations.

In sum, Cymbidium cannot promise to maximize AHP's recovery while maintaining an accounting that repeatedly changes the amount AHP supposedly owes and prevents AHP from determining when it is entitled to its remaining assets. Its accounting practices are not separate from its failure to perform in good faith. They are part of that failure.



BAILEY DUQUETTE P.C.
800 FIFTH AVENUE, SUITE 101-800
SEATTLE, WASHINGTON 98104
T 206.225.2250 | F 888.233.5869

(4) Cymbidium's financing and expense decisions reinforce the same concerns.

The affiliated financing arrangements provide additional context. Magerick pledged the Mortgage Loans to WAB and other loans were implicated in additional financing transactions by other affiliates. Those pledges were not prohibited simply because they existed. AHP acknowledges that the Amended MLSARO referenced WAB financing, and the Court has previously recognized Cymbidium's authority to pledge the assets. Dkt. 274.

The issue, however, extends beyond the contemplated WAB lien. Evidence shows that, by October 2023, multiple Mortgage Loans were concurrently pledged to both WAB and Banner Bank. Those overlapping pledges existed when Cymbidium's reconciliation reflected approximately $1.75 million outstanding, apart from the separate, disputed $2 million Keydally item. The relevant question is therefore whether payment of that claimed balance would have enabled Cymbidium to return the remaining assets free of both lenders' encumbrances—not merely whether WAB's lien could have been satisfied. The Court's observation concerning satisfaction of the WAB lien does not resolve what obligations the Banner pledges secured, what releases Banner required, or whether those requirements would have been met through satisfaction of the contractual waterfall. Satisfaction of Magerick's WAB obligation would not, by itself, establish that Banner would release the encumbrances securing Weinstein's separate borrowing. Cymbidium has not shown that payment of its claimed October 2023 balance would have secured the releases necessary to return the



BAILEY DUQUETTE P.C.
800 FIFTH AVENUE, SUITE 101-800
SEATTLE, WASHINGTON 98104
T 206.225.2250 | F 888.233.5869

remaining Mortgage Loans to AHP, including those concurrently pledged to WAB and Banner Bank. These financing arrangements and their effects on recoveries and reconveyance bear directly on whether Cymbidium exercised its discretion consistently with paragraph 6.

The same principle applies to costs charged by affiliated entities, including Land Home, Weinstein & Riley, and other Oak Harbor-related businesses. Paragraph 5 limits certain deductions to "unrelated third-party costs and fees," while paragraph 3 separately addresses third-party costs advanced by the Purchaser—*i.e.*, Cymbidium Restoration Trust. The Court has reserved the parties' competing interpretations of those provisions. Dkt. 274 at 14–15.

Whatever interpretation the Court adopts, Cymbidium must establish that the claimed charges are properly attributable to the Mortgage Loans and recoverable under the agreement. A ledger entry or evidence of payment does not, standing alone, resolve whether a charge concerned a covered Mortgage Loan, was advanced as the agreement requires, or falls within an allowable category. Conversely, the absence of an invoice should be evaluated with any other competent supporting evidence. The accounting must establish both the expenditure and its contractual treatment. This is precisely the concern addressed in *Aventa*: when the party determining a contractual payout also controls the accounting and charges made against it, the exercise of that discretion must be examined for good faith. That concern is particularly acute here because Cymbidium has not produced underlying invoices or comparable third-party



BAILEY DUQUETTE P.C.
800 FIFTH AVENUE, SUITE 101-800
SEATTLE, WASHINGTON 98104
T 206.225.2250 | F 888.233.5869

documentation supporting numerous charges deducted from AHP's recovery. Dkt. 390 ¶¶ 39–44.

(5) Cymbidium's breaches support AHP's counterclaim and its surviving affirmative defenses.

These failures have consequences beyond AHP's affirmative breach-of-contract claim. They are also relevant to AHP's defenses of material breach, prevention and hindrance, satisfaction, setoff, and recoupment.

Under Washington law, a material breach may excuse the other party's performance when the breach substantially defeats a primary purpose of the agreement. *DC Farms LLC v. Conagra Foods Lamb Weston, Inc.*, 179 Wn. App. 205, 220–21 (2014). The materiality inquiry includes the extent of the lost contractual benefit, the adequacy of damages, the likelihood of cure, and whether the breaching party acted in good faith. *Id.* at 221; *see also Cavell v. Hughes*, 29 Wn. App. 536, 539–40 (1981).

Here, AHP repeatedly disputed Cymbidium's claimed balance and requested an independent accounting before suit. By October 2023, AHP maintained that the priority obligations had already been satisfied and that the remaining Mortgage Loans and excess proceeds were due back. Cymbidium's failure to provide an adequate reconciliation and its continued assertion of a disputed outstanding balance bear directly on that controversy. These circumstances are relevant to AHP's decision to stop providing certain remittances and executing transfer documents.



BAILEY DUQUETTE P.C.
800 FIFTH AVENUE, SUITE 101-800
SEATTLE, WASHINGTON 98104
T 206.225.2250 | F 888.233.5869

(6) The Court should determine the recovery Cymbidium should have obtained, not merely accept the amounts its affiliates chose to record.

The appropriate remedy follows from the nature of the promise. Because Cymbidium was obligated to exercise best efforts in good faith to maximize recovery, the Court must determine whether it did so and, where it did not, what additional recovery compliant performance reasonably would have produced.

That inquiry requires more than accepting the stated price of an insider transaction. It requires examining the actual consideration, the transaction's economic substance, the market evidence available at the time, subsequent dealings where relevant, and any explanations for the difference between the assigned value and the value reasonably obtainable. Here, the answer to the question of actual or reasonable value—including with respect to Keydally—can be found in Oak Harbor's own internal valuations and third-party representations. Either Cymbidium breached its obligations to AHP by failing to properly account for the value of these loans or it misled its investors and auditors by materially inflating the value of the assets. *See Transbay Auto Serv., Inc. v. Chevron USA Inc.*, 807 F.3d 1113, 1119–22 (9th Cir. 2015) (holding that an appraisal submitted to a bank in connection with financing could constitute an adoptive admission of the property's value under Federal Rule of Evidence 801(d)(2)(B)); *Cent. Puget Sound Reg'l Transit Auth. v. Airport Inv. Co.*, 186 Wn.2d 336, 348–51, 378 P.3d 54 (2016) (holding that a party's adoption of an earlier appraisal constituted an admissible admission concerning property value).



BAILEY DUQUETTE P.C.
800 FIFTH AVENUE, SUITE 101-800
SEATTLE, WASHINGTON 98104
T 206.225.2250 | F 888.233.5869

**B. The Court Must Determine the Proper Waterfall and Require a Complete Accounting of the Mortgage Loans.**

Although Solis has made substantial progress in tracing the Mortgage Loans and the money generated from them, his Base Case 1 is not a final accounting under the Amended MLSARO. It depends on disputed assumptions about which transactions qualify as sales, when the accounting stops, which costs may be deducted, and what credits must be recognized. Solis has identified the financial consequences of those assumptions. He has properly left their legal resolution to the Court.

The most consequential assumption is the so-called "first sale" limitation. Base Case 1 generally treats the first recorded sale or transfer by Magerick as the endpoint for that loan's accounting, crediting the stated transaction value while excluding later receipts and costs. Yet the Amended MLSARO contains no such cutoff, and the Court has never determined that an insider transfer, merely because it is documented as a sale, ends Cymbidium's obligation to account for that loan.

These are not trivial differences in accounting methodology. They determine whether AHP has received the full benefit of the bargain and whether Cymbidium has been paid. AHP maintains that the waterfall has already been satisfied and that the remaining Mortgage Loans, other assets, and excess cash are due back. However, if the Court determines that Cymbidium retains an unsatisfied contractual entitlement under the waterfall, the Court must establish how subsequent recoveries and allowable charges affect it, and provide an enforceable mechanism for determining its



BAILEY DUQUETTE P.C.
800 FIFTH AVENUE, SUITE 101-800
SEATTLE, WASHINGTON 98104
T 206.225.2250 | F 888.233.5869

satisfaction and requiring the return of the remaining Mortgage Loans and other assets. It cannot leave AHP's reversionary rights dependent on a continuing accounting process that stops at transactions whose economic consequences remain unresolved.

(1) The Amended MLSARO Requires an Accounting of Recoveries, Not Merely the First Transaction Labeled a Sale.

As noted, at Cymbidium's urging, the Court's August 3 Order limited Solis's review to "first sales" but did not define what that limitation encompasses. AHP's position remains that this limitation, which is found nowhere in the Amended MLSARO and is not, according to Solis, an accounting term should be disregarded at trial. Solis himself has expressed uncertainty as to what constitutes a first sale.

To be clear, AHP is not suggesting that the Court necessarily follow every loan through every subsequent independent purchaser. A genuine arm's-length sale may transfer the right to subsequent recoveries to that purchaser. But, where there is a genuine question that the transfer was not arm's length (e.g., a transfer from one Oak Harbor affiliate to another or off-the-books), the first document labeled "sale" does not necessarily establish that the economic interest has been transferred or that the contractual recovery has been fully recognized.

Cymbidium's own transactions demonstrate why.

As noted, the Keydally transaction involved a purported $10 million sale of 298 Mortgage Loans from Magerick to Cymbidium, followed by the transfer of their economic interests to Keydally. Yet Magerick did not record the purported sale in its



BAILEY DUQUETTE P.C.
800 FIFTH AVENUE, SUITE 101-800
SEATTLE, WASHINGTON 98104
T 206.225.2250 | F 888.233.5869

general ledger, continued carrying the loans on its books, and subsequently acted as seller of 39 of those same loans, receiving approximately $2.38 million. Solis found no documented repurchase of those loans under the Keydally agreement. Dkt. 369 at 55–57; Dkt. 390, ¶¶ 14, 76.

Which transaction constituted the first sale in Keydally: Is it (a) the purported transfer of legal title from Cymbidium (the Purchaser) to Magerick (no documentation or consideration); (b) the purported transfer back from Magerick to Cymbidium (again, no recorded consideration); (c) the purported transfer by Cymbidium of a 100% participation interest to Keydally as part of the $10 million transaction (no cash paid by Keydally); or (d) the later transactions in which Magerick and its affiliates continued generating revenue or received proceeds from other purchasers, including insiders and related parties (for which documentation is incomplete). Simply selecting the earliest agreement does not answer that question.

The BBNY/Bonifera transactions present a similar problem. Two agreements purported to transfer the same 62 Mortgage Loans successively through BBNY and Bonifera. Yet Bymel testified that BBNY did not independently fund or possess the loans, conduct due diligence, or determine the price. Dkt. 238-1 at 298–300. Solis traced approximately $2.14 million in funding ultimately attributable to Bonifera. Dkt. 369 at 28. The Court must determine what economic transaction actually occurred before deciding which stated price or subsequent receipt belongs in the waterfall.



BAILEY DUQUETTE P.C.
800 FIFTH AVENUE, SUITE 101-800
SEATTLE, WASHINGTON 98104
T 206.225.2250 | F 888.233.5869

Other affiliate transactions were recorded through journal entries at internally assigned values, including transfers to Isanthes, Bonifera, and Argolica. Solis identified 37 such Mortgage Loans and associated values omitted from Cymbidium's own reconciliation. Dkt. 369 at 60–61. Those entries raise the same question: does an internal allocation or transfer at an assigned price constitute a completed sale that cuts off all subsequent accounting?[2]

In sum, the financial consequences of the ambiguity left by the first-sale limitation are substantial.

(2) Base Case 1 Does Not Determine Whether the Waterfall Has Been Satisfied.

As of August 31, 2026, Solis calculated $4,559,017.25 owed by AHP under Base Case 1, assuming all recorded costs and based on his admittedly uncertain application of a first-sale cut-off. Excluding disputed cost categories reduces the balance, with the most favorable modeled combination producing approximately $3.01 million owed by AHP. Dkt. 390, ¶¶ 39–43.

But those calculations do not determine the final contractual balance for several reasons.

[2] Significantly, Base Case 1 generally applies the cutoff to Magerick's dispositions but not to loans first sold by AHP. Dkt.390, ¶¶ 9, 27. The Amended MLSARO contains no express provision making the identity of the first documented seller determinative of whether subsequent receipts and costs belong in the account.



BAILEY DUQUETTE P.C.
800 FIFTH AVENUE, SUITE 101-800
SEATTLE, WASHINGTON 98104
T 206.225.2250 | F 888.233.5869

First, Base Case 1 accepts the stated consideration for purported first sales without determining whether those transactions were genuine dispositions or whether Cymbidium obtained the value reasonably available through best efforts. The $10 million Keydally credit is one example. It remains in the model notwithstanding substantially higher internal valuations and the unusual transaction structure discussed above.

Second, Base Case 1 generally excludes receipts and costs following Magerick's purported first dispositions. For Keydally-schedule loans alone, Solis identified approximately $4.02 million in later receipts and $2.52 million in later costs. Dkt. 390, ¶ 18. The Court must determine whether those amounts remained recoveries or expenses attributable to the covered Mortgage Loans and, if so, how they should be treated.

Third, Solis has not decided which costs qualify under the Amended MLSARO. Paragraph 3 defines Mortgage Loan Costs by reference to unreimbursed third-party expenditures advanced by the contractual Purchaser, Cymbidium. Paragraph 5 separately refers to "unrelated third-party costs and fees." The Court has recognized the parties' competing interpretations of that language and reserved the issue for trial. Dkt. 274 at 14–15.

Solis's models permit the Court to exclude various disputed categories, but they do not establish that every expense Magerick recorded was actually advanced



BAILEY DUQUETTE P.C.
800 FIFTH AVENUE, SUITE 101-800
SEATTLE, WASHINGTON 98104
T 206.225.2250 | F 888.233.5869

by Cymbidium, incurred for a covered loan, supported by adequate documentation, or otherwise chargeable to AHP.

Fourth, other disputed credits and contractual assumptions remain. These include the treatment of certain Schedule A loans, a disputed $2.7 million January 2023 transaction, the applicable pricing rate and its effective date, and additional recoveries identified through affiliated accounts. Dkt. 390, ¶¶ 29–38, 47; Dkt. 369, ¶¶ 133–36. Their treatment can materially affect the balance and the date on which it may have been satisfied.

These are legal and factual questions for trial. Base Case 1 provides a useful calculation under one set of assumptions. It does not establish that those assumptions are required by the contract.

(3) AHP Is Entitled to an Accounting That Follows the Loans and Their Recoveries Beyond Purported First Sales.

AHP has a stand-alone claim for accounting. The right to that full accounting does not disappear merely because Solis has calculated an outstanding balance under Base Case 1. To the contrary, the balance and Solis's own report reinforce the need for that accounting.

Washington law permits an equitable accounting where the account is too complicated to be conveniently resolved through an ordinary damages action and the party seeking relief has demanded an account that was not adequately provided. *Corbin v. Madison*, 12 Wn. App. 318, 327–28 (1974); *State v. Taylor*, 58 Wn.2d 252, 262 (1961).



BAILEY DUQUETTE P.C.
800 FIFTH AVENUE, SUITE 101-800
SEATTLE, WASHINGTON 98104
T 206.225.2250 | F 888.233.5869

*Corbin* is particularly instructive. The defendants maintained an account that allegedly included improper charges, the parties disagreed on the amount due, several assignments complicated the financial relationship, and repeated accounting requests went unanswered. The Court of Appeals affirmed an order requiring an accounting and determination of the proper contractual balance. 12 Wn. App. at 327–28.

Likewise, in *Gauthier v. Dickerson*, 41 Wn.2d 419, 421–22 (1952), the Washington Supreme Court held that reports, invoices, and debit-credit statements did not constitute an adequate accounting where they failed to disclose the receipts, expenses, and deductions necessary to determine the claimant's contractual share. The agreement there expressly required proper records, but the principle is directly relevant: producing numbers does not necessarily establish what is owed.

Here, the Court's appointment of Solis as Rule 706 expert does not, by itself, resolve AHP's accounting claim. His investigation has advanced the accounting, but the Court must still determine which recoveries, credits, and charges belong in the waterfall and whether—and when—the contractual entitlement was satisfied. The Amended MLSARO covers hundreds of loans, thousands of transactions, multiple servicers, affiliated entities, noncash credits, financing arrangements, and disputed deductions. AHP repeatedly demanded an independent reconciliation before suit and offered to pay for one. Cymbidium instead relied on successive spreadsheets that changed materially, ultimately increasing its claimed balance to nearly $27 million.



BAILEY DUQUETTE P.C.
800 FIFTH AVENUE, SUITE 101-800
SEATTLE, WASHINGTON 98104
T 206.225.2250 | F 888.233.5869

Solis's appointment, investigation, and supplemental reports confirm the account's complexity.

The accounting must also accomplish something the parties' earlier reconciliations did not: determine the balance under the actual contractual rules and establish when Cymbidium's entitlement was satisfied.

That requires looking beyond nominal first sales where the evidence shows continued economic activity by Cymbidium, Magerick, or their affiliates. If a loan was genuinely sold to an independent purchaser for consideration, AHP does not automatically claim that purchaser's later collections. But where a purported sale did not transfer the economic interest, no meaningful consideration was paid, or the same affiliated enterprise continued to collect or resell the loan, the accounting cannot simply stop at the initial transfer document.

Otherwise, a first-generation cutoff could permit the affiliated enterprise to retain subsequent economic benefits indefinitely while continuing to assert an unpaid balance against AHP. That result would be difficult to reconcile with paragraph 5's entitlement to excess recoveries and the return of remaining assets upon payment in full.

This is also why the accounting must continue if the Court finds that a balance remains at trial. Cymbidium cannot establish that AHP still owes money while leaving AHP without a reliable way to determine how future collections and dispositions reduce that balance. If Cymbidium remains entitled to recover from the



BAILEY DUQUETTE P.C.
800 FIFTH AVENUE, SUITE 101-800
SEATTLE, WASHINGTON 98104
T 206.225.2250 | F 888.233.5869

Mortgage Loans, AHP remains entitled to know what is recovered, what is deducted, and when the balance reaches zero.

An accounting limited to purported first sales would not necessarily provide that answer. Nor would it establish which Mortgage Loans and other assets remain subject to AHP's reversionary rights.

The Court should therefore determine the governing accounting rules and require a complete, loan-level account of covered receipts, dispositions, costs, and remaining assets, including subsequent transactions where necessary to establish the actual economic recovery. The account must avoid double counting and respect the rights of genuine purchasers and lenders. But it must not exclude material transactions merely because the parties' affiliates have labeled an earlier transaction a sale.

(4) <u>The Court Can Resolve the Legal Issues at Trial and Direct Any Necessary Final Reconciliation.</u>

AHP does not propose an indefinite new investigation or a second trial. The Court denied bifurcation. Dkt. 373. AHP respects that ruling.

But denying bifurcation does not eliminate AHP's accounting claim or require the Court to adopt one of Solis's scenarios without resolving the assumptions underlying it.

The Court can determine during this bench trial which transactions constitute qualifying sales, which proceeds and costs belong in the waterfall, what damages



BAILEY DUQUETTE P.C.
800 FIFTH AVENUE, SUITE 101-800
SEATTLE, WASHINGTON 98104
T 206.225.2250 | F 888.233.5869

resulted from contractual breaches, whether disputed credits should be recognized, and whether the contractual balance has been satisfied.

If the evidence permits a final calculation, the Court should make it and enter judgment. If narrow calculations remain after the governing rules have been determined, the Court can direct Solis or another appropriate neutral to perform those calculations under the Court's instructions.

If the waterfall has been satisfied, the Court should declare the date of satisfaction and direct the return of the remaining Mortgage Loans, other assets, and excess cash. If a balance remains, the judgment should establish the amount due, the rules governing subsequent recoveries and expenses, and an enforceable mechanism for determining when payment in full occurs.

The Amended MLSARO promised AHP the remaining value of the Mortgage Loans after Cymbidium received its contractual entitlement. The Court cannot enforce that promise without determining the complete account. Solis has supplied much of the financial foundation. The Court must now decide the legal rules that give his calculations meaning.

### C. Magerick Is Independently Liable for Its Assumed Obligations and Retention of Contractual Benefits.

Magerick was not merely an affiliate providing services for Cymbidium, as Cymbidium represented earlier in this case to keep Magerick and other affiliated parties out of this case. Rather, under the Secured Participation Agreement, Cymbidium conveyed to Magerick a 100% participation interest in the beneficial and



BAILEY DUQUETTE P.C.
800 FIFTH AVENUE, SUITE 101-800
SEATTLE, WASHINGTON 98104
T 206.225.2250 | F 888.233.5869

economic rights associated with the Mortgage Loans, including the right to receive all principal, interest, and other proceeds. Magerick also obtained the right to direct Cymbidium's exercise of its contractual rights. In return, Magerick expressly agreed to "bear all obligations with respect to" the Mortgage Loans. Dkt. 238-1 at 226–29.

Magerick cannot accept the benefits of the participation arrangement while disclaiming the obligations that accompanied them. In practice, Magerick financed the acquisition, maintained the accounting, received and applied proceeds, pledged the loans, and carried out many of the transactions now in dispute. Dkt. 369 at 16–32, 55–61. AHP's Fourth Counterclaim seeks to enforce the obligations Magerick expressly assumed. Dkt. 374 ¶¶ 63–75. *See also Guardian Constr. Co. v. Tetra Tech Richardson, Inc.*, 583 A.2d 1378, 1386–87 (Del. Super. Ct. 1990) (Under Delaware law, which governs the Participation Agreement, an intended creditor beneficiary may enforce a contractual promise made to satisfy an obligation owed to it, provided the intended benefit was a material purpose of the agreement).

The Court's determination that Cymbidium remains a real party in interest does not resolve Magerick's separate liability. Dkt. 274 at 6–7. Cymbidium remains bound by its promises; Magerick is independently answerable to the extent it assumed those obligations. Alternatively, if AHP cannot enforce the Participation Agreement directly, its unjust-enrichment claim seeks restitution of identifiable benefits Magerick retained at AHP's expense beyond the contractual entitlement. Dkt. 374 ¶¶ 93–102; *Nemec v. Shrader*, 991 A.2d 1120, 1130 (Del. 2010).



BAILEY DUQUETTE P.C.
800 FIFTH AVENUE, SUITE 101-800
SEATTLE, WASHINGTON 98104
T 206.225.2250 | F 888.233.5869

The ultimate accounting and judgment must therefore address both entities: Cymbidium, which made the contractual promises, and Magerick, which accepted the economic benefits, undertook the associated obligations, and controlled much of the money and assets at issue.

**D. Cymbidium Cannot Turn Alleged Warranty Breaches Into Millions in Additional Waterfall Debt.**

Cymbidium's "Atrocity List" rests on the fundamentally flawed premise that because certain Mortgage Loans were previously sold, impaired, or allegedly made difficult to monetize, Cymbidium can reverse their assigned values and add those amounts back to what AHP owes. But the Amended MLSARO provides no such automatic remedy.

The distinction is between a breach and a loss**.** The Court has held that AHP warranted its authority to transfer the Mortgage Loans and acknowledged that some loans had previously been sold. But it expressly reserved whether those breaches caused damages and, if so, how much. Dkt. 274 at 11–12. Under Washington law, Cymbidium must prove an actual economic loss caused by a breach. *Columbia Park Golf Course, Inc. v. City of Kennewick*, 160 Wn. App. 66, 82–83 (2011). It cannot recover more than necessary to obtain its contractual bargain. *Rathke v. Roberts*, 33 Wn.2d 858, 865 (1949).

Here, Cymbidium's bargain was a defined recovery under the waterfall. The Amended MLSARO eliminated AHP's mandatory repurchase obligation and required the remaining Mortgage Loans and excess proceeds to revert to AHP upon



BAILEY DUQUETTE P.C.
800 FIFTH AVENUE, SUITE 101-800
SEATTLE, WASHINGTON 98104
T 206.225.2250 | F 888.233.5869

payment in full. The loans were the means of generating that recovery; their individual assigned values were not additional debts AHP promised to pay on top of the contractual balance.

That is why the payoff question is what ultimately governs. If Cymbidium has received everything the waterfall entitles it to, the absence or impairment of a particular loan does not establish an additional waterfall shortfall. And even if a balance remains, Cymbidium cannot simply increase it by the assigned value of loans it claims were defective. It must show what independent loss the particular breach actually caused, taking account of proceeds received, other recoveries, and the existing contractual payment obligation.

The contract also provided a specific remedy for returning unwanted loans. Section 8.02 permitted Cymbidium to put loans back to AHP during the six months following October 7, 2022. That unconditional right expired April 7, 2023. The provision separately addressed notice of a material warranty breach and an opportunity to cure. Yet Cymbidium did not invoke the put-back procedure for the hundreds of loans now appearing on its Atrocity List. Indeed, it expressly disclaimed seeking put-back damages on summary judgment. Dkt. 246 at 32–33. The Court recognized that distinction and reserved the validity of the requested credit reversals for trial. Dkt. 274 at 13–16. Cymbidium is essentially seeking to obtain the equivalent of an expired repurchase remedy by repackaging it as an accounting adjustment. It may not do so.



BAILEY DUQUETTE P.C.
800 FIFTH AVENUE, SUITE 101-800
SEATTLE, WASHINGTON 98104
T 206.225.2250 | F 888.233.5869

Solis identified the same basic problem. At his deposition, he explained that the Atrocity List appeared to count the same economic obligation twice: once through the existing repayment mechanism and again through the value Cymbidium sought to add back for a supposedly defective loan. He excluded the Atrocity List from his accounting scenarios.

The list itself illustrates the absence of a reliable damages calculation. It contains 334 entries totaling $14,533,714.39. For 141 Atrocity List entries totaling approximately $5.92 million, Cymbidium cited no document supporting the "atrocity" designation. And approximately $5.79 million in claimed adjustments concerned loans Cymbidium's own records identified as owned by or vested in Oak Harbor Capital. Dkt. 369 at 67. What value was actually lost, after accounting for ownership retained, subsequent collections, sales, and other recoveries?

If Cymbidium wants to try to prove an independent warranty loss, it must identify the loan, the breached obligation, the actual loss, and the contractual basis for the requested remedy. Any correction must also account for value already received and avoid duplicating another credit or damages award. *See Eagle Point Condo. Owners Ass'n v. Coy*, 102 Wn. App. 697, 702 (2000).[3]

---

[3] Given Cymbidium's position that it may recover warranty damages independent of the waterfall balance, AHP has been forced to identify thousands of trial exhibits concerning the loans on the so-called "Atrocity List." These records demonstrate that Cymbidium's claims that the loans were impaired or could not be monetized are contradicted by its own treatment of those loans, subsequent monetizations, and representations made in state courts across the country.



BAILEY DUQUETTE P.C.
800 FIFTH AVENUE, SUITE 101-800
SEATTLE, WASHINGTON 98104
T 206.225.2250 | F 888.233.5869

In sum, Cymbidium bargained for a specified recovery, not a guaranteed return on every individual loan plus the entire waterfall balance. Once Cymbidium's entitlement under the contractual waterfall has been fully satisfied, it cannot manufacture an additional waterfall balance merely by labeling the loans "atrocities."

**E. AHP's Surviving Defenses and Counterclaims Require a Net Determination of The Parties' Rights.**

The preceding sections establish the basis for AHP's principal counterclaims. Those same facts also bear on Cymbidium's claims against AHP.

First, AHP asserts satisfaction, setoff, and recoupment. Cymbidium cannot recover amounts already satisfied through contractual credits, nor may it obtain a gross damages award without accounting for recoveries and losses arising from the same transaction. Washington recognizes recoupment where one party seeks to reduce an amount otherwise due because the other party breached an obligation arising from that transaction. *J.A. Campbell Co. v. Holsum Baking Co.*, 15 Wn.2d 239, 253 (1942). Thus, even if Cymbidium proves a remaining obligation, AHP's proven damages for Cymbidium's breaches must be considered in determining the parties' respective recoveries, without double counting or automatically treating independent damages as dated waterfall credits.

Second, AHP maintains its defenses of material breach and prevention or hindrance. Washington law recognizes that a material breach may excuse subsequent performance, and that a party may not interfere with performance and then take advantage of the resulting failure. *DC Farms LLC v. Conagra Foods Lamb Weston, Inc.*,



BAILEY DUQUETTE P.C.
800 FIFTH AVENUE, SUITE 101-800
SEATTLE, WASHINGTON 98104
T 206.225.2250 | F 888.233.5869

179 Wn. App. 205, 220–21 (2014); *Cavell v. Hughes*, 29 Wn. App. 536, 539–40 (1981). AHP's repeated requests for an accounting, Cymbidium's disputed handling of recoveries, and the transfer and custody of Mortgage Loan Documents are relevant to these defenses. AHP recognizes, however, that the Court has already determined that it owed remittance and document-delivery obligations. Dkt. 274 at 10–13. Whether Cymbidium's conduct excused particular acts of performance requires findings concerning materiality, timing, and causation.

Finally, Cymbidium must prove actual damages caused by AHP's breaches, subject to applicable mitigation principles. That requirement applies independently of whether AHP establishes its affirmative claims.

### F. The Court Should Determine When the Waterfall Was Satisfied and Enforce AHP's Reversionary Rights.

AHP asks the Court to determine that Cymbidium's entitlement under the Amended MLSARO has been satisfied and to enforce the resulting obligation to return the remaining Mortgage Loans, other assets, and excess cash.

If the waterfall has been satisfied, the Court should determine the date of satisfaction, declare the amounts and obligations discharged, and direct Cymbidium and Magerick, to the extent of their respective rights and obligations, to account for and return the remaining Mortgage Loans, proceeds, and other assets belonging to AHP. Any independent warranty liability must be addressed separately and cannot automatically revive a satisfied waterfall.



BAILEY DUQUETTE P.C.
800 FIFTH AVENUE, SUITE 101-800
SEATTLE, WASHINGTON 98104
T 206.225.2250 | F 888.233.5869

If a balance remains, the Court should determine the amount, the date through which it is calculated, and the contractual rules governing future recoveries and expenses. AHP cannot be left with an unpaid balance but no reliable means of determining how it will be satisfied. The judgment should require a verified inventory of the remaining Mortgage Loans and a continuing accounting of collections, dispositions, and allowable charges, including subsequent transactions where necessary to determine the actual recovery. It should also provide a mechanism for determining and implementing payment in full and the resulting return of the residual assets.

The Court need not conduct a second trial to accomplish this. Although the Court denied bifurcation (Dkt. 373), it did not eliminate AHP's accounting claim or its express reversionary rights. The Court can decide the governing contractual questions and the parties' liability during this bench trial, then direct any narrowly necessary arithmetic reconciliation to implement those findings. If, contrary to AHP's position, the Court determines that Cymbidium retains an unsatisfied entitlement under the contractual waterfall, it should also consider appropriate safeguards, including appointment of an independent servicer or court-supervised reporting. Those safeguards should ensure that recoveries are properly accounted for and credited, only contractually allowable charges are deducted, and the remaining Mortgage Loans, other assets, and excess cash are promptly returned to AHP upon satisfaction of that entitlement.



BAILEY DUQUETTE P.C.
800 FIFTH AVENUE, SUITE 101-800
SEATTLE, WASHINGTON 98104
T 206.225.2250 | F 888.233.5869

A judgment determining that money remains owed, without establishing how that balance will be reduced and when AHP receives the remaining assets, would leave the central dispute unresolved. The parties agreed to a waterfall with an endpoint. The Court's judgment should establish and enforce it.

Dated this 25th day of October, 2026.

Respectfully submitted,

BAILEY DUQUETTE P.C.

By: */s Hozaifa Y. Cassubhai*
Hozaifa Y. Cassubhai, WSBA #39512
800 Fifth Ave, Suite 101-800
Seattle, Washington 98104
T: 206.225.2250
E: hozaifa@baileyduquette.com

K&L GATES LLP

By: */s/ John T. Bender*
John T. Bender, WSBA #49658
925 Fourth Ave., Suite 2900
Seattle, Washington 98104
Phone: 206.623.7580
Facsimile: 206.623.7022
Email: john.bender@klgates.com

*Attorneys for Defendants/Counter-Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on this date, I caused a true and correct copy of the foregoing AHP Defendants / Counter-Plaintiffs' Amended Trial Brief served upon counsel of record herein, as follows:

Bradley S. Keller, WSBA #10665
M. Victoria Molina, WSBA #62109
1000 Second Avenue, 38th Floor
Seattle, Washington 98104
Telephone: (206) 622-2000
Facsimile: (206) 622-2522
Email: bkeller@byrneskeller.com
mvmolina@byrneskeller.com
Attorneys for Plaintiff /
Counter-Defendant / Third-Party Defendant

☒ Via ECF

I declare under penalty of perjury under the laws of the State of Washington that the foregoing is true and correct.

Dated: October 26, 2026 at Westfield, New Jersey.

/s Hozaifa Y. Cassubhai
Hozaifa Y. Cassubhai, WSBA No. 39512



BAILEY DUQUETTE P.C.
800 FIFTH AVENUE, SUITE 101-800
SEATTLE, WASHINGTON 98104
T 206.225.2250 | F 888.233.5869